1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
2

3

4     UNITED STATES OF AMERICA          )
                                        )
5                                       )
      vs.                               )
6                                       )  No. 1:16-cr-10134-DPW
                                        )
7     DAVID TKHILAISHVILI AND           )
      JAMBULAT TKHILAISHVILI,           )
8                                       )
                      Defendants.
9


10

11    BEFORE:  THE HONORABLE DOUGLAS P. WOODLOCK

12

13            EXCERPT FROM DAY TWO OF JURY TRIAL
          COMMENCEMENT OF TESTIMONY OF VAHAGN VICTOR TOROSYAN

14

15

16          John Joseph Moakley United States Courthouse
                          Courtroom No. 1
17                       One Courthouse Way
                         Boston, MA 02210
18                        May 2, 2017

19

20

21            Brenda K. Hancock, RMR, CRR
                   Official Court Reporter
22          John Joseph Moakley United States Courthouse
                       One Courthouse Way
23                     Boston, MA 02210
                        (617)439-3214
24

25

APPEARANCES:

    UNITED STATES ATTORNEY'S OFFICE
    By: AUSA Laura Kaplan
    John Joseph Moakley Federal Courthouse
    1 Courthouse Way
    Suite 9200
    Boston, MA 02210
    On behalf of The United State of America.


    FEDERAL PUBLIC DEFENDER OFFICE
    By: Oscar Cruz, Jr., Esq.
    District of Massachusetts
    51 Sleeper Street
    5th Floor
    Boston, MA 02210
    On behalf of the Defendant.


    HEDGES & TUMPOSKY, LLP
    By: Michael L. Tumposky, Esq.
    Suite 600
    50 Congress Street
    Boston, MA 02109

I N D E X

Testimony of:          Direct  Cross  Redirect  Recross

VAHAGN VICTOR TOROSYAN

By Ms. Kaplan              4


                    E X H I B I T S

          No.                In Evd.

          2.....................33
          3.....................44
          6.....................61
          7 and 8..............73
          14....................75
          9 and 10.............78
          11....................92
          29....................93
          12....................94
          13....................95
          21...................184
          22...................189

<u>EXCERPT</u>

MS. KAPLAN:  The Government calls Vahagn Victor Torosyan.

THE COURT:  All right.

THE CLERK:  Please take the witness stand, and please raise your right hand.

<u>VAHAGN VICTOR TOROSYAN, DULY SWORN BY THE CLERK</u>

THE CLERK:  Please be seated and state your full name and please spell your last name.

THE WITNESS:  Good morning, everyone.  Last name is Torosyan T-O-R-O-S-Y-A-N, first name is Vahagn and the last name is -- the middle name is Victor.

MS. KAPLAN:  May I, your Honor?

THE COURT:  You may proceed.

Mr. Torosyan, you might put the microphone a little bit closer to your mouth so that we can pick up your voice.

<u>DIRECT EXAMINATION</u>

<u>BY MS. KAPLAN:</u>

Q.   Good morning, Mr. Torosyan.

A.   Good morning.

Q.   Can you tell us what town you live in?

A.   I live in Watertown, Massachusetts.

Q.   And where are you from originally?

A.   From Armenia.

Q.   And is English your first language?

1    A.    No, it's not.

2    Q.    What is?

3    A.    Armenian.

4    Q.    What other languages do you speak?

5    A.    I speak Russian, English and Armenian, of course.

6    Q.    And are you comfortable testifying in English?

7    A.    Yes.

8    Q.    Where did you learn Russian?

9    A.    When I was born in Armenia, that was requirement for us.

10   It was U.S.S.R. back in the day, so almost everyone spoke

11   Russian in Armenia.

12   Q.    And from what age did you learn Russian?

13   A.    Since five, six year old.

14   Q.    And why did you learn Russian?

15   A.    Everybody spoke Russian in Armenia back in the days, most

16   of them.

17   Q.    When did you first come to the United States?

18   A.    2000.

19   Q.    And who did you come here with?

20   A.    By myself.

21   Q.    And where did you come in the United States?

22   A.    I came to Watertown.

23   Q.    And why did you come to Watertown?

24   A.    I came with the H1B Program, student exchange program, to

25   study.

1  Q.  Were you attending school?

2  A.  I did not.  That's exchange program.

3  Q.  And are you a U.S. citizen?

4  A.  Yes, I am.

5  Q.  When did you become a U.S. citizen?

6  A.  I believe it was 2013.

7  Q.  Are you married?

8  A.  Yes, I am.

9  Q.  And who are you married to?

10  A.  To Elen Gevorgyan.

11  Q.  How do you spell her last name?

12  A.  G-E-V-O-R-G-Y-A-N.

13  Q.  When did you get married?

14  A.  I think was 2010 or '11.

15  Q.  And is she a U.S. citizen?

16  A.  Yes, she just become a U.S. citizen.

17  Q.  Do you have children?

18  A.  I do have two children.

19  Q.  How old are they?

20  A.  Two and four.

21  Q.  Can you tell us how far you went in school?

22  A.  I have one four-year education in Computer Engineering,

23  and I have one degree in Economy, bachelor's degree.

24  Q.  And where did you get these degrees?

25  A.  In Armenia.

1  Q.   When you came to the United States how much money did you

2  have with you?

3          MR. TUMPOSKY:  Objection.

4          THE COURT:  Overruled.

5          You may answer.

6  A.   $365 in my pocket.

7  BY MS. KAPLAN:

8  Q.   And where did you work when you first came here?

9  A.   I worked at the gas station.

10 Q.   What gas station?

11 A.   In Watertown.

12 Q.   What did you do there?

13 A.   I was pumping gas.

14 Q.   How long did you do that?

15 A.   Approximately eight years.

16 Q.   And did there come a time when you purchased a business?

17 A.   The first I became supervisor, then manager, then I was a

18 partner.  Then I purchased the business in 2010.

19 Q.   And is that the same place you were pumping gas?

20 A.   Yes.

21 Q.   What was the name of that?

22 A.   Belmont Auto.

23 Q.   And when was that that you purchased Belmont Auto?

24 A.   2010.

25 Q.   How did you get money to pay for that business?

1   A.   When I was working and I was making a lot of money, and I

2   saved it.

3   Q.   Over the years have you been involved with other

4   businesses?

5   A.   Yes, I was.

6   Q.   What businesses?

7   A.   Allied Health Clinic.

8   Q.   Prior to that?

9   A.   Prior to that we had -- I opened a limousine business for

10   a short period of the time.  Then I closed it.

11   Q.   What was that called?

12   A.   Prompt Transportation.

13   Q.   What was it?

14   A.   Prompt.

15   Q.   Prompt.  And what about rental properties?

16   A.   When the market was down then I was able to purchase a few

17   rental properties.

18   Q.   How many?

19   A.   Three.

20   Q.   Where are they?

21   A.   Two of them in Watertown and a third one in Cape Cod.

22   Q.   And do you still own them?

23   A.   I still own them.

24   Q.   And you rent them out and receive money?

25   A.   Yes, I do.

1  Q.   Do you know someone by the name of David Tkhilaishvili?

2  A.   Yes, I do.

3  Q.   How long have you known him?

4  A.   It's gonna be 10 years now.

5  Q.   How did you first meet him?

6  A.   I met him at my repair shop when I was servicing his

7  vehicles.  That's how I met him.

8  Q.   What kind of vehicles?

9  A.   He had a transportation business, and he brought his

10  vehicle to service at my station.

11  Q.   What kind of transportation business?

12  A.   Medical transportation.

13  Q.   Do you see him in the courtroom today?

14  A.   Yes, I do.

15  Q.   Can you point him out and describe an article of clothing

16  that he is wearing?

17  A.   Yes.  He's the third person next to the female, and he is

18  wearing a white shirt and a suit, dark suit, blue or black.

19       MS. KAPLAN:  Let the record reflect the witness has

20  identified defendant David Tkhilaishvili.

21       THE COURT:  It will without objection.

22       MR. CRUZ:  No objection, your Honor.

23  BY MS. KAPLAN:

24  Q.   Do you know where David Tkhilaishvili is from?

25  A.   Yes, I do.

1   Q.   Where is he from?

2   A.   From Georgia.

3   Q.   Is that the Republic of Georgia?

4   A.   That is Republic of Georgia, correct.

5   Q.   Was that previously part of the U.S.S.R.?

6   A.   Yes, it is.

7   Q.   And when you would speak to David, what language would you

8   speak?

9   A.   Russian most of the time.  I would have used a few English

10   words, but Russian.

11   Q.   Did he appear to understand you?

12   A.   Yes.

13   Q.   What language did he speak?

14   A.   I believe he speaks in Russian.  We always communicate in

15   Russian, Georgian and some English, I believe.

16   Q.   And did you understand his Russian?

17   A.   Yes, I do.

18   Q.   Do you know someone by the name of Jambulat Tkhilaishvili?

19   A.   Yes, I do.

20   Q.   How do you know him?

21   A.   Through David.  It's David's brother.

22   Q.   Do you remember when you first met him?

23   A.   Approximately 2013, I believe.

24   Q.   Do you remember what occasion it was that you met him?

25   A.   David brought him to my house and introduced him to me.

1   Q.   And do you see him in the courtroom?

2   A.   Yes, I do.

3   Q.   Can you point to him and identify him by an article of

4   clothing that he is wearing?

5   A.   Yes.  He is the second person from the right wearing the

6   blue shirt.

7        MS. KAPLAN:  Let the record reflect the witness has

8   identified defendant Jambulat Tkhilaishvili.

9        MR. TUMPOSKY:  No objection.

10       THE COURT:  All right.

11  BY MS. KAPLAN:

12  Q.   And when you would speak to Jambulat Tkhilaishvili, what

13  language did you speak?

14  A.   Russian.

15  Q.   Did he appear to understand you?

16  A.   Yes.

17  Q.   And what language did he speak to you in?

18  A.   Russian.

19  Q.   Did you understand his Russian?

20  A.   Yes, I did.

21  Q.   Does Jambulat Tkhilaishvili have a nickname?

22  A.   Yes.  Jaba.

23  Q.   Jaba.  And are the defendants related?

24  A.   Yes, they are.

25  Q.   How so?

1  A.    I know they are brothers, two brothers.  That's what they

2  told me.

3  Q.    Do you know David and Jambulat Tkhilaishvili's family?

4  A.    Yes, I do.

5  Q.    Who do you know?

6  A.    I know his mother and his father.

7  Q.    How do you know them?

8  A.    David introduced them to me.

9  Q.    On what occasion?

10  A.    I believe one time we went to the fair, with me and my

11  parents and David and his parents in Boston.

12  Q.    You went to a fair?

13  A.    Yeah.

14  Q.    And what was your relationship with David Tkhilaishvili

15  like?

16  A.    We were friends, close friends.

17  Q.    Did you ever lend either David or Jambulat Tkhilaishvili

18  money?

19  A.    Yes, I did, several occasions.  David.

20  Q.    David?  Okay.  How many occasions?

21  A.    It's hard to tell.  Eight, ten, twelve.  Many occasions.

22  Q.    Do you recall the first time that you loaned David

23  Tkhilaishvili money?

24  A.    No, I can't.  I don't remember.

25  Q.    Do you remember whether he paid you back?

1   A.   He always paid me back, yes.

2   Q.   What amounts of money did you loan him?

3   A.   Different.  2,000, 1,000, 8,000, 10,000.

4   Q.   And what were these loans for?

5   A.   He always came to me, he needed some money to operate his

6   businesses or he needed some money for something.  He asked me,

7   and I lent him the money.

8   Q.   And how did you lend him the money?

9   A.   Sometimes he used my credit card, sometimes form of cash,

10   form of checks.  Different.

11   Q.   Did you have a contract or a written agreement?

12   A.   No.  Just we were friends.  Just word of mouth.

13   Q.   Is David Tkhilaishvili older or younger than you?

14   A.   He is younger than me.

15   Q.   By how many years?

16   A.   I think about five years, I believe.

17   Q.   And what about Jambulat, his brother?

18   A.   I believe he's older than me.

19   Q.   Did there come a time that you learned that David

20   Tkhilaishvili was involved in running a Suboxone clinic?

21   A.   Yes.

22   Q.   And when did you first learn that?

23   A.   First I believe was 2013.

24   Q.   Tell us, what is a Suboxone clinic?

25   A.   A Suboxone clinic, that is what we have.  Allied Health

1  Clinic is an outpatient clinic.  We treat the patients with

2  addiction.

3  Q.    What do you treat them with?

4  A.    Treat them off addiction if they are people

5  heroin-addicted, alcohol-addicted.

6  Q.    Is Suboxone a drug?

7  A.    Suboxone is itself, it's contained to Buprenorphine and

8  naloxone.  Buprenorphine does considered opiate, and Naloxone,

9  what it does is it blocks the opiate receptors in your brain.

10  Q.    When you first learned that David Tkhilaishvili was

11  involved in the Suboxone Clinic in approximately 2013, do you

12  remember what the name of that clinic was?

13  A.    I believe David's Health PC.

14  Q.    Davis?

15  A.    Davis or David's.  I believe with "d's" or Davis.

16  Q.    Okay.  And do you know where that clinic was located?

17  A.    Yes.  In Quincy, Massachusetts.

18  Q.    What address?

19  A.    21 School Street.

20  Q.    Do you know who was involved in that clinic?

21  A.    David told me the partners were he -- he was a partner

22  with a person named Kurt Fabrick.

23  Q.    Were you involved in Davis Clinic?

24  A.    No, I was not.

25  Q.    Do you know how long Davis Clinic was operational?

A.   I believe approximately a year and a half.  About a year, year and a half.

Q.   Did you invest money in Davis Clinic?

A.   No, I did not.

Q.   Do you know who did?

A.   David told me the person's name Kristina.

MR. CRUZ:  Objection, your Honor.

THE COURT:  Well, I think I am going to receive that in evidence.

Ladies and gentlemen of the jury, there sometimes are issues of what we call "hearsay," in which somebody recounts what they heard somebody else say, and our preference, of course, is to have the person who made the observation testify, but because this case to some degree turns on the interactions between Mr. Tkhilaishvili and Mr. Torosyan, I'm going to let you hear what Mr. Torosyan said Mr. Tkhilaishvili said to him.

MR. CRUZ:  And, your Honor, if I may, he had testified that he didn't have anything to do with the Clinic.

THE COURT:  I don't want argument about it.  It is received solely for the interaction between them.  Whether it is true or not is not at this point material here.  But I understand the objection.  I simply offer that instruction to the jury for the reception of this evidence.

BY MS. KAPLAN:

Q.   So, you said that David told you Kristina did?

1    A.    Yes.

2    Q.    And do you know who Kristina is?

3    A.    Yes, I do.

4    Q.    Who is that?

5    A.    She dated David years ago.

6    Q.    Do you know the last name?

7    A.    Ursova, I believe.

8    Q.    And what happened to Davis Clinic?

9    A.    David told me that he got in a litigation.

10          MR. CRUZ:  Objection, your Honor.

11          THE COURT:  Again, I am going to permit it to be

12   received, but we are not going to spend very much time on this.

13          MS. KAPLAN:  No.

14          THE COURT:  Just simply that there was a prior clinic.

15   So, limited as to inquiry here.  He may answer.

16   BY MS. KAPLAN:

17   Q.    Did Davis Clinic close?

18   A.    Davis Health PC closed, yes.

19   Q.    Do you know when it closed?

20   A.    I believe in the middle of 2014.

21   Q.    Now, prior to Davis Clinic did you know what David

22   Tkhilaishvili did for work?

23   A.    Yes.  He and his brother, they owned a transportation

24   business.

25   Q.    And what is a "transportation business"?

1    A.    It's a medical transportation.  They transferred the

2    patients from home to the hospital, and they'd be reimbursed by

3    MassHealth and Medicaid.

4    Q.    Did it involve them treating patients?

5    A.    No, it was not involving treating patients.  No treatment,

6    transportation, just simply moving people with the vehicle.

7    Q.    Were David or Jambulat Tkhilaishvili involved in any other

8    Suboxone clinics prior to Davis Health?

9    A.    No.  Only thing I'm aware of just Davis Health PC.

10   Q.    And Jambulat Tkhilaishvili, do you know what he did for

11   work?

12   A.    Well, according to David, he was with him and that he was

13   the founder of the Davis Health PC.  He helped him with the

14   Davis Health PC.  But what I saw it, he was working at the

15   pizza shop.  That's where I seen it.

16   Q.    Where was the pizza shop?

17   A.    In Stoughton?

18   Q.    Stoughton or Taunton?

19   A.    Taunton.  Sorry.  Taunton.

20   Q.    Okay.  And did you see Jambulat?  Did you ever go to the

21   pizza place?

22   A.    I did.

23   Q.    And did you see Jambulat there?

24   A.    I went once.  I saw him -- I seen him next to the pizza

25   shop, but I seen him at the pizza shop one time when I went

1  with the -- to have a recorded conversation.

2  Q.   Oh, okay.  So, this was after you had gone to the FBI?

3  A.   Yes.

4  Q.   Now, directing your attention to 2015, did you have a

5  discussion with David Tkhilaishvili about investing in another

6  business?

7  A.   Yes, I did.

8  Q.   And how did that come about?

9  A.   David approached me and asked me to invest into the

10  Clinic, new clinic, and we were the partners, me, him and

11  Jambulat, Kenton Fabrick, Olga Rusia -- Olga Dorofyeyeva and

12  Nato Rusia, and that will be an outpatient clinic.  That's what

13  he asked me to invest into.

14  Q.   And was this after Davis Clinic was closed?

15  A.   Yes.

16  Q.   And do you remember where you were when you first had this

17  conversation?

18  A.   I believe the first time, I could be wrong, but I think we

19  discussed that in Cape Cod in my summer house.

20  Q.   Where do you have a summer house?

21  A.   In Cape Cod.

22  Q.   Was he there?

23  A.   Yes, he was.

24  Q.   How many occasions was he there?

25  A.   Many occasions.  I can't count it.  10, 15.

1    Q.   Were you there, too, when he was there?

2    A.   Yes.  But sometimes he would ask me if he could stay in my

3 house by myself, and I told him, "Yes."

4    Q.   You allowed him to?

5    A.   I allowed him to.

6    Q.   And did he ask you more than once about investing in or

7 going into business with him?

8    A.   Yes.  He asked me several occasions.

9    Q.   So, what did you say the first time you talked about it?

10    A.   The first time I told him, "No."  I told him, "I don't

11 know nothing about Suboxone or investing into the addiction

12 business," but he asked me several times.  Even there was a

13 point he literally cried in my house, says, "Victor, I need

14 help."  And I told him, "Let me do a little research about

15 addiction, and I'll get back to you."

16    Q.   And which house were you in when you remember he cried to

17 you?

18    A.   In my house in Watertown.

19    Q.   And you said that he said to you, "You have to help me"?

20    A.   Yeah.  He says, "Victor, I need help.  If you don't help

21 me, my life is miserable.  It's going to be very tough for me.

22 So invest into it.  That will be great return for you and we'll

23 do the right thing for the community."

24    Q.   Okay.  And you told him what?

25    A.   I told him any decisions, anything I do I always discuss

1    with my family, with my wife and my parents.  I told him that

2    was only the -- we had a conversation several times.  Even he

3    said he had other investors.  I told him, "Why don't you go

4    with other investors."  Then, at the end, he came to --

5    "Victor, nobody wants to put the money, and why don't you do

6    it?"  And I told him, "Let me talk with my family."  And I

7    clearly remember we had a dinner in my house, and I asked my

8    family, "Look, we know David.  He's a part of our family, he's

9    a friend, and he wants me to invest into this clinic.  What do

10   you think about that?"  And everybody in my family, my wife and

11   my parents told me, "You know, it's good work.  You want to

12   help people.  At the same time you want to help your friend and

13   be profitable, I think you should do it."

14   Q.    Now, was David or Jambulat Tkhilaishvili at that dinner?

15   A.    No, they were not.

16   Q.    This was just with your family?

17   A.    My family.

18   Q.    Where were you working at the time?

19   A.    I always been working in my repair shop.  It's an auto

20   repair shop.  And then I have my rentals, so I buy the house

21   and repair and sell them, so --

22   Q.    So, you were fairly busy?

23   A.    Yep.

24   Q.    Did you reach a decision?

25   A.    I did, I did.  Yes.

1    Q.    What did you decide?

2    A.    I decided to go with the business.

3    Q.    And do you remember when it was that you made that

4    decision?

5    A.    We started negotiating in the late summer, and we signed

6    our agreement, I believe it was December of 2014.

7    Q.    And prior to you signing an agreement in December of 2014,

8    did you talk to an attorney?

9    A.    Yes, I did.

10   Q.    And who was your attorney?

11   A.    His name is Andrew Rusczek, and he's from the firm called

12   Verrill Dana.

13   Q.    Had he been your attorney prior to this?

14   A.    No.  He represented me only in this clinic.

15   Q.    And before reaching the decision about investing in the

16   Clinic did you talk to your attorney, or was it after?

17   A.    No.  I talked to him many occasions, yes, before, before.

18   Q.    Before you made the decision?

19   A.    Yes, before I made the decision.

20   Q.    And how much did you agree to invest?

21   A.    Well, I told David from day one my max is 450- to

22   $500,000, and he says, "Victor, if you put 2- to 300,000 up

23   front, then we need another hundred, at the most $200,000.

24   That's more than enough money.  We should be fine."

25   Q.    Where did you get this type of money from?

1    A.    Well, from different places.  First, I bought the house in

2    Watertown about 10 years ago.  It was $350,000, and the house

3    right now is worth 8-$900,000.  So, I had big equity.  I did a

4    cashout.

5          The second thing, my repair shop was very profitable,

6    and I made over $100,000, and I saved it.

7    Q.    And what was your understanding of the agreement?  Besides

8    that you were going to put in this money were the defendants

9    going to put in any money?

10   A.    No, he wasn't going to put the money.

11   Q.    Was he going to put anything into the business?

12   A.    Yes.  He said he had an analyzer, he had a big printer,

13   and some computers and chairs.  He told me the analyzer cost

14   close to $400,000.

15   Q.    Okay.  We'll get to that, but was David Tkhilaishvili

16   putting any of his business -- did he have a business at the

17   time?

18   A.    He did not have any business at that time.  Business was

19   closed.  The place was closed down.

20   Q.    What about the pizza place?

21   A.    Oh, he had a pizza place.  We agreed on the terms and

22   conditions.  I told him, "David, this is my last money.  You

23   know, I came to the States with $300 in a pocket, and I reached

24   this -- where I'm now it's my American dream I achieved, and

25   I'm proud, and it's very risky for me to put all my investment

1   into it." And David says, "Victor, you know, why don't we do

2   it this way: If we don't obtain a license from the Department

3   of Public Health, I will put my pizza as a collateral, and I

4   will pay you 50 percent of your -- if you lose any money,

5   50 percent of that money I will pay you back within five

6   years."

7   Q.   With interest?

8   A.   With interest, yeah. Five percent interest, I believe.

9   Q.   And what was the Clinic to be called?

10   A.   Allied Health Clinic, LLC.

11   Q.   Can you tell us about the corporate, just briefly about

12   the corporate structure of the Clinic?

13   A.   Yeah. We have Health Management and the Allied Health

14   Clinic.

15   Q.   Two separate entities?

16   A.   Two separate entities.

17   Q.   And what was the purpose of Health Management Group?

18   A.   Well, David up front told me, "So, there are two part of

19   the Clinic. There's management, in which we're going to be

20   working together, and there's the clinical part, which I'm

21   going to work with," his brother, Jambulat. And that was the

22   difference between Management and Clinic.

23           THE COURT: Ms. Kaplan, is this a point to break?

24           MS. KAPLAN: Yeah, sure.

25           THE COURT: So, we will take our morning break, ladies

1  and gentlemen, maybe 15, 20 minutes.

2  THE CLERK:  All rise.

3  (The jury exited the courtroom at 11:00 a.m.)

4  THE COURT:  Anything we need to take up before the

5  break?

6  MS. KAPLAN:  I don't think so, your Honor.

7  THE COURT:  All right.  So, we will be back here,

8  let's say, at 11:15.

9  MS. KAPLAN:  Thank you.

10  (The Honorable Court exited the courtroom at 11:00 a.m.)

11  THE CLERK:  All rise.

12  (The Honorable Court entered the courtroom at 11:19 a.m.)

13  THE COURT:  Ready for the jury?

14  MS. KAPLAN:  Yes, your Honor.

15  THE CLERK:  All rise.

16  (The jury entered the courtroom at 11:19 a.m.)

17  THE COURT:  You may continue, Ms. Kaplan.

18  MS. KAPLAN:  Thank you, your Honor.

19  CONTINUING DIRECT EXAMINATION

20  BY MS. KAPLAN:

21  Q.  I believe before the break you were telling us about the

22  corporate structure of Allied Health Clinic and Health

23  Management Group.  Can you tell us what the difference is

24  between the Clinic and the Management Group?

25  A.  Generally, I believe the terms and conditions should be

1    the same.  The percentages should be the only difference.

2    Q.    Okay.  And was the Management Group meant to manage the

3    Clinic?

4    A.    Yes.  It meant to manage the all nonclinical things at the

5    Clinic.

6    Q.    Did Health Management Group have any assets?

7    A.    He had very limited assets with some used computers and

8    some chairs, which some of them I had to send out to be

9    repaired in order to use them.

10   Q.    And at some point was Health Management Group shut down?

11   A.    Yes.

12   Q.    Did you shut it down?

13   A.    I shut it down.

14   Q.    When was that?

15   A.    I believe it was February of 2016.

16   Q.    Where was the Clinic to be located?

17   A.    On 21 School Street in Quincy, Massachusetts.

18   Q.    Is that the same location as Davis Clinic?

19   A.    Yes, it is.

20   Q.    And I think you had started to before -- I may have

21   interrupted you -- tell us the terms of ownership for the

22   Health Clinic and then Health Management Group.

23   A.    Initially, when David came to me -- and, again, I didn't

24   know -- I had no information about the medical clinic -- the

25   idea was he and his brother would get 45 percent, I would get

1    40 percent, and there was 5 percent was Notu See (ph), I

2    believe her name was.  She was going to be a doctor for us,

3    working as a doctor.  And the other 5 percent should be for a

4    clinical administrator, his name is Kenton Fabrick, and then

5    the other 5 percent for Olga Dorofyeyeva, 5 percent for her as

6    an assistant to our administrator.

7    Q.    Let me ask it this way:  The Health Clinic, Allied Health

8    Clinic --

9    A.    Mm-hmm.

10   Q.    -- did they have Class A Members and Class B Members?

11   A.    They had Class A Members and Class B Member.  On Health

12   Management I was Class A member with David on Health Clinic,

13   and I was a Class A member with Jambulat.

14   Q.    And what was your role to be in Allied Health Clinic?

15   A.    Initially I was going to be advisor with David at the

16   Management as well as with Jambulat and a silent investor.

17   Q.    And what was David Tkhilaishvili's role?

18   A.    Day-to-day operational and the Management.

19   Q.    What about Jambulat Tkhilaishvili?

20   A.    Supposed to be day-to-day operation of the Clinic after

21   opening up the Clinic.

