1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
2

3

4     UNITED STATES OF AMERICA          )
                                        )
5                                       )
      vs.                               )
6                                       ) No. 1:16-cr-10134-DPW
                                        )
7     DAVID TKHILAISHVILI AND           )
      JAMBULAT TKHILAISVILI,            )
8                                       )
                      Defendants.       )
9


10

11    BEFORE:  THE HONORABLE DOUGLAS P. WOODLOCK

12                         REDACTED
                      DAY FIVE OF JURY TRIAL
13

14

15
              John Joseph Moakley United States Courthouse
16                      Courtroom No. 1
                        One Courthouse Way
17                      Boston, MA 02210
                        Friday, May 8, 2017
18                       9:00 a.m.

19

20

21               Brenda K. Hancock, RMR, CRR
                      Official Court Reporter
22          John Joseph Moakley United States Courthouse
                      One Courthouse Way
23                    Boston, MA 02210
                        (617)439-3214
24

25

1    APPEARANCES:

2

3          UNITED STATES ATTORNEY'S OFFICE
           By: AUSA Laura Kaplan
           John Joseph Moakley Federal Courthouse
4          1 Courthouse Way
           Suite 9200
5          Boston, MA 02210
           On behalf of the United States of America.

6

7          FEDERAL PUBLIC DEFENDER OFFICE
           By: Oscar Cruz, Jr., Esq.
8          District of Massachusetts
           51 Sleeper Street
9          5th Floor
           Boston, MA 02210
10         On behalf of the Defendant David Tkhilaishvili.

11

           HEDGES & TUMPOSKY, LLP
12         By: Michael L. Tumposky, Esq.
           Suite 600
13         50 Congress Street
           Boston, MA 02109
14         On behalf of the Defendant Jambulat Tkhilaishvili.

15

16

17

18

19

20

21

22

23

24

25

I N D E X

Testimony of:                    Direct   Cross   Redirect   Recross

KEITH NELSON
By Mr. Cruz                13
By Ms. Kaplan                        15


KRISTIN KOCH
By Mr. Tumposky            17
By Ms. Kaplan                        22



                                              PAGE

Closing Argument by Ms. Kaplan          27
Closing Argument by Mr. Cruz            50
Closing Argument by Mr. Tumposky        77
Rebuttal Closing Argument by Ms. Kaplan  87

Jury Charge                             94
Verdict                                 130

1                    P R O C E E D I N G S

2              THE CLERK:  All rise.

3    (The Honorable Court entered the courtroom at 9:00 a.m.)

4              THE CLERK:  This Honorable Court is now in session.

5    Please be seated.

6              THE COURT:  Well, there are a couple of things I want

7    to take up.  First, the Indictment, a couple of things that

8    popped up.  First, with respect to the question of forfeiture,

9    is there anything that you are going to ask the jury to do, the

10   parties are going to ask the jury to do?

11             MS. KAPLAN:  No, your Honor.

12             THE COURT:  So, if there is a judgment as anticipated,

13   then forfeiture later here.  Agreed?

14             MS. KAPLAN:  Agreed.

15             MR. CRUZ:  Yes, your Honor.

16             THE COURT:  Mr. Tumposky?

17             MR. TUMPOSKY:  Yes, your Honor.

18             THE COURT:  Second, with respect to the extortion

19   counts, in reviewing my notes and so on I am a little bit

20   perplexed as to what would be the economic harm here.  Isn't

21   this just a physical harm case?

22             MS. KAPLAN:  Well, I mean, I think certainly if they

23   had been successful they would have caused economic harm to the

24   business of Allied Health.  It's possible they would have taken

25   40 percent of Victor Torosyan's profits and it's not certain --

1          THE COURT:  But that is his property.  The question is

2     economic harm.  They are threatening force, violence, fear and

3     physical harm.  That is clear.  That seems to be the

4     Government's case.  The question of what separate relevance

5     there is to economic --

6          MS. KAPLAN:  They threatened to burn the clinic down.

7     That would cause economic harm to the property.

8          THE COURT:  Why isn't that physical harm, force and

9     violence?

10          MS. KAPLAN:  Yes, that's physical harm to the

11     property.

12          THE COURT:  It seems to me it is a hangnail here

13     because of the difficulties of the Hobbs Act development, and,

14     as I reflected on it over the weekend, I wondered whether it

15     makes sense to keep the hangnail in the case.  You either have

16     it as forced violence, a fear of physical harm, or you do not

17     have it at all, I think.  For that reason, what I was going to

18     suggest is taking out the language "economic" in the redacted

19     Indictment.

20          MS. KAPLAN:  I suppose we could, your Honor.  I'm just

21     concerned about the burning the clinic down if they find that

22     that was really what the concern was.

23          THE COURT:  But I think you can argue that as

24     threatened force or violence.

25          MS. KAPLAN:  I think that's probably right, your

1    Honor.

2          THE COURT:  Well, what I am going to ask you to do is

3    to think about it --

4          MS. KAPLAN:  Okay.

5          THE COURT:  -- because I am going to raise some things

6    that touch on closing arguments.  But I would be inclined to

7    tidy up the Indictment.  If you say, "No, I'm going to argue a

8    separate economic harm," I understand that, but I am always

9    concerned about presenting the case as cleanly as possible to

10   the jury and avoiding the potential for misunderstandings.

11         Now, let me then turn to, as I reflected some more

12   over the weekend, the various salients or initiatives that the

13   parties have raised with respect to instructions.  I have, I

14   think, two things that I want to focus on, in particular.  With

15   respect to the extortion claim, I am going to define property,

16   I think, as consisting of or meaning an economic interest which

17   is capable of being transferred from one person or entity to

18   another.  The reason I do that is that we are dealing here with

19   an intangible, I believe, that is, the right to an interest in

20   this clinic, and I am not sure that the language of the case

21   law has been particularly helpful in this regard.  So, I am

22   going to try and focus it a bit more.

23         Now, what does that mean?  Well, one of the things it

24   means, as far as I am concerned, is that the transfer can be to

25   the defendant or to a person the defendant designates.  That is

1    the language, actually, that Judge Sands uses or the Sands

2    instructions use.  So, it does not have to be necessarily to

3    the defendant; it can be to some person that the defendant

4    designates.  So, in order for a defendant to have obtained the

5    property of another, there must have been a transfer, or

6    anticipated here, transfer of a legal right to that property

7    from the other person, the alleged victim, Mr. Torosyan here,

8    to a defendant or to a person the defendant designates.  That

9    addresses an instruction that the defendants have asked for.

10          I tell you that ahead of time, because that is what I

11   am going to instruct the jury on, and if you argue it, it may

12   cut your legs out from under you.  I understand you are going

13   to say, "No, no, that's the wrong instruction," and you can

14   preserve your rights that way, but bear in mind that is what I

15   am going to tell the jury, and so it will, as I say, undermine

16   your charge to the jury, I think, if you attempt to do it in

17   that fashion.

18          The second is this question of value that appears in

19   the Defendants' Motions for Judgment of Acquittal.  I think it

20   is a red herring.  It is a red herring because this is not a

21   case about valuation, it is about property.  Now, intangible

22   property may have a speculative value; one may have an interest

23   in the income stream of Amazon, which for a period of time has

24   been negative, but it is an economic interest.  So, I will

25   permit it, you will do it, and then, if you do it, I will

1    undercut you in the instructions by saying, "We are concerned

2    with the property as I define it, not as property valued in

3    some particular way."  The defendants have been making this

4    argument about it was valueless.  Maybe, maybe not.  The

5    defendants apparently didn't think it was valueless; they

6    wanted to transfer it to somebody else.  But the point is that

7    the property we are talking about for Hobbs Act purposes is

8    property that is an economic interest that can be transferred

9    from one person or entity to another.

10            Mr. Tumposky.

11            MR. TUMPOSKY:  I think, your Honor, there's two issues

12   with regards to the value of the asset.  I think with regards

13   to whether a worthless asset can be property, that may be a

14   question for the Court, but I do intend to argue that a

15   worthless asset or the deprivation of a worthless asset would

16   not have an effect on interstate commerce.

17            THE COURT:  Well, go ahead and do that.

18            MR. TUMPOSKY:  But I'm asking if the Court intends to

19   also instruct that the jury should not consider the value of

20   the asset when identifying whether commerce would be affected.

21            THE COURT:  No.  I am going to present the customary

22   interstate-commerce instruction, which is pretty open-ended,

23   but if I hear in the argument, particularly if I hear in the

24   argument that property is value, I will be instructing fairly

25   specifically.

1          MR. TUMPOSKY:  I don't intend to argue --

2          THE COURT:  These are just forewarnings on it, again,

3    so you do not get sandbagged when the instructions come up.

4    Again, I understand the defendants' view that property is

5    equated in some fashion with value.  I do not accept it, at

6    least at this stage, but we will take it up further in terms of

7    Motions for Judgment of Acquittal.

8          MR. TUMPOSKY:  And please do note my objection on that

9    point as well as on the point about transfer to third party.

10          THE COURT:  The time to make these objections is after

11    I have instructed.

12          MR. TUMPOSKY:  You will give us the opportunity?

13          THE COURT:  Yes, I will give you the opportunity.

14    Another forewarning:  The First Circuit is hell on wheels on

15    instruction challenges, and so observations like, "I would like

16    to note my objection," before I have given the instructions

17    themselves will probably not be enough.

18          MR. TUMPOSKY:  Well, I will be more specific.

19          THE COURT:  All right.  So, those are some things that

20    I wanted the parties to be aware of ahead of time.

21          Ms. Kaplan, you will think about the question of

22    whether or not economic harm is something that you want to keep

23    in the case.

24          MS. KAPLAN:  I wasn't planning to argue it, so I think

25    we can take that out.  I just need an opportunity to redact the

1    indictment again.

2          THE COURT:   Okay.   So, I think what we will do, I

3    think Ms. Beatty may have it --

4          MS. KAPLAN:   Oh, okay.

5          THE COURT:   -- on the system now, and so she can do it

6    and make the multiple copies of it.   On Page 2, the

7    next-to-last line before the statutory citation, we will strike

8    the words "economic and," so it will read, "the wrongful use of

9    actual and threatened force, violence and fear of physical

10   harm."

11         Similarly on the next-to-last line of Count Two on

12   Page 3 we will strike the words "economic and."

13         And let me just pass back -- I don't think there will

14   be any particular problem with them, but here are copies of the

15   verdict slip here.   You will take a look at them.   It is pretty

16   plain vanilla, I think, but so there is no surprise involved in

17   it.

18         The one other thing that I think I want to deal with

19   is Counts Three and Four, and that really goes to the question

20   of a healthcare benefit program.   I am going to emphasize the

21   language that says "can," and, consequently, that may have an

22   effect on the argument that the defendant David Tkhilaishvili

23   makes on Counts Three and Four.   My reading, at least at this

24   point, again, subject to reconsideration in connection with the

25   Motions for Judgment of Acquittal, which I am keeping under

1    advisement or reserving and the post-trial motions, if it comes

2    to that, is that the creation of a plan that falls within this

3    category that can provide benefits is enough, and that the

4    anachronism, if that is the argument that defendant David

5    Tkhilaishvili is making here, of the embezzlement before the

6    plan started to pay out monies is not in contravention of the

7    element here.  It is a matter of fact, whether it is a plan or

8    not, but the fact that it pays out before or after is not going

9    to be meaningful.

10        So, Mr. Cruz, you will be guided, I suppose, by that

11   as well.

12        MR. CRUZ:  Yes, your Honor.

13        THE COURT:  Okay.  All right.  So, we are ready for

14   the jury.  We have got two witnesses; is that the state of the

15   matter?  If we can get -- I guess, Agent Nelson, if you can get

16   up here.

17        MS. KAPLAN:  Will we have a break afterwards?

18        THE COURT:  Yes, we will take a break, and you can set

19   up for your closings.

20        THE CLERK:  All rise.

21        (The jury entered the courtroom at 9:15 a.m.)

22        THE CLERK:  Please be seated.

23        THE COURT:  Good morning, ladies and gentlemen.  My

24   customary greeting:  Were any of you exposed in any way to

25   anything having to do with this case outside of what you have

1    heard here in the courtroom?  And I see a negative response to

2    that.

3           So, what we are going to do today is a little bit of

4    tidying up, a couple of witnesses that we are going to hear

5    that I understand will be quite brief.  Then we will take a

6    break, or you will take a break, and then the parties will get

7    ready for closing argument.  It is their effort and opportunity

8    to attempt to persuade you regarding their position concerning

9    this set of charges.  We will hear first from the Government,

10   then from the defendants.  The Government has a right to reply

11   if there is anything that could not reasonably have been

12   anticipated in their initial closing argument.  And then we

13   will take another break, and after that I will give you the

14   charge on the law, and then the case is going to be yours.

15          So, we are very close to completing the case for your

16   consideration.  I would ask you again to maintain an open mind.

17   You have not heard all the evidence, and you have not heard the

18   arguments of counsel, let alone the instructions on the law, so

19   it is too early for you to be making even provisional views

20   about this case.  What I would like you to do is listen to this

21   last bit of evidence and listen carefully to the arguments of

22   counsel and then my instructions, and then you will be about

23   your business.

24          So, we will swear the first witness.

25          THE CLERK:  Please raise your right hand.

1        KEITH L. NELSON, DULY SWORN BY THE CLERK

2            THE CLERK:  Please be seated and state your full name.

3            THE WITNESS:  Keith L. Nelson.

4            THE COURT:  And, Mr. Cruz.

5            MR. CRUZ:  Thank you, your Honor.

6                        DIRECT EXAMINATION

7   BY MR. CRUZ:

8   Q.   Good morning.

9   A.   Good morning, Mr. Cruz.

10  Q.   Could you tell the jury what your occupation is.

11  A.   I am a Special Agent for the Federal Bureau of

12  Investigation.

13  Q.   And have you been involved in the investigation of this

14  case involving Mr. David Tkhilaishvili?

15  A.   I have.

16  Q.   During the course of your investigation in this case have

17  you had opportunities to interview Victor Torosyan?

18  A.   I have.

19  Q.   And specifically on January 22nd, 2016 did you have an

20  opportunity to interview Mr. Torosyan?

21  A.   I did.

22  Q.   During the course of that interview didn't Mr. Torosyan

23  tell you that he had let David Tkhilaishvili borrow $11,000?

24  A.   I remember him saying "borrow" 6,000 and 5,000, for a

25  total of 11,000, yes.

1    Q.    Okay.  So, he specifically told you that that money in

2    incremental payments of $5,000 and $6,000 he lent David

3    Tkhilaishvili?

4    A.    I remember the term "borrow."

5    Q.    Okay.  So, he let him borrow the money?

6    A.    On that occasion I think he used the word "borrow," yes.

7    Q.    Okay.  Are you confused at all about what he may have said

8    to you?  Do you recall exactly that he said to you the word he

9    let him "borrow"?

10            MS. KAPLAN:  Objection.

11            THE COURT:  No.  He may answer.

12   A.    It's what I wrote down, so, therefore, I remember it as

13   "borrow," yes.

14   BY MR. CRUZ:

15   Q.    And when you write your reports in terms of these

16   investigations you are sure that you are accurate in writing

17   these reports?

18   A.    Correct.

19   Q.    These reports go to the United States Attorney's Office

20   who prepare the case?

21   A.    Correct.

22   Q.    And you are careful to note any errors in translation, if

23   you will?  If someone is equivocal about what they are saying,

24   you check in with them and make sure that they are telling you

25   something accurate, correct?

1    A.    If I notice that there was a discrepancy with what he

2    said, I would clarify it during that interview.

3    Q.    Okay.  And in this case there was no discrepancy or

4    confusion about the word "borrowed," correct?

5    A.    During this interview I remember the term "borrowed."

6            MR. CRUZ:  Thank you.  No further questions, your

7    Honor.

8            MS. KAPLAN:  May I, your Honor?

9            THE COURT:  Yes.

10           Mr. Tumposky?

11           MR. TUMPOSKY:  I don't have any questions, your Honor.

12           THE COURT:  Okay.

13                        CROSS-EXAMINATION

14   BY. MS. KAPLAN:

15   Q.    Do you remember the full sentence that you wrote down when

16   you included the term "borrowed"?

17   A.    I believe it started with "owed."

18   Q.    Do you recall that what it said was, "David owes Torosyan

19   approximately $40,000, consisting of a $20,000 loan"?

20           MR. TUMPOSKY:  Objection.

21           THE COURT:  Grounds?

22           MR. TUMPOSKY:  She's reading from the report.

23           THE COURT:  No.  She is refreshing his recollection.

24   I don't think there is a dispute about what the document says.

25   A.    I remember that, yes.

1    BY MS. KAPLAN:

2    Q.   So, do you recall that he used the word "loan"

3    specifically in connection with the $20,000?

4    A.   I do.

5    Q.   And then next your testimony is that he said that $11,000

6    he borrowed in amounts of $6,000 and $5,000?

7    A.   Correct.

8    Q.   Okay.  Do you recall that you interviewed Mr. Torosyan on

9    November 24th of 2015?

10   A.   I do.

11   Q.   And was that the first time you met him?

12   A.   It was.

13   Q.   And do you recall that on that occasion, the first time

14   you met him, he told you that Tkhilaishvili took $6,000, then

15   $5,000 from the business and used it to go back to the country

16   of Georgia?

17   A.   I do, and I believe the checks were provided during that

18   meeting as well.

19   Q.   And do you recall that you interviewed Mr. Torosyan

20   another time on March 9th of 2016?

21   A.   I do.

22   Q.   And do you recall that during that conversation he told

23   you that the checks Torosyan knew were not authorized were

24   Check 1190 on August 21st, 2015 for $5,000 and Check 1191 on

25   August 22nd, 2015 for $6,000?

1   A.   Yes, I do.

2   Q.   And during those interviews with Mr. Torosyan was there

3   any other agent present?

4   A.   During those two interviews, the November, the March,

5   Special Agent Kristin Koch was present.

6          MS. KAPLAN:  I have no further questions, your Honor.

7          THE COURT:  All right.

8          MR. CRUZ:  Nothing further, your Honor.

9          THE COURT:  You may step down.  Thank you.

10               (Witness step down)

11          THE COURT:  Anything further?

12          MR. TUMPOSKY:  I would call Special Agent Koch, your

13   Honor.

14          THE COURT:  All right.

15          Agent Koch.

16          THE CLERK:  Please raise your right hand.

17          KRISTIN KOCH, DULY SWORN BY THE CLERK

18          THE CLERK:  Please be seated and state your full name.

19          THE WITNESS:  Kristin Koch.

20               DIRECT EXAMINATION

21   BY MR. TUMPOSKY:

22   Q.   Good morning.

23   A.   Good morning.

24   Q.   Could you introduce yourself to the jury.

25   A.   Good morning.

1    Q.   What do you do for work?

2    A.   I'm a Special Agent with the Federal Bureau of

3    Investigation.

4    Q.   And were you involved in investigating this case?

5    A.   Yes.

6    Q.   And, specifically, were you involved in setting up Victor

7    Torosyan with an electronic device to record his conversations

8    with the defendants?

9    A.   Yes.

10    Q.   In general terms can you tell me a little bit about this

11    device.  How does it work?

12    A.   It's depending on -- the devices that I put on him were an

13    audio and video recording device.  We would turn it on.  I

14    would give a short preamble, saying the date, the time, who

15    were the parties that were there, and the parties that

16    Mr. Torosyan was potentially going to speak with, and then we

17    would at the end meet with him again immediately afterwards and

18    turn off the equipment.

19    Q.   And do you have a discussion with the person who is going

20    to be wearing the device about how it works?

21    A.   Generally -- not really, because we tell them -- we don't

22    want them turning it on and off, so we generally don't tell

23    them how it operates.

24    Q.   And is this recording device being monitored live by the

25    FBI as the person is engaging in his conversations?

1    A.   That device is not, but there's a separate device that is

2    equipped on the individual that is sometimes monitored live,

3    depending on the situation.

4    Q.   In this case was Mr. Torosyan being monitored live as he

5    spoke to the defendants?

6    A.   In which case?  There are a number of --

7    Q.   Certainly.  In the conversation on December 9th, 2015

8    between Victor Torosyan and James Tkhilaishvili was the FBI

9    live-monitoring that transmission?

10   A.   Yes.

11   Q.   Did you have a discussion with Mr. Torosyan prior to this

12   about whether or not the transmission would be live-monitored?

13   A.   Yes.

14   Q.   What did you tell him?

15   A.   We told him that we would be listening to the

16   conversation, that because we believed that the conversation

17   would occur in Russian, we had a Russian linguist with us to

18   listen to ensure his safety in case there are any issues that

19   arose.

20   Q.   And was this right before he got in the car to drive down

21   to Taunton?

22   A.   We were in Taunton nearby where he was going to go, so it

23   was a very short drive, but, yes.

