1          UNITED STATES DISTRICT COURT
             DISTRICT OF MASSACHUSETTS
2

3

4    UNITED STATES OF AMERICA          )
                                       )
5                                      )
     vs.                               )
6                                      )  No. 1:16-cr-10134-DPW
                                       )
7    DAVID TKHILAISHVILI AND           )
     JAMBULAT TKHILAISHVILI,           )
8                                      )
                   Defendants.
9

10

     BEFORE:  THE HONORABLE DOUGLAS P. WOODLOCK
11

12

                     PRETRIAL CONFERENCE
13

14

15

          John Joseph Moakley United States Courthouse
16                  Courtroom No. 1
                   One Courthouse Way
17                 Boston, MA 02210
                Wednesday, April 26, 2017
18                   11:10 a.m.

19

20

21        Brenda K. Hancock, RMR, CRR
               Official Court Reporter
22   John Joseph Moakley United States Courthouse
                   One Courthouse Way
23                 Boston, MA 02210
                   (617)439-3214
24

25

APPEARANCES:

    UNITED STATES ATTORNEY'S OFFICE
    By: AUSA Laura Kaplan
    John Joseph Moakley Federal Courthouse
    1 Courthouse Way
    Suite 9200
    Boston, MA 02210
    On behalf of The United State of America.


    FEDERAL PUBLIC DEFENDER OFFICE
    By: Oscar Cruz, Jr., Esq.
    District of Massachusetts
    51 Sleeper Street
    5th Floor
    Boston, MA 02210
    On behalf of the Defendant.


    HEDGES & TUMPOSKY, LLP
    By: Michael L. Tumposky, Esq.
    Suite 600
    50 Congress Street
    Boston, MA 02109

1          (The following proceedings were held in open court

2     before the Honorable Douglas P. Woodlock, United States

3     District Judge, United States District Court, District of

4     Massachusetts, at the John J. Moakley United States Courthouse,

5     One Courthouse Way, Courtroom 1, Boston, Massachusetts, on

6     Wednesday, April 26, 2017):

7          THE CLERK:  All rise.

8     (The Honorable Court entered the courtroom at 11:10 a.m.)

9          THE CLERK:  This Honorable Court is now in session.

10    You may be seated.  Criminal Action Number 16-10134, United

11    States v. Tkhilaishvili.

12         THE COURT:  Well, you may be seated.  I think the

13    place where I would like to start is what I will call the

14    question of or my concern about being lost in translation.  I

15    see the references to not stipulating to transcripts, and I

16    want to understand what you think is going to be happening.  Is

17    it anything other than saying, "We don't stipulate," or does it

18    involve alternative transcripts?  Do we have a Rengifo (ph)

19    issue here?  What's going on?

20         MR. CRUZ:  As far as the transcripts are concerned,

21    your Honor, we had discussions about whether or not we were

22    going to agree that those should be entered as exhibits in this

23    case.

24         THE COURT:  Put that to one side.  The transcripts get

25    presented.  I understand that there is not a stipulation, but

1   are you telling me now that there is a stipulation with respect

2   to the accuracy of the transcripts?

3          MR. CRUZ:  I don't have a dispute with regard to the

4   accuracy of the transcripts.  What I raised in a motion that I

5   asked leave to file with the Court late was redaction of

6   portions of, I believe, one of the transcripts.  One of

7   these --

8          THE COURT:  Well, I want to understand from

9   Mr. Tumposky if there is a dispute about the accuracy of the

10   transcripts.  That right now is what I am considering.

11          MR. TUMPOSKY:  I don't have a dispute on behalf of my

12   client, no.

13          THE COURT:  All right.  So, I'm sorry to interrupt

14   you, but I just wanted to get that clarified.

15          MR. CRUZ:  Yes, your Honor.  So, the only issue I have

16   with the transcripts is that there are two specific sections

17   that I have highlighted that I think the Court should strongly

18   consider ordering redacted.  One of these sections has to do

19   with a reference to my client, David Tkhilaishvili, being

20   arrested in the past, and as I laid out in the motion filed

21   with the Court --

22          THE COURT:  But why isn't that relevant to his

23   interaction with the cooperating individual, that is, to his

24   understanding of what it was that the object of his concerns or

25   the concerns of Count One and Count Two are being reflected in

1    this conversation?

2         MR. CRUZ:  Well, your Honor, what we're talking about

3    here is the defendants' intent in terms of the attempted

4    extortion.

5         THE COURT:  Right.

6         MR. CRUZ:  The other issue that the Court obviously

7    has to consider is the state of mind of the victim, quote,

8    unquote, in the case.

9         THE COURT:  Right.

10        MR. CRUZ:  What I'm suggesting to the Court is that

11   under the circumstances presented in this transcript, where the

12   alleged victim in the case is prompting a discussion about a

13   particular issue that leads to my client stating that he had

14   been arrested in the past, the portion of the transcript that

15   has to do with the arrest itself, that goes to the defendant's

16   intent to cause or induce fear in the victim.  And what I'm

17   suggesting to the Court is that under those circumstances,

18   where the victim in the case is prompting the conversation to

19   begin with, that that doesn't speak to the defendants' intent.

20        THE COURT:  It may.  It is part of the gestalt of the

21   conversation.  That it was elicited from the defendant,

22   according to your characterization, does not mean that the

23   defendant is not or could not be held to be comfortable with

24   the idea that the object of the extortion understands that he

25   has a criminal record.

1          MR. CRUZ:  Well, your Honor, the object of the

2     extortion, according to the Government, is that the defendants

3     in this case --

4          THE COURT:  No, no.  The individual who was the object

5     of this extortion.

6          MR. CRUZ:  The individual who is the object of the

7     extortion, that individual is, again, prompting a conversation

8     about a subject that leads, unfortunately, to this discussion

9     of a prior arrest, and what I am suggesting to the Court is

10    that the defendant's state of mind -- well, the defendant's

11    intent to cause or induce fear in the victim is the issue here,

12    and under these circumstances I'm suggesting that this

13    discussion or this mention of an arrest doesn't speak to that

14    intent.

15         THE COURT:  Well, I am not so certain that I agree

16    concerning it.  I am much more interested in the 403 question

17    and the larger question of bowdlerizing the transcript, how you

18    cut it out in a way that does not in some fashion distort the

19    full context.

20         MR. CRUZ:  Well, your Honor, there are other

21    references in the transcript to the possession of a weapon.

22         THE COURT:  I understand all of that.  So, if I am

23    correct, I should look at this and say can that highlighted

24    portion be cut out?  That is the management problem.

25         MR. CRUZ:  Yes, your Honor.

1          THE COURT:  The larger problem is does it distort the

2     conversation itself?  I understand your contention that this is

3     a trained or at least advised cooperating witness --

4          MR. CRUZ:  Yes.

5          THE COURT:  -- who is trying to encourage someone to

6     say things that may be inculpatory.  It may be more than

7     inculpatory.  It may be unfairly prejudicial if they ever see

8     the light of day at trial.

9          MR. CRUZ:  Well, and I think the gist of the argument

10    here, your Honor, is that there are other references to

11    Mr. Tkhilaishvili's possession of a weapon in the past.  If

12    this is the subject of the conversation, if this is what is

13    intended to induce fear in the victim, why is there a need to

14    also add a reference to an arrest?

15         THE COURT:  All right.  So, you are concerned about

16    the Government's case, that they don't need all of this, this

17    is enough.  I think I understand that theory.

18         So, Ms. Kaplan, why not take it out?  I would not let

19    you directly introduce prior convictions, so it comes in back

20    door.  Does it have to come in?

21         MS. KAPLAN:  I think that we can actually take out, on

22    Page 5 of Document 108, the Motion *in Limine* that was filed

23    yesterday or yesterday afternoon, the final attribution to

24    David Tkhilaishvili.  I think that can be removed, where he

25    says, "Because I don't have any problems.  Everything is fine

1    with me, knock on wood.  I haven't been arrested in 12 years.

2    One time I showed it and I got arrested, but that was -- I

3    haven't had any problems in six years."  That's not a problem.

4         THE COURT:  So, those two sentences, "I haven't been

5    arrested in 12 years," and, "I haven't had any problems," could

6    be taken out?

7         MS. KAPLAN:  That's fine.

8         THE COURT:  Okay.  So, I think that that makes sense

9    under these circumstances.  Now, it may come in in some other

10   circumstance, if the foundation is laid for its introduction,

11   but in presenting this to the jury, at least initially, in the

12   Government's case in chief, I take Ms. Kaplan's suggestion as

13   an appropriate one.  So, we will permit that to be excised and

14   allow the Motion *in Limine* to that extent, bearing in mind the

15   larger issue of there may be circumstances in which prior

16   convictions of the defendants come out.

17        MR. CRUZ:  I understand, your Honor.

18        THE COURT:  So, let me -- I'm sorry.

19        MR. CRUZ:  There was a second portion that I'm asking

20   the Court to redact, and that has to do with the witness named

21   Kristina Ursova, who is referenced in the transcript by

22   Mr. Torosyan.  He, again, elicits conversation having to do

23   with a prior incident between Mr. Tkhilaishvili and Ms. Ursova

24   that had nothing to do with Allied Health Clinic.  It was in a

25   previous clinic that they had been employed in together.  There

1    is an allegation by in eliciting this conversation the way that

2    Mr. Torosyan describes it is that, "You knocked her out.  You

3    hit her."  First of all, that's a mischaracterization that is

4    based on the discovery we received --

5         THE COURT:  What did he say in response?

6         MR. CRUZ:  What he said in response was the following:

7    He says that the -- the alleged victim in the case says, "You

8    hit her in the office in front of the staff.  You can't do

9    that."  Essentially what the --

10        THE COURT:  I'm sorry.  "You hit her in the office in

11   front of the staff," and he says, "Yeah."