22   Q.    And what was -- you said Kenton Fabrick was also an owner?

23   A.    He was the owner and a Clinical Administrator.

24   Q.    Clinic Administrator?

25   A.    Yes.

1    Q.   What's the role of the Clinic Administrator?

2    A.   So, he's all the policies, procedures in the Clinic.

3    Q.   And Olga Dorofyeyeva, did she have a role?

4    A.   She was going to be assistant for the Clinic

5   Administrator, but I believe was sometimes in 2015, March or

6   April, as far as I remember, she said she doesn't want to have

7   anything to do with the Clinic. She quit.

8    Q.   But she was an owner? She was in the operating letter

9   agreement?

10   A.   Initially she was, yes.

11   Q.   And was the idea that you would be at Allied Health Clinic

12   on a full-time basis?

13   A.   Well, there was no idea initially it be full time. Again,

14   my role was supposed to be as an investor, as a silent investor

15   and advisor for the Clinic.

16   Q.   And besides you, who were the other investors in Allied

17   Health Clinic?

18   A.   Only me.

19   Q.   Did either of the defendants invest any money into Allied

20   Health Clinic?

21   A.   No, they did not.

22   Q.   What about Health Management Group?

23   A.   All the summer David brought some used items but no cash.

24   Q.   And the used items, we will talk about that in a minute,

25   but did you hire an architect?

1  A.   Architect been hired previously by David, but I paid the

2  fee myself.

3  Q.   And where did you pay the fee from?

4  A.   From my personal account.

5  Q.   Do you remember how much it was?

6  A.   I don't.

7  Q.   Okay.  Now, you talked about equipment that was brought

8  over to Allied Health.  Did you bring any equipment?

9  A.   Well, down the road we almost -- right now we change

10  almost everything.  We changed most of the computers, we bought

11  new chairs, and we bought another refrigerator.  Everything was

12  used, so we had to replace them.

13  Q.   But when Allied Health Clinic was formed, you were

14  starting to tell us about the equipment.  Was there a lab

15  machine there?

16  A.   There was a lab machine, yes.  But when we started David

17  told me he had a used what is called "analyzer lab machine,"

18  which was worth several-hundred-thousand dollars, and I have

19  asked on many occasions, "Can I see the machine," because I

20  never seen an analyzer, and he always said to me, "Tomorrow,

21  tomorrow."  Then, one day I learned he sold that, and we ended

22  up buying another one.

23  Q.   Was the money that David got from the sale of the analyzer

24  used for Allied Health?

25  A.   He kept it.  He kept it.  He never put the money back into

1    the account.  We had an argument.  I told him, "Listen, we're

2    partners.  You sell anything, you have to put the money back to

3    the account."  He said he's in a financial hardship.  He needs

4    the money.

5    Q.   I'm sorry.  He said what?

6    A.   He's having a financial hardship, and he needs the money.

7    Q.   And what other equipment -- and let me go back for a

8    second.

9         That analyzer, where did that analyzer come from?

10   A.   We leased that.

11   Q.   No, no.  When Allied Health Clinic was formed, tell us

12   about what other equipment was brought to Allied Health Clinic.

13   A.   What David brought I'll put this way.  David bought some

14   used chairs, tables and some computers and telephones.  Then we

15   end up that what he brought from the Management, and, again,

16   that's a few thousand dollars, if so, worth.

17   Q.   And how many computers do you say that David Tkhilaishvili

18   brought?

19   A.   Approximately five, six, maybe, used computers.

20   Q.   Were these computers that were new?

21   A.   No.  Nothing was new.

22   Q.   How old were they?

23   A.   Well, some of them after a few months we just replaced

24   them.  They stopped working.  They were old.  I don't know the

25   exact date, but everything was used.  I mean that even the

1  medical chairs he brought, there were cut on them, they were

2  broken.  We had to send that out to upholstery shop, and I

3  paid, I believe, $500 to be repaired.

4  Q.    You said a few tables?

5  A.    A few tables, yes.  Just the regular office tables.

6  Q.    Other than the five to six computers, a couple of chairs

7  and the tables, did David Tkhilaishvili bring any other

8  equipment to Allied Health Clinic?

9  A.    No, he did not.

10  Q.    And you never saw this analyzer?

11  A.    Never seen one.

12  Q.    Now, did there come a time when you purchased computers

13  for the Clinic?

14  A.    Yes, I did.

15  Q.    How many?

16  A.    I believe I bought five or six, I bought.

17  Q.    And who paid for those?

18  A.    I did.

19  Q.    From what money?

20  A.    I paid now from the Clinic money.

21  Q.    What about something called "client lists"?  Is there such

22  a thing as client lists for Suboxone clinics?

23  A.    Well, before we opened the Clinic, so, again, I didn't

24  know about having a running medical clinic, and I asked David,

25  "How are we going to get the patients?  How are we going to get

1  them?"  And David told me he has a waiting list.

2  Q.   Did you ever see that list?

3  A.   He sent me.  I did see the list, but I didn't want to use

4  that list.

5  Q.   And why didn't you want to use that list?

6  A.   Well, when I looked up the list I noticed two things.

7  First, I think he took that list from someplace that they don't

8  belong to Allied and we shouldn't use it; and the second was I

9  believe that's a HIPAA violation.

10          MR. TUMPOSKY:  Objection, your Honor.

11          THE COURT:  No, I will permit that to stand.

12  BY MS. KAPLAN:

13  Q.   And where did you think that he took it from?

14  A.   I believe he took it from his old practice from Kurt

15  Fabrick.

16  Q.   Is that Davis Clinic?

17  A.   Davis Clinic, yeah.

18  Q.   And, by the way, when Davis -- you said that Davis Clinic

19  closed?  Did you testify that Davis Clinic closed?

20  A.   Yes.

21  Q.   Do you know whether that practice opened somewhere else?

22  A.   I have no information.  I don't think it's been opened,

23  no.

24  Q.   Well, did you see the client lists, the patients?

25  A.   I did.

1   Q.   And where did you see them?

2   A.   I believe he showed me on his computer, as far as I

3   remember.

4   Q.   And do you keep client lists on your computer?

5   A.   Well, on personal computer, no, we can't.  That's HIPAA

6   violation.  We can't do that.

7   Q.   Now, did there come a time, I think you said it was in

8   December of 2014, that an agreement, that a letter agreement

9   was drafted, negotiated?

10  A.   Yes.

11  Q.   And who drafted that agreement?

12  A.   My attorney, Andrew Rusczek, with Emily Kretchmer.

13  Q.   And what firm was Emily from?

14  A.   Krokidas & Bluestein.

15  Q.   And was that agreement signed?

16  A.   Yes, it was.

17  Q.   And are you familiar with -- who was it signed by?

18  A.   Initially signed by me and David.

19  Q.   And are you familiar with David's signature?

20  A.   Yes, I am.

21       MS. KAPLAN:  If I may, your Honor, I would like to

22  show the witness Exhibit 2.

23       THE COURT:  You may.

24       MS. KAPLAN:  And this is an agreed-upon exhibit.

25       THE COURT:  All right.  Is it going to be displayed to

1  the jury now?

2          MS. KAPLAN:  Yes.

3          THE COURT:  All right.  So, it is received.

4          (Exhibit No. 2 received into evidence)

5  BY MS. KAPLAN:

6  Q.    Do you recognize Exhibit 2?

7  A.    Yes, I do.

8  Q.    And what do you recognize it to be?

9  A.    This is our letter agreement, which was our initial

10  operating agreement for Allied Health Clinic.

11  Q.    And turning to Page 2 of that agreement, do you see your

12  signature?

13  A.    Yes, I do.

14  Q.    And do you see David Tkhilaishvili's?

15          THE COURT:  If we could just pause for a moment.

16  There are monitors for the folks in the back, and Ms. Beatty is

17  going to show you how to do it.

18          THE JUROR:  Thank you, your Honor.

19          THE COURT:  It is like it used to be flying in

20  airplanes.  Everybody got a screen that they can look at close

21  by?

22  BY MS. KAPLAN:

23  Q.    So, you identified your signature on that; is that

24  correct?

25  A.    That's correct.

1  Q.   And is there a date above it?

2  A.   There is a date above it, yes.

3  Q.   And that's December 12th of 2014?

4  A.   It's December 11, 2014.

5  Q.   Well, the date above your signature.

6  A.   Yes, it does.

7  Q.   And on the left of that page is there another signature?

8  A.   Yes, there's another signature.

9  Q.   Whose is it?

10 A.   David Tkhilaishvili.  David's.

11 Q.   And also signed on December 12th of 2014?

12 A.   Yes.

13 Q.   And you said that your attorneys prepared this agreement?

14 A.   With Emily, yes.

15 Q.   And what was your understanding of the basic terms of this

16 agreement?

17 A.   Well, the agreement was so I invest in the Clinic up to

18 $300,000.  Then after, when we opened the Clinic, become

19 operational, I had to invest another up to $200,000, and in the

20 event of the Clinic doesn't become operational, David will pay

21 50 percent of my investment back to me.

22 Q.   And in the third paragraph, Paragraph 3, do you see a

23 pledge of the pizza place?

24 A.   Yes, I do.

25 Q.   Can you tell us about that?

1   A.    Yes.  Shall I read this?

2   Q.    Just tell us what you understand this to be.

3   A.    So, one second.  It's, in other words, saying that in the

4   event it doesn't become operational, "...I contribute to AHC

5   and HMG.  You will not change your interest in Classic Pizza,

6   Inc...."

7         So, in other words, he put in the pizza as a

8   collateral.  He can't sell them or do anything to it or change

9   the ownership.  If it doesn't become operational, he will pay

10  my amount back to me, my investment, 50 percent of my

11  investment back to me.

12  Q.    And are you familiar with something called the "Special

13  Consent Authority"?

14  A.    Yes, I am.

15  Q.    And is the Special Consent Authority contained in this

16  agreement?

17  A.    Yes.

18  Q.    Can you tell us where?

19  A.    In the page --

20  Q.    First, tell us what it is.

21  A.    The Special Consent Authority is when I start investment I

22  told David, "David, so when I invest into something I want to

23  make sure that in the event of this agreement we can try to

24  negotiate this, but if we don't come to an agreement and I have

25  the final word, so I can make the best decisions for the best

1   for the Clinic, and that's only contingency."  I told him,

2   "That's the only contingency.  That's the only way I will

3   invest into the Clinic."  I made it very clear.

4   Q.   And did he agree?

5   A.   Yes, he did agree.

6   Q.   Show us in this agreement where that Special Consent

7   Authority is.

8   A.   On the second page on the bottom it says, "If there is a

9   deadlock and they cannot agree, Jambulat will work with their

10   respective attorneys to negotiate in good faith for 30 days.

11   If after 30 days there is still a deadlock, Jambulat and Victor

12   will use meditation (sic) to solve (sic)," it.  This is for the

13   meditation (sic).

14         Then on Page 3 it says, "Notwithstanding the

15   foregoing, until Victor recovers the entire investments in AHC

16   and HMG, in the event of deadlock on any matter voted on by

17   Victor and Jambulat, Victor will have authority to decide the

18   matter; provided..."

19   Q.   And you see on each of these pages at the bottom there is

20   a "DT" and a "VT"?

21   A.   Yes.  We initialled, both of us.

22   Q.   And is there another place, any other place where the

23   Special Consent Authority shows up in this agreement?

24   A.   Yes.  I believe if we turn to Page 4 under "Miscellaneous"

25   section it says the same thing:  "Notwithstanding anything to

1    the contrary herein, Victor has the authority to make a final

2    determination with respect to any decision of the members of

3    Class A Members or any other decision concerning AHC until

4    Victor recovers his entire investment in AHC and HMG."

5    Q.    Okay.  And then turning to Page 5, do you see where it

6    says, "Operating Agreement of Health Management Group"?

7    A.    Yes, I do.

8    Q.    And it sets forth who the Class A Members are and who the

9    Class B Members are?

10   A.    Yes.

11   Q.    And you and David Tkhilaishvili are the Class A Members?

12   A.    We are Class A Members, and Kenton, Jambulat, Olga, Nato

13   Rusia, they are Class B Members.

14   Q.    And who is Nato Rusia?

15   A.    Well, I never met that lady.  I believe I met her at my

16   repair shop some point one time.  And David told me, "There is

17   a person named Nato Rusia.  She's a doctor.  She gonna be

18   working for us as a doctor and put all the policies and

19   procedures in place."

20   Q.    Do you know if she is a doctor?

21   A.    I have no information.

22   Q.    You never met her?

23   A.    I never met her.

24   Q.    And for the Health Management Group was there Special

25   Consent Authority in this agreement?

1    A.    Yes, there was.

2    Q.    Where is that?

3    A.    On Page 7.  It says, "Notwithstanding the foregoing, until

4    Victor recovers his entire investments in AHC and HMG, in the

5    event of deadlock on any matter voted on by Victor and David,

6    Victor will have the authority to decide the matter..."

7    Q.    And above that is there a discussion about if there is a

8    deadlock and you can't agree David and Victor will work with

9    their respective attorneys to negotiate in good faith for 30

10   days?

11   A.    Yes.  We decided if in the event of before we are going to

12   argument or anything like that, we will try to work with

13   somebody else to resolve the problem.

14   Q.    And does the Special Consent Authority come up anywhere

15   else in this agreement?

16   A.    I believe it does on Page 8 under "Miscellaneous" section.

17   It says, "Notwithstanding anything to the contrary herein,

18   Victor has the authority to make a final determination with

19   respect to any decision of the members or Class A Members or

20   any other decision concerning HMG until Victor recovers his

21   entire investment in AHC and HMG."

22   Q.    Okay.  And then I had skipped ahead, but going back to

23   Page 1 of this Exhibit A, this is for the Allied Health Clinic,

24   correct?  Does it set out the members and the membership

25   interests?

1    A.    Yup.

2    Q.    And the Class A Members are who?

3    A.    The Class A Members -- may I have the Allied Health

4    Clinic?  This is the Health Management.

5    Q.    No.  If you look on Page 1 of Exhibit A.

6    A.    Yup.  Health Manage -- yes.  Okay.  Sorry.  What was the

7    question?

8    Q.    Who were the Class A Members?

9    A.    Class A Members on Health Management it's --

10   Q.    No.  Allied Health Clinic.

11   A.    Allied Health Clinic, me and Jambulat.

12   Q.    And then Kenton, David and Nato Rusia are Class B Members?

13   A.    Class B Members.

14   Q.    And then going to Page 9 of this agreement, do you see it

15   says, "Separate Letter Agreement Between Victor and David"?

16   A.    Yes.

17   Q.    Tell us what this is.

18   A.    Well, I knew David had some financial problem, he owed

19   some money to people, and I told him, "David, I'm willing to

20   give you $20,000.  Just pay off your debts, and you can have a

21   clear mind and soul.  You can work at the Clinic.  When the

22   Clinic becomes operational, just start paying me back."

23   Q.    Who did he owe money to?

24   A.    To David Tkhilaishvili.  Oh, who did -- oh, I have no

25   idea.  I knew -- he told me he had some debts.  I don't know

1   who he owed the money to.

2   Q.   And do you recall when it was that you first made an

3   investment of money into Allied Health?

4   A.   I believe the first time was late 2014.

5   Q.   Do you know how much it was?

6   A.   If I can take a look, I'll -- I believe the first one I

7   invested was 3,600, the very first one.  I have to take a look

8   my -- the investment chart, so --

9   Q.   Okay.  Well, all right.  Did you make small investments at

10  first?

11  A.   At the beginning I paid 3,600, 1,100, 1,000, but at the

12  end of 2014 I gave a $70,000 big investment into a general

13  contractor.

14  Q.   Where did you get these monies?

15  A.   I saved them.  I had a savings account, and I sold

16  actually one of my real estate properties prior to that in

17  Waltham, and my auto repair shop was successful, and plus my

18  rentals gives me positive revenue, and I saved it.

19  Q.   And did you later invest other money?

20  A.   I did.  I invested a lot more money, yes, I did.

21  Q.   And did you take loans to invest this money over the

22  course of time?

23  A.   Yes, I did.

24  Q.   How many loans?

25  A.   I believe I took, all together, four or five loans to

1    invest into it.

2    Q.   Who did you take loans from?

3    A.   I took the loans from private citizens, and I took the

4    loans against equity of my house.  I took the loans against my

5    rental property, and I took loans against my business.  I

6    mean --

7    Q.   When you say "private citizens," who are you referring to?

8    A.   I'm referring to my landlord.  His name is "Sal."

9    Q.   You say "my landlord."  Is that the landlord for Allied

10   Health?

11   A.   Allied Health Clinic landlord.

12   Q.   Did you sell anything of a personal nature to come up with

13   some money?

14   A.   I did.  And I sold my wife's jewelry to operate the

15   Clinic.

16   Q.   How much was your wife's jewelry worth that you sold?

17   A.   12,500.

18   Q.   And directing your attention to late 2014 into 2015, where

19   did you do your personal banking?

20   A.   Repeat the question again, please.

21   Q.   Where did you do your personal banking?

22   A.   What years?

23   Q.   2014.  Into 2014.

24   A.   Citizens Bank.

25   Q.   How many accounts did you have at Citizens Bank in 2014

1   through 2016?

2   A.   I have, I believe, one checking, one saving and one

3   business account.

4   Q.   And were you the signatory on these accounts?

5   A.   Yes.

6   Q.   Were these accounts in your name?

7   A.   Yes, they are.  Mine and my wife's, two names, joint

8   account.

9   Q.   What's your wife's name?

10  A.   Elen Gevorgyan.

11  Q.   And were the checks in her name?

12  A.   Yes.  On the top, but I was on the account too.

13  Q.   Why were the checks in her name?

14  A.   Well, the way I have, I sort of in my mind, I'm like I

15  will use this account to pay every expense of the Clinic.

16  That's easier for track down everything.  Then, in case if

17  something happens, you know, God forbid to me or something

18  goes, my wife has the full access to it.

19  Q.   Did there come a time that there was an organizational

20  meeting for Allied Health?

21  A.   Yes, there was.

22  Q.   Do you remember when that was?

23  A.   I believe it was May 3rd of 2015.

24  Q.   And do you know where it was held?

25  A.   Yes.  It was at David's apartment in Quincy,

1    Massachusetts.

2    Q.    At David's apartment?

3    A.    Yes.

4    Q.    That's David Tkhilaishvili?

5    A.    David Tkhilaishvili's apartment.

6    Q.    And what was the purpose of having an organizational

7    meeting?

8    A.    We meet, organizational meeting, and at the meeting I was

9    elected as the chairperson, and Kenton was secretary, and we

10   were discussing the budgets and discussing the operation of the

11   Clinic and Management.

12   Q.    Who else was there?

13   A.    Olga Dorofyeyeva was there too.  At the meeting was me,

14   James Tkhilaishvili, David Tkhilaishvili, Kenton Fabrick, Olga

15   Dorofyeyeva.

16   Q.    And were you appointed to do something in connection with

17   that meeting?

18   A.    Yes.  I was appointed as the chairperson.

19   Q.    And what happened at that Board meeting?

20   A.    We discussed the budget, we discussed the operation of the

21   Clinic.

22   Q.    And at the Board meeting was the letter agreement that you

23   and David had signed adopted as the operating agreement?

24   A.    Yes.  It was clearly the letter agreement was adopted and

25   signed, and everybody acknowledged that that was the operating

1  agreement, and everybody signed it.

2  Q.   And were there minutes prepared of this meeting?

3  A.   Yes, there were.

4         MS. KAPLAN:  And may I, your Honor, show the witness

5  Exhibit 3, which is in evidence?

6         THE COURT:  All right.  It is received.

7             (Exhibit No. 3 received into evidence)

8         MS. KAPLAN:  I should say it has been agreed upon.

9  BY MS. KAPLAN:

10  Q.   And do you recognize this?

11  A.   Yes, I do.

12  Q.   What do you recognize it to be?

13  A.   That was the first Organizational Meeting.

14  Q.   And is it signed by anybody?

15  A.   Yes, it is signed.

16  Q.   Well, are these the minutes from that meeting?

17  A.   That's the minutes of the meeting, which is signed by me,

18  Jambulat, Olga, and Kenton and David.

19  Q.   And you have seen those signatures before?

20  A.   Well, I haven't seen this.  The only signature before that

21  I seen, just me, my signature, and David's, but those are -- I

22  believe those are their signatures.

23  Q.   Well, have you seen Kenton Fabrick's signature before?

24  A.   Yes, I did.

25  Q.   So, do you recognize his signature on this document?

1    A.   All of them I recognize.  All of the signatures, I

2    recognize them.

3    Q.   Okay.  And these minutes reflect what took place at that

4    organizational meeting?

5    A.   One more time the question?

6    Q.   Do these minutes reflect what actually took place at that

7    meeting.

8    A.   Yes, it did.

9          MS. KAPLAN:  I offer it into evidence, your Honor, and

10   ask that it be published to the jury.

11         THE COURT:  Yes, I have received it, so it can be

12   published to the jury.

13   BY MS. KAPLAN:

14   Q.   And I would ask that you turn to -- you see the first page

15   is the organizational meeting --

16   A.   Yup.

17   Q.   -- of the first LLC members of Allied Health Clinic?

18   A.   Yes, I do.

19   Q.   And the second page are the signatures?

20   A.   Yes.

21   Q.   And then on the third page, this is Kenton Fabrick, who is

22   attesting that these are the things that happened at the

23   meeting?

24   A.   Yes.

25   Q.   And do you see the fourth bullet?

1  A.    I do.

2  Q.    And what does that say?

3  A.    It says, "The Letter Agreement between Vahagn Victor...and

4  David Tkhilaishvili dated December 11, 2014," which is letter

5  agreement, "a true and correct copy of which is attached hereto

6  as Attachment B, is the 'operating agreement' that is referred

7  in paragraph 5 of the Minutes and which was presented at the

8  Meeting."

9  Q.    And then the next page is Attachment A and Attachment B.

10  What's behind Attachment B?

11  A.    Even in the organizational meeting, if we read that, it

12  says, "The Secretary presented an overview of the" Minutes, and

13  that was the acknowledgement of our operating agreement, too.

14  Q.    And then attached is Exhibit B?

15  A.    Mm-hmm.

16  Q.    Is that the letter we were just talking about, the letter

17  agreement?

18  A.    Yes, it is.

19  Q.    Can you tell us -- so, when you made these investments of

20  money into Allied Health Clinic how did you make the

21  investments?  Was it cash, was it check?

22  A.    Checks.

23  Q.    And where did you -- did you deposit the checks?

24  A.    Initially I put all the money from my personal account.

25  That agreement was after the Clinic would become operational or

1   we receive the license from the Department of Public Health, we

2   will start paying everything from the Health Clinic and Health

3   Management account.

4   Q.   Where were the bank accounts for Allied Health Clinic and

5   Health Management Group?

6   A.   In Bank of America.

7   Q.   And you told us that David Tkhilaishvili -- well, what did

8   you tell us David Tkhilaishvili's role was at Allied Health

9   Clinic and Health Management?

10  A.   Well, in the Health Management David was going to be

11  day-to-day manager of the Management, and that Jambulat's role

12  was supposed to be day-to-day manager of the clinical part of

13  the --

14  Q.   And after you signed this agreement in December of 2014,

15  were there certain bills that had to be paid?

16  A.   Yes.  David paid certain bills.  Well, there were two

17  parts.  There were bills I learned later on he had some debts

18  he paid, but also when I signed it very next day, I believe, we

19  sent, I believe it was $22,000, close to that, to our company

20  attorney.  I had to pay the landlord two checks.  I believe it

21  was 5,500, 5,502 and 3,600.  Then there was construction fees.

22  So, we ended up putting, like, $100,000 within the first week

23  or two.

24  Q.   Were you there on a daily basis?

25  A.   No, I was not on a daily basis.

1   Q.   Were bills coming in that had to be paid?

2   A.   I had no idea, so David just gave me the bills, and I paid

3   them.

4   Q.   Where did you pay them from?

5   A.   From my personal account.

6   Q.   And would you have David Tkhilaishvili show you receipts,

7   or did he just ask you for the money?

8   A.   No.  He would have asked me for -- initially there was

9   nothing.  He just would bring, "Victor, we have to pay this

10   amount, we have to pay that amount."  He could have write on a

11   piece of paper, "We need $6,00 to this person," or, "We need

12   $3,000 to this one," and I would write out the check.

13   Q.   Who would write out the check?

14   A.   I.

15   Q.   From your personal account?

16   A.   From my personal account.

17   Q.   And after December 2014, so in early 2015 was the Clinic

18   making any money in the beginning?

19   A.   No, there was nothing.  There was nothing making money.

20   Q.   And what did you need to become operational?

21   A.   Well, we needed a few things.  First, we had to complete

22   the construction.  Then we had to submit the paperwork to the

23   Department of Public Health and to be accepted as a Clinic.

24   Then, after that, we had to have credentialing with the

25   insurance companies.  Then we could be an operational clinic.

1    Q.    What kind of construction did you have to do?

2    A.    Our architect had drawings.  We had to spend close to, it

3    was I believe $176,000 was estimated for the repair.

4    Q.    But Davis Clinic was there before, correct?

5    A.    That's correct.

6    Q.    Why did you have to do all that construction?

7    A.    Because they didn't have the clinical standards.

8    Q.    So, can you explain that to us, what do you mean by that?

9    A.    So, the PC and the Clinic standard requirements are

10   different between the Department of Public Health.  The

11   entrance has to be different, and the cooling/heating system

12   has to be different.  So, when David gave it to me, he said,

13   "This is the only way we have to be licensed as a clinic from

14   the Department of Public Health, we have to complete this

15   construction."

16   Q.    Was Davis Clinic a PC as opposed to an LLC?  Is that what

17   you're saying?

18   A.    It's not about the LLC.  He was a PC, in other words, was

19   a doctor's office.  So, there's difference between doctor's

20   office and the Clinic.  So, at his previous practice the doctor

21   owns pretty much the practice, and at the Clinic,

22   non-professional, not a doctor.  I believe 22 or 27 states in

23   the United States they are allowed to be owner of the Clinic.

24   No physician can own the Clinic.

25   Q.    So, you got an estimate from a company?

1    A.   David provided me the estimate.

2    Q.   And that was for $176,000?

3    A.   I believe so.

4    Q.   And who was the estimate from?

5    A.   The person's name was Hung.  David knew him.

6    Q.   When was the construction work supposed to start?

7    A.   Well, he started in December of 2014, which that was a big

8    mistake.

9    Q.   Who is "he"?

10   A.   David.

11   Q.   Why was that a mistake?

12   A.   As I told you before, I had done some -- buy the house and

13   sold it, and I know certain regulations about City Hall, and

14   one of the most important factors, you have to have what is

15   called a "permit" in order to start the construction.  And

16   then, besides having a permit, you have to check with the

17   Zoning Department and make sure the zoning allows at that

18   specific location to have a clinic.  I asked David to check it,

19   and David got back to me, says, "I checked it.  Everything was

20   fine."

21   Q.   And did Allied Health actually have a permit to start the

22   construction?