24   Q.   So, maybe about five minutes before the conversation

25   started?

```
1    A.    Yes.

2    Q.    Thank you.

3          I want to just turn your attention now to the

4    circumstances of the arrest of James Tkhilaishvili.

5    A.    Yes.

6    Q.    What time was he arrested?

7    A.    It was approximately 6:00 a.m.

8    Q.    And were you present?

9    A.    Yes.

10   Q.    So, when you went into his -- you went into his house to

11   arrest him?

12   A.    Yes.

13          MS. KAPLAN:  Objection.

14          THE COURT:  Yes.  Sustained.

15   BY MR. TUMPOSKY:

16   Q.    When you first spoke to James that morning did you ask him

17   for permission to do something?

18          MS. KAPLAN:  Objection.

19          THE COURT:  Sustained.  Let me see you at sidebar.

20   (SIDEBAR CONFERENCE AS FOLLOWS):

21          THE COURT:  I take it that this is being offered as

22   non-verbal conduct indicating innocence?

23          MR. TUMPOSKY:  I am intending to elicit evidence that

24   he was cooperative during the arrest.

25          THE COURT:  To what end?
```

1          MR. TUMPOSKY:  Specifically, he allowed them to --

2          THE COURT:  No.  To what end?

3          MR. TUMPOSKY:  To show that he is innocent.

4          THE COURT:  I am not going to permit it to come in in

5     that form.  If the defendant wants to testify, that is a

6     different issue, but he doesn't get to testify by non-verbal

7     conduct through this witness.  It is beyond the scope of proper

8     evidence in this case.

9          MR. TUMPOSKY:  Well, may I ask if there were any

10    firearms found in the search of the house?

11         THE COURT:  No.  This isn't a firearm case.

12         MR. TUMPOSKY:  Well, they have asked Victor Torosyan

13    whether he carried firearms.

14         THE COURT:  Do you want someone to say, "Of course he

15    didn't keep it in his house; he kept it elsewhere"?  This is

16    just extraneous, quite apart from the point of its purpose

17    being a non-verbal hearsay by the defendant, who is not

18    offering his own testimony in the case.  It is really

19    extraneous to the case itself, so I exclude it.

20    (END OF SIDEBAR CONFERENCE)

21    BY MR. TUMPOSKY:

22    Q.   Special Agent Koch, I think you testified a few minutes

23    ago that you were monitoring Mr. Torosyan live during this

24    conversation between himself and James.

25    A.   Yes.

1    Q.   And did that include when he got in his car after the

2    conversation was over?

3    A.   Yes.

4          MR. TUMPOSKY:  Your Honor, with the Court's

5    permission, I would like to play a very brief audio clip for

6    the Special Agent and just ask her to identify it.

7          THE COURT:  All right.

8          MS. KAPLAN:  Objection.  I believe we have already

9    heard it.

10         THE COURT:  Well, I am trying to recall.  We had some

11   technical difficulties here.  Has this been presented to the

12   jury yet?

13         MS. KAPLAN:  It has, and it's in evidence, your Honor,

14   I believe.

15         MR. TUMPOSKY:  I did play it during the cross of

16   Mr. Torosyan.

17         THE COURT:  I think we do not need to redo it again.

18         MR. TUMPOSKY.  Nothing further.

19         THE COURT:  Ms. Kaplan.

20         MS. KAPLAN:  Just briefly, your Honor.

21                        CROSS-EXAMINATION

22   BY MS. KAPLAN:

23   Q.   You said that Mr. Torosyan was wearing a transmitter?

24   A.   Yes.

25   Q.   And what was the purpose of that?

1    A.   To ensure that we knew what was going on in the

2    conversation in case any issues arose.

3    Q.   And there was a translator with you?

4    A.   Yes.

5    Q.   And she was telling you what was being said?

6    A.   Yes.

7    Q.   And did you hear Mr. Torosyan when he got back in the car

8    and he was making the comments that he was making about the

9    conversation not going as expected?

10   A.   I recall that he made comments.  I don't recall the

11   specific nature.

12   Q.   Where did he go immediately after the meeting with

13   Jambulat Tkhilaishvili?

14   A.   He met us at another location nearby.

15   Q.   What was the purpose of that meeting?

16   A.   To discuss with him what had just happened, and he would

17   tell us what happened in that particular meeting in case there

18   was something that the translator didn't get in real time that

19   we needed to know.

20   Q.   And did he tell you during that meeting immediately that

21   the conversation had not gone as expected?

22   A.   Yes.

23   Q.   Did you take the transmitter at that time?

24   A.   Yes.

25   Q.   And did you take the other equipment from him?

1    A.    Yes.

2    Q.    So, you had access to the disc, you could listen yourself

3    to the recording?

4    A.    Yes.

5    Q.    There was no attempt by him to hide what had happened

6    during that meeting?

7    A.    No, there was not.

8              MS. KAPLAN:  I have no further questions.

9              THE COURT:  All right.  Anything else?

10             MR. TUMPOSKY:  No, your Honor.

11             THE COURT:  All right.  You may step down.

12                       (Witness stepped down)

13             THE COURT:  Anything further from the defendants?

14             MR. CRUZ:  Your Honor, for David Tkhilaishvili, the

15   defense would rest.

16             MR. TUMPOSKY:  On behalf of James Tkhilaishvili, we

17   rest.

18             THE COURT:  All right.

19             MS. KAPLAN:  The Government rests, your Honor.

20             THE COURT:  All right.  So, ladies and gentlemen, that

21   means all the evidence, the body of material that you are going

22   to make your determination from, is before you, but you have

23   not had it put in context.  That is going to be done, I think,

24   by the closing arguments of counsel, and the legal construct

25   that you are going to use in evaluating it is going to be

1   provided by me in instructions.  In short, there is a little

2   bit more to do here for us to present this case to you.

3          So, in order to kind of set up, we will take maybe

4   five, ten minutes before we hear the closing arguments of

5   counsel, and, as I indicated, we will hear the closing

6   arguments of counsel, then we will take another break, then you

7   will hear my instructions, and then the case will be given to

8   you.  So we will take a break at this point.

9          THE CLERK:  All rise.

10          (The jury exited the courtroom at 9:33 a.m.)

11          THE COURT:  You may be seated.  One further point:  Is

12   there any problem with the instructions here?  Let me note that

13   the defendants, I believe, are renewing their Motions for

14   Judgment of Acquittal.

15          MR. TUMPOSKY:  We are.

16          MR. CRUZ:  Yes, your Honor, we are.

17          THE COURT:  And, as I have indicated, I am reserving

18   on that.  I am going to put it to the jury.

19          With respect to the Indictment, just because of the

20   further redaction of it, I want to emphasize one thing, and

21   that is in the next-to-last line in Counts One and Two where it

22   refers to physical harm to Victor Torosyan and others, if

23   necessary, I will refer to the "others" as including the clinic

24   that was threatened with arson here, just so we have got that

25   corner squared so that there is no misunderstanding, again, if

1    that is necessary.

2         Now, is there any issue with respect to the verdict

3    slip?

4         MR. CRUZ:  No, your Honor.

5         MS. KAPLAN:  No, your Honor.

6         MR. TUMPOSKY:  No.

7         THE COURT:  So, we will run off copies of the

8    Indictment as redacted, and we will run off copies of the

9    verdict slips.  I will be giving them to the jury, who will use

10   that as a kind of construct to walk the jurors through the

11   legal issues that are presented in this case by the charges

12   themselves.

13        So, we will take maybe five minutes to get things

14   straightened away.

15        MS. KAPLAN:  That's fine, your Honor.

16        THE CLERK:  All rise.

17    (The Honorable Court exited the courtroom at 9:38 a.m.

18                        (Recess taken)

19        THE CLERK:  All rise.

20    (The Honorable Court entered the courtroom at 9:47 a.m.)

21        THE COURT:  Ready for the jury?

22        MS. KAPLAN:  Yes, your Honor.

23        THE CLERK:  All rise.

24        (The jury entered the courtroom at 9:50 a.m.)

25        THE CLERK:  Please be seated.

1          THE COURT:  So, ladies and gentlemen, as I indicated,

2     we will start with the closing arguments of counsel.

3          Closing argument is an argument.  You had some sneak

4     previews of arguments in some of the questions that I excluded

5     during the course of the trial because they were not the

6     appropriate time to offer argument.  This is the appropriate

7     time.  Argument is an effort to persuade you.  That is not to

8     demean argument.  It is simply to focus you on what it is.

9     What counsel will attempt to do, I believe, is call to your

10    attention those things that they think support their position

11    in this case.  But you have to be diligent; that is to say, you

12    have to listen very carefully, and if you hear somebody make

13    reference to some piece of evidence that you didn't think came

14    in during the case, of course, you will disregard it.  But what

15    you are doing is listening to how counsel tells you they think

16    the case should shape up in light of the evidence that was

17    presented and a way for you to kind of focus your minds on what

18    is really involved in this case, what is really in dispute.

19         So, we will start first with Ms. Kaplan on behalf of

20    the Government.

21         MS. KAPLAN:  Thank you, your Honor.

22                        CLOSING ARGUMENT

23    BY MS. KAPLAN:  Good morning.  As I told you in my opening

24    statement, you are not here to litigate a business dispute.

25    You are not here to consider whether these were fair contracts,

1   what percentages this one should have gotten and what

2   percentages that one should have gotten.  That's not before

3   you.  That business dispute may or may not be settled in

4   another court at another time.  But that is not why you are

5   here today.  Today you are here to decide whether these two

6   defendants (indicating) conspired to commit extortion and

7   attempted to extort Victor Torosyan of his interest in Allied

8   Health; and that means very simply that you need to decide

9   whether the defendants used threats of force, violence, or fear

10  to obtain his property.  That means that you need to decide

11  whether David Tkhilaishvili embezzled or stole money from a

12  healthcare program.

13       Now, you have heard testimony from Victor Torosyan and

14  other witnesses in this case, and it is your job to determine

15  whether these witnesses are credible, in other words, whether

16  they are worthy of your belief, and there's no magic formula

17  that anyone can give you to do that.  You just need to use your

18  common sense and your everyday knowledge of people.

19       What I told you in my opening statement is that you

20  would hear from the victim, Victor Torosyan, who made the

21  unfortunate mistake of entering into a business relationship

22  with these defendants, and what you heard is that these

23  defendants took advantage of the generosity of Victor Torosyan.

24  They borrowed money from him on multiple occasions.  He paid

25  for multiple vacations for David Tkhilaishvili.  He bought an

engagement ring for David Tkhilaishvili so he could bring it to
his fiancee in Georgia.  They used his home on Cape Cod.  Even
when he wasn't there he gave him the security code.  He said,
"Go, use my home."  They used him, period.

And you heard from Olga Dorofyeyeva, who corroborated
much of what Victor Torosyan said, and she told you that early
on she warned Victor that these defendants were using him.  She
told you that she overheard a conversation between the two
defendants in which they talked about the fact that they didn't
like Victor Torosyan, but they did like his money, and that's
why they were going to go into business with him.  These
defendants were opportunists.  They took Victor Torosyan's
money for this business, and then, when they were done with
him, they thought they could just spit him out.

Now, what the defendants told you in their opening
statement was that this case was not about threats, that they
would prove to you that this was a calculated plan by
Mr. Torosyan to take over Allied Health, that this was a scheme
by Victor Torosyan, and that they were, in fact, the victims.

So, let's talk about that briefly.  My first question
is why?  Why would he do that?  Why would Victor Torosyan want
this failing, unprofitable business that had now put him in
debt, all the loans that he had to take, and that he didn't
even want to be involved with in the first place but got
involved with because these defendants represented that they

1        knew how to run a Suboxone clinic?

2              This defendant, Jambulat Tkhilaishvili (indicating),

3        had no such experience.  The only evidence you have heard about

4        his work history is that he was a pizza delivery man.  So, why

5        would Victor Torosyan want to enter into business with these

6        defendants?  He didn't.

7              And, second, this idea that Victor Torosyan came up

8        with this plan to accuse the defendants of threatening him with

9        harm in order to obtain control of the business, it just

10       doesn't make sense.

11             So, first of all, let me back up and get one thing

12       established.  If David Tkhilaishvili had really invested

13       anything into Allied Health before Victor Torosyan became

14       involved, as the defendants would like you to believe, don't

15       you think that you would have seen that memorialized in the

16       Letter Agreement and then later in the Operating Agreements?

17       You heard both defendants were represented by attorneys in this

18       case.  Why isn't that critical fact, if it's true, in those

19       legal agreements?  If David Tkhilaishvili had really invested

20       anything, any assets, any money into Allied Health, why didn't

21       you see it in the legal agreements?  Why, Members of the Jury?

22       Because it didn't happen.

23             And, although the defendants have no obligation

24       whatsoever to put on any evidence, the burden of proof is

25       always with the Government.  I would ask you to keep your eyes

1    on the evidence.  Ask yourselves did you see any evidence of

2    any investment by David Tkhilaishvili?  And just because we

3    attorneys in the opening statement and now in closings say

4    something, argue something, that's not evidence.  You must

5    decide this case on the evidence.  Just because we asked the

6    question of the witness on the witness stand doesn't mean it's

7    evidence.  It's the answer of the witness coupled with the

8    question that's evidence for you.

9         So, ask yourselves whether there was any evidence that

10   David Tkhilaishvili put anything other than what Ms. Zimmerman,

11   Lindsay Zimmerman, from the FBI showed you in her chart, which

12   I think was about $1,300.  I submit to you there was not.

13        But, even more importantly, Victor Torosyan did not

14   need to concoct a story about being threatened in order to

15   remove the defendants from Allied Health.  He had that

16   authority.  He always did.  That's the Special Consent

17   Authority, the Vahagn Authority that you heard about.  It

18   always allowed him to remove the defendants.

19        So, let's look at 2.8 first, and this is an exhibit,

20   Exhibit 10, 2.8, Duty of Loyalty, that the defendants showed

21   you.  And if you read the whole thing, it does, in fact, at the

22   top say, "The members shall have a fiduciary duty of good faith

23   and loyalty to the company and any violation of such duty by a

24   member will be grounds for forfeiture."  But at the bottom it

25   also says, talks about the members' interests and says that

1    they cannot in any way transfer to the LLC any personal debt or

2    the debt of any business in which such member is involved in

3    each case without the approval of both Class A members.

4        Now, the defendants tried to make the argument that

5    this Duty of Loyalty provision was only put into the Operating

6    Agreements later on as a way for Victor Torosyan to take

7    advantage of the defendants.  Again, the defendants all had

8    attorneys, so did Victor Torosyan, and the defendants signed

9    these agreements.

10       If you look at the Letter Agreement, which is one of

11   the first exhibits that was entered into evidence, Exhibit 2,

12   you'll see that there was the Duty of Loyalty in that

13   provision, there was the Special Consent Authority, which says

14   no member can in any way transfer to Allied Health Clinic any

15   personal debt or the debt of any business in which the member

16   is currently or has in the past been involved.  But it also

17   talks about the fact that Victor Torosyan had the discretion to

18   remove the defendants if in his reasonable discretion and his

19   reasonable judgment he believed it was in the best interest of

20   Allied Health.

21       So, this was not something new, this provision 2.8,

22   and Victor Torosyan didn't need to make up a story about his

23   life being threatened, about these threats by the defendants,

24   in order to remove the defendants from Allied Health.  And even

25   if this 2.8 Duty of Loyalty provision was put in later on, why

1    shouldn't Victor Torosyan, the man who had invested almost

2    half-a-million dollars into Allied Health, why shouldn't he

3    have put in this provision that would protect his investment?

4    Why shouldn't he have negotiated the best contract that he

5    could to protect what he told you was his life savings?

6            Finally, with respect to the defendants' case, I want

7    to talk about their witness, Saba, and very briefly.  Saba is a

8    man who, by his own admission, hasn't worked for some 15 years,

9    a man with a vision, he wants you to believe.  He wants you to

10   believe that opening a Suboxone clinic was his vision.  Is that

11   believable?  You heard from all the witnesses in this case that

12   that idea was David Tkhilaishvili's.  It wasn't his vision,

13   because Suboxone clinics have been around for some time.  But,

14   in fact, Saba told you himself he didn't even want to be

15   involved or put his name anywhere near a Suboxone clinic.  He

16   acted as if it was somehow beneath him.

17           And Olga Dorofyeyeva told you that the only thing that

18   Saba did at Davis Health Clinic -- remember, that was the first

19   Suboxone clinic that David Tkhilaishvili had -- the only thing

20   that Saba did was drive Dr. Kurt Fabrick around.  He was

21   David's translator, his go-to guy, his driver.

22           Saba wasn't at David Tkhilaishvili's house when Olga

23   and Kenton Fabrick were getting the licenses and taking care of

24   the zoning and the construction, when they were working out of

25   David's apartment.  apartment.  In fact, you may recall on

1    cross-examination, when I asked him about that, when I asked

2    him about the fact that he had been working at Allied Health

3    and doing all this work, he admitted that, in fact, he was

4    working, he was living in Los Angeles at the time before Victor

5    Torosyan became involved.  Remember he told you he was a

6    screenwriter.  So, he wasn't really involved in setting up

7    Allied Health at all.

8            What this was, Members of the Jury, was just a debt

9    that David Tkhilaishvili owed to Saba from Davis Clinic and

10   that these defendants now conspired to get Victor Torosyan to

11   pay for, just like everything else Victor Torosyan paid for for

12   David Tkhilaishvili.

13           So, who is Saba?  You decide.  But I submit to you

14   that Saba was just another person looking for a handout from

15   Victor Torosyan, a handout to the tune of $100,000, maybe

16   $300,000.  And why?  Maybe David Tkhilaishvili did promise Saba

17   from Davis Clinic that he was going to pay him some money.  But

18   how does that become Victor Torosyan's problem?  Victor was not

19   involved in Davis Clinic.  Davis Health and Allied Health are

20   two completely separate entities.  That debt is these

21   defendants' (indicating) problem, not Victor Torosyan's, but,

22   as always, David Tkhilaishvili tried to get Victor Torosyan to

23   pay for his debts.

24           And, again, if you look at Exhibit 2 and you look at

25   Exhibit 10, you'll see that David Tkhilaishvili was not

1  permitted to transfer any debts of any business in which the

2  member is currently or has in the past been involved.  That was

3  not permissible.  Victor Torosyan had no obligation to pay the

4  debts of David Tkhilaishvili.  He made no promises to David of

5  that nature, and he certainly made no promises of that to Saba.

6  And, again, if he had, why wasn't that memorialized in the

7  Letter Agreement or in the Operating Agreements?  Why didn't

8  the defendants, if they had made that promise to Saba,

9  memorialize it in the Letter Agreement or in the Operating

10  Agreements?  Saba was just another person, another opportunist,

11  much like the defendants, looking for a handout from Victor

12  Torosyan.

13          So, let's talk about what this case is really about,

14  and I just want to go through a very quick chronology of events

15  so you have the timeline.  In the Spring and Summer of 2014

16  David Tkhilaishvili approaches Victor Torosyan about investing

17  in Allied Health.  Davis Clinic is coming to an end at that

18  point.  In December 2014, some months later, Victor Torosyan

19  agrees to become a silent investor in Allied Health, and he

20  signs a Letter Agreement, along with David Tkhilaishvili.  In

21  that Letter Agreement is the Special Consent Authority.  David

22  Tkhilaishvili pledges in that Letter Agreement his pizza

23  business as collateral.

24          In January of 2015 Victor Torosyan told you that the

25  construction that was supposed to be happening to build out

1    Allied Health is halted because there's no permits, there's

2    zoning issues, and it's halted until March of 2015.  In the

3    Spring and Summer of 2015 Olga Dorofyeyeva comes to Victor

4    Torosyan and she tells him that the construction is not

5    progressing, and that's when she warns Victor Torosyan about

6    David and Jambulat Tkhilaishvili.  In August of 2015 the

7    defendants ask Victor Torosyan to release their collateral of

8    the pizza business, and that's when Victor Torosyan tells you

9    the threats immediately begin.  They threaten that they want

10   his profits, 40 percent of his profits, and they threaten that

11   they want 5 percent and then another 5 percent of his interest

12   so that they could give it to someone else.  Right after that

13   David Tkhilaishvili leaves for Georgia, and he writes himself

14   two checks, the $5,000 and $6,000 checks, from Allied Health

15   without authorization.

16           In September of 2015 the Operating Agreements are

17   signed by all parties.  There are lawyers for all the parties,

18   and they all agree.  Jambulat Tkhilaishvili then comes to

19   Belmont Auto Repair, and you hear that he threatens Victor

20   Torosyan.  Yeah, he signs the agreement, but then he goes on to

21   threaten Victor.  Victor leaves for Dubai and Armenia with his

22   family.

23           In November of 2015 Victor comes back at the end of

24   September, and now it's November of 2015.  The construction is

25   complete, Department of Health, licenses obtained, all of the

1    health insurance contracts are in place, and this is when the

2    meeting happens at Allied Health with the defendants where they

3    lock Victor Torosyan in the exam room and they threaten him.

4    In November of that same month David Tkhilaishvili takes $3,500

5    without authorization.  Victor subsequently reports the threats

6    to his lawyers.  He goes to the FBI and he records

7    conversations with David Tkhilaishvili.

8            In January of 2016 the defendants are removed from

9    Allied Health.  In the Spring, months later, these defendants

10   bring a lawsuit against Victor Torosyan.

11           You will hear from the Judge in his instructions that

12   for the attempted extortion and the conspiracy counts the

13   Government has to prove that, if the defendants had been

14   successful, their actions would have affected interstate

15   commerce, and the Court is going to tell you what that means.