12        MR. CRUZ:  Yes.

13        THE COURT:  Okay.

14        MR. CRUZ:  And just to put this in context, that's at

15   the prior employment.

16        THE COURT:  I understand that, and we will get to that

17   in a moment, I think, and perhaps I will bookmark that part of

18   the Motion *in Limine*, because I do want to get to the question

19   of the introduction of the Davis evidence.  I am not exactly

20   sure what the Government is proposing to introduce, and I will

21   get to that in a minute.

22        MR. CRUZ:  Okay.

23        THE COURT:  But it is part and parcel of the same

24   thing.  If you look at it and say we are talking about someone

25   eliciting from a potential victim fear, and knowing that he is,

1    that is, ratifying a statement of violent treatment of someone

2    in the previous clinic, that would ordinarily come in.

3         Now, the concern here and the concern I have -- I will

4    front it now, we will get to it later -- is that I am concerned

5    that the predominant, maybe the almost entire effect of

6    introducing Classic Pizza and Davis is propensity evidence.  It

7    can be tarted up in certain ways by using some of the language

8    of acceptable ways to introduce this evidence, but its

9    predominant impact, unless controlled in some fashion, is

10   propensity evidence, and it is not something I am likely to let

11   in.  I am going to let in, I think, stuff that might touch on

12   Davis, have to, I think, and the question is how much.

13        MR. CRUZ:  Right.

14        THE COURT:  And the question of whether or not that

15   particular portion is going to be introduced is I think related

16   to how much else.  If it were, "You beat up your girlfriend

17   before," unrelated to Davis --

18        MR. CRUZ:  Yes.

19        THE COURT:  -- then I don't think there would be a

20   problem.  But it is related to Davis, so it presents a problem

21   that I want to address as we go along.

22        MR. CRUZ:  Yes, your Honor.  Yes, your Honor.

23        THE COURT:  Okay?

24        MR. CRUZ:  And in terms of the redaction, I mean, will

25   the Court at least consider doing that under the circumstances?

1      THE COURT:  I will consider it, I am considering it,

2 but I am not going to put it into a ruling until I have dealt

3 with it in its broader context.

4      MR. CRUZ:  All right.  So, in other words, we are

5 going to see how this comes --

6      THE COURT:  Right.  We are having a conversation now.

7 At a certain point the conversation will come to an end and I

8 will tell you what I think is going to happen.

9      MR. CRUZ:  I understand, your Honor.  And I guess my

10 concern is will the Government be allowed to mention this issue

11 during the course of its opening statement?

12      THE COURT:  I don't know.  That is what this

13 conversation is going to lead to.  Okay?

14      MR. CRUZ:  All right.

15      THE COURT:  So, now back to translation.  Obviously,

16 my concern is that there not be any misunderstanding by the

17 defendants or the jury about what is being said in a foreign

18 language, and there have been some misgivings asserted by some

19 of the translators here about the dialects involved and

20 differences, and so Ms. Beatty, who is always ahead of all of

21 us, has been looking around to see that we get the properly

22 qualified translators, and at this stage it is going to be

23 quite expensive.  That is not your business, it is mine, but it

24 is going to be quite expensive, because we are going to have to

25 bring in somebody from Los Angeles and somebody from New Jersey

1    to deal with that, but to ensure that there is accuracy in the

2    translations.  I have to have two translators, just because

3    work rules among translators require taking turns on it.  But I

4    want to know if there is anything else that I should be

5    concerned about with particularity in this question of

6    translation.

7         MR. CRUZ:  If I may, your Honor, there was one thing

8    that the Government brought to our attention in terms of some

9    additional amendments or edits to the final version of the

10   transcript that were not done by a linguist translator, they

11   were done by the victim in the case, the alleged victim,

12   Mr. Torosyan, and, of course, I have a concern that if he is

13   allowed to comment on something that a translator/linguist

14   wasn't able to produce a response for, that there is some

15   amount of subjectivity that is being --

16        THE COURT:  Well, let me tell you how I deal with that

17   or will deal with it.  Number one, I do not want and do not see

18   a reason that there should be displayed to the jury a back and

19   forth or the editorial process, the markup process between a

20   translator and the person who was actually there.  I assume

21   that this transcript and the conversation is going to come in

22   through -- and "John Doe A" is Mr. Torosyan, is it?

23        MS. KAPLAN:  Yes.

24        THE COURT:  I assume it is going to come in through

25   Mr. Torosyan, and Mr. Torosyan is going to say, I assume, "I

1   have read the transcript, I have reviewed the transcript, the

2   transcript accurately reflects what was said as translated and

3   as I understood it," and that is where it lands.  It does not

4   go any farther than that, unless somebody wants to tell me that

5   they want to have it go farther than that.  People deal with

6   and try to finalize transcripts up to the last moment, and I do

7   not want to burden the process with the potential that they are

8   going to get, not sandbagged, but you understand what I am

9   talking about, sandbagged with somebody saying, "Well, in draft

10  number five you said that this word meant this and that."  All

11  we are going to have is that transcript, and Mr. Torosyan, you

12  can go after Mr. Torosyan about, "Does it mean that, does it

13  mean this," but not by reference to legislative history of the

14  transcript.

15          MR. CRUZ:  Sure, sure.  But as far as those final

16  edits, what I had mentioned to Ms. Kaplan was that I didn't

17  have a problem with the final edits that were done by

18  Mr. Torosyan, as long as they were reviewed by a linguist, and

19  that person could give an opinion about whether they agreed

20  with that or not.

21          THE COURT:  Well, that introduces this new dimension

22  or potential for --

23          MS. KAPLAN:  And that's my fault.  I neglected to get

24  back to Mr. Tumposky and Mr. Cruz.  We did check with the

25  linguist, and those changes are consistent with the linguist's

1    understanding.  If he wants something in writing, we --

2             THE COURT:  So, a problem has been solved.

3             MS. KAPLAN:  Yes.

4             MR. CRUZ:  Thank you.

5             THE COURT:  So, what you have got is the transcript.

6    Your clients may say, "That is not accurate," and that is why I

7    started by saying we have got a concern about accuracy.

8             Now, Mr. Torosyan, my simple understanding of nations

9    around the Black Sea, is Armenian?

10            MR. CRUZ:  Yes.

11            MS. KAPLAN:  Yes.

12            THE COURT:  So, do we have a problem with his

13   translations here, dialectic, anything like that?

14            MS. KAPLAN:  Not that I'm aware of, your Honor.

15            MR. CRUZ:  And, your Honor, and I think you are aware

16   of this, but the parties that are part of this conversation,

17   Mr. Torosyan, Mr. Tkhilaishvili, they speak two completely

18   different languages, Armenian and Georgian, but the overlay is

19   the common Russian language.

20            THE COURT:  Right.

21            MR. CRUZ:  So, they are doing their best, in other

22   words, depending on their expertise or level of understanding

23   of Russian to communicate things to each other in essentially a

24   different language --

25            THE COURT:  I think I understand that.  What I do not

1    want is for somebody to pop up in the middle of the trial and

2    say, "Wait a minute, we don't know who is saying what to whom

3    in what language," that kind of thing.  We think we have the

4    gold standard for Georgian interpreters here.  We have an

5    overlay, as you say, of Armenian in it, and they are speaking

6    to each other in Russian in some fashion.  I think we have got

7    everything covered, but because earlier translators expressed

8    some misgivings or concern that they did not have all of the

9    relevant competences entirely, I wanted to be sure that we were

10   on the same page on this.  So, I understand that there is not

11   an issue.  We will get, as I said, the best people we can find

12   in the country to try the case.  All right?

13          MR. CRUZ:  And, your Honor, just so that I'm clear on

14   this, there isn't any issue with regard to the translation of

15   these conversations by these linguists, but I want to be sure

16   that I'm not crossing a line when I suggest, and this is

17   according to their linguist and their translator, that my

18   client's competency in Russian was not very good.

19          THE COURT:  Well, I don't know how you are going to do

20   that, but I think you may have to do it through Mr. Torosyan,

21   unless your client is testifying.

22          MR. CRUZ:  Well, I think I can do it through their own

23   linguist translator who comments and it's a part of the

24   transcript.

25          THE COURT:  Well, having done a fair number of

1    transcript cases myself in various incarnations, and

2    understanding the dangers that are presented by that kind of

3    thing, how is this coming in, Ms. Kaplan?

4          MS. KAPLAN:  Well, on the transcripts the linguists

5    did note that one of the defendant's Russian skills was poor

6    and unintelligible.

7          THE COURT:  So, ordinarily, annotated transcripts

8    don't come in, and I don't know if you are planning on putting

9    the translator on or the interpreter on.

10          MS. KAPLAN:  No.

11          THE COURT:  Are you?  Because let me just tell you

12    about the transcript.  The transcript is the transcript.

13          MR. CRUZ:  Yes.

14          THE COURT:  "Here is the transcript --"

15          MR. CRUZ:  Absolutely.

16          THE COURT:  -- without saying, "I give him a C plus

17    for his Russian skills."  It is whatever was said on this is

18    what is involved.

19          MR. CRUZ:  Yes.

20          THE COURT:  Now, if we have an expert witness

21    translator who comes in and says he does not speak Russian very

22    well, that is a different issue, but it would have to be in

23    there separately, not by annotation.

24          MR. CRUZ:  Well, I believe that, Ms. Kaplan can

25    correct me if I'm wrong, but we have discussed this already.  I

1  believe she agreed that that was something that I could state,

2  because those are two different issues.  The transcript is

3  accurate, the transcript is accurate, but the other issue is is

4  the client's ability to speak the language questionable, and

5  that's a separate issue.

6       THE COURT:  So, are we going to have a disembodied

7  translator stating in an annotation to the transcript that his

8  skills are limited?