23   A.   No, they did not.

24   Q.   And what about the zoning?

25   A.   Zoning wasn't allowed for having a clinic, either.

1    Q.   Zoning wasn't what?

2    A.   Did not allow to have a clinic at that specific location,

3   that premises.

4    Q.   Who was responsible for overseeing the construction of

5   Allied Health?

6    A.   David.

7    Q.   And who was going to pay for that?

8    A.   I was going to pay for it.

9    Q.   So, did the construction actually start?

10   A.   He started the construction without the permit, yes.

11   Q.   Did you discover that?

12   A.   I discovered when he was overseas.

13   Q.   And what did you do?

14   A.   Well, I went when he was overseas, and I want to make sure

15   the construction goes fine, and I was going for that two weeks,

16   I believe, back and forth more often, and I noticed that there

17   was no sign on the window for permit, and I asked the general

18   contractor, "Where is the permit?"  He's, like, "Well, it will

19   be tomorrow, tomorrow."  Then Monday I told him, "Listen, if

20   you don't provide me permit tomorrow, I'm going to personally

21   stop the construction.  You can't work here."  Then he told me

22   they don't have a permit.

23   Q.   So, did you stop the construction?

24   A.   I personally stopped the construction.

25   Q.   How long was the construction stopped for?

1    A.    I would say approximately three months.

2    Q.    And during that three months did you obtain a permit?

3    A.    Well, we end up hiring the attorney in Quincy, Ed Flemming

4    of Flemming.  He helped us to prepare the paperwork, and we

5    went -- of course it cost us a lot of money -- we went to the

6    Quincy City Hall, and finally we were able to grant the waiver,

7    and they provided us with the permit to start the construction.

8    Q.    And were there issues with the zoning?

9    A.    Yeah.  Zoning didn't allow it.  They told us, "At that

10   premises you can't have a medical clinic."

11   Q.    And was the attorney helping you with that issue as well?

12   A.    He was helping me, yes.

13   Q.    How much did you pay for that attorney?

14   A.    The attorney overall I believe we paid close to $10,000,

15   but overall it's cost us about $30,000, because we had to get

16   involved -- I had to get involved with the consulting, a few

17   other consulting company as well as our company attorney.  So,

18   it ended up costing us close to $30,000.

19   Q.    Who paid for that?

20   A.    I did personally.

21   Q.    From your personal account?

22   A.    From my personal account.

23   Q.    Now, did you learn that there was an issue with the

24   construction from somebody in particular?

25   A.    Well, initially, again, I wasn't going to the Clinic, so

1   David was looking, and he would have come to my house and would

2   have provided me the report of how things going, and Olga

3   Dorofyeyeva constantly told me that --

4          MR. TUMPOSKY:  Objection.

5          THE COURT:  No, I will permit this.  This is not

6   necessarily for the truth of the matter but simply that this is

7   what Mr. Torosyan was informed of and what he understood at the

8   time.

9   A.   So, Olga Dorofyeyeva told me, Victor, that's not what

10   going on.  Why don't you go to the Clinic and take a look

11   yourself.

12   Q.   Where was she working out of at the time?

13   A.   At that time -- she was supposed to work when we opened

14   the Clinic, and at the same time she had to work with, prepare

15   the paperwork with Kenton Fabrick at the Allied Health Clinic.

16   Q.   Where were they working out of?

17   A.   Out of that office, I would guess, but at the same time

18   they moved the office to David's apartment.

19   Q.   In Quincy?

20   A.   In Quincy.

21   Q.   What did you say to Olga?

22   A.   I told her, "No, it's fine."  The funny part was that

23   David the night before was at my house, and I asked him, "How's

24   the construction?"  He's like, "Well, just got to paint it and

25   we'll be done in a couple of days."

1    Q.    And then the next day you heard from Olga?

2    A.    The next day Olga came to the repair shop and says,

3    "Victor, you have to come.  If you don't believe me, you have

4    to come."

5    Q.    And did you not believe her?

6    A.    I did not.  So, Olga was dating David's brother Jambulat,

7    and then, as far as I know, Jambulat -- they broke up, and I

8    always thought sort of because Jambulat left her she's sort of

9    taking revenge.  Plus, there was no reason for me to believe

10   her and not believe my friend.  But I went and I went the same

11   day when she came, and I went the very same day to the Clinic.

12   Q.    And do you remember when this is, now?

13   A.    I would say it was approximately May of 2015.

14   Q.    And when you got there who else was there?

15   A.    David was there, Kenton was there.

16   Q.    And what did you see?

17   A.    There was no walls, there was nothing.  The whole place

18   was a mess.

19   Q.    What did you do?

20   A.    Well, I'm, like, "David, what's going on?  You're telling

21   me something and in reality it's something different," and he

22   started, "I will explain to you.  They said it takes two days."

23   I mean, I told him, "Listen, you lied to me, I mean, you

24   crossed a line and as a friendship, as a business partner, you

25   can't misrepresent something like this.  This is a serious

1    problem."  We had an argument.

2    Q.    And when Olga came to your repair shop, where did you

3    meet?  Did you have an office there?

4    A.    No.  It's just a waiting area.

5    Q.    And what else did she tell you besides about the

6    construction?

7    A.    She told me David is screwing me over and lying to me and

8    stealing money from me.

9              MR. TUMPOSKY:  Objection.

10             THE COURT:  Just a moment.  Let me just respond.

11             What I am doing, ladies and gentlemen, is narrowing

12   the receipt of this evidence.  It is really notice that is

13   going on here.  Whether what Olga said was true or not true is

14   not at issue at this point.  What is relevant for you to

15   consider is what it was that Mr. Torosyan heard and what that

16   did as a foundation for any further acts that he took in the

17   case.  So, I overrule the objection with that limiting

18   instruction.

19   BY MS. KAPLAN:

20   Q.    Tell us what she told you.

21   A.    She told me that David is lying to me and misrepresenting

22   everything, and I should start checking things a little -- take

23   things a little more seriously.

24   Q.    Did she tell you about any altercations that she had had

25   with David?

1   A.   She told me later on they had an argument, and she told me

2   later on that David conduct something bad towards his

3   ex-girlfriend.

4   Q.   When you say "later on," do you remember when that was?

5   A.   I don't.  I believe it was June, in the middle of June.

6   Then, after that incident, I start talking with Olga little

7   more.

8   Q.   After she told you about the construction?

9   A.   Yeah.  I started sort of trusting her more then, and I

10   started checking things after May, and I discovered she was

11   right.

12   Q.   So, when the next conversation that you had with Olga,

13   when she is telling you some of these things, she told you that

14   she had -- tell us what she told you.

15   A.   She told me a few things.  The first thing Olga told me

16   about the construction.  Then, after the construction, about

17   the entire -- the money and investment, it's not correct.  Then

18   she told me that David knocked down his girlfriend at the

19   office.

20          MR. CRUZ:  Objection, your Honor.

21          THE COURT:  Again, I am going to permit this for

22   notice purposes, not for the truth of the matter.

23   A.   As well as David one time got very angry and flipped

24   the -- kicked the table or flipped the table and was really,

25   she was very afraid of her at that point.

1    Q.   Who did she tell you that David got angry and flipped the

2    table at?

3    A.   Well, flipped the table was with Kenton and her, and also

4    she told me that David knocked down at the Clinic his

5    girlfriend, which is named Kristina Ursova.

6    Q.   Was that at Davis Clinic or Allied?

7    A.   No, it was at Davis Health PC.

8    Q.   Do you recall her telling you anything about Jambulat

9    Tkhilaishvili?

10          MR. TUMPOSKY:  Objection.

11          THE COURT:  No, he may answer.

12    A.   Yes, she did, she did.  Later on she told me that Jambulat

13    himself several times used force towards her --

14          MR. TUMPOSKY:  Objection.

15    A.   -- as well as the --

16          THE COURT:  I am overruling the objection again on the

17    same basis.  That is, I am limiting it to notice.

18    A.   So, used the force towards --

19          MS. KAPLAN:  I'm sorry.  Let the judge finish.

20          THE COURT:  I'm limiting it to the question of notice

21    here.  So, you may continue.

22    A.   So, she told me Jambulat personally used the force towards

23    her as well, and also Jambulat had some argument with somebody

24    in Downtown Boston.  One day she picked her up on the --

25          MR. TUMPOSKY:  Objection.

1    THE COURT:  Overruled.

2    A.    And that she find out that David stabbed somebody -- I

3    mean Jambulat stabbed somebody in Downtown Boston.

4         THE COURT:  I emphasize, ladies and gentlemen, that

5    this is not being received for the truth of the matter, and it

6    is up to you to decide whether or not you credit testimony that

7    Mr. Torosyan heard this information, and we are not dealing

8    with a case about some other assault some other place, but it

9    may be relevant to you to decide what it was that either of the

10   defendants thought they were inducing in Mr. Torosyan, that is,

11   whether or not they were inducing fear of some sort of harm,

12   physical harm.

13   BY MS. KAPLAN:

14   Q.    When you heard this, how did you feel?

15   A.    I felt -- I felt terrible.  I was very surprised, and I

16   didn't know what to do.  And I talked even with David, and I

17   didn't talk with Jambulat.  I asked David if he did such a

18   thing, if he went crazy at the office with the Kenton and Olga

19   and he knocked down Kristina.  He admitted, says he did, and I

20   asked him, "Why did you do that?"  I mean, he blamed me because

21   it was my fault he flipped on Olga and Kenton.  That's what he

22   told me.  And about Kristina he says, "Everybody has to learn

23   their lesson.  The same thing with the Clinic.  People have to

24   learn their lesson."

25   Q.    The delay in the construction, was there a financial cost

1    in the delay?

2    A.   It was a big financial cost, yes.  So, it was the end of

3    January I asked for a meeting at the office.  I don't know

4    remember if Jambulat being there or not, but I know it was me,

5    David, Olga and Kenton, and I told them, "Look, if we fail to

6    obtain a permit from the City of Quincy, we're going to be

7    shutting down this whole thing."  And then after two months,

8    three months we were able to sort of solve the problem, but it

9    cost us a lot of money and a lot of time.

10   Q.   How much did it cost?

11   A.   Overall, close to $30,000.

12   Q.   Oh, that was the $30,000.  Okay.

13   A.   Yeah.

14   Q.   Now, did you hire any consultants to help out at Allied

15   Health?

16   A.   Yes, I did.

17   Q.   Who did you hire?

18   A.   Well, there were a few consulting companies I hired.  So,

19   one of them was Benchmark.  The other was Gargulio & Rudnick,

20   and the third one was David Ball, Ball Consulting.

21   Q.   And who was Gargulio --

22   A.   Gargulio & Rudnick.

23   Q.   Is that a law firm?

24   A.   They were a law firm, but they were not representing us as

25   legally.  They were consulting us.

1  Q.   And who was Bob Griffith?

2  A.   I believe -- I know he works at the firm, and he was

3  consultant for Allied Health, and also he is supposed to be the

4  mediator in the event of me and David were having an argument.

5  Q.   Okay.  And do you know whether -- how did you come to Bob

6  Griffith?  How did you find him?

7  A.   David introduced him to me.

8  Q.   Did he previously represent David?

9  A.   David told me he represented him in the previous case.

10  Q.   And he was a lawyer?

11  A.   He's a lawyer.  He represented him.

12  Q.   And did Allied Clinic have its own attorneys?

13  A.   Yes.

14  Q.   Who was that?

15  A.   Krokidas & Bluestein.

16  Q.   And the defendants, did they have their own attorneys?

17  A.   Well, to my belief, that initially was Krokidas &

18  Bluestein, but later on, when we start negotiating on operating

19  agreement and they hired, because I told them we have to both

20  represent by the attorney, I believe his last name is Jeremy

21  Steinberg, I believe.

22  Q.   Sternberg?

23  A.   Sternberg.

24  Q.   Who paid for Allied's attorneys?

25  A.   The agreement was any legal fee which has any connection

1    with the Clinic we would have paid by the Allied Health, and it

2    came out of my personal account.

3    Q.    Who paid for the defendants' attorney?

4    A.    I did.

5    Q.    From your personal account?

6    A.    Personal account.

7    Q.    And why did you pay for the defendants' attorneys?

8    A.    Well, again, that was the agreement, so anything we spent

9    on attorney or legal fees has to do with the Clinic, so that

10   was the agreement, we would pay from the Clinic account, which

11   initially was my account.  He didn't have the money or he would

12   have paid it.  So, that's what he told me.

13   Q.    Did there finally come a time where Allied Health received

14   a Certificate of Occupancy for the building?

15   A.    Yes.

16   Q.    And do you remember when that was?

17   A.    If I take a look, I believe it was in August, but I have

18   to take a look.

19         MS. KAPLAN:  If I may show the witness Exhibit 6,

20   which has been agreed to by the parties as well, your Honor?

21         THE COURT:  Yes, and that is received.

22              (Exhibit No. 6 received into evidence)

23   BY MS. KAPLAN:

24   Q.    Do you recognize that document?

25   A.    Yes, I do recognize it.

1    Q.    And what do you recognize that to be?

2    A.    This is from City of Quincy, Certificate of Occupancy.

3    Q.    And does this refresh your recollection as to when it was

4    issued?

5    A.    Yes.  Date of issue is August 6, 2015.

6    Q.    Now, at some point in August of 2015 did Allied have an

7    annual meeting?

8    A.    Yes.

9    Q.    And what was the purpose of that meeting?

10   A.    We were having another Board meeting for the Minutes of

11   the Clinic, and that was -- I believe it was August 22nd.

12   Q.    Where was that meeting?

13   A.    At the Clinic in the waiting room.

14   Q.    Who was present?

15   A.    At the Clinic was me, David, Jambulat, Kenton and Bob, Bob

16   Griffith.

17   Q.    And what happened during that meeting?

18   A.    Well, we discussed like we are going to get -- have the

19   final approval from the Department of Public Health initially,

20   and where we're going to be doing it, so, in other words, the

21   structure of the Clinic, the policies and the procedures.

22   That's what initially we discussed.

23   Q.    And after that meeting was over did something happen?

24   A.    Yes, it did.

25   Q.    What happened?

A.   After that meeting David and Jambulat came to me, was,

like, "Can we go to the next room and talk?"  And I told them,

"Yeah, it's fine, let's talk."  And then David presented me a

piece of paper, which I don't believe that he wrote that out,

because that's too much legal language, saying, "Listen,

there's a buyer, somebody wants to buy the pizza shop, and I

really want to sell it, because that takes my time, and I want

to sell that so I can -- me and my brother can be full time at

the Clinic."

Q.   What was your reaction?

A.   Initially I thought that's a good idea, so I know he's

selling, you know, and he want to sell it to spend more time at

the Clinic, which makes sense, and he will have some money, he

will pay some of his debts.  Initially, it did make sense to

me.

          MS. KAPLAN:  And with the Court's permission I would

like to show the witness Exhibits 4 and 5, which have been

agreed to as well.

          THE COURT:  Yes.

BY MS. KAPLAN:

Q.   First, looking at Exhibit 5, do you recognize that

document?

A.   Yes, I do.

Q.   And is this the agreement that he brought with him?

A.   Yes, it is.

1    Q.   And can you tell us what this agreement says, basically?

2    A.   Well, basically I can't read it, but what it says,

3    initially it said to release the -- amend our initial operating

4    agreement.  Then that was quick, and I'm like, "Okay, that

5    makes sense, but now the question is within a month or two what

6    if we don't get our license from the Department of Public

7    Health?  And I told him, "All right.  Only contingency, only

8    conditions I will put the contingency to list this if you keep

9    the money in an escrow account in the event if we don't obtain

10   the license so you can pay me back."  And he agreed, even

11   though that wasn't -- that didn't give me legal protection, but

12   that's what I came up with, and I quickly wrote that on a

13   computer and printed it, and we both signed it.

14   Q.   So, Exhibit 4 is the document that David Tkhilaishvili

15   presented to you amending the letter agreement?

16   A.   Yes.

17   Q.   And basically saying that you would release the pizza

18   place so they could sell it, correct?

19   A.   That they can sell it, correct.

20   Q.   And you signed this agreement?

21   A.   I did.

22   Q.   And David Tkhilaishvili signed this agreement?

23   A.   He did.

24   Q.   And why is it that you think that he didn't write this?

25   A.   Well, this is not his language.  He doesn't have this

1    vocabulary, I believe.

2    Q.    And Exhibit 5, is this what you were just talking about,

3    that you wanted to make sure that David Tkhilaishvili held onto

4    the money in the event that he sold the pizza place?

5    A.    Correct.

6    Q.    And you signed this, and David Tkhilaishvili signed this

7    as well?

8    A.    Correct.

9    Q.    And did you testify that Jambulat Tkhilaishvili was

10   present?

11   A.    He was there too, yes.

12   Q.    And these were signed on August 22nd of 2015?

13   A.    Yes, both the same date after the meeting.

14   Q.    And what happened after that meeting?

15   A.    Surprisingly, right after I signed that, like less than a

16   blink of eye, they both of them turned 180 degrees, they become

17   different person.  They started raising their voice on me and

18   telling me that, "You know what?  You have to give up" my

19   Special Consent Authority, and then I have to give up some

20   percentages for myself, and then threatened if I don't agree on

21   their demands they can, first of all, break down everything,

22   burn down the Clinic.  And then the second thing, this came

23   from Jambulat, says -- and David confirmed that later -- says,

24   saying, you know, he gonna get involved, the ten outlaws

25   involved, and either they come here or I have to go to Athens

1    in Greece and meet them to resolve this problem.  And they are

2    telling me -- I mean, that was one of the worst day of my life.

3    And the people, the friends, and just looking at me and telling

4    me if I don't agree with them and me and my family, we're all

5    going to be hurt, and there were nine families, nine people who

6    had a problem with them.  They disappeared from here.

7    Q.    Where were you when this conversation took place?

8    A.    In the room on the left side.  There's a small room, the

9    medical assistant room.  We were there.

10   Q.    Who else was there?

11   A.    Me, him, and his brother, the three of us.

12   Q.    David and Jambulat Tkhilaishvili?

13   A.    Yes.

14   Q.    Was there anyone else there?

15   A.    No.

16   Q.    And what was the tone of the voice?

17   A.    They were yelling at me.  They were very loud and angry on

18   me and just screaming at me.

19   Q.    Were you sitting or standing?

20   A.    We were standing.

21   Q.    Where were they standing?

22   A.    They were standing by the door, and I was in the corner.

23   Q.    What did you say to them?

24   A.    I was surprised.  First of all, knowing David and -- I

25   mean, I wasn't close with Jambulat, and I wasn't, first of all,

1    expecting, and I was shaking, and I tell them, "Guys, come on,

2    why are you doing this to me?"  And they told me, "We don't

3    need you to tell us what to do anymore, and this is what's

4    going to happen."  And I told them, "We had agreed and we have

5    a contract," and they said, you know, David replied right

6    there, says, "My brother doesn't live by the contract."  I'm

7    like, "David, you know, we agreed on something.  We should

8    honor that."  They start repeating the same thing, and I told

9    them, "All right.  Let me talk with my lawyer, see what I can

10   come up with."

11   Q.   How did the meeting end?  Is that how it ended?

12   A.   It ended, yeah.  So, they repeatedly told me the same

13   thing, and I was shaking, and I just got out and I sort of

14   shaking.  I didn't know what to do, and I was very, very

15   confused.

16   Q.   Did you leave?

17   A.   I left.  I left, yes.

18   Q.   Did you tell anyone what had happened?

19   A.   Yes.  I told -- I discussed that with Bob, and I discussed

20   that --

21   Q.   Bob who?

22   A.   Bob Griffith.  And I discussed that with my attorney, and

23   I discussed that with my family, of course.

24   Q.   And at that time, so it's August, late August now, how

25   much money had you invested in Allied Health Clinic?

1    A.    At that time I believe already it was close to $400,000.

2    I have to look, but I believe it was about $400,000.

3    Q.    And shortly after this incident occurred did you get a

4    phone call from one of the defendants?

5    A.    Yes, David, from David.  First of all, David I learned

6    that, so right after that he texted me something saying, "Oh,

7    you know what happened with Kristina's mother?"  Like, he will

8    play the game that one day -- one second he would have

9    threatened you.  The next second he would have sort of text you

10   something like everything was okay.  And he called me up and I

11   was in a room when he called me, in the living room, and I was

12   talking to him, like, "David, you know, what's going on, man?

13   I mean, come on.  That's not what we agreed, you know.  We just

14   got to figure this out.  I put all the money I had and I worked

15   hard, and you know how I work and how I earned that money.  How

16   can you do it to me?"  And he's like, "Hey, that's what it is.

17   I can't control my brother."  I'm like, "Why don't we go --

18   let's go to talk with Bob."  He's, like, "Well, I don't need

19   anybody to tell me what to do, you know."  And then we start

20   talking.  He got angry and screaming on the phone.  He's, like,

21   "I'll go to Bob's house and I'll put a bullet in his head."

22   Q.    Did he say anything to you during that conversation on the

23   phone about Jambulat?

24   A.    Yes.  He says he can't control his brother, his brother

25   shot the people in the head, and that was very, very scary.

1   Q.   When you suggested -- how long did the conversation last?

2   A.   I don't remember.  It could be about 10 minutes, 10 to 20

3   minutes.  I don't remember.

4   Q.   And you said you had suggested that you go to talk to Bob

5   Griffith?

6   A.   Yes, absolutely.  I told him, "Let's go to talk with Bob,

7   see what he can do," you know.  I mean, I'm certainly not going

8   to go to see outlaws.  That's not what we, you know, live with,

9   so there is no point for me to see anybody.  I'm not going to

10   go to Greece, and I'm not going to meet with anybody.  I'm just

11   going to talk with attorneys, see what we can do.

12   Q.   And is that, in fact, what the letter of agreement

13   provided --

14   A.   Yes.

15   Q.   -- that if there was a dispute, that you would go to

16   lawyers or a mediator?

17   A.   Yes, we did.  That's what is provided.

18   Q.   Did you ever try and work things out between yourself and

19   the defendants and --

20   A.   Absolutely.

21   Q.   No.  With the consultant, with Bob Griffith?

22   A.   Yes, we did.  I talked with Bob, and I told him, "Listen,

23   this is what happened, okay?  And we need somehow to solve this

24   problem.  I put all this money.  Now we just choosing a

25   different way."

1  Q.  But did you ever meet with Bob with the defendants at the

2  same time?

3  A.  With him, no, I did not.  He didn't want to meet, and I

4  have on several occasions, "Let's meet."  He didn't want to

5  meet with him.

6  Q.  Again, during that phone conversation, what was the tone

7  of David Tkhilaishvili's voice?

8  A.  Oh, he was screaming, he was yelling.  I remember I told

9  him, "Listen, you know, I told this to my family, to my wife,

10  you know," and I remember him saying, "Victor, be a man.  You

11  know, you don't tell things to your wife."  I'm like, "David,

12  'be a man' is not me.  You don't tell things to your wife, God

13  forbid something happens, she has to know what's going on."

14  Q.  And how were you feeling at this time?

15  A.  I was shaking, I was shaking.  I was very, very scared at

16  that time.

17  Q.  What happened next after that August 23rd conversation?

18  A.  After that David went to Georgia to see his fiancee.

19  Q.  How do you know he went to Georgia to see his fiancee?

20  A.  Well, first of all, I bought the ticket through my credit

21  card.  The second that -- I knew he was going to go see his

22  fiancee.  I believe on that occasion before even, way before

23  then, before everything happened I gave him a gift as a ring to

24  give to his fiancee.

25  Q.  And how did you know for that particular trip he was going

1    to see his fiancee?

2    A.   He told me he was going to see his fiance.

3    Q.   And did you pay for that trip?

4    A.   I did, yeah.

5    Q.   What did you pay for?

6    A.   I used my credit card to pay for it.

7    Q.   Pay for what?

8    A.   For that trip.

9    Q.   What about that trip?

10   A.   So, I paid the ticket, yeah, I bought the ticket.

11   Q.   The plane ticket?

12   A.   Plane ticket.

13   Q.   And you gave him your credit card?

14   A.   Credit card.

15   Q.   Was this from the Allied account?

16   A.   I don't remember.  I believe it was my personal account,

17   but I don't remember which credit card I used.  I don't think I

18   had an Allied account at that time.  I believe it was my

19   personal credit card account.

20   Q.   How long was he gone?

21   A.   I think it was two or three weeks.

22   Q.   So, sometime in mid-September he came back?

23   A.   He came back, I believe it was September 11 or 12th.

24   Q.   Did he ever tell you that he was going to Georgia to meet

25   with investors?

1    A.    No, he did not.

2    Q.    Did you ever ask him when he goes to Georgia to find some

3    investors?

4    A.    No, I did not.

5    Q.    And when he came back did he ever tell you that he had met

6    with any investors?

7    A.    No, he did not.

8    Q.    Now, at some point did you learn that David Tkhilaishvili

9    had written two checks from the Allied Clinic account just

10   prior to going to Georgia?

11   A.    Yes, I did.

12   Q.    And when did you learn this?

13   A.    When he was gone.

14   Q.    How much were the checks for?

15   A.    Five and $6,000.

16   Q.    Do you know when he wrote those checks?

17   A.    It was right before everything happened, so he put the

18   money into the account for expenses.  Then he wrote the five

19   and $6,000 checks and left.

20   Q.    Was he authorized to write those checks?

21   A.    No, he was not authorized to sign that amount of the

22   checks for himself.

23   Q.    Did he ask you if he could write those checks?

24   A.    No, he did not.

25   Q.    And what checking account were they from?

1    A.    Bank of America.

2         MS. KAPLAN:  With the Court's permission, I would like

3    to show the witness Exhibits 7 and 8, which have been agreed

4    upon by the parties.

5         THE COURT:  Yes, you may, and they are received.

6         (Exhibit Nos. 7 and 8 received into evidence)

7    BY MS. KAPLAN:

8    Q.    Looking, first, at Exhibit 7, can you tell us what that

9    is?

10   A.    That's the Allied Health Clinic account.

11   Q.    And it's a check written to David Tkhilaishvili in the

12   amount of $5,000?

13   A.    Yes.  He, first of all, to our agreement he can't write up

14   this amount of checks.  It has to be both of us signature on

15   them.  The second thing is in the middle of the financial

16   hardship there is no way he could have taken even one dollar

17   extra for it.

18   Q.    What do you mean by that?

19   A.    I mean, I wouldn't allow to take him $11,000.  $11,000 is

20   a lot of money, when we spent over $400,000, and that was

21   30 percent more than we anticipated, and we haven't even opened

22   up the Clinic yet, and there's no point for him to --

23   Q.    So, you wouldn't have authorized it?

24   A.    No, I wouldn't.  No.

25   Q.    And looking at Exhibit 8, please, is that another Allied

1  Health Clinic check?

2  A.   Yes.

3  Q.   And it's in the amount of $6,000?

4  A.   Yes.

5  Q.   And he wrote that check?

6  A.   He did.

7  Q.   Did you authorize him to write that check?

8  A.   I did not.

9  Q.   And you learned about it after he was gone?

10 A.   After he was gone, yeah.

11 Q.   And at that time had the Clinic opened?

12 A.   No.

13 Q.   Were you seeing patients?

14 A.   No.

15 Q.   Were you making any money?

16 A.   No.

17 Q.   Had you ordered materials for the Clinic?

18 A.   Yes, we order.

19 Q.   What are "reagents"?

20 A.   "Reagents," that's compound or mixture you add to the

21 system to cause chemical reaction.  We add that to analyzer.