16   It basically means that there needs to be a *de minimis* or a

17   minimal effect upon interstate commerce.

18           First, remember, this is an attempted extortion case,

19   so there does not need to have been any effect on interstate

20   commerce whatsoever, because the percentage wasn't taken, the

21   monies weren't taken.  But, had the defendants been successful,

22   there would have been an effect on interstate commerce.  And

23   how do you know that?  You know it for many reasons.

24           Allied Health was clearly a business that was involved

25   in interstate commerce.  You heard that reagents were purchased

1    from companies outside of Massachusetts.  The analyzer they

2    used was manufactured outside of Massachusetts.  Suboxone,

3    itself, is manufactured outside of Massachusetts.  You heard

4    that the insurance companies that Allied Health had contracts

5    with do business outside of Massachusetts.  You heard about the

6    loans from the banks that Victor Torosyan took money from.

7    They operate outside of Massachusetts.

8              The 40 percent of the profits that they were demanding

9    from Victor Torosyan is money.  It may not have been -- these

10   defendants may have taken it and not reinvested it in Allied

11   Health.  That is money that Victor Torosyan could have

12   reinvested in Allied Health.  So, it depleted the assets of

13   Allied Health.

14             I could continue on and on, but I think that you get

15   the point.  And the fact that Allied Health may or may not have

16   been profitable has nothing to do with whether the actions of

17   these defendants would have affected interstate commerce.

18             So, let's first talk about the embezzlement counts,

19   and that's Counts Three and Four in the Indictment, and only

20   defendant David Tkhilaishvili is charged in those counts.

21   These counts involve the $1,500 check that David Tkhilaishvili

22   wrote to himself in November of 2015 without authorization and

23   the draw from Granite Payroll for $2,000.  So, it's a total of

24   $3,500.  And David Tkhilaishvili is going to argue, has argued,

25   that he was entitled to all of these monies as salary.

1        So, let me show you why he's wrong, and this is why we

2    went through all the checks with Victor Torosyan and with

3    Lindsay Zimmerman.  So, Exhibit 5 shows you the $23,514.17 that

4    David Tkhilaishvili got from Allied Health, and the defense

5    showed you this because they wanted to argue that that's all he

6    got.  But what you will see, Members of the Jury, is that the

7    $23,000 only accounts for the amounts that David Tkhilaishvili

8    received from Allied Health.  Here is the $23,000 down here

9    (indicating), and it shows you that it's from Allied Health,

10   Allied Health, Allied Health, and Allied Health.  What it

11   doesn't show you -- again, these are Allied Health -- these are

12   all the monies that David Tkhilaishvili received from Allied

13   Health from December of 2014 to November of 2015.  What it

14   doesn't show you is the monies that he also received from

15   Victor Torosyan's personal Citizens Bank account.

16       So, here you have 11 1/2 months, because it started in

17   the middle of the month, times 3,000, which was his monthly

18   salary, and that should be $34,500 that he was entitled to for

19   that 11 1/2 month period.  These amounts are the $3,500

20   (indicating).  These are the amounts that the Government

21   alleges are over and above what he was entitled to.  It also

22   doesn't account for these monies below here (indicating), these

23   miscellaneous monies, the $5,000, the $6,000 that Victor

24   Torosyan gave David Tkhilaishvili before he went to the

25   Republic of Georgia.  So, this $1,500 and that $2,000 are the

1     $3,500 that the Government alleges is the embezzlement counts,

2     Three and Four.  It's monies over and above what the defendant

3     was entitled to as salary.

4              And, remember, Victor Torosyan told you that in

5     November of 2015 he told David Tkhilaishvili that no one was

6     getting salary because there was no money in Allied Health.

7     And you recall that this 3,000 right above where the red box

8     is, this $3,000 Check Number 346, was monies that Victor

9     Torosyan gave to David Tkhilaishvili because he said he needed

10    more money, and Victor said to him, "You either pay this back

11    or you take this as your salary, and no one's getting any more

12    salary."  Yet, David went and on his own took the $1,500 and

13    had a draw come from Granite Payroll as additional monies that

14    he took.  That's why he's charged with embezzlement in Counts

15    Three and Four.

16             For the embezzlement counts the Government also needs

17    to prove that these monies came from a healthcare program.

18    Now, you know that Allied Health was a healthcare program as

19    early as July 2015, when it received its contract from

20    Medicare -- this is Exhibit 29 -- which was effective as of

21    July 1st of 2015.  You also know that they received their

22    Harvard Pilgrim Healthcare Insurance which was effective as

23    early as November 2015, and that was Exhibit 12.  You heard

24    from Victor Torosyan that the company was seeing patients in

25    November of 2015 and began billing some patients as well.  Some

1    patients were not charged, but others who had Medicare and who

2    had Harvard Pilgrim, they were charged, and Allied Health did

3    bill the insurance companies.  The fact that Allied Health may

4    have been waiting for reimbursement until January of 2016 is of

5    no moment when you're considering whether this was a healthcare

6    program.  There's no question that in November of 2015 Allied

7    Health was operating as a healthcare benefit program as defined

8    under the law.  That simply means that Allied Health was an

9    entity that was providing a medical benefit or service for

10   which payment may be made under a plan or contract.

11       At the time of David Tkhilaishvili's embezzlement of

12   monies from Allied Health in November of 2015 Allied Health was

13   licensed by the Department of Health; they had contracts in

14   place with insurance companies for reimbursement for medical

15   benefits and services.  They were a healthcare benefit program

16   at the time that David Tkhilaishvili embezzled the $3,500.

17       So, what is this case about?  This case, contrary to

18   what the defendants said in their opening and will undoubtedly

19   argue before you again in their closings, is that this case is

20   all about threats, threats made by the defendants to Victor

21   Torosyan and his family and the clinic if he did not surrender

22   his interest in the clinic to them.  They want you to believe

23   that Victor Torosyan is just like them, specifically just like

24   David Tkhilaishvili.  Two peas in a pod, remember?  Similar

25   personality, loud, boisterous, fireworks.  But you observed

1    Victor Torosyan.   You observed his demeanor as he testified.

2    Did he seem to you to be another pea in a pod to David

3    Tkhilaishvili?  You must decide that.  But even the defendants'

4    own witness, Iraki, remember the MBA student, he told you that

5    he always knew Victor Torosyan to have a good nature, a good

6    personality.  The defendants told him that.

7         This is a case about these defendants who had a

8    vision, Members of the Jury.  They did have a vision, a vision

9    of making money, lots of money, by stealing from a man who had

10   come to America with only a few hundred dollars in his pocket,

11   a man that had worked his way up from pumping gas to owning

12   that same auto repair shop, a man that was able to save his

13   money, provide for his family, and even on many occasions give

14   money to his friends, friends who later would grow greedy and

15   take advantage of him.

16        You heard from Victor Torosyan about the threats made

17   by both defendants.  You heard from Victor Torosyan what was in

18   his head as he heard these threats, their claims to have

19   contacts with thieves-in-law, their claims to cut people, put

20   bullets in people's heads.  You heard how frightened he was,

21   and you saw his demeanor on the witness stand.  You heard what

22   he learned from Olga Dorofyeyeva about the defendants, about

23   their prior acts of violence, and that she, herself, knew

24   enough when it was time to get out.

25        And you heard from Levon, who witnessed the threats in

1   the parking lot.  He told you how angry the defendants were.

2   He told you he heard them demanding Victor's property.  He told

3   you how close Jambulat Tkhilaishvili got to Victor, and that

4   David Tkhilaishvili had to step in between.  He told you about

5   the fear that he saw in Victor Torosyan's eyes.

6          And then, Members of the Jury, you heard or we read

7   the words for you from David Tkhilaishvili's own mouth, from

8   the consensual recordings at a time before the defendants knew

9   that Victor Torosyan had gone to the FBI.  So, even if you

10  choose not to believe the testimony of Victor Torosyan for one

11  reason or another, you have defendant David Tkhilaishvili's own

12  words, his threats of violence to Victor and the clinic, his

13  claim that he couldn't control his brother, Jambulat, who had

14  put a bullet in someone's head, his claims of what they had

15  done in the past to people who had gone against them.  These

16  defendants not once, not twice, but repeatedly threatened to

17  hurt Victor Torosyan and his family if he did not surrender his

18  interest in Allied Health.  This is what this case is all

19  about, Members of the Jury.

20         David Tkhilaishvili, when Victor asks him about a

21  manager, "And nine people disappeared.  One killed himself.  My

22  brother did this one," Tkhilaishvili responds, "I am telling

23  you that -- that I can do that."  "I just wanted to kill all

24  five people right on the spot.  It was just a matter of a

25  minute."  And then he says, "I'm not saying this to you, I am

1    not saying because we want to scare someone.  I'm telling you

2    because you're my partner, we're together, so that you know to

3    not end up in those situations.  So that you know that --"

4         "That's why I hit her, Kristina, you know?  48,000 and

5    she sent it.  She was not supposed to send it."

6         David Tkhilaishvili:  "There should not even be one

7    complaint.  God forbid tomorrow the person has 40 percent and

8    he will shoot someone."  "Look what we've done, two doctors,

9    two doctors."

10        And Victor asks about, "Kristina.  You hit her in the

11   office in front of staff.  You can't do that."

12        David Tkhilaishvili confirms he hit her and says,

13   "It's ours.  She made me do that.  And, uh, anyway, because --"

14        And Victor tells you what was going on in his mind.

15   "Well, so now you might get agitated and hit me also.  You're

16   not normal."

17        And David Tkhilaishvili says, "When I told her ten

18   times that her money was supposed to be returned, it was

19   something else here.  She's an idiot, and that idiot almost

20   lost $95,000."  And he tells Victor, "Because when you tell

21   someone once, twice, three times --"

22        And then he tells Victor Torosyan:  "No, my brother

23   said that thieves-in-law don't have the last word on us.

24   That's first.  And, secondly, I went to Atenk (ph)," which you

25   heard is Athens in Greece, "to get this business.  I could get

1   it without that, but I don't want it to be on my soul.  I was

2   in Ukraine and I was in Moscow and -- to everybody, twenty

3   thieves-in-law have been informed about my business.  Twenty.

4   Twenty people, and they will control the whole world."

5          When Victor asks him, "Listen, who are the

6   thieves-in-law that let you?", David Tkhilaishvili says, "Who

7   are they?  They are those who gave the idea."

8          And Victor asks, "Are you going to go against me?"

9          David says, "No, no.  Against you -- if you go against

10  us, God forbid.  You get it?"  And then David tells him, "Like

11  I told you, one can't tell what will happen.  No one knows what

12  will happen.  That's why everything should be done nicely, in a

13  normal fashion.  Let's say literally he was my partner, friend,

14  man.  He said some bullshit and he got cut right in Downtown

15  Boston, man.  Arno, man.  How could he get cut?  The whole idea

16  was in my hands."

17         Can you imagine being Victor Torosyan and listening to

18  this?

19         And then David says, "We didn't make a contract to

20  have him killed.  They f'd up his mom, and he just went crazy

21  afterwards, started shooting up drugs and ruined his life."

22         When Victor asks, "And then you tell me, 'My brother

23  is crazy, I can't control him,'" David responds, "It was an

24  accident.  The police -- and he shot seven times nine bullets

25  at people."  He's talking about his brother, Jambulat, here.

1          And Victor asks, "What will you do to me?"

2          David says, "Well, I don't know.  I cannot tell you.

3    God forbid if I turn against you what would you do?  The same

4    goes for you."  David goes on to say, "If something here

5    doesn't work out the way we want, we won't be here and you

6    won't be here and there won't be, because --

7          "What will be?"

8          "What will be is that our souls will be empty, and

9    when our souls are empty who the fuck knows what will be then?"

10         Here he talks about shooting a friend.  He says, "It

11   happened.  We were drunk.  He hit me and did that thing."

12         And here David Tkhilaishvili reminds Victor Torosyan,

13   "I always carry a gun with me.  I always carry a gun with me."

14   He tells Victor, "I have 20 people in New York.  I have Bakha,

15   the thief-in-law.  He's our brother."

16         And when Victor questions him, "In New York there's a

17   thief-in-law that's a friend of yours?"

18         David says, "Of course, our friend, our brother.  He

19   controls everything in New York and everywhere.  But, anyway,

20   besides that this kind of friend is a different thing."

21         Victor says, "I don't have friends that are

22   thieves-in-law.  I lead a normal life."

23         And David Tkhilaishvili says, "Well, that's how we

24   grew up.  What can I do?  We live a nice, clean, normal life.

25   But everyone, the thieves-in-law, they listen to us.  It takes

1   a phone call to Georgia and the word goes out.  People are

2   killing each other.  We make a phone call, and our word is all

3   it takes," and he says, "That's how it is in my family.  That's

4   it, because that's how we roll."

5          That is what this case is about, Members of the Jury.

6   That is extortion, and it is a crime.  Even if you believe that

7   Victor Torosyan had made a promise to Saba to give him his

8   interest in Allied Health, these defendants had no right to

9   make these threats, because no one under any circumstances has

10  the right to threaten another person with physical harm.  It's

11  against the law and the defendants knew that.  This was a plan,

12  a scheme, not by Victor Torosyan, but by the defendants, a plan

13  to get Victor Torosyan to invest in a company that they would

14  then loot and throw him out of.  If they were so upset about

15  Victor Torosyan's control over Allied Health, they should have

16  sought legal recourse.  But that's not how they wanted to

17  resolve this matter, because remember what they said?  They are

18  outlaws.  They don't believe in contracts.  That's why Jambulat

19  Tkhilaishvili signed the Operating Agreement and then continued

20  to threaten Victor Torosyan.  That's why he signed the

21  Operating Agreement at the same time.  Contracts meant nothing

22  to either of these defendants, because they always knew that in

23  the end they would resort to threats and violence to get their

24  way, because that's how they roll.

25          Victor Torosyan had the courage to seek help from law

1    enforcement to put an end to these threats, and not because he

2    wanted to take over this failing business, this business that

3    had $8,000 in its checking account, this business that Victor

4    Torosyan has now invested over $885,000 in.  He sought help

5    because what they did is a crime, the crime of extortion and

6    embezzlement, and for that I ask you to find these defendants

7    guilty of a conspiracy to commit extortion, attempted

8    extortion, and to find David Tkhilaishvili (indicating) guilty

9    of embezzlement.

10            THE COURT:  Thank you, Ms. Kaplan.

11            Mr. Cruz.

12            MR. TUMPOSKY:  May we approach, your Honor?

13            THE COURT:  Yes, although if it's some

14   non-contemporaneous objection, of course, it is going to be

15   overruled.

16   (SIDEBAR CONFERENCE AS FOLLOWS):

17            MR. TUMPOSKY:  Your Honor, well, it is an objection.

18            THE COURT:  Why wasn't it made contemporaneously with

19   the closing argument?

20            MR. TUMPOSKY:  My understanding was perhaps mistaken

21   that it is appropriate also to wait until the end to not

22   interrupt.

23            THE COURT:  No, it is not.  If you want a response

24   that is mitigating in some fashion you have to deal with it

25   immediately.  But what is the objection?

1          MR. TUMPOSKY:  I have three objections.  At the

2     beginning the Government argued that we had said in our opening

3     we would prove that Victor had a specific motive.  Of course,

4     that's not our obligation.

5          THE COURT:  I deal with that in the instruction about

6     who has the burden.

7          MR. TUMPOSKY:  The Government argued that commerce was

8     affected because Allied Health had contracts with out-of-state

9     companies.  Allied Health is not the victim here, Victor

10    Torosyan is, so whatever Allied Health did in interstate

11    commerce is not relevant.

12         THE COURT:  I don't believe that that is the law

13    either.

14         MR. TUMPOSKY:  And there was an argument that the

15    defendants also sought a profit-splitting arrangement, and I

16    don't believe that came out during the testimony.

17         THE COURT:  I am going to leave it to the jury to

18    decide the evidence in the case.

19         So, I overrule those objections on two grounds:

20    First, they were not contemporaneously made.  They have to be

21    made contemporaneously if you want an immediate response.

22    Number two, I don't find them to be well-founded.

23    (END OF SIDEBAR CONFERENCE)

24         MR. CRUZ:  May it please the Court.

25         THE COURT:  You may proceed.

1          CLOSING ARGUMENT

2     BY MR. CRUZ:  Folks, I'm just going to make sure that you can

3     see the visual presentation on your screens.  Okay.  Thank you.

4          Ladies and gentlemen, at the beginning of this case we

5     did tell you, or I did tell you, I should say, that what we are

6     really dealing with here is a business dispute between Victor

7     Torosyan, David Tkhilaishvili and his brother, James

8     Tkhilaishvili.  Everything that you have heard and seen in this

9     particular case points to that conclusion.  What the Government

10    has offered you in this case is testimony, evidence and

11    documentation that is rife with ambivalence and indecision all

12    on the part of their most important witness, Mr. Victor

13    Torosyan.

14         When you think about whether or not any threats were

15    truly made in this case, what I would like to refer you to, as

16    I told you in my opening statements, is keep an eye on and pay

17    attention to what happened in the aftermath of these supposed

18    threats.  Was Victor Torosyan intimidated?  Did he act as

19    though he was frightened?  And I suggest to you that he didn't.

20    In fact, the opposite occurred, and the evidence has shown that

21    Mr. Torosyan's position with regard to his authority and power

22    within the business didn't diminish as one would think if

23    somebody was being threatened with violence, if his family was

24    being threatened with violence, or if people were threatening

25    to burn down the business.  In fact, the opposite occurred.

1          First, on August 22nd of 2015, this is the date that

2    the first set of threats occurred, and on that date we have

3    evidence presented by the Government that Victor Torosyan and

4    David Tkhilaishvili and his brother James were talking about

5    this particular waiver regarding the pizza business

6    (indicating).  This first waiver in Exhibit 4 is the waiver

7    that both David and James wanted Victor Torosyan to sign.  And

8    in this waiver they suggested that, if they sell the pizza

9    place, that they would be able to keep the profits and do

10   whatever they wanted with them.

11         Victor Torosyan presents this second waiver

12   (indicating) during that meeting, and in the second waiver, as

13   you can see in the highlighted text, which is in Exhibit 5, he

14   inserts this provision, that, "I, David Tkhilaishvili, will

15   keep entire money in the escrow account and will not use them."

16   So, in this exchange between Victor Torosyan, David and James

17   Tkhilaishvili, Victor Torosyan wins because he gets both David

18   and James to agree to tie up their money in escrow."  You

19   cannot spend the money that you get from any sale of the pizza

20   place, that is my word here," and that is what they do.

21         Now, on August 22nd of 2015 you heard that this was

22   the first time that David and James threatened Victor Torosyan,

23   that they approached him in one of the rooms of the clinic,

24   that they threatened him personally with violence, his family,

25   and to burn down the clinic if his interest was not turned over

1    to a specific person, that being the witness Saba

2    Kikoliashvili.  Do you really think that this threat would have

3    occurred in the aftermath of this exchange where you have

4    Victor Torosyan winning the negotiation and telling David and

5    James, "You're not going to get any money; you're not going to

6    be able to use the money that you get from selling the pizza

7    business; what you're going to do is make sure that it's

8    deposited into an escrow account so that I know where the money

9    is and I know that my investment is safe"?  Because that was

10   the original purpose of pledging the pizza business, to make

11   sure that his investment was secured.  He won those

12   negotiations, and it makes absolutely no sense that James and

13   David Tkhilaishvili would have threatened him in such a manner

14   as he told you after he won this bought of negotiations.  He

15   won, he was in charge, and that carried on throughout this

16   particular case.

17          Now, in the months after this initial set of threats

18   in August of 2015 you heard Mr. Torosyan say or try to explain

19   why he didn't go to law enforcement.  He waited months until he

20   told the FBI that he was being threatened with violence in this

21   manner.

22          What he did tell you he did, after each and every one

23   of these instances where he was allegedly threatened, he would

24   tell David and James Tkhilaishvili, "Let me go talk to my

25   lawyers."  Does that sound like someone who is being

1    threatened, or does that sound like someone who is trying to

2    negotiate a better position in a contract dispute?

3            After this first set of alleged threats in August he

4    said that he told his lawyer, Bob Griffith, not only about the

5    requests or demands that David and James were making but about

6    the threats.  But did Bob Griffith, Attorney Bob Griffith, or

7    anybody else, including Mr. Torosyan, himself, go to law

8    enforcement?  No.  And I would ask each and every one of you to

9    think about that.  Does that make sense to you, that someone

10   put in a position where they were threatened, their family was

11   threatened, their livelihood was threatened, if they would even

12   waste one second before going to law enforcement?  Absolutely

13   not.  And it didn't happen in this case because no threats were

14   made.  This was a business dispute from day one, and it didn't

15   escalate to the point, I would suggest to you, where either

16   Attorney Bob Griffith or Victor Torosyan, himself, felt it

17   necessary to go to the police, and that's why it didn't happen.