9       MR. CRUZ:  Yes.

10       THE COURT:  That is the agreement here?

11       MS. KAPLAN:  Well, we turned over the transcripts with

12  the annotations.  And, frankly, I hadn't focused, your Honor,

13  on the fact that that cover page probably shouldn't have been

14  on it.  It should have just been the transcript.

15       THE COURT:  Well, okay, but now we are talking about

16  we are going to try the case, and so I don't know where the

17  linguist or translator, or whoever it is, is and whether or not

18  you want to put someone like that on the stand for this kind

19  of -- whether Mr. Cruz does or you for this kind of thing.  I

20  am just looking at it from the perspective of somebody popping

21  up in the middle of the trial and saying, "Hearsay, your

22  Honor," and it is a pretty good evidentiary objection under

23  these circumstances.  By contrast, if you don't care, if that's

24  a quick and efficient way to get it in front of the jury or a

25  comment in front of the jury, I don't mind, but I don't want a

1    surprise.  That's all.

2              MS. KAPLAN:  I think the Government's fine just

3    leaving it as is, if you have no problem with the annotation on

4    the transcript.

5              THE COURT:  No, I don't, unless somebody is going to

6    raise it.  If it is an efficient way of getting this particular

7    contention before the jury, that is fine.

8              MR. CRUZ:  And, your Honor, I don't intend to

9    elaborate on what the linguist said in the transcript to any

10   degree further than what is listed there.

11             THE COURT:  All right.  So, that helps me to

12   understand a little bit more about this.

13             You are in an unaccustomed quiet, Mr. Tumposky.  Do

14   you have any concerns about things being lost in translation?

15             MR. TUMPOSKY:  Not on the translation.  My main issue

16   is going to be on the 404 evidence, when the Court is ready to

17   hear that.

18             THE COURT:  Okay.  So, then, let's step back a bit.

19   The Government has provided a kind of comprehensive response to

20   the several motions of the defendants, and I simply propose to

21   go through that.  But, first, I want to start with the

22   summaries, which is Docket Number 88.  I assume that they have

23   been shared with the defendants, or if they have not they are

24   going to be.

25             MS. KAPLAN:  They have been shared, yes.

1          THE COURT:  Okay.  And any problems with them, apart

2     from their evidence?  My only concern is if they distort

3     somehow the evidence in the case or are argumentative.

4          MR. TUMPOSKY:  I think there was the one issue that we

5     flagged, and I guess there was agreement on that --

6          MR. CRUZ:  Right.

7          MR. TUMPOSKY:  -- that that was fixed.

8          MR. CRUZ:  There were two transactions that had been

9     separated from a grouping, and those are the two transactions,

10    I believe, that relate to the embezzlement count.  We had

11    discussed why they needed to be separated.  It's an issue for

12    the jury as to whether or not those transactions are

13    questionable.  We don't need to add the overlay of them being

14    separated in a summary chart.  So, I would ask the Government

15    if they could just include it with the larger grouping so

16    there's no distinction that the jury may draw an inference

17    from.

18          THE COURT:  Okay.

19          MS. KAPLAN:  And we did that.

20          THE COURT:  Okay.  So, I assume that those will come

21    in here.  Part of my assumption in dealing with these sorts of

22    things is to outline what is fair game in an opening statement

23    here.  The use of the summary would be fair game.  I don't know

24    whether it is significant enough to justify it, but, in any

25    event, it can be done that way.

1          Now we get to what I will call "84," which is David's

2     "thieves-in-law" reference, and I just want to be sure that we

3     are on the same page as far as how that is going to be

4     characterized.  I understood that it is simply going to be

5     identified as a term for Russian organized crime, no more, no

6     less.

7          MS. KAPLAN:  Correct.

8          THE COURT:  And that the witness is not going to all

9     of a sudden say, in particular, this kind of aspect of it.  It

10    is simply that the definition is "Russian organized crime."

11    That's it.

12         MS. KAPLAN:  Right.  He might say, "Like the mafia,"

13    but that's it.

14         THE COURT:  All right.  You understand what the

15    presentation is here.  Now, is that agreeable?

16         MR. CRUZ:  Well, your Honor, except for the mafia,

17    quote, unquote, part.  That's just a characterization that I

18    don't think is necessary.

19         THE COURT:  And I feel the same way about it.  I would

20    like to have it simply at "Russian organized crime," unless

21    there is some special reason for proliferating the meaning of

22    "thieves-in-law" by comparison to Mediterranean terminology.

23         MS. KAPLAN:  Well, it's only I'm not exactly sure when

24    I ask the witness what he's is going to -- I have spoken to him

25    before.

1          THE COURT:  Oh, I think you should become sure of what

2     the witness is going to say.

3          MS. KAPLAN:  If you want me to instruct him not to use

4     the word "mafia," I will do that.

5          THE COURT:  Yes.  Just say that, "We have agreed upon

6     the definition to avoid any other problems, so when you are

7     asked what 'thieves-in-law' is, the definition that you are

8     limited to is 'Russian organized crime.'"  Now, if somebody

9     comes in and says, "Well, what do you really mean by 'Russian

10    organized crime,'" then Katie bar the door, but for purposes of

11    moving this along, that is the way I would like you to do it,

12    and so he could get instructed and there will not be any

13    sandbagging.  I cannot imagine there will be any sandbagging,

14    but if there is I would simply say, "Ladies and gentlemen, just

15    to save your time," to the jury, "I instructed that we will use

16    that definition here so we can move along."

17         MS. KAPLAN:  Okay, your Honor.

18         THE COURT:  So, we are all on the same page and agreed

19    on that; is that right?

20         MR. CRUZ:  Yes, your Honor.

21             (Mr. Tumposky nodded affirmatively)

22         THE COURT:  So, I allow the Motion 84 to the extent

23    that thieves-in-law, at least when initially presented by a

24    witness, will be identified as a term for "Russian organized

25    crime."

1          Now, I come to the three pictures here, and I think I

2     understand the Government to want to have or be prepared to

3     rest with just one of those pictures; is that it?

4          MS. KAPLAN:  Yes, but not the picture that I was

5     referring to in this motion.  So, there was a picture the

6     Government wanted to put into evidence which is a picture of

7     David Tkhilaishvili at a shooting range, and I think that the

8     Government has now agreed that we don't need to introduce that

9     photo.

10          But the one that I had forgotten to press the issue on

11     is there was a photograph of an American Express Card in the

12     name of one of the witnesses, Olga, and I won't even attempt to

13     pronounce her last name right now, that --

14          THE COURT:  You are going to work all weekend to be

15     able to pronounce it.

16          MS. KAPLAN:  I know I am going to have to do that --

17     that David Tkhilaishvili had that credit card in his wallet at

18     the time of his arrest.  So, it's a picture of the back of the

19     credit card.  And that's the only picture I would be seeking to

20     introduce with respect to the search of the computer or any of

21     the items.

22          THE COURT:  So, turning back, then, to the Motion *in*

23     *Limine* Number 89, that is allowed, upon the Government's

24     representation that it will not be using those three pictures.

25          Turning to the picture that they do want to use or

1    that the Government does want to use.

2           MR. CRUZ:  Your Honor, I would maintain an objection

3    to that, because the issue here is, at least I believe from the

4    Government's perspective, whether Mr. Tkhilaishvili had

5    possession of that credit card.  That credit card was issued to

6    Olga Dorofyeyeva, and she was an employee of Allied Health.

7    That credit card there is no dispute was utilized by people at

8    the clinic for things such as buying supplies that were

9    necessary for the business, et cetera.  The Government is also

10   contending that the credit card was used for personal purposes.

11   I don't see the need to introduce a photograph that --

12          THE COURT:  What is the problem?  What is the problem

13   with the --

14          MR. CRUZ:  We are not disputing it, I guess is the

15   issue.

16          THE COURT:  So, what is the problem with, "Here is the

17   object that is used to access the funds"?  It is a totem, I

18   suppose, is one way to refer to it.  But, in any event, I don't

19   understand what the problem is.  If it showed the witness in a

20   compromising position or showed the defendant threatening the

21   witness, that is another issue.  This is simply, "Here is the

22   card that was used for," according to the Government -- it is

23   up to the jury whether they think so -- "Here is the card that

24   was used for purposes of the improper transactions."

25          MR. CRUZ:  Well, I think that what may be the issue is

1   whether the photograph in and of itself is misleading in any

2   way.  It is a photograph --

3         THE COURT:  How is it misleading?

4         MR. CRUZ:  Well, it's taken from Mr. Tkhilaishvili's

5   computer.  There's nothing that I have been provided with that

6   lays a foundation of what the context of taking the picture

7   was, whose possession the card was in when the picture was

8   taken, whether it's a picture that was produced by Ms. Olga or

9   some other employee of --

10        THE COURT:  Maybe I jumped ahead, but I assume it is a

11  credit card that is issued to a particular employee for the use

12  of a particular employee on behalf of the company, that is,

13  Olga.

14        MR. CRUZ:  Yes.

15        THE COURT:  And, ordinarily -- I haven't seen Olga,

16  but she probably does not look like David Tkhilaishvili.

17        MR. CRUZ:  Yes, your Honor.  I understand, your Honor,

18  and I don't know if you have been provided with the picture

19  itself.

20        THE COURT:  No.

21        MR. CRUZ:  But it is the back of the credit card.  You

22  can see the credit card number.  There's no signature on it, I

23  don't believe.

24        THE COURT:  Right.  But somebody who is handling the

25  negotiation of the credit card is going to look at Olga and

1    then look at David Tkhilaishvili and say, "You have changed a

2    good deal since that photograph was made."

3           MR. CRUZ:  Well, I mean, I don't think that there's

4    any allegation that Mr. Tkhilaishvili had the credit card, if

5    that's what this picture depicts, in terms of his actual

6    possession of the credit card without authorization.  I don't

7    think there is any issue as far as that is concerned.