22 Q.   And is that something that's necessary to operate a

23 Suboxone clinic?

24 A.   Well, yes.  We have to have -- it's good to have your own

25 screening at your clinic.  That was an idea of, initial idea

1    from the doctor and from David, and that's the analyzer he was

2    referring he had one, then he sold one.  Then we had to buy

3    them in order to have a clinic, yes.

4    Q.   And where did you order these reagents from?

5    A.   The firm called Microgenics.

6         MS. KAPLAN:  With the Court's permission, I would like

7    to show the witness Exhibit 14, which is agreed upon.

8         THE COURT:  Yes, it is received.

9              (Exhibit No. 14 received into evidence)

10   BY MS. KAPLAN:

11   Q.   Do you recognize Exhibit 14?

12   A.   Yes, I do.

13   Q.   What do you recognize it to be?

14   A.   This is the reagents we ordered for our analyzer.

15   Q.   And that's an invoice from Microgenics?

16   A.   Yes.

17   Q.   And can you see on the right side where Microgenics' is,

18   the office?

19   A.   Yeah.  They're in Fremont, California.

20   Q.   Now, at this time were you still trying to obtain a

21   license to operate?

22   A.   Yes.

23   Q.   And who did you have to get that license from?  I think

24   you said the Department of Public Health?

25   A.   The Department of Public Health.

1    Q.    Were your attorneys involved in that process?

2    A.    Our attorneys were involved in that process and the

3    consulting companies.

4    Q.    And did they tell you you needed to do something else in

5    order to get the license from the Department of Public Health?

6    A.    Well, yes.  We have to have our occupancy permit in place

7    in order to finalize the Department of Public Health.

8    Q.    But in addition to that, what else did you have to have?

9    A.    We had to have the policies, procedures down; we had to

10   have the operating agreement ready; we had to have all the

11   construction be completed in order to finalize for the --

12   Q.    And at that time did you have operating agreements, or did

13   you have the letter agreement?

14   A.    We had a letter agreement which served, that came up as

15   operating agreement.

16   Q.    But did the attorneys tell you that you needed formal

17   operating agreements?

18   A.    Yes, they did.

19   Q.    And were there attorneys involved in -- were there going

20   to be one operating agreement or two?

21   A.    There were two operating agreements, one for the Health

22   Management and the second one for the Health Clinic, and our

23   attorneys were negotiating the terms and conditions.

24   Q.    And who, in particular, was negotiating -- drafted and

25   negotiated the operating agreement?

1   A.   That was between Andrew Rusczek and Jeremy Sternberg.

2   Q.   So, Andrew was your attorney?

3   A.   Yes, and Jeremy for David and Jambulat.

4   Q.   And did you sign these agreements?

5   A.   Yes, I did.

6   Q.   And who else signed the agreements?

7   A.   All the members of the Clinic, which is beside Nato Rusia.

8   Q.   And do you remember when you signed the agreements?

9   A.   I believe I signed on -- that was the day before I left.

10  I believe it was September 11 or 12th.  If I looked I can

11  just --

12  Q.   This is 2015?

13  A.   2015.  2015, yes.

14  Q.   And at this time the defendants, did they sign?

15  A.   They all signed, yes, but David did not.  David signed

16  after he came back.

17  Q.   From Georgia?

18  A.   From Georgia, yeah.

19  Q.   Which you said was around September 12th?

20  A.   He came back at that time, but he came and I left, I

21  think.  He came and I left was the same day or day after, so we

22  didn't see each other.

23  Q.   And prior to you signing the agreements, these operating

24  agreements, had you already been threatened by the defendants?

25  A.   Yes, I did.  They did threaten me, yes, on August 22.

1  Q.   Why did you agree to enter into these operating agreements

2  with the defendants who had threatened you?

3  A.   Look, first of all, Robert Griffith, he tried to calm

4  everything down.  The second, I put all the money, and I put

5  everything I had into it, and what else should I have done?  I

6  mean, if my attorney advised me they don't necessarily have to

7  sign, I can sign the operating agreement and present that to

8  the Department of Public Health.  I didn't have to deal with

9  them.  But I'm, like, "No, let them, you know, know what's

10  going on."  In other words, it's eight years of my best years

11  in the United States, and losing the friend, it's very hard

12  thing for me, and I forgive them in my heart.  I'm, like,

13  "Okay, let's try to move on and see what's going on."

14          MS. KAPLAN:  If I may, your Honor, show the witness

15  Exhibits 9 and 10, which has been agreed upon by the parties?

16          THE COURT:  Yes.  It is received.

17          (Exhibit Nos. 9 and 10 received into evidence)

18  BY MS. KAPLAN:

19  Q.   Do you recognize Exhibits 9 and 10?

20  A.   Yes, I do.

21  Q.   And what do you recognize Exhibit 9 to be?

22  A.   Exhibit 9 is the agreement, operating agreement between

23  Health Management Group, Allied and Health Management Group.

24  Q.   And what is Exhibit 10?

25  A.   It is the same for the Allied Health Clinic, operating

1  agreement.

2  Q.   Are they the same terms for each, for the Health Clinic as

3  for the Health Management Group?

4  A.   Generally it's the same, but the percentages were

5  different.

6  Q.   Percentages of ownership?

7  A.   Ownership was different, yes.

8  Q.   Okay.  And do you see on the front page of both it's dated

9  as of September 11th of 2015?

10  A.   Yes, I do.

11  Q.   And who prepared these documents?

12  A.   Andrew Rusczek prepared this with Jeremy Sternberg.

13  Q.   And if we could turn to the signature page, which is 33 on

14  Exhibit 9.  And is that everybody's signature?

15  A.   Yes, everybody's signature.

16  Q.   And then for Exhibit 10, Page 34, signatures of everyone

17  there, Jambulat, Tkhilaishvili, yourself?

18  A.   Yes.

19  Q.   Olga, Kenton and David Tkhilaishvili?

20  A.   Mm-hmm.

21  Q.   And you said a few moments ago that you did not need to

22  get these signatures of the defendants, that you were told

23  that?

24  A.   Yes.

25  Q.   Does it say that somewhere in these operating agreements?

1    A.    Yes, it does.

2    Q.    Do you know where that is?

3    A.    I can look.  On Health Management -- I believe it doesn't

4    have the page number.  The section "Health Management Group

5    LLC.  Amended and Restated Operating Agreement."  In the first

6    section it says, "Until Vahagn Victor Torosyan recovers his

7    entire investment in LLC and -- "

8    Q.    So, let me stop you for a second.  So I think this is the

9    fourth page of Exhibit 9 that you're reading from.

10   A.    It doesn't have the page number.

11   Q.    I know, but can you count the pages so we know which page

12   it is?

13   A.    Yes.  The fourth page.

14   Q.    The fourth page, the "WHEREAS" section?  So, it's the

15   third full paragraph you're reading from?

16   A.    Yes, "WHEREAS" section on the last -- start in the middle.

17   Q.    Okay.  So, what are you showing us there?

18   A.    This provides me Special Consent Authority, that's what it

19   talks about.  It's, Until Vahagn Victor recovers entire

20   investment LLC and the Health Clinic, in the event of dispute

21   between David Tkhilaishvili and Victor Torosyan, Vahagn Victor

22   will have the authority to decide the matter based on

23   reasonable judgment regarding what is in the best interests of

24   the LLC.

25   Q.    So, now it's called, it went from the "Special Consent

1    Authority," it's called the "Vahagn authority"?

2    A.    "Vahagn authority."  That's what we call it.

3    Q.    Okay.  And then, looking at the last "WHEREAS" paragraph

4    on this page -- do you see this one (indicating)?

5    A.    Yes.

6    Q.    Is that where it says that you do not need the signature

7    of David Tkhilaishvili?

8    A.    Yes, it does.

9    Q.    Okay.  And then if we could go to Exhibit 10, which is the

10   Operating Agreement for Allied Health Clinic, and going to the

11   fourth page there, is the "Vahagn authority" in that second

12   "WHEREAS" paragraph as well?

13   A.    It's the same section, "WHEREAS," yes, it has -- it says

14   the same thing:  "In the event of dispute between Jambulat

15   Tkhilaishvili and Vahagn Victor Torosyan, Vahagn Victor

16   Torosyan will have the authority to decide the matter based on

17   reasonable judgment regarding what is the best interest of LLC

18   ('Vahagn Authority')."

19   Q.    And then in the last "WHEREAS" paragraph is the same as

20   what you just read and says that this agreement is adopted even

21   without the signature of Jambulat?

22   A.    Yes.  It is the last sentence, two sentences:  And hereby

23   adopt this Agreement, without the signature of Jambulat

24   Tkhilaishvili.

25   Q.    Now, you said these were basically the same terms as the

1   letter agreement except for the percentages, correct?

2   A.    That's correct.

3   Q.    So, if we could go to Exhibit 9 and go to Schedule I,

4   which is the last page of Exhibit 9, is this what sets out the

5   percentages for Health Management Group?

6   A.    Yes, it does.

7   Q.    Okay.  And when you're talking about the percentages, you

8   see "Percentage Interest" here?

9   A.    Yes, I do.

10   Q.    And some of the percentages change?

11   A.    Yes.

12   Q.    Can you tell us why?

13   A.    Well, I have to explain to you a little longer, if I may

14   have a few minutes.  So, initially when we started, David

15   presented the person Nato Rusia, and since we're going to be --

16   we're going to have the grant from the Department of Public

17   Health as a clinic, and I didn't want to have somebody at the

18   Clinic which I never met.  So, I told him, "I'm going to be

19   removing Nato Rusia from the percentages, and to be fair I'm

20   not going to keep her percentages by myself; I'm going to split

21   the percentages among both of us."  So, I gave him half of Nato

22   Rusia's percentages, and I kept half myself.

23   Q.    And did you give another --

24   A.    Then, additionally, I give the 5 percent back to Olga.

25   That was my decision.

1    Q.   Okay.

2    A.   Because we want to make sure -- we don't want somebody

3    that didn't put the money into the Clinic and be part of it,

4    and I want to make sure everybody who is the partner at the

5    Clinic, either they invested money into it or they worked at

6    the Clinic.

7    Q.   Well, did David Tkhilaishvili invest any money in the

8    Clinic?

9    A.   No, he did not invest the money, but the agreement him and

10   his brother, as the work order invest, so he was the second

11   section.  He was a working partner at the Clinic.

12   Q.   Did Kenton or Olga invest any money?

13   A.   They did not invest money, no.  But the agreement, and I

14   agreed from day one, so everybody, David, Kenton and Olga, they

15   get 5 percent to be as administrator and assistant

16   administrator of the Clinic, and they have to get 5 percent

17   interest from the Clinic.

18   Q.   So, these were people who were actually working at Allied

19   Health, correct?

20   A.   Yes, but at that time Olga was not, and I told Olga in a

21   meeting, and I met her, I told her, "Olga, you have to make a

22   decision if you want to come back work with Allied or" -- I

23   mean, I gave her a contract, and I told her, "You can either

24   start working or not."  She didn't want to come back to Allied.

25   Q.   So, she had been working, but by this time she had already

1  left?

2  A.    She had already left, correct.  But I still gave her a

3  chance unless she wants to come back, so --

4  Q.    But Nato Rusia you had never even met?

5  A.    I never met her, no.

6  Q.    And then, turning to the Allied Health Clinic Operating

7  Agreement, Exhibit 10, the last page, these set out the

8  percentages as well, correct?

9  A.    That's correct.

10  Q.    And did these percentages change?

11  A.    Yes, they did.  So, the same thing I did from Nato Rusia

12  percentage, I split it among Class A Members, which is being

13  Jambulat Tkhilaishvili.  He kept half of the percentages, and I

14  kept the other half, as well as give the 5 percent back to

15  Olga.

16  Q.    Now, you had testified that David Tkhilaishvili could not

17  take out money or make any expenditures on behalf of Allied

18  Health without your authorization.

19  A.    Correct.

20  Q.    Was there a monetary amount on that as well?

21  A.    I believe if I looked, it was -- if you give me a second,

22  I can try to find that.  It was 1,000 or 2,000.  I can check

23  that.

24  Q.    If you look on Page 13 of Exhibit 10.

25  A.    Exhibit 10, Page 13.  Yes.  It says 1,000.  "Expenditures

1    in excess over $1,000 individually."

2    Q.    And is that the same provision in Allied Health Clinic

3    Operating Agreement?

4    A.    I haven't looked, but I'm sure, yes.  If I may look, then

5    I can tell you for sure.

6    Q.    Okay.  If you look at Exhibit 9.

7    A.    Yes, it does say the same amount and the same terms and

8    conditions.

9    Q.    And were there any issues with David and Jambulat

10   Tkhilaishvili signing these operating agreements?

11   A.    Yes.  They were negotiating and David and Jambulat, they

12   didn't want to sign it, and even when David was in Georgia we

13   were negotiating, and David told me, "My brother doesn't need a

14   contract so he doesn't live by the contract."  So, I told him,

15   "Listen, it's in your best interests for you and for your

16   brother to sign, but if you don't sign it in a couple of days,

17   I'm going to sign it and present it to the Department of Public

18   Health myself."

19   Q.    And did he sign it?

20   A.    He did sign it, yes.

21   Q.    David?

22   A.    He and his brother both did.

23   Q.    Do you remember the circumstances under which Jambulat

24   Tkhilaishvili signed the agreement?

25   A.    Yes, I do.

1    Q.    Where were you?

2    A.    I was at the shop and --

3    Q.    When you say "the shop," what shop?

4    A.    At my repair shop in Watertown.  David came -- Jambulat

5    came to the repair shop, and then we had some conversation

6    prior to that, but after the conversation he signed.

7    Q.    What was the conversation that you had?

8    A.    It's what I call a conversation.  So, we went on the side,

9    and he start again the threats, like, "Victor, look, you know,

10   I don't live by the contract.  These contracts mean nothing to

11   me, so things have to be my way.  If somebody stays in my way,

12   I'll just put a bullet in the person's head.  And this contract

13   has absolutely no meaning for me, and you have to do two

14   things, most importantly.  The first, you have to give your

15   5 percent to Saba right now, and the other 5 percent later on

16   we will tell you who to give to."

17        And then the second thing is the amount of the funds,

18   that he wants the 40 percent back to him from day one from when

19   we start receiving the money from the insurance companies.

20   Q.    So, he wanted some of the profits?

21   A.    He wanted some of the profits in advance, correct.

22   Q.    And what tone of voice was he using?

23   A.    Well, he was very, very out loud yelling and he was very

24   angry.

25   Q.    And very what?

1    A.    Angry.

2    Q.    And were you sitting or standing?

3    A.    We were on the side of it, so we were standing, both of

4    us.

5    Q.    Side of what?

6    A.    On the side of the building.

7    Q.    So, you were outside?

8    A.    Oh, yeah.  I didn't want to talk in front of my customers.

9    I told him, "Listen, you know, let's go on the side and see

10   what you want to tell me."

11   Q.    And what did you tell him?

12   A.    I told him, "First of all, we never discussed about giving

13   the percentages to Saba.  Why should I give the percentage to

14   Saba or I give percentages for someone else?  That's not what

15   we agreed on."  And the second thing, it's the customers next

16   to the building.  I told him, "Listen I got to talk with my

17   legal advisor and get back to you."

18   Q.    And how were you feeling during that conversation?

19   A.    I was shaking, I was shaking.  I almost -- I'm sorry.  I

20   almost peed in my pants when he was talking to me.

21   Q.    You mentioned Saba.  Who was Saba?

22   A.    Saba is the friend of David and Jaba.

23   Q.    Do you know his last name?

24   A.    I don't.  I don't remember his last name.

25   Q.    Had you met him before?

1    A.    I did, yeah.

2    Q.    And did he invest any money in Allied Health Clinic?

3    A.    No, he did not.

4    Q.    Do you know whether he was involved in Davis Health

5    Clinic?

6    A.    According to David, yes, he was helping him out with

7    transportation, moving the doctors back and forth, and that's

8    what David told me.

9    Q.    Was Saba supposed to work at Allied Health Clinic?

10   A.    There was never a discussion about Saba.  The first time

11   they brought up, that was in August.  Then in November they

12   brought up about Saba, that he has to work.

13   Q.    Did Jambulat Tkhilaishvili sign the agreement?

14   A.    Yes, he did.

15   Q.    And when he signed it did he have the full agreement?

16   A.    Yes, right there.

17   Q.    Now, you had mentioned that you went away after David came

18   back from Georgia.  Do you remember when that was?

19   A.    I believe it was September 13.

20   Q.    And how long did you go away for?

21   A.    I think it was two days or a little more.  Two days -- 15

22   days, I believe.  Two weeks or --

23   Q.    Two weeks?

24   A.    Yeah, about two weeks.

25   Q.    Who did you go away with?

1    A.    With my wife.

2    Q.    And your children?

3    A.    No.  No, I'm sorry.  I went by myself, so my wife was in

4    Armenia with my children.  I went there myself.

5    Q.    And where did you go?

6    A.    I went to Armenia first.  It was my wife's wedding.  Then

7    after that me and my wife, we went to vacation to Dubai.

8    Q.    And who paid for that vacation?

9    A.    I did.  It's my vacation.  I paid from my pocket.

10    Q.    And how did you pay?

11    A.    From my personal credit card account.  From my personal

12    credit card account.

13    Q.    Okay.  What kind of credit card did you have?

14    A.    American Express was my personal credit card.  I just

15    bought a ticket and I went.

16    Q.    And when you were there how did you pay for things?

17    A.    Some cash, some of my personal -- I used my personal

18    credit card, and some of it cash, some of it credit card.

19    Q.    What about a debit card?

20    A.    I might use it.  I don't remember.  There were certain

21    occasions when they don't take American Express I could have

22    used a Visa or MasterCard debit card.

23    Q.    Did you use any Allied Health Clinic monies to pay for

24    that vacation?

25    A.    No.  I didn't use a penny for it, no.

1    Q.   So, between August 23rd, when David Tkhilaishvili went to

2    Georgia, and September when did you come back?

3    A.   I want to say September 29th or 30th.

4    Q.   So, between the time when David Tkhilaishvili went away

5    and you came back from Georgia did you see him?

6    A.   See who?

7    Q.   David Tkhilaishvili.

8    A.   No, I did not.

9    Q.   And the Operating Agreements -- or let me back up.

10        The letter agreement, which was Exhibit 2 that we saw

11   earlier, did that spell out the salaries that each member of

12   the Clinic and the Health Management Group were to receive?

13   A.   Yes.

14   Q.   And do you remember what the salary was for each one?

15   A.   I believe -- I could look, but I believe $3,000 was for

16   David and $2,000 was for me, and that until we become

17   operational.  Then after that, when we become operational and

18   profitable, David is supposed to receive 4,000, and I agreed to

19   keep my salary the same, 2,000, afterwards.

20   Q.   And how were you to receive your salary?  Was it going to

21   be --

22   A.   Initially I was paying everybody from my personal account.

23   Everything was going out from my personal account.

24   Q.   How long did that last?

25   A.   I want to say until we received the occupancy,

1    approximately eight, nine months, plus/minus.

2    Q.   And did you receive salary during that time period?

3    A.   Initially I did, yes, at the beginning.

4    Q.   And did Allied --

5         MS. KAPLAN:  Could I just have a moment, your Honor?

6         THE COURT:  You may.

7                     (Pause)

8    BY MS. KAPLAN:

9    Q.   Did Allied Health Clinic eventually use a payroll company

10   for salary?

11   A.   Yes.

12   Q.   And what was the name of the payroll company?

13   A.   Granite Payroll.

14   Q.   When did Allied first start using Granite?

15   A.   I think David, I want to say in September of 2015 or

16   October of 2015.  September, I will say.

17   Q.   Do you know who owns Granite Payroll Company?

18   A.   The person's name David -- I forgot his last name.  His

19   name was David, but I don't remember his last name.

20   Q.   Okay.  And why did you use Granite Payroll?

21   A.   David is the one who introduced me to him, says he used

22   him before.

23   Q.   Did Allied Health eventually obtain a license to operate?

24   A.   Yes, we did.

25   Q.   Do you remember when that was?

1    A.    If I may take a look to refresh my memory.

2    Q.    I'm going to show you Exhibit 11, which is agreed upon by

3    the parties.

4    A.    I think it was in September, but I can check.

5          THE COURT:  Exhibit 11 is admitted.

6          (Exhibit No. 11 received into evidence)

7    BY MS. KAPLAN:

8    Q.    What is that?

9    A.    It was approved on September 23rd.  This is the approval

10   from the Department of Public Health as the recognition of

11   Allied Health Clinic as a clinic.

12   Q.    Can you just pull out the second page of that.

13   A.    I did.

14   Q.    And then the third.  Is that the actual clinic license?

15   A.    Yes, it is.

16   Q.    And it's dated September 23 of 2015?

17   A.    Mmm-hmm.  Yes.

18   Q.    Now, did Allied Health Clinic need to enter into a

19   contract with health insurance companies --

20   A.    Yes.

21   Q.    -- to pay claims for its patients?

22   A.    Yes.

23   Q.    Tell us about that.

24   A.    Well, the way healthcare works, in order for you to be

25   compensated for your services, you have to have what are called

1    the credentialing with the insurance companies, in other words,

2    be approved by them.  And we would submit our application.

3    They would review the application.  They would say, "Okay, we

4    accept you, and we will pay you for your services," or they

5    will turn around and say, "No, we are not going to accept your

6    application," and turn you back.

7    Q.   And did you enter into various contracts with insurance

8    companies?

9    A.   Yes, we did.

10   Q.   And do you remember with who?

11   A.   Well, yes.  It's MassHealth, Harvard Pilgrim, and

12   Commonwealth Care.  Also Medicare, Medicaid.

13          MS. KAPLAN:  With permission, your Honor, I would like

14   to show the witness Exhibit D.  It's a late exhibit, so it

15   wasn't agreed upon earlier.

16          THE COURT:  Is it agreed upon or not at this point?

17          MR. TUMPOSKY:  Yes.

18          MR. CRUZ:  Yes, your Honor.

19          THE COURT:  So, we would be making that Exhibit 29.

20             (Exhibit No. 29 received into evidence)

21   BY MS. KAPLAN:

22   Q.   Do you recognize Exhibit 29?

23   A.   Yes, I do.

24   Q.   And what do you recognize this to be?

25   A.   This is Medicare enrollment information for one of our

1    insurances.

2    Q.    And does it show the effective date of this insurance?

3    A.    July 1, 2015.

4    Q.    And did you say that you also entered into contracts with

5    Harvard Health?

6    A.    Yes, I did.

7    Q.    And do you know where Harvard Health has offices?

8    A.    I know they are nationwide.  They have an office in

9    Massachusetts, in Connecticut, New Hampshire, a few different

10   states.

11   Q.    Okay.  And with the Court's permission, I am showing you

12   Exhibit 12, and I ask whether you recognize this document.

13   A.    Yes, I do.

14         MS. KAPLAN:  And it's agreed upon, your Honor.

15   BY MS. KAPLAN:

16   Q.    What do you recognize it to be?

17   A.    This is the Harvard Pilgrim contract dated July 19th,

18   2016.

19         THE COURT:  And that is received.

20              (Exhibit No. 12 received into evidence)

21   BY MS. KAPLAN:

22   Q.    And looking at Page 2 on this document, do you see when

23   this agreement became effective?

24   A.    Yes.  Effective date November 1, 2015.

25   Q.    So, as early as July and then later in November Allied

1   Health Clinic had at least two forms of -- contracts with two

2   health providers, correct?

3   A.   That's correct.

4   Q.   And what did that entitle you to do, once you got the

5   various health insurance in place?

6   A.   Once we have the various health insurances in place and we

7   obtained the license from the Department of Public Health, we

8   were able to see the patients, do the services, and then we

9   could get reimbursement from the insurance companies.

10          MS. KAPLAN:  One more, if I could quickly do this,

11   your Honor, Exhibit 13, which has been agreed upon.

12   BY MS. KAPLAN:

13   Q.   Do you recognize this?

14   A.   Yes, I do.

15   Q.   What is that?

16   A.   That's the credentialing from MassHealth.

17          THE COURT:  And that is received.

18          (Exhibit No. 13 received into evidence)

19   BY MS. KAPLAN:

20   Q.   And that is another health carrier?

21   A.   Yes.  That's one of our major health carrier insurances.

22   Q.   And when was this effective as of?

23   A.   January 12th, 2016.

24          THE COURT:  Is this a break point?

25          MS. KAPLAN:  Perfect.

1      THE COURT:  So, we will break for lunch, ladies and

2  gentlemen, which should be waiting for you in the jury room.

3  We will try to get back here about 1:45 to continue with the

4  testimony.

5      THE CLERK:  All rise.

6      (The jury exited the courtroom at 12:57 p.m.)

7      THE COURT:  Just an update.  Where are we standing in

8  terms of time?  And let me tell you the initiative I was

9  thinking about, which is to go all day on Thursday, too.

10     MS. KAPLAN:  Go all day -- I'm sorry?

11     THE COURT:  Thursday.  But where do we stand?

12     MS. KAPLAN:  I think we're getting through this

13  witness, your Honor.  I think I probably have another hour with

14  him.

15     THE COURT:  So, how long for your case, I guess is

16  what I am trying to get at.  If I am going to go on Thursday I

17  want to tell the jurors ahead of time.

18     MS. KAPLAN:  Well, he is certainly the longest

19  witness.  The next four or five witnesses are relatively short.

20     THE COURT:  Tell you what, if you could think about

21  it, both sides think about it over the break.  I just want to

22  get an idea about it here.

23     MR. CRUZ:  Sure.

24     THE COURT:  All right.  We will be in recess and come

25  back at 1:45.

1        (The Honorable Court exited the courtroom at 12:59 p.m.)

2            THE CLERK:  All rise.

3        (The Honorable Court entered the courtroom at 1:48 p.m.)

4            THE CLERK:  This Honorable Court is now in session.

5    Please be seated.

6            THE COURT:  So, no more than two sentences each.  How

7    much longer?

8            MS. KAPLAN:  I think I was overly optimistic in that I

9    will go longer with this witness, which means we will probably

10   go until at least Friday.

11           THE COURT:  With your case?

12           MS. KAPLAN:  Yes.

13           THE COURT:  Even including a full day on Thursday?

14           MS. KAPLAN:  We may be able to finish by the end of

15   Thursday, your Honor.  We may be able to finish by the end of

16   Thursday.

17           THE COURT:  And then there is a defense case of some

18   length.

19           MR. CRUZ:  Yes, your Honor.

20           THE COURT:  A day or two?

21           MR. CRUZ:  I would say, to be on the safe side, your

22   Honor, two days, your Honor, two half days.

23           THE COURT:  Because I have got another trial to start.

24   You are not quite in the rearview mirror yet, but you are

25   getting there, and so that tells me as much as I need to know

1    at this point.