18           So, in the months after August of 2015 Victor

19   Torosyan's power within Allied Health increases even more than

20   this exchange of waivers concerning the pizza business.  As you

21   saw in September of 2011 -- I'm sorry -- September 11th of

22   2015, we have this Duty of Loyalty provision that is inserted

23   into the final Operating Agreement or contract for Allied

24   Health by Victor Torosyan's lawyers at Verrill Dana, and this

25   particular provision gives Mr. Torosyan even more power and

1    authority than he had under the original Letter Agreement that

2    was signed back in December of 2014.  And, as you can see in

3    the highlighted provision, "Any violation of such duty by a

4    member will be grounds for forfeiture of such member's entire

5    interest upon the consent of the Class A members."

6         Now, Ms. Kaplan showed you a section of the

7    December 14th Letter Agreement and argued that that provided

8    Victor Torosyan back in December of 2014 with the same

9    authority, and that's not true.  As you can see from this

10   provision, which is also in the Letter Agreement of December

11   2014 (indicating), which Ms. Kaplan did not show you in her

12   presentation, if you read this you will see that it states

13   that, "Notwithstanding the foregoing, until Victor recovers his

14   entire investments in Allied Health and Health Management

15   Group, in the event of deadlock on any matter voted on by

16   Victor and Jambulat, Victor will have the authority to decide

17   the matter."  It goes on to state that his decision is the

18   final decision in any business disputes.

19        And you folks can read that provision in its entirety

20   as part of Exhibit 2 in your deliberations.  But nowhere in

21   that provision, which is the Special Consent Authority that

22   we're talking about, does it say that Victor Torosyan can't

23   exterminate or eliminate the entire membership interest of

24   David and James Tkhilaishvili.  That does not appear anywhere

25   in the original Letter Agreement.  And I suggest to you that

1    Duty of Loyalty, Section 2.08, that provision that ends up in

2    the final draft of that contract is very different and gives

3    Mr. Torosyan even more power than he had under the previous

4    agreement and arrangement with David and James Tkhilaishvili,

5    and if that's the case he is doing it through his attorneys and

6    he is doing it in the face of threats of violence to himself,

7    his family and his livelihood.  Again, he is not going to the

8    police or to the FBI, but he is working with his attorneys to

9    get more leverage within the business.

10           Now, in order for Mr. Torosyan to exercise this Duty

11   of Loyalty provision, which he ultimately did, because he

12   ejected both David and James Tkhilaishvili from the business in

13   January of 2016, he had to have a number of violations of this

14   Duty of Loyalty to use in order to exercise the provision, and

15   what he used is everything that you have heard during the

16   course of this trial, which is the allegations of threats of

17   violence by both David and James Tkhilaishvili, and also the

18   issue regarding the embezzlement or stealing of money without

19   authorization.  So, he needed those claims, and I suggest to

20   you that they are false claims for one purpose and one purpose

21   only, which was to seize control of the business.  Whether, as

22   Ms. Kaplan argues, it was profitable or not, the point is that

23   everybody involved in this venture from the beginning thought

24   that there would be some realization of large profits when this

25   company became a success.  That's really what we're talking

1    about here.

2           Now, with regard to the threats portion or the alleged

3    threats portion of this case, you folks have heard evidence

4    indicating that the basis for the threats was, "Give a

5    percentage of your ownership interests to Saba Kikoliashvili."

6    And you heard from Mr. Kikoliashvili, and he testified to you

7    that Victor Torosyan on more than one occasion, first in that

8    Watertown restaurant meeting in the Fall of 2015, and then in a

9    later phone call when he spoke to Mr. Torosyan in December of

10   2015, he told you, "Victor Torosyan promised me, personally,

11   that I was going to get 5 percent of an ownership interest in

12   this business, that I had earned it, and that he recognized

13   that."  Ladies and gentlemen, if that is the case, then why

14   would there have been a need to make these threats in the first

15   place?

16          At that meeting at the Watertown restaurant

17   Mr. Kikoliashvili testified that David and James Tkhilaishvili

18   were present, and they saw and heard what Victor Torosyan told

19   Saba.  Now, when Victor Torosyan testified, he said David and

20   James were there.  He also said that Saba was there, and he

21   tried to qualify promising the interest in this way:  He said,

22   "You're not going to get an interest in this clinic that we're

23   dealing with right now that we just opened.  I can't offer you

24   a position there, but you will have a job in the next clinic

25   that we open."  Mr. Saba testified, "That's not what he told

1   me.  He told me I had an interest in this clinic that is open

2   now, but that he couldn't offer me a job until the following

3   clinic location was open."

4         And I ask you, ladies and gentlemen, what difference

5   does it really make?  A promise is a promise, and if those

6   words came from Victor Torosyan's mouth, "You earned the

7   5 percent and you're going to get it," again, why would David

8   and James Tkhilaishvili, who are watching this unfold in front

9   of them, feel the need to threaten Victor Torosyan to do

10  something he already agreed to do?

11        This is all going to fall or rise on whether you think

12  Victor Torosyan is credible, whether he is telling the truth.

13  And when you think about Mr. Saba, I'm going to ask you how

14  different is he from Levon Jyulnazaryan, and you heard from Mr.

15  Jyulnazaryan.  He is the person who came in and testified about

16  being present at that early November 2015 meeting where Victor

17  Torosyan was threatened a second time, and he saw the fear in

18  Victor Torosyan's face when he left, and he saw some of the

19  activity that both David and James were engaged in to quote,

20  unquote, threaten him.

21        Now, when you compare Saba and Mr. Jyulnazaryan, they

22  are very similar in the sense that Mr. Jyulnazaryan was also

23  not in a position to, given his background, be the CFO of a

24  medical business.  You heard that prior to that job he had been

25  working at a failed restaurant venture in South Carolina before

1    Victor Torosyan offered him that position, which, by the way,

2    was David Tkhilaishvili's job, but he was gone at this point

3    because of the Duty of Loyalty provision.  What you also heard

4    was that Mr. Jyulnazaryan was Victor Torosyan's childhood

5    friend, that he knew him from the time that he was 14, and I

6    would suggest to you, ladies and gentlemen, that that says it

7    all.  Mr. Jyulnazaryan is and was Mr. Torosyan's friend,

8    confidante and supporter, and, most importantly, he is on the

9    payroll, and he still is on the payroll because he is working

10   for Mr. Torosyan and he has an interest in Allied Health,

11   according to him 4.9 percent of an ownership interest, and he

12   has backed Mr. Torosyan at every turn for those reasons,

13   including signing off on an affidavit in the civil case that

14   Mr. Tkhilaishvili and his brother brought, backing Mr. Torosyan

15   yet again.

16        So, I suggest to you, ladies and gentlemen, that his

17   testimony should be taken with a grain of salt, because,

18   clearly, he knows where his livelihood is coming from and he is

19   being loyal to his friend, and for those reasons he will

20   support his friend in this endeavor, which is continuing to

21   maintain control of this business.  And I tell you that there

22   is a little bit of a difference between Mr. Jyulnazaryan and

23   Saba, because, although Saba didn't have much by way of

24   experience in the medical business, he did explain to you

25   exactly what it was that he did to help start Allied Health up.

1    He told you that Victor Torosyan recognized that, and for that

2    very reason Victor Torosyan, himself, offered him the ownership

3    interest.  And, yes, he is David Tkhilaishvili's friend; yes,

4    he is someone who is supportive, arguably, of David

5    Tkhilaishvili.  But the difference between these two people,

6    ladies and gentlemen, is that Mr. Torosyan, himself, promised

7    that interest, therefore, there's no need and was no need ever

8    for threats to be made against him by David Tkhilaishvili.

9         Now, ladies and gentlemen, the other issue that we're

10   dealing with here is this claim that Victor Torosyan makes that

11   David Tkhilaishvili took money from Allied Health Clinic

12   without authorization, and specifically that there were two

13   payments that were made in November of 2015 that were not

14   authorized, the $1,500 check and then the $2,000 draw through

15   payroll.  And I would suggest to you that one way of looking at

16   this entire issue is that Mr. Torosyan in his work at Allied

17   Health created a culture of loose management of financial

18   irresponsibility, and you heard from him personally that he has

19   done things such as lend employees money, that he has paid for

20   housing costs for employees, that he has spent money on trips

21   for himself, that he has bought or purchased a car through his

22   business, Belmont Auto, with Allied Clinic funds.  All of these

23   things he he's done, yet at the same time he's being critical

24   of Mr. Tkhilaishvili for doing essentially the same thing, and

25   I would suggest to you that it isn't exactly the same thing.

1   Mr. Torosyan needs it to be taking money without authority in

2   order for the exercise of his Duty of Loyalty power to work,

3   and he needs it to be stealing or taking because that's the

4   basis for the Government's claims in Counts Three and Four of

5   embezzlement.  In other words, "If I don't know about it,

6   you're stealing it."  But I would suggest to you that he did

7   know about it, and he did know about it because he had done it

8   in the past.

9          And when we're talking about specifically August of

10  2015, we heard a little bit this morning from Special Agent

11  Nelson about the $5,000 and the $6,000 checks that are

12  referenced in evidence.  And what did Special Agent Nelson say?

13  He said, "Mr. Torosyan told me that he, David, borrowed

14  $11,000, and that that $11,000 was broken up into payments of

15  $5,000 and $6,000," which, coincidently, are the amounts of the

16  two checks that you have in evidence before you.  So, which is

17  it?  Did he lend him the money, or did David Tkhilaishvili take

18  the money without authorization?  Again, this is another

19  example of Victor Torosyan being ambivalent with you and being

20  indecisive with the FBI about whether or not the money was

21  taken, quote, unquote, which would mean embezzlement, or

22  whether it was borrowed, which means he knew about it and it

23  wasn't stealing.

24          So, back in August of 2015 the money was lent to David

25  Tkhilaishvili.  Victor Torosyan knew about it.  And, as you

1   will see with regard to the payroll payments, this is an email

2   that is in evidence (indicating).  It's dated November 27th of

3   2015.  And in this email you will see that Victor Torosyan is

4   asking David Tkhilaishvili for information regarding the

5   payroll for the month of November of 2015, and you can see the

6   specific dates that are referenced.  David Tkhilaishvili

7   provided Victor with that information.  So, does it make sense

8   to each of you that Victor Torosyan is now saying that he

9   didn't know about the salary payments for November 2015?  One

10  would think that a payment that was made on November 19th,

11  which is the subject of Count Four of the indictment, that

12  information would be contained in this email or message to

13  Victor Torosyan.  So, he did know about it.  And with regard to

14  the $1,500 check that was issued or signed by David

15  Tkhilaishvili earlier that month, that was $1,500, which is the

16  same salary payment that David Tkhilaishvili took all year long

17  up until that point.

18          And as you will see in Exhibit 26, which was provided

19  by Agent Zimmerman, the highlighted section shows that -- or

20  the entire thing shows that David Tkhilaishvili was getting

21  paid $1,500 twice a month regularly.  Those are all salary

22  payments, and that is consistent with what the Letter Agreement

23  states his salary would be for the year.

24          The highlighted section specifically points out the

25  payroll payments for August and September of 2015.  Those are

1    the months after which Mr. Torosyan lends David $11,000.

2    That's what he told Special Agent Nelson. David still gets his

3    salary in August and in September of 2015, despite the fact

4    that Victor Torosyan loaned him $11,000.

5         So, what I'm suggesting to you, ladies and gentlemen,

6    is the same thing happened in November of 2015, when Victor

7    Torosyan says to you, "$3,000 in October of 2015 was a loan

8    that I gave him and I told him there was no money to pay

9    employees' salary, so if you don't pay me back within a week,

10   you consider that your salary for November of 2015." But can

11   you really believe that statement? Here we have proof by way

12   of the email from David to Victor Torosyan giving him all the

13   information for November payroll. He never complained about

14   it. He didn't tell the FBI about it until months later. But

15   clearly he knew about it. And the $1,500 check was consistent

16   with all of the monies that he had received previously by way

17   of payroll. It wasn't any more, it wasn't any less. And if

18   you are wondering what the difference is between the $1,500

19   payment earlier in the month and the $2,000 payment later in

20   the month, the Letter Agreement states specifically that

21   David's salary is going to go up to $52,000 a year once the

22   clinic becomes operational. That clinic officially became

23   operational in the middle of November of 2015, so David took a

24   payroll draw that was consistent with that higher salary of

25   $52,000.

1    Would David Tkhilaishvili have written himself a check

2    for $1,500 in November of 2015 and then gone to the trouble of

3    getting a payroll draw through a payroll company if he was

4    trying to steal the money?  And I would suggest to you that

5    that's not the case.  Victor Torosyan had a large cash

6    investment in this company.  You can be sure that he was

7    watching how every penny was spent.  He knew what checks were

8    being written, and he also knew what was going on with payroll.

9    And if that's the case, then this isn't embezzlement.  What

10   this is, is a false claim on his part which is designed

11   specifically to let him execute this Duty of Loyalty provision,

12   one more thing to add to the checklist which gives him the

13   authority to take both David and James out of the equation with

14   regard to Allied Health.

15       So, I ask you to look at this evidence carefully,

16   because what's going on in August of 2015 with the loan and

17   then the payroll payments being made -- and you know it's a

18   loan because that's what he told the FBI -- and the situation

19   in November of 2015 is the same thing.  David was entitled to

20   his salary in November, and he took it, and Victor Torosyan

21   knew it, didn't complain about it.

22       Lastly, ladies and gentlemen, with regard to this

23   issue Mr. Torosyan said, "We can't pay anybody in November

24   because we don't have any money."  Yet you heard that somehow,

25   and this wasn't something that Agent Zimmerman was able to

1    determine from looking through the bank records and statements

2    that she had reviewed, which were voluminous, he had

3    approximately $100,000 in November of 2015 and previous to that

4    that he was able to invest in a business called "Powerhouse

5    Kickboxing Gym" in Watertown, Massachusetts.  Agent Zimmerman

6    couldn't find any evidence of any transactions of that type

7    relating to that business venture.  So, is it true that he

8    really didn't have any money to pay employees?  It isn't.  He

9    had the money.  David Tkhilaishvili was entitled to that money

10   in November of 2015, and Victor Torosyan knew it.

11          The other information that you heard about the misuse

12   of clinic monies primarily came from witness Olga Dorofyeyeva,

13   and specifically she touched on a number of things, including

14   cell phones that were being paid for with company money, the

15   American Express Card that was in her name that was being paid

16   for with company funds, and her car insurance was being paid

17   with company funds.  She explained each of those things to you.

18   Victor Torosyan told the FBI, "I didn't know anything about

19   those things, and I never authorized those payments."  Yet she

20   told you the cell phones were a carryover from Davis Clinic.

21   "We all had cell phones related to Davis Clinic that was a

22   business expense, and that practice carried over to Allied

23   Health."  That's why she still had her phone, and that's why

24   the company was still paying for it.

25          In addition to that, she said that the Amex Card that

1    was filled out in her name was in her name because she had an

2    ownership interest and she had the ability to, according to

3    David, Victor and Kenton Fabrick, apply for this card because

4    she was an owner.  She told you that she monitored those bills,

5    that to her knowledge David Tkhilaishvili never used the Amex

6    Card for any personal reasons, and that those bills, after she

7    reviewed them, were sent to Kenton Fabrick, Victor Torosyan and

8    David Tkhilaishvili, and she would always copy at least two of

9    them so that she would make sure that the bill was paid, and

10   the bills were paid at that point as they always had been, by

11   Victor Torosyan.  So, who do you think ultimately got copies of

12   those Amex bills?  He did.  Yet he tells the FBI, "I didn't

13   know anything about that, and when I took a closer look I saw

14   that there were things that I wouldn't have authorized."  Well,

15   that's very convenient.  Now he is able to add that to his

16   laundry list of violations of the Duty of Loyalty that get him

17   control of the business.

18          Lastly, with regard to the car insurance, he said, "I

19   never told David that he could pay for Olga's car insurance on

20   two occasions."  What did she say to you?  She said that was a

21   business-related expense, because it was a business vehicle.

22   Again, there is no misuse of funds here.  These are all false

23   allegations that are being put forth in order to take control

24   of the business.

25          Lastly, with regard to Ms. Dorofyeyeva, you heard that

1     she clearly is no fan of David Tkhilaishvili, but I would

2     suggest to you that she's also being or has exhibited signs of

3     being ambivalent with regard to David Tkhilaishvili, and the

4     reason for that is because she had been with him all along

5     through the time at Davis, through the startup of Allied

6     Health, which they all work worked on, according to her, and

7     she never left him.  Whatever his personal issues were,

8     whatever his affect was, however he acted around both her and

9     Kenton Fabrick when they were working at his home in the home

10     office, she didn't leave him, she wasn't afraid of him, and she

11     was thinking about making this business a success.

12         So, I would ask that you think about that in assessing

13     her testimony.  And you should also consider the fact that she

14     is currently on Victor Torosyan's payroll.  She lent Victor

15     Torosyan money.  It's not clear whether she lent it to Kenton

16     Fabrick or to Allied Health or to Victor Torosyan, but you

17     heard him answer questions about that, and he wasn't very clear

18     in his answers, but the bottom line is that Olga Dorofyeyeva to

19     this day is still being paid by Allied Health, Victor Torosyan.

20     She is firmly in his camp, just like Mr. Levon Jyulnazaryan,

21     and she's going to say what he needs her to say in order to

22     keep control of Allied Health.

23         Now, with regard to the transcripts that you have as

24     evidence before you, Ms. Kaplan went on at length about these

25     transcripts, because, quite frankly, it is the Crown Jewel of

1   the Government's case.  She says that those are David's words,

2   and that they are threatening in nature.  And what I would

3   suggest to you, ladies and gentlemen, is that you should review

4   these transcripts and these pieces of evidence very carefully,

5   and it's the November 25th transcript and the November 30th,

6   2015 transcript, and the reason for that is because Victor

7   Torosyan had a hand in their creation from the very beginning.

8   The FBI provided him with the recording equipment, they told

9   him what he needed to do.  He met with David Tkhilaishvili on

10  both those occasions, and, as you will see from reviewing these

11  transcripts, he steered the conversation into areas that he was

12  aware of already, into things about David Tkhilaishvili that he

13  knew, and, based on his 10 years of being friendly with this

14  person, was never frightened of previously, he continued

15  maintaining a relationship with him.  But Victor Torosyan knew

16  that if he brought these subjects up during the course of these

17  recorded conversations they would be of interest to the FBI,

18  because the FBI was listening, but he was not afraid of what

19  David Tkhilaishvili was saying.

20         In addition to that, ladies and gentlemen, you heard

21  that -- this is the first page of the November 25th transcript

22  (indicating), and you can see in the highlighted text these

23  transcripts were translated from three different languages,

24  Russian, Armenian and Georgian, and you can see the comment

25  there in the highlighted text from the linguist who did the

1    translation that David Tkhilaishvili speaks poorly, with

2    significant errors, and his speech is often disconnected and

3    unintelligible, and that's with regard to his command of the

4    Russian language.  So, I ask you to consider that in thinking

5    about how to assess these transcripts.  And, as an analogy, you

6    can think to yourself what does a person who speaks English

7    poorly, with significant errors and is often disconnected and

8    unintelligible, would sound like?  Would that person be easy to

9    understand?  Would that person make mistakes?  So, use an

10    expert linguist translator's opinion about his command of the

11    Russian language to assess these transcripts.

12           What you should also do is consider the fact that

13    Victor Torosyan had a hand in editing these transcripts.  You

14    heard an exchange between myself and Alla Lubinsky, which is

15    the linguist, who was the first witness in this case that

16    helped do the translations of the transcripts that you have in

17    evidence, and she agreed that Victor Torosyan had provided

18    editing assistance to her and to a second linguist who had

19    already gone through the recordings, and that he made multiple

20    additions and suggestions, and I highlighted one specifically,

21    the word "drunk" versus the word "shoot," where the word

22    "drunk" appeared initially after the hours put in by two

23    translator linguists in translating this into English.  He

24    changed those words or this particular word "drunk" to "shoot"

25    on multiple occasions.  And what's the effect of that?  The

1    effect of that is to make David Tkhilaishvili sound more

2    violent, more aggressive.  And this happens throughout the

3    transcripts that you have before you.

4         Ms. Lubinsky also said that in the 21 years that she

5    has worked with the Department of Justice she has never done

6    this, she has never been asked to let a participant in a

7    recorded conversation pipe in as to what's being stated.  And,

8    again, he is adding things where words are unintelligible and

9    he's adding things in complete form that didn't exist there

10   previously, according to Ms. Lubinsky's testimony.  So, I ask

11   you to think about that in assessing how valuable these

12   transcripts are to you and whether or not what you are reading

13   are the words of David Tkhilaishvili, or are they the words of

14   Victor Torosyan, who clearly has an interest in the outcome of

15   this case?

16        Even though Mr. Torosyan had the ability to edit these

17   transcripts, I would suggest to you that there are some grains

18   of truth within these transcripts, and you can see some of the

19   excerpts that I've brought forward, which is that on each of

20   these occasions Mr. Tkhilaishvili is denying any harm or threat

21   toward Victor Torosyan.  "I'm not saying this to you, I'm not

22   saying because we want to scare someone.  I'm telling you

23   because you are my partner, we are together."  In the next

24   excerpt, "Okay, but whether you want a contract to be this way

25   or however you want it, I will not go against you.  I will

1   never do that."  And, lastly, a lot of talk about this

2   "thieves-in-law" term.  He says in this excerpt, "Never in my

3   life had I said thieves-in-law."  So, even though this set of

4   transcripts has Victor Torosyan's fingerprints all over it,

5   edits, changes, et cetera, there are some bits of truth in the

6   transcripts, which is that David Tkhilaishvili never directly

7   threatens Victor Torosyan in these conversations.  He always

8   says, "No, I'm not talking about you."  He always says that he

9   wants to work out whatever their differences are, that he

10   doesn't care about the 5 percent interest to Mr. Saba.  He says

11   all of those things.