8           THE COURT:  Maybe I am getting in too deep on this.

9    Are you going to use the credit card itself or the picture?

10   What's going on?

11          MS. KAPLAN:  There is going to be testimony about

12   Defendant Tkhilaishvili asking Olga to take the credit card out

13   in her name because he had poor credit; and, in fact, upon his

14   arrest that credit card -- and he used that credit card for

15   Allied Health expenses and for other expenses, and upon his

16   arrest that credit card was in his wallet.  So, it's

17   corroborative of the testimony of the witnesses.

18          THE COURT:  I'm sorry, but I just don't see the issue.

19          MR. CRUZ:  That's fine, your Honor, but I didn't want

20   the Court to think that that credit card was photographed when

21   he was arrested.  It wasn't.  This was just a picture that was

22   taken off of the --

23          THE COURT:  You mean that he was attempting to pass

24   himself off as Olga at booking?

25          MR. CRUZ:  Not that he was passing himself off as a

1    woman, but that he had the card without authority, in other

2    words.

3             THE COURT:  That is for the Government to develop,

4    and, apparently, they will develop it in some fashion, whether

5    it is with authority or without authority, but, in any event,

6    as a way of avoiding difficulties created by his own credit

7    problems.  And that is at least what he tells Olga?  Am I right

8    about that?

9             MR. CRUZ:  Right.

10            MS. KAPLAN:  And just so we are clear, that picture

11   didn't come off of the computer.  That picture was in his

12   wallet when he was arrested in his apartment.

13            THE COURT:  Is the picture different from the credit

14   card?

15            MS. KAPLAN:  Not that I'm aware of.

16            THE COURT:  No, but is it unattached from the credit

17   card?

18            MS. KAPLAN:  I'm sorry.  Is the picture --

19            THE COURT:  Sometimes credit cards have pictures of

20   the person who is authorized to use it.

21            MS. KAPLAN:  There is no picture.

22            MR. TUMPOSKY:  It's a photo of the credit card sitting

23   on a table.

24            MS. KAPLAN:  It's a photo of the back of the credit

25   card.

1          THE COURT:  Well, okay.

2          MS. KAPLAN:  You can see the name of "Olga," and I

3   think you can see the number of the credit card.

4          THE COURT:  So, it is found on his computer; is that

5   it?

6          MS. KAPLAN:  It's found in a wallet at his apartment

7   at the time of the arrest.

8          THE COURT:  So, if he wanted to call up amazon.com and

9   say, "I would like to order a book," he could use that credit

10  card there?

11         MS. KAPLAN:  Right.

12         THE COURT:  Okay.

13         MR. CRUZ:  Right.

14         THE COURT:  So, I don't see a problem with it.

15         MR. CRUZ:  Okay.

16         THE COURT:  So, I think we have dealt with 89 already.

17         Now, the term "extorted," again, this is Motion

18  Number 85, I don't know whether this is simply making sure that

19  the witnesses don't go off into a discussion of terms of art

20  here, but it would strike me that they can offer their

21  percipient observations without using the word "extorted,"

22  Ms. Kaplan.

23         MS. KAPLAN:  I don't anticipate the witness will use

24  the word "extorted," and I will also instruct the witness not

25  to.

1          THE COURT:  So, that is allowed to the extent the

2     Government will be authorized to instruct the witnesses not to

3     use a particular term here.  Again, if there is some suggestion

4     of some sandbagging, I will deal with that with instructions to

5     the jury.

6          Number 91 is the cell phone that, as I understand it,

7     David paid for on Jambulat's cell phone with improper funds,

8     what the Government contends are improper funds.

9          MR. TUMPOSKY:  Yes.  The allegation is essentially

10    that he took out I think it was five cell phone accounts and

11    distributed them to several of the employees, including

12    Jambulat.  Jambulat is not charged with any financial-related

13    crimes, and so my position is that it's not relevant that he

14    was, in fact, one of the recipients of a phone.  It's not

15    relevant to the case against him.

16         THE COURT:  So, what are we going to say, that a phone

17    was improperly paid for by David and made available to JT?  If

18    you want an instruction to the jury, I will give an instruction

19    to the jury, but I don't see that as an issue.

20         MR. TUMPOSKY:  Well, my suggestion would be that the

21    employees could be identified in some other fashion other than

22    by name, or just simply that there were five employees.  I

23    don't think it really matters who they were.  The Government's

24    position is that no one was supposed to get a phone, so whether

25    they were secretaries or presidents doesn't really matter.

1   Their position is no one should have gotten one.  So, can we

2   just say he gave phones for five employees, no employees were

3   supposed to get them, and that's that?

4            THE COURT:  Ms. Kaplan, any view about that?

5            MS. KAPLAN:  I don't think I have a problem with that

6   other than I think the phones may have been in the names of

7   some individuals who were not employees of Allied Health.  So,

8   I could ask -- I could have him testify employees and other

9   individuals who are not employed by Allied.

10           THE COURT:  Individuals who were not authorized to

11  receive them, the monies were used for that.  Okay, that's the

12  protocol that we will describe, again, subject to some

13  refinement if a door is opened or there is some reason to think

14  that it is unfair to tie the Government's hands in that way.

15  But that seems to me to be a way around the problem of two

16  separate types of charges in which one defendant is not charged

17  in the question of embezzlement.

18           So, then we have sequestration.  I understand there is

19  no objection to the sequestration orders here.  You are going

20  to have to police it to some degree yourselves.  I will not, or

21  I can't; I don't know who these people are there.  But you will

22  tell them that, both, they are not supposed to be in the

23  courtroom, and they are not supposed to discuss their testimony

24  among themselves here.  So, that is allowed.

25           And I think, then, that brings us back to the question

1    of prior bad acts, and what I think I need to know from you,

2    Ms. Kaplan, is how you are going to be attempting to introduce

3    this.  You have in mind my view from 25,000 feet that this is

4    largely propensity.  There may be reasons, but it is largely

5    propensity, and so I want to understand how you propose to

6    introduce --

7          MS. KAPLAN:  I think in our reply I tried to narrow

8    what the Government will try and do here, and I think that with

9    respect to Davis Clinic there is an awful lot of overlap.

10    There are many of the same employees that were at Davis Clinic.

11          THE COURT:  Can I interrupt you by asking if we talk

12    about that they were employees of a prior business here, don't

13    we deal with that without getting into the suggestion or the

14    contention that the prior business was basically fleeced in the

15    same way or the principal involved was fleeced in the same way

16    as is charged here?  I am not thinking of excluding things

17    about saying, "You worked in a prior business that was called

18    'Davis,' you were 'X,'" but I don't think I want to get into

19    the trial itself the secondary bad act, I mean, proving the

20    other bad act, which is, of course, a criminal bad act.

21          MS. KAPLAN:  Right, and I understand that, unless, of

22    course, the door is somehow opened, which it may very well be

23    opened.

24          THE COURT:  With respect to opening doors, don't act

25    on your own, or anyone don't act on your own knowledge.  If you

1    think a door has been opened, come up and see me at sidebar.

2        MS. KAPLAN:  Okay.  So, there's all the interconnected

3    relationships, and I understand that your Honor doesn't have an

4    issue with that.  The other thing where it comes up is that it

5    goes to some motive on the part of the defendants, because they

6    owed money to some of the individuals at Davis, which is why

7    they are trying to get Mr. Torosyan's interest at Allied, and

8    that was part of the reason that they needed to pay people

9    back.  So, again, we don't have to go into the embezzlement of

10   funds, and I won't do that unless the door has been opened and

11   we have gotten your permission to do that.

12        THE COURT:  Okay.  That seems fair to me.  I will hear

13   from the defendants on it, but that seems a fair way of drawing

14   the line on this, and it may go to the bias of the witnesses

15   themselves, too.

16        MR. TUMPOSKY:  And I think that is right in the

17   general sense, and I want to highlight this issue, because it

18   is going to be an issue during the course of the trial, which

19   is that not everything applies to both.  There's no evidence

20   that I've seen that Jambulat owed money to anyone, and so I

21   think it's just important that we be careful in applying

22   certain rules to --

23        THE COURT:  As to that, I would think about

24   instructing the jury, but I probably believe that the Court

25   helps those who help themselves, and so you bring it out on

1    cross-examination.  "You are not saying this about Jambulat?"

2         MR. TUMPOSKY:  Jambulat or James.

3         THE COURT:  "You are not saying that about James?"

4    "No."  "Thank you."  And sit down, unless you think you are

5    going to get something more out of these witnesses.  So, that

6    is the way I would prefer to have it.  If it turns out to be

7    some problem, then you will ask for some instruction, but I

8    don't think it is going to be an instructional problem.

9         MR. CRUZ:  Your Honor, with regard to the

10   interconnected relationships, I don't have an objection to

11   getting into employee overlap, certainly, in some context to

12   how Allied started the precursor with the Davis Clinic,

13   et cetera.

14        THE COURT:  Right.

15        MR. CRUZ:  But we get back to the issue of this

16   witness, Kirstina Ursova, and when Ms. Kaplan states that the

17   defendants owed people from Davis money, we're really only

18   talking about one issue, which is David Tkhilaishvili

19   supposedly owed money to Kristina Ursova, which therefore

20   would, according to the Government, motivate him for some

21   reason to threaten Victor Torosyan with regard to reducing his

22   interest or --

23        THE COURT:  Well, as an alternative source of monies

24   to pay off the previous person who claims an interest.