2            I think I will tell the jury that we would like to sit

3    on Thursday.  I do not like to disappoint them in the sense of

4    telling them something initially that they were going to work

5    9:00 to 1:00, and if there are objections, I will not sit the

6    full day on Thursday.  Okay?

7            THE CLERK:  All rise.

8        (The jury entered the courtroom at 1:50 p.m.)

9            THE CLERK:  Please be seated.

10            THE COURT:  You may continue, Ms. Kaplan.

11            MS. KAPLAN:  Thank you, your Honor.

12                    CONTINUED DIRECT EXAMINATION

13    BY MS. KAPLAN:

14    Q.   Mr. Torosyan, I think we are now into November of 2015,

15    and the Allied Health Clinic is seeing patients, correct?

16    A.   We started seeing patients on November, I believe it was

17    16 of 2015.

18    Q.   And at some point in November of 2015 -- correct?

19    A.   Yes.

20    Q.   -- was there an opening party at Allied Health Clinic?

21    A.   I believe the opening party took place in October, October

22    or November.  That was before we opened the doors.

23    Q.   I'm sorry.  You have to keep your voice up.

24    A.   Excuse me.  That was before -- definitely that was before

25    November 9th, the opening party was.

1    Q.   Okay.  And where was it?

2    A.   At the Clinic.

3    Q.   Who attended?

4    A.   Friends, family members.

5    Q.   The defendants?

6    A.   Defendants as well, with their parents and their friends.

7    Q.   And from the time that you came back from vacation at the

8    end of September until the opening party were you seeing David

9    Tkhilaishvili and Jambulat Tkhilaishvili?

10   A.   I seen David because he had an attorney next to my work.

11   I bumped into him a few times in Watertown, but generally for

12   the clinical-wise we seen him only one time November, I believe

13   it was 4th or 3rd, with Saba in Watertown.

14   Q.   When you bumped into David Tkhilaishvili was he always

15   threatening you?

16   A.   Well, when we were in Watertown on the street he did not

17   threaten me.  We were by the -- there was a building.  I was

18   doing renovation.  He just parked the car and went and we just

19   said, "Hi" and left.

20   Q.   And when was the next conversation that you can remember

21   with the defendants again about the demands that they were

22   making that you surrender your interests in Allied Health?

23   A.   Once we had a conversation that they asked me to have Saba

24   join the Allied Health Clinic --

25         MR. TUMPOSKY:  Your Honor, objection.

1          THE COURT:  Grounds?

2          MR. TUMPOSKY:  Clarity as to who is speaking.

3          THE COURT:  Okay.  So, I want you to develop that more

4    specifically.

5          MS. KAPLAN:  Okay.

6    BY MS. KAPLAN:

7    Q.   Who asked you?

8    A.   David asked me to meet in Watertown with him, his brother

9    and Saba.

10   Q.   And did you agree to do that?

11   A.   I did.

12   Q.   What was the purpose of the meeting?

13   A.   He want to discuss the situation with Saba.  He was going

14   to bring something about Saba, he told me on the phone.

15   Q.   So, what happened at that meeting?

16   A.   So, we went in, I believe it was on Arsenal Street.  We

17   met at the restaurant.  They asked me too if Saba was going to

18   join the Allied Health, and I was very clear to them, told

19   them, "Saba is not going to be a part of Allied Health."

20   Q.   And Saba was present at this time?

21   A.   Yes, he was.

22   Q.   Did they say why they wanted Saba to be part of Allied

23   Health?

24   A.   Well, they said, what David told me he worked a lot, he

25   did a lot of work to it, and he has to be part of it.  Plus he

1    gonna help him with his personal work at the marketing and

2    everything else for the Clinic.

3    Q.    And had Saba, to your knowledge, been involved at all in

4    Allied Health Clinic?

5    A.    No, he was not.

6    Q.    What was your response other than --

7    A.    My response was, first of all, before when people saying

8    something I want to understand the logic behind it, and I told

9    him, "David, when we started this negotiation up front there

10   was never discussed anything about Saba.  Why you bring that up

11   now?"  And I told him, "I am going to strongly stay on my

12   answer he's not going to be part of it."  Plus I haven't seen

13   Saba.  I can't see -- maybe he's a good guy, but I never seen

14   him working at anywhere else.

15   Q.    After that did you receive a phone call from one of the

16   defendants?

17   A.    Yes, I did.  So, David called me, and I remember the date.

18   That was next day of my opening party at the fitness center in

19   Watertown, which was November 8 he called me.

20   Q.    What's the fitness center in Watertown?

21   A.    So, that's a fitness center.  It's a regular -- it's a gym

22   I opened in Watertown, and I invited David and everybody else

23   to the party.

24   Q.    And you opened it in November of 2015 as well?

25   A.    No.  The opening date was November 8.

1  Q.   Okay.  And so, you received a phone call from David

2  Tkhilaishvili at that time?

3  A.   On November 8th.

4  Q.   And what did he want?

5  A.   He says, "Victor, there are a few things we have to

6  discuss about the Clinic, so we're going to be opening up the

7  Clinic very soon.  Please come to the Clinic tomorrow, and it's

8  going to be me and my brother."

9  Q.   And did you agree to do that?

10  A.   Yes, I did.

11  Q.   Did you go there the next day?

12  A.   I did go next day.

13  Q.   And that was November 9th?

14  A.   November 9th.

15  Q.   And tell us what happened.  Tell us who was there when you

16  got there.

17  A.   So, that was before getting calls, so what I do in early

18  November, I go to Cape Cod and turn the water off, and a friend

19  of mine came from out of state, and I told him, "Could you come

20  with me to help me out to close down the water and do winter

21  close-up in Cape Cod?"  And I told him, "On our way we're going

22  to stop by the Clinic for half an hour."  And he says, "Fine."

23  And the two of us, we went to the Clinic.

24  Q.   Who was the friend?

25  A.   His name is Levon Juylnazaryan.

1   Q.   Okay.  And how do you know Levon?

2   A.   I know him from since we were 14-year-old from back in

3   Armenia.

4   Q.   Do you know what time you got to the Clinic?

5   A.   I don't remember, no.

6   Q.   Was it during the day or at night?

7   A.   Day.

8   Q.   And what happened?

9   A.   When I parked the car, Jambulat was in the parking lot.

10  He was on the phone, and I just say, "Hi," and I walked inside,

11  and saw David, and I say, "Hi."  And the friend of mine came

12  with me, and I told my friend to wait either in the waiting

13  area or wait in the parking lot, because he can't come to the

14  Clinic, and --

15  Q.   Why couldn't he come to the Clinic?

16  A.   That's a violation of HIPAA.  You can't let anybody not

17  employed by the entity come to the Clinic.  So, I told him,

18  "You can wait anywhere you want, either the waiting room or the

19  parking lot," and I was waiting in the area.  Then Kenton was

20  there, and I went and I say, "Hi," and then after a few minutes

21  Jambulat came from outside.

22  Q.   Okay.  And where did you go?

23  A.   They took me, I believe, to the exam room, 1 the number

24  is.  It's next to the management office.  They took me there.

25  We went inside.  They locked the door, and they locked the

1    door, and they just went crazy.  Two brothers, they just went

2    absolutely crazy on me.

3    Q.    What did they say?

4    A.    Well, the first they said --

5                MR. TUMPOSKY:  Objection.

6                THE COURT:  At this point I think it is important to

7    identify the particular statements by the particular persons.

8                MS. KAPLAN:  I'm sorry.

9    BY MS. KAPLAN:

10   Q.    Tell us what was said by each of the defendants.

11   A.    Well, initially when they locked the doors, and I'm, like,

12   "What's going on here?"  And they started -- first Jaba

13   started.  He's, like, "Listen, I'm going to be leaving the

14   country in a couple of days, and prior to leave I want to make

15   sure you give your 5 percent of the bet to Saba, and you give

16   the 40 percent to us, and the other 5 percent we give to --

17   I'll let you know who to give to."  And they told me, "You have

18   no options, so if, God forbid, this is how it is, I don't care

19   about the way you want to solve it.  If you want to solve it

20   that way, and I will go so far, will 'F' up the person, and if

21   anybody, God forbid, stays in my way and I'll put a bullet in

22   his head."

23   Q.    Who said that?

24   A.    Jaba said that.

25   Q.    Were you seated or standing?

1   A.   All of us were standing.  They were by the door, and I was

2   inside.  Then David -- I didn't know Jaba, so I always keep a

3   distance from him, but I was surprised by David, and David

4   proved that Jaba's actions, and even he went crazy, and there

5   was a time he struck the table so bad that he came so close to

6   punch me.

7   Q.   With what?  What did he come close to punching you with?

8   A.   With a fist.  So, he say the same thing.  Then he turn to

9   his brother Jaba.  He's, like, "Jaba, this is the time we have

10   to get rid of him; otherwise he going to be a problem," and

11   I'm, like, really, David?  After all these year I've been like

12   a brother to you.  Is that what you're telling me, you're going

13   to get rid of me?  For, for, for what?  For money?"

14   Q.   And then what happened?

15   A.   Then, after that, Jaba come down to David, let David leave

16   the room.  David left the room, and Jaba says, "Victor, you

17   know, you are part of the family and you're a friend."  I'm,

18   like, "Man, I'm not a part of your family.  Family members,

19   they don't treat each other this way.  There was a time when I

20   thought we were part of it, but we are not.  And I can't give

21   you any answer about your demands, and I will talk with my

22   legal representative, and I'll get back to you."

23   Q.   What did he say?

24   A.   He says he doesn't care about the legal representative.

25   He lives -- he has his principle of the life, so, "You want to

1  talk to him, talk to him, and get back to me."  I'm like,

2  "Okay.  I'll talk to him and get back to you."

3  Q.   How long were you inside that exam room with the

4  defendants?

5  A.   I would say approximately 10, 15 minutes.

6  Q.   And how did you feel during that conversation?

7  A.   I don't think I ever been scared like that in my entire

8  life.

9  Q.   And where was Mr. Levon?

10  A.   I don't know where he was.  I'm assuming either outside or

11  parking lot, but when we walk out he was in the hallway when we

12  went outside.  I don't know where he was, but he wasn't in the

13  Clinic.

14  Q.   And when you left the exam room where did you go?

15  A.   When we went to the exam room, went through the hallway,

16  we went outside in the parking lot then and I saw Levon's face,

17  because he noticed that I wasn't right.  So, he's, like,

18  "What's going on?  What's going on?"  And I didn't want to talk

19  anything, and Jaba start again talking about that I have to

20  give up the percentages, and I was sort of trying to change the

21  subject, and then when I was on the side, then David came and

22  start talking to me.  I noticed that Jambulat opened up David's

23  black Mercedes.  In the front glove box he pulled a -- the

24  knife, put it in the pocket.

25  Q.   Did he show you the knife?

1    A.    No.  That was -- I -- the way he put it in the pocket,

2    that was really scaring me, so he didn't want me to see the

3    knife, so that made me more scared than he pulled a knife on

4    me.

5    Q.    Did the argument continue in the parking lot?

6    A.    It did continue for a couple of minutes, and I changed the

7    subject, and I told him, "I have to talk with my legal team and

8    I'll get back to you."  I didn't want to continue in front of

9    my friend.

10   Q.    Did they say anything to you about the police at that

11   time?

12   A.    Yes.  They asked me, like, "Are you --"

13   Q.    Who?  Tell us who.

14   A.    Jambulat says, "Are you going to go the cops?"  I told

15   him, "Perhaps.  I'll do what I have to do."  And they always

16   made it clear, even the first time when back in August

17   happened, David says, "Victor, you know, if you go to police or

18   you go to the court, you're not going to go anywhere, because

19   people gone in the past and they haven't got anything."

20   Q.    How did you get to the Clinic that day?

21   A.    I drove my vehicle.

22   Q.    And did you drive with Levon?

23   A.    Yes.

24   Q.    Did you have a gun with you?

25   A.    Absolutely not.

1   Q.   By this time in November how much money had you invested

2   in the Clinic?

3   A.   At that time was, I would say, close to -- over $400,000,

4   450,000.

5   Q.   And had either of the defendants invested any money into

6   the Clinic?

7   A.   No, they did not.

8   Q.   When was the next time you spoke with either of the

9   defendants?

10   A.   After that, when I went home we talked with David again.

11   Q.   You said, "We."  Who's "we"?

12   A.   I'm sorry.  I'm a little --

13   Q.   How did you talk to him?

14   A.   On the phone.

15   Q.   Did you call him, or did he call you?

16   A.   I don't remember, honestly.  I don't remember who called

17   who.  I think I called him.

18   Q.   What did you say?

19   A.   "Listen, what's going on?  Why are you doing this to me?,"

20   you know.  "This is all my life I put into this, and I trusted

21   you like a brother.  Why are you doing this to me?"  Then he

22   told me he has no control over his brother, and that's what it

23   is.  At that time -- and I was sort of confused.  I didn't know

24   that was his brother's idea or his idea.  I didn't know whose

25   idea it was to act like that.

1     And then I told him, "Listen," you know, "we're going

2    to talk with the meditator (ph), and we're going to go see

3    Bob."  And he says, "Victor, we don't need anybody to tell us

4    what to do.  My brother doesn't live by the contracts."

5    Q.    And by "Bob," do you mean Bob Griffith?

6    A.    Sorry.  Bob Griffith, yes.

7    Q.    How long did that conversation last?

8    A.    Maybe 10, 20 minutes.

9    Q.    What else did you talk about?  That's a long time.

10    A.    Well, talk about it.  First of all, I emotionally was

11    down.  You know, I told him, "Listen, I got two little kids at

12    home.  I don't know what to do, man.  Should I leave this

13    state?"  It was tough for me.  I mean, it's very hard for me.

14    You come home, you got kids home, and you put all the money,

15    then you get these stories.  I didn't know what to do.

16    Q.    So, did you make a decision at some point to do something?

17    A.    Yes.  I went to Bob Griffith, and I asked him, "Bob, this

18    can't continue.  This is what it is, and this is what I'm

19    facing.  I need some help."

20    Q.    And as a result of the conversation that you had with Bob

21    Griffith, did you go somewhere else?

22    A.    Yes.  I went to my attorney, and I told him the same thing

23    to my attorney.

24    Q.    Which attorney?

25    A.    Of Verrill Dana, and Andrew Rusczek and John Estad, as

1   well as Paul Shaw was there.

2   Q.   Those are all attorneys?

3   A.   All attorneys.  And I told him, "This is what happened."

4   They advised me to seek for the -- "Try to call the federal

5   agency, see if they were interested to help you."  And I told

6   them, "Please."

7   Q.   And after meeting with your attorneys, did you talk to the

8   FBI?

9   A.   Yes, I did.

10  Q.   Do you remember what day that was?

11  A.   I don't remember.

12  Q.   Was that still in November?

13  A.   It was in November, I believe, yes.  It was mid-November.

14  Q.   And did you tell the FBI what you have told this jury?

15  A.   I told them, the FBI, what happened, and I told them, "I

16  need my help.  I don't know what to do."

17  Q.   Did you agree to wear a wire and record conversations with

18  the defendants?

19  A.   Yes, I did.

20  Q.   And did you do that?

21  A.   Yes, I did.

22  Q.   How many times?

23  A.   I believe I did once with David and once with Jambulat.

24  Q.   Once or twice with David, or more than that?

25  A.   More than once, because we had to record I believe it was

1    twice with David, twice with David, once with Jambulat, I

2    believe.  I know Jambulat was once, but the Clinic I was going

3    in and out sometimes for the clinical issues, but I believe it

4    was with David once or twice, maybe once or twice.  I don't

5    remember exact.

6    Q.   And prior to meeting with the defendants to record these

7    conversations did you tell anyone that you were talking to the

8    FBI, that you talked to the FBI?

9    A.   I did.

10   Q.   Who did you tell?

11   A.   I talked with close family friend, Jack, and I talk

12   about the -- we have a common friend.  His name is Anzar

13   Tuhane (ph).  I talked to my family members.  I just told them,

14   "Listen, if something happens this is the story."  And I

15   believe I -- I believe I discussed that with Kenton and Olga as

16   well.

17   Q.   And do you know who Kenton Fabrick was living with at that

18   particular time?

19   A.   Yes, I do.  He was living with David.

20   Q.   Do you know how long he lived with David?

21   A.   I would say approximately six months.  Six months he lived

22   with David.

23   Q.   Why did you tell these individuals that you had gone to

24   the FBI?

25   A.   At that time I told them, "This is what happened with me

1   in my life."  And so I called the FBI.  And David and I'm not

2   going to have any, or with Jambulat I'm not going to have any

3   relationship with the business.

4   Q.   But why did you tell these people that you were working

5   with the FBI?

6   A.   Well, for a different part.  Kenton and Olga for the

7   business purposes, because there were a lot of issues we had to

8   discuss together, and I was always avoiding them or preventing

9   the meetings.  And the family members I told them, especially

10  my spiritual friend Jack, and I told them because, God forbid,

11  if something happens they know what's going on.

12  Q.   Directing your attention to November 25th, do you recall

13  meeting with David Tkhilaishvili on that day wearing a wire?

14  A.   Yes.

15  Q.   And do you know where you were?

16  A.   We were in the Clinic, yes.  I went in the Clinic.

17  Q.   Who put the wire on you?

18  A.   The FBI agent.

19  Q.   And was there a video on as well as audio?

20  A.   Yes, there was video and audio recording.

21  Q.   And tell us what happened at the meeting.

22  A.   I went to the meeting --

23  Q.   Who was there?

24  A.   Initially I went to the parking lot, and I put on the wire

25  as well as the camera with the agent, and I went to the Clinic,

1    and David was there.  And then we start talking about it, and

2    David came to me like always, and he start just going crazy,

3    and he told me about his outlaw friends, that, "Listen, this is

4    my outlaw friends, that they have control, and my brother Jaba

5    is very famous guy, the outlaws listen to his advices, and they

6    do what he tell them to do, and technically he shot the people,

7    and he does what he wants to do."

8    Q.    "He" who?

9    A.    Jambulat.

10   Q.    What language were you speaking in during this meeting?

11   A.    In Russian.

12   Q.    And have you listened to a recording of the meeting?

13   A.    Yes, I did.

14   Q.    And, in fact, when you listened to the recording did you

15   hear some things that were not -- well, did you review a

16   transcript?

17   A.    Yes, I did.

18   Q.    And did you hear some things that were not on the

19   transcript?

20   A.    What do you mean?

21   Q.    Were you able to fill in some of the blanks?

22   A.    There were a couple of changes, small changes I did, yes.

23   Q.    And did the recording that you listened to fairly and

24   accurately represent the conversation that you had with David

25   Tkhilaishvili on November 25th?

1  A.   Absolutely, yes.

2  Q.   And you have since reviewed that recording of the

3  conversation?

4  A.   Yes.

5  Q.   I show you Exhibit 19.

6       MS. KAPLAN:  If I may, your Honor?  It's in evidence.

7       THE COURT:  You may.

8  BY MS. KAPLAN:

9  Q.   Is that a transcript of the recording from November 25th

10  of 2015?

11  A.   Yes, it is.

12  Q.   And is that the transcript that you reviewed --

13  A.   Yes.

14  Q.   -- while you were listening to the recording?

15  A.   Yes.

16       MS. KAPLAN:  Your Honor, at this time I would ask to

17  be able to read certain portions of that transcript with the

18  witness while it's being displayed for the jury.

19       THE COURT:  Yes.

20  BY MS. KAPLAN:

21  Q.   So, if we can start with Page 2, Line 21.  And "VT," that

22  stands for "Victor Torosyan;" is that right?

23  A.   Yes.

24  Q.   And "DT" is David Tkhilaishvili?

25  A.   Yes.

Q.   So, you read your part starting with Line 21, if you would.

(READING OF TRANSCRIPT OF RECORDING, EXHIBIT 19, AS FOLLOWS - AS READ BY AUSA LAURA KAPLAN AND VAHAGN VICTOR TOROSYAN):

A.   Yes, you see, the most important thing is that here you need to work, like hmm, hmm, when we are meeting we start talking, hmm, regarding -- we go back and forth start saying that thing went this way here and things went that way there, hmm.  Those -- you see, our conversation always when we start talking like all about cuts, who and whatever, it is not the conversation we need.

Q.   I don't have those conversations with you here, never, and it's just --

A.   No, we had a talk here.  Last time when you and your brother, hmm, what you brought, closed the door and start -- started talking.  You know, it is not a professional.

Q.   We are the people who created the system over the past 12 years in order that everyone would know us, respect us, respect our words so that everything would be okay, and to know that one can't buy us, even with a hundred billion in our family and in our business, and around us we will be together.  We will be friends.  We will be friends and no one will be above us.

A.   And what does it mean "above us."

Q.   "Above us" means that, let's say we say this is how it's supposed to be, and someone says, "No, it's not."

1  A.   But when we started talking the very first day you came to

2  me, and I told you, "These are the conditions."  You agreed to

3  those conditions.

4  Q.   The conditions and the words I said to you I will never

5  forget.  Whatever I said 10 years ago I remember, and I listen

6  and I do it all in life.

7  A.   Hmm.

8  Q.   You know, today we are this way.  No one knows how it will

9  be tomorrow, and you know everything should be as it's supposed

10  to be, and the conversation was like this.  I asked you, and

11  that's why I created the Clinic.  You and I should be like one.

12  If we disagree we must agree.  We have to agree, because we

13  have had internal experience with each other for eight years

14  and everything.  We have trust and obligations towards each

15  other that we need to fulfill, both you and I.  Tomorrow, when

16  I put in 20,000,000, 5,000,000, 1,000,000 or $100 I will never

17  -- tomorrow there'll be a time, independence.  I will never

18  tell you I have the last word because --

19  A.   David, I'm saying this because in the past --

20  Q.   Well, you are saying or not saying.

21  A.   No.  Look, the past shows that any businesses you did

22  failed.  That's first.  And, secondly, you end up, hmm.

23  Q.   All my businesses succeeded.

24  A.   No, wait, please.  All your partners that you did business

25  with parted with you.  You always tell me that.

1    Q.    No, we didn't part ways.  It's just I don't feel that.

2    See, you can see yourself in a gas station business, right?  I

3    can't in a body shop, see myself in a body shop.  We all have

4    our professions.  I can't say, let's say, "David, go and fix

5    that car."  I'm just bringing an example.

6    A.    No, you --

7    Q.    Everyone does their thing.

8    A.    All your partners end up --

9    Q.    I just come in and set up management.

10   A.    It's through fighting.

11   Q.    No, not through fighting.  I never had partners.  I had

12   only managers.  Let's take Parzuki (ph), another one.  He can

13   live three centuries and not bring one percent.

14   A.    Why is that?

15   Q.    Because he doesn't have it in him.  He doesn't know

16   friendship, he doesn't know family, and he doesn't know the

17   street.  He knows --

18   A.    Well, it is business.  What does the street have to do

19   with it?  What are you talking about?

20   Q.    In business the street is very important.  When your guy

21   comes and you know that is $100 and he pays $85, but he will

22   get $120 for something that's $100, let him pay.  Now, the

23   system doesn't work that way.  When you do things that way you

24   end up having problems.  You shouldn't.  This one will pay, and

25   that one won't pay.  You may have a brother coming or someone

1  else -- well, you know, there is such a thing.  Then there was

2  an electrician that came, Yura.

3  A.   I understand.  But we have -- look, we have a contract.

4  Everything that we are, hmm, doing, we have to do according to

5  the contract, whatever we have.

6  Q.   We do have a contract and we are doing everything

7  according to the contract.  I don't have any problems with the

8  contract.

9  A.   Okay.

10  Q.   Speaking of contracts, what I say about the contracts is

11  that everything should be done according to the contract.  What

12  does it mean "according to the contract"?  You took out a loan,

13  and while you took out the loan --

14  A.   No, no, I'm not talking about that.

15  Q.   So?

16  (READING OF TRANSCRIPT PAUSED)

17        MS. KAPLAN:  Top of Page 5.

18        THE WITNESS:  Oh, I'm sorry.

19  (READING OF TRANSCRIPT CONTINUED):

20  A.   I'm talking about our operational agreement, our agreement

21  when we started.

22  Q.   Okay.  Regarding the operational agreement, regarding

23  everything.

24  A.   Okay.

25  Q.   Did you take anything?

1    A.   We have, we have, hmm, for example, we have it.  For

2    example, hmm, under the agreement, that I, let's say, have

3    40 percent, 42.5 percent now, correct?

4    Q.   Well, whatever there is --

5    A.   No, wait.  Now you want me to give 5 percent from my

6    interest to Saba, then to give 5 percent to someone else?

7    Q.   I don't want anything.  I have never talked about the

8    interest with you, Brother.

9    A.   Hmm, hmm.

10   Q.   You have talked to my brother.  I don't care about the

11   interest at all.  My brother gave me his interest, and I am all

12   set.  You and my brother talked, and he told you --

13   A.   Oh, well, I talked to him, and he told me that the same

14   that you had told me on the phone.  We don't live by the

15   contract.  We live on our way.  How does it work that way?

16   Q.   With you?

17   A.   Yes.

18   Q.   With you it's like that?

19   A.   How can you do that?

20   Q.   Because we entered in a business where contracts should

21   not exist between us, because the way things are going here are

22   such that we don't need contracts.  It should be you and I,

23   because everything is different here.  You will see the loss we

24   will have here in three months.  All the this and that.  Yes,

25   you made a contract with us.  That's fine.  I, uh -- it can be

1    like that for five years, if you want.  We don't care about

2    that.  Also, what we have here is that I wouldn't do that when

3    I have money in the future also, but you did that.  That's

4    fine.

5    A.   Yes.

6    Q.   By that you --

7    A.   You can't -- you can't manage money.  Your numbers --

8    Q.   That's true.

9    A.   You understand?  You --

10   (READING OF TRANSCRIPT PAUSED)

11        MS. KAPLAN:  Then going ahead to Page 9, Line 127,

12   starting with Line 127.

13   (READING OF TRANSCRIPT CONTINUED):

14   A.   You come to me, you come to me at the opening, and the

15   next day you tell me I had a manager and nine people disappear.

16   One killed himself.  My brother did this one.

17   Q.   I am telling you that, that I can do that.

18   A.   What can you do?

19   Q.   What can I do?  This is what I can do.  When I had

20   problems with those people in the office --

21   A.   Yes, hmm.

22   Q.   The ones I told you about in the office when I saw that

23   they wanted to hit --

24   A.   Hmm, hmm.

25   Q.   I just wanted to kill all five people right on the spot.

1   It was just a matter of a minute.  And my brother didn't let

2   me.  It took just a minute.  Something happened and they ran

3   away.  How is that possible?  But you won't be able to do

4   anything like that, for instance, because you are different.

5   I, I am different.  Let's say I cannot -- I was just standing

6   there, and they all ran away, and all five people don't live in

7   Boston.  I am just saying this.

8   A.   Well, yes, but we are doing business together.  Why are

9   you saying that?

10  Q.   I'm not saying this to you.  I'm not saying because we

11  want to scare someone.  I am telling you because you are my

12  partner.  We are together.

13  A.   Hmm.  Yes, what does it mean?

14  Q.   And so that you know to not end up in those situations, so

15  that you know that.