12         And, again, what you have in front of you is a bit of

13   evidence that is ambivalent.  Is it a threat, is it not a

14   threat?  And it is not anything like those earlier unrecorded

15   interactions that Victor Torosyan talked about, because both in

16   August of 2015 and in early November of 2015 those meetings

17   with David and James Tkhilaishvili were not recorded, and he

18   described them in graphic detail as being almost physically

19   violent.  And, as you read through these transcripts, or at

20   least the portions that we've highlighted, you'll see that

21   that's not the tenor of these conversations.  There's never any

22   threat to harm Victor Torosyan directly, to lock him in a room

23   or to do anything of that nature.  In fact, a lot of the

24   conversation has to do with business-related issues.  So, you

25   will see all of that.

1    So, I would argue to you that these words in these

2    transcripts are not and should not be important to you, because

3    clearly they were not important or meaningful to Victor

4    Torosyan. And how do you know that? You know that because of

5    the way that he acted in the aftermath of all of these threats.

6    You know that, in other words, he wasn't afraid. He wasn't

7    afraid of any of -- of David or James. He interacted with

8    them, he talked to them, he worked with them. He let David

9    Tkhilaishvili go to his house in Mashpee on multiple occasions,

10   giving him the keys to the home and the security code to the

11   house, which he never changed, and he did so even after many of

12   these threats were made. That was October 30th of 2015. And

13   that's what Mr. Iraki Laliashvili testified to. So, ask

14   yourselves whether or not that makes sense to each of you, that

15   someone who had been threatened with physical violence in this

16   way and whose family had been threatened with physical violence

17   would have allowed that person who made those threats access to

18   his home and didn't change the locks or the security code or

19   anything else. So, he didn't act like a person that had been

20   threatened or whose money had been taken from him.

21   Ladies and gentlemen, I'm just going to leave you with

22   a couple of pieces of evidence that you have before you. This

23   is a photo of the opening party for Allied Health in October of

24   2015 (indicating), and what I'm going to suggest to you, ladies

25   and gentlemen, or argue to you, is that these pictures of the

1   opening party for Allied Health are really what this case is

2   all about.  They reveal the truth of what is happening between

3   Victor Torosyan, David Tkhilaishvili and James Tkhilaishvili

4   throughout this entire time period.  Now, this isn't a truth

5   that you are going to get from listening to testimony or

6   looking at a document.  This is a truth that you see with your

7   own eyes, and I'm going to ask, as I scroll through these

8   pictures, whether or not Victor Torosyan looks like man who is

9   frightened.  There he is with James Tkhilaishvili at the

10  opening party; there he is with David and James' parents, whom

11  he came to know very well over the ten-year period he knew

12  them; there he is with his wife and his two children

13  interacting at this opening party with two people who had

14  threatened his life and their lives, and I ask you to look in

15  their faces and judge for yourselves whether or not anyone in

16  that photograph is frightened.

17          And, finally, ladies and gentlemen, you see everyone

18  involved in this opening party cutting the cake, excited about

19  the future of the company and hopes that it will be profitable.

20  Victor Torosyan does not look frightened in this photograph

21  because he never was.

22          Ladies and gentlemen, as this case proceeded I think

23  you noticed that Victor Torosyan's demeanor changed while he

24  was on the witness stand.  At the beginning of my argument I

25  said to you that he exhibited signs of ambivalence, of

1    indecision, second-guessing, if you want to call it that, and

2    as he continued in his testimony in this trial he appeared to

3    be apologetic to David Tkhilaishvili.  He expressed emotion,

4    and he did that because he realized that this sequence of

5    events that he had started by involving the FBI months after

6    these alleged threats were first made, that he couldn't control

7    that process any longer, that this was a train that had gotten

8    out of control, that he couldn't stop.  And I would argue to

9    you that that emotion that you saw was feelings of regret on

10   his part at what had happened to David Tkhilaishvili and what

11   had happened to their friendship and their relationship because

12   he wanted control of Allied Health.  That process he could

13   control through attorneys in negotiation, and he did it well,

14   but when you involve the FBI it's a different story, and he

15   realized I think -- strike that -- and he realized during the

16   course of this trial that the consequences here are grave.

17   This is an important situation, and he couldn't control it any

18   longer, but it's too late for him to take it back, it's too

19   late for him to say something different, although he did on

20   multiple occasions about various things.  He's leaving it to

21   each of you to make a decision about whether or not David

22   Tkhilaishvili is guilty of conspiring to commit extortion, of

23   attempting to commit extortion and of embezzlement.  That's a

24   very important decision, which he has brought to you in an

25   ambivalent and indecisive manner, and you could see that from

1    his affect.

2           The Government has the burden of proving this case to

3    you beyond a reasonable doubt.  Being ambivalent, being

4    indecisive and second-guessing yourself is certainly not proof

5    beyond a reasonable doubt.  Victor Torosyan was not comfortable

6    while on the witness stand, as you saw, and neither should any

7    of you be.

8           David Tkhilaishvili is not guilty of threatening

9    anybody.  There was no reason to threaten Victor Torosyan.  He

10   had promised Saba the interest.

11          David Tkhilaishvili is not guilty of embezzlement or

12   stealing.  Victor Torosyan lent him the $3,000, and then knew

13   about the salary that he took in November of 2015.  All of

14   these are just false claims to get control of the business,

15   which he ultimately did.  This case is something that should be

16   decided in state court.  The process has already started by

17   David and James Tkhilaishvili.  You, as jurors, should make a

18   decision in this case that allows them to continue that dispute

19   in state court, because it is a business dispute.  This was

20   never about a crime.

21          So, for those reasons I am going to ask that you find

22   David Tkhilaishvili not guilty.  Thank you.

23          THE COURT:  Thank you, Mr. Cruz.

24          I think, ladies and gentlemen, in light of the time

25   period, what we will do now is take our morning break, say,

1    15 minutes, and then we will continue with the closing

2    arguments of counsel and probably go straight into the

3    instructions after that.  In any event, you have got almost all

4    of it, but not all of it, so you are not going to talk about

5    the case, you are going to talk about other things.  We will

6    see you in about 15 minutes.

7         THE CLERK:  All rise.

8         (The jury exited the courtroom at 11:20 a.m.)

9         THE COURT:  You may be seated.  The question of the

10   juror that you raised, Mr. Tumposky, do you want to pursue that

11   any further?

12        MR. TUMPOSKY:  I would still press it, your Honor.  I

13   don't have my colleague here to provide any additional --

14        THE COURT:  Well, I said that, in order to press it,

15   we would have to have testimony from the --

16        MR. TUMPOSKY:  I don't have that.

17        THE COURT:  Well, I observed the jurors throughout

18   here.  It is sometimes possible for people who show up not to

19   understand the ebb and flow of the case, that from time to time

20   jurors will appear to be closing their eyes while they are

21   receiving evidence, but I do not find that juror or any juror

22   to have checked out of the case here and, while I have a

23   proffer, I do not have an occasion on which it is appropriate

24   to have it and which I indicated that I would accept it, any

25   testimony to the contrary.  So, for that reason I am not going

1    to exclude the juror as requested here.

2         Now, I think we have touched on everything that needs

3    to be dealt with before I go into charge, but I think, however,

4    I want to be sure that there is not something else, because

5    when the arguments are concluded it is my expectation that I am

6    going to go right into the charge here.  So, is there anything

7    else that we need to take up?

8         MS. KAPLAN:  No, your Honor.

9         MR. CRUZ:  No, your Honor.

10        THE COURT:  All right.  If there is, if something

11   arises, you will tell me in a timely fashion that there is, but

12   otherwise, when we conclude the arguments I am likely to go

13   right into the charge, unless the arguments are longer than

14   seems appropriate to keep the jury.  So, we will be back in ten

15   minutes.

16        THE CLERK:  All rise.

17   (The Honorable Court exited the courtroom at 11:23 a.m.)

18             (Recess taken)

19        THE CLERK:  All rise.

20   (The Honorable Court entered the courtroom at 11:35 a.m.)

21        THE COURT:  Ready for the jury?

22        MS. KAPLAN:  Yes, your Honor.

23        MR. CRUZ:  Yes.

24        THE CLERK:  All rise.

25        (The jury entered the courtroom at 11:38 a.m.)

1          THE CLERK:  Please be seated.

2          THE COURT:  Mr. Tumposky.

3          MR. TUMPOSKY:  Thank you, your Honor.

4                       CLOSING ARGUMENT

5    BY MR. TUMPOSKY:  Victor Torosyan wanted control over the

6    clinic and would stop at nothing to get it.  He lied to the

7    FBI, lied to his own lawyers, and he lied to you.

8          Let's go back to December 2015 when Victor Torosyan,

9    wearing a recording device, drove down to Taunton for the sole

10   purpose of getting James to say something incriminating on

11   tape.  Topic after topic Victor brought up, "You threatened me

12   and you locked me in a room.  You were using me."  And time

13   after time he did not get the answer he was quote, unquote,

14   expecting, in other words, the answer that the FBI and his

15   lawyers wanted.  So, he needed some excuse for why he hadn't

16   gotten these answers.  He got back in his car and began to

17   mutter to himself, he says, but he knew, he knew that the FBI

18   was listening.

19                     (Audio played)

20        MR. TUMPOSKY:  "Can't believe it, 180 degrees

21   opposite."

22                     (Audio played)

23        MR. TUMPOSKY:  "Can't understand it."

24                     (Audio played)

25        MR. TUMPOSKY:  Has no idea.  He's surprised, so he

1    says.  So, now Victor has only his word, only his word that

2    James threatened him.  Is that enough for him to win the civil

3    case and keep control over the clinic?  Well, he's not sure,

4    but he knows that the best way to get rid of James once and for

5    all is to make sure he is convicted of a crime.

6           So, Victor Torosyan's testimony, ladies and gentlemen,

7    his credibility, is really all that they've got.  And if you

8    actually sit back and analyze his credibility, well, then

9    you'll realize they have not much at all.  Just think about all

10   the times that he lied during his testimony.  He told us he had

11   never paid himself out of clinic funds, but then we found out

12   just a couple of months ago he wrote himself a check for

13   $25,000.  He also, as it turns out, repaired company cars at

14   his own auto-body shop, paid the auto-body shop $6,000 out of

15   clinic funds, and expects, of course, to be repaid that $6,000

16   by the clinic once it becomes profitable.  He admits that he

17   lied about his reasons for expelling James.  He gave three

18   reasons, right?  The first two were financial, James engaged in

19   some financial improprieties.  Well, he admitted when he

20   testified those were not true.

21           Can we activate the video monitor, please.

22           He gives three reasons in this document here, but as

23   it turns out the first two were completely false that James had

24   engaged in financial impropriety, because we know James had

25   nothing to do with the finances of the company.

1          Now, the third reason, well, he's sticking with that,

2     and we will get to that a little bit later.

3          What else did he lie about?  He lied about his

4     biography on the clinic website.  He said that he was trained

5     in physics, mathematics.  This is what it says on the website,

6     trained in physics and mathematics.  Well, it turns out what he

7     really meant was that he took these classes in high school.

8          He lied about Olga's 5 percent.  He said, "No, I'm

9     keeping the 5 percent open for her if she wants to come back."

10    Well, she says, "No, that was forfeited when I left."  And,

11    regardless, ladies and gentlemen, that 5 percent, if it's being

12    held open for Olga or not, right now Victor has it.

13         He also lied about Saba's 5 percent.  He says, "I

14    never promised Saba 5 percent of the clinic.  I said he could

15    have 5 percent of some future clinic."  Well, Saba testified,

16    "No, I was promised 5 percent of this clinic."  Now, who do you

17    believe more on that point?  What does Saba have to gain in

18    this case?  Nothing.  What does he have to gain in general,

19    right?  His family is rich.  He's a screenwriter by day and an

20    Uber driver by night.  He has no stake in the outcome of this

21    case.  Victor lied about that 5 percent.

22         He also lied about Saba's involvement in the clinic.

23    According to Victor, Saba was a nobody, had nothing to do with

24    the clinic.  Well, you heard Saba say, "No, I was heavily

25    involved in the clinic's formation, negotiating with various

1    stakeholders before Victor even got involved, but once Victor

2    did get involved, no, I was still there."  In fact, as it turns

3    out, Saba was cc'd on numerous e-mails that Victor was cc'd on

4    as well.  I guess Victor forgot about that when he said Saba

5    had nothing to do with the clinic.  He lied about that as well.

6            He lied about how he formed the clinic.  Ladies and

7    gentlemen.  He said on the website, "Well, I researched

8    Suboxone for a year and a half, and then I decided I was going

9    to open the clinic, which I did with the help of several

10   consultants."  We know that's not true.  In fact, he knew

11   nothing about this clinic at all until David approached him

12   with the idea.  He liked the idea, and so he signed on as an

13   investor.

14           He also lied about why he formed the clinic, right?

15   On the website it says, and he testified, "I started this

16   clinic to help with the opiate abuse in the community."  Well,

17   that's a noble pursuit, if it's true.  But as we also know,

18   ladies and gentlemen, he knew absolutely nothing about Suboxone

19   until David approached him with his idea for making the clinic,

20   knew absolutely nothing about it.  But now he says it was to

21   help with opioid abuse.

22           It seems like Victor likes to spin some apocryphal

23   tales.  He exaggerates when it serves his interest.  He came to

24   this country, he says, on a worker exchange visa as a trained

25   economist, yet his first job was pumping gas at a gas station.

1    Only $365 in his pocket, he says, yet he saved enough money

2    from pumping gas to supposedly buy the gas station and then

3    from there buy several houses which he could rent out.  Well,

4    he makes himself sound like he's the quintessential American

5    dream, if any of it is true.

6         And he lied about not knowing he was being

7    live-monitored by the FBI.  When he testified he said, "I

8    didn't know that they were actually listening along as I was

9    riding in my car muttering to myself about how surprised I was

10   about how the conversation with James went."  He said, "I

11   didn't know they were listening."  Well, we heard from the

12   agent who said just minutes before she told Victor, Agent Koch

13   told Victor, "We're going to be listening in on this

14   conversation," and it was important to her that he understand

15   that, so just minutes before he told her this, and now he gets

16   up and says, "I had no idea."  Why would he do that?  Why would

17   he lie about something that seems so insignificant, whether he

18   was being live-monitored by the FBI?  Well, the reason for that

19   is simple, ladies and gentlemen, because he thought that he

20   knew the point I was trying to make, and he wanted to cut it

21   off at the pass.  And that was really his demeanor throughout

22   whenever he was being examined by me or David's lawyer, always

23   arguing, always trying to explain himself when he wasn't

24   supposed to, always trying to win the point.  Victor can never

25   stand to lose anything, even in a question-and-answer format.

1    Victor can't even stand to answer the most basic fundamental

2    questions in a simple way.

3         For example, I questioned him about whether or not his

4    percentage increased between the original Letter Agreement and

5    the Operating Agreement.  Remember that?  We have the Letter

6    Agreement here.  It's 45 percent for James, 41 percent for

7    Victor.  This is in 2014.  Then we come to the Operating

8    Agreement, and now Victor's percentage has gone up, and James'

9    percentage went down.  I said to Victor, "Isn't it true that

10   your percentage went up between 2014 and 2015?"  It's a

11   numerical question, and he could not give a straight answer.

12   "I need to explain, he says, it's not a yes or no."  Well, is

13   43 higher than 40, or whatever the numbers are, right?  Is 43

14   higher than 40?  Well, according to Victor, that depends on

15   your definition of "is."  He can't answer a single question

16   straight.

17        So, think about all that when you think about these

18   supposed threats that Victor says James said to him on several

19   occasions, right?  Three instances of threats, Victor says, one

20   in August of 2015 in the clinic.  Does Victor call the police

21   after he's threatened?  No.  He sort of hints, "Maybe I told my

22   lawyers," but he's not really sure about that, and he might not

23   have told his lawyers until November.  And what happens after

24   these August threats?  Well, you saw the photos.  They have an

25   opening-day party where everyone's invited.  Victor invites

1    David to his house in Cape Cod, invites David to a party at his

2    new boxing gym.  And then September 2015 Victor says there was

3    another round of threats, this time at the auto-body shop where

4    Saba was there.

5         But you heard from Saba, who has no dog in this fight.

6    Saba says Victor seemed fine, not afraid.  When he came back

7    from talking with James outside, Victor wasn't scared.  James

8    signed the new Operating Agreement, the men shook hands, they

9    hugged, and they went on their way.  Everything was fine.  And

10   then you have these supposed threats in November at the clinic

11   with Levon, now CFO Levon.  Levon never heard any threats.

12   What he heard was a conversation between the three about Saba's

13   5 percent.  That's all he heard.  Levon himself said that.

14        And did Victor go to the police then, in November of

15   2015?  No.  But he did go to his civil lawyers.  He says,

16   "Well, I went to my civil lawyers because I didn't understand

17   how to call the police."  Does that seem credible to you,

18   ladies and gentlemen, he doesn't know how to contact the

19   police?  Because within two weeks of going to his civil lawyers

20   he got in touch with the U.S. Attorney's Office and the FBI and

21   was now being wired for sound.  And now he says, "I don't know

22   how to engage law enforcement when I need them."  That's his

23   excuse for not calling the police.  Another Victor lie.

24        So, think about Victor's credibility or lack of

25   credibility when you evaluate the threats that he says James

1    made, and think about it when you listen to or read the

2    conversations between David and Victor.  Did David say some

3    things that were aggressive, hostile?  Maybe he did.  Was he

4    yelling, confrontational?  Yes.  But he was angry, angry

5    because Victor had gone back on his word to Saba about the

6    5 percent, not because he wanted Victor to be afraid of him so

7    Victor would hand over some property that David wasn't entitled

8    to.  That wasn't extortion.  This was an argument, is what it

9    was, ladies and gentlemen.

10           And what was Saba's 5 percent worth?  Well, 5 percent

11   of the clinic in November of 2015 wasn't worth much, wasn't

12   worth much.  This is supposedly what everyone was fighting

13   over.  The clinic did not earn one dollar until at least

14   December of 2015, and maybe even January of 2016.  At the time,

15   according even to Victor, the clinic was worthless, practically

16   bankrupt.  In fact, even to this day they're still not turning

17   a profit.  They have $8,000 in the bank.  Well, so what does

18   that matter, right?  It was his interest, 5 percent.  What does

19   it matter how much it was worth?  Well, there's an interesting

20   sort of technical part of this case as well, and it's not

21   enough just to show there were some threats and that someone

22   wanted some property.  The Government also has to show that if

23   Victor had lost the property at issue that interstate commerce

24   would have been affected.

25           Well, what does it mean to affect interstate commerce?

1    I doubt any of you have taken Constitutional law.  I took it 15

2    years ago, and I'm not sure that I can tell you exactly what

3    that means.  The Judge will instruct you generally on that.

4    But "interstate commerce" basically is the flow of goods and

5    money between states.  If it was between countries we might

6    call it "trade."  Between states we call it "interstate

7    commerce."  So, the Government has to prove that if the

8    defendants had been successful in getting that percentage from

9    Victor that it would have affected interstate commerce,

10   percentage of his worthless company.  If they haven't proven

11   that, then James is not guilty.

12         Let's move on to a slightly less technical topic about

13   there was much discussion in the Government's case,

14   particularly, and that was James' role in the clinic and his

15   experience.  Now, remember, not $1, not $1, even according to

16   the FBI analyst, of clinic funds ever went to James, not $1.

17   He was not involved in construction, not involved in finance,

18   not involved in operations.  So, what was he?  Well, he was the

19   owner.  If the company made a profit he would have gotten some

20   eventually.  It didn't, so he didn't.  He wasn't working there,

21   so he wasn't on salary.  End of story.  That's it.

22         Don't be distracted, ladies and gentlemen.  This is

23   not a case about who made a bad business decision, about who

24   was a good friend, a lousy boyfriend, or even a decent human

25   being.  How much time did the Government waste trying to prove

1    to you that Victor got taken advantage of, that he entered into

2    a bad business deal?  That's not what this case is about.  This

3    case is about something very specific.  You are not deciding

4    whether James violated some rule of business ethics.

5            And you have to keep the defendants separate during

6    your deliberations.  That's very important, ladies and

7    gentlemen.  You have to keep them separate.

8            What did the Government fail to present to you in

9    their case against James?  A transcript, a transcript of the

10   conversation.  We know that the conversation happened and the

11   FBI was monitoring it.  We know because I asked Victor about

12   it.  That's how we know.  The Government never presented it to

13   you -- and it's their obligation to marshal the evidence in

14   this case -- they never presented to you a transcript of this

15   recording.  And why not?  Why do you think that is, ladies and

16   gentlemen?  Because they knew that if they gave you that

17   transcript it would have hurt their case, and because of that

18   all you have to rely on is Victor's word, which, as I said, is

19   not much at all.