25        MR. CRUZ:  Yes.  And I guess that may be an issue, but

1    to take it a step further and talk about a domestic dispute

2    between them that again relates --

3            THE COURT:  That part I don't know about.  So,

4    explain --

5            MR. CRUZ:  It's interconnected, because I think the

6    Government wants to get into that as well.

7            THE COURT:  So, Ms. Kaplan?

8            MS. KAPLAN:  So, first, I just want to correct that

9    it's not just Ms. Ursova that was owed money.  It was an

10   individual by the name of Saba who was involved to some extent

11   in Davis, as well as Olga, who it appears at various times

12   David Tkhilaishvili was promising her some interest in Allied

13   because of the work she did at Davis.

14           There was an incident that occurred at Davis Clinic

15   between -- an altercation between David Tkhilaishvili and

16   Kirstina Ursova at Davis Clinic, and this was witnessed by

17   Kenton Fabrick, who was an employee at Davis Clinic and then

18   went over to Allied, and he'll testify, and at some point

19   Mr. Torosyan became aware of this physical altercation that

20   occurred.

21           THE COURT:  So, let me just pause with it.  Is it

22   domestic abuse?  Do they have a relationship of some sort apart

23   from the business?

24           MS. KAPLAN:  No.

25           MR. CRUZ:  I understand that they did, your Honor.

1      THE COURT:  Well, in any event, whether they did or

2  not --

3      MS. KAPLAN:  I'm sorry, I'm sorry.  Yes.  I misspoke.

4  Yes, they did.  But this occurred at the workplace.

5      THE COURT:  And so, the Government's evidence is, as I

6  understand it, he smacked her?

7      MS. KAPLAN:  Yes.

8      THE COURT:  And so, Mr. Torosyan learns about this at

9  some point.  How did he learn about it?

10      MS. KAPLAN:  He learned about it from either Olga or

11  Kenton Fabrick, I believe, but he learned about it before -- in

12  between the various threats that he was getting from the

13  defendant.  So, it goes to his state of mind.

14      THE COURT:  One other question:  Is there evidence,

15  direct evidence, that David knew that Mr. Torosyan knew about

16  him smacking -- her name eludes me right now.

17      MS. KAPLAN:  Kristina Ursova.

18      THE COURT:  Kirstina.

19      MS. KAPLAN:  I don't know.  I'm not aware of that.

20      THE COURT:  All right.

21      MR. CRUZ:  Your Honor --

22      MS. KAPLAN:  Well --

23      THE COURT:  I said "direct evidence."  You may say

24  that there is circumstantial evidence of it, but I just want to

25  understand what it is that David understood that the purported

victim or intended victim understood about his tendencies to resolve conflicts by smacking people.

MS. KAPLAN: So, that takes us back to where we started today, and that was the transcript of a conversation between David Tkhilaishvili and Mr. Torosyan about the incident with Kirstina Ursova where they are discussing the incident.

THE COURT: All right. Okay.

MR. CRUZ: So, your Honor, first of all, you asked how Mr. Torosyan learned about this incident, and the Government responded that he heard either from Olga or from Kenton, who worked at Davis Clinic. First of all, Olga, according to the discovery, never witnessed the incident. She overheard them arguing.

THE COURT: Well, she could communicate that. She could communicate to someone else that she heard that David had assaulted Kirstina.

MR. CRUZ: Quite frankly, I don't know what she told him. She didn't --

THE COURT: It doesn't make any difference, from my perspective. As an evidentiary matter, it does not make any difference whether she saw it or not. That she communicated it to Mr. Torosyan is the critical part for this purpose.

MR. CRUZ: What I want to focus on is the Court had described it as he had smacked her, quote, unquote.

THE COURT: That was a shorthand way.

1          MR. CRUZ:  No, I understand.  And that's actually what

2     Mr. Torosyan brought up in the conversation in the transcript.

3     But my issue is that Kenton Fabrick, which is the person who

4     witnessed the incident, was interviewed by the FBI and

5     effectively stated that he witnessed an argument, a verbal

6     argument between them, that David did not threaten Kirstina,

7     and that he pushed her against a table.  That was the extent of

8     it.  So, first of all, for Mr. Torosyan to say that, "Kenton

9     Fabrick told me about this," and then to characterize it as he

10    knocked her out or he smacked her --

11         THE COURT:  What we have in the transcript is a

12    ratification by David.

13         MR. CRUZ:  I agree he didn't deny it, but what I'm

14    saying is --

15         THE COURT:  He said, as I recall -- I should have that

16    transcript in front of me.  I don't.

17         MR. CRUZ:  I think he said, "She made me do it," or

18    something to that effect.

19         THE COURT:  Well, he says, "Yeah," I think, something

20    like that.  Maybe you can get me the transcript.  But he

21    ratified it.  Now, you may minimize it.  You may say it was

22    just a shove over to the table.

23         MR. CRUZ:  Well, I'm not saying this.  Kirstina Ursova

24    herself said it.

25         THE COURT:  But you may bring it out and develop it,

1    that life has those moments in which people resort to some

2    modest physical encounter.

3         MR. CRUZ:  I understand, your Honor.  But despite the

4    fact that Mr. Tkhilaishvili accepted or didn't contest what

5    Mr. Torosyan was saying, Mr. Torosyan's understanding of what

6    happened was wrong, to begin with, it was erroneous.

7         THE COURT:  Well, it doesn't make any difference

8    whether it was wrong.  It is what he believed.  And maybe even

9    a further point, and it is one I want to end this on, which is,

10   going through the questions of instructions does it make any

11   difference, particularly when we are dealing with a cooperating

12   witness like this, what Mr. Torosyan actually believed or what

13   David believed Mr. Torosyan believed for purposes of the

14   intent?

15        MR. CRUZ:  Well, the focus should be on the defendant

16   or the person who is --

17        THE COURT:  So, now he is presented with a witness who

18   says, or call him a mark, who says, "You hurt her," or, "You

19   hit her."  And, frankly, maybe I should have the precise text

20   in front of me.  If you have an extra copy, or maybe if I could

21   steal somebody's copy, it would be helpful.

22        MR. CRUZ:  I understand, your Honor.

23        THE COURT:  Anybody?

24        MR. TUMPOSKY:  I only have it electronically, your

25   Honor.  I don't know if that would help.

1          MS. KAPLAN:  I have it.

2          THE COURT:  If you could surrender for present

3    purposes just that portion of it.

4          (Document provided to the Court by Ms. Kaplan)

5                    (Pause)

6          THE COURT:  So, what we have, let me give perhaps a

7    dramatic reading in which Mr. Torosyan says, "You understand

8    you have no right to touch her?"  "Wait.  Touch who?", says

9    David.  Mr. Torosyan says, "Kirstina.  You hit her in the

10   office in front of staff.  You can't do that."  David says, "In

11   front of Kenton."  Mr. Torosyan says, "In front of Kenton."

12   David says, "It's ours.  She made me do that, and anyway,

13   because" -- and then Mr. Torosyan says, which is probably

14   critical to all of this, "Well, so you might get agitated and

15   hit me also.  You're not normal."

16         Okay.  That reflects his perception, Mr. Torosyan's

17   perception, and to the degree that I parse this for purposes of

18   attempt or conspiracy, to say what is critically important is

19   what David believes, David has been told about what the mark

20   believes, and that is in his mind, and it seems to me it gets

21   in.

22         MR. CRUZ:  Well, your Honor, what I will note, and

23   this is cited in my filing with the Court, the Goodoak case,

24   the First Circuit case, that states that the Court also noted

25   that where the victim is afraid, quote, unquote, because he

1    holds a belief that is erroneous, that state-of-mind evidence

2    is arguably less probative on the question of whether the

3    defendant attempted to induce fear.

4         THE COURT:  Well, that goes to the larger question of

5    a sting operation, and it seems to me that, while I understand

6    that language, it really is a caution or adjuration to me to be

7    careful about letting this kind of stuff in.

8         But, all that having been said, it seems to me right

9    on point under either of the theories here of whether or not I

10   should permit the jury or instruct the jury they have to think

11   about the state of mind of the person who is the mark, a

12   difficult issue when the mark already knows what the scheme is

13   that they are trying to develop by undercover activity, and

14   David's approach.

15        Let me pause with one thing while you are thinking

16   about your response to that.  I keep using "David" and "James"

17   or "Jambulat."  I don't want to demean anybody, and I am always

18   concerned about using first names in a familiar way that

19   suggests second-class citizenship, and I have problems with

20   names.  You are all forewarned about it.  But is there a

21   preference about referring to the defendants here or others

22   with names that are hard, for me anyway, to pronounce?

23        MR. TUMPOSKY:  I would be fine with "James."  I don't

24   have an issue with that.

25        THE COURT:  Okay.

1          MR. CRUZ:  Neither do I, your Honor.

2          THE COURT:  All right.  So, Ms. Kaplan, unless there

3     is some reason why I should be much more formal about it, I may

4     slip into informality here, and I do not mean in any way to

5     denigrate the individuals involved.  I just want to be sure I

6     am able to communicate my understanding of who I am talking

7     about.  Okay?

8          So, back to this issue.  It is evidence.  Is it

9     overwhelming evidence?  David says she made him do it.  I don't

10    know what that means, but he got mad as hell at her and he

11    smacked her, or pushed her, or edged her toward the table,

12    whatever it is.  But she made him do it.

13         MR. CRUZ:  And I think that's part of the problem,

14    your Honor, is that whatever Mr. Torosyan believed happened was

15    in error in the first place, because other people have stated

16    what Mr. Torosyan is describing didn't happen.

17         THE COURT:  So, Mr. Torosyan, too, said what I

18    consider to be critically important on this issue:  "Well, so

19    you may get agitated and hit me also.  You're not normal."

20    That is the expression of the person that David is confronting

21    who says, "I'm fearful of you.  You might do it to me.  And, by

22    the way, you're not normal," for whatever that means.  But it

23    suggests that he is in a fearful state and that David

24    understands that he is in a fearful state.  A jury could find

25    that David understood it.  David could also understand it is

1    just whiskey talk.