16  A.   What should I know?  Why the "f" do you need to know such

17  things, David?

18  Q.   Oh, Come on.  (Chuckles).

19  A.   Yes?

20  Q.   Like, really.  We'll kill those five people, damn it.

21  We'll catch everyone.  They will close down everything.

22  A.   Well --

23  Q.   And everything, man.  How can you not know all that?  You

24  should know everything.

25  A.   Yes, David.  I don't want to.

1  Q.   And the same things about my brother, the same things.  We

2  are different people.  Honestly, that's why we created all

3  this.  We fucking bought them here.  We put everyone in their

4  place, in short the way it's supposed to be so that all are

5  happy.  My family.  Kenton has been with us for three years,

6  and we are keeping an eye on everything.  Uh, Saba, he hasn't

7  seen his family for four years.  He worked with me and he

8  didn't take a dollar from me.

9  A.   Why?

10  Q.   Because --

11  A.   Let him work.  Why don't you -- I don't understand.

12  Q.   Look, we cannot work for other people.  We work for us,

13  Brother.  He works for himself now.  He does his thing.  He

14  helped me to create this.

15  A.   So, you are saying he's your friend, but then you say,

16  yesterday you told me he was not your friend.

17  Q.   He -- a friend is a different thing, you know what I mean?

18  He is a good person.

19  A.   You -- I haven't seen any friend that you have.

20  Q.   In America, I have a few friends in America.  That's one.

21  Then a friend is -- see, you tell me you have 50 friends,

22  right?  From those 50 only one may not stand up.  Let's say

23  someone shoots at you.

24  A.   Why shooting?  Why do you think that way?

25  Q.   For example, when you need money everyone should be by

1  your side.  When you have something --

2  A.   Well, when I needed money I took it.  And you --

3  Q.   No.  Taking is one thing.  When you say a word they all

4  have to come by and ask you what do you need, "How much do you

5  need?"

6  A.   Why?

7  Q.   If someone needs $2,000,000, do you think I could sleep at

8  night?  How can I do that knowing you need money, man?  I would

9  not be able to sleep.  I have no money, but I send to Saba in

10  order that, if something is needed.

11  A.   So, dear, honestly --

12  Q.   Friendship means something else for us.

13  A.   No, that's --

14  Q.   That's how friendships should be.  For example, I have

15  friends in Georgia.

16  A.   No.  You know what --

17  Q.   It only takes one phone call and I know that they will

18  come on foot and do whatever I need.  That's real friendship.

19  A.   But, you see, you aren't behaving properly.  You

20  understand?  You know, in front of, hmm, Olga you, hmm, want to

21  go off on -- you went off on Kenton.  Hmm.  You strike your

22  hand on the table, and here you do the same.  Why so?

23  (READING OF TRANSCRIPT PAUSED)

24  BY MS. KAPLAN:

25  Q.   Okay.  I'm going to stop you now, and if I may ask you,

1   back to Line 154, where you say, "Let's say someone shoots at

2   you," or David Tkhilaishvili says that, and then you say, "Why

3   shooting?"

4   A.   Yes.

5   Q.   The word for shoot, what is that in Russian?

6            MR. CRUZ:  Objection, your Honor.

7            THE COURT:  He may answer.

8   A.   Shooting, there are different -- you can use the words

9   "streelet" (ph), one, and "book book" (ph), and the different

10  words -- in slang -- they have other slangs.  If I read then I

11  can tell.  They have many slangs in the Russian language for

12  the "book book" that says there shooting as well.

13  Q.   But this word "shooting," when you first read this

14  transcript did you see that word?

15  A.   I believe it was a different word, and I changed it, and

16  if I may look at the old one I can remember what it was,

17  because in the slang they have different slangs, and I don't

18  know all the slangs.

19  Q.   Does it also mean drunk or drinking?

20           MR. CRUZ:  Objection, your Honor.

21  A.   No, no, no, no, no, no, no.

22           THE COURT:  Sustained on that.  It's a leading

23  question.

24           MS. KAPLAN:  Okay.

25  BY MS. KAPLAN:

1    Q.    Did you listen to the disc?

2    A.    Yes, I did.

3    Q.    And did you hear -- is this an accurate representation of

4    what you heard?

5    A.    It is the accurate representation, yes.

6    Q.    Okay.  Turning to Page 13, Line 181, we'll continue.

7    A.    Yes.

8    (READING OF TRANSCRIPT CONTINUED):

9    A.    David, you want to do business like they do it on the

10   street.

11   Q.    No, I don't want to do it like on the street.  I don't

12   want to do that.  I want us to make billions, and that we are

13   like other people who know how life works.

14   A.    Yes.  You know, you know, you know what the main thing is?

15   The thing is that, when you want to do -- when you want us to

16   be together you come to me, close the door and start

17   threatening me.  Why?  You walk back and forth, hitting things.

18   Why?  What's the point?

19   Q.    I hit things because my brother told me when I came that

20   Victor and I spoke and we agreed it is going to be this, this,

21   this and this way, and when those --

22   A.    I, I -- yes.

23   Q.    -- conversations started here, I told him, "What's going

24   on, man?  What's happening?  Why is it not that way?"

25   A.    Why don't you tell your brother, "Why does Victor have to

1   give his interest to other people?"  Did you ever tell him

2   that?

3   (READING OF TRANSCRIPT PAUSED)

4          MS. KAPLAN:  Okay.  And then turning to Page 15, Line

5   213.

6   (READING FROM TRANSCRIPT CONTINUED):

7   A.   When we -- every other time we talk both of you and your

8   brother say things like, "I'll burn this place, I'll break this

9   place," hundred times.  Why?  Why do you say such things?

10  What's the point?

11  Q.   Because we worked here for three years to create this

12  place.

13  A.   Hmm.

14  Q.   If for this place -- I told you this is our family.

15  A.   Hmm.

16  Q.   And this is our house.

17  A.   Hmm.

18  Q.   We grew up here.  We put everything in here we earned in

19  10 or 11 years.

20  A.   Hmm.

21  Q.   You put in half a million or 600,000 in a year, but we put

22  in three years and 1,000,000.

23  A.   Hmm.

24  Q.   All our money, all our -- all the debts, everything.

25  Everything has been put into this.

1  A.   Hmm.

2  Q.   And everyone, not just me.  Besides me there are ten other

3  people.

4  A.   Hmm.

5  Q.   Starting with Vakho, Tengo, everyone worked hard here and

6  did everything.

7  A.   Hmm, hmm.

8  Q.   This is our family business.

9  A.   Hmm.

10  Q.   In our family business we know how all of this is done.

11  A.   Hmm.

12  Q.   If someone does something that we may not like or approve

13  of, everything will be destroyed and fucked up.  That refers to

14  our relationship in the business.  That's why we don't want

15  anyone, and that's why we are alone and always have to, what do

16  we say?  That we -- that's why with our partners or people our

17  word is law.  The word is important.

18  A.   Dav, Dav, we are not on the street.

19  Q.   That's it.  That's why.

20  A.   In business?

21  Q.   No, no, wait.  The word is --

22  A.   It is --

23  Q.   It's not the street.  The word is --

24  A.   No, no, no.

25  Q.   -- a man's thing.

1    A.    You are wrong, Dav.

2    Q.    Wait.

3    A.    A man is not --

4    Q.    Wait, Victor.  They will ask everywhere.

5    A.    Ask whom?  Where?

6    Q.    You have to give a word.

7    A.    What are you talking about?

8    Q.    Not here.  We will sit down at a restaurant.

9    A.    Hmm.

10   Q.    We will come together.

11   A.    Hmm.

12   Q.    And if I didn't do something for you --

13   A.    Who?

14   Q.    -- something else will happen?

15   A.    What do you mean "something else will happen"?

16   Q.    The word is worth a billion for me, Brother.  I don't know

17   if it is not the same for you.  Then --

18   A.    I, I --

19   Q.    -- then, then we will talk in a different fashion.  Then

20   we will be partners and we will do business, business.  You

21   will have yours and --

22   A.    David, either, either, either way, either way, either way

23   this is how it is with us, our relationship.

24   Q.    And either way, if that's the case, then a lot has to

25   change.

1    A.   Yes.  We --

2    Q.   A lot has to be done.

3    A.   We -- we don't have friendly relationship anymore.  We

4    don't.

5    Q.   Yes, yes.  Well, friendly relationship.  I don't know what

6    you think, but a friendly relationship in a minute like this I

7    shot a friend.

8    A.   You shot a friend?

9    Q.   Yes.  Well, it happened.  We were drunk, and he, he hit me

10   and did that thing, and then we are friends and we will always

11   be friends.  If for eight years we were friends there is no

12   excuse for these kinds of conversations.  A decision has to be

13   made.  Okay?  You do understand that it was difficult for me,

14   right?

15   A.   Well, look --

16   Q.   So, come, come.  There is no problem here.

17   A.   How can -- how can one shoot a friend?

18   Q.   Well, uh, and hit each other, and I had a gun, and I

19   fired.  What's the problem?

20   A.   What do you mean?  That's a big problem.

21   Q.   Well, that's how it is.  These things happen.  He's

22   childhood friend.

23   A.   Well, that's not normal.

24   Q.   Well, whether it's normal or not, it happens, sometimes

25   this way and sometimes that way.  But let all of this go.

1  Well, we remained friends.  Are you telling me you have never

2  hit a friend?

3  A.    A friend?

4  Q.    Yes.

5  A.    Of course I haven't.

6  Q.    Well, how come?  Sometimes it happens that you --

7  A.    Hit a friend, David?

8  Q.    You do something, like you would be drunk and would do

9  something fucking crazy.

10 A.    Well, how can you hit a friend?  Tell that we will --

11 right there.  (Background voices).

12 Q.    You would be drunk, and you would do a fucking crazy

13 thing.  You need to come to your senses a little.  Everything

14 happens.  This happens and that happens.

15 A.    Look, David, you -- even now that --

16 Q.    There is nothing here.

17 A.    We just started the business.  You are saying that you

18 went, hmm, somewhere recently, hmm, and met up with people and

19 showed them a gun.  Why the "f" would you do such things?

20 Q.    I need to.  First of all, I always carry a gun with me.

21 A.    Always?  You always carry a gun with you?

22 Q.    Always.  I always carry a gun with me.  That's first.

23 A.    But you don't have a gun license.

24 Q.    I have a license, and I have other kinds, too.  That's

25 first.  Secondly, secondly, my brother has a license and other

1    kinds too unregistered.  That's that.  That's first.

2    A.    Both of you?  Both of you have both legal and --

3    Q.    Both of us.  That's first, yes.  That's first.  Secondly,

4    when I go to places like that, I always carry it with me.

5    A.    A gun?

6    Q.    Yes.  Why not?  That's the problem?

7    A.    Well, you don't have a right to have it on you.

8    Q.    Why can't I?

9    A.    If you run into problems, you will get arrested.

10   Q.    No, I won't get arrested.

11   A.    How so?

12   (READING OF TRANSCRIPT PAUSED)

13   Q.    I think you have Line 303, for you.

14   A.    Oh.

15   (READING OF TRANSCRIPT CONTINUED):

16   A.    Yes, but you need to understand.

17   Q.    It won't create a problem for you.

18   A.    Look, you are talking to me and you are telling me that

19   you -- you understand I'm doing business with you, and you are

20   saying that I'm talking to you and your brother, your brother.

21   You told me on the phone your brother told me, told me on my

22   face, "We don't live by the contracts we live by, hmm, well, by

23   our ways and the ways we see it."

24   Q.    No, no.

25   A.    We have a co -- co-- contract, contract.

1    Q.   So what?  We have a contract, a contract we have with

2    people and how we need to carry ourselves, that's all.  What's

3    the problem?  We have a contract.  That's good.  All is good.

4    Whatever we agreed upon with you we have to make a decision on

5    all of that and finalize it.  That's all.  There is nothing

6    else there.

7    A.   Dav, you see, when you know that your partner, hmm, is,

8    you see, you are telling me such things that we are working

9    together, we are in a business together and --

10    Q.   Look, here in a word, whatever we have here I know

11    everything, and I will set things up in here in such a way that

12    no one -- just stand and observe.

13    A.   David, you don't have a, hmm, basic education, a simple

14    education.

15    Q.   I don't need education.  What I have --

16    A.   Of course you do.

17    Q.   -- no one has here.  Yesterday I told Joan what to do, and

18    she was fucking shocked, all of the finance information.

19    A.   Well, they --

20    Q.   Wait, wait.  I had this company.  I have everything here.

21    If there's a problem or something happens, you tell me.  I will

22    set up things here in such a way that --

23    A.   Well, to tell every time, every time --

24    Q.   Your money, look --

25    A.   Every time, every time these conversations and threats, it

1  just kills me, David.

2  Q.  Conversations -- no, I came to you and I told you and

3  that's how it was supposed to be so that you and I --

4  A.  Well, yes.

5  Q.  -- so that you and I are one company.

6  A.  David, when you do those -- do you understand?

7  Q.  You and I --

8  A.  Do you understand what a partner is?

9  Q.  You and I --

10  A.  A partner is when people communicate.

11  Q.  No.

12  A.  That's what a partner is.  I have a partner now.

13  Q.  I have --

14  A.  Excuse me, excuse me.  I have a partner now, Kostya.  I

15  sit down and talk to him -- a guy -- talk to the guy.

16  Q.  Well, come on.  Kostya, Kostya, may God keep him in good

17  health.  He is a different person from a different life.  We

18  are different people.  Kostya --

19  A.  How different?

20  Q.  Uh, four centuries will pass, four centuries, 400 years.

21  A.  Hmm.

22  Q.  And in this business --

23  A.  Well, what does business have to do with this?

24  Q.  Shouldn't be working.

25  A.  I'm talking about the business.  I'm talking about the

1   human relationship, David.  Do you understand?

2   Q.   I am telling you to leave all this behind.

3   A.   David, look, there is --

4   Q.   So that you, you would be respected, and you --

5   A.   David, look, there is more and if -- yes, if -- educate

6   yourself a little.  For example, read the Warren Buffett works

7   and Charlie Munger.  Those people have billion-dollar

8   companies.

9   Q.   You see, you want to make your money, don't you, and make

10  the company work?

11  A.   No, David.

12  Q.   I can't read that Buffett.  I --

13  A.   David, these are different problem that you can't --

14  Q.   -- set up things so that everyone would make money so that

15  everything would be fine and so that everyone would be happy.

16  A.   Yes.  Our money.  I -- I don't want to go to jail because

17  of the way we make the money --

18  Q.   To jail?

19  A.   What?

20  Q.   People made $10,000,000 --

21  A.   Hmm.

22  Q.   -- in a year or two, and no one went to jail.

23  A.   But, Dav, dear, I don't want to live like that.  I don't

24  live --

25  Q.   No one lives like that.  Here, ten people do one thing

1   that -- this is not what I pay for.  I don't need a big staff,

2   but I specifically do everything so that we all -- so that we

3   have all the notes and everything we need, you know, so that

4   everything would be correct so that we don't lose $1 and never

5   go to jail for that.

6   A.    Dav, dear, what you say, hmm --

7   Q.    Those conversations --

8   A.    The way you behave yourself as a business partner and as a

9   human being is not normal.

10   Q.    That's because when I don't like something, like it was

11   with Fabrick, right?  When I didn't like something I could have

12   stepped back.  If I don't like something I do this right on the

13   spot because --

14   A.    What do you say you do?

15   Q.    Well, Fabrick, for example, he started this bullshit,

16   started it, well, childish talk when he was drunk.  He started

17   saying like things, "I will leave and Olga will too," this and

18   that, and I could, you know, say, "Well, okay, where would you

19   go," this and that.  But I did the opposite.  I tell him, "If

20   you leave I will fuck you.  Go ahead."  Something of this

21   nature, you know.  That's not our style, and that's why I do my

22   part.

23   A.    You live like a street thug and not like a businessman,

24   David.

25   Q.    A street thug, really?  He owes me.  I put $200,000 or

1    $300,000 in for him, and he wanted to destroy everything here.

2    So, I just drinking --

3    A.    Dav --

4    Q.    That's not going to fly here.

5    A.    Dav, do you understand in the business, look, like I told

6    you before you opened the place, and as soon as you opened it

7    you took a vacation for three months.  I don't know any

8    businessman in the world that opens a business and takes a

9    three-month vacation right away.

10   Q.    No.  I took my vacation and went because it was needed,

11   and, uh, my life needed that.

12   A.    David, I'm like, like a businessperson, and I know that

13   when you have a brand new business you don't take three months

14   off.  I -- and that's why I fell apart.

15   (READING OF TRANSCRIPT PAUSED)

16   Q.    Okay.  And if I could just ask you, when you're talking

17   about that he took three months off for vacation, are you

18   talking about Allied Health?

19   A.    No.  He's talking -- we're talking about Davis Health, PC.

20   Q.    Davis Health Clinic?

21   A.    Davis Health Clinic, yeah.

22   Q.    And when you were referring to "Fabrick," was that Kenton

23   or Kurt Fabrick?

24   A.    Kurt Fabrick.

25   Q.    Do you know who Kurt Fabrick is?

1  A.   I never met him, but I believe he is the brother of Kenton

2  Fabrick.

3  Q.   And was he involved in Davis Clinic?

4  A.   Yes.

5  Q.   And you mentioned somebody by the name Kostya.  Who is

6  that?

7  A.   Kostya, he's my partner at the gym.

8  Q.   At the gym?

9  A.   In Watertown, yeah.  And, if I may, and I believe the word

10  on the pass was, on the slang was booknich (ph).

11        MR. CRUZ:  Objection, your Honor.

12        THE COURT:  I am striking the answer.

13        You are only to answer questions that are put to you.

14  Don't volunteer information.

15  BY MS. KAPLAN:

16  Q.   So, I'm looking at Line 364 on Page 23, where it says, "So

17  I just drinking."

18  A.   Yes.

19  Q.   Is that the word?  Is that what it said, "drinking"?

20        MR. CRUZ:  Objection, your Honor.

21        THE COURT:  He may answer this question.

22  A.   I believe -- it says "drinking" here.  I don't remember.

23  I don't remember.  I just don't remember.  I don't remember.

24  Q.   Okay.  That's fine.

25        Okay.  Turning to Page 27, Line 440, and I'll start

1  with, "Today or tomorrow.  I came to you?"

2  (READING OF TRANSCRIPT CONTINUED):

3  A.   You came to me 20 times, and I turned you down 20 times.

4  Q.   Yes, that was before.  Last time when I came to you I told

5  you about my idea and said, "Victor, there is money in this.

6  If you have money invested, it will be like this and this and

7  this.  You will be in satellites, you will be in management."

8  I opened everything for you.

9  A.   Hmm.

10  Q.   Okay.  All this.  You, from here from there, you said

11  33 percent and 40 percent.  Well, I didn't start negotiating.

12  I don't like negotiating.  Then this and that happened.

13  Whatever it was, 40 percent or 33 percent, I didn't have a

14  problem with that.  Later you talked to my brother and agreed

15  upon 40 percent.

16  A.   Your brother, your brother came to me at work and he want

17  me to take out my 10 percent and give to Saba and other people.

18  Why should I do that?

19  Q.   Well, if not, then you should tell him, "Jaba, we can't do

20  this in five minutes."  You should have said --

21  A.   Well, he came to me at work.  What could I --

22  Q.   When he came you should have told him, "Sorry, I am at

23  work now.  Let's meet in the evening."

24  A.   Right.  Well, listen --

25  Q.   Instead of giving him your word.

A.   Okay, I get it.  But what do you think, why should I give
my 10 percent to Jaba?

Q.   It doesn't matter.  You --

A.   If I tell you, "Give me all your interest," will you give
it to me?

Q.   I will tell you that, uh, if you, you wanted to take all
the interest, put it under your name and leave us nothing.
Remember that?  But if you tell me that you need 5 percent and
explain that you need that to sell everything, then I would
tell you --

A.   To sell it whom?  You are telling me that your interest --

Q.   I may.  I may tell you --

A.   You can give it to --

Q.   I may tell you that I may say, "Yes," I may say, "No," and
I may say whatever it is.  I will not tell you "Yes" and
then --

A.   Dav, you understand in any normal business partners don't
talk about things like, "If it doesn't work out I'll burn the
place up, if it doesn't work out, I will destroy it."  They
don't say things like that.

Q.   We don't say things like that.  We do say that if
something here doesn't work out the way we want --

A.   Hmm.

Q.   We won't be here, and you won't be here, and there won't
be because --

1   A.   But what will be?  What will be?

2   Q.   Because what will be, what will be is that our souls will

3   be empty, and when our souls are empty --

4   A.   Hmm.

5   Q.   -- who the fuck knows what will be then?

6   A.   But what?  What exactly?

7   Q.   Well, I don't know.  It can be anything.  Who the fuck

8   knows?

9   A.   What does, "Who the fuck knows," mean?

10  Q.   Well, I don't know.  Well, anything can happen.  Maybe we

11  will end up kicking everyone out of here, everything --

12  A.   What do you mean kick out?

13  Q.   Well, I don't know.  Let's say we may tell Fariba (ph),

14  "Fuck you.  Get the hell out of here."  For example, anything

15  can happen.  Or maybe we will do something to you.  Maybe --

16  A.   But what will you do to me?

17  Q.   Well, I don't know.  I cannot tell you.  God forbid if I

18  turn against you what would you do?  The same goes for you.

19  A.   Well, what would I do?  I wouldn't do things like that to

20  you.

21  Q.   Would you just sit at home?

22  A.   No.

23  Q.   If you don't have power in you, that's the fucking end of

24  it.  That's why I want to --

25  A.   I won't sit at home.  There are laws, and I will do

1  everything according to the law.

2  Q.   Look, today doing things by law may take 20 years, so you

3  may say something, and I may say something else, and God

4  forbid, but in a word that's not going to work.  Instead of

5  sitting and having this conversation here, we could have the

6  insurance a week ago.  We don't have the insurance because of

7  these conversations.  I swear on my mother's life we are

8  different people.  We are God's children, and whatever happens

9  to us comes from up there.  We are honest towards God and in

10  life and everything.

11  A.   So how --

12  (READING OF TRANSCRIPT PAUSED)

13  Q.   No, no.  Stop there.  I just want to ask you, who is

14  Fariba (ph)?

15  A.   Dr. Fariba (ph) was our initial professional service

16  director.

17  Q.   He was working at Allied Health?

18  A.   He was working at Allied Health.

19  Q.   Okay.  And then turning to Page 42, Line 719.

20  (READING OF TRANSCRIPT CONTINUED):

21  A.   You made a contract, entered into the contract.  You took

22  a 6,000 and 5,000 and made a new contract with Hang and went to

23  Georgia.  You need it for your nerves.  You, hmm, had no right

24  to draw a new contract with Hang.  You didn't tell me a word

25  about it.  You didn't show me a single contract.  You took

1  11,000.

2  Q.   Look, look.  I'll tell you everything now.

3  A.   Go ahead.  Tell me, please.  I'm listening.

4  Q.   I told you that we needed to pay Hang in July $22,000.

5  A.   Right.

6  Q.   Otherwise he would want -- okay?

7  A.   Yes, and I put the money, put the money so that --

8  Q.   $22,000.  Wait.  Yes.  We needed to pay Hang $22,000.  In

9  order not to pay Hang, I would talk to him so that we could pay

10  all the -- and I transferred your $11,000 to September and took

11  my $11,000 out of Hang's money.

12  A.   But, David, do you understand what you have done?  You

13  took it from the company.

14  Q.   Yes.

15  A.   You took the money from the company which we were supposed

16  to pay him in September.

17  Q.   Uh-huh.

18  A.   You took the money from the company, and you were supposed

19  to pay Hang, and you didn't pay Hang, and you still haven't

20  paid him.

21  Q.   Well, I didn't pay Hang.  What can we do?

22  A.   What?

23  Q.   Well, we have big expenses.

24  A.   Well, everybody has expenses, David.

25  Q.   Wait, wait.

A.   I don't have money either.  Do you understand what the

point is?

Q.   If you don't have money, look, money --

A.   When I met you I had a perfect life.  Then --

Q.   Okay, okay, because we don't have money, and that's why I

do everything to take money from other people, too.  I have

five people now --

A.   Hmm.

Q.   -- who want to invest money.  If you want --

A.   Who are those five people?

Q.   Wait.  If you want, they can give it to us by charging

interest.  If you want, they can give it to us on interest, and

we will pay back the interest.

A.   Dav --

Q.   If you want, will buy interest?

A.   Yes.  You know, all of your people, I really don't want to

meet anyone.  I'm sick and tired of your people.

Q.   Well, if you are sick and tired, then don't bring up the

money issue.

A.   Okay.

Q.   Yes.  In order to get money --

A.   You take 11,000 David.

Q.   Wait.  I take $11,000.

A.   How about the telephone, my phone?  I paid for five people

for entire year, and when I bring it up to you, you tell me,

1  "Shame on you bringing up the subject."

2  Q.   Please don't talk about the telephones anymore.

3  A.   Why not?

4  Q.   Well, because --

5  A.   $6,000, $7,000 is big money.

6  Q.   No, no, no.  $6,000 or $7,000 is big money, yes.  It

7  wasn't $6,000 or $7,000.

8  A.   It was six, six, six.

9  Q.   It was $250 for five months.  It's $1,000.

10  A.   No, no, no.  It was 11 months.  I counted.

11  Q.   Okay.  Write that down also, please.  You will take that

12  back too, and I don't want to hear about the phones again

13  anymore.

14  A.   Dav, do you understand, you take things --

15  Q.   I swear on my mother's life no more.  That's it about the

16  telephones.  Whatever happened, forget it.  It's ending in

17  April.  Forget about it.

18  A.   Olga's car is on the credit card.  Why should I pay her

19  personal car insurance?

20  Q.   No.  Regarding insurance, I told you that --

21  A.   I told you all that before.

22  Q.   -- we owe her money, and she said that --

23  A.   No, no, you didn't -- you did it prior to that also,

24  David.  You did that prior to that also.

25  Q.   I never did it.

1   A.   You did it, David.

2   Q.   In November she had a cancellation.

3   A.   David, you are telling the truth -- you are not telling

4   the truth.

5   Q.   And she used --

6   A.   David, dear, prior to that you paid from the company money

7   and --

8   Q.   Look, you know my situation this year, but I haven't spent

9   $1 on my personal expenses, not a dollar.  I did everything and

10   didn't alarm you.

11   A.   What's there to alarm me for?  You --

12   Q.   What alarm?

13   A.   And I -- I sucked all my blood out of me.  You sucked all

14   my blood out of me.

15   Q.   50,000.  You should have just given me a minimum of

16   $50,000 as a gift.

17   A.   I should have given you 50,000 a gift?

18   Q.   Yes, at a minimum.

19   A.   You are insane, David, I swear.

20   Q.   If you bring me an idea like that, I will give you

21   $100,000 as a gift.

22   A.   You, you are crazy, I swear to God.

23   Q.   No, I'm not crazy.

24   A.   You say such things that --

25   Q.   That's right.  I gave you $30,000 in a heartbeat.

A.    You have not given me a penny in your life.  For six years
I have known you, you have not given me a penny as a gift, and
you want me to give you a gift?