20           What it all comes down to, ladies and gentlemen, is

21   that Victor Torosyan wanted control over that clinic, and he

22   needs to get rid of James in order to do it, because he knows

23   he cannot prove any of the things he is claiming James did.  He

24   knows that the best way to get rid of him is to make sure that

25   he is convicted of a crime.  But I am confident, ladies and

1   gentlemen, that you will see through Victor's clever strategy

2   and find James not guilty.  Thank you.

3           THE COURT:  Thank you, Mr. Tumposky.

4                   REBUTTAL CLOSING ARGUMENT

5   BY MS. KAPLAN:  The defendants want you to believe that this

6   case rises and falls on the testimony of Victor Torosyan.  It

7   does not.  Not only do you have the transcripts and have the

8   words of David Tkhilaishvili and also the words through him of

9   his brother -- and, remember, they are charged with conspiracy,

10  they are co-conspirators.  The Government has to prove they

11  reached an agreement, they were in this together.  So, what

12  David Tkhilaishvili says about his brother, they are involved

13  in the conspiracy together.  But it's not just Victor

14  Torosyan's words, it's not just defendant David Tkhilaishvili's

15  words, but you also have the testimony of Levon.

16          The defendants try and explain the tapes away by

17  telling you, well, you see that the translator puts on here

18  that there's bad Russian and it's in Armenian, it's in all

19  sorts of foreign languages.  But Alla Lubinsky told you that

20  "unintelligible" meant that there were places where you

21  couldn't hear the tapes.

22          And Olga Dorofyeyeva told you she never had any

23  problem.  She met Jambulat on a Russian dating site.  Do you

24  remember that?  He puts an ad on a Russian website for dating,

25  so he's got to speak decent-enough Russian that he has got to

1   be able to communicate with the women he was meeting on that

2   website.  She said she never had any problems communicating

3   with him.  She said David's Russian was fine.  So, the issue

4   about they speak poor Russian, maybe they didn't understand

5   when they said "shots," "shooting" to Victor what they really

6   meant was "drunk," that's not just believable, Members of the

7   Jury.  The translator.  Did she have assistance from Victor

8   Torosyan?  She told you not once, not twice, not three times,

9   but repeatedly she never spoke to Victor Torosyan, she never

10  met Victor Torosyan.  Victor Torosyan was the victim in the

11  case, he worked with the Government, he worked with the FBI,

12  and that's who made the suggested edits to the transcript once

13  he listened to the tapes and read along with the transcripts.

14  But you could read through the transcripts and the places where

15  the edits were made, where "shot" and "drunk" were interposed.

16  There are very few places, I would submit to you.

17          Now, the defendants want you to believe that Victor

18  Torosyan was not scared, and they say, you know, if these

19  threats had really happened in August he would not have stayed

20  at Allied Health, he would not have had this opening party and

21  he would not have continued to engage in business with these

22  two defendants.  Do you really believe that Victor Torosyan

23  wasn't frightened of these defendants?  You're going to have to

24  make that decision for yourself.

25          But even if you don't believe that he was scared,

1    Members of the Jury, it's not necessary for the Government to

2    prove that a victim actually feared that a defendant would

3    carry out a threatened use of force, violence or fear in order

4    to unlawfully obtain property in an attempted extortion case.

5    And that's what this is.  What the Government has to prove is

6    that the defendants attempted to instill fear in a victim.  So,

7    if you want to decide that you don't believe that Victor

8    Torosyan was really frightened of these defendants, and I

9    submit to you that he was, just like he told you, just like

10   Olga said she was, the Government need not prove that anyway.

11   All the Government needs to prove is that these defendants

12   intended to instill fear in Victor Torosyan, and that they did.

13          Now, why didn't Victor Torosyan go to law enforcement?

14   He told you why.  He had his whole life savings, his whole

15   investment in Allied Health.  He told you he was gone, he

16   didn't see the defendants in September.  David was gone, then

17   he was gone.  So, now we're into October.  He comes back, he

18   tells you David Tkhilaishvili was like family to him, he was a

19   friend, he had half-a-million dollars tied up now.  Is it

20   believable for Victor Torosyan not to have gone to law

21   enforcement, to try and wait it out?  You will have to decide

22   that, but I submit to you that it is.

23          Again, Members of the Jury, this is not a business

24   dispute.  But just a few things that both defendants said I

25   just want to go over quickly what the evidence was.  The reason

1    that Victor Torosyan adds this Duty of Loyalty, I submit to

2    you, if you look at Exhibit 2, which is the Letter Agreement,

3    Page 9 -- if we could have it for the jury.  No, I'm sorry.

4    Page 2.

5           You see at the bottom that if there is a deadlock and

6    they cannot agree, Jambulat and Victor will work with their

7    respective attorneys to negotiate in good faith 30 days.  If

8    after 30 days there is still a deadlock, Jambulat and Victor

9    will use mediation to resolve the conflict.  And there is a

10   corresponding section that applies to David Tkhilaishvili, too.

11   This is from December of 2014.  This is the first Letter

12   Agreement, Members of the Jury.  These defendants have an

13   obligation, if there was a dispute, to go to the attorneys or

14   to go for mediation.  And what you heard is that, when Victor

15   repeatedly asked them to do that, when they made their threats

16   and he asked them to do that, what he was told by David

17   Tkhilaishvili was he was going to put a bullet in the

18   attorney's head.  So, is it any wonder that by September, when

19   the Operating Agreements are being negotiated, that the lawyers

20   put in this Duty of Loyalty, which says that the defendants can

21   be removed?  I submit to you I could go through, we can go

22   through these documents, but this is not a business dispute.

23   This is a case about threats, and none of what the defendants

24   did is excused by anything in these legal documents.

25           Did Victor Torosyan pay for his trip, his vacations

1    from Allied Health?  You heard the testimony.  You heard it

2    from him and you heard it from Lindsay Zimmerman.  There were

3    no payments for Victor Torosyan's vacations from Allied Health.

4    It came from his own personal Citizens Bank account.  There was

5    no evidence that Victor Torosyan stole any money.  He told you

6    about the $25,000 that he paid to American Express, because he

7    had loaned $50,000 to Allied Health, and he had an American

8    Express bill that he had to pay.

9           The $5,000 and the $6,000 you heard, they keep

10   dwelling on the fact that on one occasion Victor Torosyan told

11   the FBI that David borrowed that money.  You heard on two other

12   occasions, including the very first occasion, that Victor

13   Torosyan went to the FBI.  He told them plain and clear, you

14   heard that from agent Nelson, that David Tkhilaishvili took

15   that money, that $11,000 that he was not authorized to take.

16   The reports that you heard about from Agent Nelson are the

17   agent's reports.  Those are not the reports of Victor Torosyan.

18   You saw the payroll email again that Mr. Cruz showed you.  And

19   you saw that it has an attachment.  But you didn't see the

20   attachment, Members of the Jury, talked about the payroll, and

21   when asked about it, Victor Torosyan said that was about

22   payroll for the other employees at Allied.  That was not Victor

23   Torosyan somehow authorizing David Tkhilaishvili to take this

24   additional $3,500 in salary.  And salary, Members of the Jury?

25   That $2,000 draw from granite payroll, if that was salary, why

1    wasn't it on a W-2?  Why wasn't it on a 1099?  It was a direct

2    deposit into his account.  That wasn't salary.

3            When Victor Torosyan was asked about this, one of the

4    defense attorneys made a big deal about this $100,000 for this

5    other business, Powerhouse, and that if Allied Health really

6    had no money to pay salary why didn't Victor Torosyan put that

7    $100,000 in Allied Health?  I mean, really?  So, Victor

8    Torosyan, who has given almost $885,000 into Allied Health, he

9    should have put another $100,000 in so he could have paid

10   salary?  I mean, wasn't he entitled to do what he wanted to do

11   with his own personal money and not provide any more funds to

12   Allied Health if they weren't making money?

13           Let's talk about Olga Dorofyeyeva and her testimony.

14   What she told you about the Amex card was not that it was

15   because of her ownership interest that she put that card in her

16   name.  She told you she put it in her name because David

17   Tkhilaishvili had poor credit and he asked her to put that card

18   in her name.

19           The car insurance.  She told you that the car

20   insurance was never paid by Allied Health.  Victor Torosyan

21   told you that.  The only time it was paid for as a business

22   expense was at Davis Health, Davis Health where Victor Torosyan

23   had no involvement.  That was a decision that David

24   Tkhilaishvili made to pay her.  Victor Torosyan did not pay her

25   car insurance.  Whether Olga Dorofyeyeva was on the payroll,

1    there's no evidence of that.  She did not say she was on the

2    payroll, and you didn't see any evidence of that from Allied

3    Health.  What you heard her say is that her friend, Kenton

4    Fabrick, asked for $20,000 -- I don't even remember what the

5    amount was -- but asked for money, $10,000.  She gave it to

6    him, she didn't give it to Allied, and it was his to do what he

7    wanted with it.  If he wanted to invest it in Allied Health he

8    could, and she said that they were paying her back that money.

9    Why wasn't a transcript provided to you of the conversation

10   with Jambulat Tkhilaishvili?  It wasn't, because what you know

11   was that at the time that Victor Torosyan recorded his

12   conversation with Jambulat Tkhilaishvili Victor had stupidly

13   already told several people, a handful of people, that he had

14   gone to the FBI, and that's why the statements were made by

15   Jambulat Tkhilaishvili, whatever they were, and that's why it

16   was not presented to you, Members of the Jury.  He knew when he

17   met with Victor Torosyan at that meeting that Victor had gone

18   to the FBI.  Again, the defendants say this is all Victor

19   Torosyan's word.  It's not, Members of the Jury.  You have got

20   the transcript.  You have got the testimony of Levon, who not

21   only heard David Tkhilaishvili in that parking lot, but he

22   heard Jambulat and he heard them being angry and demanding

23   property from Victor Torosyan.

24          This case was not about tough talk, this case was not

25   about masculinity, and this case was not about peacocking.

1    This case was about these defendants who threatened the life of

2    Victor Torosyan and his family if he did not agree to surrender

3    his property.  The emotion that you saw from Victor Torosyan on

4    the witness stand was not an apology to David Tkhilaishvili.

5    It was fear and it was disappointment that somebody who he

6    considered to be a family member, a younger brother, a friend,

7    had so taken advantage of him.  That's what this case is about,

8    Members of the Jury.  It's the words from the defendants' own

9    mouths, their threats, David Tkhilaishvili's threats about what

10   his brother, Jambulat, would do to Victor.

11         Tell these defendants with your verdict that they are

12   not above the law, they cannot take the law into their own

13   hands, and find them guilty of the crimes of which they are

14   charged.

15                          JURY CHARGE

16         THE COURT:  Ladies and gentlemen, now that you have

17   heard all the evidence in the case and you have heard the

18   arguments of counsel, it becomes my obligation to instruct you

19   on the law.  This is the point at which our respective roles

20   become quite clear.  We have been together in the courtroom for

21   about a week, sharing in the observation of the evidence and

22   development of the case.  But now you are going to go into the

23   jury room.  We are not going to be there, and we have to be

24   sure and you have to be sure that you handle your

25   responsibilities the way the law expects you to.

1          I have been telling you throughout that this is

2     requiring you to decide this case solely on the basis of the

3     evidence and in light of the instructions on the law that I

4     give you, and this is my opportunity to try to develop more

5     fully, in a holistic setting, what those instructions are.  But

6     I have been giving you instructions throughout.  I started

7     giving you instructions when we first met to decide whether or

8     not you were the appropriate people to be on this jury.  And

9     so, you will take into consideration all of the instructions

10    that I have given at the outset, during the course of the

11    trial, and, finally, these instructions in evaluating the

12    evidence in the case.

13          But let me go back to beginnings.  When we started, I

14    talked about three important points.  They are the background

15    points, background for any criminal case in the United States.

16    They are, first, the idea that the defendants are presumed

17    innocent.  They come into court with a cloak of innocence over

18    their shoulders, and it is not until or unless the Government

19    takes that cloak from them by showing beyond a reasonable doubt

20    each essential element of the offense against them that that

21    presumption of innocence disappears.  So, we start with the

22    idea that there is a presumption of innocence.

23          We then turn to the idea that the burden is always on

24    the Government.  That means the defendants, as I said, at the

25    outset do not have to do anything at all.  They can sit in the

1    courtroom and look the Government straight in the eye and say,

2    "Prove it," and unless and until the government does, they

3    cannot be found guilty.  Now, that does not mean that they

4    cannot explore the evidence in the case, that they cannot

5    develop the evidence in the case, but what that means is the

6    burden always rests with the government to persuade you on the

7    basis of all of the evidence that they have satisfied the

8    elements of the offense.

9          There is a very particular dimension to this that I

10   mentioned at the outset, I want to emphasize it again, and that

11   is that no defendant is obligated to testify.  It is a

12   Constitutional protection embedded in the Fifth Amendment to

13   the Constitution, the idea that anyone who is accused of a

14   crime has the right to remain silent in the face of that

15   accusation, and in order to protect that Constitutional right,

16   you have to put it out of your mind.  It is just not evidence

17   in the case.  It is something that you simply will not regard

18   in evaluating all of the other evidence in the case.

19         Finally, the jury has to make its determination on the

20   basis of proof beyond a reasonable doubt.  That is in some ways

21   viewed by some of the Courts, anyway, as being one of those

22   concepts that can be embedded in the jurors' minds; we do not

23   have to talk to them about it, they have an idea.  I suppose

24   that is part of a larger view of what the jury is.  The jury is

25   the common conscience of the community.  Together they will be

1    able to determine what is reasonable doubt and what is not.

2        My own view is it might be helpful for you to have

3    some further words about reasonable doubt, not that they are

4    providing you with some sort of magic explanation, but to give

5    you a sense of the gravity and the dimensions of the concept of

6    reasonable doubt.

7        As I have said, the burden is always on the Government

8    to prove beyond a reasonable doubt that a defendant is guilty

9    of the charge made against that defendant, and I will say here

10   again, as I have said before, you are evaluating each defendant

11   separately.  Simply because you reach some judgment about one

12   of the defendants does not mean that that same judgment is

13   reached as to the other defendant.  They each stand separately

14   before you and are entitled to your separate consideration of

15   their cases.

16       But the burden, as I said, rests on the Government to

17   show as to each defendant separately proof beyond a reasonable

18   doubt.  That is a strict and heavy burden, but it does not mean

19   that a defendant's guilt must be proved beyond all possible

20   doubt.  It does require that the evidence exclude any

21   reasonable doubt concerning a defendant's guilt.  A reasonable

22   doubt might arise not only from the evidence that was actually

23   produced but also from the lack of evidence.  Reasonable doubt

24   exists when, after weighing and considering all of the

25   evidence, using reason and common sense, jurors cannot say that

1    they have a settled conviction of the truth of the charge.

2          Of course, a defendant is never to be convicted on

3    suspicion or conjecture.  If, for example, you view the

4    evidence in the case as reasonably permitting either of two

5    conclusions, one that a defendant is guilty as charged, the

6    other that the defendant is not guilty, you will find the

7    defendant not guilty.  You must give the defendant the benefit

8    of the doubt under those circumstances.  It is not sufficient

9    for the Government to establish a probability, even a strong

10   one, that a fact charged is more likely true than not true.

11   That is not enough to meet the burden of proof beyond a

12   reasonable doubt.  On the other hand, there are very few things

13   in this world that we know with absolute certainty, and in

14   criminal cases the law does not require proof that overcomes

15   every possible doubt.

16         So, concluding my instructions on the burden, let me

17   instruct you that what the Government must do to meet its heavy

18   burden is to establish the truth of each part of each offense

19   charged by proof that convinces you and leaves you with no

20   reasonable doubt and, thus, satisfies you that you can,

21   consistently with your oath as jurors, base your verdict upon

22   it.  If you so find as to a particular charge against a

23   particular defendant, you will return a verdict of guilty on

24   that charge.  If, on the other hand, you think there is a

25   reasonable doubt about whether the defendant is guilty of a

1   particular offense, you must give the defendant the benefit of

2   that doubt and find the defendant not guilty.

3          So, what are you going to do in this case?  You are

4   going to decide it solely on the basis of the evidence.  There

5   are some things that you just put out of your mind.  We chose

6   you because we thought that you were a group of people who

7   would be able to put predisposition, or prejudice, or bias, or

8   undue sympathy out of your mind.  That is not part of this

9   case.

10         There is an image of justice that is used sometimes on

11  courthouses.  On the very top of the courthouse you will see a

12  statue of a woman.  She has a sword in one hand, she has got

13  scales in another, and she has got a blindfold.  Actually, she

14  is up there in the bookshelf (indicating).  We do not have one

15  on top of the courthouse here.  Now, why does she have a sword

16  in her hand?  That is pretty easy to see.  She is there to

17  enforce the law.  Why does she have scales?  That is pretty

18  easy to see, too.  She is there balancing the evidence,

19  weighing it.  But why does she have a blindfold on?  She has a

20  blindfold on, I would suggest to you, because she is

21  disciplining herself to prevent herself from being exposed to

22  or considering the extraneous matters:  the bias, the

23  prejudice, the undue sympathy.  And that is what you are going

24  to do; you are going to apply that same discipline in your

25  evaluation of the evidence.

1       Now, there are some things that are not evidence,

2    quite apart from background kinds of prejudice or bias.  During

3    the course of the trial there have been arguments and

4    statements of counsel.  They are designed to direct my

5    attention to various things so that I can rule on them and that

6    sort of thing, but they are not evidence.  There are questions

7    that are asked of witnesses.  Embedded in some of those

8    questions are statements of fact.  Unless the witness embraces

9    it, that is not evidence either.  A classic is, "Didn't you see

10   it raining on Friday?"  The witness says, "No."  Well, it was

11   not raining on Friday because it was included in that question,

12   it is the answer that counts, and that is what you are going to

13   be looking at.

14       You are going to put to one side the way in which I

15   have made evidentiary rulings.  Of course, you will follow the

16   rulings.  It has been my responsibility, is my responsibility,

17   to make this case move as swiftly, efficiently and fairly as

18   possible.  There are rules for that, and I try to enforce them.

19   Because we have got good lawyers here, they do not need to hear

20   me give them instructions sugarcoated.  I tend to be fairly

21   blunt.  But you should understand I do not have a view in this

22   case.  I simply want to be sure that it is played against the

23   rules.

24       And you should understand as well that with respect to

25   witnesses, for example, lay witnesses, people who are not

1    trained in the law, they come in here and it is not quite what

2    they are used to.  This is not a kind of encounter group where

3    people come in and just talk about whatever is on their mind.

4    They have to respond to the particular question with a

5    particular answer, and if they do not, as you have seen, I tell

6    them they should.  But all of that is simply my effort to make

7    sure that this case is presented to you according to the rules.

8    I am obligated to play by the rules.  So are you.

9         Now, we turn to what is evidence.  The evidence is the

10   testimony of witnesses, perhaps the most important aspect of

11   testimony in a case like this, because it means that you get to

12   size those witnesses up, make an evaluation of those witnesses.

13        I sometimes feel embarrassed when I start instructing

14   jurors about evaluating witnesses.  You do it every day in your

15   life.  Every day in your life someone is coming to you and

16   trying to sell you something or persuade you of something, and

17   you use your common sense to make that evaluation.  Now I am

18   going to ask you to be a little bit more self-aware in

19   evaluating the testimony of witnesses.  In some ways this is a

20   little bit like an imaginative projection of yourself into a

21   conversation or into a situation that has been presented here

22   in court through the testimony of witnesses.  You have had

23   experience with various people, people who continue to talk

24   perhaps not in response to a particular question.  You can

25   evaluate whether or not they are treading water or they are

1   simply that kind of person.

2       I used to have a secretary who worked with me for 20

3   years, and she would, when confronted with unusual

4   circumstances or people who are acting differently than the

5   rules require, she would say, "Well, that's their way."  You

6   have got to think about that.  You have got to think about how

7   these people who appeared before you speak in the ordinary

8   course, whether or not they are strained, whether or not they

9   seem to be trying to put something over on you, whether or not

10  they are responsive in the sense of ultimately getting to the

11  issues that were raised by the questions.  Those are all things

12  for you to decide, and there is no magic involved, except the

13  magic of human experience and the common understanding of the

14  jurors, that is you, in evaluating this.

15      Now, there are ways to evaluate particular witnesses.

16  One of the issues that sometimes arises is what we call "prior

17  statements."  In this case, actually at the end of the day

18  today, we had an example of this.  You heard Mr. Torosyan

19  testify on the stand regarding the reasons for certain kinds of

20  transactions, whether they were unauthorized or loans or not.

21      Bear in mind that you have to either accept or reject

22  what the witness says on the stand.  That is what it means to

23  be the final finders of fact.  But there are tools.  One of

24  those tools is were there prior inconsistent statements, and if

25  there were, were there prior consistent statements?  You

1   understand what is involved here.  If someone says something on

2   the stand and it turns out they have said something entirely

3   different before, well, it may cause you to wonder about

4   whether or not what they said on the stand is truthful.  It is

5   a fine evidentiary point that I think is not going to be so

6   important to you here, but that they said something

7   inconsistent is not itself evidence that what they said that

8   was inconsistent is true, but it is a piece of evidence that

9   you can use in deciding whether or not what they said here was

10  true in light of all of the evidence that you have, all of the

11  experience that you bring to bear on this.  It is the usual

12  kind of, "Gee, can I trust somebody who says something

13  different in some other setting than this?"  You do that all

14  the time.  You will do that here.  Similarly, if you find that

15  someone testified or spoke, made a statement, before it became

16  pertinent at trial because it was being challenged that was

17  consistent with what they said, well, you will say, "Gee, they

18  maintained some consistency here."