2         MR. CRUZ:  Well, your Honor, then I will end with this

3    quote again from <u>Goodoak</u>, where the Court states that, "Where,

4    on the other hand, the defendant did not expect and should not

5    have expected to produce a given state of mind, evidence that

6    such a state of mind resulted will tell the jury little about

7    whether the defendant, in fact, attempted to frighten the

8    victim."

9         And in this particular case I would suggest David

10   wouldn't have expected to engage in this conversation but for

11   Mr. Torosyan bringing it up in the first place.

12        THE COURT:  Well, that is certainly true.

13        MR. CRUZ:  And if he spontaneously said these things,

14   that's one thing, your Honor, but that's not how it went.

15        THE COURT:  Okay.  I think I understand this enough to

16   say I am not going to exclude it here.  It is part of the

17   transcript.  The other portion the Government has agreed upon

18   taking out, but this stays in.

19        MR. CRUZ:  Note my objection, your Honor.

20        THE COURT:  Okay.

21        MR. TUMPOSKY:  So, I think on the broader issue of 404

22   evidence, and if the Court thinks this is useful, I see it in

23   three categories.  One would be prior bad acts that the

24   victim --

25        THE COURT:  I don't mean to cut you off, but I think I

1   can cut you off, because we are not talking about anything

2   other than this, are we?

3        MR. TUMPOSKY: Well, I have --

4        THE COURT: No, but I don't understand the Government

5   to being offering Classic Pizza or, while there was an

6   initiative to offer Davis, we have pared Davis down to

7   interrelationships arising out of it and perhaps money owed to

8   Davis employees that would be funded by the alleged

9   embezzlement or extortion here.

10       MS. KAPLAN: Correct.

11       MR. TUMPOSKY: I just want to be clear.

12       THE COURT: You pretty much won.

13       MR. TUMPOSKY: I appreciate that, so I won't say too

14   much.

15       THE COURT: Right.

16       MR. TUMPOSKY: But that in the discovery that was

17   produced there's various mentions of supposed previous acts of

18   violence that were testified to -- or not testified to -- but

19   that witnesses describe, not the victim but other people.

20       THE COURT: The guiding principle, and I think

21   Ms. Kaplan understands this, but let me just state it so that

22   everybody does, to the degree that the witness has expressed a

23   concern or is aware of prior acts of violence by the defendants

24   here, I think it's fair game to bring it in. Now, does it come

25   in as a conviction? No. Does it come in if somebody observed

1    prior violence but the victim was not made aware of it?  No.

2    That is a tree that fell in the forest without the victim

3    around.  But if there's evidence to support the idea that the

4    victim is aware of it, then it comes in.

5            MR. TUMPOSKY:  Well, can I just make a separate point?

6            THE COURT:  Can come in.  Maybe stuff that if he

7    kicked a cat or something like that, that may not do it.

8            MR. TUMPOSKY:  On that limited issue about violence or

9    acts of violence that are communicated directly to the victim,

10   what the evidence in this trial is going to be, as I understand

11   it, is primarily testimony from the alleged victim and

12   recordings that depict conversations between the victim and the

13   co-defendant, not my client, the co-defendant David.  In those

14   conversations the Government claims David references his prior

15   misdeeds but also references prior misdeeds of James, and

16   there's no evidence that James intended to communicate those

17   prior misdeeds.

18           THE COURT:  What are we talking about with

19   specificity?

20           MR. TUMPOSKY:  Shot someone in the head, stabbed

21   someone back in Georgia, or wherever it was.  David says that,

22   "My brother did these things."

23           THE COURT:  Then, it seems to me it's probably a

24   cautionary instruction that I am going to have to deal with,

25   because what David is saying is, "I have a number of arrows in

my quiver, and one of them is that James is also a violent

person." That comes in. Now, as to David and probably as to

James under co-conspirator hearsay law, if the Government is

able to satisfy <u>Petrozziello</u> and <u>Bourjaily</u> kinds of issues.

MR. TUMPOSKY: Well, there is still a question of

relevance, even if it comes in as a co-conspirator --

THE COURT: Oh, I think it's relevant. "Here we are,

we can hurt you in a variety of different ways. I can do it

like I did to Kirstina," whatever that was. "James can do it

because he shot somebody when he was in Georgia."

MR. TUMPOSKY: And what I would say is it's probably

under that below threshold relevant to the case against David.

My concern is that the overflow prejudice --

THE COURT: Why isn't it relevant to a conspiracy? If

we assume that they have entered into a conspiracy -- I'm not

assuming it -- but if I assume that they have entered into a

conspiracy, then he is liable for the acts and statements of

his co-defendant to the degree that they are in furtherance of

the conspiracy and during the time period in which the

conspiracy is alleged to have taken place. He might even be

responsible for ones before that.

But the short of it is that, if your co-conspirator

talks a lot and says something about you, that can be

introduced as to you. Now, you may get up and say or you may

ask for a limiting instruction saying there is no evidence that

1    this took place, this is simply David saying it, but to the

2    degree that the conspiracy is one to extort through the use of

3    fear, then the statements, any of the statements of either of

4    the co-conspirators are admissible for that purpose, whether or

5    not -- if you want me to say to the jury or you are going to

6    develop it in some fashion there is no evidence that this took

7    place, it is admitted solely for the purpose of whether or not

8    in the Government's contention that it induced fear in the

9    victim.

10          MR. TUMPOSKY:  And there's also no evidence that James

11   intended for this information to be communicated, and that's

12   the issue that I have.

13          THE COURT:  I don't think that you have to have

14   approval by one co-conspirator of whatever another

15   co-conspirator could foreseeably say.  If there was some

16   evidence that, "Don't tell him about the guy I shot in

17   Georgia," that is a different issue.

18          MR. TUMPOSKY:  I guess I don't want to sort of

19   conflate the hearsay and the relevance issue.  I agree that

20   under the hearsay analysis, if there is a proof of a conspiracy

21   and it's in furtherance, then it's not hearsay.  What I am

22   saying is, in order to establish relevance, the Government has

23   to show James was aware these threats were going to be

24   communicated.

25          THE COURT:  I don't think that's right, at least as

1    you have explained it.  I think what is critically important or

2    a necessary precondition is that it is in furtherance of the

3    conspiracy, and in furtherance here is the attempt to induce

4    fear in the victim that violence will be used to achieve the

5    economic interests that the defendants are trying to achieve.

6         MR. TUMPOSKY:  Well, if I may try and flesh that out

7    in the next day or two, your Honor --

8         THE COURT:  I will hear you on that.  I assume that

9    this aspect of it is not going to be in opening statement, or

10   is it, that is, David said, "James shot somebody in Georgia"?

11        MS. KAPLAN:  No, no.

12        THE COURT:  Okay.  I will fine-tune it, but the broad

13   outline of this is, I think, fairly clear.  Also, because I

14   date myself by saying this, and that I do not want to show a

15   pride of authorship, but I wrote extensively, I think it was in

16   1987, a case called United States v. Dray in which I talk about

17   the ways in which co-conspirator hearsay comes in and the

18   circumstances in which it comes in.

19        MR. TUMPOSKY:  Versus?

20        THE COURT:  Dray.

21        MR. TUMPOSKY:  D-r-e?

22        THE COURT:  D-r-a-y, and it was just at the time that

23   Bourjaily was coming down.  But that was my kind of outline of

24   it, and it has been, from my perspective, serviceable since

25   then, and you will want to take a look at it to see, or you may

1    want to take a look at it and see how I approach these issues.

2            MR. CRUZ:  Your Honor, again at the risk of beating a

3    dead horse, I just want to point one issue out to the Court

4    with regard to the Kristina Ursova matter.  My understanding

5    from the review of the discovery, and I don't think the

6    Government will disagree, is that there was a threat, quote,

7    unquote, or threats made by both David and James at an earlier

8    date than when this transcript or this recording was done, the

9    one that we're focusing on today.  That interaction was not

10   recorded.  So, any evidence regarding that situation will be

11   through testimony of Victor Torosyan.  So, on November 9th, I

12   believe, of 2015, that's when the threats, quote, unquote, are

13   made to him with regard to --

14           THE COURT:  These are the unrecorded threats?

15           MR. CRUZ:  These are the unrecorded threats.  But this

16   is the crux of the case for the Government, which is, "They

17   asked me to divvy up my interest in the business and give it to

18   various people, and they threatened to do various things to me

19   if I didn't."  It's not clear whether Mr. Torosyan knew about

20   the Kirstina Ursova situation at that point.

21           And I highlight the difference only because in this

22   transcript that is being introduced there's no request on the

23   part of David from Victor to give up his interest.  Arguably,

24   there's no threat made to him directly to give up his interest.

25   So, I think it's critical to the question of Mr. Torosyan's

1    knowledge.

2           THE COURT:  You can argue that to the jury, but it is

3    evidence, and we are talking about the duration of the

4    conspiracy, and if during the duration of the conspiracy

5    Mr. Torosyan was aware of the potential for violence that David

6    presented, the Government contends, then it comes in, and you

7    can say, "They didn't record or there wasn't recorded this

8    initial encounter between them, so we don't even know what was

9    said.  Now let's focus on the rest of it.  He wasn't asking him

10   for anything in the recorded translations."  I'm not telling

11   you how your argument is going to go, but I am trying to

12   outline the fact that you can make that argument, but the

13   evidence is in there, I think.  Now, you are going to have to

14   deal with the evidence there.  It is not going to get excluded

15   on the idea that he didn't say it both times.

16           MR. CRUZ:  Right.  But I just wanted to highlight the

17   chronology and that it's not clear whether he knew about

18   Kirstina Ursova and that incident at the time --

19           THE COURT:  Right, and that's not critical to my

20   determination with respect to the admissibility, given that he

21   was aware at a time during the course of the conspiracy.  Okay?