Q.    You sound like you are unhappy here.  Is that so?

A.    Yes.

Q.    Yes?

A.    I'm not happy with you, David.

Q.    Okay.  If you are not happy, then let's talk, and you can
take your money, and it's your life.  It's up to you.  What can
I do?

A.    David, the thing is that I put up the money.

Q.    The thing is that I don't want people to be unhappy here.
It's the opposite.  People should be happy and --

A.    Well, how can I be happy with you when every time I talk
to you, you say, every other word you say, "I'll burn down the
place up.  I'll shortly speak.  I had nine people whom I kicked
out."

Q.    I never tell you -- I don't repeat it many times.  I --

A.    You told me everything then, David.

Q.    The day before yesterday I said --

A.    Right here.

Q.    Wait.

A.    What did you say?

Q.    What I told you is --

A.    You told me that you had a manager.  I quote you.  Is that

1    correct?

2    Q.    Yes.

3    A.    Who was a problem, correct?

4    Q.    Yes.

5    A.    You told me he ended up dying, and the second one was

6    deported back, correct?

7    Q.    Yes, yes.

8    A.    Those are your words.

9    Q.    Yes, it did happen to both of them.

10   A.    Yes, it did happen to both of them?  Hmm.  If I am with

11   you, I'm your partner.  When you tell me such things, then that

12   means the same will happen to me?

13   Q.    No.

14   A.    So, why you tell me such things?

15   Q.    He stole my money.

16   A.    So, if he stole your money you should kill him, hmm?

17   Q.    No.

18   A.    Then you tell me --

19   Q.    He stole my money.

20   A.    Yes, but --

21   Q.    I forgave him for that and just let him go, and later he

22   went after, wanted to come after me, to come after us.

23   A.    Yes, to come after you, and then you made a contract to

24   have kill him?

25   Q.    No, I didn't make a contract to have anyone killed.

1  A.   Hmm.  Common.

2  Q.   We didn't make a contract to have him killed.  He, uh --

3  they fucked up his mom, and he just went crazy afterwards,

4  started shooting up drugs and ruined his life.

5  A.   And then you tell me, "My brother is crazy, I can't

6  control him.  He went to the neighbor's house and shot the guy

7  in the head," did this and that.

8  Q.   It was an accident.  When, uh, the police -- and he shot

9  seven times nine bullets at people.

10  A.   At people?

11  Q.   Yes, it happened.

12  A.   Well, look, if you tell me such things, what do you want

13  me to think?

14  Q.   No, because you, you wait, you are a person who --

15  A.   What person?  I'm your business --

16  Q.   You understand life.  Wait, wait.

17  A.   What's there to understand?  David, dude --

18  Q.   Understand life, understand life.

19  A.   David, do you understand I started to work with you, we do

20  business.

21  Q.   Wait.  All normal people understand that everyone has a

22  background, you understand?  Everyone has a background and

23  everyone has all kind of stuff, but we don't do something just

24  for nothing.

25  A.   David, I am talking to you.

1    Q.   Everything.

2    A.   And you tell me, uh, "We will get together, we'll go to

3    ten thieves-in-law, let them resolve the problem."

4    Q.   I never told you that.

5    A.   You told me that.

6    Q.   Never in life have I said "thieves-in-law."

7    A.   "I will bring ten thieves-in-law to tell you that you are

8    wrong."  I am repeating your words.

9    Q.   No, I didn't.

10   A.   And your brother said that same.

11   Q.   I didn't, no.  My brother said that thieves-in-law don't

12   have the last word on us.  That's first.

13        And, secondly --

14   A.   You told me, "Atenk (ph), go ahead, go to Atenk, to ten

15   thieves-in-law."

16   Q.   I went to -- I went to Atenk to get this business, and,

17   fuck it all, I could get that without that, but I don't want it

18   to be on my soul.

19   A.   You -- you went to Atenk?

20   Q.   Yes, I was in -- I was in Ukraine, and I was in Moscow

21   and --

22   A.   Who did you go to?

23   Q.   To everybody.  Twenty thieves-in-law have been informed

24   about my business, twenty, twenty people, and they will control

25   the entire world.

1   A.   But, Dav, you understand you do such abnormal things --

2   Q.   Well, that's how you get in this business.

3   A.   David, you are a thug.  You know that?

4   Q.   You won't get in.

5   A.   Act like a businessman, not like a thug.

6   Q.   You won't get in.

7   A.   What do you mean?  What are thieves-in-law?

8   Q.   They won't let you.

9   A.   Why won't they?

10  Q.   No way.

11  A.   Listen, who are the thieves-in-law that let you?

12  Q.   Who are they?  They were those who gave the idea, and he

13  was stopped, and that's all.

14  A.   Dude, Dav, dear, you have been watching movies like that.

15  Q.   And he would be stopped for life.

16  A.   I don't know.  Either you watch movies or --

17  Q.   No, I don't watch movies.  We are people who, God forbid,

18  if someone tries to go against us, we go against them.

19  A.   Against me?  Are you going to go against me now?

20  Q.   No, no.  Against you?  If you go against us, God forbid.

21  You get it?

22  A.   I get what?  What are you going to do?

23  Q.   Against -- well, like I told you, one can't tell what will

24  happen.  No one knows what will happen.  That's why everything

25  should be done nicely in a normal fashion.  Let's say, man,

1   literally, he was my partner, friend, man, he said some

2   bullshit, and he got cut right in Downtown Boston, man, Arno,

3   man.  How could he get cut?  The whole idea was in my hands.

4   How could --

5   A.   Listen, do you understand these are abnormal things

6   that --

7   Q.   Because he said bullshit.  He was drunk and he said

8   bullshit.  He shouldn't have said that, and when you say

9   bullshit you have to pay for it.  I'm not saying to pay by

10  being cut or killed or, uh, in a word, in Downtown Boston.

11  A.   It's not normal.  Your brother is crazy too.  How can you

12  do things like that?

13  Q.   That's why he is nicely getting his ticket soon, and he

14  will leave for Ukraine for good.  He will never go to Boston

15  again.  That's why before he leaves he wants to --

16  A.   Dav, dude, you know what?  I'm so tired of this.

17  Q.   Everything.  Set everything up, transfer everything, and

18  everything will be okay.

19  A.   You just -- you got me into this whole thing to just use

20  me.  That's what it is.

21  Q.   Oh, come on.

22  A.   I know you.

23  Q.   To use -- you think I am using you?  I don't take a dollar

24  from you.  Eight months --

25  A.   You don't take -- you don't take it?  You are lying.

1    Every month you take your salary upfront, upfront, the $3,000

2    upfront, upfront.

3    Q.   It doesn't matter if I take it upfront or --

4    A.   It does matter.

5    Q.   If there is money, what difference does it make?

6    A.   Yes, it makes a difference, a big difference.  It is not

7    your money.  It is my money.

8    (READING OF TRANSCRIPT PAUSED)

9    Q.   I just want to stop here and ask a few questions.  Back on

10   Page 42 you start talking about entering into a contract with

11   Hang.  Who is that?

12   A.   Hang is the general contractor who David hired to do

13   renovation at Allied.

14   Q.   Okay.

15        THE COURT:  Ms. Kaplan, is this a good place to take a

16   brief break?

17        MS. KAPLAN:  Sure.

18        THE COURT:  Okay.  So, we will take maybe a ten-minute

19   break, ladies and gentlemen.

20        THE CLERK:  All rise.

21        (The jury exited the courtroom at 2:55 p.m.)

22        THE COURT:  So, we will take five, ten minutes.

23                    (Recess taken)

24        THE CLERK:  All rise.

25        (The Honorable Court entered the courtroom at 3:08 p.m.)

1          THE COURT:  Ready for the jury?

2          MS. KAPLAN:  Yes, your Honor.

3          (The jury entered the courtroom at 3:09 p.m.)

4          THE CLERK:  Please be seated.

5          THE COURT:  You may continue, Ms. Kaplan.

6                    CONTINUED DIRECT EXAMINATION

7     BY MS. KAPLAN:

8     Q.   Mr. Torosyan, during that last section of the transcript

9     that we were reading there was some conversation between you

10    and Mr. Tkhilaishvili about the telephone, and he tells you not

11    to talk about the telephones anymore.  Do you recall that?

12    A.   Yes.

13    Q.   Can you tell us what the situation was with the

14    telephones?

15    A.   Well, when Olga came to me back in May and told me about

16    that, and I start checking things out on David, and one of the

17    important things I find out, that he used the telephone for

18    five lines for -- and paid that from my account, from the

19    business account.

20    Q.   So, when you say he paid it from your business account --

21    A.   He paid from the credit card, I believe, and the credit

22    card paid by my personal account.

23    Q.   Okay.  So, what credit card was it?

24    A.   My personal -- oh, Olga's American Express, I believe,

25    initially it was.

1    Q.   And who had possession of that card?

2    A.   He did.

3    Q.   "He" being who?

4    A.   David Tkhilaishvili.

5    Q.   And how did you know that he was using the American

6    Express card in Olga's name?

7    A.   Well, two ways.  The first thing I did, I started checking

8    into the statements on American Express, and on the statement I

9    noticed that it was in a file in the management office, and I

10   noticed the bills.  I believe it was AT&T.  And I asked him,

11   "What is this AT&T bill?"  Then I start doing a little more

12   checkup, and I find out that those are the phones he used for

13   five lines.

14   Q.   Did you have a company phone?

15   A.   No, I never did.  I used my personal cell phone.

16   Q.   Did anyone have company phones?

17   A.   No, just him and --  he had, and Kenton didn't have.  I

18   didn't have.

19   Q.   And how many phones were being paid for?

20   A.   Five.

21   Q.   Over what period of time?

22   A.   As far as I find out, maybe it was earlier, from day one

23   until May, when I discovered that he promised me he gonna stop,

24   and I sort of believed again, and then again I noticed that on

25   September.  Then I sort of stopped that, and I told Olga to

1    cancel her account; "I'm not going to pay anymore for that

2    credit card."

3    Q.    So, the American Express account you told him you

4    canceled?

5    A.    Yes.

6    Q.    But you were paying the American Express bill in Olga's

7    name that David Tkhilaishvili had possession of with your

8    personal monies?

9    A.    Correct.

10   Q.    And why didn't he want you to talk about that anymore?

11   A.    About?  About the phones?

12   Q.    The phones.

13   A.    Well --

14        MR. TUMPOSKY:  Objection.

15        THE COURT:  Well, if he knows.  If he had a

16   conversation where it had been revealed to him.

17   BY MS. KAPLAN:

18   Q.    Had you had prior conversations with David Tkhilaishvili

19   about that?

20   A.    I -- I talked to him in May, and I told him, "David,

21   that's the wrong thing to do."  He asked me apologies, and I

22   told him -- he said, "That will never happen again," and then

23   the same thing happened months later.  And for him it's

24   nothing.  For him it's thousands, nothing, phones are nothing.

25   Everything is nothing.

1    Q.   Because it's your money?

2    A.   It's my money.  It's not his money.

3    Q.   And then you say on one page, "Olga's car is on the credit

4    card.  Why should I pay her personal car insurance?"  What was

5    that about?

6    A.   When I was checking the statement I noticed some sort of

7    payment towards the account, and I asked him, "What is that?"

8    And David said, "She had to pay the --" Olga's personal car

9    insurance.  I told him, "Why do I have to pay Olga's

10    insurance?"  And David says, "We didn't have no money.  We used

11    that."  David told me he didn't have money to pay Olga's car

12    insurance.  He used the credit card to pay.

13    Q.   Do you know why he would be paying Olga's car insurance?

14    A.   God knows.  No.

15    Q.   So, did you pay for Olga's car insurance?

16    A.   Well, he did pay it in the past, yes.  I did.

17    Q.   He paid it with what?

18    A.   What he did, he used the credit card for transaction.

19    Then he would pay the credit card outstanding balance from my

20    account, from my personal account.

21    Q.   So, when you say he used the credit card, he used the

22    American Express card in Olga's name --

23    A.   Yeah.

24    Q.   -- and then that bill was paid with your personal money?

25    A.   Correct.

1    Q.   And going to Page 48 at the bottom, Line 843, do you see

2    at the bottom where you say, "And you tell me we will get

3    together, we'll go to ten thieves-in-law and let them resolve

4    the problem."  What is your understanding of what

5    "thieves-in-law" are?

6    A.   Well, in the old U.S.S.R., the criminal world, everything

7    being sold by what is called the thieves-in-laws, and if any

8    dispute on the street, they get involved and solve that.

9    Q.   And then you talk about going to -- you're asking -- he

10   tells you that he went to Atenk, and you said, "You went to

11   Atenk?"  What is "Atenk"?

12   A.   Atenk is the Greece, the capital of --

13   Q.   Athens?

14   A.   Athens, yep.

15   Q.   And after that David Tkhilaishvili is talking about

16   somebody, it sounds like -- I thought it was, "Arnak cut right

17   in Downtown Boston."  Arno.  Do you know who he is talking

18   about there?

19   A.   Yes, I do.

20   Q.   And who is that?

21   A.   That's one of the community guys.

22   Q.   What's a "community guy"?

23   A.   In the Armenian community in Watertown.  That's how I know

24   him.

25   Q.   And had you heard anything about Arno prior to your

1   involvement in Allied Health with David Tkhilaishvili?

2   A.   David, yes.  David himself told me they had a business

3   together and they had a dispute.

4   Q.   And did he tell you what happened?

5   A.   He did not personally tell me what happened.

6   Q.   But here in this conversation he's telling you that he got

7   cut in Downtown Boston?

8   A.   Arno got cut, yes.  His brother got cut.  Down in the road

9   when I learned from two people about Arnok, and I asked him, I

10  asked the same to Olga, and I heard that from Saba as well, and

11  I asked him.  He says, "There were issues, and he didn't behave

12  properly, and my brother had to cut him."

13  Q.   "My brother" being who?

14  A.   Jambulat.

15  Q.   And then turning ahead to Page 55, Line 971, starting with

16  reading on Line 971.

17  (READING OF TRANSCRIPT CONTINUED):

18  A.   You're not normal.  You, hmm, will either scare them or

19  you will beat them up.

20  Q.   What do you mean I will scare them?  Why would I?

21  A.   You knocked Kristina out right in front of the people in

22  the office, so people, people are scared.

23  Q.   Wait, wait.  No one is scared of me.  Everyone knows my

24  personality, those who know and everyone knows how to do

25  everything.  I don't beat anyone up for nothing, and I don't do

1  anything to anyone.

2  A.   But do you understand you have no right to touch her?

3  Q.   Wait.  To touch who?

4  A.   Kristina.  You hit her in the office in front of staff.

5  You can't do that.

6  Q.   In front of Kenton.

7  A.   In front of Kenton.

8  Q.   It's ours, and she made me do that, and uh, anyway,

9  because --

10  A.   Well, so you might get agitated and hit me also.  You are

11  not normal.

12  Q.   Wait, wait.  Mistakes.  When I told her fucking ten times

13  that her money was supposed to be returned, it was something

14  else here.  She's an idiot, and that idiot almost lost $95,000.

15  A.   Come on.  What does an idiot have to do with this?

16  Q.   Because when you tell someone once, twice, three times --

17  (READING OF TRANSCRIPT PAUSED)

18  Q.   Okay.  And then turning to Page 59, please, and Line 1046.

19  (READING OF TRANSCRIPT CONTINUED):

20  Q.   "We have a nice, clean, normal life."

21  A.   He doesn't.

22  Q.   Everyone, thieves listen to us, people listen.  It takes a

23  phone call to Georgia and the word goes out.  Let's say if

24  people are killing each other we make a phone call and our word

25  is all it takes.

1   A.    Hmm.

2   Q.    That's it.

3   A.    Hmm.  But that's too bad if that's the case.

4   Q.    That's how it is in my family.  That's it.  Because that's

5   how we roll.  That's first.

6          Secondly, a friend like Saba, let's say all your fifty

7   friends combined can't do what Saba can do alone, but as a

8   friend -- you know what a friend is?  It's the one who you will

9   stand for till the end.  You know, he may do something that

10   will hurt me later, and then he will stop being a friend, and

11   that's why --

12   A.    Dav, Dav, that's why I'm telling you.

13   Q.    The same thing when in a quiet place.  You know, they want

14   to do everything.

15   A.    You tell me you have five, five, five friends.  From five

16   friends name one.  You didn't name one yet.

17   Q.    In Boston?

18   A.    Yes.  Hmm.

19   Q.    In America?

20   A.    You told me you have five friends.  Name one, please.

21   Q.    In America I have my brother, like I told you.

22   A.    No.  A brother is a blood brother.

23   Q.    The rest of them are friends, like friends, not this kind

24   of friend.

25   A.    So, you don't have friends?

1  Q.   Well, what do you mean I have no friends?  I have Vakho,

2  Tengo, Irakliy, Revaz, Zurab.  They're all mine.  When I go

3  home I have Rasha.

4  A.   Oh, come on.

5  Q.   Who else do you want?  I have Miro.  I have about twenty

6  people in New York.  I have Bakha, the thief-in-law.  He's our

7  brother, our brother.  When I'm in Georgia --

8  A.   Who?

9  Q.   Bakha?

10  A.   Whose Bakha?

11  Q.   He's our friend in New York, a thief-in-law.  Uh, when

12  left -- he lived with us for three years in Batumi.  We brought

13  him in.  Anyway --

14  A.   Of course, our friend, our brother, he controls

15  everything.

16  (READING OF TRANSCRIPT PAUSED)

17  Q.   No.  You missed Line 1071.

18  A.   Oh, I'm sorry.

19  (READING OF TRANSCRIPT CONTINUED):

20  A.   In New York there is a thief-in-law and he's your friend?

21  Q.   Of course, our friend, our brother.  He controls

22  everything in New York and everywhere.  But, anyway, besides

23  that this kind of friend is a different thing.

24  A.   For example, I don't --

25  Q.   A friend, a friend.

1    A.   I don't have friends that are thieves-in-law.  I live a

2    normal life.

3    Q.   Well, that's how we grew up.  What can I do?

4    A.   You understand?

5    Q.   They are good people.  They don't do anything bad.

6    A.   I'm not saying they are bad, but you understand in

7    business I don't think we should have people like that

8    involved.

9    Q.   Well, they don't come to business establishments here.

10   The person who came here was my father.  Peter, who is building

11   churches, he consecrated it.  Thieves-in-law don't come here,

12   and there is none of that here.  It's when the thieves, when

13   someone informs about something, then they -- everyone has

14   their business.  Everyone has their position.

15   A.   Dav, dude, I don't know.  You just, you know, you live a

16   street life, and that, hmm, is what scares me a lot.

17   Q.   Well, I live an honest life, not like you do everything

18   today, and tomorrow someone will backstab you.

19   (END OF READING OF TRANSCRIPT)

20        MS. KAPLAN:  At this time, your Honor, I would ask if

21   we could play the portion that we just read so that the jury

22   can hear for themselves and see the video of this portion.

23        THE COURT:  Yes.

24        MS. KAPLAN:  And I believe that's 19-2.

25                  (Video played)

BY MS. KAPLAN:

Q.   Okay.  Directing your attention to November 30th, did you

meet again with defendant David Tkhilaishvili where you were

wearing a wire?

A.   When?

Q.   November 30th.

A.   I believe I was, yes.  It was that date.

Q.   And who put a wire on you?

A.   FBI Agent Kristin.

Q.   And was there a video as well?

A.   The initial time you're talking about?

Q.   No, this is the second time, November 30th, now.

A.   Second time.  I don't remember the second time.  I really

don't remember.  If I may read it, if I show, it brings me

memory.  I really don't remember.

Q.   Okay.  I'm going to show the witness Exhibit 20 in

evidence and ask did you review that transcript?

A.   Yes, I reviewed this.

Q.   And did you listen to the tape with the transcript?

A.   Give me one second.  Yes, yes, yes, yes, yes, yes.  I

remember, yes.

Q.   And what language are you speaking in during that

conversation?

A.   Russian.

Q.   Do you remember having that meeting now with David

1    Tkhilaishvili?

2    A.    Yes, I do.

3    Q.    Can you tell us if you recall what happened during that

4    meeting?

5    A.    Well, we talk about the percentages and we talk about the

6    general what happened that day.  So, that's what we discussed.

7          MS. KAPLAN:  All right.  I'm going to ask, your Honor,

8    to do the same thing, read certain portions of Exhibit 20 with

9    the witness.

10          THE COURT:  Yes, you may.

11          MS. KAPLAN:  Starting with Page 2, Line 26, and I will

12    start with DT, being David Tkhilaishvili.

13    (READING FROM TRANSCRIPT OF RECORDING, EXHIBIT 20):

14    Q.    If just one, just one percent hears something, he is

15    Armenian, and that will be the fucking end of it.  A Georgian?

16    He doesn't know anything, but an Armenian, he knows very well.

17    You know how you need do this business?  Quietly so that no one

18    knows, to sneak in and out and that's all.  Basically like

19    that.

20    A.    But what would it change that you would need to be so

21    sneaky?  She hasn't done anything, has she?

22    Q.    Wait, wait.  That's because this is a general clinic.

23    A.    Hmm.

24    Q.    One that is closely monitored by the DEA.

25    A.    Well, let it be.

1  Q.   And everything.

2  A.   For Heaven's sake.

3  Q.   No.  Well, yes, for Heaven's sake.  Everything should be.

4  A.   That's good that it's being monitored.

5  Q.   There should not be even one complaint.  God forbid

6  tomorrow the person has 40 percent and he will shoot someone.

7  A.   Who will he shoot?

8  Q.   Let's say Jaba, for example.

9  A.   Jaba?  Well, tell him he can't shoot people.

10  Q.   I know that, but his brain is not working.  If the

11  person -- anyways, I told him just that, man.  I told you a

12  hundred times already.  It has been that the person was close

13  by and do it together and then see what --

14  A.   Tell me why there, hmm, you are saying that he'll shoot.

15  Why should you shoot?  Tell him, "Well, man, are you crazy or

16  what?"

17  Q.   Well, you can't explain him that.  If the person sees that

18  it's like that, that's why I didn't -- it was -- he said before

19  that regarding the financing his final word would be needed.

20  There won't be.  But you did everything, and that's how the

21  conversation started.

22          And the second thing was regarding this.  When he came

23  you could have told him, "Jaba, this is a very serious subject.

24  Let's talk after five o'clock or tomorrow.  I am going to

25  Armenia.  When I return we will."  You shook his hand, and

1  that's it, that's all.

2  A.   Dude, Dav, I was there.  I was the one who talked to him,

3  and I know what I said.  You are saying this as if you were

4  there.  It didn't happen the way you are saying.  (Ringing

5  sound).

6  (READING OF TRANSCRIPT PAUSED)

7       MS. KAPLAN:  And then turning to Page 8, Line 118:

8  (READING OF TRANSCRIPT CONTINUED):

9  Q.   "Look what we've done.  Fucked two doctors, two doctors.

10  One was stripped of his license, and the other one we are

11  working with the DEA now.  Yes, the prosecutor's office is

12  working on it.  We are going to fuck him soon.  Plus, plus, we

13  got the office, we brought in Bob, we brought in you and set

14  everything up.  Now we're up and running.  God willing, we have

15  done that.

16  A.   Well, you, you tell me, you --

17  (READING OF TRANSCRIPT PAUSED)

18  Q.   No.  Line 119 on Page 8.

19  A.   Sorry.  Sorry.  I had the wrong page.

20  (READING OF TRANSCRIPT CONTINUED):

21  A.   What two doctors?  What are you talking about?

22  Q.   They fucked Fabrick and the Pakistani?

23  A.   Oh, the Pakistani is working here.

24  Q.   Well, he -- Fabrick is in basement.  Pakistani works.  The

25  DEA is working on it.  The prosecutor's office is working on it

1   and is working on it.  We're going to fuck them over, the

2   Pakistani and all of them.  We are going to lock them up at

3   least for six months.  It just costs a little money.  They're

4   all working.  I have all the CDs and everything.  You don't

5   know what they're going to do with him.  They're going to fuck

6   him over.  He will bring a half a million dollars, and there

7   will be everything.

8   A.   Well, will you make him bring the money?

9   Q.   Of course.  They are going to make him pay and everything.

10  As for Fabrick, he will never get his license back, but the

11  Pakistani will go to jail.

12  (READING OF TRANSCRIPT PAUSED)

13  Q.   Do you know what David Tkhilaishvili is talking about

14  there, the Pakistani?

15  A.   Well, as far as I remember, down in the road when we start

16  having the Clinic, and time to time I want to understand what

17  went wrong on his previous practice, so he told me there was a

18  guy from Pakistan, and I don't think he ever mentioned the

19  name.  He always called him "Pakistani."  And he and Kurt

20  Fabrick had a dispute with him, and he made Kurt Fabrick lost

21  his license.

22  Q.   Okay.  And turning to Page 17, Line 276.  Are you on

23  Page 17?

24  A.   Yes.

25  (READING OF TRANSCRIPT CONTINUED):

1    Q.    Yes, we need to straighten this out for Kenton, and, look,

2    I also, you know, was getting everything incorrectly.  You get

3    the first check at the end of the month, then one in the

4    middle, and then again at the end of the month.  I was getting

5    once for the entire month.

6    A.    Well, you, you tell me, you come before it begins that you

7    want your salary for the entire month up front.

8    Q.    Yes, but --

9    A.    And you did that not once but a hundred times.

10   Q.    Well, for example -- yes, but that was a mistake.  You

11   guys get -- you get -- let's say Kenton gets $4,500 and I get

12   3,000?

13   A.    Well, that's because you, you, your job cannot be compared

14   to his job.

15   Q.    That's a mistake.

16   A.    You think you do the same thing?  I don't get it.

17   Q.    No, no, no.  Kenton gets $1,500, and I get $1,500.

18   A.    Where did you get 1,500?  He doesn't get 1,500.

19   Q.    Well, he was getting it for two weeks.

20   A.    Oh, you mean for two weeks?

21   Q.    Yes.

22   A.    Yes, I see.

23   Q.    Yes.  And you guys were getting yours on the 30th, the

24   15th and the 30th, so for three pay periods you were getting --

25   Kenton gets 4,500.

1  A.    And I'm getting 3,000.

2  (READING OF TRANSCRIPT PAUSED)

3  Q.    No.

4  A.    Oh.

5  (READING OF TRANSCRIPT CONTINUED):

6  A.    Ooh, ooh.

7  Q.    And I am getting 3,000.

8  A.    But your salary got 4,000 extra before that, and you got

9  other things, and you got everything.  You got that much

10  already, David.

11  Q.    No, no.  I got bonuses, but that's a different thing.  I

12  am talking about this.  Now it's the end of --

13  A.    And you also put the apartment up as a rent office.  You

14  already did so many things, you know.

15  Q.    That's because the apartment --

16  A.    Oh, come on, man.  Stop it.

17  Q.    If you look at all of this, where Christmas comes and then

18  I spoke to Sao, Sao tells me that 10 percent is not a problem.

19  We will give what's needed.  And he also says that there are a

20  couple of other people, so that if we want more money later he

21  can work it out.  In short, he will find it and bring it for

22  10 percent or even less.