19          That is to say you have tools.  You should be

20  conscience of those tools, you should use those tools, but none

21  of them decides the case.  What decides the case is your common

22  sense.

23          Now, this case is in some ways about words.  What do

24  the words mean?  It is made a little bit more difficult because

25  we have translations, translations from languages in which at

1    least there is some testimony there is varying degrees of

2    capacity to speak and understand.  That makes it just a little

3    bit clearer than in other cases, but in other cases we

4    encounter this process of what do they mean, what were they

5    saying, what is the import of that?  And you have got to make

6    that determination in this case.  You have got to do what you

7    ordinarily do but in the context of foreign languages and the

8    thrust and parry of cross-examination, how much of what you

9    have heard about what people said is actually what they said;

10   and, second, does it mean what those words that are used mean?

11   You have had a dispute about shooting and drinking.  You have

12   had testimony about what they might mean under these

13   circumstances.  You look at the entire context and decide what

14   does it mean here.  You do that all the time.  It is

15   contextual.

16        But the point I want to make is it's up to you.  You

17   have the right to believe everything a witness says, disbelieve

18   what a witness says, or decide some of it is true, some of it

19   is not true, and you must act on that evaluation.

20        Now, there are other things.  There are exhibits that

21   we have had.  They show, or purport to, anyway, the business

22   relationships involved here.  In some ways exhibits are just

23   inanimate human beings.  They are the product of some sort of

24   voice that animated them, that created them, and you evaluate

25   those exhibits the same way you evaluate live testimony here.

1    Those are the kinds of things that you will look at and decide

2    whether they are credible, what do they mean, can you rely on

3    them.  You apply the same kind of disciplined analysis that you

4    do with live witnesses.

5         You have some pictures.  You look at the pictures and

6    say, "What do they tell me about that occasion and the

7    relationship between the parties and among the parties?"  You

8    have all had experience with photographs.  They capture a

9    moment but perhaps do not capture the texture of the moment as

10   well as you would in reflecting on that moment.  But you use

11   the pictures as another piece of evidence to understand what is

12   going on.

13        Now, I talked briefly about the kinds of evidence, but

14   I want to step back a bit, because it is important I think in

15   this case to tell you about the two ways that judges and

16   lawyers think about evidence, although, when you reflect on it,

17   you will think everybody else does, too; they just are less

18   highfalutin in the way in which they describe it.  Judges and

19   lawyers divide evidence in two parts:  one, direct evidence,

20   the other, circumstantial evidence.

21        Direct evidence is pretty easy to understand.  It is

22   direct observation.  Somebody is standing in the room and they

23   see somebody punch somebody else in the nose.  You have seen it

24   happen.

25        Or let's go to my image of me as a traffic cop.

1  Direct evidence is, if you are standing on the corner and you

2  see two cars coming through and the traffic cop isn't very good

3  and the two cars smack into each other, you have seen an

4  accident.  There is direct evidence of an accident.

5  And let's take that a little bit differently to

6  explore what is circumstantial evidence.  You are walking up

7  the street five minutes after you heard this big bang, and you

8  see two mangled cars in the middle of the street.  Well, you

9  didn't actually see them smack into each other.  You heard a

10  big bang, and you see them mangled.  You can draw the

11  conclusion that there was an automobile accident five minutes

12  before, when you heard the bang.  Now, that is circumstantial

13  evidence.  It is also common sense.  It is what your mind

14  permits you to do to fill in the blanks.

15  There is another way of thinking about it.  It is,

16  hopefully, past that time of the year in which we have snow,

17  but think about this:  You go to bed at night, you look out at

18  the front lawn, it is clear.  You go to bed at 10:00, get up at

19  6:00 or 7:00, you look out.  It looks clear.  And then you look

20  at the front lawn and it has got snow on it.  Now, the way I

21  set this up, of course, is that there was not snow on the

22  ground when you went to bed, there is snow on the ground now.

23  There is circumstantial evidence that it snowed overnight.  At

24  least you might think that that is an appropriate, common sense

25  conclusion to reach.

1          You might look and see footprints in the snow, and

2     then you could say, "Well, I guess somebody was walking around

3     my front yard between the hours of 10:00 and 7:00.  And maybe

4     you would say, "Well, look at the size of those footprints.  It

5     must have been a man.  Only a man could have footprints that

6     large."  Maybe.  But we do live in a time in our civilization

7     in which teenage girls where Doc Martens to the prom, and so

8     you might say, "I am not sure what I think about who it was who

9     was walking or the gender of the person who was walking out

10    there."  And maybe you will take it a step further.  Could you

11    say it is a person with glasses on?  You are the final finders

12    of fact.  I cannot tell you one way or the other.  I can

13    suggest to you some common sense, and it may not be common

14    sense to be able to draw that kind of conclusion.

15         Now, what do I mean by all of this?  I mean that you

16    are going to have to take all the circumstances, bring them all

17    together to make your evaluation of this case.

18         So, what is it about in terms of the law?  What I am

19    going to do is ask Ms. Beatty to pass to you two documents that

20    we will walk through that tell you what the Government charges

21    and what it is that you have to decide.  One is the Indictment.

22    It is the document, the charging document, in this case.  The

23    other is the Verdict Slip.  We will walk through it.  You do

24    not have to read it right now, right at this point, but it

25    frames I think fairly well what is involved in this case and

1    what it is that we need you to decide.

2          As the parties have indicated, there are four counts

3    to the Indictment.  There are two of Extortion and two of

4    Embezzlement from a Health Care Provider.  Counts One and Two

5    are the Extortion counts.  Counts Three and Four are the

6    Embezzlement counts.  Counts One and Two allege against both

7    David and Jambulat Tkhilaishvili, but you will evaluate them

8    separately.

9          Now, I want you to start with a larger idea.  The

10   criminal law does not deal with negligence.  In this context it

11   is dealing with willful and knowing violations.  What do I mean

12   by "willfulness"?  What do I mean by "knowing"?

13         The word "knowing," as that term is going to be used

14   during the course of these instructions, means that the act was

15   done voluntarily and intentionally and not because of some

16   mistake or accident or misunderstanding.

17         With respect to "willfully," what I mean is that the

18   act was done voluntarily and intelligently and with the

19   specific intent that the underlying crime be committed; that is

20   to say with a bad purpose either to disobey or disregard the

21   law, not to act by some ignorance or accident or mistake.  That

22   is a distinguishing feature of the criminal law.

23         So, now let's turn to the specific provisions that we

24   are dealing with here, one extortion, the other embezzlement.

25         Counts One and Two, as I said, deal with the crime of

1    Extortion.  They deal with it in a somewhat different way that

2    we will discuss in greater detail.  But Count One talks about a

3    Conspiracy to Extort.  When we are talking about a "conspiracy"

4    in this setting, we are talking about whether or not there was

5    an agreement, as specified in this Indictment, not some other

6    agreements among the parties or the individuals, that existed

7    between at least two persons; and, second, that the defendant

8    at issue himself willfully joined into that agreement.

9           So, what is the agreement?  What is the object?  Well,

10   it is extortion, but you will understand that a conspiracy does

11   not have to be completed.  It is an agreement to do something.

12   It has a prospective view.

13          Now we turn to Count Two.  Count Two is Attempted

14   Extortion.  What is "attempt"?  Well, to prove intent the

15   Government has to prove that the defendant intended to commit

16   the underlying crime, that is, extortion; and, second, that the

17   defendant engaged in a purposeful act that under the

18   circumstances that defendant believed to be and in fact

19   amounted to a substantial step toward the commission of the

20   crime and strongly corroborated the defendant's criminal

21   intent.  Again, it does not have to be completed, that is,

22   extortion does not have to be completed, but there has to be an

23   attempt to do so, as I have defined it.

24          So, let's talk about extortion, because that is what

25   it is that is the object of the alleged conspiracy and the

1    alleged attempt.  For purposes of the statute that is at issue,

2    you will see a reference to "Section 1951" below.  That is the

3    relevant Federal statute.

4           "Extortion" is the obtaining of another person's

5    property with his consent when that consent is induced or

6    brought about through the use or threatened use of force,

7    violence, or fear of physical harm.

8           In order for a defendant to have obtained the property

9    of another, there must have been a transfer of legal right to

10   that property from that other person, the alleged victim, to

11   the defendant or to a person that the defendant designates.

12   That, in broad brush, is what completed extortion is about;

13   but, of course, we are talking here about attempted extortion

14   or conspiracy to extort.

15          So, what do we mean in this context that the

16   Government has to prove with respect to the underlying

17   extortion?

18          First, the Government has to prove that the

19   defendants, separately considered, conspired or attempted

20   knowingly and willfully to obtain the property of the alleged

21   victim, Victor Torosyan;

22          Second, again the Government must prove beyond a

23   reasonable doubt that the defendants sought to obtain that

24   property by extortion, as I have defined it;

25          Third, that the defendants specifically intended that

1     the alleged victim would part with the property because of the

2     extortion; and,

3              Fourth, that as a result of the defendant's extortion

4     interstate commerce or an item moving in interstate commerce

5     would be delayed, obstructed or affected.

6              Those are the four elements that the Government must

7     prove.

8              So, we start with this idea of obtaining property.

9              "Property" for these purposes means an economic

10    interest which is capable of being transferred from one person

11    to another.  In the Indictment you can see that what the

12    Government is alleging to be the property at issue concerns an

13    interest in the clinic, an ownership interest in the clinic.

14    The law sometimes calls that "intangible property," but it is

15    an economic interest that is alleged, if you find it, that

16    means that it can be transferred in some fashion.  But that is

17    what you are looking at here.  You are not concerning yourself

18    with what the value of it is at any given point.  It is simply

19    that, as a legal matter, it is an economic interest that could

20    be transferred from one person to another or one entity to

21    another.

22              So, then we turn to the larger question of what does

23    "fear of injury" mean in this setting?  Well, you are going to

24    look at it from two perspectives:  one, what is it that the

25    defendant intended -- this is a matter for circumstantial

1    evidence -- but also you are going to be considering it in

2    terms of what would a reasonable person understand who hears

3    whatever that person hears to be the purport of the

4    conversation?  Does a reasonable person look at this and say,

5    "That is a threat," or does a reasonable person look at it and

6    say, "That is whiskey talk"?  You have got to evaluate that.

7    You have got to decide whether or not what is being

8    communicated is a threat and that the defendants themselves

9    intended that it be a threat.

10        Now, one of the ways of thinking about this is to say,

11   well, this property was not worth much; under these

12   circumstances it was not much of a threat.  In fact, maybe the

13   defendants had some interest of their own in the property.

14   That all may be true.  But the focus of extortion is on the

15   wrongful use of these means.  You do not have to consider

16   whether the defendant believed that the property was rightfully

17   his.  Using force or violence or threats of force or violence

18   to obtain property, as I have described "property," is

19   wrongful.  That is within the scope of the intention here.

20   What this Federal law is supposed to do is punish people who

21   use wrongful means, extortion, threats of violence to obtain

22   property.  So, you will understand what you have to focus on

23   and what you do not have to focus on.

24        Now, we turn, then, to the question of interstate

25   commerce, which was discussed at some length by the parties.

1    If you decide that the defendant obtained another's property

2    against his will by the use or threat of force, violence, or

3    fear of injury, then you are going to ask yourself whether or

4    not that action would affect interstate commerce in any way or

5    degree.  You must determine whether there was an actual or

6    potential effect on commerce between two or more states.  If

7    you decide that there was any effect at all on interstate

8    commerce, then that is enough to satisfy this element, bearing

9    in mind on all of these elements the Government has to prove

10   them beyond a reasonable doubt.

11        The effect could be minimal.  For example, under

12   certain circumstances, if there were a diversion of funds that

13   could be used to purchase articles which travel through

14   interstate commerce, you could find that that was sufficient as

15   an effect on commerce.  Of course, because we are dealing with

16   attempt and conspiracy, you understand that it does not have to

17   be completed, but if you decide that interstate commerce would

18   potentially or probably be affected if the defendant had

19   successfully completed his actions, then that element of

20   affecting interstate commerce is satisfied.

21        You do not have to find that the interstate commerce

22   was actually affected.  However, if the defendant had finished

23   his actions and done all he intended to do, and you determine

24   that there has been no effect on interstate commerce, then you

25   cannot find the defendant guilty, because that element is not

1     satisfied.

2           You do not have to decide whether or not the effect on

3     interstate commerce was harmful or beneficial.  The Government

4     satisfies its burden of proving an effect on interstate

5     commerce if it proves beyond a reasonable doubt any effect,

6     whether it was harmful or not.  The defendant need not even

7     have anticipated an effect on interstate commerce.  You may

8     find that the effect is a natural consequence of his actions.

9           If you find that the defendant intended to take

10    certain actions, that is, he did the acts that are charged in

11    the Indictment or the Government has alluded to in its closing

12    argument in order to obtain property, and you find those

13    actions have either caused or would probably cause an effect on

14    interstate commerce, then you may find that the requirements of

15    this element have been satisfied.

16          So, let's go back to the way in which the Government

17    has charged this extortion here in Counts One and Two, Count

18    One being the Conspiracy, Count Two being the Attempt.

19          I told you that a "conspiracy" is an agreement between

20    two or more persons, and it has to be the agreement that is

21    alleged in this Indictment.  It can be spoken or unspoken.  It

22    does not have to have a formal agreement or plan which everyone

23    involved sat down together and worked out in detail.  But the

24    Government must prove beyond a reasonable doubt that those who

25    were involved, those two or more persons, shared a general

1    understanding about the crime, that is, the crime of Extortion.

2    Simply because they acted similarly in their various

3    activities, or may even have associated with each other, or

4    even discussed common, long-range aims or interests does not

5    necessarily establish proof of the existence of a conspiracy,

6    but you can consider those factors.

7         Remember I told you it had to be willful.  That means

8    to act voluntarily and intelligently with a specific intent

9    that the underlying crime be committed; that is to say, with a

10   bad purpose either to disobey or disregard the law and not to

11   act by ignorance or mistake.

12        Consequently, the Government must prove two types of

13   intent beyond a reasonable doubt:  first, that the defendant

14   had an intent to agree to this conspiracy and an intent that

15   the underlying crime be committed.  Simply because they were

16   together at various times, the two defendants here or any other

17   alleged members of this conspiracy are not necessarily to be

18   held to be conspirators.  A person who has no knowledge of a

19   conspiracy but simply happens to act in a way that is

20   furthering the object or purpose of the conspiracy does not

21   thereby necessarily become a conspirator.  But the Government

22   does not have to prove the conspiracy succeeded or was

23   achieved.  The crime of conspiracy is complete upon the

24   agreement to commit the underlying offense.

25        Now, in evaluating the conspiracy, you evaluate all of

1    the evidence, but let me suggest that one way that you do that

2    is you start looking at what the particular defendant you are

3    considering did, what that particular defendant said under the

4    circumstances.  The statements and actions of conspirators

5    during the course of the conspiracy and in furtherance of the

6    conspiracy, of course, can be considered.  But start with the

7    individual and build from that to engage in a disciplined

8    analysis of whether or not the individual defendant before you

9    is guilty of the offense charged, that is, the offense of

10   Conspiracy.

11          With respect to attempt, there is not much more to say

12   than I said.  That is to say that the defendant has to be shown

13   beyond a reasonable doubt to have committed the crime of

14   extortion, intended to commit the crime of extortion, and that

15   the defendant engaged in some purposeful act that, under the

16   circumstances as the defendant understood them, amounted to a

17   substantial step toward the commission of the crime and

18   strongly corroborated intent.  Making threats of physical harm,

19   those are the kinds of things that could be a substantial step,

20   if you find them.  But, you see, you are going to have to find

21   the underlying facts before you can determine whether or not

22   the law here has been satisfied.

23          I talked in terms of the threat to an individual here.

24   Mr. Torosyan is who is alleged in the Indictment, but if you go

25   back to Count One and look at it, in the second line from the

1    bottom just above the citation to the statute it says,

2    "...threats of force, violence, fear of physical harm to Victor

3    Torosyan, and others..."  The "others" could be the clinic as

4    an entity, if you were to find threats to do physical damage to

5    the facilities themselves.

6         The point is this:  We are talking about force and

7    violence and threats of force or violence that were, as the

8    Government alleges, intentionally made to put Mr. Torosyan or

9    perhaps the entity under threat that would be the foundation,

10   the leverage for extortion.

11        Now, let me turn to Counts Three and Four.  Those are

12   the ones alleged solely against David Tkhilaishvili.  These are

13   counts that allege embezzlement in connection with health care.

14   The Government must prove two essential elements -- or actually

15   three in connection with this kind of embezzlement:

16        First, that the defendant embezzled, or stole, or

17   converted money or property belonging to a health care benefit

18   program;

19        Second, that the defendant did so knowingly and

20   willfully; and,

21        Third, that the money or property had a value of over

22   $100.

23        Let me talk about the health care benefit program.

24   The statutes that are relevant here say that it means any

25   public or private plan or contract that affects commerce under

1   which any medical benefit, item, or service is provided to any

2   individual and includes any individual or entity who is

3   providing a medical benefit, item, or service for which payment

4   may be made under the plan or contract.  That is the range that

5   it has.  If it is that kind of plan, then the embezzlement

6   comes within the scope of the statute.

7        So, what is "embezzlement"?  It is the voluntary and

8   intentional taking for one's own use the property or money of

9   another after that property came into the possession of the

10  person taking it by virtue of their employment or position of

11  trust.

12       Here, the allegation is that David Tkhilaishvili had

13  access to the funds of the clinic, and he took them, and he

14  took them by converting them wrongfully for his own use.  To

15  take money or property means to knowingly and willfully deprive

16  the owner of its use or benefit.

17       Now, there has been evidence about what the nature of

18  the relationships were, what the understandings were, what the

19  understandings were within the company about when money could

20  be taken out and when it could not be taken out.  It is for you

21  to sort out here to decide whether or not it was a taking or it

22  was an understanding about the way in which the funds could be

23  used by persons who had access to the funds.

24       To "convert money" means to appropriate or use such

25  money or property for the benefit of oneself or any other

1   person who is not the rightful owner with the intent to deprive

2   the rightful owner of the property or money.

3         So, you see, you are evaluating what is going on in

4   that company when they spend the money or someone takes the

5   money, if you find it.  We are still in the interstate commerce

6   area.  We are still talking about the same kind of was there an

7   effect on interstate commerce.

8         You will understand why we are talking about

9   interstate commerce.  It is what brings it into the Federal

10  Court.  An offense like this could be charged, perhaps, in the

11  State Court, but when interstate commerce is involved,

12  interstate commerce being at the core of our *Constitution* and

13  why we created our *Constitution*, then there is Federal

14  jurisdiction if you find that there was an effect on interstate

15  commerce.  Similarly, although, frankly, $100 does not seem

16  quite so much nowadays, the reason that $100 was used is to

17  provide a certain minimum threshold before you got into Federal

18  Court to dispute it, probably to say maybe *de minimis* if it is

19  less than that.  But, in any event, you have to find more than

20  $100 is involved, and you will see that in these two counts the

21  Government has alleged more than $100 was embezzled.

22        Those are the broad-brush and maybe even some fine

23  points on the law that you must apply to determine whether or

24  not the Government has proved beyond a reasonable doubt each

25  essential element of the offense as I have described it to you.

1          Now, what I am going to do at this point is, I am

2     going to see counsel at the sidebar to talk about whether there

3     needs to be any further instructions here, and then I will be

4     back to talk to you about how you conduct your business.

5     (SIDEBAR CONFERENCE AS FOLLOWS):

6          THE COURT:  Anything else from the Government?

7          MS. KAPLAN:  No, your Honor.

8          THE COURT:  Mr. Cruz?

9          MR. CRUZ:  No, your Honor.

10         MR. TUMPOSKY:  I have several objections, your Honor.

11    I object to the inclusion of language that would allow for a

12    conviction where the property that the defendants were

13    supposedly seeking to obtain was not for their own benefit but

14    for someone else's.  I don't believe it can be extortion if the

15    property is intended for a third party.

16         THE COURT:  I will not be making that change, but I

17    understand the objection.

18         MR. TUMPOSKY:  I object to the instruction that an

19    item can be considered property if it is worthless; in other

20    words, there must be some proof that the item has value in

21    order for it to be considered property.

22         THE COURT:  Again, as I indicated, the term "value" is

23    not helpful in these circumstances.  We are talking in terms of

24    economic interest, and the jury can consider it from their

25    perspective, so I will not make a change on that.

1    MR. TUMPOSKY:  I object to the Court not instructing

2    on the claim of right defense whereas the defendants believe

3    that they were or someone else was legally entitled to the

4    property that it would not be extortion.