22   Anything else that we need to take up on that?

23           So, what I have done with respect to the motion *in

24   limine* under 404(b), prior acts, that is Number 75, is we have

25   had a discussion.  The Government has indicated that it will

1   introduce evidence with respect to the Davis matter to show

2   relationships among witnesses and perhaps to show motive in the

3   sense of some of the witnesses may have been asking for money,

4   and David and James were looking for ways to fund their

5   response.  But beyond that none, unless somebody approaches me

6   at the sidebar.  So, it is allowed to that extent.

7           With respect to the, permit me to say, late-filed

8   motion *in limine*, I am prepared to exclude that portion that we

9   discussed earlier on, and the Government has agreed to that.  I

10  am not prepared to exclude the portion that deals with the

11  encounter of whatever dimension between David and Kirstina.

12          MR. CRUZ:  That's fine, your Honor.  Note my

13  objection.

14          THE COURT:  Okay.  Anything else that we need to talk

15  about before trial?

16          MS. KAPLAN:  I have a question for you, your Honor,

17  since I haven't tried a case here.

18          THE COURT:  Sure.

19          MS. KAPLAN:  So, the defendants have agreed to many of

20  the Government's exhibits, which are now just trial exhibits.

21  Do you want me to still go through the foundational questions

22  with witnesses?

23          THE COURT:  Not so much foundational, but I want the

24  jury to be aware and the record to reflect that a document or a

25  something has been introduced, and so language along the lines

1  of, "I now offer Exhibit 5, a letter, which is not, as I

2  understand it, your Honor, objected to," and then I will allow

3  it.  But the record will reflect it and the jury will be

4  alerted to the idea that a document has been introduced or a

5  something has been introduced.

6  MR. TUMPOSKY:  The only other issue, if we are going

7  to go through --

8  THE COURT:  Does that fully answer the question for

9  you?

10  MS. KAPLAN:  Yes.

11  THE COURT:  What I am basically saying is you don't

12  start the trial by saying, "I offer all of the things that

13  aren't objectionable."

14  MS. KAPLAN:  No, no.  And I'm going to ask the

15  witnesses to talk about all of these documents, anyway.  I just

16  wanted to know if you wanted me to go through, "Are those a

17  fair and accurate representation?"

18  THE COURT:  Unless there is some -- the jury may look

19  at it and say, "This doesn't look like a fair and accurate

20  representation."

21  MS. KAPLAN:  Right.

22  THE COURT:  I don't think they are going to.  But the

23  shorthand, the direct route as opposed to the scenic route of

24  introducing it is simply to say, "Here is Document Number 1.  I

25  don't believe it is objected to.  I offer it."  And I would

1    say, "Admitted."

2         MR. TUMPOSKY:  The only other issue is some of the

3    exhibits that are contested.  I don't know if now is the time

4    that we're going to address that, or do we do that the first

5    day?

6         THE COURT:  I'm happy to do it, if I can do it now or

7    shortly with a full understanding of it.  What are we talking

8    about?  Just give me categories.

9         MR. TUMPOSKY:  Well, I know, personally, for my case I

10   have maybe three exhibits that I want to put in, and one of

11   them I know --

12        THE COURT:  These are ones you want to put in that you

13   are concerned about the Government --

14        MR. TUMPOSKY:  They have indicated on two of them that

15   they are going to object.

16        THE COURT:  So, what are we talking about?

17        MR. TUMPOSKY:  Well, one, and I'm not sure exactly

18   what I will do in the end on this, but there actually was a

19   recording involving Torosyan and James.  The Government has

20   indicated it does not intend to put it in.  I may --

21        THE COURT:  Where did it take place?  What is its

22   provenance?

23        MR. TUMPOSKY:  The idea was that Victor would get a

24   recording of James making threats.  That was a notion that took

25   place, I believe, at the clinic, is where the recording was.

1          THE COURT:  So, the thrust of your presentation would

2     be, "Even when he was trying to develop threats he couldn't do

3     it.  Here is a tape?"

4          MR. TUMPOSKY:  That's essentially right, your Honor.

5          THE COURT:  What's the problem with that?

6          MS. KAPLAN:  It's inadmissible hearsay, your Honor.

7     It's not a statement against a party opponent.  It's a

8     self-serving statement by a defendant.

9          THE COURT:  I think it may be, I think it may be

10    offered fairly against the Government, and it may be offered

11    for a non-hearsay purpose, that is, true or not, here is what

12    he said, and if it is a "Kum ba yah" moment, it is inconsistent

13    with the tape that is being offered.  We will talk about it

14    some more, but you are entitled to my kind of understanding of

15    things.

16         MS. KAPLAN:  Well, I would like an opportunity to

17    brief it as well.

18         THE COURT:  Sure.  That's fine.  The first question I

19    ask is, is this opening statement material?  Because that means

20    I have to deal with it quickly rather than --

21         MR. TUMPOSKY:  I would like to at least discuss it

22    generally during my opening, because I think it's very

23    important, not the words, necessarily, but that there was a

24    conversation, it was monitored.

25         THE COURT:  If there is a question about the

admissibility of a piece of evidence that I can give the
parties a heads-up about and they want to use it in opening
statement, I want to be able to deal with it.  If it's done in
a general sort of way, "Ladies and gentlemen, they had a number
of interactions, and these were not threatening interactions.
You will hear one of the tapes," it's a kind of general
discussion not directed at all of this, that's fine.  Then we
don't have to deal with that up front.  If, by contrast, you
say, "And you are going to hear another tape, not just the tape
the Government has, but you are going to hear another tape, and
that other tape will make clear that they were best buddies,"
or whatever it makes clear.

MR. TUMPOSKY:  I would like the liberty to develop
that.

THE COURT:  So, Ms. Kaplan, you will look at it, and I
think we will take it up on Monday morning --

MR. TUMPOSKY:  Sure.

THE COURT:  -- the question, that that is just a small
portion of whatever your opening statement is.  Okay.  What
else?

MS. KAPLAN:  Well, I just ask for leave to file
something.

THE COURT:  Yes.  I am not saying by 1:30 today.  Get
me something no later than, let's say, noon on Sunday.

MS. KAPLAN:  I can do that, your Honor.

1        MR. TUMPOSKY:  The other exhibit that I know is

2   contested, there was a civil case that was sort of going on at

3   the same time that a lot of this other evidence was being

4   developed.

5        THE COURT:  What was civil case?

6        MR. TUMPOSKY:  It was a suit that the brothers filed

7   against Victor when he essentially ejected him from the

8   business using his supposed contractual authority.  A judge in

9   the Superior Court essentially froze that ejection, that

10  expulsion and held it pending a full trial on the merits,

11  essentially.  So, what I want to do is actually introduce --

12       THE COURT:  What is the state of that litigation now?

13  Is it stayed?

14       MR. TUMPOSKY:  It's frozen.  It's stayed, yes.

15       THE COURT:  "Froze" is a much more vivid way of

16  describing it, but I understand the word "stayed."

17       MR. TUMPOSKY:  It is stayed, your Honor.  So, the

18  judge wrote a decision, essentially, and there is a piece of it

19  which says, "Well, this action where Victor Torosyan

20  unilaterally expelled the defendants from the business, I'm

21  issuing an injunction against that.  That's not going to take

22  effect.  We're going to hold that until the civil case goes

23  through a full trial."  And I want to put that piece of the

24  judge's decision in, because I think it's relevant to --

25       THE COURT:  You are not going to get the judge's

1   decision in, unless it deals with an act that is material to

2   this case.  Let me just outline again, so you can refine your

3   response to whatever I am going to say.

4           MR. TUMPOSKY:  Sure.

5           THE COURT:  The fact of the litigation can come in and

6   the fact that they contested his position can come in, but

7   interlocutory decrees by another Court and its memoranda do not

8   come in.

9           MR. TUMPOSKY:  And I'm not putting it in to show that

10  there's some sort of legal imprimatur on any particular

11  conduct.  I want it in to show Victor's state of mind; in other

12  words, he read that decision and he knows that he needs to

13  prevail essentially in some way against the defendants.

14          THE COURT:  You can raise the issue without enlisting

15  the support of a Superior Court Judge as a non-appearing

16  witness in this case to speak to the question of likelihood of

17  success on the merits.  No.  But you can ask him --

18          MR. TUMPOSKY:  "You got a decision -- "

19          THE COURT:  No, no.

20          MR. TUMPOSKY:  How would I phrase it, your Honor?

21          THE COURT:  "You are in litigation with him.  You are

22  trying to prevail on that litigation.  It became very

23  important, it's important to you to prevail in this case, isn't

24  it?  This is really why you went to the Government, isn't it?

25  You found yourself in a position in which you were going to be

1   in a business dispute, and you have decided that you would

2   enlist the FBI in dealing with it."  That is fair enough.  But

3   not whoever the judge is, not Judge Wilkins, not whoever.  They

4   do not get in.

5          MR. TUMPOSKY:  Well, what if I just say, "You knew

6   that the issue of expulsion would not be resolved until the end

7   of the civil trial"?

8          THE COURT:  Well, I guess that's right.  I mean, I

9   don't see that as a problem.

10          MR. TUMPOSKY:  Without mentioning because a judge

11   ordered it.

12          THE COURT:  Right, that this was an open question that

13   was going to be litigated in the case.

14          Any objection to that, Ms. Kaplan?

15          MS. KAPLAN:  No.  I don't know exactly what we are

16   talking about here, and just so your Honor is aware, the victim

17   had gone to the FBI before any legal action.

18          THE COURT:  Okay.  But right now here in court or

19   Monday here in court, wherever he shows up, he is going to be

20   somebody who has got an axe to grind, big surprise, a witness

21   with an axe to grind, and he is going to come in and say -- and

22   he is going to be confronted by saying, "What is really

23   animating you here is you want to get a business advantage,

24   and, in fact, you are in litigation with these guys, aren't

25   you?"  Guys or guy.