23  A.    Simply Ja -- you need to hold yourself together and not

24  get rattled and do things like that, to be professional and do

25  your job.  You don't need to.  Hmm, no.  You don't need to,

1  hmm, on the table, hmm.  You don't need to do that, you know.

2  Q.   Who told you that?  Why did I slam on it?

3  A.   You don't need --

4  Q.   That's because I told him that --

5  A.   Dude, if you, hmm, if you, you had something, then you

6  wouldn't right on the spot.  Why do you?

7  Q.   Man, you told him that you -- you with me stood on my

8  side.  We told him, "Just wait for now about this percentage

9  until, until MassHealth comes in, until, until --"

10  A.   Later.

11  Q.   And later, whatever he told you, sit down and make a

12  decision.  Plus, I was drinking with friends all night, and

13  when it all -- this and that, I wasn't feeling good, and when

14  we started these conversations, these conversations kill me.

15  A.   David, but before that you hit Kristina before the staff

16  also.  You did that and went off on Kenton.

17  Q.   These conversations, these conversations --

18  A.   You need to conduct yourself properly.

19  Q.   Properly, yes.  I -- what I do properly, as I see it, I

20  have my job, I do my -- whatever you tell me to do, I have to

21  do it.  What we cannot have between our parents and our

22  everything, this, this and this, that's our whole life, man.

23  We all got in.  I don't know if you know everything.  It was a

24  fucking mess, man.  One hundred patients came in, 20,000,

25  25,000.

1  A.   What are you saying yourself?  You are saying that Jaba,

2  hmm, one needs to understand his mindset, you know?

3  Q.   Yes, but don't tell him that, tell what to do.  But then

4  things come at him from here, from there, from everywhere.  He

5  said he went and celebrated -- we went and celebrated.  You

6  know how we celebrated Saba's 5 percent?  We celebrated it in a

7  big way.  That's because he -- we always wanted -- I offered

8  him.  I swear on my mother he refused it.  That's why I put in

9  Nato.  I wanted to put in Saba.

10  A.   And Nato.  Who is Nato anyways?

11  Q.   Nato is our relative who --

12  A.   You owe her money?

13  Q.   We do owe her money.  That's first.  And also she is a

14  nurse?

15  A.   How much money did you take from her?

16  Q.   Well, about $70,000, in short.  She is studying to be a

17  Registered Nurse, and she will be with us tomorrow or the day

18  after tomorrow, and also, if anything, I wanted that.  But,

19  brother, I swear I didn't want to get Saba in at all.  I know

20  that Saba is the kind of person --

21  A.   Dude, you brought Saba a few days later.

22  Q.   Huh?

23  A.   You brought Saba.  It all happened.  You had this planned

24  out, because Saba appeared from out of blue.  "This is Saba,

25  and I'm going to be 5 percent."

Q.   He came, and I swear to God, I swear on -- Jaba made that
decision himself, too.  If I also knew our -- that's it, in
short.  He decided that for himself and said, in short, "David,
he said, there is God in this life, right?"  And this guy for
three years, three years, man, every day, you know how he
lived?  He took, uh, stupid pills because he had --

A.   Hmm.

Q.   Yes, then.  I didn't know, very serious.

A.   Dude, if he is taking pills like that --

Q.   His neurosis was going through the roof.  It was
impossible.

A.   He's taking pills like that, and you want him to come here
and --

Q.   No, not now, man.  It was then.  He is relaxed now,
doesn't smoke cigarettes anymore, and he's smart.  He does
everything.  Just tell him how he needs.  Before it wasn't.
Every day we got emails about court, about this, about that.
He was fucked up.  Four guys came over here.  He was sitting in
the room writing a restraining order.  You know what he wrote
about me?  It was fucking bad.  I -- everything for him.  They
were fucking shocked, man.  It was all Saba.  Bob and I -- in
short, it was *War and Peace*.  Did for him for $10.  Can you
imagine, they were fucking him for eight months?  At the same
time we kept the office.  I went to Georgia, my home was put
for collateral.  $1,100 just to pay for the amount.

1    A.    You take money from everybody, you understand?  You owe

2    Kristina, you owe Nato.

3    Q.    Kristina?  Put 110,000 --

4    A.    Dude, everyone, you understand?  Debt, debt, debt.

5    Q.    Look, put 110,000 --

6    A.    You owe Olga --

7    Q.    Look, put 110,000.

8    A.    You owe me too.

9    Q.    This faggot did this.  What can I do?

10   A.    What can you do?  Hmm.  We started work.

11   Q.    We need to, we need to -- and hire professionals, and we

12   need to know --

13   A.    Oh, dude, come on.  If you were professional everything

14   would be -- everything would be -- why did we start this

15   conversation the first day?  Everything was just fine before

16   that.  We went and celebrated at the North End, and in the

17   morning gave them to sign, and the two brothers went off on me.

18   Q.    Yes.  Look, he knew that you had the last word on that

19   here.  Then, when we started on the agreement, we told him, and

20   he said, "No," and then these conversations started here.

21   That's because I told you there also, I told you there,

22   "Victor, all the finances, all the money that you invested as

23   an investor -- "

24   A.    Yes, but I told you from the first day that I wanted it

25   this way.  If you didn't want --

1   Q.   But that way, that way, I didn't want, I didn't have a

2   clue about that.  I didn't know such a project at all, how it

3   works.

4   A.   Also, you to people -- there were cases where you also to

5   people -- we will talk about that later.  I'd tell you more.

6   Q.   Man, like I told you, there is God, there are people and

7   there is life.  Everyone has their thing.  I never -- somebody

8   else's -- I asked Kristina, "How much do you have?"  She says,

9   "I have 14,000 left," right?  I gave 96,000 when I -- besides

10  that there was 20,000 for this, then 150,000 for that.

11  A.   From the company -- when you went to Georgia you said

12  about 150-200,000.  How much did you take from the company all

13  together, 150, 200, as you said before?

14  Q.   How much did I take?

15  A.   Yes.

16  Q.   Uh, took 300.

17  A.   300,000.

18  Q.   And all that money started coming since January.  Before

19  January it was like that, you know.  We were paying all the

20  debts, this and that.  Well, I managed, man.  That's why I hit

21  her, Kristina, you know?  48,000 and she sent it.  She was not

22  supposed to send it.  $48,000, man.  Then I went and stopped --

23  A.   Yes, you understand you hit one in the Clinic, man.  It's

24  a serious thing.  You could have been sued for that and just

25  fucked up.

1   Q.   I knew it, but anyways, when -- look, when something goes

2   wrong in the Clinic he comes in the morning, you know, he's so

3   mad.

4   A.   Who?

5   Q.   Fabrick.  He's mad, sits there and -- "Don't fire, don't,"

6   things like that.  You know?  Ah -- oh, in a word his madness

7   transferred onto me, you know?  Olga then took me outside and

8   said, "David, please," this and that.  You know, she calmed me

9   down.

10   A.   David, the problem is that when you get upset at the

11   moment, like I'm telling you, you shouldn't ever have any

12   weapons on you.  You can -- at the moment you are capable of

13   doing anything to anyone.  There I -- I had never seen you like

14   that.  The way you went off on me, I thought you were going to

15   -- me right there.

16   Q.   Uh, why did I hit?

17   A.   Ooh, ooh.

18   Q.   Had it been someone else in her place -- if the person is

19   an idiot -- you know what it is for him?  Life.

20   A.   For me, for me, you went off on me.

21   Q.   No, no.

22   A.   Not him.  If you talked to him that would be different

23   story.  You went off on me.

24   Q.   I did that so he wouldn't start anything here.  I did that

25   so that -- I wanted to talk to you.

1    A.   You went off on me.  If you were talking to him I wouldn't

2    understand, but you went off on me.

3    Q.   Well, why shouldn't I be talking to him?  I told you that

4    he -- now is not the time to talk.  I couldn't tell him that.

5    A.   Why not?  Tell him, "Listen, control of yourself."

6    Q.   No.  He would ask, "How come?  You gave your word, did you

7    this and did that.  That's it, we are done."  I just told him,

8    "Wait."

9    A.   Dude, just so that you know, I never gave him my word,

10   never in my life that --

11   Q.   This is what he told:  "David, he said, everything must be

12   as -- "

13   A.   He came over to me.  I just wanted to close the subject at

14   that moment, because there were clients and everything.  I

15   couldn't --

16   Q.   That's not how you close a subject.

17   A.   Of course that's how I close it.

18   Q.   No, no, no.

19   A.   Man, I never told him that I agreed with his conditions.

20   You have that personality, and so has Jaba.  You guys think

21   that whatever you say I have to say, "Yes."  That's not how it

22   works.

23   Q.   No, no.

24   A.   I have to think about it.  I need a day or a month or two.

25   Q.   Yes, that's why that's -- that's why I did that.  He

1  called and told me, "David, I talked to Victor."

2  A.   You say something at night, then in the morning you think

3  it's all done.

4  Q.   33 percent here, 33 percent there.  I told him, "However

5  it shapes out, that's how -- "

6  A.   You tell him, hmm -- I was thinking.

7  Q.   Fourteen percent.

8  A.   I want him, "Why do you thi-thi-think I should give my

9  percentage?  You give away your percentage?"

10 Q.   About Sao?  What do you think?  Where do we stand

11 regarding money?  How much money do we have here?  Is there

12 100,000?

13 A.   There is 100,000, yes.

14 Q.   Is there anything else in the house?

15 A.   We can get more if we need to.  We don't need debts now.

16 We have a lot of debts now.

17 Q.   We don't need Sao's money now, do we?

18 A.   No, not now.  Don't say anything.  We don't need money

19 now.

20 Q.   Then I will tell Sao, I will tell Sao that we are waiting

21 for permits and stuff.

22 A.   Yes.

23 Q.   And we will let him know after that, because --

24 A.   That's fine.  Say that is one -- hmm -- should talk.

25 Q.   And what's going on with Hang?  He keeps on calling and

1  calling and calling.  He annoyed the fuck out of me already.

2  It's been a while.  Anyways, we need to straighten this out.

3  Also everyone, everything has to be in writing.  Uh, the fact

4  that we give more salary to Kenton, other things we give -- I

5  also need something, this and that.

6  A.   You already got your salary for this month.

7  Q.   This month.  But now at the end of the month --

8  A.   You took it on the 1st of the month.

9  Q.   Yes.  At the end of the month now I need another check.

10  Then we will get on the payroll, you know?

11  A.   No, you have already got your salary for the entire month,

12  including today.  I already told you.

13  Q.   Yes, but it wasn't -- you guys got yours on the 30th, the

14  15th and the 30th.  You just got yours now on the 30th, then on

15  the 15th, and then again on the 30th.  I got mine on --

16  A.   It is the same thing.

17  Q.   The 30th and on the 15th.  That's it.

18  A.   No, David.  Hold on, hold on, hold on.  I got mine on the

19  15th, on the 3rd, and I mean 30th.  That's it.

20  Q.   No.  You got it on the 30th.

21  A.   On the 15th and 30th, and you got the money up front twice

22  and sometimes more.

23  Q.   Yes, but you guys get it three times:  on the 30th, the

24  15th and the 30th, and I got it twice.

25  A.   What are you talking about, David?

1  Q.   I got 1,500 all together.

2  A.   David, you -- what are you talking about?

3  Q.   Two weeks; isn't that so?

4  A.   No, the 15th.  Our contract says the 15th and 30th.  What

5  now?  Do you want more money again now?

6  Q.   Contract, contract, no, no, no.  Contract is one thing,

7  but, uh, for Kenton, it, uh, causes problems, because he also

8  had the same contract at first that he cannot do that.

9  A.   We need to -- we need to -- we need to --

10  Q.   That's what I'm saying.  That's a problem.  It needs to be

11  every two weeks.

12  A.   We need to, we need to -- with Kenton, Kenton's money, his

13  -- the person that did his job, got his money, and the rest

14  is --

15  Q.   Yes, I understand.  But, anyways, you know it's fucked up.

16  I have no time to get it.  It's fucked up, man.  For $3,000

17  raised the salary, but we need to do something.  It's the end

18  of the year, Christmas is coming, this and that.  It's fucked

19  up.

20  A.   There is no money, David.

21  Q.   If there is no money, then we need to take it from Sao.

22  (READING FROM TRANSCRIPT PAUSED)

23  Q.   So, let me ask you, who is Sao?

24  A.   Sao is our landlord for the Allied Health Clinic.

25  Q.   Okay.  And what is David Tkhilaishvili trying to do with

1    Sao?

2    A.    David was -- after he took that $11,000 and then he start

3    engaging in a conversation with Sao to obtain another loan, and

4    I did not want him to take any loans behalf of Allied Health.

5    Q.    Was he authorized to do that?

6    A.    No, he was not.

7    Q.    And there is talk in this portion of the conversation

8    about Kenton and his salary.  Can you tell us what that was

9    about?

10   A.    The Kenton salary.  So, he talks about sometimes he takes

11   the money up front, and then he would have come back again, he

12   wants the money again.  Then he compares his salary with

13   Kenton's salary.  I believe Kenton was receiving 3,000 at that

14   time, so 1,000 we are accumulating for the future.  We had some

15   agreement with Kenton.  I have to review that.  So that was

16   referring to he wants the money, 4,000, up front, David.

17   Q.    And there are a few times where you are talking about he,

18   you keep talking about he came to you and that you should

19   have -- but that's not how -- that you should have said

20   something else to him.  Who was he talking about?

21   A.    If you may read that paragraph again?

22   Q.    Okay.  So, on Page 22, Line 361, where you say, "Not him

23   --" do you see that?  "If you talk to him that would be a

24   different story.  You went off on me."

25          And then David Tkhilaishvili says, "I did that so he

1  wouldn't start anything here."

2       Do you know who David Tkhilaishvili is talking about

3  there?

4  A.   Just give me one second a little further up, if I may, to

5  refresh my memory.

6                    (Pause)

7  Q.   And where you say, "Why not tell him, 'Listen, control,

8  take control of yourself.'"

9  A.   Yeah, yeah.  Yes, that's Jambulat, Jambulat's story, I

10 believe.  That's Jambulat.  "Him" is Jambulat, yes.  He talks

11 about Jambulat.

12 Q.   And where we've just read, and you've seen the

13 conversation about Kristina and the money, does that have

14 anything to do with Allied Health, or is that about Davis

15 Clinic?

16 A.   That absolutely has nothing to do with Allied Health.

17 It's between him and Davis Health hitting Kristina.

18 (END OF READING OF TRANSCRIPT)

19       MS. KAPLAN:  That's it for the recording.

20 BY MS. KAPLAN:

21 Q.   Did you also meet after these two conversations with

22 Jambulat Tkhilaishvili wearing a wire?

23 A.   I met with Jambulat wearing a wire.  Yes, I did.

24 Q.   And where was that meeting?

25 A.   In Taunton at his pizza place.

1    Q.    You went to the pizza place?

2    A.    Yes.

3    Q.    And who put the wire on you?

4    A.    Agents, Federal Agents.

5    Q.    And tell us what happened at that meeting.

6    A.    When I went to Jambulat, I was expecting completely

7    different responses, but he was completely different person at

8    that day, and he start talking about, like, completely

9    different, 180 degrees different person.  Then I talked to him

10   at the Clinic, or I talked to him when he came to the repair

11   shop.

12   Q.    And how was he different?

13   A.    So, he was talking nice, and he even hugged me, which was

14   a surprise.  He was tapping my back.

15   Q.    Had he ever done that before?

16   A.    No.  We've seen each other only a few times.

17   Q.    Do you know why he was acting so differently at that

18   meeting?

19          MR. TUMPOSKY:  Objection.

20          THE COURT:  If he knows, he can answer.

21          THE WITNESS:  I might -- I thought about that.  I

22   believe --

23          THE COURT:  Do you know anything from talking to him,

24   or is this your speculation?

25          THE WITNESS:  I just have my own --

1          THE COURT:  So, I am going to exclude the answer.

2     Q.    From the opening of the Clinic in November of 2014 through

3     December of 2015 how many times did you see Jambulat

4     Tkhilaishvili at the Clinic?

5     A.    From opening day till?

6     Q.    December 2015, when you had this meeting with him.

7     A.    I seen him -- I believe the opening took place October.  I

8     seen him once in Watertown.  I seen him once when he threatened

9     me at the Clinic on November to -- also that time when -- I

10    went two, three times when I went to Taunton.

11    Q.    So, it sounds like you saw him once at Allied Health

12    Clinic.

13    A.    Yes.

14    Q.    And that was at the opening party?

15    A.    It was opening party.  Then after opening party was when

16    he threatened me.

17    Q.    Twice?

18    A.    So, that was twice.

19    Q.    Did you ever see him at Allied Health Clinic to work?

20    A.    Never seen him do anything over there.

21    Q.    Did he ever do any work for Allied Health Clinic?

22    A.    No, he did not.

23    Q.    Did he appear to you to have any knowledge of how to run a

24    Suboxone Clinic?

25    A.    Initially when we met he said, "Yes," he has an idea, but

I requested several times to meet and discuss how we are going
to run the business, because to me that was the business I was
-- I had no knowledge of it.  But David and him, they assured
me David will start the initial process.  Once we get the
permit done and we become declared from the Department of
Public Health recognized clinic, Jambulat can run the Clinic.

Q.   Did you ever have any conversations with Jambulat
Tkhilaishvili about running the Clinic?

A.   Nothing at all.

Q.   Did there come a time that your lawyers, some of your
lawyers took legal action to have the defendants removed from
Allied Health Clinic?

A.   Yes, they did.

Q.   And which lawyers were that?

A.   Verrill Dana.

Q.   And when was that?

A.   I believe it was January 6th or 7th of 2016.

        MS. KAPLAN:  If I may show the witness Exhibit 21?  It
is agreed to by the parties, your Honor.

        THE COURT:  All right.

            (Exhibit No. 21 received into evidence)

BY MS. KAPLAN:

Q.   Do you recognize that document?

A.   Yes, I do.

Q.   What do you recognize that to be?

1   A.   So, in this document, using my Special Consent Authority

2   and right, I removed Jambulat and David from the Clinic.

3   Amendment to our Operating Agreement as well.

4        MS. KAPLAN:   Okay.  And can we see Page 2, please.

5   BY MS. KAPLAN:

6   Q.   And Paul Shaw, is that one of the attorneys at Verrill

7   Dana?

8   A.   Yes.

9   Q.   And this letter tells both defendants that they are

10  prohibited from conducting any business in the name of or on

11  behalf of either the Clinic or Health Management, correct?

12  A.   Yes, correct.

13  Q.   And that they are prohibited from coming onto the premises

14  or having any contact with any employees or other personnel of

15  the Clinic; is that correct?

16  A.   That's correct.

17  Q.   And the letter was dated January 7th of 2016?

18  A.   Yes.

19  Q.   And at that time you had already -- had you already gone

20  to your lawyers and the FBI?

21  A.   Yes, I did.

22  Q.   Now, did there come a time that you were sued by somebody?

23  A.   Yes, there was.

24  Q.   And who sued you?

25  A.   David and Jambulat Tkhilaishvili.  They sued me.

1    Q.    And when was that?

2    A.    I have to, if I may have -- I believe it was late February

3    or March.  I have to -- if I can take a look at the notes, then

4    I can tell you.  I don't remember exact date, but it was later

5    on.

6    Q.    But it was after you had already gone to the FBI?

7    A.    Absolutely, yes.

8    Q.    And do you know what the status of that case is?

9    A.    It's pending.

10   Q.    And you are a defendant in that case?

11   A.    I was the -- I was defendant, they were plaintiff.

12   Q.    And did you ever sue the defendants?

13   A.    Well, we'd in a pending (ph), so I did not ever sue them,

14   so I applied for the -- for the -- on their comments, and, as

15   far as I know, my attorney postponed that civil case before we

16   find an answer for the federal case.

17   Q.    What is the status of Allied Health Clinic now?

18   A.    Financial-wise or generally?

19   Q.    Well, is it operating?

20   A.    It is operational, yes.

21   Q.    And are you making money?

22   A.    I'm not --

23            MR. TUMPOSKY:  Objection.

24            THE COURT:  Overruled.  You may answer.  The answer

25   stands, I guess.

1      MR. TUMPOSKY:  I'm sorry.  I didn't hear the answer,

2  then.

3      THE COURT:  Repeat your answer.

4      THE WITNESS:  Sure.  So, we are not making money.

5  BY MS. KAPLAN:

6  Q.  How is Allied Health Clinic being funded?

7  A.  Until now I've been funding Allied Health Clinic from my

8  personal account.

9  Q.  Has anyone else contributed any money from the time that

10  Allied Health Clinic started operating till now?

11  A.  No.

12  Q.  Can you tell us how much money you have invested since the

13  beginning of Allied Health Clinic?

14  A.  As far as I know, it's a little over 890,000.

15  Q.  And how much did David Tkhilaishvili invest?

16  A.  Nothing.

17  Q.  What about Jambulat Tkhilaishvili?

18  A.  Nothing.

19  Q.  Did either of the defendants ever pay you back any part of

20  your investment?

21  A.  They haven't paid me anything back yet.

22  Q.  Did they ever sell Classic Pizza?

23  A.  I have no information.

24  Q.  You don't know?

25  A.  I don't know.

1    Q.   And since you went to the FBI have you done a complete

2    review of the financial documents of Allied Health Clinic?

3    A.   Yes, I did.

4    Q.   How were the books kept at Allied Health?

5    A.   In a very, very bad way.  So, he put all the notes when he

6    was there at that time -- he's supposed to --

7    Q.   "He" who?

8    A.   David.  Sorry.  David was going to keep all the books and

9    records, which everything was misplaced, so we have to start

10    from beginning, from day one.

11    Q.   But how were the finances --

12    A.   Through the QuickBooks.

13    Q.   And who was responsible for QuickBooks?

14    A.   Back in the days, David was responsible.

15    Q.   And can you tell us what "QuickBooks" is?

16    A.   Yeah.  That's every time, in other words, when we use

17    expenses we put profit and loss statements in it at the end of

18    the year.  Electronically we transfer that to our account, and

19    an accountant is able to create the taxes for the Clinic as

20    well as for the individuals.

21    Q.   And were you asked by the FBI to produce all of the

22    QuickBooks for Allied Health Clinic?

23    A.   Yes, I did.

24    Q.   And did you?

25    A.   Yes, I did.

1          MS. KAPLAN:  I show the witness Exhibit 22, which is

2     agreed to by the parties.

3          THE COURT:  All right.  It is received.

4               (Exhibit No. 22 received into evidence)

5     BY MS. KAPLAN:

6     Q.   Do you recognize that document?

7     A.   Yes, I do.

8     Q.   And can you tell us what it is.

9     A.   Yes.  They printed this from our QuickBooks.  That's my

10    investment chart.

11    Q.   I'm sorry.  It's your what?

12    A.   That's my investment, my contribution towards Allied

13    Health Clinic.

14    Q.   Okay.  You are talking about the whole of QuickBooks is?

15    A.   Well, this is my overall what I invested into Allied

16    Health Clinic.

17    Q.   Okay.  So, this is a record of all the monies that were

18    coming into Allied Health Clinic and going out?

19    A.   Let me take a look how much you have.  This shows how much

20    I contributed to Allied Health Clinic, my contribution.

21    Q.   Okay.  And turning to Page 7, if you would, do you see

22    that handwriting?

23    A.   Yes, I do.

24    Q.   Whose handwriting is that?

25    A.   That's -- I wrote it down, and me and David, we both

1   signed.

2   Q.   And what does it say?

3   A.   As of 10/15/15 we both agreed that I invested over --

4   Q.   Just read what it says in your handwriting.

5   A.   "As of 10/15/2015 everything is correct."

6   Q.   And is that your signature underneath?

7   A.   Yes, it is.

8   Q.   And underneath is whose signature?

9   A.   David's signature.

10   Q.   And then there's more handwriting underneath.  Can you

11   tell us what that is?

12   A.   "American Express 15,000," and then, "Terminal."

13   Q.   What does that mean?

14   A.   Well, I guess something with American Express expenses.

15   This is additional 15,000.

16   Q.   Okay.  And do you remember the circumstances of David

17   signing this, agreeing that as of 10/15/2015 everything is

18   correct?

19   A.   I do remember that day, yes.

20   Q.   Tell us what happened.

21   A.   Well, we just went over the books, and we checked it and

22   how much I invested, and we both agreed and signed it.

23   Q.   Did there come a time in late October or November of 2015

24   that you had discussions with David Tkhilaishvili about his

25   salary?  We heard some of that on the recording.

1   A.   Yes, I did.

2        THE COURT:  Ms. Kaplan, are we going to be going on

3   for a bit more?

4        MS. KAPLAN:  Yes.

5        THE COURT:  So, we will break for the day, I think,

6   here.

7        Ladies and gentlemen, I want to raise with you, and

8   perhaps you will think overnight about this, the prospect of

9   sitting all day on Thursday to keep moving through and try to

10  make progress here.  If you can do it, that's fine.  If one of

11  you cannot do that, just tell us and we will not do it.  I have

12  told you we would be sitting from 9:00 to 1:00, and when I make

13  a representation I try to live up to it, but if we can make

14  additional time on Thursday it might be helpful.  So, think

15  about it, and Ms. Beatty will inquire of you tomorrow morning

16  regarding that.

17       In any event, you will be back here tomorrow morning

18  in the jury room by 8:45 so we can start promptly at 9:00 and

19  continue with the case.  Again, bear in mind my instructions.

20  Do not talk to anybody about the case, do not do any research.

21  Take a breather from the case.  We will see you tomorrow

22  morning.

23       THE CLERK:  All rise.

24       (The Jury exited the courtroom at 4:00 p.m.)

25       THE COURT:  Please be seated.  What I think I would

1  like is just a written outline of the anticipated time taken

2  with witnesses so I can get a clearer understanding of how much

3  longer this is going to go.  So, tomorrow morning if you can

4  share it with each other and give me a prognosis for how much

5  time the evidence is going to take in this case so I can do

6  some planning about dealing with the witnesses.  That is both

7  from the prosecution and from the defense here.  I just want to

8  get a sense of how much longer we are going to go.  I don't

9  know whether the jury is going to buy into a full day Thursday,

10  but we will go step by step.  Okay?

11        Anything else that we need to talk about?

12        MR. CRUZ:  No.

13        MS. KAPLAN:  No, thank you.

14        THE COURT:  Okay.  We will be in recess.

15        THE CLERK:  All rise.

16     (The Honorable Court exited the courtroom at 4:02 p.m.)

17        (WHEREUPON, the proceedings adjourned at 4:02 p.m.)

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

4          I, Brenda K. Hancock, RMR, CRR and Official Court

5    Reporter of the United States District Court, do hereby certify

6    that the foregoing transcript constitutes, to the best of my

7    skill and ability, a true and accurate transcription of my

8    stenotype notes taken in the matter of *United State of America*

9    *v. Tkhilaishvili, et al.*, No. 1:16-cr-10134-DPW.

10

11

12

13

14   Date:    10/16/17              /s/ *Brenda K. Hancock*
                                    Brenda K. Hancock, RMR, CRR
15                                  Official Court Reporter

16

17

18

19

20

21

22

23

24

25