5    THE COURT:  And there again, when we are dealing

6    solely with the question of extortion by means of threats of

7    violence or force, the claim of right is not material to the

8    determination.

9    MR. TUMPOSKY:  And I object to the Court's instruction

10   on interstate commerce in that, where the victim is an

11   individual, a heightened standard would be appropriate, and the

12   Court did not instruct on the heightened standard.

13   THE COURT:  I decline to instruct on heightened

14   standard.  That is language that Courts use to talk to each

15   other about the way in which they conduct the analysis.

16   MR. TUMPOSKY:  I would request that the Court give my

17   proposed instruction on prior bad acts, specifically that they

18   are not to prove criminal propensity but only to show the

19   effect on the victim's state of mind and only then if the

20   defendants were specifically aware that the victim knew about

21   the prior bad acts.

22   THE COURT:  Okay.  I think I will give something on

23   that.

24   MR. TUMPOSKY:  And then I think the Court had a slip

25   of the tongue in the burden-of-proof language, and I believe

1    you said that it is not a strict and heavy burden.  I'm

2    assuming you were intending to say that it was a strict and

3    heavy burden.

4           THE COURT:  I hope I did not say it that way, but if I

5    did, I will correct it now.

6           MR. TUMPOSKY:  Thank you.  That's all.

7           THE COURT:  I am just going to tell the jury how they

8    conduct their deliberations.

9    (END OF SIDEBAR CONFERENCE)

10          THE COURT:  Let me mention two more things to refine

11   this a bit.  I want to talk, first, about whether or not I had

12   a slip of the tongue.  There was a suggestion that I did.  I

13   hope I did not, but if I did, let me correct it now.

14          You should understand that the burden of proof beyond

15   a reasonable doubt is a strict and heavy burden.  It is not

16   required that there be proof beyond all possible doubt, but it

17   must be proof beyond all reasonable doubt.  It is a different

18   burden than other burdens that are imposed.  It is the heaviest

19   burden that the law has.  But you should understand that you

20   are evaluating this case against that strict and heavy burden

21   in making your evaluation.

22          There is a second, more precise issue having to do

23   with evidence in the case.  You heard evidence that you may

24   say, "Well, gee, isn't that a crime?"  You may say, "Well, I

25   heard evidence about domestic abuse," perhaps.  You should

1   understand that evidence of other bad acts, if that is what

2   they are, has been permitted here really for two basic

3   purposes:  first, to show what effect it would have on

4   Mr. Torosyan in determining whether or not he was being

5   threatened.  References to past uses of force and violence

6   might be considered to be threatening themselves, that they may

7   occur again, if Mr. Torosyan heard them, because that is how

8   you are going to evaluate the question of whether or not a

9   reasonable person under the circumstances would think that they

10  were being threatened.

11         But more than that, the intent here that we are really

12  focusing on is the defendants,' separately considered, and

13  those defendants have to intend that there was a threat.  One

14  of the ways you can evaluate that is to say would the

15  defendants have been aware that Mr. Torosyan had been told

16  about some other prior violent acts?  You will look at them

17  from that perspective as well.  One thing you cannot use them

18  for is to say, "I do not really like domestic violence.  I

19  think he may have engaged in domestic violence, so I am going

20  to convict him of whatever it is the Government charged here."

21  That is not proper.  You have to use it in that disciplined

22  sort of way.

23         There is one other way that you might use the

24  evidence.  That is to say, you can use it to evaluate the

25  credibility of a witness.  You may say a witness has got an axe

1   to grind, a grudge to settle, and so the witness tells a story

2   about some purported bad act in the past.  It is going to be up

3   to you to determine what the credibility of a witness is, and

4   that is one of the things that you will use.

5          There was a throwaway line used by one of the

6   witnesses to describe what she was afraid others might have

7   thought of her:  "A woman scorned."  Well, you are going to use

8   all of this evidence to make your own evaluation.  You know

9   people have multiple layers of attitude toward other people,

10  and you are going to use what they say happened in the past to

11  decide whether or not that influences the credibility, the

12  trustworthiness of what they said here.

13         So, those so-called "other bad acts" are things that

14  you can use in evidence but not use in evidence to say, if you

15  find them, "Because they took place, consequently, we are going

16  to find somebody guilty of the crimes charged here."  You must

17  consider solely the crimes charged here, using all of the

18  evidence that is available.

19         So, now let me turn to the question of what do you do.

20  Well, this is the point at which you can have a conversation.

21  I have been telling you you cannot talk to anybody.  Now you

22  can talk to each other, but our hope is that it is going to be

23  a civil conversation, it is going to involve people sharing

24  their views and attempting to produce what we expect juries to

25  produce, which is, by the use of common recollection, a shared

1    verdict.

2         You must return a verdict that is unanimous to be

3    recorded by the Court.  Now, what that means is that there

4    should be a rational discussion of the evidence by all the

5    jurors for the purpose of reaching a unanimous verdict, but

6    each juror is to decide the case for himself or herself in the

7    context of the evidence and the law and with proper

8    consideration of other jurors' views.  That means you can

9    reconsider if you are persuaded by rational discussion, not

10   solely for the purpose of reaching a unanimous verdict.

11        If you want to communicate with the Court, and my hope

12   is that the instructions have been clear enough that there will

13   not be a need to do so, but if you want to communicate with the

14   Court during the course of the jury deliberations -- excuse me.

15   Let me just grab something.

16        (The Court conferred with the Clerk off the record)

17        THE COURT:  If you want to communicate with the Court,

18   you are going to have to do it in writing signed by a

19   foreperson.  That is why I asked Ms. Beatty to get me the list,

20   because, after a nationwide search, Ms. XXXXXXX, you have

21   become the foreperson of the jury.  What that means is that you

22   will function like a retail bank manager to make sure that all

23   of the accounts are kept clear.  It does not mean that you have

24   an extra vote.  It does not mean you get any extra money.  What

25   it means is you just act as the foreperson for the jury to

1    handle the deliberations which are going to take place around

2    the table.  The idea is that there be a rational discussion, a

3    civil discussion, that people do not talk over each other, and

4    somebody has to be the foreperson, and so, as I said, I will

5    assist you in that first decision.

6         If you do have these questions, they should be signed

7    by Ms. XXXXXXX, as the foreperson, or if she will not sign

8    them, then signed by another juror.  Understand that it will

9    take a while, perhaps, to answer any questions that you have,

10   because the questions will come in, I will share them with

11   counsel, we will talk about what the proper response is, and

12   then we will get back to you.  But if you have such questions,

13   that is the way to do it.  You do not talk to the Court

14   Security Officer or something like that.  It is with the Court.

15        Creature-comfort things like, "When do we eat?", you

16   get to eat as soon as I am through, and you know more or less

17   the schedule that we have here.  Those things can be addressed

18   to Ms. Beatty, if she is out there, or the Court Officer, if

19   they are out there.  But anything that has to do with this

20   case, do it in writing directed to me.  I will respond after

21   consulting with counsel.

22        One thing you should not tell us is where you stand.

23   At some point you are going to start taking a vote, and if you

24   are like lots of other jurors, the first vote is not

25   necessarily unanimous.  We should not know.  You should not

1    tell us.  That is not something that you should communicate to

2    the Court.  But anything else that touches on this case you

3    should.

4         Now, I told you when we started that you are going to

5    go in that room, and we do not know what you are doing.  I have

6    tried to give you instructions on the law.  We expect you to

7    follow the law.  You have heard the evidence.  We expect you to

8    decide this case on the basis of the evidence.  But we do not

9    know how you go about your business.  It is behind closed doors

10   and meant to be.  So, maybe it is too much for me to tell you

11   how you should go about your business, but I will make a

12   suggestion, and the suggestion is bottomed on this idea:

13        The parties have worked very hard in this case, as you

14   have seen.  It has been very well tried by the parties,

15   vigorously, and now they are leaving it to you.  They want to

16   be sure that you have considered everything in the case.  There

17   is sometimes an almost hydraulic pressure that causes jurors to

18   say, "Let's take a straw vote.  Let's see if we can figure this

19   out right away and we can get this done with."  Do not do it.

20   Or I should say I suggest you do not do it, because you get to

21   decide what you do.

22        What I would suggest you do is you sit at the table

23   and take turns, one after the other, in which each juror says

24   something about a piece of evidence that was meaningful to the

25   juror without necessarily taking a position, because once you

1   take a position, then you are defending the position, and the

2   key to this is that process of collective recollection toward

3   collective judgment, and so hearing what everybody else has to

4   say that is meaningful to them may prompt you to think, "Well,

5   let me think about how that works."  That, in short, is a way

6   to begin the process that in the past has I think served other

7   jurors well.

8           Ultimately, you will reach a verdict, and you will

9   report it to the Court Officer, that is, report that you have

10  reached a verdict, and then the Verdict Slip will be brought

11  back into the courtroom to be read out loud.  It is an awesome

12  responsibility.  In a democracy we think the people can do it.

13  We think you can do it.

14          So, if there is nothing further from counsel, I will

15  let you retire, with one final point.  I have to play by the

16  rules, too.  One of the rules is that only 12 persons can

17  deliberate in the case, so there are two alternates.

18          Mr. XXXXXXXXX, and, Ms. XXXXX, you are the alternates

19  in this case.  I hate this rule.  The reason I hate the rule is

20  that anybody who pays attention during the course of the trial

21  and has been involved in it should be permitted to deliberate,

22  but that is not what the drafters of the *Federal Rules of*

23  *Criminal Procedure* say.  They say that I have to separate you

24  from the other jurors.

25          Some Judges in this court then take the alternates and

1    put them in another room.  That is not what I do.  What I am

2    going to do is tell you that you are free to go home.  Give

3    Ms. Beatty your contact information.  Do not discuss this case

4    with anyone until Ms. Beatty gets in touch with you, because

5    from time to time during the deliberations one of the jurors is

6    excused, and then I have to reach to the alternates themselves.

7    So, you are still involved in this case.  You are still subject

8    to my rule about not talking to anybody about the case, because

9    if you are called back the jury has to start from the beginning

10   again to make sure that you have heard what everybody else has

11   to say.  I do not like the rule, because I think that people

12   like you who clearly have been paying attention to the evidence

13   in the case and giving up your time should have the opportunity

14   to deliberate.  But that is not what the rules say, and so at

15   this point I will separate you.  You can pick up your things,

16   tell Ms. Beatty where you can be found, and you have our

17   profound thanks for your attendance here.

18            So, with that, the jurors may retire to the jury room.

19            THE CLERK:  All rise.

20            (The jury exited the courtroom at 1:00 p.m.)

21            THE COURT:  So, five-minute rule.  You have got to be

22   available within five minutes.  If you are not, things will

23   happen in your absence here.  So, tell Ms. Beatty where you can

24   be reached if we have some word from the jury or need to get

25   together again.

1              Anything further that we need to talk about?

2              MS. KAPLAN:  No, your Honor.

3              MR. CRUZ:  No, your Honor.

4              MR. TUMPOSKY:  No, your Honor.

5              THE COURT:  Okay.  We will be in recess.  Thank you.

6         (The Honorable Court exited the courtroom at 1:00 p.m.)

7                         (Recess taken)

8              THE CLERK:  All rise.

9         (The Honorable Court entered the courtroom at 4:10 p.m.)

10             THE COURT:  I am informed we have a verdict, so I will

11    bring the jury in.

12             THE CLERK:  All rise.

13             (The jury entered the courtroom at 4:10 p.m.)

14             THE CLERK:  Please be seated.

15             THE COURT:  Madam Foreperson, I understand the jury

16    has reached a unanimous verdict; is that correct?

17             THE CLERK:  Yes.

18             THE COURT:  If you could pass the verdict slip to

19    Ms. Beatty.

20                         (Pause)

21             THE CLERK:  What say you, Madam Foreperson, on Count

22    One, is the defendant David Tkhilaishvili guilty or not guilty?

23             THE FOREPERSON:  Guilty.

24             THE CLERK:  And on Count One is the defendant Jambulat

25    Tkhilaishvili guilty or not guilty?

1           THE FOREPERSON:  Guilty.

2           THE CLERK:  On Count Two is the defendant David

3      Tkhilaishvili guilty or not guilty?

4           THE FOREPERSON:  Guilty.

5           THE CLERK:  And is the defendant Jambulat

6      Tkhilaishvili guilty or not guilty?

7           THE FOREPERSON:  Guilty.

8           THE CLERK:  On Count Three is the defendant David

9      Tkhilaishvili guilty or not guilty?

10          THE FOREPERSON:  Guilty.

11          THE CLERK:  And on Count Four is David Tkhilaishvili

12     guilty or not guilty?

13          THE FOREPERSON:  Guilty.

14          THE CLERK:  Madam Foreperson and, Members of the Jury,

15     you, upon your oaths, do say that the defendant David

16     Tkhilaishvili and Jambulat Tkhilaishvili are guilty, David on

17     Counts One, Two, Three and Four, and Jambulat on Counts One and

18     Two.  So say you, Madam Foreperson, and so say you, Members of

19     the Jury?

20              (The jury answered affirmatively)

21          THE COURT:  Anything further from counsel?

22          MS. KAPLAN:  No, your Honor.

23          MR. CRUZ:  No.

24          MR. TUMPOSKY:  No, thank you.

25          THE COURT:  So, what that means, ladies and gentlemen,

1       is your jury service is completed.  I want to make a couple of

2       comments here.  It would be improper for me to comment on the

3       substance of your verdict.  As I pointed out to you, you are

4       the final finders of fact in this case.  But I can comment on

5       the way in which you went about your business.  It was clear to

6       us that you were paying very careful attention to the evidence

7       as it came in here.  That is what we hope for, and that, I

8       think, is what we got from you.  What that means is that the

9       parties got a fair trial from an impartial set of jurors.

10              We understand that we have taken time from you, and I

11      do not want to take too much more time from you, but I think I

12      should tell you a couple of things.  One, in this Judicial

13      Circuit no party or representative of a party may contact a

14      juror after the verdict is returned.  This is not the kind of

15      case in which that would happen, but if it did you should feel

16      free to contact Ms. Beatty, and we will address the issue.  The

17      reason that that rule has been established by the Court of

18      Appeals for this Judicial Circuit is that we want to maintain

19      the protection the jurors are entitled to, to their

20      confidentiality and to their sense of security.

21              I cannot tell you what to do anymore.  That is to say,

22      if you want to talk to somebody about the verdict, you are free

23      to do so.  But I want you to think about this:  You have had a

24      confidential discussion with another group of individuals.  It

25      may occur to you that you would not want to have somebody talk

1    about what you said in confidence outside of your presence, and

2    if you feel that way, then perhaps you will not want to talk to

3    other people yourself.  You are free to do what you want, but

4    perhaps the best thing under these circumstances is simply to

5    say, "I have had my jury service," express general views about

6    your jury service, but not disclose what your colleagues had to

7    say.  That, of course, is up to you.  You are free to talk to

8    whoever you want to talk to.

9         What we look for from a jury is a fair and impartial

10   consideration of all the evidence.  That, I think, as I said,

11   is what I think we got from you, and for that you have our

12   thanks, and, as I said, you are free to go.  I would add one

13   other thing.  If you want to stay, and if there are any of you

14   who stay just a few minutes, I would like to come in and thank

15   you personally for your jury service.  That may not be

16   attractive enough to keep you here, but, in any event, I have

17   to tell you that I have got a couple of minutes that I want to

18   spend with the lawyers in the case, and when I have I will

19   stick my head in the jury room and see if anybody is there that

20   I can thank personally.  But I want to thank you together here

21   in the courtroom.  And, of course, if I come in, feel free to

22   offer any observations about how we can make jury service a

23   little bit more comfortable, perhaps, for your successors as

24   jurors or any other observations that you want to make, apart

25   from the particulars of this case.

1          So, on behalf of the parties and on behalf of the

2     Court, thank you very much.  You are free to go.

3          THE CLERK:  All rise.

4          (The jury exited the courtroom at 4:18 p.m.)

5          THE COURT:  What is the view of the Government with

6     respect to bail?

7          MS. KAPLAN:  The Government would move, pursuant to

8     18 U.S.C. Section 3143(a), for immediate remand of both

9     defendants.  These are crimes of violence of which they have

10    just been convicted.  I think that they are both a danger to

11    the community and there is a significant risk that they will

12    not reappear for sentencing.

13         THE COURT:  All right.  Mr. Cruz, anything or,

14    Mr. Tumposky?

15         MR. CRUZ:  Your Honor, I would ask that the Court

16    consider allowing David Tkhilaishvili to remain on release on

17    the conditions that he currently is on.  He has been on those

18    conditions essentially from the beginning of this case.  There

19    is an electronic-monitoring condition that was put in place

20    which he has abided by, and which would assure the Court that

21    there won't be any contact with anyone involved in this case or

22    any issues regarding risk of flight, necessarily.

23         He has been in communication with me from the

24    beginning preparing for this case, and I have no reason to

25    believe that there would be any danger that he poses to anyone

1 | in this case, your Honor.

2 | THE COURT:  Mr. Tumposky?

3 | MR. TUMPOSKY:  Yes.  On behalf of James Tkhilaishvili,

4 | I would also ask that he be allowed to remain out of custody

5 | pending sentencing.  He has no record of any kind.  He has been

6 | on release for a year without even the slightest hint of a

7 | violation.  He has been working steadily during that time.  He

8 | has family here.  His parents -- his father has been here and

9 | his mother is here today, I believe, and have been supporting

10 | him throughout the course of this trial.  There is no reason to

11 | expect that he would not return, and there is no danger to the

12 | community that he poses while out on release, and if the Court

13 | is concerned specific conditions could address any issues the

14 | Court has.

15 | THE COURT:  Well, the obligation I have under

16 | Section 3143 is to determine whether there is a substantial

17 | likelihood that a Motion for Acquittal or a New Trial will be

18 | granted.  That is one basis.  At this point I do not know of

19 | any.

20 | The second issue that I have to consider, at least in

21 | this context, is whether or not there is a finding that I could

22 | make by clear and convincing evidence that the defendant is not

23 | likely to flee or pose a danger to any other person in the

24 | community.  With respect to the question of flight, while the

25 | balance has changed somewhat, I credit the representations of

1    the parties that the defendants have appeared here

2    consistently, and for that purpose I find that there is clear

3    and convincing evidence that there is not likely to be flight.

4          But it is the question of posing a danger to any other

5    person or the community that is bothersome to me.  The evidence

6    in this case, credited by the jury, and credited by me, having

7    made a determination by a fair preponderance independently for

8    purposes of co-conspirator hearsay, is that the defendants

9    engaged in a conspiracy to commit extortion, that they

10   attempted to commit extortion.  The statements that were made

11   by the defendants are such that I have reason to believe that

12   there is a concern about their posing a danger to other persons

13   in the community.

14         In particular, with reference to David Tkhilaishvili,

15   there have been incidents in which the defendant has had

16   encounters with witnesses in this case.  They have been

17   permitted or indulged in this case.  They will be indulged no

18   more.  There is no reason for me to believe that there is clear

19   and convincing evidence that these individuals will not pose a

20   danger to any other person or the community, and for that

21   reason I am going to revoke their bail and put them in the

22   custody of the Attorney General.  I do so, however, with this

23   proviso:  that there is not adequate opportunity for the

24   defendants to develop a submission, full submission with

25   respect to bail.  I will consider a full submission with

1  respect to bail.  I would ask that it be provided by no later

2  than Friday of this week, earlier, if you can put it together.

3       But on the basis of the record that I now have, it

4  seems to me that it would be improvident and, frankly, in

5  violation of my obligations under Section 3143 for me to keep

6  the defendants enlarged.  So, I remit them to the custody of

7  the Attorney General and the Marshal's Service.

8       Is there anything further that we need to take up?

9       MS. KAPLAN:  No, your Honor.

10      THE COURT:  One other thing.  I made the point to the

11  jury, I will make it to you.  I thought the case was very well

12  tried, vigorously tried, fairly tried by the parties in this

13  case, and the parties on all sides can rest assured that they

14  were very well represented in this case.

15      The sentencing in the case will take place on

16  August 10th at 2:30 p.m.  Is there anything further?

17      MR. TUMPOSKY:  I believe I'm on a planned vacation for

18  that week, your Honor.

19      THE COURT:  Do you have an idea of when the next

20  available time would be?

21      MR. TUMPOSKY:  I could be available I would think the

22  following week.

23      THE COURT:  The 14th at 2:30?

24      MR. CRUZ:  That's fine you, your Honor.

25      MR. TUMPOSKY:  That's fine, your Honor.

1          THE COURT:  Okay.  Thank you very much.  We will be in

2     recess.

3          (The Honorable Court exited the courtroom at 4:25 p.m.)

4          (WHEREUPON, the proceedings adjourned at 4:25 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

4          I, Brenda K. Hancock, RMR, CRR and Official Court

5    Reporter of the United States District Court, do hereby certify

6    that the foregoing transcript constitutes, to the best of my

7    skill and ability, a true and accurate transcription of my

8    stenotype notes taken in the matter of *United States v.*

9    *Tkilaishvili*, No. 1:16-cr-10134-DPW.

10

11

12

13   Date:   4/13/18              /s/ *Brenda K. Hancock*
                                  Brenda K. Hancock, RMR, CRR
14                                Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25