1    MR. TUMPOSKY:  Yes.

2    THE COURT:  So, that will be permitted.

3    MR. CRUZ:  Just to follow up on that, your Honor --

4    THE COURT:  Sure.

5    MR. CRUZ:  -- there will be evidence coming in that

6    Mr. Torosyan did exercise his authority under the Operating

7    Agreement to eliminate their interests.  Without getting into

8    whether a judge contradicted or vetoed that exercise, would it

9    be --

10   THE COURT:  "Froze" I think is the term of art.

11   MR. CRUZ:  -- right.  Would it be appropriate for us

12   to say that their interests are still valid without --

13   THE COURT:  No.  The validity of the interests is not

14   material to this case and even relevant in this case unless you

15   are saying he had no interest so there could not be a threat of

16   economic harm, and that seems not likely.  The extent of it is

17   to say that there is dispute among these parties about various

18   aspects of this, but it seems to me that conspiring to engage

19   in the use or threat of use of force, physical violence,

20   survives ongoing disputes about whose economic interests will,

21   in fact, ultimately prevail.

22   MR. CRUZ:  All right.

23   THE COURT:  Was there an opinion?

24   MR. TUMPOSKY:  I'm sorry?

25   THE COURT:  Was there an opinion?  Was there something

1  written?

2       MR. TUMPOSKY:  Yes.

3       MR. CRUZ:  Yes, there was, your Honor.

4       THE COURT:  I don't think I have it, or maybe I do.

5  Do I?

6       MR. CRUZ:  You don't, because we will be releasing a

7  copy of all of the exhibits, the list, and we can provide it to

8  the Court.

9       THE COURT:  Why don't you give me a sneak preview of

10 it.  I would like to look at it, just so I am more fully aware

11 of what is going on.

12      MR. TUMPOSKY:  Sure.

13      MR. CRUZ:  And one last question, your Honor.  Back to

14 the issue of the transcripts that are being admitted, and maybe

15 this isn't a fair question at this point because we haven't

16 started the trial, but I am concerned with the back and forth

17 that is certain to take place with regard to the transcripts,

18 which is, certain portions of the transcript are going to be

19 highlighted by the Government.  Obviously, they're going to

20 argue that these were threatening, these comments were

21 threatening to Mr. Torosyan.  We will be able to respond to

22 that, but I guess my question is to the Court how much leeway

23 will the Court give the Government to flesh out further what

24 these individual comments are all about or elicit new

25 information that may be hearsay, may not be?

1    THE COURT:  Well, I don't know about that, but let me

2    tell you how ordinarily I deal with foreign-language

3    transcripts or conversations.  I will permit a narrative.  That

4    is, the Government can ask Mr. Torosyan, "Did you have a

5    conversation?  What was said in the conversation in a general

6    sort of way?  What was said back and forth?"  Then, "Was it

7    recorded?"  "Yes."  Offer the transcript.  "This is the

8    transcript."  The jury will get to listen to the foreign

9    language because, as difficult as this is, the forcefulness of

10   presentation is something that is appropriate, and they will

11   walk through the transcript itself -- not walk through it --

12   simply follow along with the transcript itself.  I don't know

13   what kind of software the Government is using, whether or not

14   it is going to be able to identify, "We are at this point in

15   the transcript when you are hearing that."

16       Ms. Kaplan?

17       MS. KAPLAN:  Well, what I was intending to do, your

18   Honor, is because these are in Russian, I was not going to play

19   the calls with the exception of one part of it.  There's also

20   video.  So, just one part, just so they are able to hear the

21   forcefulness of the conversation and see the defendant.  What I

22   was going to do is put them in through Mr. Torosyan and to read

23   with Mr. Torosyan certain portions, because, although there are

24   only two transcripts that I plan on using, they are very long,

25   and they go back and forth, and I think it will bore the jury

1     to tears.  So, the pages have been numbered, and I was going to

2     direct him to certain pages and lines and read with him and

3     just -- you know, sometimes I will ask him, "What was your

4     understanding of what the defendant said?"

5            THE COURT:  So, I'm not going to foreclose that.  I do

6     not want an extended transcript.  I once had a case in which I

7     was involved and Judge Garrity was involved in which the

8     cooperating witness was particularly instructed not to turn on

9     the tape recorder when he left his house in Gloucester on his

10     trip to Danvers, and he did, and so the jury, because there was

11     no objection, the jury got to listen to the type of music that

12     he was interested in from Gloucester to Danvers.  Judge Garrity

13     was more indulgent than I would be under those circumstances.

14     So, if they are going to focus on something, I will permit them

15     to focus on portions of it, and you can develop the larger

16     portion.

17            MR. CRUZ:  Sure.

18            THE COURT:  But I do not want this to be a movie about

19     sleep that shows someone sleeping for 12 hours.  It has got to

20     be focused on what is important.

21            MR. CRUZ:  I understand that, your Honor.  And I guess

22     what I want to avoid, I understand what the Court is saying in

23     a situation where a particular excerpt of the transcript is

24     brought up, let's talk about the Kirstina Ursova situation, and

25     the FBI has had and Ms. Kaplan has had ample opportunity to

1  question Mr. Torosyan about that situation and she asks him,

2  "Well, how did that make you feel?"  And, in addition to

3  reiterating what was stated, he adds to that, "Well, I know

4  that he hit three other people, too."  That sort of thing is --

5       THE COURT:  Well, I hope that Mr. Torosyan does not do

6  that, because I will have to instruct him in the presence of

7  the jury about the limitations of what he has to do, and I'm

8  sure Ms. Kaplan will alert him to his obligations and will be

9  alert to the effect of such an instruction in the presence of

10  the jury to the principal witness.

11       MR. CRUZ:  Thank you.

12       THE COURT:  The Government is going to get to explore

13  with direct testimony that he had a conversation, that kind of

14  thing, in a general sort of way.  It cannot go on forever.

15  Then, "Now I would like to direct you specifically -- this was

16  recorded, right," or however you do it, but, "This was

17  recorded, right?"  "Yup, it was."  "Here's a transcript.  Is

18  this a fair and accurate transcript?"  "Yes, it is."  "Now I

19  want to direct you to Page 7.  Here is this communication."

20

21       By the way, if there is some question about what the

22  words are, you can ask that.  And you can ask the Oprah

23  question, maybe it won't be put as a an Oprah kind of question,

24  "How did that make you feel?"  But it is relevant to the

25  question of how the defendants understood their impact to be

1      upon the individual.  All right?

2              MR. CRUZ:  Yes.

3              THE COURT:  So, that is how I will deal with it, and

4      if somebody wants to play more, not the music from Gloucester

5      to Danvers, but wants to play some more, you can.

6              I want to go back to this question of jury

7      instructions, because I am thinking about it.  That seems to

8      me, that is, who is it that we are concerned about here seems

9      to me to be the real kind of legal instructional issue.  Is

10     there any dispute that it is in the context of conspiracy the

11     understanding of the defendant that I am instructing the jury

12     about?  Putative understanding of the cooperating witness may

13     be evidentiary of the understanding of the defendant, but I am

14     not instructing the jury, because it is not a substantive

15     violation, about you had looked to the understanding of the

16     victim here.  I have just outlined it broadly.  You may want to

17     think about it.

18             Obviously, you would want to think about it, Ms.

19     Kaplan, some more, but that is on my mind now.  It will not be

20     resolved until I instruct the jury.  It is whatever I instruct

21     the jury.  But that is the one that stuck out at me.  I do not

22     see much else here that is beyond garden-variety Hobbs Act

23     stuff, but maybe you --

24             MR. TUMPOSKY:  Well, there are some discrepancies

25     between the significant --

1          THE COURT:  Okay.  And neither one of you are going to

2     get the language you want.  It will be my language.  I just

3     want to know conceptually whether or not there are some things

4     that you think I ought to be looking at.

5          MR. TUMPOSKY:  There are a couple of things, your

6     Honor.

7          THE COURT:  Then, what I would ask you to do is just

8     file something that just says with particular reference, "The

9     Court may wish to consider these," just so I am kind of up to

10    speed on that issue.  But I have outlined the question of, call

11    it "scienter," that I think is critical here, and it is

12    scienter of the defendants and not of the victim.  The victim

13    becomes subordinate to the scienter of the defendants.  Maybe I

14    have got that wrong.  If I do, then I will stand instructed,

15    but think about instructing me on that.  Okay?

16         MS. KAPLAN:  Yes, your Honor.

17         THE COURT:  Anything else?

18         MR. CRUZ:  No, your Honor.

19         MS. KAPLAN:  No, your Honor.

20         THE COURT:  Okay.  So, I will be receiving some

21    further filings from the parties to shape it, but we will be

22    off and running on Monday morning.  Okay?

23         MS. KAPLAN:  Thank you.

24         THE COURT:  Thank you.  And this is Ms. Kaplan's.  I

25    am passing it back.

1          MS. KAPLAN:  Thank you, your Honor.

2          THE CLERK:  All rise.

3     (The Honorable Court exited the courtroom at 12:38 p.m.)

4        (WHEREUPON, the proceedings adjourned at 12:38 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

        I, Brenda K. Hancock, RMR, CRR and Official Court

Reporter of the United States District Court, do hereby certify

that the foregoing transcript constitutes, to the best of my

skill and ability, a true and accurate transcription of my

stenotype notes taken in the matter of *United State of America*

*v. Tkhilaishvili, et al.*, No. 1:16-cr-10134-DPW.

Date:    04/30/18              /s/ *Brenda K. Hancock*
                               Brenda K. Hancock, RMR, CRR
                               Official Court Reporter