1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
2

3

4     UNITED STATES OF AMERICA          )
                                        )
5                                       )
      vs.                               )
6                                       )  No. 1:16-cr-10134-DPW
                                        )
7     DAVID TKHILAISHVILI AND           )
      JAMBULAT TKHILAISVILI,            )
8                                       )
                       Defendants.      )
9


10

11    BEFORE:  THE HONORABLE DOUGLAS P. WOODLOCK

12

13                     DAY TWO OF JURY TRIAL

14

15

16          John Joseph Moakley United States Courthouse
                       Courtroom No. 1
17                    One Courthouse Way
                      Boston, MA 02210
18                  Tuesday, May 2, 2017
                        9:00 a.m.

19

20

21           Brenda K. Hancock, RMR, CRR
                   Official Court Reporter
22        John Joseph Moakley United States Courthouse
                    One Courthouse Way
23                   Boston, MA 02210
                     (617)439-3214

24

25

1    APPEARANCES:

2

         UNITED STATES ATTORNEY'S OFFICE
3        By: AUSA Laura Kaplan
         John Joseph Moakley Federal Courthouse
4        1 Courthouse Way
         Suite 9200
5        Boston, MA 02210
         On behalf of the United States of America.

6

7        FEDERAL PUBLIC DEFENDER OFFICE
         By: Oscar Cruz, Jr., Esq.
8        District of Massachusetts
         51 Sleeper Street
9        5th Floor
         Boston, MA 02210
10       On behalf of the Defendant David Tkhilaishvili.

11

         HEDGES & TUMPOSKY, LLP
12       By: Michael L. Tumposky, Esq.
         Suite 600
13       50 Congress Street
         Boston, MA 02109
14       On behalf of the Defendant Jambulat Tkhilaishvili.

15

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2

3                                                PAGE

4    Opening Statement by Ms. Kaplan          27
     Opening Statement by Mr. Cruz            50
5    Opening Statement by Mr. Tumposky        77

6

7
     Testimony of:            Direct  Cross  Redirect  Recross
8
     ALLA LUBINSKY
9    By Ms. Kaplan            37                60
     By Mr. Cruz                      44                 62
10   By Mr. Tumposky                  63

11

12   VAHAGN TOROSYAN
     By Ms. Kaplan            63
13

14
                          E X H I B I T S
15
                     No.              In Evd.
16
                     19 and 19-1...........40
17                   20 and 20-1..........41
                     2.....................91
18                   3....................103
                     6....................120
19                   7 and 8.............131
                     14...................134
20                   9 and 10.............137
                     11...................150
21                   29...................152
                     12...................153
22                   13...................154
                     21...................243
23                   22...................247

24                                    For ID.
                     19A..................57
25                   20B..................59

1              P R O C E E D I N G S

2         THE CLERK:  All rise.

3    (The Honorable Court entered the courtroom at 9:00 a.m.)

4         THE CLERK:  This Honorable Court is now in session.

5    You may be seated.  Criminal Action Number 16-10134, United

6    States v. Tkhilaishvili.

7         THE COURT:  So, are we ready for the jury?

8         MS. KAPLAN:  Yes, your Honor.

9         THE COURT:  And, as I understand it, you are going to

10   put the interpreter on first.  Is that the plan?

11        MS. KAPLAN:  Yes.

12        THE COURT:  So, we will bring the jury in.

13        MS. KAPLAN:  Your Honor, after openings, if we could

14   just have a moment to move the podium back to where it started?

15        THE COURT:  I assume that defense counsel has to open

16   as well.  We will do that.

17        THE CLERK:  All rise.

18             (The jury entered the courtroom)

19        THE CLERK:  Please be seated.

20        THE COURT:  Good morning, ladies and gentlemen.  I am

21   going to make what you will find is my customary good morning

22   to you by asking have any of you had any conversations with

23   anyone, have you had any exposure, have you had any

24   communications about this case or anything about this case

25   other than what you have heard in the courtroom?  I see a

1     negative response to that, as a consequence of which I am going

2     to ask Ms. Beatty to swear you as the panel that will decide

3     this case.

4         THE CLERK:  All jurors please rise and raise your

5     right hands.  Do you and each of you solemnly swear that you

6     will well and truly try this case of the United States of

7     America against the defendants at bar according to the law and

8     the evidence, so help you God?

9             (The jurors answered affirmatively)

10        THE CLERK:  Please be seated.

11        THE COURT:  So, we are ready to begin, ladies and

12    gentlemen.  The case will proceed really in three parts in the

13    courtroom.  First, we have the opening statements of the

14    parties, then we will have the evidence itself, and then the

15    closing arguments of the parties, and then I will give you my

16    instructions on the law.

17        Let me just explain what an opening statement is

18    about.  I've always thought that it is a little bit like the

19    top of a jigsaw puzzle box.  The evidence is going to come to

20    you in bits and pieces here, and, as a consequence, it is

21    useful for you to have an outline of where this is going, how

22    the pieces fit together, at least how counsel think the pieces

23    fit together.  But I want to emphasize that, unlike many jigsaw

24    puzzles that at least I've dealt with, and perhaps you have,

25    too, sometimes not all the pieces are there and from time to

 1    time they do not fit together the way that people expect them

 2    to fit together.  That is a way of cautioning you that this

 3    opening statement is an outline of what counsel thinks the

 4    evidence is going to be in the case.  It is not the evidence

 5    itself.  The evidence is going to come to you from the

 6    witnesses and the documents that you will see here.  That is

 7    what you are going to rely on.  But as a way of orienting you

 8    to what it is that the parties think is at issue and the

 9    evidence that pertains to those issues the opening statement is

10    like the top of a jigsaw puzzle box.

11         We'll start first with Ms. Kaplan on behalf of the

12    Government, and then we will hear from the defense counsel as

13    well.

14         Ms. Kaplan.

15         MS. KAPLAN:  Thank you, your Honor.

16                      OPENING STATEMENT

17    BY MS. KAPLAN:  May it please the Court, Counsel, Members of

18    the Jury.  Good morning.

19         This case is about this defendant (indicating), David

20    Tkhilaishvili, along with his brother (indicating) Jambulat

21    Tkhilaishvili, who exploited the generosity and perhaps the

22    naivety of the victim in this case, a businessman who made a

23    very unfortunate and costly mistake of agreeing to enter into a

24    business arrangement with these two defendants.

25         Only one man invested any money into this business,

1    only one man took any of the financial risks, only one man

2    poured his life's savings into the business, and that man is

3    not sitting at that table, but you will hear from him.  There

4    were contracts, and there were lawyers, and all the t's were

5    crossed and the i's were dotted.  This was a business

6    arrangement among friends, perhaps, until it wasn't, until

7    these defendants decided that, despite the contracts they had

8    signed, and despite agreements that they had entered into, and

9    despite the promises that had been made, they weren't going to

10   play by the rules anymore, and so they decided to take matters

11   into their own hands.

12         In 2014 this man (indicating), defendant David

13   Tkhilaishvili, came to a man he had known for many years.  His

14   name is Vahagn Victor Torosyan, or Victor, or Mr. Torosyan we

15   will call him, and he asked him for help.  He asked

16   Mr. Torosyan to invest in a Suboxone clinic in Quincy,

17   Massachusetts.  Suboxone is a drug that is taken to help

18   patients overcome addiction to heroin.  And this defendant

19   asked Mr. Torosyan not once, and not twice, but several times.

20   Mr. Torosyan you will hear was in the auto repair business.  He

21   knew nothing about running a Suboxone clinic.  But David

22   Tkhilaishvili told Mr. Torosyan that he and his brother,

23   Jambulat, had many years of experience running medical clinics.

24   This was not true.

25         Why did these defendants come to Mr. Torosyan?

1    Because David Tkhilaishvili, you will hear, had come to Victor

2    Torosyan before.  Mr. Torosyan was older than David

3    Tkhilaishvili, and Mr. Torosyan knew David Tkhilaishvili.  He

4    knew his brother, Jambulat, he knew his parents.  They were

5    friends.  They went out to eat together, they socialized

6    together.  Mr. Torosyan loaned David Tkhilaishvili money on

7    more than one occasion.  He had given him gifts.  He had helped

8    him in other business endeavors.  And David Tkhilaishvili knew

9    that Mr. Torosyan had money, and he knew that he was a

10   knowledgeable and respected businessman.

11          In fact, you will hear that Mr. Torosyan came to this

12   country with several-hundred dollars in his pocket.  He started

13   to pump gas, and from pumping gas he bought an auto repair

14   business, and from that he was able to invest in real estate,

15   rental properties, and he was able to provide for his family.

16   These defendants knew that Mr. Torosyan had money, he was an

17   easy target, and they knew that he could be exploited.

18          As time went on and David Tkhilaishvili continued to

19   try to convince Mr. Torosyan to invest money in his business,

20   Mr. Torosyan made a decision that he would later come to

21   regret.  He agreed to help the defendants, he agreed that he

22   would loan money to the defendants, but he would be a silent

23   partner in the business, he would not be a part of the

24   day-to-day operation of the business, because, again, he knew

25   nothing about running a Suboxone clinic.  But he agreed to

1   invest in the clinic.

2           And in exchange for Mr. Torosyan's agreement to invest

3   money in the clinic, the defendants agreed to pledge their

4   collateral that they had in a pizza place, pizza business.

5   They had no money to put up, so that was the best they could

6   do.

7           This promise was memorialized, it was written up in a

8   Letter Agreement, and it was dated December 11th of 2014, and

9   it was signed by Victor Torosyan and David Tkhilaishvili.

10  Pursuant to that Letter Agreement, and because of the size of

11  Mr. Torosyan's investment, Mr. Torosyan understandably wanted

12  certain protections for himself, and the Letter Agreement gave

13  Mr. Torosyan the power to decide any disputed issue and to make

14  final determinations until his investment was returned.  In

15  other words, he had ultimate authority until he was paid back.

16  This came to be known as the "Special Consent Authority" and

17  later became known as the "Vahagn Authority."  The Letter

18  Agreement also set out the percentages of ownership and it set

19  out the salary of each of the individuals involved in this

20  business.

21          Now, you will come to learn that David and Jambulat

22  Tkhilaishvili are from the Republic of Georgia, and Victor

23  Torosyan is from Armenia.  All three men understand and speak

24  Russian, and that's how they communicate with each other.  The

25  agreements were in English.  There were attorneys involved for

1    all parties, including the defendants, including Mr. Torosyan,

2    and including the clinic.  These were attorneys who drafted and

3    reviewed the agreements and gave advice to each of their

4    clients.  Mr. Torosyan, as with everything else you will come

5    to hear, paid for all those attorneys.  He had the contracts

6    drawn up, and he made an initial loan to David Tkhilaishvili of

7    $20,000, and then he invested over $200,000 in the clinic.  The

8    clinic was to be called "Allied Health Clinic," and there was

9    also to be a management company that ran Allied Health Clinic,

10    and that's called "Health Management Group."

11           Now, just prior to the formation of Allied Health --

12    and I'm going to call Allied Health Clinic and Health

13    Management Group "Allied Health," both entities -- just prior

14    to the formation of Allied Health David Tkhilaishvili had been

15    involved in another Suboxone clinic called "Davis Health."  But

16    the defendants' involvement in Davis Health had come to an end

17    in the Summer of 2014, and David Tkhilaishvili decided he

18    wanted to open up yet another Suboxone clinic in the same

19    location, and many of the same employees from Davis Clinic

20    became employees of Allied Health, and you will hear from them.

21           Over the course of the year that it took the clinic,

22    Allied Health, to get up and running, Mr. Torosyan saw this

23    defendant (indicating), Jambulat Tkhilaishvili, on three

24    occasions.  One was at the opening party for Allied Health, and

25    two were to threaten his life.

1          In the Spring of 2015, a clinic employee named Olga

2     Dorofyeyeva, who you will hear from -- she had worked at Davis

3     Clinic, then she went to work at Allied Health -- she alerted

4     Mr. Torosyan to certain problems at the clinic, and she pleaded

5     with him to come down and to see for himself that the

6     construction at the clinic that Mr. Torosyan was paying the

7     bills for at the request of David Tkhilaishvili, that the

8     construction that was supposed to be ongoing wasn't happening

9     and she and another employee, Kenton Fabrick, were working at

10    David Tkhilaishvili's apartment at the time.

11         Mr. Torosyan did not believe Olga Dorofyeyeva at

12    first, but when he finally did come down to the clinic he was

13    shocked to see that the renovations were nowhere near complete,

14    as David Tkhilaishvili had told him, as he thought they were

15    because he had been paying for them.  The clinic was in a state

16    of complete disarray.  Needless to say, it became quickly

17    apparent to Mr. Torosyan that he had to take a much more active

18    role in the running of Allied Health.  His investment at this

19    point was now up to several-hundred dollars.  If he didn't take

20    that active role he feared that he would lose his entire

21    investment.

22         Something else happened during that meeting with Olga

23    Dorofyeyeva.  Olga Dorofyeyeva had been the girlfriend of

24    Jambulat Tkhilaishvili and had worked previously at Davis

25    Clinic, as I told you.  She told Mr. Torosyan many things, many

1    things about the defendants that made Mr. Torosyan very

2    concerned and scared and things that made Mr. Torosyan start to

3    question the decision that he had made to enter into business

4    with these two defendants.

5          On August 22nd of 2015 there was a meeting at the

6    clinic, and afterwards both defendants asked to speak to

7    Mr. Torosyan privately.  They asked Mr. Torosyan to release

8    their security interest that they had put up from the pizza

9    business.  In fact, they had an agreement, a written agreement,

10   in hand for Mr. Torosyan to sign right then and there, and they

11   told Mr. Torosyan that by selling their pizza business they

12   could use that money to actually put some money into Allied

13   Health, which up to then they hadn't invested any money, and

14   they told Mr. Torosyan it would allow them to take a more

15   active role in the business.  Mr. Torosyan thought that was a

16   good idea and he agreed to sign that release.  You will hear

17   that it was almost immediately after Mr. Torosyan signed the

18   release of the defendants collateral in the business in the

19   pizza business that he noticed a change in the attitudes of the

20   defendants.  And this, Members of the Jury, is when this case

21   changes from what might have been a straightforward business

22   dispute into the crime of extortion and embezzlement.

23         As soon as Mr. Torosyan signed the paper releasing the

24   defendants from their obligation to pledge their pizza place as

25   collateral for their investment in Allied Health the defendants

1   began to threaten him.  They demanded that he give up his

2   ultimate authority over the clinic, the Special Consent

3   Authority, and the Vahagn Authority that I mentioned.  They

4   demanded that he give up a percentage of his ownership in the

5   clinic, and they threatened that if he didn't agree to their

6   demands that they would hurt him and his family.

7        During this conversation David Tkhilaishvili told Mr.

8   Torosyan that there were nine people who had a problem with him

9   in the past, and he had made all of them, with their families,

10  disappear.  Both defendants threatened to burn the clinic down

11  if Mr. Torosyan did not do as they say and give up his

12  authority in the clinic and a certain percentage of his

13  ownership.  They told him that they didn't care about the

14  contracts that had been signed, and that if anyone wanted to go

15  against them they would put a bullet in that person's head.

16       Mr. Torosyan was understandably shocked, and he

17  questioned the defendants about what had made them change their

18  attitude towards him, and they told him that they didn't care

19  about contracts, that they lived an outlaw life.  Mr. Torosyan

20  offered to go with the defendants, to talk to their attorneys,

21  to meet with a mediator, and this was all as the contract

22  provided that they were supposed to do if there were any

23  disputes.  But David Tkhilaishvili would have none of it, and,

24  in fact, he told Mr. Torosyan that he would put a bullet in the

25  attorney's head.  The defendants also told Mr. Torosyan that

1  they were going to get 10 thieves-in-law, which you will hear

2  is a commonly used expression for Russian organized crime, to

3  help them.  In order to buy time, Mr. Torosyan said he would

4  think about the defendants' demands.  The threats continued and

5  in a subsequent telephone call between David Tkhilaishvili and

6  Victor Torosyan Mr. Tkhilaishvili told Mr. Torosyan that he had

7  arranged for nine people to disappear, and he could make

8  Mr. Torosyan disappear, too.

9       A few weeks later, in September of 2015, David

10 Tkhilaishvili went to Georgia, the Republic of Georgia, and, as

11 far as Mr. Torosyan knew, it was so that David Tkhilaishvili

12 could visit his fiancee.  The defendant had told him that's why

13 he was going to Georgia.  In fact, Mr. Torosyan had paid for

14 David Tkhilaishvili's trip to Georgia.  He had given David

15 Tkhilaishvili an engagement ring to give to his fiancee, and

16 Mr. Torosyan had paid for this trip on Mr. Torosyan's personal

17 credit card, not the money from Allied Health, but his personal

18 credit card.

19      While David Tkhilaishvili was gone Mr. Torosyan

20 discovered that David Tkhilaishvili had written two checks that

21 he was not authorized to write, one for $5,000 and one for

22 $6,000, and he actually cashed the $11,000 from Allied funds,

23 and he took the cash with him to Georgia.  At the same time

24 Operating Agreements for Allied Health Clinic and Health

25 Management Group which were needed to get a license from the

1   Department of Health were being negotiated and they were

2   completed, and now signatures needed to be obtained from all of

3   the individuals who had to sign.  The Operating Agreements for

4   each company were essentially the same as the Letter Agreement,

5   and it still gave Mr. Torosyan the ultimate decisionmaking

6   authority.  That didn't change.  Now, up until that time David

7   Tkhilaishvili and Jambulat Tkhilaishvili had not repaid any

8   money, nor had anyone else invested any money in the clinic

9   besides Victor Torosyan.

10          On September 12th of 2015, while his brother was in

11  Georgia, defendant James Tkhilaishvili went to Mr. Torosyan's

12  auto repair shop in Belmont to sign the Operating Agreement.

13  Mr. Torosyan explained what the Operating Agreement was,

14  although the defendants both had lawyers, and the defendant

15  Jambulat Tkhilaishvili signed the agreement, but he continued

16  to make his demands and he continued to threaten Mr. Torosyan.

17  Defendant Jambulat Tkhilaishvili demanded that Mr. Torosyan

18  surrender 10 percent of his interest in the clinic because he

19  said he wanted to bring his friends into the business.  Among

20  the things that Jambulat Tkhilaishvili threatened was to burn

21  down the clinic unless Mr. Torosyan agreed to surrender

22  10 percent of his interest.  Again, to buy time and to avoid a

23  confrontation in front of Mr. Torosyan's employees at the auto

24  repair shop, Mr. Torosyan told Jambulat Tkhilaishvili that he

25  would think about it.

1          When David Tkhilaishvili returned from Georgia several

2    weeks later Mr. Torosyan left on his own vacation to Armenia

3    and Dubai for a few weeks.  And now we're into November of

4    2015.  Now the clinic has gotten all the licenses, the

5    Certificate of Occupancy for the building, the construction is

6    done, and the clinic starts to see patients.  But the threats

7    continued, and early in November David Tkhilaishvili once again

8    demanded that Mr. Torosyan surrender some of his interest in

9    the clinic.  He told Mr. Torosyan that he wanted to give

10   5 percent of Mr. Torosyan's shares to his friend Saba, a man

11   who David Tkhilaishvili owed money to from Davis Clinic.  Saba

12   was a man who had done no work at Allied Clinic, he did not

13   invest any money in Allied Clinic.  He had no right to any of

14   the money or the interest in Allied Clinic.  Mr. Torosyan,

15   again, put David Tkhilaishvili off.

16          On November 8th, 2015 David Tkhilaishvili called

17   Mr. Torosyan and asked him to meet at the clinic the next day,

18   and Mr. Torosyan agreed.  The next day at the clinic both

19   defendants appeared and they asked to talk to Mr. Torosyan

20   privately in an exam room.  Now, Mr. Torosyan had come to the

21   clinic with his friend Levon, but Levon waited in another part

22   of Allied Health.  Once inside of the exam room the defendants

23   closed the door, they locked the door, and they began again

24   with their demands and their threats.  They wanted Mr. Torosyan

25   to surrender his interests in Allied Health and to give them

1   40 percent of his profits.  They were angry, and they screamed,

2   and they yelled, and they pounded on the table, and this went

3   on for some time.  David Tkhilaishvili even suggested to his

4   brother Jambulat that they get rid of Mr. Torosyan right then

5   and there.  As things escalated, David Tkhilaishvili reached to

6   hit Mr. Torosyan with his fists, but Jambulat Torosyan

7   restrained him, and David Tkhilaishvili left the exam room.

8         But defendant Jambulat Tkhilaishvili remained behind

9   with Mr. Torosyan, and Jambulat Tkhilaishvili then told

10  Mr. Torosyan in no uncertain terms that he had no other choice

11  but to agree to their demands, or otherwise he would burn down

12  the clinic and make Mr. Torosyan disappear.

13        You will hear that Mr. Torosyan, given what he had

14  been told by Olga Dorofyeyeva and other individuals, was

15  terrified, and he feared for his life and for that of his

16  family.  He had heard many things by now about both defendants,

17  and now he had heard it from their own mouths, but he had

18  invested his life's savings in this clinic.

19        When the meeting was over they all left, they went

20  outside into the parking lot, and the conversation continued,

21  and Mr. Torosyan observed Jambulat Tkhilaishvili remove a large

22  switchblade from the console in his car.  Outside in that

23  parking lot the defendants continued to yell at Mr. Torosyan

24  and threaten him, and they were angry, and Mr. Torosyan will

25  tell you what they said, but Levon who was there now will tell

1    you what he heard, and he will tell you what he observed about

2    Mr. Torosyan's demeanor at that time and the fear that he saw

3    in Mr. Torosyan.

4         At this point in time Mr. Torosyan's investment in

5    Allied Health Clinic was over half-a-million dollars.  The

6    defendants' investment?  Nothing.  Mr. Torosyan feared that it

7    would all be lost, but now he knew that things had gotten too

8    far, and he was scared and he knew he needed help.  He went to

9    one attorney who was the consultant for Allied Health, and then

10   he was sent to another attorney, and he told them what had

11   happened, and he agreed to seek help and immediately reached

12   out to the FBI and the Government.

13        You will hear that Mr. Torosyan told the Government

14   what had happened, and he agreed to wear a wire and to meet

15   with the defendants and record conversations.  You will hear

16   what happened during those meetings with both defendants.

17        In January of 2016 Mr. Torosyan's attorneys took legal

18   action, legal action that was authorized by the Operating

19   Agreements to end the defendants' involvement in the clinic.

20   You will also hear that a review of the financial records by

21   the FBI showed that in November of 2015 David Tkhilaishvili

22   took money from Allied Health Clinic that he was not entitled

23   to take.  David Tkhilaishvili claimed that these monies were

24   owed to him for salary, but he had already been paid his salary

25   in accordance with the Operating Agreement, and he had already

1    been given yet another loan by Mr. Torosyan.  And Mr. Torosyan

2    had told him, "Yes, I will give you the loan.  You repay it, or

3    else you use this money as your salary for the month of

4    November."  Instead, David Tkhilaishvili, always needing more,

5    helped himself to money from Allied Health Clinic, monies that

6    belonged to a healthcare program that he was not entitled to

7    take, and that is the crime of embezzlement.

8            These are federal crimes, Members of the Jury, and

9    both defendants have been charged with the crimes of Attempted

10   Extortion and a Conspiracy to Commit Extortion.  David

11   Tkhilaishvili has been charged with two counts of embezzle from

12   a healthcare program.

13           "Extortion" is the obtaining of property from another

14   or attempting to obtain property from another by the wrongful

15   use of actual or threatened force, violence or fear.  The

16   evidence in this case is that the defendants between December

17   2014 and November 2015 conspired to and did use threats of

18   physical harm to attempt to take property from Victor Torosyan.

19   That is the crime of extortion.

20           Members of the Jury, keep your eye on the ball here.

21   This case is not about who was entitled to what percentage of

22   the business or who had more shares, this case is not about who

23   was a better manager or why the business was not successful,

24   and this case is not about who was trying to get a leg up in a

25   civil lawsuit.  I would ask you to not get caught up in the

1    details of the business dispute.  This may have started as a

2    business dispute, but make no mistake about it, these

3    defendants violated the law.  It is a crime to use a threat and

4    to use physical harm to attempt to take property from another

5    person, even if you think you are entitled to that property,

6    because the law does not permit anyone ever, even someone who

7    is legitimately owed money, to threaten physical harm to

8    another to resolve a business dispute.  That's the crime of

9    extortion.

10           I'm confident that after you have heard the evidence

11   in this case you will find that the defendants, that these

12   defendants conspired to and attempted to extort Victor

13   Torosyan, and that David Tkhilaishvili stole money for which he

14   was not entitled from a healthcare program, and you will find

15   these defendants guilty on all counts.

16           THE COURT:  Thank you, Ms. Kaplan.

17           Mr. Cruz.

18           MR. CRUZ:  Yes.  Thank you.

19                      OPENING STATEMENT

20   BY MR. CRUZ:  Good morning, ladies and gentlemen.  I represent

21   David Tkhilaishvili, and just for the sake of simplicity, I

22   will refer to David Tkhilaishvili as "David" and to his brother

23   Jambulat as "James."  I think it will be a lot easier for all

24   of us.

25           Ladies and gentlemen, this case is not about threats.

1    This case is about Victor Torosyan's calculated plan to take

2    over Allied Health, the idea, the business plan that David

3    Tkhilaishvili had come up with.  You have heard that David

4    Tkhilaishvili was involved in a medical business prior to

5    Allied Health being born, and that was the former Davis Clinic.

6    As you heard Ms. Kaplan say, that clinic was housed in the same

7    office space as what came to be known as Allied Health.  When

8    that business ended David Tkhilaishvili and a number of other

9    people that he worked with at that clinic who you will hear

10   from, including Kenton Fabrick and Ms. Olga Dorofyeyeva, had

11   worked with him at Davis.  They were familiar with the

12   business.  And when Davis closed David wanted to improve on the

13   business, he wanted to open another business, and that was when

14   Allied Health, or the idea, I should say, for Allied Health and

15   Health Management Group was born.

16        You will hear that from approximately May of 2014

17   through the latter part of 2014, probably November or December,

18   David Tkhilaishvili, Kenton Fabrick and Olga Dorofyeyeva were

19   working to realize Allied Health, and during that process David

20   Tkhilaishvili still had to pay the rent at 21 School Street in

21   Quincy, Massachusetts, because that was the office space.

22        You will hear that David Tkhilaishvili paid Olga

23   Dorofyeyeva and Kenton Fabrick for their help in coming up with

24   what would come to be Allied Health.  They used their

25   collective knowledge in order to reformulate this business and

1    make a better product.  You will also hear that David

2    Tkhilaishvili did a number of other things, and there were a

3    number of other expenditures, including consulting with

4    architects who would rebuild the space or remodel the space,

5    including hiring or at least consulting with construction

6    contractors, people that would help with the actual remodel.

7    And the point of all of this, ladies and gentlemen, is that all

8    of these things cost money, and all of these things don't just

9    happen for free.

10            So, Victor Torosyan ultimately comes into the business

11   and is an investor.  He infuses the business with money, and he

12   does this in the latter part of 2014, but the reason for that

13   is that Mr. Tkhilaishvili from May until the latter part of

14   2014 has engaged in all of these expenditures, is at the point

15   where he is, for lack of a better term, cash poor, and needs to

16   keep this business idea going.  So, he goes to Victor Torosyan.

17   They have a discussion in the latter part of 2014 about Allied

18   Health.  They talk about how Allied Health will be the first of

19   what will hopefully be a chain of these Suboxone clinics, and

20   that they will realize large profits, ultimately, if everything

21   is a success.  And Victor believes in David's plan.  He knows

22   that David has worked in this business previously in terms of

23   his experience with Davis, and he has known David for six to

24   eight years.  They have a relationship.  So, he agrees to

25   invest at that point.

1          Now, ladies and gentlemen, you will hear that in terms

2     of this relationship these two gentlemen are from both the

3     Republic of Georgia and the Republic of Armenia, and you will

4     hear that their relationship was unique in the sense that they

5     were both very similar in terms of their personalities.  They

6     were both strong-willed, they were both competitive.  They were

7     two peas in a pod, if you will.  And when they got together

8     socially in terms of their business, what have you, there were

9     always fireworks.  These two gentlemen talked to each other a

10    certain way.  They were very boisterous, they were very loud.

11    They had discussions that sometimes became heated.  But this is

12    just the way that these two gentlemen with the same

13    personalities essentially acted around each other.  So, when

14    you listen to their conversations, or I should say when you

15    read the transcripts of their conversations, you should use

16    that and the evidence you will hear as a filter and try to get

17    an insight into what their relationship was like, that this

18    talk, quote, unquote, that you will hear and read was something

19    that happened between them all of the time.

20         Now, a few things that I think are quite important and

21    that were not mentioned by Ms. Kaplan.  The subject of this

22    case has to do with threats, and the first of these threats you

23    will hear occurred in August of 2014, August 22nd,

24    specifically, and you heard Ms. Kaplan say that Victor Torosyan

25    met with both David and James at the clinic, and that they

1    demanded, after signing these releases for the pizza business,

2    that they demanded immediately after signing that he give up

3    his power under the Letter Agreement -- he had final

4    decisionmaking authority on all the business decisions -- and

5    also that he give up a percentage of his ownership interest to

6    somebody else.  And you will hear that after this meeting

7    Victor Torosyan didn't go to the police.  He didn't try to move

8    his family to a safe location.  As a matter of fact, you will

9    hear that he waited approximately three months before he told

10    anybody about these alleged threats, and the person that he

11    told wasn't anybody in law enforcement.  It was his attorney.

12    His attorney then went to, or contacted, I should say, people

13    within the United States Attorney's Office, and, in turn, the

14    FBI became involved.

15         Victor Torosyan used the tools that he had at his

16    disposal and his resources in order to achieve the ultimate

17    goal here, which is to seize control of this business that

18    David Tkhilaishvili had conceived of and had spent hours and

19    lots of his money to try to make a reality.

20         You will hear that after this August 22nd, 2014 set of

21    threats Victor Torosyan's power, if you will, within the

22    business structure didn't diminish, which is what these threats

23    were about, "You can't have final decisionmaking authority,

24    we're not happy with that, and if you don't give that up, we're

25    going to hurt you, we're going to burn down this clinic,"

1    et cetera, et cetera.  So, his bargaining position, you will

2    see, doesn't diminish, it actually becomes stronger, and it

3    becomes stronger with the help of one of the tools that I just

4    mentioned, which was his attorneys.

5         When you see the Letter Agreement that the business

6    operated under and you see the provision that gives Victor

7    ultimate decisionmaking authority for the business, you will

8    note that that provision is very different from what the

9    parties end up signing in September of 2014, which is the final

10   Operating Agreement for Allied Health that's negotiated with

11   the help of attorneys, including Victor's attorneys, and in

12   that final Operating Agreement, which does incorporate the

13   majority of the Letter Agreement, there is one slight change,

14   which is something called a "Duty of Loyalty" provision.  You

15   will have that, you will be able to read it.  And essentially

16   what it says is, not only does Victor Torosyan have final

17   decisionmaking authority within the business context, but, "If

18   you breach this Duty of Loyalty to the company and to the

19   members of this partnership, I can eliminate your interest

20   completely.  I can essentially freeze you out of this

21   business."

22        So, I want you to note that when you hear the evidence

23   this is a much different provision than what was in the Letter

24   Agreement originally, and it was negotiated through

25   Mr. Torosyan's attorneys, and it was negotiated after these

1    threats on August 22nd were made in order to get him to give up

2    this authority.

3         So, as I said, his position didn't diminish, it just

4    got stronger, because on September 14th or September 11th of

5    2014 he was able to get David and James Tkhilaishvili to

6    essentially, with open eyes, sign a document that gave Victor

7    all of the power, not only business-making decisions, but, "If

8    you breach this Duty of Loyalty the two of you are out

9    100 percent, you're cut out."

10        Now, between September of 2014, when this arrangement

11   or business agreement is signed, and November of 2014 the

12   threats allegedly continue, and I want you to pay close

13   attention to what's going on within that time period.  There's

14   a bit of a lull, and you'll see that the reason for that is

15   because Victor, David and everyone else working at the clinic

16   are furiously trying to get everything ready for the clinic to

17   actually open, because when the clinic opens, then it becomes

18   profitable at some point down the line.  Everything is just

19   prep work up until that point.  So, from September of 2014,

20   when David and James essentially sign away all of their rights

21   because Victor negotiated for that, they are working to open

22   the clinic, and Victor needs David to help with that process.

23   So, nothing happens.

24        You will see that nothing happens until November of

25   2015, I should say, when the clinic is already opened, the

1    Operating Agreement has been signed, and at that point Victor

2    Torosyan notifies his attorney, "By the way, these guys have

3    been threatening me since August of this year, 2015."  No one

4    has heard about these claims until that point.  Mind you, while

5    the clinic is preparing to open, while Victor Torosyan is

6    negotiating for greater bargaining power and gets it, then he

7    decides, "I'm going to contact my attorney and tell him about

8    these threats that have been going on now for three months."

9    The FBI becomes involved, the U.S. Attorney's Office becomes

10   involved, and these recorded conversations take place.

11       Now, you have also heard about an incident in early

12   November where Victor and his friend Levon come to the clinic

13   and where a series of other threats similar to the ones in

14   August take place.  There is no recording, as I understand it,

15   of this situation.  It's just going to be Mr. Torosyan's

16   testimony about what happened.  And at that point, as I said,

17   this friend of his, Levon, is there.

18       Now, interestingly enough, once Victor is able to

19   eliminate David and James from the business structure, this

20   individual Levon is made the Chief Financial Officer of Allied

21   Health.  Levon is Victor's best friend, and coincidently he is

22   a witness who is going to be there to verify how afraid Victor

23   was after this meeting with David and James in November of

24   2015.  You will also hear that, once the Operating Agreement

25   was signed and the FBI became involved and did these recordings

1    of David and James on various occasions -- I'm sorry -- David

2    and Victor on various occasions, two occasions, that Victor was

3    in a position to exercise his Special Consent Authority, and he

4    did so at the end of 2015.  After the FBI's involvement, after

5    all of the recordings had been done, he contacts his attorneys

6    and this is the right time to do this.  So, he sends David and

7    James notice, "I'm exercising my Special Consent Authority

8    under the Operating Agreement that you all signed, and you are

9    to vacate the premises.  You are done here."  But they notify

10   all the employees of Allied Health that this is the case, that

11   David and James are no longer allowed on the property, and they

12   are gone at that point.  Victor notifies the FBI that he has

13   done this, and David and James Tkhilaishvili are officially

14   done with Allied Health.

15         Interestingly enough, the basis for one of the threats

16   or both of the threats that you have heard about, one of the

17   bases for it is, "You have to diminish your interest, you've

18   got to give up 5 percent to this third party."  And this is a

19   very important point that you didn't hear in the Government's

20   summation.  Victor Torosyan said to the FBI on more than one

21   occasion, "I never promised anybody, including this Saba

22   Kikoliashvili, any percentage of our ownership interest or my

23   ownership interest."  However, you are going to hear that there

24   was a recorded conversation between Victor Torosyan and this

25   Saba gentleman.  The FBI was listening, and during that

1    conversation on more than one occasion Victor Torosyan said,

2    "You're entitled to 5 percent.  I recognize the work you've

3    done, and you're going to get it."  The 5 percent that he was

4    supposedly being threatened to give up he's personally

5    negotiating with Saba to give him.

6          So, that's information that you are going to get.

7          The other thing, ladies and gentlemen, that I want you

8    to pay attention to as the evidence develops is Victor's

9    actions during the course of the months that these threats

10   allegedly were taking place, and interestingly enough, as the

11   threats increased in frequency, Victor Torosyan has showed no

12   fear of David or James Tkhilaishvili.  He kept reporting to the

13   clinic, he kept interacting with them.  He went to an opening

14   party at which they were eating cake and sipping champagne.

15   Mr. Torosyan, in fact, brought his wife and his children to

16   this party in October of 2015, after all of these threats to

17   him and his family, quote, unquote, had been made.

18         You will also hear that Victor Torosyan allowed David

19   Tkhilaishvili to go to his home on Mashpee on more than one

20   occasion without him even being there, and on one occasion in

21   October of 2015, again after all these threats had been made,

22   you will hear that not only did Victor Torosyan say to David

23   Tkhilaishvili, "You can go and use my house in Mashpee, here's

24   the security code, here are the keys.  I trust you."

25         So, again, as the evidence develops I ask you to pay

1    attention to Mr. Torosyan's behavior during the course of time

2    that these threats are increasing and are becoming more severe

3    and use that to make your decision.

4           Lastly, ladies and gentlemen, I am going to say to you

5    that when Victor Torosyan was able to exercise this Special

6    Consent Authority and essentially get rid of David and James

7    from the business, in the months after that David and James

8    responded and filed a civil lawsuit in which they wanted to

9    make sure that their interests in Allied Health were protected.

10   So, instead of acting on the threats that they had allegedly

11   made so many times before, what they did instead was resorted

12   to the State Court process to try to resolve this issue,

13   because, as I said to you at the beginning of my statement,

14   this is not a case about threats, this isn't a case about

15   stealing money or embezzling money.

16          You will hear that with regard to the embezzlement

17   issue the finances, as Mr. Torosyan understood them, were run

18   between Mr. Torosyan and David.  Mr. Torosyan was aware of

19   everything that was happening with the bank accounts and the

20   credit cards.  He loaned money if people needed money.  His

21   employees would get a salary, and if they came to him and they

22   needed additional monies, he would loan it to them.  The bottom

23   line is he was aware of everything.  He knew where every penny

24   was going because, as Ms. Kaplan told you, he had personally

25   poured so much money into this venture that he wanted to make

1  sure he understood where everything was and who was getting

2  paid what amounts.

3        So, this case isn't about threats and stealing money

4  or embezzlement.  Those are just the tools, as I stated to you

5  previously, that Victor Torosyan needed to use and the

6  appearance that he needed to create in order to exercise his

7  Special Consent Authority, because when you see that document

8  and you see the action, the formal action that he filed to get

9  David and James out of the business, he stated, "They

10  threatened me," and he stated they took money without

11  authorization, the same subjects of this criminal

12  investigation.  So, he used all of those tools not because he

13  was threatened, not because anyone stole any money, but because

14  he wanted this business which he believed would be lucrative

15  all for himself.

16        When we are done with this case and the evidence is

17  completed, I'll ask you to find my client not guilty.  Thank

18  you.

19        THE COURT:  Thank you, Mr. Cruz.

20        Mr. Tumposky.

21                     OPENING STATEMENT

22  BY MR. TUMPOSKY:  It's December 9th of 2015, and Victor

23  Torosyan finally has his chance to try to find something,

24  anything that could prove and support these wild allegations

25  that he has been making against James Tkhilaishvili, to try to

1    find something, anything that will allow him to expel James

2    from the business that they owned together, to try to find

3    something, anything, that will give him control of the clinic

4    once and for all, because the clinic is losing money, but in

5    Victor's mind it has the potential to make him rich.

6         So, he turns on the wire provided to him courtesy of

7    the FBI and sets about to record a conversation with James in

8    the hopes that he will get him to say something bad about

9    himself or his brother, David.  If his plan succeeds, he would

10   be able to exercise a special clause in the contract that he

11   has with the brothers that allows him to seize their interest

12   if he thinks they did something wrong.  But Victor's plan

13   fails.  Despite his best efforts, the conversation with James

14   is, as it always was, normal and friendly.

15        So, Victor, as he gets in his car to go home, begins

16   to rethink this plan of his, because he knows that the FBI

17   Agents that he has been working with and his civil lawyers will

18   need some explanation for why he was unable to get the proof of

19   this supposed violent nature of James that he has been telling

20   them about.  He will need some excuse for why he could not get

21   the proof that they wanted.  So, what does he do?  He tucks his

22   chin down towards his lapel and begins to mutter to himself

23   about how he is shocked, surprised and shocked at how the

24   conversation with James went, surprised and shocked that it was

25   normal and friendly.

1            So, Victor's new plan is to go with what he has got,

2    which is just his word, just his word that James has threatened

3    him.  Will that be enough to win the civil case?  Well, Victor

4    is not sure.  But he knows, ladies and gentlemen, he knows that

5    the best way to make sure he gets rid of James is to make sure

6    that James is convicted of extortion.

7            So, let's back up about a year, 2014, when the clinic

8    is being formed.  You will hear that David Tkhilaishvili, with

9    his experience, his hard work and some of his capital, begins

10   the process of forming this clinic.  Victor comes on and

11   provides some additional and substantial financing for the

12   clinic.

13           You are going to hear about James's role, which was

14   that of a co-owner.  Now, the Government may try and contend

15   through the evidence that James wasn't qualified to be in this

16   position.  Well, we can discuss that.  But even if you don't

17   believe that he was, I want you to keep something in mind, that

18   sometimes being someone's brother is enough to be in a position

19   of power in this country.  That's the way that it works, right?

20   Keep that in mind.  So, that's the setup.

21           James is the co-owner of the clinic, along with

22   Victor, and things are going okay, but Victor then begins to

23   become concerned about the amount of money that it's costing to

24   establish this clinic.  It's more than he was expecting.  So,

25   he begins to scrutinize some of the financial decisions that

1   David has been making, and he doesn't like them.  He gets into

2   a dispute, an argument with David about some of these

3   decisions.  He doesn't like some of the expenditures that are

4   being made.

5        But this has nothing to do with James.  James is not

6   involved in the day-to-day running of the clinic.  He is not

7   involved in the finances of the clinic.

8        Then there is a dispute about a man named Saba.

9   Victor had promised Saba 5 percent, and now Victor has changed

10  his mind and does not want to give the 5 percent.  David and

11  Victor argue about this.  Again, nothing to do with James.

12  There's some discussion about whether they would renegotiate

13  the profit-sharing.  As it stands now in the contract, Victor

14  gets 100 percent of the profits.  Could this be renegotiated?

15  Victor says, "Sure."  Then he goes back on that.  Again, David

16  and Victor have an argument about this.  Nothing to do with

17  James.

18       So, this is important, because at this point, for

19  whatever reason, Victor is unhappy with David and he wants to

20  get rid of him, and really what he wants is to control the

21  clinic for himself.  But in Victor's mind, in order to control

22  the clinic for himself, of course, it's not enough to just get

23  rid of David.  He must get rid of James as well.  So, he

24  treated them as sort of a joint entity, but, as the Court has

25  instructed you, you must not.  You must keep them separate and

1    evaluate the evidence against them independently.

2            Now, you are going to hear some evidence throughout

3    the course of this case that was recorded, both audio and

4    visual, and the Government is going to suggest to you that

5    these recordings between David and Victor, well, they amounted

6    to extortion.  I want you to keep a few things in mind when you

7    listen to these recordings.  Was there some peacocking going

8    on, some hyper-masculinity, some tough talk?  Yeah, maybe.  But

9    also keep in mind when you listen to the context in which these

10   recordings were made who is bringing up what topic, and also

11   keep in mind that one person on that tape knows that the FBI is

12   listening.

13           Now, I also want you to keep in mind when you think

14   about these recordings and when you think about Victor's

15   testimony when he gets in front of you his credibility.  We

16   have already talked about how he had some motive to want to

17   take the business over for himself, and think about that when

18   you think about his credibility.  But then think about some

19   other issues that are going to come up when he is testifying,

20   about how he has described his background, how he has described

21   the formation of the clinic and also about how, Mr. Cruz has

22   discussed, Victor's behavior after these supposed threats had

23   been made.  How did he act?  Did he act like someone who was

24   truly afraid of James and David, going to parties, hiring

25   lawyers, negotiating?  Right?  Was he acting like someone who

1    was truly afraid, inviting David and James around his family?

2    Keep that in mind when you evaluate his credibility as well.

3           In the end, what this case is about is that Victor

4    wanted to get rid of David and James from the clinic and

5    control it for himself.  Because he had no evidence that James

6    had done anything wrong, he decided to concoct this notion that

7    James had threatened him.

8           I am confident, ladies and gentlemen, that at the end

9    of this trial you will see through Victor's cunning strategy

10   and find James not guilty.  Thank you.

11          THE COURT:  Thank you, Mr. Tumposky.  Mr. Tumposky, I

12   wonder if you and Mr. Cruz could help move the podium over to

13   the side there so we can start with the witnesses.

14          MR. TUMPOSKY:  Certainly.

15                            (Pause)

16          MS. KAPLAN:  May I, your Honor?

17          THE COURT:  Is the podium in front of any of the

18   jurors?  You are going to be looking across at the witness

19   table.

20          Maybe if we could move it back a little bit, that

21   would be helpful.

22          And you may call your first witness.

23          MS. KAPLAN:  Thank you, your Honor.  The Government

24   calls Alla Lubinsky.

25

1        ALLA LUBINSKY, DULY SWORN BY THE CLERK

2            THE CLERK:  Please be seated and state your full name

3     and please spell your last name.

4            THE WITNESS:  My name is Alla Lubinsky.

5            THE COURT:  If you could spell your last name,

6     Ms. Lubinsky.

7            THE WITNESS:  L-U-B-I-N-S-K-Y.

8            THE COURT:  Thank you.

9            THE WITNESS:  The first name is spelled A-L-L-A.

10           THE COURT:  You may inquire.

11           MS. KAPLAN:  Thank you, your Honor

12                      DIRECT EXAMINATION

13    BY MS. KAPLAN:

14    Q.   Good morning, Ms. Lubinsky.

15    A.   Good morning.

16    Q.   Can you tell us where you are from.

17    A.   I was born in St. Petersburg, former Lenongrad, Russia.

18    Q.   What is your first language?

19    A.   Russian.

20    Q.   Where do you work?

21    A.   I work for the FBI.

22    Q.   What do you do for the FBI?

23    A.   I am a language analyst, and I do translations and

24    interpreting.

25    Q.   And how long have you done that?

1    A.    June will be my 21st year.

2    Q.    And have you worked for the FBI for 21 years?

3    A.    Yes.

4    Q.    And can you tell us your educational background, please.

5    A.    I have a Master's Degree in Education and majored in

6    English.

7    Q.    Does your job involve preparing transcripts?

8    A.    Yes.

9    Q.    Can you tell us how you prepare transcripts.

10   A.    We work with both documents and audio materials, and if it

11   is an audio material we usually save files in an electronic

12   format, which are recordings, and we use special software to

13   allow us to listen to the audio.  We use headphones and listen

14   to the audio and then translate what we hear.

15   Q.    And does that include foreign-language transcripts?

16   A.    Yes, definitely.

17   Q.    And does that include translating from Russian, the

18   Russian language into English?

19   A.    From Russian into English, yes.

20   Q.    When you make these translations is there any input from

21   the participants in the conversations?

22   A.    Not whatsoever.

23   Q.    Did you have occasion to review transcripts in this case

24   that were transcribed from Russian into English?

25   A.    Yes, I did.

1    Q.   And did this review include transcripts of conversations

2    that took place on November 25th and November 30th of 2015?

3    A.   Yes.

4         MS. KAPLAN:  With your permission, your Honor, I would

5    ask to show the witness Exhibits 19 and 20, if I may.

6         THE COURT:  You may.

7         MS.  KAPLAN:  And I would ask that they be pulled up

8    on the screen, please.

9    A.   Okay.  This is a translation of the conversation between

10   the foreign participants, Victor Torosyan and David

11   Tkhilaishvili and Kenton Fabrick.

12   BY MS. KAPLAN:

13   Q.   On which date are you looking, and which exhibit number

14   are you referring to?

15   A.   It is Number 494197 and --

16   Q.   Do you see an exhibit number on the bottom?

17   A.   I'm sorry.  Yes.  It says November 25, 2015.

18   Q.   Okay.  Is that Exhibit 19?

19   A.   Yes, Exhibit 19.

20   Q.   And do you see your name on there?

21   A.   Yes.

22   Q.   What role did you have in preparing that exhibit?

23   A.   I was a reviewer on this translation.

24   Q.   And is that translation -- did you listen to the tape when

25   you translated that?

1   A.   Yes, I listened to the tape, and I looked at the

2   translation that was done originally by another linguist.

3   Q.   And does that translation, the transcript fairly and

4   accurately represent what you heard on the tape?

5   A.   Yes, it does.

6          MS. KAPLAN:  And the tape is Exhibit 19-1.  I believe

7   it's agreed to, your Honor.

8          THE COURT:  All right.  It is received.

9          (Exhibit Nos. 19 and 19-1 received into evidence)

10          MS. KAPLAN:  And I would offer both 19 and 19-1 into

11   evidence, and I see that it has already been published to the

12   jury.

13          THE COURT:  Yes.

14   BY MS. KAPLAN:

15   Q.   Okay.  And with respect to Exhibit 20 -- we'll come back

16   to 19 in a moment -- if you could just look at Exhibit 20.

17          MS. KAPLAN:  And if we could have that on the screen,

18   please.

19          THE COURT:  And that is offered, because there is no

20   objection to it in this form?

21          MS. KAPLAN:  Well, there was an objection.  I assume

22   there is not anymore.

23          MR. CRUZ:  Your Honor, just for clarification

24   purposes, I believe these are the two latest incarnations.

25          THE COURT:  They are the ones that are going to be

1    presented to the jury.

2              MR. CRUZ:  And just for purposes of clarification, I

3    would object to the admission of the edited transcripts.

4              THE COURT:  I don't know what that means, but I'll

5    tell you what is going to happen.  This is what the Government

6    is offering as the transcript of the conversation at issue in

7    the case.

8              MR. CRUZ:  Yes, your Honor.

9              THE COURT:  The jury may believe it, they may not

10   believe it, but a witness is apparently going to testify that

11   it is a fair and accurate translation, and we will go from

12   there.

13             MR. CRUZ:  I understand.

14             THE COURT:  So, both of them, that is 19 and 20, are

15   going to be received, as are the tapes.  I date myself.  The

16   CDs, I guess, are going to be received here, and we will go

17   from there.

18             (Exhibit Nos. 20 and 20-1 received into evidence)

19             THE COURT:  But we are not, unless it is somehow

20   relevant, going to be doing legislative history.

21             MR. CRUZ:  No, your Honor.  Just note my objection to

22   those two exhibits.

23             THE COURT:  All right.  Overruled.

24   BY MS. KAPLAN:

25   Q.   Going back to Exhibit 19 for a moment --

1    A.    Yes.

2    Q.    -- after you had done the original translation did the FBI

3    ask you to look at some edits that were made to those

4    transcripts by one of the participants in the conversation?

5    A.    Yes, they did.

6    Q.    And did you review these changes?

7    A.    Yes, I did.

8    Q.    Did you go back and listen to the discs again, and were

9    the edits accurate?

10   A.    Yes, multiple times.

11   Q.    And then going to Exhibit 20, what date is that, and who

12   are the participants?

13   A.    That is November 30th, 2015, and the participants are

14   Victor Torosyan and David Tkhilaishvili.

15   Q.    And you reviewed the discs --

16   A.    Yes.

17   Q.    -- of it and made the translations from the discs?

18   A.    Yes.  I reviewed the translation made by a different

19   linguist.

20   Q.    And then did the FBI subsequently give you edits from one

21   of the participants in the conversations?

22   A.    Yes.

23   Q.    And did you review the discs to make sure that those edits

24   were accurate?

25   A.    Yes, I did.

1          MS. KAPLAN:  Again, your Honor, I would offer 19 and

2     20 and 19-1 and 20-1 into evidence.  And you already admitted

3     them.

4          THE COURT:  I have received them.  I understand there

5     is an objection to them, but they are received in evidence.

6          And what this means, ladies and gentlemen, is you can

7     evaluate it.  You may not believe that they are accurate, you

8     may believe that they are accurate.  That is for you to decide.

9     But this is evidence that you will have for consideration.

10    BY MS. KAPLAN:

11    Q.   Looking now at Exhibit 19, do you see at the bottom that

12    there is an indication that the Russian being spoken was

13    unintelligible?

14    A.   Unintelligible -- we denote as "unintelligible" the

15    conversation that we could hear, but it is garbled, and we

16    cannot make out exactly what was said either due to a

17    participant maybe mumbling, or the quality of the recording may

18    not be really good.

19    Q.   Were you able to understand the Russian on the discs that

20    you listened to that you translated?

21    A.   Yes.

22    Q.   And did the participants to the conversation seem to

23    understand each other?

24    A.   Yes.

25         MR. TUMPOSKY:  Objection.

1            THE COURT:  Well, I will sustain that objection.  She

2       will not be permitted to testify about what she believes people

3       that she was not present and observing believed or didn't

4       believe.  That is going to be up to you.

5       BY MS. KAPLAN:

6       Q.    Do you know what the word in Russian is for

7       "thieves-in-law"?

8       A.    Yes, I know.

9       Q.    What word is that?

10      A.    Vor zakonia (ph).

11      Q.    And is that a common expression in Russian?

12      A.    It's very well known.

13            MS. KAPLAN:  I have no further questions, your Honor.

14            THE COURT:  All right.  Mr. Cruz.

15            MR. CRUZ:  Thank you.

16                           CROSS-EXAMINATION

17      BY MR. CRUZ:

18      Q.    Good morning, Ms. Lubinsky.

19      A.    Yes.

20      Q.    Ms. Lubinsky, you had testified that you are a translator

21      who works for the Federal Bureau of Investigation, correct?

22      A.    Correct.

23      Q.    And you have done so for the last 20 years?

24      A.    Yes.  Twenty-one soon.

25      Q.    You have worked closely with not only the U.S. Attorney's

1   Office but also with a number of different federal law

2   enforcement agencies?

3   A.    Not really.  We don't work closely together.  I do

4   translations and interpreting.

5   Q.    Well, you have worked with the U.S. Attorney's Office in

6   the past?

7   A.    Only when the need to testify in a case comes up.

8   Q.    But do you work for the Department of Justice?

9   A.    Yes.

10  Q.    All right.  And the Department of Justice is the umbrella,

11  if you will, under which the U.S. Attorney's Office operates,

12  correct?

13  A.    Correct.

14  Q.    And they pay your salary?

15  A.    I'm sorry.  What?

16  Q.    And they pay your salary for doing this work?

17  A.    Yes.

18  Q.    Now, with regard to the transcripts that have just been

19  admitted into evidence, you stated that you had done the

20  original translation of the tapes of both of these

21  conversations yourself?

22  A.    No, I did not do the original translation; it was done by

23  a different linguist.  I did an operational review on that

24  translation.

25  Q.    Okay.  So, they were done by another linguist or more than

1    one linguist?

2    A.    As far as I know, by one linguist.

3    Q.    Okay.  And then you reviewed that person's work?

4    A.    Yes.

5    Q.    And that's normally what the process is, correct, that the

6    linguists do the translation, and then you check their work?

7    A.    Operational review is a procedure that is established by

8    the FBI Foreign Language Program to check all translations that

9    are produced by the personnel of that foreign language

10   services, and there are categories of translations that are

11   operationally reviewed.  They include all translations into

12   foreign language from -- into the foreign language from

13   English; they include all translations into English that are

14   disseminated outside of the Bureau; and they also include all

15   translations that are submitted as part of any court

16   proceedings.  So, this is what the operational review is.

17   Q.    All right.  And I believe that Ms. Kaplan asked you that

18   it isn't the normal course for participants in these

19   conversations to work on the editing process, correct, of the

20   translations?

21   A.    I don't know if it's a normal procedure or not.  I cannot

22   testify to that.

23   Q.    Well, I believe that you said that it wasn't, that that

24   didn't happen, that you translated --

25   A.    I was asked to review the edits that were done by one of

1    the participants.

2    Q.    Okay.  But that is not normally how this works, correct?

3    A.    I can't say "normally" or not.  I can only say in my

4    personal experience it happened this time.

5    Q.    And you are fully satisfied with the abilities of the

6    linguists that you have worked with in terms of doing these

7    translations, correct?

8    A.    Yes.

9    Q.    Okay.  And then you do a check of their work, correct?

10   A.    Correct.

11   Q.    So, it's unusual for something like this to happen, that a

12   participant is asked to weigh in on the editing process or the

13   translation process.

14   A.    I had no part in that process at all.  I was just given

15   the edits to review.

16   Q.    I understand that you didn't have a part in that process;

17   you were just asked to do something.  But I'm asking in your

18   experience this is unusual, isn't it?

19   A.    For me it was the first time that I was asked to do that.

20   Q.    The first time in your 21 years, correct?

21   A.    Yes.

22   Q.    Is that fair to say?

23   A.    Yes.

24   Q.    All right.  Now, when you were doing these corrections

25   that Mr. Torosyan suggested to you, you took notes about them,

1    correct?

2    A.    Correct.

3    Q.    And I received a copy of these notes this morning, but on

4    more than one occasion you note, "Victor suggests," correct?

5    A.    It was just my personal notes.  I did not, you know,

6    phrase them specifically in any way.

7    Q.    Okay.  But I'm asking in your notes regarding these

8    translations and Mr. Torosyan helping you with the editing

9    process --

10   A.    He didn't help me in any way.  I had no contact with him

11   or did not have any input from him at all.

12   Q.    Well, if he didn't have any contact with you, then why are

13   you saying in your notes, "Victor suggests," repeatedly?

14   A.    Well, because I just phrased it this way, but I had no

15   contact whatsoever with him.  It was suggested that that edit

16   was suggested.  That's how I just phrased it.

17   Q.    Well, who suggested it to you?  I'm assuming it was

18   Mr. Torosyan.

19   A.    I assume too, yeah.

20   Q.    Okay.  So, Mr. Torosyan is suggesting changes in these

21   transcripts to you, the qualified translator?

22   A.    These changes refer mostly to those parts that were either

23   unintelligible sometimes to me, that I could not hear them

24   well, and when I heard multiple times -- sometimes, you know,

25   when you first hear something you're not sure, and then

1   sometime later you hear it again, and then you realize this is

2   what was said.  It's a very common thing that happens.

3   Q.   So, let me see if I understand your answer.  You're saying

4   that in certain parts of these transcripts, if something was

5   unintelligible, you would take Mr. Torosyan's suggestion as to

6   what was stated during that part of the conversation?

7   A.   Again, after very carefully listening multiple times to

8   what was said, sometimes you do realize this is what was said,

9   and that's what happened in this case --

10  Q.   And is it fair to say --

11  A.   -- on those occasions.

12  Q.   Is it fair to say that on the occasions that you didn't

13  understand what was being said you just deferred to

14  Mr. Torosyan, right?

15  A.   I did not do that.  I only put down what I fully

16  understand and what I can hear clearly.

17  Q.   Well, what you fully understand after Mr. Torosyan is

18  making suggestions to you, correct?

19        MS. KAPLAN:  Objection to Mr. Torosyan making

20  suggestions to her.

21        THE COURT:  Well, I think we want to be clear about

22  the character of the suggestions, Mr. Cruz, unless you have

23  reason to believe that there were actual in-person

24  communications between Mr. Torosyan and the witness.

25        MR. CRUZ:  I understand, your Honor.

1    BY MR. CRUZ:

2    Q.   Ma'am, in addition to noting in your notes of these edits

3    that Mr. Torosyan did that Victor, quote, unquote suggests, you

4    also have on many occasions written down, "Victor added;" isn't

5    that true?  Would you like to -

6    A.   I need to refer to my notes, if you don't mind.

7    Q.   Sure.

8    A.   May I refresh my memory?  Or you can tell me when the

9    occasion was.

10             MR. CRUZ:  May I approach the witness?

11             THE COURT:  You may.

12   BY MR. CRUZ:

13   Q.   I'm just going to ask you to take a look at that.

14   A.   Sure.

15   Q.   Are those the notes that we are referring to?

16   A.   Yes.

17   Q.   I'm just going to focus you on this particular page

18   (indicating).

19   A.   Mm-hmm.

20   Q.   So, on this particular page there are a couple of entries

21   where you write down, "Victor added," correct?

22   A.   Yeah.  That means that that was on the tape, and if I

23   agreed to the change that means that I heard it.  It's only

24   what I heard personally.

25   Q.   Okay.  But you did write down, "Victor added," correct?

1    A.   Well, I just made those notes for myself, honestly, just

2    sort of how I phrased it, nothing else.

3    Q.   But in the original work that was done on these

4    translations --

5    A.   That means that that part was missing, either I did not

6    hear it or it just didn't come up on the tape clearly.

7    Q.   So, you didn't hear it, but Mr. Torosyan added it,

8    correct?

9    A.   I only put in my translation, the final version, what I

10   could clearly hear after multiple times of checking and

11   verifying.

12   Q.   But, ma'am, these additions that Victor made were not a

13   part of the original transcript, were they?

14   A.   This means that, again --

15        THE COURT:  Just a moment.  Just a moment.

16   Ms. Lubinsky --

17        THE WITNESS:  Yes.  Sorry.

18        THE COURT:  You are going to have to answer just the

19   question that is put to you --

20        THE WITNESS:  Sure.

21        THE COURT:  -- and not go beyond it here.

22        THE WITNESS:  Sure.

23        THE COURT:  If somebody wants some additional

24   information, they will ask for it.  But just listen carefully

25   to the question and answer just the question.  All right?

1    BY MR. CRUZ:

2    Q.   So, these additions that Victor made were not in your

3    original translation, correct?

4    A.   Yes.

5         MR. CRUZ:  Now, your Honor, I'm going to ask the

6    witness about some of these additions, and I'm prefacing this

7    with the Court, because I don't want to run afoul of anything

8    that we have discussed previously.

9         THE COURT:  No.  You can make an inquiry like that.

10        MR. CRUZ:  All right.

11        THE COURT:  We are not going to, as I say, do an

12   entire legislative history, but if there are particular ones

13   you want to point to, you can do that.

14        MR. CRUZ:  Yes, your Honor.

15   BY MR. CRUZ:

16   Q.   So, with regard to the transcript on November 25th of

17   2015, there are changes from the first transcript that you

18   produced to the one that was edited with Mr. Torosyan's help,

19   correct?

20   A.   I'm sorry.  What page are you referring to?

21   Q.   We are talking about -- and I apologize, because I have

22   line numbers -- so, we're talking about Line 154 for 11/25.

23   A.   Could I have the page number?  I'm sorry.

24   Q.   If you give me a moment, we'll get it.

25                       (Pause)

1    Q.   It's Page 11.

2    A.   Page 11?

3    Q.   Yes.

4    A.   Yeah.

5    Q.   And that's Line 154.

6    A.   Yes.

7    Q.   So, the last three words in that particular line are,

8    "Shoots at you"?

9    A.   Yes.

10   Q.   And, ma'am, so the last three lines in that transcript

11   are, "Shoots at you," or the last three words on Line 154, and

12   do you recall that in the original transcript that last line

13   was, "If one stands up, they all should"?

14   A.   I need to look at the transcripts.  I'm sorry.  I just

15   cannot from my memory recall that exact place and exact phrase.

16            MR. CRUZ:  Excuse me a moment, your Honor.

17            THE COURT:  Yes.

18                      (Pause)

19            MR. CRUZ:  If I could just have a moment, your Honor.

20   We have it electronically, and I can show it to the witness.

21            THE COURT:  Yes.

22                      (Pause)

23   BY MR. CRUZ:

24   Q.   So, ma'am, I'm going to focus you to the line on the

25   screen that says, "I haven't seen any friends that you have."

1          THE COURT:  I don't know if your software permits it

2     to be blown up or identified, just so it is focused for

3     everybody.  Another alternative is to simply use the screen.

4          MS. KAPLAN:  It's not in evidence, your Honor.

5          THE COURT:  I understand.

6     BY MR. CRUZ:

7     Q.   Okay.  So, we have highlighted the portion of the

8     transcript, the original transcript, and, again, the last

9     sentence in that particular section of the transcript is not,

10    "Shoots at you."  It's, "If one stands up, they all should"?

11    A.   I just want to be sure that this transcript you are

12    showing me is the transcript that was reviewed by me, not the

13    original translation that was done by a different linguist.  I

14    just want to be sure that this is the transcript that I

15    operationally reviewed.

16    Q.   We can show you the cover page, if that will help.

17    A.   Yes, please.

18    Q.   Okay.  That's the cover page, ma'am.

19    A.   Yes, that's fine.  Thank you.

20    Q.   So, the line, "Shoots at you," was added in the edited

21    version that Mr. Torosyan helps with, but the original

22    transcript said, "If one stands up, they all should," correct?

23    A.   This, then, was changed after a careful review --

24    Q.   Just a yes or no.

25    A.   -- of the edit, and this, then, was changed accordingly to

1    what I heard.

2    Q.   It was changed according to Mr. Torosyan's suggestion,

3    correct?

4    A.   It was changed according to what I heard when I reviewed

5    it again.

6    Q.   Well, let's just take one more moment here to look at the

7    next line, which is 155.  Do you see that?

8    A.   Yes.

9    Q.   And it says, "Why shooting"?

10   A.   Yes.  And I can actually explain --

11   Q.   Please.

12   A.   Okay, sure.

13   Q.   So, the edited version that Mr. Torosyan works on says,

14   "Why shooting?," correct?  And the original version that you

15   have in front of you says, "Why stand up?"

16   A.   Okay.

17            THE COURT:  Just a moment.

18            THE WITNESS:  May I explain?

19            THE COURT:  Ms. Lubinsky, just answer the question

20   that is put to you.  If somebody wants an explanation, they

21   will ask for it, but they have not, so they are asking a

22   particular question.  You answer the particular question.

23            THE WITNESS:  Would you repeat your question, please?

24   BY MR. CRUZ:

25   Q.   So, the original -- I'm sorry -- so, the edited version

1    that was done with the help of Mr. Torosyan says, "Why

2    shooting?," correct?

3    A.    Correct.

4    Q.    But the original draft that you and the other linguists

5    worked on says, "Why stand up?," correct?

6    A.    Correct.

7    Q.    And this happens throughout this transcript; isn't that

8    true?

9    A.    I wouldn't say throughout the transcript.  On several

10   occasions.  And the word, the Russian word, the two Russian

11   verbs are similar.

12   Q.    I understand that.  I understand that.

13        Now, you went through the same process with the

14   transcript for November 30th, correct?

15   A.    Yes.

16   Q.    And in the November 30th transcript -- do you have it in

17   front of you?

18   A.    Yes.

19   Q.    I am going to ask you to take a look at that.

20        THE COURT:  So the record is clear, I will mark it for

21   identification.  It is not evidence in the case.  You have seen

22   the document, just to make a comparison for yourselves, but it

23   is not the evidence in the case.  But what has been referred to

24   as the "original transcript" I will have marked as 19A, and it

25   will be put into evidence as an exhibit, not available for you

1    in the jury room.

2              MR. CRUZ:  Yes, your Honor.

3              THE COURT:  So.

4              (Exhibit 19A marked for identification)

5    BY MR. CRUZ:

6    Q.    So, ma'am, with regard to the November 30th transcript --

7    A.    Yes.

8    Q.    -- I'm going to focus you on Line 37.  So, I'm going to

9    focus you on Line 37 of the edited transcript that you have in

10   front of you.  All right?

11   A.    I'm sorry.  What was the line number?

12   Q.    Line 37.

13   A.    Okay.

14   Q.    Do you have that?

15   A.    Yes, I do.

16   Q.    And in that Line 37 it says, "Who will he shoot"?

17   A.    Yes.

18   Q.    Now, in Line 37 of the original transcript that

19   Mr. Torosyan did not edit it says, "Who will get him drunk"?

20   A.    Yes.

21   Q.    Now, are you telling me that the word "shoot" and the word

22   "drunk" are interchangeable?

23   A.    Yes.  It's the same Russian verb that belongs to the

24   category of slang.  It's a very informal --

25   Q.    It's a yes or no, ma'am.  You are saying the word "shoot"

1   is the same as the word "drunk"?

2   A.   Yes.   In this case, yes.

3   Q.   Okay.   Ma'am, Mr. Torosyan's edits were incorporated into

4   this final draft of both transcripts that was submitted as

5   evidence, correct?

6   A.   Correct.

7   Q.   He helped you with the editing process?

8           MS. KAPLAN:   Objection.

9           THE COURT:   Well, I think the jury understands the

10   character of the interaction between them.

11           MR. CRUZ:   I understand.

12   BY MR. CRUZ:

13   Q.   He added things to the transcripts that you accepted,

14   correct?

15   A.   Some of them, yes.

16   Q.   And in many instances it was when you couldn't hear what

17   was being said, it was unintelligible, correct?

18   A.   No.

19   Q.   Well, he added to the transcript, correct?

20   A.   He did, but I heard it.

21   Q.   Ma'am, yes or no, he added to the transcript?

22   A.   Yes.

23   Q.   And at his suggestion you changed things in the

24   transcripts, correct?

25   A.   Correct.

1          MR. CRUZ:  I have no further questions, your Honor.

2          THE COURT:  All right.  And so, we will have marked

3     the so-called "original transcript," but the one that was

4     reviewed as 20B For Identification.

5          (Exhibit No. 20B marked for identification)

6          THE COURT:  Mr. Tumposky.

7                        CROSS-EXAMINATION

8     BY MR. TUMPOSKY:

9     Q.   As far as you know, Mr. Torosyan made no edits to any

10    transcript of himself and James, right?

11    A.   I'm sorry?

12    Q.   As far as you know, Mr. Torosyan made no edits to any

13    transcripts involving him and James, right?

14    A.   Right.

15    Q.   And you were not asked to review any of Mr. Torosyan's

16    edits to any conversation between Mr. Torosyan and James,

17    right?

18    A.   I was asked to review the edits that I was provided.

19    Q.   You were not asked to review any of Mr. Torosyan's edits

20    to conversations between him and James, right?

21    A.   I was asked to review the edits.

22    Q.   The edits that you reviewed were to conversations between

23    David and Mr. Torosyan, right?

24    A.   Both of the transcripts that I reviewed were a

25    conversation between the two participants that you mentioned.

```
 1    Q.    David and Mr. Torosyan?

 2    A.    Yes.

 3    Q.    You were not asked to review Victor's edits to

 4    conversations between Mr. Torosyan and James, right?

 5    A.    No.

 6              MR. TUMPOSKY:  Thank you.

 7              THE COURT:  All right.

 8              MS. KAPLAN:  Just briefly, your Honor.

 9                        REDIRECT EXAMINATION

10    BY MS. KAPLAN:

11    Q.    Ms. Lubinsky, I just want to be clear.  Did you have any

12    contact with Victor Torosyan?

13    A.    Absolutely not.

14    Q.    Have you ever spoken with or met him?

15    A.    Absolutely not.

16    Q.    And who did you have contact with about the edits from

17    Victor Torosyan?

18    A.    Only with the Case Agent.

19    Q.    From the FBI?

20    A.    Yes.

21    Q.    Okay.  And can you estimate how many changes were made in

22    the transcripts?

23    A.    Maybe about 20.

24    Q.    To the transcripts?

25    A.    Yes.
```

1    Q.   And can you explain to us -- you said that the word

2    "shooting" and "drunk" are the same in Russian?

3    A.   Yes.  The verb is the same, and it absolutely sounds

4    exactly the same in both cases.  The most common meaning is to

5    get drunk.  There's a slight difference in the position of the

6    stress or emphasis on the first syllable or on the second

7    syllable, and so after listening many times I simply concluded

8    that the emphasis fell more strongly on the first syllable,

9    which makes it "shoot" instead of "getting drunk."

10   Q.   And where you added the word "shoot" did you ever add it

11   to a place that you couldn't hear it?

12   A.   No.

13   Q.   Did you ever make any changes from the original

14   translation to things that you couldn't hear based on the

15   suggestions through the Case Agent from Victor Torosyan?

16   A.   No.

17   Q.   And did you on some occasions reject some of the changes

18   that were recommended?

19   A.   I did.

20   Q.   Yes?

21   A.   Yes.

22           MS. KAPLAN:  I have no further questions, your Honor.

23           THE COURT:  All right.  Mr. Cruz?

24           MR. CRUZ:  Thank you, your Honor.

25

<u>RECROSS-EXAMINATION</u>

1

<u>BY MR. CRUZ:</u>

2

Q.   Ma'am, when you talked about the word "shoot" versus

3

"drunk" being the same, the truth of the matter is that, when

4

you reviewed these transcripts and these audio recordings

5

originally, your conclusion, as a certified linguist in Russian

6

for 21 years, was that it was "drunk" and not "shoot," correct?

7

A.   Correct.

8

Q.   And you only changed it after Mr. Torosyan made the

9

suggestion; isn't that true?

10

A.   True.

11

     MR. CRUZ:  No further questions, your Honor.

12

     THE COURT:  All right.  Mr. Tumposky?

13

     MR. TUMPOSKY:  Nothing, your Honor.

14

     THE COURT:  All right.  You may step down,

15

Ms. Lubinsky.  Thank you.

16

     THE WITNESS:  Thank you.

17

     THE COURT:  Why don't you leave those materials there,

18

and the parties will take care of them.  Okay?

19

                    (Witness stepped down)

20

     MS. KAPLAN:  The Government calls Vahagn Victor

21

Torosyan.

22

     THE COURT:  All right.

23

     THE CLERK:  Please take the witness stand, and please

24

raise your right hand.

25

1      <u>VAHAGN VICTOR TOROSYAN, DULY SWORN BY THE CLERK</u>

2          THE CLERK:  Please be seated and state your full name

3      and please spell your last name.

4          THE WITNESS:  Good morning, everyone.  Last name is

5      Torosyan T-O-R-O-S-Y-A-N, first name is Vahagn and the last

6      name is -- the middle name is Victor.

7          MS. KAPLAN:  May I, your Honor?

8          THE COURT:  You may proceed.

9          Mr. Torosyan, you might put the microphone a little

10     bit closer to your mouth so that we can pick up your voice.

11                     <u>DIRECT EXAMINATION</u>

12     <u>BY MS. KAPLAN:</u>

13     Q.   Good morning, Mr. Torosyan.

14     A.   Good morning.

15     Q.   Can you tell us what town you live in?

16     A.   I live in Watertown, Massachusetts.

17     Q.   And where are you from originally?

18     A.   From Armenia.

19     Q.   And is English your first language?

20     A.   No, it's not.

21     Q.   What is?

22     A.   Armenian.

23     Q.   What other languages do you speak?

24     A.   I speak Russian, English and Armenian, of course.

25     Q.   And are you comfortable testifying in English?

1    A.    Yes.

2    Q.    Where did you learn Russian?

3    A.    When I was born in Armenia, that was requirement for us.

4    It was U.S.S.R. back in the day, so almost everyone spoke

5    Russian in Armenia.

6    Q.    And from what age did you learn Russian?

7    A.    Since five, six year old.

8    Q.    And why did you learn Russian?

9    A.    Everybody spoke Russian in Armenia back in the days, most

10   of them.

11   Q.    When did you first come to the United States?

12   A.    2000.

13   Q.    And who did you come here with?

14   A.    By myself.

15   Q.    And where did you come in the United States?

16   A.    I came to Watertown.

17   Q.    And why did you come to Watertown?

18   A.    I came with the H1B Program, student exchange program, to

19   study.

20   Q.    Were you attending school?

21   A.    I did not.   That's exchange program.

22   Q.    And are you a U.S. citizen?

23   A.    Yes, I am.

24   Q.    When did you become a U.S. citizen?

25   A.    I believe it was 2013.

```
 1    Q.    Are you married?

 2    A.    Yes, I am.

 3    Q.    And who are you married to?

 4    A.    To Elen Gevorgyan.

 5    Q.    How do you spell her last name?

 6    A.    G-E-V-O-R-G-Y-A-N.

 7    Q.    When did you get married?

 8    A.    I think was 2010 or '11.

 9    Q.    And is she a U.S. citizen?

10    A.    Yes, she just become a U.S. citizen.

11    Q.    Do you have children?

12    A.    I do have two children.

13    Q.    How old are they?

14    A.    Two and four.

15    Q.    Can you tell us how far you went in school?

16    A.    I have one four-year education in Computer Engineering,

17    and I have one degree in Economy, bachelor's degree.

18    Q.    And where did you get these degrees?

19    A.    In Armenia.

20    Q.    When you came to the United States how much money did you

21    have with you?

22              MR. TUMPOSKY:  Objection.

23              THE COURT:  Overruled.

24              You may answer.

25    A.    $365 in my pocket.
```

1    BY MS. KAPLAN:

2    Q.    And where did you work when you first came here?

3    A.    I worked at the gas station.

4    Q.    What gas station?

5    A.    In Watertown.

6    Q.    What did you do there?

7    A.    I was pumping gas.

8    Q.    How long did you do that?

9    A.    Approximately eight years.

10   Q.    And did there come a time when you purchased a business?

11   A.    The first I became supervisor, then manager, then I was a

12   partner.  Then I purchased the business in 2010.

13   Q.    And is that the same place you were pumping gas?

14   A.    Yes.

15   Q.    What was the name of that?

16   A.    Belmont Auto.

17   Q.    And when was that that you purchased Belmont Auto?

18   A.    2010.

19   Q.    How did you get money to pay for that business?

20   A.    When I was working and I was making a lot of money, and I

21   saved it.

22   Q.    Over the years have you been involved with other

23   businesses?

24   A.    Yes, I was.

25   Q.    What businesses?

```
 1    A.    Allied Health Clinic.

 2    Q.    Prior to that?

 3    A.    Prior to that we had -- I opened a limousine business for

 4    a short period of the time.  Then I closed it.

 5    Q.    What was that called?

 6    A.    Prompt Transportation.

 7    Q.    What was it?

 8    A.    Prompt.

 9    Q.    Prompt.  And what about rental properties?

10    A.    When the market was down then I was able to purchase a few

11    rental properties.

12    Q.    How many?

13    A.    Three.

14    Q.    Where are they?

15    A.    Two of them in Watertown and a third one in Cape Cod.

16    Q.    And do you still own them?

17    A.    I still own them.

18    Q.    And you rent them out and receive money?

19    A.    Yes, I do.

20    Q.    Do you know someone by the name of David Tkhilaishvili?

21    A.    Yes, I do.

22    Q.    How long have you known him?

23    A.    It's gonna be 10 years now.

24    Q.    How did you first meet him?

25    A.    I met him at my repair shop when I was servicing his
```

1    vehicles.  That's how I met him.

2    Q.   What kind of vehicles?

3    A.   He had a transportation business, and he brought his

4    vehicle to service at my station.

5    Q.   What kind of transportation business?

6    A.   Medical transportation.

7    Q.   Do you see him in the courtroom today?

8    A.   Yes, I do.

9    Q.   Can you point him out and describe an article of clothing

10   that he is wearing?

11   A.   Yes.  He's the third person next to the female, and he is

12   wearing a white shirt and a suit, dark suit, blue or black.

13          MS. KAPLAN:  Let the record reflect the witness has

14   identified defendant David Tkhilaishvili.

15          THE COURT:  It will without objection.

16          MR. CRUZ:  No objection, your Honor.

17   BY MS. KAPLAN:

18   Q.   Do you know where David Tkhilaishvili is from?

19   A.   Yes, I do.

20   Q.   Where is he from?

21   A.   From Georgia.

22   Q.   Is that the Republic of Georgia?

23   A.   That is Republic of Georgia, correct.

24   Q.   Was that previously part of the U.S.S.R.?

25   A.   Yes, it is.

1  Q.   And when you would speak to David, what language would you

2  speak?

3  A.   Russian most of the time.  I would have used a few English

4  words, but Russian.

5  Q.   Did he appear to understand you?

6  A.   Yes.

7  Q.   What language did he speak?

8  A.   I believe he speaks in Russian.  We always communicate in

9  Russian, Georgian and some English, I believe.

10  Q.   And did you understand his Russian?

11  A.   Yes, I do.

12  Q.   Do you know someone by the name of Jambulat Tkhilaishvili?

13  A.   Yes, I do.

14  Q.   How do you know him?

15  A.   Through David.  It's David's brother.

16  Q.   Do you remember when you first met him?

17  A.   Approximately 2013, I believe.

18  Q.   Do you remember what occasion it was that you met him?

19  A.   David brought him to my house and introduced him to me.

20  Q.   And do you see him in the courtroom?

21  A.   Yes, I do.

22  Q.   Can you point to him and identify him by an article of

23  clothing that he is wearing?

24  A.   Yes.  He is the second person from the right wearing the

25  blue shirt.

1          MS. KAPLAN:  Let the record reflect the witness has

2     identified defendant Jambulat Tkhilaishvili.

3          MR. TUMPOSKY:  No objection.

4          THE COURT:  All right.

5     BY MS. KAPLAN:

6     Q.   And when you would speak to Jambulat Tkhilaishvili, what

7     language did you speak?

8     A.   Russian.

9     Q.   Did he appear to understand you?

10    A.   Yes.

11    Q.   And what language did he speak to you in?

12    A.   Russian.

13    Q.   Did you understand his Russian?

14    A.   Yes, I did.

15    Q.   Does Jambulat Tkhilaishvili have a nickname?

16    A.   Yes.  Jaba.

17    Q.   Jaba.  And are the defendants related?

18    A.   Yes, they are.

19    Q.   How so?

20    A.   I know they are brothers, two brothers.  That's what they

21    told me.

22    Q.   Do you know David and Jambulat Tkhilaishvili's family?

23    A.   Yes, I do.

24    Q.   Who do you know?

25    A.   I know his mother and his father.

1  Q.   How do you know them?

2  A.   David introduced them to me.

3  Q.   On what occasion?

4  A.   I believe one time we went to the fair, with me and my

5  parents and David and his parents in Boston.

6  Q.   You went to a fair?

7  A.   Yeah.

8  Q.   And what was your relationship with David Tkhilaishvili

9  like?

10  A.   We were friends, close friends.

11  Q.   Did you ever lend either David or Jambulat Tkhilaishvili

12  money?

13  A.   Yes, I did, several occasions.  David.

14  Q.   David?  Okay.  How many occasions?

15  A.   It's hard to tell.  Eight, ten, twelve.  Many occasions.

16  Q.   Do you recall the first time that you loaned David

17  Tkhilaishvili money?

18  A.   No, I can't.  I don't remember.

19  Q.   Do you remember whether he paid you back?

20  A.   He always paid me back, yes.

21  Q.   What amounts of money did you loan him?

22  A.   Different.  2,000, 1,000, 8,000, 10,000.

23  Q.   And what were these loans for?

24  A.   He always came to me, he needed some money to operate his

25  businesses or he needed some money for something.  He asked me,

1   and I lent him the money.

2   Q.   And how did you lend him the money?

3   A.   Sometimes he used my credit card, sometimes form of cash,

4   form of checks.  Different.

5   Q.   Did you have a contract or a written agreement?

6   A.   No.  Just we were friends.  Just word of mouth.

7   Q.   Is David Tkhilaishvili older or younger than you?

8   A.   He is younger than me.

9   Q.   By how many years?

10  A.   I think about five years, I believe.

11  Q.   And what about Jambulat, his brother?

12  A.   I believe he's older than me.

13  Q.   Did there come a time that you learned that David

14  Tkhilaishvili was involved in running a Suboxone clinic?

15  A.   Yes.

16  Q.   And when did you first learn that?

17  A.   First I believe was 2013.

18  Q.   Tell us, what is a Suboxone clinic?

19  A.   A Suboxone clinic, that is what we have.  Allied Health

20  Clinic is an outpatient clinic.  We treat the patients with

21  addiction.

22  Q.   What do you treat them with?

23  A.   Treat them off addiction if they are people

24  heroin-addicted, alcohol-addicted.

25  Q.   Is Suboxone a drug?

1    A.    Suboxone is itself, it's contained to Buprenorphine and

2    naloxone.   Buprenorphine does considered opiate, and Naloxone,

3    what it does is it blocks the opiate receptors in your brain.

4    Q.    When you first learned that David Tkhilaishvili was

5    involved in the Suboxone Clinic in approximately 2013, do you

6    remember what the name of that clinic was?

7    A.    I believe David's Health PC.

8    Q.    Davis?

9    A.    Davis or David's.   I believe with "d's" or Davis.

10   Q.    Okay.   And do you know where that clinic was located?

11   A.    Yes.   In Quincy, Massachusetts.

12   Q.    What address?

13   A.    21 School Street.

14   Q.    Do you know who was involved in that clinic?

15   A.    David told me the partners were he -- he was a partner

16   with a person named Kurt Fabrick.

17   Q.    Were you involved in Davis Clinic?

18   A.    No, I was not.

19   Q.    Do you know how long Davis Clinic was operational?

20   A.    I believe approximately a year and a half.   About a year,

21   year and a half.

22   Q.    Did you invest money in Davis Clinic?

23   A.    No, I did not.

24   Q.    Do you know who did?

25   A.    David told me the person's name Kristina.

1          MR. CRUZ:  Objection, your Honor.

2          THE COURT:  Well, I think I am going to receive that

3    in evidence.

4          Ladies and gentlemen of the jury, there sometimes are

5    issues of what we call "hearsay," in which somebody recounts

6    what they heard somebody else say, and our preference, of

7    course, is to have the person who made the observation testify,

8    but because this case to some degree turns on the interactions

9    between Mr. Tkhilaishvili and Mr. Torosyan, I'm going to let

10   you hear what Mr. Torosyan said Mr. Tkhilaishvili said to him.

11         MR. CRUZ:  And, your Honor, if I may, he had testified

12   that he didn't have anything to do with the Clinic.

13         THE COURT:  I don't want argument about it.  It is

14   received solely for the interaction between them.  Whether it

15   is true or not is not at this point material here.  But I

16   understand the objection.  I simply offer that instruction to

17   the jury for the reception of this evidence.

18   BY MS. KAPLAN:

19   Q.   So, you said that David told you Kristina did?

20   A.   Yes.

21   Q.   And do you know who Kristina is?

22   A.   Yes, I do.

23   Q.   Who is that?

24   A.   She dated David years ago.

25   Q.   Do you know the last name?

1    A.    Ursova, I believe.

2    Q.    And what happened to Davis Clinic?

3    A.    David told me that he got in a litigation.

4          MR. CRUZ:  Objection, your Honor.

5          THE COURT:  Again, I am going to permit it to be

6    received, but we are not going to spend very much time on this.

7          MS. KAPLAN:  No.

8          THE COURT:  Just simply that there was a prior clinic.

9    So, limited as to inquiry here.  He may answer.

10   BY MS. KAPLAN:

11   Q.    Did Davis Clinic close?

12   A.    Davis Health PC closed, yes.

13   Q.    Do you know when it closed?

14   A.    I believe in the middle of 2014.

15   Q.    Now, prior to Davis Clinic did you know what David

16   Tkhilaishvili did for work?

17   A.    Yes.  He and his brother, they owned a transportation

18   business.

19   Q.    And what is a "transportation business"?

20   A.    It's a medical transportation.  They transferred the

21   patients from home to the hospital, and they'd be reimbursed by

22   MassHealth and Medicaid.

23   Q.    Did it involve them treating patients?

24   A.    No, it was not involving treating patients.  No treatment,

25   transportation, just simply moving people with the vehicle.

1    Q.   Were David or Jambulat Tkhilaishvili involved in any other

2    Suboxone clinics prior to Davis Health?

3    A.   No.  Only thing I'm aware of just Davis Health PC.

4    Q.   And Jambulat Tkhilaishvili, do you know what he did for

5    work?

6    A.   Well, according to David, he was with him and that he was

7    the founder of the Davis Health PC.  He helped him with the

8    Davis Health PC.  But what I saw it, he was working at the

9    pizza shop.  That's where I seen it.

10   Q.   Where was the pizza shop?

11   A.   In Stoughton?

12   Q.   Stoughton or Taunton?

13   A.   Taunton.  Sorry.  Taunton.

14   Q.   Okay.  And did you see Jambulat?  Did you ever go to the

15   pizza place?

16   A.   I did.

17   Q.   And did you see Jambulat there?

18   A.   I went once.  I saw him -- I seen him next to the pizza

19   shop, but I seen him at the pizza shop one time when I went

20   with the -- to have a recorded conversation.

21   Q.   Oh, okay.  So, this was after you had gone to the FBI?

22   A.   Yes.

23   Q.   Now, directing your attention to 2015, did you have a

24   discussion with David Tkhilaishvili about investing in another

25   business?

1    A.    Yes, I did.

2    Q.    And how did that come about?

3    A.    David approached me and asked me to invest into the

4    Clinic, new clinic, and we were the partners, me, him and

5    Jambulat, Kenton Fabrick, Olga Rusia -- Olga Dorofyeyeva and

6    Nato Rusia, and that will be an outpatient clinic.  That's what

7    he asked me to invest into.

8    Q.    And was this after Davis Clinic was closed?

9    A.    Yes.

10   Q.    And do you remember where you were when you first had this

11   conversation?

12   A.    I believe the first time, I could be wrong, but I think we

13   discussed that in Cape Cod in my summer house.

14   Q.    Where do you have a summer house?

15   A.    In Cape Cod.

16   Q.    Was he there?

17   A.    Yes, he was.

18   Q.    How many occasions was he there?

19   A.    Many occasions.  I can't count it.  10, 15.

20   Q.    Were you there, too, when he was there?

21   A.    Yes.  But sometimes he would ask me if he could stay in my

22   house by himself, and I told him, "Yes."

23   Q.    You allowed him to?

24   A.    I allowed him to.

25   Q.    And did he ask you more than once about investing in or

1    going into business with him?

2    A.    Yes.  He asked me several occasions.

3    Q.    So, what did you say the first time you talked about it?

4    A.    The first time I told him, "No."  I told him, "I don't

5    know nothing about Suboxone or investing into the addiction

6    business," but he asked me several times.  Even there was a

7    point he literally cried in my house, says, "Victor, I need

8    help."  And I told him, "Let me do a little research about

9    addiction, and I'll get back to you."

10   Q.    And which house were you in when you remember he cried to

11   you?

12   A.    In my house in Watertown.

13   Q.    And you said that he said to you, "You have to help me"?

14   A.    Yeah.  He says, "Victor, I need help.  If you don't help

15   me, my life is miserable.  It's going to be very tough for me.

16   So invest into it.  That will be great return for you and we'll

17   do the right thing for the community."

18   Q.    Okay.  And you told him what?

19   A.    I told him any decisions, anything I do I always discuss

20   with my family, with my wife and my parents.  I told him that

21   was only the -- we had a conversation several times.  Even he

22   said he had other investors.  I told him, "Why don't you go

23   with other investors."  Then, at the end, he came to --

24   "Victor, nobody wants to put the money, and why don't you do

25   it?"  And I told him, "Let me talk with my family."  And I

1    clearly remember we had a dinner in my house, and I asked my

2    family, "Look, we know David.  He's a part of our family, he's

3    a friend, and he wants me to invest into this clinic.  What do

4    you think about that?"  And everybody in my family, my wife and

5    my parents told me, "You know, it's good work.  You want to

6    help people.  At the same time you want to help your friend and

7    be profitable, I think you should do it."

8    Q.   Now, was David or Jambulat Tkhilaishvili at that dinner?

9    A.   No, they were not.

10   Q.   This was just with your family?

11   A.   My family.

12   Q.   Where were you working at the time?

13   A.   I always been working in my repair shop.  It's an auto

14   repair shop.  And then I have my rentals, so I buy the house

15   and repair and sell them, so --

16   Q.   So, you were fairly busy?

17   A.   Yep.

18   Q.   Did you reach a decision?

19   A.   I did, I did.  Yes.

20   Q.   What did you decide?

21   A.   I decided to go with the business.

22   Q.   And do you remember when it was that you made that

23   decision?

24   A.   We started negotiating in the late summer, and we signed

25   our agreement, I believe it was December of 2014.

1    Q.    And prior to you signing an agreement in December of 2014,

2    did you talk to an attorney?

3    A.    Yes, I did.

4    Q.    And who was your attorney?

5    A.    His name is Andrew Rusczek, and he's from the firm called

6    Verrill Dana.

7    Q.    Had he been your attorney prior to this?

8    A.    No.  He represented me only in this clinic.

9    Q.    And before reaching the decision about investing in the

10   Clinic did you talk to your attorney, or was it after?

11   A.    No.  I talked to him many occasions, yes, before, before.

12   Q.    Before you made the decision?

13   A.    Yes, before I made the decision.

14   Q.    And how much did you agree to invest?

15   A.    Well, I told David from day one my max is 450- to

16   $500,000, and he says, "Victor, if you put 2- to 300,000 up

17   front, then we need another hundred, at the most $200,000.

18   That's more than enough money.  We should be fine."

19   Q.    Where did you get this type of money from?

20   A.    Well, from different places.  First, I bought the house in

21   Watertown about 10 years ago.  It was $350,000, and the house

22   right now is worth 8-$900,000.  So, I had big equity.  I did a

23   cashout.

24         The second thing, my repair shop was very profitable,

25   and I made over $100,000, and I saved it.

1    Q.   And what was your understanding of the agreement?  Besides

2    that you were going to put in this money were the defendants

3    going to put in any money?

4    A.   No, he wasn't going to put the money.

5    Q.   Was he going to put anything into the business?

6    A.   Yes.  He said he had an analyzer, he had a big printer,

7    and some computers and chairs.  He told me the analyzer cost

8    close to $400,000.

9    Q.   Okay.  We'll get to that, but was David Tkhilaishvili

10   putting any of his business -- did he have a business at the

11   time?

12   A.   He did not have any business at that time.  Business was

13   closed.  The place was closed down.

14   Q.   What about the pizza place?

15   A.   Oh, he had a pizza place.  We agreed on the terms and

16   conditions.  I told him, "David, this is my last money.  You

17   know, I came to the States with $300 in a pocket, and I reached

18   this -- where I'm now it's my American dream I achieved, and

19   I'm proud, and it's very risky for me to put all my investment

20   into it."  And David says, "Victor, you know, why don't we do

21   it this way:  If we don't obtain a license from the Department

22   of Public Health, I will put my pizza as a collateral, and I

23   will pay you 50 percent of your -- if you lose any money,

24   50 percent of that money I will pay you back within five

25   years."

1    Q.    With interest?

2    A.    With interest, yeah.  Five percent interest, I believe.

3    Q.    And what was the Clinic to be called?

4    A.    Allied Health Clinic, LLC.

5    Q.    Can you tell us about the corporate, just briefly about

6    the corporate structure of the Clinic?

7    A.    Yeah.  We have Health Management and the Allied Health

8    Clinic.

9    Q.    Two separate entities?

10   A.    Two separate entities.

11   Q.    And what was the purpose of Health Management Group?

12   A.    Well, David up front told me, "So, there are two part of

13   the Clinic.  There's management, in which we're going to be

14   working together, and there's the clinical part, which I'm

15   going to work with," his brother, Jambulat.  And that was the

16   difference between Management and Clinic.

17            THE COURT:  Ms. Kaplan, is this a point to break?

18            MS. KAPLAN:  Yeah, sure.

19            THE COURT:  So, we will take our morning break, ladies

20   and gentlemen, maybe 15, 20 minutes.

21            THE CLERK:  All rise.

22            (The jury exited the courtroom at 11:00 a.m.)

23            THE COURT:  Anything we need to take up before the

24   break?

25            MS. KAPLAN:  I don't think so, your Honor.

1          THE COURT:  All right.  So, we will be back here,

2     let's say, at 11:15.

3          MS. KAPLAN:  Thank you.

4        (The Honorable Court exited the courtroom at 11:00 a.m.)

5          THE CLERK:  All rise.

6        (The Honorable Court entered the courtroom at 11:19 a.m.)

7          THE COURT:  Ready for the jury?

8          MS. KAPLAN:  Yes, your Honor.

9          THE CLERK:  All rise.

10        (The jury entered the courtroom at 11:19 a.m.)

11          THE COURT:  You may continue, Ms. Kaplan.

12          MS. KAPLAN:  Thank you, your Honor.

13                 CONTINUING DIRECT EXAMINATION

14     BY MS. KAPLAN:

15     Q.   I believe before the break you were telling us about the

16     corporate structure of Allied Health Clinic and Health

17     Management Group.  Can you tell us what the difference is

18     between the Clinic and the Management Group?

19     A.   Generally, I believe the terms and conditions should be

20     the same.  The percentages should be the only difference.

21     Q.   Okay.  And was the Management Group meant to manage the

22     Clinic?

23     A.   Yes.  It meant to manage the all nonclinical things at the

24     Clinic.

25     Q.   Did Health Management Group have any assets?

1   A.   He had very limited assets with some used computers and

2   some chairs, which some of them I had to send out to be

3   repaired in order to use them.

4   Q.   And at some point was Health Management Group shut down?

5   A.   Yes.

6   Q.   Did you shut it down?

7   A.   I shut it down.

8   Q.   When was that?

9   A.   I believe it was February of 2016.

10   Q.   Where was the Clinic to be located?

11   A.   On 21 School Street in Quincy, Massachusetts.

12   Q.   Is that the same location as Davis Clinic?

13   A.   Yes, it is.

14   Q.   And I think you had started to before -- I may have

15   interrupted you -- tell us the terms of ownership for the

16   Health Clinic and then Health Management Group.

17   A.   Initially, when David came to me -- and, again, I didn't

18   know -- I had no information about the medical clinic -- the

19   idea was he and his brother would get 45 percent, I would get

20   40 percent, and there was 5 percent was Notu See (ph), I

21   believe her name was.  She was going to be a doctor for us,

22   working as a doctor.  And the other 5 percent should be for a

23   clinical administrator, his name is Kenton Fabrick, and then

24   the other 5 percent for Olga Dorofyeyeva, 5 percent for her as

25   an assistant to our administrator.

1    Q.    Let me ask it this way:  The Health Clinic, Allied Health

2    Clinic --

3    A.    Mm-hmm.

4    Q.    -- did they have Class A Members and Class B Members?

5    A.    They had Class A Members and Class B Member.  On Health

6    Management I was Class A member with David on Health Clinic,

7    and I was a Class A member with Jambulat.

8    Q.    And what was your role to be in Allied Health Clinic?

9    A.    Initially I was going to be advisor with David at the

10   Management as well as with Jambulat and a silent investor.

11   Q.    And what was David Tkhilaishvili's role?

12   A.    Day-to-day operational and the Management.

13   Q.    What about Jambulat Tkhilaishvili?

14   A.    Supposed to be day-to-day operation of the Clinic after

15   opening up the Clinic.

16   Q.    And what was -- you said Kenton Fabrick was also an owner?

17   A.    He was the owner and a Clinical Administrator.

18   Q.    Clinic Administrator?

19   A.    Yes.

20   Q.    What's the role of the Clinic Administrator?

21   A.    So, he's all the policies, procedures in the Clinic.

22   Q.    And Olga Dorofyeyeva, did she have a role?

23   A.    She was going to be assistant for the Clinic

24   Administrator, but I believe was sometimes in 2015, March or

25   April, as far as I remember, she said she doesn't want to have

1    anything to do with the Clinic.  She quit.

2    Q.   But she was an owner?  She was in the operating letter

3    agreement?

4    A.   Initially she was, yes.

5    Q.   And was the idea that you would be at Allied Health Clinic

6    on a full-time basis?

7    A.   Well, there was no idea initially it be full time.  Again,

8    my role was supposed to be as an investor, as a silent investor

9    and advisor for the Clinic.

10   Q.   And besides you, who were the other investors in Allied

11   Health Clinic?

12   A.   Only me.

13   Q.   Did either of the defendants invest any money into Allied

14   Health Clinic?

15   A.   No, they did not.

16   Q.   What about Health Management Group?

17   A.   All the summer David brought some used items but no cash.

18   Q.   And the used items, we will talk about that in a minute,

19   but did you hire an architect?

20   A.   Architect been hired previously by David, but I paid the

21   fee myself.

22   Q.   And where did you pay the fee from?

23   A.   From my personal account.

24   Q.   Do you remember how much it was?

25   A.   I don't.

1    Q.    Okay.  Now, you talked about equipment that was brought

2    over to Allied Health.  Did you bring any equipment?

3    A.    Well, down the road we almost -- right now we change

4    almost everything.  We changed most of the computers, we bought

5    new chairs, and we bought another refrigerator.  Everything was

6    used, so we had to replace them.

7    Q.    But when Allied Health Clinic was formed, you were

8    starting to tell us about the equipment.  Was there a lab

9    machine there?

10   A.    There was a lab machine, yes.  But when we started David

11   told me he had a used what is called "analyzer lab machine,"

12   which was worth several-hundred-thousand dollars, and I have

13   asked on many occasions, "Can I see the machine," because I

14   never seen an analyzer, and he always said to me, "Tomorrow,

15   tomorrow."  Then, one day I learned he sold that, and we ended

16   up buying another one.

17   Q.    Was the money that David got from the sale of the analyzer

18   used for Allied Health?

19   A.    He kept it.  He kept it.  He never put the money back into

20   the account.  We had an argument.  I told him, "Listen, we're

21   partners.  You sell anything, you have to put the money back to

22   the account."  He said he's in a financial hardship.  He needs

23   the money.

24   Q.    I'm sorry.  He said what?

25   A.    He's having a financial hardship, and he needs the money.

1    Q.   And what other equipment -- and let me go back for a

2    second.

3         That analyzer, where did that analyzer come from?

4    A.   We leased that.

5    Q.   No, no.  When Allied Health Clinic was formed, tell us

6    about what other equipment was brought to Allied Health Clinic.

7    A.   What David brought I'll put this way.  David bought some

8    used chairs, tables and some computers and telephones.  Then we

9    end up that what he brought from the Management, and, again,

10   that's a few thousand dollars, if so, worth.

11   Q.   And how many computers do you say that David Tkhilaishvili

12   brought?

13   A.   Approximately five, six, maybe, used computers.

14   Q.   Were these computers that were new?

15   A.   No.  Nothing was new.

16   Q.   How old were they?

17   A.   Well, some of them after a few months we just replaced

18   them.  They stopped working.  They were old.  I don't know the

19   exact date, but everything was used.  I mean that even the

20   medical chairs he brought, there were cut on them, they were

21   broken.  We had to send that out to upholstery shop, and I

22   paid, I believe, $500 to be repaired.

23   Q.   You said a few tables?

24   A.   A few tables, yes.  Just the regular office tables.

25   Q.   Other than the five to six computers, a couple of chairs

1    and the tables, did David Tkhilaishvili bring any other

2    equipment to Allied Health Clinic?

3    A.   No, he did not.

4    Q.   And you never saw this analyzer?

5    A.   Never seen one.

6    Q.   Now, did there come a time when you purchased computers

7    for the Clinic?

8    A.   Yes, I did.

9    Q.   How many?

10   A.   I believe I bought five or six, I bought.

11   Q.   And who paid for those?

12   A.   I did.

13   Q.   From what money?

14   A.   I paid now from the Clinic money.

15   Q.   What about something called "client lists"?  Is there such

16   a thing as client lists for Suboxone clinics?

17   A.   Well, before we opened the Clinic, so, again, I didn't

18   know about having a running medical clinic, and I asked David,

19   "How are we going to get the patients?  How are we going to get

20   them?"  And David told me he has a waiting list.

21   Q.   Did you ever see that list?

22   A.   He sent me.  I did see the list, but I didn't want to use

23   that list.

24   Q.   And why didn't you want to use that list?

25   A.   Well, when I looked up the list I noticed two things.

1   First, I think he took that list from someplace that they don't

2   belong to Allied and we shouldn't use it; and the second was I

3   believe that's a HIPAA violation.

4           MR. TUMPOSKY:  Objection, your Honor.

5           THE COURT:  No, I will permit that to stand.

6   BY MS. KAPLAN:

7   Q.   And where did you think that he took it from?

8   A.   I believe he took it from his old practice from Kurt

9   Fabrick.

10  Q.   Is that Davis Clinic?

11  A.   Davis Clinic, yeah.

12  Q.   And, by the way, when Davis -- you said that Davis Clinic

13  closed?  Did you testify that Davis Clinic closed?

14  A.   Yes.

15  Q.   Do you know whether that practice opened somewhere else?

16  A.   I have no information.  I don't think it's been opened,

17  no.

18  Q.   Well, did you see the client lists, the patients?

19  A.   I did.

20  Q.   And where did you see them?

21  A.   I believe he showed me on his computer, as far as I

22  remember.

23  Q.   And do you keep client lists on your computer?

24  A.   Well, on personal computer, no, we can't.  That's HIPAA

25  violation.  We can't do that.

1    Q.    Now, did there come a time, I think you said it was in

2    December of 2014, that an agreement, that a letter agreement

3    was drafted, negotiated?

4    A.    Yes.

5    Q.    And who drafted that agreement?

6    A.    My attorney, Andrew Rusczek, with Emily Kretchmer.

7    Q.    And what firm was Emily from?

8    A.    Krokidas & Bluestein.

9    Q.    And was that agreement signed?

10   A.    Yes, it was.

11   Q.    And are you familiar with -- who was it signed by?

12   A.    Initially signed by me and David.

13   Q.    And are you familiar with David's signature?

14   A.    Yes, I am.

15            MS. KAPLAN:  If I may, your Honor, I would like to

16   show the witness Exhibit 2.

17            THE COURT:  You may.

18            MS. KAPLAN:  And this is an agreed-upon exhibit.

19            THE COURT:  All right.  Is it going to be displayed to

20   the jury now?

21            MS. KAPLAN:  Yes.

22            THE COURT:  All right.  So, it is received.

23            (Exhibit No. 2 received into evidence)

24   BY MS. KAPLAN:

25   Q.    Do you recognize Exhibit 2?

1   A.   Yes, I do.

2   Q.   And what do you recognize it to be?

3   A.   This is our letter agreement, which was our initial

4   operating agreement for Allied Health Clinic.

5   Q.   And turning to Page 2 of that agreement, do you see your

6   signature?

7   A.   Yes, I do.

8   Q.   And do you see David Tkhilaishvili's?

9        THE COURT:   If we could just pause for a moment.

10  There are monitors for the folks in the back, and Ms. Beatty is

11  going to show you how to do it.

12       THE JUROR:   Thank you, your Honor.

13       THE COURT:   It is like it used to be flying in

14  airplanes.  Everybody got a screen that they can look at close

15  by?

16  BY MS. KAPLAN:

17  Q.   So, you identified your signature on that; is that

18  correct?

19  A.   That's correct.

20  Q.   And is there a date above it?

21  A.   There is a date above it, yes.

22  Q.   And that's December 12th of 2014?

23  A.   It's December 11, 2014.

24  Q.   Well, the date above your signature.

25  A.   Yes, it does.

1   Q.   And on the left of that page is there another signature?

2   A.   Yes, there's another signature.

3   Q.   Whose is it?

4   A.   David Tkhilaishvili.  David's.

5   Q.   And also signed on December 12th of 2014?

6   A.   Yes.

7   Q.   And you said that your attorneys prepared this agreement?

8   A.   With Emily, yes.

9   Q.   And what was your understanding of the basic terms of this

10  agreement?

11  A.   Well, the agreement was so I invest in the Clinic up to

12  $300,000.  Then after, when we opened the Clinic, become

13  operational, I had to invest another up to $200,000, and in the

14  event of the Clinic doesn't become operational, David will pay

15  50 percent of my investment back to me.

16  Q.   And in the third paragraph, Paragraph 3, do you see a

17  pledge of the pizza place?

18  A.   Yes, I do.

19  Q.   Can you tell us about that?

20  A.   Yes.  Shall I read this?

21  Q.   Just tell us what you understand this to be.

22  A.   So, one second.  It's, in other words, saying that in the

23  event it doesn't become operational, "...I contribute to AHC

24  and HMG.  You will not change your interest in Classic Pizza,

25  Inc...."

1              So, in other words, he put in the pizza as a

2      collateral.  He can't sell them or do anything to it or change

3      the ownership.  If it doesn't become operational, he will pay

4      my amount back to me, my investment, 50 percent of my

5      investment back to me.

6      Q.    And are you familiar with something called the "Special

7      Consent Authority"?

8      A.    Yes, I am.

9      Q.    And is the Special Consent Authority contained in this

10     agreement?

11     A.    Yes.

12     Q.    Can you tell us where?

13     A.    In the page --

14     Q.    First, tell us what it is.

15     A.    The Special Consent Authority is when I start investment I

16     told David, "David, so when I invest into something I want to

17     make sure that in the event of this agreement we can try to

18     negotiate this, but if we don't come to an agreement and I have

19     the final word, so I can make the best decisions for the best

20     for the Clinic, and that's only contingency."  I told him,

21     "That's the only contingency.  That's the only way I will

22     invest into the Clinic."  I made it very clear.

23     Q.    And did he agree?

24     A.    Yes, he did agree.

25     Q.    Show us in this agreement where that Special Consent

1    Authority is.

2    A.    On the second page on the bottom it says, "If there is a

3    deadlock and they cannot agree, Jambulat will work with their

4    respective attorneys to negotiate in good faith for 30 days.

5    If after 30 days there is still a deadlock, Jambulat and Victor

6    will use meditation (sic) to solve (sic)," it.  This is for the

7    meditation (sic).

8         Then on Page 3 it says, "Notwithstanding the

9    foregoing, until Victor recovers the entire investments in AHC

10   and HMG, in the event of deadlock on any matter voted on by

11   Victor and Jambulat, Victor will have authority to decide the

12   matter; provided..."

13   Q.    And you see on each of these pages at the bottom there is

14   a "DT" and a "VT"?

15   A.    Yes.  We initialled, both of us.

16   Q.    And is there another place, any other place where the

17   Special Consent Authority shows up in this agreement?

18   A.    Yes.  I believe if we turn to Page 4 under "Miscellaneous"

19   section it says the same thing:  "Notwithstanding anything to

20   the contrary herein, Victor has the authority to make a final

21   determination with respect to any decision of the members of

22   Class A Members or any other decision concerning AHC until

23   Victor recovers his entire investment in AHC and HMG."

24   Q.    Okay.  And then turning to Page 5, do you see where it

25   says, "Operating Agreement of Health Management Group"?

1    A.    Yes, I do.

2    Q.    And it sets forth who the Class A Members are and who the

3    Class B Members are?

4    A.    Yes.

5    Q.    And you and David Tkhilaishvili are the Class A Members?

6    A.    We are Class A Members, and Kenton, Jambulat, Olga, Nato

7    Rusia, they are Class B Members.

8    Q.    And who is Nato Rusia?

9    A.    Well, I never met that lady.  I believe I met her at my

10   repair shop some point one time.  And David told me, "There is

11   a person named Nato Rusia.  She's a doctor.  She gonna be

12   working for us as a doctor and put all the policies and

13   procedures in place."

14   Q.    Do you know if she is a doctor?

15   A.    I have no information.

16   Q.    You never met her?

17   A.    I never met her.

18   Q.    And for the Health Management Group was there Special

19   Consent Authority in this agreement?

20   A.    Yes, there was.

21   Q.    Where is that?

22   A.    On Page 7.  It says, "Notwithstanding the foregoing, until

23   Victor recovers his entire investments in AHC and HMG, in the

24   event of deadlock on any matter voted on by Victor and David,

25   Victor will have the authority to decide the matter..."

1   Q.   And above that is there a discussion about if there is a

2   deadlock and you can't agree David and Victor will work with

3   their respective attorneys to negotiate in good faith for 30

4   days?

5   A.   Yes.  We decided if in the event of before we are going to

6   argument or anything like that, we will try to work with

7   somebody else to resolve the problem.

8   Q.   And does the Special Consent Authority come up anywhere

9   else in this agreement?

10  A.   I believe it does on Page 8 under "Miscellaneous" section.

11  It says, "Notwithstanding anything to the contrary herein,

12  Victor has the authority to make a final determination with

13  respect to any decision of the members or Class A Members or

14  any other decision concerning HMG until Victor recovers his

15  entire investment in AHC and HMG."

16  Q.   Okay.  And then I had skipped ahead, but going back to

17  Page 1 of this Exhibit A, this is for the Allied Health Clinic,

18  correct?  Does it set out the members and the membership

19  interests?

20  A.   Yup.

21  Q.   And the Class A Members are who?

22  A.   The Class A Members -- may I have the Allied Health

23  Clinic?  This is the Health Management.

24  Q.   No.  If you look on Page 1 of Exhibit A.

25  A.   Yup.  Health Manage -- yes.  Okay.  Sorry.  What was the

1    question?

2    Q.    Who were the Class A Members?

3    A.    Class A Members on Health Management it's --

4    Q.    No.  Allied Health Clinic.

5    A.    Allied Health Clinic, me and Jambulat.

6    Q.    And then Kenton, David and Nato Rusia are Class B Members?

7    A.    Class B Members.

8    Q.    And then going to Page 9 of this agreement, do you see it

9    says, "Separate Letter Agreement Between Victor and David"?

10   A.    Yes.

11   Q.    Tell us what this is.

12   A.    Well, I knew David had some financial problem, he owed

13   some money to people, and I told him, "David, I'm willing to

14   give you $20,000.  Just pay off your debts, and you can have a

15   clear mind and soul.  You can work at the Clinic.  When the

16   Clinic becomes operational, just start paying me back."

17   Q.    Who did he owe money to?

18   A.    To David Tkhilaishvili.  Oh, who did -- oh, I have no

19   idea.  I knew -- he told me he had some debts.  I don't know

20   who he owed the money to.

21   Q.    And do you recall when it was that you first made an

22   investment of money into Allied Health?

23   A.    I believe the first time was late 2014.

24   Q.    Do you know how much it was?

25   A.    If I can take a look, I'll -- I believe the first one I

1 invested was 3,600, the very first one.  I have to take a look

2 my -- the investment chart, so --

3 Q. Okay.  Well, all right.  Did you make small investments at

4 first?

5 A. At the beginning I paid 3,600, 1,100, 1,000, but at the

6 end of 2014 I gave a $70,000 big investment into a general

7 contractor.

8 Q. Where did you get these monies?

9 A. I saved them.  I had a savings account, and I sold

10 actually one of my real estate properties prior to that in

11 Waltham, and my auto repair shop was successful, and plus my

12 rentals gives me positive revenue, and I saved it.

13 Q. And did you later invest other money?

14 A. I did.  I invested a lot more money, yes, I did.

15 Q. And did you take loans to invest this money over the

16 course of time?

17 A. Yes, I did.

18 Q. How many loans?

19 A. I believe I took, all together, four or five loans to

20 invest into it.

21 Q. Who did you take loans from?

22 A. I took the loans from private citizens, and I took the

23 loans against equity of my house.  I took the loans against my

24 rental property, and I took loans against my business.  I

25 mean --

1    Q.    When you say "private citizens," who are you referring to?

2    A.    I'm referring to my landlord.  His name is "Sal."

3    Q.    You say "my landlord."  Is that the landlord for Allied

4    Health?

5    A.    Allied Health Clinic landlord.

6    Q.    Did you sell anything of a personal nature to come up with

7    some money?

8    A.    I did.  And I sold my wife's jewelry to operate the

9    Clinic.

10   Q.    How much was your wife's jewelry worth that you sold?

11   A.    12,500.

12   Q.    And directing your attention to late 2014 into 2015, where

13   did you do your personal banking?

14   A.    Repeat the question again, please.

15   Q.    Where did you do your personal banking?

16   A.    What years?

17   Q.    2014.  Into 2014.

18   A.    Citizens Bank.

19   Q.    How many accounts did you have at Citizens Bank in 2014

20   through 2016?

21   A.    I have, I believe, one checking, one saving and one

22   business account.

23   Q.    And were you the signatory on these accounts?

24   A.    Yes.

25   Q.    Were these accounts in your name?

1    A.    Yes, they are.  Mine and my wife's, two names, joint

2    account.

3    Q.    What's your wife's name?

4    A.    Elen Gevorgyan.

5    Q.    And were the checks in her name?

6    A.    Yes.  On the top, but I was on the account too.

7    Q.    Why were the checks in her name?

8    A.    Well, the way I have, I sort of in my mind, I'm like I

9    will use this account to pay every expense of the Clinic.

10   That's easier for track down everything.  Then, in case if

11   something happens, you know, God forbid to me or something

12   goes, my wife has the full access to it.

13   Q.    Did there come a time that there was an organizational

14   meeting for Allied Health?

15   A.    Yes, there was.

16   Q.    Do you remember when that was?

17   A.    I believe it was May 3rd of 2015.

18   Q.    And do you know where it was held?

19   A.    Yes.  It was at David's apartment in Quincy,

20   Massachusetts.

21   Q.    At David's apartment?

22   A.    Yes.

23   Q.    That's David Tkhilaishvili?

24   A.    David Tkhilaishvili's apartment.

25   Q.    And what was the purpose of having an organizational

1    meeting?

2    A.   We meet, organizational meeting, and at the meeting I was

3    elected as the chairperson, and Kenton was secretary, and we

4    were discussing the budgets and discussing the operation of the

5    Clinic and Management.

6    Q.   Who else was there?

7    A.   Olga Dorofyeyeva was there too.  At the meeting was me,

8    James Tkhilaishvili, David Tkhilaishvili, Kenton Fabrick, Olga

9    Dorofyeyeva.

10   Q.   And were you appointed to do something in connection with

11   that meeting?

12   A.   Yes.  I was appointed as the chairperson.

13   Q.   And what happened at that Board meeting?

14   A.   We discussed the budget, we discussed the operation of the

15   Clinic.

16   Q.   And at the Board meeting was the letter agreement that you

17   and David had signed adopted as the operating agreement?

18   A.   Yes.  It was clearly the letter agreement was adopted and

19   signed, and everybody acknowledged that that was the operating

20   agreement, and everybody signed it.

21   Q.   And were there minutes prepared of this meeting?

22   A.   Yes, there were.

23        MS. KAPLAN:  And may I, your Honor, show the witness

24   Exhibit 3, which is in evidence?

25        THE COURT:  All right.  It is received.

```
 1              (Exhibit No. 3 received into evidence)

 2         MS. KAPLAN:  I should say it has been agreed upon.

 3  BY MS. KAPLAN:

 4  Q.    And do you recognize this?

 5  A.    Yes, I do.

 6  Q.    What do you recognize it to be?

 7  A.    That was the first Organizational Meeting.

 8  Q.    And is it signed by anybody?

 9  A.    Yes, it is signed.

10  Q.    Well, are these the minutes from that meeting?

11  A.    That's the minutes of the meeting, which is signed by me,

12  Jambulat, Olga, and Kenton and David.

13  Q.    And you have seen those signatures before?

14  A.    Well, I haven't seen this.  The only signature before that

15  I seen, just me, my signature, and David's, but those are -- I

16  believe those are their signatures.

17  Q.    Well, have you seen Kenton Fabrick's signature before?

18  A.    Yes, I did.

19  Q.    So, do you recognize his signature on this document?

20  A.    All of them I recognize.  All of the signatures, I

21  recognize them.

22  Q.    Okay.  And these minutes reflect what took place at that

23  organizational meeting?

24  A.    One more time the question?

25  Q.    Do these minutes reflect what actually took place at that
```

1   meeting.

2   A.   Yes, it did.

3        MS. KAPLAN:   I offer it into evidence, your Honor, and

4   ask that it be published to the jury.

5        THE COURT:   Yes, I have received it, so it can be

6   published to the jury.

7   BY MS. KAPLAN:

8   Q.   And I would ask that you turn to -- you see the first page

9   is the organizational meeting --

10  A.   Yup.

11  Q.   -- of the first LLC members of Allied Health Clinic?

12  A.   Yes, I do.

13  Q.   And the second page are the signatures?

14  A.   Yes.

15  Q.   And then on the third page, this is Kenton Fabrick, who is

16  attesting that these are the things that happened at the

17  meeting?

18  A.   Yes.

19  Q.   And do you see the fourth bullet?

20  A.   I do.

21  Q.   And what does that say?

22  A.   It says, "The Letter Agreement between Vahagn Victor...and

23  David Tkhilaishvili dated December 11, 2014," which is letter

24  agreement, "a true and correct copy of which is attached hereto

25  as Attachment B, is the 'operating agreement' that is referred

1    in paragraph 5 of the Minutes and which was presented at the

2    Meeting."

3    Q.   And then the next page is Attachment A and Attachment B.

4    What's behind Attachment B?

5    A.   Even in the organizational meeting, if we read that, it

6    says, "The Secretary presented an overview of the" Minutes, and

7    that was the acknowledgement of our operating agreement, too.

8    Q.   And then attached is Exhibit B?

9    A.   Mm-hmm.

10   Q.   Is that the letter we were just talking about, the letter

11   agreement?

12   A.   Yes, it is.

13   Q.   Can you tell us -- so, when you made these investments of

14   money into Allied Health Clinic how did you make the

15   investments?  Was it cash, was it check?

16   A.   Checks.

17   Q.   And where did you -- did you deposit the checks?

18   A.   Initially I put all the money from my personal account.

19   That agreement was after the Clinic would become operational or

20   we receive the license from the Department of Public Health, we

21   will start paying everything from the Health Clinic and Health

22   Management account.

23   Q.   Where were the bank accounts for Allied Health Clinic and

24   Health Management Group?

25   A.   In Bank of America.

1    Q.    And you told us that David Tkhilaishvili -- well, what did

2    you tell us David Tkhilaishvili's role was at Allied Health

3    Clinic and Health Management?

4    A.    Well, in the Health Management David was going to be

5    day-to-day manager of the Management, and that Jambulat's role

6    was supposed to be day-to-day manager of the clinical part of

7    the --

8    Q.    And after you signed this agreement in December of 2014,

9    were there certain bills that had to be paid?

10   A.    Yes.  David paid certain bills.  Well, there were two

11   parts.  There were bills I learned later on he had some debts

12   he paid, but also when I signed it very next day, I believe, we

13   sent, I believe it was $22,000, close to that, to our company

14   attorney.  I had to pay the landlord two checks.  I believe it

15   was 5,500, 5,502 and 3,600.  Then there was construction fees.

16   So, we ended up putting, like, $100,000 within the first week

17   or two.

18   Q.    Were you there on a daily basis?

19   A.    No, I was not on a daily basis.

20   Q.    Were bills coming in that had to be paid?

21   A.    I had no idea, so David just gave me the bills, and I paid

22   them.

23   Q.    Where did you pay them from?

24   A.    From my personal account.

25   Q.    And would you have David Tkhilaishvili show you receipts,

1   or did he just ask you for the money?

2   A.   No.  He would have asked me for -- initially there was

3   nothing.  He just would bring, "Victor, we have to pay this

4   amount, we have to pay that amount."  He could have write on a

5   piece of paper, "We need $6,00 to this person," or, "We need

6   $3,000 to this one," and I would write out the check.

7   Q.   Who would write out the check?

8   A.   I.

9   Q.   From your personal account?

10  A.   From my personal account.

11  Q.   And after December 2014, so in early 2015 was the Clinic

12  making any money in the beginning?

13  A.   No, there was nothing.  There was nothing making money.

14  Q.   And what did you need to become operational?

15  A.   Well, we needed a few things.  First, we had to complete

16  the construction.  Then we had to submit the paperwork to the

17  Department of Public Health and to be accepted as a Clinic.

18  Then, after that, we had to have credentialing with the

19  insurance companies.  Then we could be an operational clinic.

20  Q.   What kind of construction did you have to do?

21  A.   Our architect had drawings.  We had to spend close to, it

22  was I believe $176,000 was estimated for the repair.

23  Q.   But Davis Clinic was there before, correct?

24  A.   That's correct.

25  Q.   Why did you have to do all that construction?

1    A.    Because they didn't have the clinical standards.

2    Q.    So, can you explain that to us, what do you mean by that?

3    A.    So, the PC and the Clinic standard requirements are

4    different between the Department of Public Health.  The

5    entrance has to be different, and the cooling/heating system

6    has to be different.  So, when David gave it to me, he said,

7    "This is the only way we have to be licensed as a clinic from

8    the Department of Public Health, we have to complete this

9    construction."

10   Q.    Was Davis Clinic a PC as opposed to an LLC?  Is that what

11   you're saying?

12   A.    It's not about the LLC.  He was a PC, in other words, was

13   a doctor's office.  So, there's difference between doctor's

14   office and the Clinic.  So, at his previous practice the doctor

15   owns pretty much the practice, and at the Clinic,

16   non-professional, not a doctor.  I believe 22 or 27 states in

17   the United States they are allowed to be owner of the Clinic.

18   No physician can own the Clinic.

19   Q.    So, you got an estimate from a company?

20   A.    David provided me the estimate.

21   Q.    And that was for $176,000?

22   A.    I believe so.

23   Q.    And who was the estimate from?

24   A.    The person's name was Hung.  David knew him.

25   Q.    When was the construction work supposed to start?

1    A.    Well, he started in December of 2014, which that was a big

2    mistake.

3    Q.    Who is "he"?

4    A.    David.

5    Q.    Why was that a mistake?

6    A.    As I told you before, I had done some -- buy the house and

7    sold it, and I know certain regulations about City Hall, and

8    one of the most important factors, you have to have what is

9    called a "permit" in order to start the construction.  And

10   then, besides having a permit, you have to check with the

11   Zoning Department and make sure the zoning allows at that

12   specific location to have a clinic.  I asked David to check it,

13   and David got back to me, says, "I checked it.  Everything was

14   fine."

15   Q.    And did Allied Health actually have a permit to start the

16   construction?

17   A.    No, they did not.

18   Q.    And what about the zoning?

19   A.    Zoning wasn't allowed for having a clinic, either.

20   Q.    Zoning wasn't what?

21   A.    Did not allow to have a clinic at that specific location,

22   that premises.

23   Q.    Who was responsible for overseeing the construction of

24   Allied Health?

25   A.    David.

1    Q.    And who was going to pay for that?

2    A.    I was going to pay for it.

3    Q.    So, did the construction actually start?

4    A.    He started the construction without the permit, yes.

5    Q.    Did you discover that?

6    A.    I discovered when he was overseas.

7    Q.    And what did you do?

8    A.    Well, I went when he was overseas, and I want to make sure

9    the construction goes fine, and I was going for that two weeks,

10   I believe, back and forth more often, and I noticed that there

11   was no sign on the window for permit, and I asked the general

12   contractor, "Where is the permit?"  He's, like, "Well, it will

13   be tomorrow, tomorrow."  Then Monday I told him, "Listen, if

14   you don't provide me permit tomorrow, I'm going to personally

15   stop the construction.  You can't work here."  Then he told me

16   they don't have a permit.

17   Q.    So, did you stop the construction?

18   A.    I personally stopped the construction.

19   Q.    How long was the construction stopped for?

20   A.    I would say approximately three months.

21   Q.    And during that three months did you obtain a permit?

22   A.    Well, we end up hiring the attorney in Quincy, Ed Flemming

23   of Flemming.  He helped us to prepare the paperwork, and we

24   went -- of course it cost us a lot of money -- we went to the

25   Quincy City Hall, and finally we were able to grant the waiver,

1    and they provided us with the permit to start the construction.

2    Q.   And were there issues with the zoning?

3    A.   Yeah.  Zoning didn't allow it.  They told us, "At that

4    premises you can't have a medical clinic."

5    Q.   And was the attorney helping you with that issue as well?

6    A.   He was helping me, yes.

7    Q.   How much did you pay for that attorney?

8    A.   The attorney overall I believe we paid close to $10,000,

9    but overall it's cost us about $30,000, because we had to get

10   involved -- I had to get involved with the consulting, a few

11   other consulting company as well as our company attorney.  So,

12   it ended up costing us close to $30,000.

13   Q.   Who paid for that?

14   A.   I did personally.

15   Q.   From your personal account?

16   A.   From my personal account.

17   Q.   Now, did you learn that there was an issue with the

18   construction from somebody in particular?

19   A.   Well, initially, again, I wasn't going to the Clinic, so

20   David was looking, and he would have come to my house and would

21   have provided me the report of how things going, and Olga

22   Dorofyeyeva constantly told me that --

23          MR. TUMPOSKY:  Objection.

24          THE COURT:  No, I will permit this.  This is not

25   necessarily for the truth of the matter but simply that this is

1    what Mr. Torosyan was informed of and what he understood at the

2    time.

3    A.    So, Olga Dorofyeyeva told me, Victor, that's not what

4    going on.  Why don't you go to the Clinic and take a look

5    yourself.

6    Q.    Where was she working out of at the time?

7    A.    At that time -- she was supposed to work when we opened

8    the Clinic, and at the same time she had to work with, prepare

9    the paperwork with Kenton Fabrick at the Allied Health Clinic.

10   Q.    Where were they working out of?

11   A.    Out of that office, I would guess, but at the same time

12   they moved the office to David's apartment.

13   Q.    In Quincy?

14   A.    In Quincy.

15   Q.    What did you say to Olga?

16   A.    I told her, "No, it's fine."  The funny part was that

17   David the night before was at my house, and I asked him, "How's

18   the construction?"  He's like, "Well, just got to paint it and

19   we'll be done in a couple of days."

20   Q.    And then the next day you heard from Olga?

21   A.    The next day Olga came to the repair shop and says,

22   "Victor, you have to come.  If you don't believe me, you have

23   to come."

24   Q.    And did you not believe her?

25   A.    I did not.  So, Olga was dating David's brother Jambulat,

1   and then, as far as I know, Jambulat -- they broke up, and I

2   always thought sort of because Jambulat left her she's sort of

3   taking revenge.  Plus, there was no reason for me to believe

4   her and not believe my friend.  But I went and I went the same

5   day when she came, and I went the very same day to the Clinic.

6   Q.   And do you remember when this is, now?

7   A.   I would say it was approximately May of 2015.

8   Q.   And when you got there who else was there?

9   A.   David was there, Kenton was there.

10  Q.   And what did you see?

11  A.   There was no walls, there was nothing.  The whole place

12  was a mess.

13  Q.   What did you do?

14  A.   Well, I'm, like, "David, what's going on?  You're telling

15  me something and in reality it's something different," and he

16  started, "I will explain to you.  They said it takes two days."

17  I mean, I told him, "Listen, you lied to me, I mean, you

18  crossed a line and as a friendship, as a business partner, you

19  can't misrepresent something like this.  This is a serious

20  problem."  We had an argument.

21  Q.   And when Olga came to your repair shop, where did you

22  meet?  Did you have an office there?

23  A.   No.  It's just a waiting area.

24  Q.   And what else did she tell you besides about the

25  construction?

1    A.    She told me David is screwing me over and lying to me and

2    stealing money from me.

3          MR. TUMPOSKY:  Objection.

4          THE COURT:  Just a moment.  Let me just respond.

5          What I am doing, ladies and gentlemen, is narrowing

6    the receipt of this evidence.  It is really notice that is

7    going on here.  Whether what Olga said was true or not true is

8    not at issue at this point.  What is relevant for you to

9    consider is what it was that Mr. Torosyan heard and what that

10   did as a foundation for any further acts that he took in the

11   case.  So, I overrule the objection with that limiting

12   instruction.

13   BY MS. KAPLAN:

14   Q.    Tell us what she told you.

15   A.    She told me that David is lying to me and misrepresenting

16   everything, and I should start checking things a little -- take

17   things a little more seriously.

18   Q.    Did she tell you about any altercations that she had had

19   with David?

20   A.    She told me later on they had an argument, and she told me

21   later on that David conduct something bad towards his

22   ex-girlfriend.

23   Q.    When you say "later on," do you remember when that was?

24   A.    I don't.  I believe it was June, in the middle of June.

25   Then, after that incident, I start talking with Olga little

1    more.

2    Q.   After she told you about the construction?

3    A.   Yeah.  I started sort of trusting her more then, and I

4    started checking things after May, and I discovered she was

5    right.

6    Q.   So, when the next conversation that you had with Olga,

7    when she is telling you some of these things, she told you that

8    she had -- tell us what she told you.

9    A.   She told me a few things.  The first thing Olga told me

10   about the construction.  Then, after the construction, about

11   the entire -- the money and investment, it's not correct.  Then

12   she told me that David knocked down his girlfriend at the

13   office.

14           MR. CRUZ:  Objection, your Honor.

15           THE COURT:  Again, I am going to permit this for

16   notice purposes, not for the truth of the matter.

17   A.   As well as David one time got very angry and flipped

18   the -- kicked the table or flipped the table and was really,

19   she was very afraid of her at that point.

20   Q.   Who did she tell you that David got angry and flipped the

21   table at?

22   A.   Well, flipped the table was with Kenton and her, and also

23   she told me that David knocked down at the Clinic his

24   girlfriend, which is named Kristina Ursova.

25   Q.   Was that at Davis Clinic or Allied?

```
 1   A.    No, it was at Davis Health PC.

 2   Q.    Do you recall her telling you anything about Jambulat

 3   Tkhilaishvili?

 4              MR. TUMPOSKY:  Objection.

 5              THE COURT:  No, he may answer.

 6   A.    Yes, she did, she did.  Later on she told me that Jambulat

 7   himself several times used force towards her --

 8              MR. TUMPOSKY:  Objection.

 9   A.    -- as well as the --

10              THE COURT:  I am overruling the objection again on the

11   same basis.  That is, I am limiting it to notice.

12   A.    So, used the force towards --

13              MS. KAPLAN:  I'm sorry.  Let the judge finish.

14              THE COURT:  I'm limiting it to the question of notice

15   here.  So, you may continue.

16   A.    So, she told me Jambulat personally used the force towards

17   her as well, and also Jambulat had some argument with somebody

18   in Downtown Boston.  One day she picked her up on the --

19              MR. TUMPOSKY:  Objection.

20              THE COURT:  Overruled.

21   A.    And that she find out that David stabbed somebody -- I

22   mean Jambulat stabbed somebody in Downtown Boston.

23              THE COURT:  I emphasize, ladies and gentlemen, that

24   this is not being received for the truth of the matter, and it

25   is up to you to decide whether or not you credit testimony that
```

1  Mr. Torosyan heard this information, and we are not dealing

2  with a case about some other assault some other place, but it

3  may be relevant to you to decide what it was that either of the

4  defendants thought they were inducing in Mr. Torosyan, that is,

5  whether or not they were inducing fear of some sort of harm,

6  physical harm.

7  BY MS. KAPLAN:

8  Q.   When you heard this, how did you feel?

9  A.   I felt -- I felt terrible.  I was very surprised, and I

10  didn't know what to do.  And I talked even with David, and I

11  didn't talk with Jambulat.  I asked David if he did such a

12  thing, if he went crazy at the office with the Kenton and Olga

13  and he knocked down Kristina.  He admitted, says he did, and I

14  asked him, "Why did you do that?"  I mean, he blamed me because

15  it was my fault he flipped on Olga and Kenton.  That's what he

16  told me.  And about Kristina he says, "Everybody has to learn

17  their lesson.  The same thing with the Clinic.  People have to

18  learn their lesson."

19  Q.   The delay in the construction, was there a financial cost

20  in the delay?

21  A.   It was a big financial cost, yes.  So, it was the end of

22  January I asked for a meeting at the office.  I don't know

23  remember if Jambulat being there or not, but I know it was me,

24  David, Olga and Kenton, and I told them, "Look, if we fail to

25  obtain a permit from the City of Quincy, we're going to be

 1  shutting down this whole thing."  And then after two months,

 2  three months we were able to sort of solve the problem, but it

 3  cost us a lot of money and a lot of time.

 4  Q.   How much did it cost?

 5  A.   Overall, close to $30,000.

 6  Q.   Oh, that was the $30,000.  Okay.

 7  A.   Yeah.

 8  Q.   Now, did you hire any consultants to help out at Allied

 9  Health?

10  A.   Yes, I did.

11  Q.   Who did you hire?

12  A.   Well, there were a few consulting companies I hired.  So,

13  one of them was Benchmark.  The other was Gargulio & Rudnick,

14  and the third one was David Ball, Ball Consulting.

15  Q.   And who was Gargulio --

16  A.   Gargulio & Rudnick.

17  Q.   Is that a law firm?

18  A.   They were a law firm, but they were not representing us as

19  legally.  They were consulting us.

20  Q.   And who was Bob Griffith?

21  A.   I believe -- I know he works at the firm, and he was

22  consultant for Allied Health, and also he is supposed to be the

23  mediator in the event of me and David were having an argument.

24  Q.   Okay.  And do you know whether -- how did you come to Bob

25  Griffith?  How did you find him?

1    A.   David introduced him to me.

2    Q.   Did he previously represent David?

3    A.   David told me he represented him in the previous case.

4    Q.   And he was a lawyer?

5    A.   He's a lawyer.  He represented him.

6    Q.   And did Allied Clinic have its own attorneys?

7    A.   Yes.

8    Q.   Who was that?

9    A.   Krokidas & Bluestein.

10   Q.   And the defendants, did they have their own attorneys?

11   A.   Well, to my belief, that initially was Krokidas &

12   Bluestein, but later on, when we start negotiating on operating

13   agreement and they hired, because I told them we have to both

14   represent by the attorney, I believe his last name is Jeremy

15   Steinberg, I believe.

16   Q.   Sternberg?

17   A.   Sternberg.

18   Q.   Who paid for Allied's attorneys?

19   A.   The agreement was any legal fee which has any connection

20   with the Clinic we would have paid by the Allied Health, and it

21   came out of my personal account.

22   Q.   Who paid for the defendants' attorney?

23   A.   I did.

24   Q.   From your personal account?

25   A.   Personal account.

1    Q.   And why did you pay for the defendants' attorneys?

2    A.   Well, again, that was the agreement, so anything we spent

3    on attorney or legal fees has to do with the Clinic, so that

4    was the agreement, we would pay from the Clinic account, which

5    initially was my account.  He didn't have the money or he would

6    have paid it.  So, that's what he told me.

7    Q.   Did there finally come a time where Allied Health received

8    a Certificate of Occupancy for the building?

9    A.   Yes.

10   Q.   And do you remember when that was?

11   A.   If I take a look, I believe it was in August, but I have

12   to take a look.

13         MS. KAPLAN:  If I may show the witness Exhibit 6,

14   which has been agreed to by the parties as well, your Honor?

15         THE COURT:  Yes, and that is received.

16         (Exhibit No. 6 received into evidence)

17   BY MS. KAPLAN:

18   Q.   Do you recognize that document?

19   A.   Yes, I do recognize it.

20   Q.   And what do you recognize that to be?

21   A.   This is from City of Quincy, Certificate of Occupancy.

22   Q.   And does this refresh your recollection as to when it was

23   issued?

24   A.   Yes.  Date of issue is August 6, 2015.

25   Q.   Now, at some point in August of 2015 did Allied have an

1    annual meeting?

2    A.    Yes.

3    Q.    And what was the purpose of that meeting?

4    A.    We were having another Board meeting for the Minutes of

5    the Clinic, and that was -- I believe it was August 22nd.

6    Q.    Where was that meeting?

7    A.    At the Clinic in the waiting room.

8    Q.    Who was present?

9    A.    At the Clinic was me, David, Jambulat, Kenton and Bob, Bob

10   Griffith.

11   Q.    And what happened during that meeting?

12   A.    Well, we discussed like we are going to get -- have the

13   final approval from the Department of Public Health initially,

14   and where we're going to be doing it, so, in other words, the

15   structure of the Clinic, the policies and the procedures.

16   That's what initially we discussed.

17   Q.    And after that meeting was over did something happen?

18   A.    Yes, it did.

19   Q.    What happened?

20   A.    After that meeting David and Jambulat came to me, was,

21   like, "Can we go to the next room and talk?"  And I told them,

22   "Yeah, it's fine, let's talk."  And then David presented me a

23   piece of paper, which I don't believe that he wrote that out,

24   because that's too much legal language, saying, "Listen,

25   there's a buyer, somebody wants to buy the pizza shop, and I

1    really want to sell it, because that takes my time, and I want

2    to sell that so I can -- me and my brother can be full time at

3    the Clinic."

4    Q.    What was your reaction?

5    A.    Initially I thought that's a good idea, so I know he's

6    selling, you know, and he want to sell it to spend more time at

7    the Clinic, which makes sense, and he will have some money, he

8    will pay some of his debts.  Initially, it did make sense to

9    me.

10         MS. KAPLAN:  And with the Court's permission I would

11   like to show the witness Exhibits 4 and 5, which have been

12   agreed to as well.

13         THE COURT:  Yes.

14   BY MS. KAPLAN:

15   Q.    First, looking at Exhibit 5, do you recognize that

16   document?

17   A.    Yes, I do.

18   Q.    And is this the agreement that he brought with him?

19   A.    Yes, it is.

20   Q.    And can you tell us what this agreement says, basically?

21   A.    Well, basically I can't read it, but what it says,

22   initially it said to release the -- amend our initial operating

23   agreement.  Then that was quick, and I'm like, "Okay, that

24   makes sense, but now the question is within a month or two what

25   if we don't get our license from the Department of Public

1     Health?  And I told him, "All right.  Only contingency, only

2     conditions I will put the contingency to list this if you keep

3     the money in an escrow account in the event if we don't obtain

4     the license so you can pay me back."  And he agreed, even

5     though that wasn't -- that didn't give me legal protection, but

6     that's what I came up with, and I quickly wrote that on a

7     computer and printed it, and we both signed it.

8     Q.    So, Exhibit 4 is the document that David Tkhilaishvili

9     presented to you amending the letter agreement?

10    A.    Yes.

11    Q.    And basically saying that you would release the pizza

12    place so they could sell it, correct?

13    A.    That they can sell it, correct.

14    Q.    And you signed this agreement?

15    A.    I did.

16    Q.    And David Tkhilaishvili signed this agreement?

17    A.    He did.

18    Q.    And why is it that you think that he didn't write this?

19    A.    Well, this is not his language.  He doesn't have this

20    vocabulary, I believe.

21    Q.    And Exhibit 5, is this what you were just talking about,

22    that you wanted to make sure that David Tkhilaishvili held onto

23    the money in the event that he sold the pizza place?

24    A.    Correct.

25    Q.    And you signed this, and David Tkhilaishvili signed this

1    as well?

2    A.    Correct.

3    Q.    And did you testify that Jambulat Tkhilaishvili was

4    present?

5    A.    He was there too, yes.

6    Q.    And these were signed on August 22nd of 2015?

7    A.    Yes, both the same date after the meeting.

8    Q.    And what happened after that meeting?

9    A.    Surprisingly, right after I signed that, like less than a

10   blink of eye, they both of them turned 180 degrees, they become

11   different person.  They started raising their voice on me and

12   telling me that, "You know what?  You have to give up" my

13   Special Consent Authority, and then I have to give up some

14   percentages for myself, and then threatened if I don't agree on

15   their demands they can, first of all, break down everything,

16   burn down the Clinic.  And then the second thing, this came

17   from Jambulat, says -- and David confirmed that later -- says,

18   saying, you know, he gonna get involved, the ten outlaws

19   involved, and either they come here or I have to go to Athens

20   in Greece and meet them to resolve this problem.  And they are

21   telling me -- I mean, that was one of the worst day of my life.

22   And the people, the friends, and just looking at me and telling

23   me if I don't agree with them and me and my family, we're all

24   going to be hurt, and there were nine families, nine people who

25   had a problem with them.  They disappeared from here.

1   Q.   Where were you when this conversation took place?

2   A.   In the room on the left side.  There's a small room, the

3   medical assistant room.  We were there.

4   Q.   Who else was there?

5   A.   Me, him, and his brother, the three of us.

6   Q.   David and Jambulat Tkhilaishvili?

7   A.   Yes.

8   Q.   Was there anyone else there?

9   A.   No.

10   Q.   And what was the tone of the voice?

11   A.   They were yelling at me.  They were very loud and angry on

12   me and just screaming at me.

13   Q.   Were you sitting or standing?

14   A.   We were standing.

15   Q.   Where were they standing?

16   A.   They were standing by the door, and I was in the corner.

17   Q.   What did you say to them?

18   A.   I was surprised.  First of all, knowing David and -- I

19   mean, I wasn't close with Jambulat, and I wasn't, first of all,

20   expecting, and I was shaking, and I tell them, "Guys, come on,

21   why are you doing this to me?"  And they told me, "We don't

22   need you to tell us what to do anymore, and this is what's

23   going to happen."  And I told them, "We had agreed and we have

24   a contract," and they said, you know, David replied right

25   there, says, "My brother doesn't live by the contract."  I'm

1  like, "David, you know, we agreed on something.  We should

2  honor that."  They start repeating the same thing, and I told

3  them, "All right.  Let me talk with my lawyer, see what I can

4  come up with."

5  Q.   How did the meeting end?  Is that how it ended?

6  A.   It ended, yeah.  So, they repeatedly told me the same

7  thing, and I was shaking, and I just got out and I sort of

8  shaking.  I didn't know what to do, and I was very, very

9  confused.

10  Q.   Did you leave?

11  A.   I left.  I left, yes.

12  Q.   Did you tell anyone what had happened?

13  A.   Yes.  I told -- I discussed that with Bob, and I discussed

14  that --

15  Q.   Bob who?

16  A.   Bob Griffith.  And I discussed that with my attorney, and

17  I discussed that with my family, of course.

18  Q.   And at that time, so it's August, late August now, how

19  much money had you invested in Allied Health Clinic?

20  A.   At that time I believe already it was close to $400,000.

21  I have to look, but I believe it was about $400,000.

22  Q.   And shortly after this incident occurred did you get a

23  phone call from one of the defendants?

24  A.   Yes, David, from David.  First of all, David I learned

25  that, so right after that he texted me something saying, "Oh,

1    you know what happened with Kristina's mother?"  Like, he will

2    play the game that one day -- one second he would have

3    threatened you.  The next second he would have sort of text you

4    something like everything was okay.  And he called me up and I

5    was in a room when he called me, in the living room, and I was

6    talking to him, like, "David, you know, what's going on, man?

7    I mean, come on.  That's not what we agreed, you know.  We just

8    got to figure this out.  I put all the money I had and I worked

9    hard, and you know how I work and how I earned that money.  How

10   can you do it to me?"  And he's like, "Hey, that's what it is.

11   I can't control my brother."  I'm like, "Why don't we go --

12   let's go to talk with Bob."  He's, like, "Well, I don't need

13   anybody to tell me what to do, you know."  And then we start

14   talking.  He got angry and screaming on the phone.  He's, like,

15   "I'll go to Bob's house and I'll put a bullet in his head."

16   Q.   Did he say anything to you during that conversation on the

17   phone about Jambulat?

18   A.   Yes.  He says he can't control his brother, his brother

19   shot the people in the head, and that was very, very scary.

20   Q.   When you suggested -- how long did the conversation last?

21   A.   I don't remember.  It could be about 10 minutes, 10 to 20

22   minutes.  I don't remember.

23   Q.   And you said you had suggested that you go to talk to Bob

24   Griffith?

25   A.   Yes, absolutely.  I told him, "Let's go to talk with Bob,

1    see what he can do," you know.  I mean, I'm certainly not going

2    to go to see outlaws.  That's not what we, you know, live with,

3    so there is no point for me to see anybody.  I'm not going to

4    go to Greece, and I'm not going to meet with anybody.  I'm just

5    going to talk with attorneys, see what we can do.

6    Q.   And is that, in fact, what the letter of agreement

7    provided --

8    A.   Yes.

9    Q.   --  that if there was a dispute, that you would go to

10   lawyers or a mediator?

11   A.   Yes, we did.  That's what is provided.

12   Q.   Did you ever try and work things out between yourself and

13   the defendants and --

14   A.   Absolutely.

15   Q.   No.  With the consultant, with Bob Griffith?

16   A.   Yes, we did.  I talked with Bob, and I told him, "Listen,

17   this is what happened, okay?  And we need somehow to solve this

18   problem.  I put all this money.  Now we just choosing a

19   different way."

20   Q.   But did you ever meet with Bob with the defendants at the

21   same time?

22   A.   With him, no, I did not.  He didn't want to meet, and I

23   have on several occasions, "Let's meet."  He didn't want to

24   meet with him.

25   Q.   Again, during that phone conversation, what was the tone

1    of David Tkhilaishvili's voice?

2    A.   Oh, he was screaming, he was yelling.  I remember I told

3    him, "Listen, you know, I told this to my family, to my wife,

4    you know," and I remember him saying, "Victor, be a man.  You

5    know, you don't tell things to your wife."  I'm like, "David,

6    'be a man' is not me.  You don't tell things to your wife, God

7    forbid something happens, she has to know what's going on."

8    Q.   And how were you feeling at this time?

9    A.   I was shaking, I was shaking.  I was very, very scared at

10   that time.

11   Q.   What happened next after that August 23rd conversation?

12   A.   After that David went to Georgia to see his fiancee.

13   Q.   How do you know he went to Georgia to see his fiancee?

14   A.   Well, first of all, I bought the ticket through my credit

15   card.  The second that -- I knew he was going to go see his

16   fiancee.  I believe on that occasion before even, way before

17   then, before everything happened I gave him a gift as a ring to

18   give to his fiancee.

19   Q.   And how did you know for that particular trip he was going

20   to see his fiancee?

21   A.   He told me he was going to see his fiance.

22   Q.   And did you pay for that trip?

23   A.   I did, yeah.

24   Q.   What did you pay for?

25   A.   I used my credit card to pay for it.

1    Q.    Pay for what?

2    A.    For that trip.

3    Q.    What about that trip?

4    A.    So, I paid the ticket, yeah, I bought the ticket.

5    Q.    The plane ticket?

6    A.    Plane ticket.

7    Q.    And you gave him your credit card?

8    A.    Credit card.

9    Q.    Was this from the Allied account?

10   A.    I don't remember.  I believe it was my personal account,

11   but I don't remember which credit card I used.  I don't think I

12   had an Allied account at that time.  I believe it was my

13   personal credit card account.

14   Q.    How long was he gone?

15   A.    I think it was two or three weeks.

16   Q.    So, sometime in mid-September he came back?

17   A.    He came back, I believe it was September 11 or 12th.

18   Q.    Did he ever tell you that he was going to Georgia to meet

19   with investors?

20   A.    No, he did not.

21   Q.    Did you ever ask him when he goes to Georgia to find some

22   investors?

23   A.    No, I did not.

24   Q.    And when he came back did he ever tell you that he had met

25   with any investors?

1   A.    No, he did not.

2   Q.    Now, at some point did you learn that David Tkhilaishvili

3   had written two checks from the Allied Clinic account just

4   prior to going to Georgia?

5   A.    Yes, I did.

6   Q.    And when did you learn this?

7   A.    When he was gone.

8   Q.    How much were the checks for?

9   A.    Five and $6,000.

10  Q.    Do you know when he wrote those checks?

11  A.    It was right before everything happened, so he put the

12  money into the account for expenses.  Then he wrote the five

13  and $6,000 checks and left.

14  Q.    Was he authorized to write those checks?

15  A.    No, he was not authorized to sign that amount of the

16  checks for himself.

17  Q.    Did he ask you if he could write those checks?

18  A.    No, he did not.

19  Q.    And what checking account were they from?

20  A.    Bank of America.

21        MS. KAPLAN:  With the Court's permission, I would like

22  to show the witness Exhibits 7 and 8, which have been agreed

23  upon by the parties.

24        THE COURT:  Yes, you may, and they are received.

25        (Exhibit Nos. 7 and 8 received into evidence)

1    BY MS. KAPLAN:

2    Q.   Looking, first, at Exhibit 7, can you tell us what that

3    is?

4    A.   That's the Allied Health Clinic account.

5    Q.   And it's a check written to David Tkhilaishvili in the

6    amount of $5,000?

7    A.   Yes.  He, first of all, to our agreement he can't write up

8    this amount of checks.  It has to be both of us signature on

9    them.  The second thing is in the middle of the financial

10   hardship there is no way he could have taken even one dollar

11   extra for it.

12   Q.   What do you mean by that?

13   A.   I mean, I wouldn't allow to take him $11,000.  $11,000 is

14   a lot of money, when we spent over $400,000, and that was

15   30 percent more than we anticipated, and we haven't even opened

16   up the Clinic yet, and there's no point for him to --

17   Q.   So, you wouldn't have authorized it?

18   A.   No, I wouldn't.  No.

19   Q.   And looking at Exhibit 8, please, is that another Allied

20   Health Clinic check?

21   A.   Yes.

22   Q.   And it's in the amount of $6,000?

23   A.   Yes.

24   Q.   And he wrote that check?

25   A.   He did.

1    Q.   Did you authorize him to write that check?

2    A.   I did not.

3    Q.   And you learned about it after he was gone?

4    A.   After he was gone, yeah.

5    Q.   And at that time had the Clinic opened?

6    A.   No.

7    Q.   Were you seeing patients?

8    A.   No.

9    Q.   Were you making any money?

10   A.   No.

11   Q.   Had you ordered materials for the Clinic?

12   A.   Yes, we order.

13   Q.   What are "reagents"?

14   A.   "Reagents," that's compound or mixture you add to the

15   system to cause chemical reaction.  We add that to analyzer.

16   Q.   And is that something that's necessary to operate a

17   Suboxone clinic?

18   A.   Well, yes.  We have to have -- it's good to have your own

19   screening at your clinic.  That was an idea of, initial idea

20   from the doctor and from David, and that's the analyzer he was

21   referring he had one, then he sold one.  Then we had to buy

22   them in order to have a clinic, yes.

23   Q.   And where did you order these reagents from?

24   A.   The firm called Microgenics.

25             MS. KAPLAN:  With the Court's permission, I would like

1    to show the witness Exhibit 14, which is agreed upon.

2              THE COURT:  Yes, it is received.

3                    (Exhibit No. 14 received into evidence)

4    BY MS. KAPLAN:

5    Q.    Do you recognize Exhibit 14?

6    A.    Yes, I do.

7    Q.    What do you recognize it to be?

8    A.    This is the reagents we ordered for our analyzer.

9    Q.    And that's an invoice from Microgenics?

10   A.    Yes.

11   Q.    And can you see on the right side where Microgenics' is,

12   the office?

13   A.    Yeah.  They're in Fremont, California.

14   Q.    Now, at this time were you still trying to obtain a

15   license to operate?

16   A.    Yes.

17   Q.    And who did you have to get that license from?  I think

18   you said the Department of Public Health?

19   A.    The Department of Public Health.

20   Q.    Were your attorneys involved in that process?

21   A.    Our attorneys were involved in that process and the

22   consulting companies.

23   Q.    And did they tell you you needed to do something else in

24   order to get the license from the Department of Public Health?

25   A.    Well, yes.  We have to have our occupancy permit in place

1    in order to finalize the Department of Public Health.

2    Q.    But in addition to that, what else did you have to have?

3    A.    We had to have the policies, procedures down; we had to

4    have the operating agreement ready; we had to have all the

5    construction be completed in order to finalize for the --

6    Q.    And at that time did you have operating agreements, or did

7    you have the letter agreement?

8    A.    We had a letter agreement which served, that came up as

9    operating agreement.

10   Q.    But did the attorneys tell you that you needed formal

11   operating agreements?

12   A.    Yes, they did.

13   Q.    And were there attorneys involved in -- were there going

14   to be one operating agreement or two?

15   A.    There were two operating agreements, one for the Health

16   Management and the second one for the Health Clinic, and our

17   attorneys were negotiating the terms and conditions.

18   Q.    And who, in particular, was negotiating -- drafted and

19   negotiated the operating agreement?

20   A.    That was between Andrew Rusczek and Jeremy Sternberg.

21   Q.    So, Andrew was your attorney?

22   A.    Yes, and Jeremy for David and Jambulat.

23   Q.    And did you sign these agreements?

24   A.    Yes, I did.

25   Q.    And who else signed the agreements?

1    A.    All the members of the Clinic, which is beside Nato Rusia.

2    Q.    And do you remember when you signed the agreements?

3    A.    I believe I signed on -- that was the day before I left.

4    I believe it was September 11 or 12th.  If I looked I can

5    just --

6    Q.    This is 2015?

7    A.    2015.  2015, yes.

8    Q.    And at this time the defendants, did they sign?

9    A.    They all signed, yes, but David did not.  David signed

10   after he came back.

11   Q.    From Georgia?

12   A.    From Georgia, yeah.

13   Q.    Which you said was around September 12th?

14   A.    He came back at that time, but he came and I left, I

15   think.  He came and I left was the same day or day after, so we

16   didn't see each other.

17   Q.    And prior to you signing the agreements, these operating

18   agreements, had you already been threatened by the defendants?

19   A.    Yes, I did.  They did threaten me, yes, on August 22.

20   Q.    Why did you agree to enter into these operating agreements

21   with the defendants who had threatened you?

22   A.    Look, first of all, Robert Griffith, he tried to calm

23   everything down.  The second, I put all the money, and I put

24   everything I had into it, and what else should I have done?  I

25   mean, if my attorney advised me they don't necessarily have to

1    sign, I can sign the operating agreement and present that to

2    the Department of Public Health.  I didn't have to deal with

3    them.  But I'm, like, "No, let them, you know, know what's

4    going on."  In other words, it's eight years of my best years

5    in the United States, and losing the friend, it's very hard

6    thing for me, and I forgive them in my heart.  I'm, like,

7    "Okay, let's try to move on and see what's going on."

8            MS. KAPLAN:  If I may, your Honor, show the witness

9    Exhibits 9 and 10, which has been agreed upon by the parties?

10           THE COURT:  Yes.  It is received.

11           (Exhibit Nos. 9 and 10 received into evidence)

12   BY MS. KAPLAN:

13   Q.   Do you recognize Exhibits 9 and 10?

14   A.   Yes, I do.

15   Q.   And what do you recognize Exhibit 9 to be?

16   A.   Exhibit 9 is the agreement, operating agreement between

17   Health Management Group, Allied and Health Management Group.

18   Q.   And what is Exhibit 10?

19   A.   It is the same for the Allied Health Clinic, operating

20   agreement.

21   Q.   Are they the same terms for each, for the Health Clinic as

22   for the Health Management Group?

23   A.   Generally it's the same, but the percentages were

24   different.

25   Q.   Percentages of ownership?

1  A.   Ownership was different, yes.

2  Q.   Okay.  And do you see on the front page of both it's dated

3  as of September 11th of 2015?

4  A.   Yes, I do.

5  Q.   And who prepared these documents?

6  A.   Andrew Rusczek prepared this with Jeremy Sternberg.

7  Q.   And if we could turn to the signature page, which is 33 on

8  Exhibit 9.  And is that everybody's signature?

9  A.   Yes, everybody's signature.

10  Q.   And then for Exhibit 10, Page 34, signatures of everyone

11  there, Jambulat, Tkhilaishvili, yourself?

12  A.   Yes.

13  Q.   Olga, Kenton and David Tkhilaishvili?

14  A.   Mm-hmm.

15  Q.   And you said a few moments ago that you did not need to

16  get these signatures of the defendants, that you were told

17  that?

18  A.   Yes.

19  Q.   Does it say that somewhere in these operating agreements?

20  A.   Yes, it does.

21  Q.   Do you know where that is?

22  A.   I can look.  On Health Management -- I believe it doesn't

23  have the page number.  The section "Health Management Group

24  LLC.  Amended and Restated Operating Agreement."  In the first

25  section it says, "Until Vahagn Victor Torosyan recovers his

1      entire investment in LLC and -- "

2      Q.   So, let me stop you for a second.  So I think this is the

3      fourth page of Exhibit 9 that you're reading from.

4      A.   It doesn't have the page number.

5      Q.   I know, but can you count the pages so we know which page

6      it is?

7      A.   Yes.  The fourth page.

8      Q.   The fourth page, the "WHEREAS" section?  So, it's the

9      third full paragraph you're reading from?

10     A.   Yes, "WHEREAS" section on the last -- start in the middle.

11     Q.   Okay.  So, what are you showing us there?

12     A.   This provides me Special Consent Authority, that's what it

13     talks about.  It's, Until Vahagn Victor recovers entire

14     investment LLC and the Health Clinic, in the event of dispute

15     between David Tkhilaishvili and Victor Torosyan, Vahagn Victor

16     will have the authority to decide the matter based on

17     reasonable judgment regarding what is in the best interests of

18     the LLC.

19     Q.   So, now it's called, it went from the "Special Consent

20     Authority," it's called the "Vahagn authority"?

21     A.   "Vahagn authority."  That's what we call it.

22     Q.   Okay.  And then, looking at the last "WHEREAS" paragraph

23     on this page -- do you see this one (indicating)?

24     A.   Yes.

25     Q.   Is that where it says that you do not need the signature

1    of David Tkhilaishvili?

2    A.   Yes, it does.

3    Q.   Okay.  And then if we could go to Exhibit 10, which is the

4    Operating Agreement for Allied Health Clinic, and going to the

5    fourth page there, is the "Vahagn authority" in that second

6    "WHEREAS" paragraph as well?

7    A.   It's the same section, "WHEREAS," yes, it has -- it says

8    the same thing:  "In the event of dispute between Jambulat

9    Tkhilaishvili and Vahagn Victor Torosyan, Vahagn Victor

10   Torosyan will have the authority to decide the matter based on

11   reasonable judgment regarding what is the best interest of LLC

12   ('Vahagn Authority')."

13   Q.   And then in the last "WHEREAS" paragraph is the same as

14   what you just read and says that this agreement is adopted even

15   without the signature of Jambulat?

16   A.   Yes.  It is the last sentence, two sentences:  And hereby

17   adopt this Agreement, without the signature of Jambulat

18   Tkhilaishvili.

19   Q.   Now, you said these were basically the same terms as the

20   letter agreement except for the percentages, correct?

21   A.   That's correct.

22   Q.   So, if we could go to Exhibit 9 and go to Schedule I,

23   which is the last page of Exhibit 9, is this what sets out the

24   percentages for Health Management Group?

25   A.   Yes, it does.

1  Q.  Okay.  And when you're talking about the percentages, you

2  see "Percentage Interest" here?

3  A.  Yes, I do.

4  Q.  And some of the percentages change?

5  A.  Yes.

6  Q.  Can you tell us why?

7  A.  Well, I have to explain to you a little longer, if I may

8  have a few minutes.  So, initially when we started, David

9  presented the person Nato Rusia, and since we're going to be --

10  we're going to have the grant from the Department of Public

11  Health as a clinic, and I didn't want to have somebody at the

12  Clinic which I never met.  So, I told him, "I'm going to be

13  removing Nato Rusia from the percentages, and to be fair I'm

14  not going to keep her percentages by myself; I'm going to split

15  the percentages among both of us."  So, I gave him half of Nato

16  Rusia's percentages, and I kept half myself.

17  Q.  And did you give another --

18  A.  Then, additionally, I give the 5 percent back to Olga.

19  That was my decision.

20  Q.  Okay.

21  A.  Because we want to make sure -- we don't want somebody

22  that didn't put the money into the Clinic and be part of it,

23  and I want to make sure everybody who is the partner at the

24  Clinic, either they invested money into it or they worked at

25  the Clinic.

1   Q.   Well, did David Tkhilaishvili invest any money in the

2   Clinic?

3   A.   No, he did not invest the money, but the agreement him and

4   his brother, as the work order invest, so he was the second

5   section.  He was a working partner at the Clinic.

6   Q.   Did Kenton or Olga invest any money?

7   A.   They did not invest money, no.  But the agreement, and I

8   agreed from day one, so everybody, David, Kenton and Olga, they

9   get 5 percent to be as administrator and assistant

10  administrator of the Clinic, and they have to get 5 percent

11  interest from the Clinic.

12  Q.   So, these were people who were actually working at Allied

13  Health, correct?

14  A.   Yes, but at that time Olga was not, and I told Olga in a

15  meeting, and I met her, I told her, "Olga, you have to make a

16  decision if you want to come back work with Allied or" -- I

17  mean, I gave her a contract, and I told her, "You can either

18  start working or not."  She didn't want to come back to Allied.

19  Q.   So, she had been working, but by this time she had already

20  left?

21  A.   She had already left, correct.  But I still gave her a

22  chance unless she wants to come back, so --

23  Q.   But Nato Rusia you had never even met?

24  A.   I never met her, no.

25  Q.   And then, turning to the Allied Health Clinic Operating

1    Agreement, Exhibit 10, the last page, these set out the

2    percentages as well, correct?

3    A.    That's correct.

4    Q.    And did these percentages change?

5    A.    Yes, they did.  So, the same thing I did from Nato Rusia

6    percentage, I split it among Class A Members, which is being

7    Jambulat Tkhilaishvili.  He kept half of the percentages, and I

8    kept the other half, as well as give the 5 percent back to

9    Olga.

10   Q.    Now, you had testified that David Tkhilaishvili could not

11   take out money or make any expenditures on behalf of Allied

12   Health without your authorization.

13   A.    Correct.

14   Q.    Was there a monetary amount on that as well?

15   A.    I believe if I looked, it was -- if you give me a second,

16   I can try to find that.  It was 1,000 or 2,000.  I can check

17   that.

18   Q.    If you look on Page 13 of Exhibit 10.

19   A.    Exhibit 10, Page 13.  Yes.  It says 1,000.  "Expenditures

20   in excess over $1,000 individually."

21   Q.    And is that the same provision in Allied Health Clinic

22   Operating Agreement?

23   A.    I haven't looked, but I'm sure, yes.  If I may look, then

24   I can tell you for sure.

25   Q.    Okay.  If you look at Exhibit 9.

1    A.    Yes, it does say the same amount and the same terms and

2    conditions.

3    Q.    And were there any issues with David and Jambulat

4    Tkhilaishvili signing these operating agreements?

5    A.    Yes.  They were negotiating and David and Jambulat, they

6    didn't want to sign it, and even when David was in Georgia we

7    were negotiating, and David told me, "My brother doesn't need a

8    contract so he doesn't live by the contract."  So, I told him,

9    "Listen, it's in your best interests for you and for your

10   brother to sign, but if you don't sign it in a couple of days,

11   I'm going to sign it and present it to the Department of Public

12   Health myself."

13   Q.    And did he sign it?

14   A.    He did sign it, yes.

15   Q.    David?

16   A.    He and his brother both did.

17   Q.    Do you remember the circumstances under which Jambulat

18   Tkhilaishvili signed the agreement?

19   A.    Yes, I do.

20   Q.    Where were you?

21   A.    I was at the shop and --

22   Q.    When you say "the shop," what shop?

23   A.    At my repair shop in Watertown.  David came -- Jambulat

24   came to the repair shop, and then we had some conversation

25   prior to that, but after the conversation he signed.

1    Q.    What was the conversation that you had?

2    A.    It's what I call a conversation.  So, we went on the side,

3    and he start again the threats, like, "Victor, look, you know,

4    I don't live by the contract.  These contracts mean nothing to

5    me, so things have to be my way.  If somebody stays in my way,

6    I'll just put a bullet in the person's head.  And this contract

7    has absolutely no meaning for me, and you have to do two

8    things, most importantly.  The first, you have to give your

9    5 percent to Saba right now, and the other 5 percent later on

10   we will tell you who to give to."

11            And then the second thing is the amount of the funds,

12   that he wants the 40 percent back to him from day one from when

13   we start receiving the money from the insurance companies.

14   Q.    So, he wanted some of the profits?

15   A.    He wanted some of the profits in advance, correct.

16   Q.    And what tone of voice was he using?

17   A.    Well, he was very, very out loud yelling and he was very

18   angry.

19   Q.    And very what?

20   A.    Angry.

21   Q.    And were you sitting or standing?

22   A.    We were on the side of it, so we were standing, both of

23   us.

24   Q.    Side of what?

25   A.    On the side of the building.

1    Q.   So, you were outside?

2    A.   Oh, yeah.  I didn't want to talk in front of my customers.

3    I told him, "Listen, you know, let's go on the side and see

4    what you want to tell me."

5    Q.   And what did you tell him?

6    A.   I told him, "First of all, we never discussed about giving

7    the percentages to Saba.  Why should I give the percentage to

8    Saba or I give percentages for someone else?  That's not what

9    we agreed on."  And the second thing, it's the customers next

10   to the building.  I told him, "Listen I got to talk with my

11   legal advisor and get back to you."

12   Q.   And how were you feeling during that conversation?

13   A.   I was shaking, I was shaking.  I almost -- I'm sorry.  I

14   almost peed in my pants when he was talking to me.

15   Q.   You mentioned Saba.  Who was Saba?

16   A.   Saba is the friend of David and Jaba.

17   Q.   Do you know his last name?

18   A.   I don't.  I don't remember his last name.

19   Q.   Had you met him before?

20   A.   I did, yeah.

21   Q.   And did he invest any money in Allied Health Clinic?

22   A.   No, he did not.

23   Q.   Do you know whether he was involved in Davis Health

24   Clinic?

25   A.   According to David, yes, he was helping him out with

1    transportation, moving the doctors back and forth, and that's

2    what David told me.

3    Q.    Was Saba supposed to work at Allied Health Clinic?

4    A.    There was never a discussion about Saba.  The first time

5    they brought up, that was in August.  Then in November they

6    brought up about Saba, that he has to work.

7    Q.    Did Jambulat Tkhilaishvili sign the agreement?

8    A.    Yes, he did.

9    Q.    And when he signed it did he have the full agreement?

10   A.    Yes, right there.

11   Q.    Now, you had mentioned that you went away after David came

12   back from Georgia.  Do you remember when that was?

13   A.    I believe it was September 13.

14   Q.    And how long did you go away for?

15   A.    I think it was two days or a little more.  Two days -- 15

16   days, I believe.  Two weeks or --

17   Q.    Two weeks?

18   A.    Yeah, about two weeks.

19   Q.    Who did you go away with?

20   A.    With my wife.

21   Q.    And your children?

22   A.    No.  No, I'm sorry.  I went by myself, so my wife was in

23   Armenia with my children.  I went there myself.

24   Q.    And where did you go?

25   A.    I went to Armenia first.  It was my wife's wedding.  Then

1   after that me and my wife, we went to vacation to Dubai.

2   Q.    And who paid for that vacation?

3   A.    I did.  It's my vacation.  I paid from my pocket.

4   Q.    And how did you pay?

5   A.    From my personal credit card account.  From my personal

6   credit card account.

7   Q.    Okay.  What kind of credit card did you have?

8   A.    American Express was my personal credit card.  I just

9   bought a ticket and I went.

10  Q.    And when you were there how did you pay for things?

11  A.    Some cash, some of my personal -- I used my personal

12  credit card, and some of it cash, some of it credit card.

13  Q.    What about a debit card?

14  A.    I might use it.  I don't remember.  There were certain

15  occasions when they don't take American Express I could have

16  used a Visa or MasterCard debit card.

17  Q.    Did you use any Allied Health Clinic monies to pay for

18  that vacation?

19  A.    No.  I didn't use a penny for it, no.

20  Q.    So, between August 23rd, when David Tkhilaishvili went to

21  Georgia, and September when did you come back?

22  A.    I want to say September 29th or 30th.

23  Q.    So, between the time when David Tkhilaishvili went away

24  and you came back from Georgia did you see him?

25  A.    See who?

1    Q.    David Tkhilaishvili.

2    A.    No, I did not.

3    Q.    And the Operating Agreements -- or let me back up.

4          The letter agreement, which was Exhibit 2 that we saw

5    earlier, did that spell out the salaries that each member of

6    the Clinic and the Health Management Group were to receive?

7    A.    Yes.

8    Q.    And do you remember what the salary was for each one?

9    A.    I believe -- I could look, but I believe $3,000 was for

10   David and $2,000 was for me, and that until we become

11   operational.  Then after that, when we become operational and

12   profitable, David is supposed to receive 4,000, and I agreed to

13   keep my salary the same, 2,000, afterwards.

14   Q.    And how were you to receive your salary?  Was it going to

15   be --

16   A.    Initially I was paying everybody from my personal account.

17   Everything was going out from my personal account.

18   Q.    How long did that last?

19   A.    I want to say until we received the occupancy,

20   approximately eight, nine months, plus/minus.

21   Q.    And did you receive salary during that time period?

22   A.    Initially I did, yes, at the beginning.

23   Q.    And did Allied --

24         MS. KAPLAN:  Could I just have a moment, your Honor?

25         THE COURT:  You may.

1                        (Pause)

2     BY MS. KAPLAN:

3     Q.    Did Allied Health Clinic eventually use a payroll company

4     for salary?

5     A.    Yes.

6     Q.    And what was the name of the payroll company?

7     A.    Granite Payroll.

8     Q.    When did Allied first start using Granite?

9     A.    I think David, I want to say in September of 2015 or

10    October of 2015.  September, I will say.

11    Q.    Do you know who owns Granite Payroll Company?

12    A.    The person's name David -- I forgot his last name.  His

13    name was David, but I don't remember his last name.

14    Q.    Okay.  And why did you use Granite Payroll?

15    A.    David is the one who introduced me to him, says he used

16    him before.

17    Q.    Did Allied Health eventually obtain a license to operate?

18    A.    Yes, we did.

19    Q.    Do you remember when that was?

20    A.    If I may take a look to refresh my memory.

21    Q.    I'm going to show you Exhibit 11, which is agreed upon by

22    the parties.

23    A.    I think it was in September, but I can check.

24              THE COURT:  Exhibit 11 is admitted.

25                    (Exhibit No. 11 received into evidence)

1   BY MS. KAPLAN:

2   Q.   What is that?

3   A.   It was approved on September 23rd.  This is the approval

4   from the Department of Public Health as the recognition of

5   Allied Health Clinic as a clinic.

6   Q.   Can you just pull out the second page of that.

7   A.   I did.

8   Q.   And then the third.  Is that the actual clinic license?

9   A.   Yes, it is.

10  Q.   And it's dated September 23 of 2015?

11  A.   Mmm-hmm.  Yes.

12  Q.   Now, did Allied Health Clinic need to enter into a

13  contract with health insurance companies --

14  A.   Yes.

15  Q.   -- to pay claims for its patients?

16  A.   Yes.

17  Q.   Tell us about that.

18  A.   Well, the way healthcare works, in order for you to be

19  compensated for your services, you have to have what are called

20  the credentialing with the insurance companies, in other words,

21  be approved by them.  And we would submit our application.

22  They would review the application.  They would say, "Okay, we

23  accept you, and we will pay you for your services," or they

24  will turn around and say, "No, we are not going to accept your

25  application," and turn you back.

1   Q.   And did you enter into various contracts with insurance

2   companies?

3   A.   Yes, we did.

4   Q.   And do you remember with who?

5   A.   Well, yes.  It's MassHealth, Harvard Pilgrim, and

6   Commonwealth Care.  Also Medicare, Medicaid.

7        MS. KAPLAN:  With permission, your Honor, I would like

8   to show the witness Exhibit D.  It's a late exhibit, so it

9   wasn't agreed upon earlier.

10       THE COURT:  Is it agreed upon or not at this point?

11       MR. TUMPOSKY:  Yes.

12       MR. CRUZ:  Yes, your Honor.

13       THE COURT:  So, we would be making that Exhibit 29.

14            (Exhibit No. 29 received into evidence)

15   BY MS. KAPLAN:

16   Q.   Do you recognize Exhibit 29?

17   A.   Yes, I do.

18   Q.   And what do you recognize this to be?

19   A.   This is Medicare enrollment information for one of our

20   insurances.

21   Q.   And does it show the effective date of this insurance?

22   A.   July 1, 2015.

23   Q.   And did you say that you also entered into contracts with

24   Harvard Health?

25   A.   Yes, I did.

1    Q.   And do you know where Harvard Health has offices?

2    A.   I know they are nationwide.  They have an office in

3    Massachusetts, in Connecticut, New Hampshire, a few different

4    states.

5    Q.   Okay.  And with the Court's permission, I am showing you

6    Exhibit 12, and I ask whether you recognize this document.

7    A.   Yes, I do.

8         MS. KAPLAN:  And it's agreed upon, your Honor.

9    BY MS. KAPLAN:

10   Q.   What do you recognize it to be?

11   A.   This is the Harvard Pilgrim contract dated July 19th,

12   2016.

13        THE COURT:  And that is received.

14            (Exhibit No. 12 received into evidence)

15   BY MS. KAPLAN:

16   Q.   And looking at Page 2 on this document, do you see when

17   this agreement became effective?

18   A.   Yes.  Effective date November 1, 2015.

19   Q.   So, as early as July and then later in November Allied

20   Health Clinic had at least two forms of -- contracts with two

21   health providers, correct?

22   A.   That's correct.

23   Q.   And what did that entitle you to do, once you got the

24   various health insurance in place?

25   A.   Once we have the various health insurances in place and we

```
 1   obtained the license from the Department of Public Health, we

 2   were able to see the patients, do the services, and then we

 3   could get reimbursement from the insurance companies.

 4             MS. KAPLAN:  One more, if I could quickly do this,

 5   your Honor, Exhibit 13, which has been agreed upon.

 6   BY MS. KAPLAN:

 7   Q.   Do you recognize this?

 8   A.   Yes, I do.

 9   Q.   What is that?

10   A.   That's the credentialing from MassHealth.

11             THE COURT:  And that is received.

12             (Exhibit No. 13 received into evidence)

13   BY MS. KAPLAN:

14   Q.   And that is another health carrier?

15   A.   Yes.  That's one of our major health carrier insurances.

16   Q.   And when was this effective as of?

17   A.   January 12th, 2016.

18             THE COURT:  Is this a break point?

19             MS. KAPLAN:  Perfect.

20             THE COURT:  So, we will break for lunch, ladies and

21   gentlemen, which should be waiting for you in the jury room.

22   We will try to get back here about 1:45 to continue with the

23   testimony.

24             THE CLERK:  All rise.

25             (The jury exited the courtroom at 12:57 p.m.)
```

1          THE COURT:  Just an update.  Where are we standing in

2     terms of time?  And let me tell you the initiative I was

3     thinking about, which is to go all day on Thursday, too.

4          MS. KAPLAN:  Go all day -- I'm sorry?

5          THE COURT:  Thursday.  But where do we stand?

6          MS. KAPLAN:  I think we're getting through this

7     witness, your Honor.  I think I probably have another hour with

8     him.

9          THE COURT:  So, how long for your case, I guess is

10    what I am trying to get at.  If I am going to go on Thursday I

11    want to tell the jurors ahead of time.

12         MS. KAPLAN:  Well, he is certainly the longest

13    witness.  The next four or five witnesses are relatively short.

14         THE COURT:  Tell you what, if you could think about

15    it, both sides think about it over the break.  I just want to

16    get an idea about it here.

17         MR. CRUZ:  Sure.

18         THE COURT:  All right.  We will be in recess and come

19    back at 1:45.

20         (The Honorable Court exited the courtroom at 12:59 p.m.)

21         THE CLERK:  All rise.

22         (The Honorable Court entered the courtroom at 1:48 p.m.)

23         THE CLERK:  This Honorable Court is now in session.

24    Please be seated.

25         THE COURT:  So, no more than two sentences each.  How

1  much longer?

2  　　　　MS. KAPLAN:  I think I was overly optimistic in that I

3  will go longer with this witness, which means we will probably

4  go until at least Friday.

5  　　　　THE COURT:  With your case?

6  　　　　MS. KAPLAN:  Yes.

7  　　　　THE COURT:  Even including a full day on Thursday?

8  　　　　MS. KAPLAN:  We may be able to finish by the end of

9  Thursday, your Honor.  We may be able to finish by the end of

10  Thursday.

11  　　　　THE COURT:  And then there is a defense case of some

12  length.

13  　　　　MR. CRUZ:  Yes, your Honor.

14  　　　　THE COURT:  A day or two?

15  　　　　MR. CRUZ:  I would say, to be on the safe side, your

16  Honor, two days, your Honor, two half days.

17  　　　　THE COURT:  Because I have got another trial to start.

18  You are not quite in the rearview mirror yet, but you are

19  getting there, and so that tells me as much as I need to know

20  at this point.

21  　　　　I think I will tell the jury that we would like to sit

22  on Thursday.  I do not like to disappoint them in the sense of

23  telling them something initially that they were going to work

24  9:00 to 1:00, and if there are objections, I will not sit the

25  full day on Thursday.  Okay?

1          THE CLERK:  All rise.

2      (The jury entered the courtroom at 1:50 p.m.)

3          THE CLERK:  Please be seated.

4          THE COURT:  You may continue, Ms. Kaplan.

5          MS. KAPLAN:  Thank you, your Honor.

6                CONTINUED DIRECT EXAMINATION

7  BY MS. KAPLAN:

8  Q.   Mr. Torosyan, I think we are now into November of 2015,

9  and the Allied Health Clinic is seeing patients, correct?

10  A.   We started seeing patients on November, I believe it was

11  16 of 2015.

12  Q.   And at some point in November of 2015 -- correct?

13  A.   Yes.

14  Q.   -- was there an opening party at Allied Health Clinic?

15  A.   I believe the opening party took place in October, October

16  or November.  That was before we opened the doors.

17  Q.   I'm sorry.  You have to keep your voice up.

18  A.   Excuse me.  That was before -- definitely that was before

19  November 9th, the opening party was.

20  Q.   Okay.  And where was it?

21  A.   At the Clinic.

22  Q.   Who attended?

23  A.   Friends, family members.

24  Q.   The defendants?

25  A.   Defendants as well, with their parents and their friends.

1   Q.   And from the time that you came back from vacation at the

2   end of September until the opening party were you seeing David

3   Tkhilaishvili and Jambulat Tkhilaishvili?

4   A.   I seen David because he had an attorney next to my work.

5   I bumped into him a few times in Watertown, but generally for

6   the clinical-wise we seen him only one time November, I believe

7   it was 4th or 3rd, with Saba in Watertown.

8   Q.   When you bumped into David Tkhilaishvili was he always

9   threatening you?

10  A.   Well, when we were in Watertown on the street he did not

11  threaten me.  We were by the -- there was a building.  I was

12  doing renovation.  He just parked the car and went and we just

13  said, "Hi" and left.

14  Q.   And when was the next conversation that you can remember

15  with the defendants again about the demands that they were

16  making that you surrender your interests in Allied Health?

17  A.   Once we had a conversation that they asked me to have Saba

18  join the Allied Health Clinic --

19          MR. TUMPOSKY:  Your Honor, objection.

20          THE COURT:  Grounds?

21          MR. TUMPOSKY:  Clarity as to who is speaking.

22          THE COURT:  Okay.  So, I want you to develop that more

23  specifically.

24          MS. KAPLAN:  Okay.

25  BY MS. KAPLAN:

1    Q.    Who asked you?

2    A.    David asked me to meet in Watertown with him, his brother

3    and Saba.

4    Q.    And did you agree to do that?

5    A.    I did.

6    Q.    What was the purpose of the meeting?

7    A.    He want to discuss the situation with Saba.  He was going

8    to bring something about Saba, he told me on the phone.

9    Q.    So, what happened at that meeting?

10   A.    So, we went in, I believe it was on Arsenal Street.  We

11   met at the restaurant.  They asked me too if Saba was going to

12   join the Allied Health, and I was very clear to them, told

13   them, "Saba is not going to be a part of Allied Health."

14   Q.    And Saba was present at this time?

15   A.    Yes, he was.

16   Q.    Did they say why they wanted Saba to be part of Allied

17   Health?

18   A.    Well, they said, what David told me he worked a lot, he

19   did a lot of work to it, and he has to be part of it.  Plus he

20   gonna help him with his personal work at the marketing and

21   everything else for the Clinic.

22   Q.    And had Saba, to your knowledge, been involved at all in

23   Allied Health Clinic?

24   A.    No, he was not.

25   Q.    What was your response other than --

1   A.    My response was, first of all, before when people saying

2   something I want to understand the logic behind it, and I told

3   him, "David, when we started this negotiation up front there

4   was never discussed anything about Saba.  Why you bring that up

5   now?"  And I told him, "I am going to strongly stay on my

6   answer he's not going to be part of it."  Plus I haven't seen

7   Saba.  I can't see -- maybe he's a good guy, but I never seen

8   him working at anywhere else.

9   Q.    After that did you receive a phone call from one of the

10  defendants?

11  A.    Yes, I did.  So, David called me, and I remember the date.

12  That was next day of my opening party at the fitness center in

13  Watertown, which was November 8 he called me.

14  Q.    What's the fitness center in Watertown?

15  A.    So, that's a fitness center.  It's a regular -- it's a gym

16  I opened in Watertown, and I invited David and everybody else

17  to the party.

18  Q.    And you opened it in November of 2015 as well?

19  A.    No.  The opening date was November 8.

20  Q.    Okay.  And so, you received a phone call from David

21  Tkhilaishvili at that time?

22  A.    On November 8th.

23  Q.    And what did he want?

24  A.    He says, "Victor, there are a few things we have to

25  discuss about the Clinic, so we're going to be opening up the

1   Clinic very soon.  Please come to the Clinic tomorrow, and it's

2   going to be me and my brother."

3   Q.   And did you agree to do that?

4   A.   Yes, I did.

5   Q.   Did you go there the next day?

6   A.   I did go next day.

7   Q.   And that was November 9th?

8   A.   November 9th.

9   Q.   And tell us what happened.  Tell us who was there when you

10  got there.

11  A.   So, that was before getting calls, so what I do in early

12  November, I go to Cape Cod and turn the water off, and a friend

13  of mine came from out of state, and I told him, "Could you come

14  with me to help me out to close down the water and do winter

15  close-up in Cape Cod?"  And I told him, "On our way we're going

16  to stop by the Clinic for half an hour."  And he says, "Fine."

17  And the two of us, we went to the Clinic.

18  Q.   Who was the friend?

19  A.   His name is Levon Juylnazaryan.

20  Q.   Okay.  And how do you know Levon?

21  A.   I know him from since we were 14-year-old from back in

22  Armenia.

23  Q.   Do you know what time you got to the Clinic?

24  A.   I don't remember, no.

25  Q.   Was it during the day or at night?

1   A.   Day.

2   Q.   And what happened?

3   A.   When I parked the car, Jambulat was in the parking lot.

4   He was on the phone, and I just say, "Hi," and I walked inside,

5   and saw David, and I say, "Hi."  And the friend of mine came

6   with me, and I told my friend to wait either in the waiting

7   area or wait in the parking lot, because he can't come to the

8   Clinic, and --

9   Q.   Why couldn't he come to the Clinic?

10  A.   That's a violation of HIPAA.  You can't let anybody not

11  employed by the entity come to the Clinic.  So, I told him,

12  "You can wait anywhere you want, either the waiting room or the

13  parking lot," and I was waiting in the area.  Then Kenton was

14  there, and I went and I say, "Hi," and then after a few minutes

15  Jambulat came from outside.

16  Q.   Okay.  And where did you go?

17  A.   They took me, I believe, to the exam room, 1 the number

18  is.  It's next to the management office.  They took me there.

19  We went inside.  They locked the door, and they locked the

20  door, and they just went crazy.  Two brothers, they just went

21  absolutely crazy on me.

22  Q.   What did they say?

23  A.   Well, the first they said --

24          MR. TUMPOSKY:  Objection.

25          THE COURT:  At this point I think it is important to

1    identify the particular statements by the particular persons.

2              MS. KAPLAN:  I'm sorry.

3    BY MS. KAPLAN:

4    Q.    Tell us what was said by each of the defendants.

5    A.    Well, initially when they locked the doors, and I'm, like,

6    "What's going on here?"  And they started -- first Jaba

7    started.  He's, like, "Listen, I'm going to be leaving the

8    country in a couple of days, and prior to leave I want to make

9    sure you give your 5 percent of the bet to Saba, and you give

10   the 40 percent to us, and the other 5 percent we give to --

11   I'll let you know who to give to."  And they told me, "You have

12   no options, so if, God forbid, this is how it is, I don't care

13   about the way you want to solve it.  If you want to solve it

14   that way, and I will go so far, will 'F' up the person, and if

15   anybody, God forbid, stays in my way and I'll put a bullet in

16   his head."

17   Q.    Who said that?

18   A.    Jaba said that.

19   Q.    Were you seated or standing?

20   A.    All of us were standing.  They were by the door, and I was

21   inside.  Then David -- I didn't know Jaba, so I always keep a

22   distance from him, but I was surprised by David, and David

23   proved that Jaba's actions, and even he went crazy, and there

24   was a time he struck the table so bad that he came so close to

25   punch me.

1    Q.    With what?  What did he come close to punching you with?

2    A.    With a fist.  So, he say the same thing.  Then he turn to

3    his brother Jaba.  He's, like, "Jaba, this is the time we have

4    to get rid of him; otherwise he going to be a problem," and

5    I'm, like, really, David?  After all these year I've been like

6    a brother to you.  Is that what you're telling me, you're going

7    to get rid of me?  For, for, for what?  For money?"

8    Q.    And then what happened?

9    A.    Then, after that, Jaba come down to David, let David leave

10   the room.  David left the room, and Jaba says, "Victor, you

11   know, you are part of the family and you're a friend."  I'm,

12   like, "Man, I'm not a part of your family.  Family members,

13   they don't treat each other this way.  There was a time when I

14   thought we were part of it, but we are not.  And I can't give

15   you any answer about your demands, and I will talk with my

16   legal representative, and I'll get back to you."

17   Q.    What did he say?

18   A.    He says he doesn't care about the legal representative.

19   He lives -- he has his principle of the life, so, "You want to

20   talk to him, talk to him, and get back to me."  I'm like,

21   "Okay.  I'll talk to him and get back to you."

22   Q.    How long were you inside that exam room with the

23   defendants?

24   A.    I would say approximately 10, 15 minutes.

25   Q.    And how did you feel during that conversation?

1   A.   I don't think I ever been scared like that in my entire

2   life.

3   Q.   And where was Mr. Levon?

4   A.   I don't know where he was.  I'm assuming either outside or

5   parking lot, but when we walk out he was in the hallway when we

6   went outside.  I don't know where he was, but he wasn't in the

7   Clinic.

8   Q.   And when you left the exam room where did you go?

9   A.   When we went to the exam room, went through the hallway,

10  we went outside in the parking lot then and I saw Levon's face,

11  because he noticed that I wasn't right.  So, he's, like,

12  "What's going on?  What's going on?"  And I didn't want to talk

13  anything, and Jaba start again talking about that I have to

14  give up the percentages, and I was sort of trying to change the

15  subject, and then when I was on the side, then David came and

16  start talking to me.  I noticed that Jambulat opened up David's

17  black Mercedes.  In the front glove box he pulled a -- the

18  knife, put it in the pocket.

19  Q.   Did he show you the knife?

20  A.   No.  That was -- I -- the way he put it in the pocket,

21  that was really scaring me, so he didn't want me to see the

22  knife, so that made me more scared than he pulled a knife on

23  me.

24  Q.   Did the argument continue in the parking lot?

25  A.   It did continue for a couple of minutes, and I changed the

1    subject, and I told him, "I have to talk with my legal team and

2    I'll get back to you."  I didn't want to continue in front of

3    my friend.

4    Q.   Did they say anything to you about the police at that

5    time?

6    A.   Yes.  They asked me, like, "Are you --"

7    Q.   Who?  Tell us who.

8    A.   Jambulat says, "Are you going to go the cops?"  I told

9    him, "Perhaps.  I'll do what I have to do."  And they always

10   made it clear, even the first time when back in August

11   happened, David says, "Victor, you know, if you go to police or

12   you go to the court, you're not going to go anywhere, because

13   people gone in the past and they haven't got anything."

14   Q.   How did you get to the Clinic that day?

15   A.   I drove my vehicle.

16   Q.   And did you drive with Levon?

17   A.   Yes.

18   Q.   Did you have a gun with you?

19   A.   Absolutely not.

20   Q.   By this time in November how much money had you invested

21   in the Clinic?

22   A.   At that time was, I would say, close to -- over $400,000,

23   450,000.

24   Q.   And had either of the defendants invested any money into

25   the Clinic?

1    A.    No, they did not.

2    Q.    When was the next time you spoke with either of the

3    defendants?

4    A.    After that, when I went home we talked with David again.

5    Q.    You said, "We."  Who's "we"?

6    A.    I'm sorry.  I'm a little --

7    Q.    How did you talk to him?

8    A.    On the phone.

9    Q.    Did you call him, or did he call you?

10   A.    I don't remember, honestly.  I don't remember who called

11   who.  I think I called him.

12   Q.    What did you say?

13   A.    "Listen, what's going on?  Why are you doing this to me?,"

14   you know.  "This is all my life I put into this, and I trusted

15   you like a brother.  Why are you doing this to me?"  Then he

16   told me he has no control over his brother, and that's what it

17   is.  At that time -- and I was sort of confused.  I didn't know

18   that was his brother's idea or his idea.  I didn't know whose

19   idea it was to act like that.

20          And then I told him, "Listen," you know, "we're going

21   to talk with the meditator (ph), and we're going to go see

22   Bob."  And he says, "Victor, we don't need anybody to tell us

23   what to do.  My brother doesn't live by the contracts."

24   Q.    And by "Bob," do you mean Bob Griffith?

25   A.    Sorry.  Bob Griffith, yes.

1    Q.    How long did that conversation last?

2    A.    Maybe 10, 20 minutes.

3    Q.    What else did you talk about?  That's a long time.

4    A.    Well, talk about it.  First of all, I emotionally was

5    down.  You know, I told him, "Listen, I got two little kids at

6    home.  I don't know what to do, man.  Should I leave this

7    state?"  It was tough for me.  I mean, it's very hard for me.

8    You come home, you got kids home, and you put all the money,

9    then you get these stories.  I didn't know what to do.

10   Q.    So, did you make a decision at some point to do something?

11   A.    Yes.  I went to Bob Griffith, and I asked him, "Bob, this

12   can't continue.  This is what it is, and this is what I'm

13   facing.  I need some help."

14   Q.    And as a result of the conversation that you had with Bob

15   Griffith, did you go somewhere else?

16   A.    Yes.  I went to my attorney, and I told him the same thing

17   to my attorney.

18   Q.    Which attorney?

19   A.    Of Verrill Dana, and Andrew Rusczek and John Estad, as

20   well as Paul Shaw was there.

21   Q.    Those are all attorneys?

22   A.    All attorneys.  And I told him, "This is what happened."

23   They advised me to seek for the -- "Try to call the federal

24   agency, see if they were interested to help you."  And I told

25   them, "Please."

1    Q.   And after meeting with your attorneys, did you talk to the

2    FBI?

3    A.   Yes, I did.

4    Q.   Do you remember what day that was?

5    A.   I don't remember.

6    Q.   Was that still in November?

7    A.   It was in November, I believe, yes.  It was mid-November.

8    Q.   And did you tell the FBI what you have told this jury?

9    A.   I told them, the FBI, what happened, and I told them, "I

10   need my help.  I don't know what to do."

11   Q.   Did you agree to wear a wire and record conversations with

12   the defendants?

13   A.   Yes, I did.

14   Q.   And did you do that?

15   A.   Yes, I did.

16   Q.   How many times?

17   A.   I believe I did once with David and once with Jambulat.

18   Q.   Once or twice with David, or more than that?

19   A.   More than once, because we had to record I believe it was

20   twice with David, twice with David, once with Jambulat, I

21   believe.  I know Jambulat was once, but the Clinic I was going

22   in and out sometimes for the clinical issues, but I believe it

23   was with David once or twice, maybe once or twice.  I don't

24   remember exact.

25   Q.   And prior to meeting with the defendants to record these

1    conversations did you tell anyone that you were talking to the

2    FBI, that you talked to the FBI?

3    A.    I did.

4    Q.    Who did you tell?

5    A.    I talked with close family friend, Jack, and I talk

6    about the -- we have a common friend.  His name is Anzar

7    Tuhane (ph).  I talked to my family members.  I just told them,

8    "Listen, if something happens this is the story."  And I

9    believe I -- I believe I discussed that with Kenton and Olga as

10   well.

11   Q.    And do you know who Kenton Fabrick was living with at that

12   particular time?

13   A.    Yes, I do.  He was living with David.

14   Q.    Do you know how long he lived with David?

15   A.    I would say approximately six months.  Six months he lived

16   with David.

17   Q.    Why did you tell these individuals that you had gone to

18   the FBI?

19   A.    At that time I told them, "This is what happened with me

20   in my life."  And so I called the FBI.  And David and I'm not

21   going to have any, or with Jambulat I'm not going to have any

22   relationship with the business.

23   Q.    But why did you tell these people that you were working

24   with the FBI?

25   A.    Well, for a different part.  Kenton and Olga for the

1    business purposes, because there were a lot of issues we had to

2    discuss together, and I was always avoiding them or preventing

3    the meetings.  And the family members I told them, especially

4    my spiritual friend Jack, and I told them because, God forbid,

5    if something happens they know what's going on.

6    Q.    Directing your attention to November 25th, do you recall

7    meeting with David Tkhilaishvili on that day wearing a wire?

8    A.    Yes.

9    Q.    And do you know where you were?

10   A.    We were in the Clinic, yes.  I went in the Clinic.

11   Q.    Who put the wire on you?

12   A.    The FBI agent.

13   Q.    And was there a video on as well as audio?

14   A.    Yes, there was video and audio recording.

15   Q.    And tell us what happened at the meeting.

16   A.    I went to the meeting --

17   Q.    Who was there?

18   A.    Initially I went to the parking lot, and I put on the wire

19   as well as the camera with the agent, and I went to the Clinic,

20   and David was there.  And then we start talking about it, and

21   David came to me like always, and he start just going crazy,

22   and he told me about his outlaw friends, that, "Listen, this is

23   my outlaw friends, that they have control, and my brother Jaba

24   is very famous guy, the outlaws listen to his advices, and they

25   do what he tell them to do, and technically he shot the people,

1    and he does what he wants to do."

2    Q.    "He" who?

3    A.    Jambulat.

4    Q.    What language were you speaking in during this meeting?

5    A.    In Russian.

6    Q.    And have you listened to a recording of the meeting?

7    A.    Yes, I did.

8    Q.    And, in fact, when you listened to the recording did you

9    hear some things that were not -- well, did you review a

10   transcript?

11   A.    Yes, I did.

12   Q.    And did you hear some things that were not on the

13   transcript?

14   A.    What do you mean?

15   Q.    Were you able to fill in some of the blanks?

16   A.    There were a couple of changes, small changes I did, yes.

17   Q.    And did the recording that you listened to fairly and

18   accurately represent the conversation that you had with David

19   Tkhilaishvili on November 25th?

20   A.    Absolutely, yes.

21   Q.    And you have since reviewed that recording of the

22   conversation?

23   A.    Yes.

24   Q.    I show you Exhibit 19.

25          MS. KAPLAN:  If I may, your Honor?  It's in evidence.

1          THE COURT:  You may.

2    BY MS. KAPLAN:

3    Q.   Is that a transcript of the recording from November 25th

4    of 2015?

5    A.   Yes, it is.

6    Q.   And is that the transcript that you reviewed --

7    A.   Yes.

8    Q.   -- while you were listening to the recording?

9    A.   Yes.

10         MS. KAPLAN:  Your Honor, at this time I would ask to

11   be able to read certain portions of that transcript with the

12   witness while it's being displayed for the jury.

13         THE COURT:  Yes.

14   BY MS. KAPLAN:

15   Q.   So, if we can start with Page 2, Line 21.  And "VT," that

16   stands for "Victor Torosyan;" is that right?

17   A.   Yes.

18   Q.   And "DT" is David Tkhilaishvili?

19   A.   Yes.

20   Q.   So, you read your part starting with Line 21, if you

21   would.

22   (READING OF TRANSCRIPT OF RECORDING, EXHIBIT 19, AS FOLLOWS -

23   AS READ BY AUSA LAURA KAPLAN AND VAHAGN VICTOR TOROSYAN):

24   A.   Yes, you see, the most important thing is that here you

25   need to work, like hmm, hmm, when we are meeting we start

1    talking, hmm, regarding -- we go back and forth start saying

2    that thing went this way here and things went that way there,

3    hmm.  Those -- you see, our conversation always when we start

4    talking like all about cuts, who and whatever, it is not the

5    conversation we need.

6    Q.    I don't have those conversations with you here, never, and

7    it's just --

8    A.    No, we had a talk here.  Last time when you and your

9    brother, hmm, what you brought, closed the door and start --

10   started talking.  You know, it is not a professional.

11   Q.    We are the people who created the system over the past 12

12   years in order that everyone would know us, respect us, respect

13   our words so that everything would be okay, and to know that

14   one can't buy us, even with a hundred billion in our family and

15   in our business, and around us we will be together.  We will be

16   friends.  We will be friends and no one will be above us.

17   A.    And what does it mean "above us."

18   Q.    "Above us" means that, let's say we say this is how it's

19   supposed to be, and someone says, "No, it's not."

20   A.    But when we started talking the very first day you came to

21   me, and I told you, "These are the conditions."  You agreed to

22   those conditions.

23   Q.    The conditions and the words I said to you I will never

24   forget.  Whatever I said 10 years ago I remember, and I listen

25   and I do it all in life.

1    A.    Hmm.

2    Q.    You know, today we are this way.  No one knows how it will

3    be tomorrow, and you know everything should be as it's supposed

4    to be, and the conversation was like this.  I asked you, and

5    that's why I created the Clinic.  You and I should be like one.

6    If we disagree we must agree.  We have to agree, because we

7    have had internal experience with each other for eight years

8    and everything.  We have trust and obligations towards each

9    other that we need to fulfill, both you and I.  Tomorrow, when

10   I put in 20,000,000, 5,000,000, 1,000,000 or $100 I will never

11   -- tomorrow there'll be a time, independence.  I will never

12   tell you I have the last word because --

13   A.    David, I'm saying this because in the past --

14   Q.    Well, you are saying or not saying.

15   A.    No.  Look, the past shows that any businesses you did

16   failed.  That's first.  And, secondly, you end up, hmm.

17   Q.    All my businesses succeeded.

18   A.    No, wait, please.  All your partners that you did business

19   with parted with you.  You always tell me that.

20   Q.    No, we didn't part ways.  It's just I don't feel that.

21   See, you can see yourself in a gas station business, right?  I

22   can't in a body shop, see myself in a body shop.  We all have

23   our professions.  I can't say, let's say, "David, go and fix

24   that car."  I'm just bringing an example.

25   A.    No, you --

1    Q.   Everyone does their thing.

2    A.   All your partners end up --

3    Q.   I just come in and set up management.

4    A.   It's through fighting.

5    Q.   No, not through fighting.  I never had partners.  I had

6    only managers.  Let's take Parzuki (ph), another one.  He can

7    live three centuries and not bring one percent.

8    A.   Why is that?

9    Q.   Because he doesn't have it in him.  He doesn't know

10   friendship, he doesn't know family, and he doesn't know the

11   street.  He knows --

12   A.   Well, it is business.  What does the street have to do

13   with it?  What are you talking about?

14   Q.   In business the street is very important.  When your guy

15   comes and you know that is $100 and he pays $85, but he will

16   get $120 for something that's $100, let him pay.  Now, the

17   system doesn't work that way.  When you do things that way you

18   end up having problems.  You shouldn't.  This one will pay, and

19   that one won't pay.  You may have a brother coming or someone

20   else -- well, you know, there is such a thing.  Then there was

21   an electrician that came, Yura.

22   A.   I understand.  But we have -- look, we have a contract.

23   Everything that we are, hmm, doing, we have to do according to

24   the contract, whatever we have.

25   Q.   We do have a contract and we are doing everything

1   according to the contract.  I don't have any problems with the

2   contract.

3   A.   Okay.

4   Q.   Speaking of contracts, what I say about the contracts is

5   that everything should be done according to the contract.  What

6   does it mean "according to the contract"?  You took out a loan,

7   and while you took out the loan --

8   A.   No, no, I'm not talking about that.

9   Q.   So?

10  (READING OF TRANSCRIPT PAUSED)

11           MS. KAPLAN:  Top of Page 5.

12           THE WITNESS:  Oh, I'm sorry.

13  (READING OF TRANSCRIPT CONTINUED):

14  A.   I'm talking about our operational agreement, our agreement

15  when we started.

16  Q.   Okay.  Regarding the operational agreement, regarding

17  everything.

18  A.   Okay.

19  Q.   Did you take anything?

20  A.   We have, we have, hmm, for example, we have it.  For

21  example, hmm, under the agreement, that I, let's say, have

22  40 percent, 42.5 percent now, correct?

23  Q.   Well, whatever there is --

24  A.   No, wait.  Now you want me to give 5 percent from my

25  interest to Saba, then to give 5 percent to someone else?

1   Q.   I don't want anything.  I have never talked about the

2   interest with you, Brother.

3   A.   Hmm, hmm.

4   Q.   You have talked to my brother.  I don't care about the

5   interest at all.  My brother gave me his interest, and I am all

6   set.  You and my brother talked, and he told you --

7   A.   Oh, well, I talked to him, and he told me that the same

8   that you had told me on the phone.  We don't live by the

9   contract.  We live on our way.  How does it work that way?

10  Q.   With you?

11  A.   Yes.

12  Q.   With you it's like that?

13  A.   How can you do that?

14  Q.   Because we entered in a business where contracts should

15  not exist between us, because the way things are going here are

16  such that we don't need contracts.  It should be you and I,

17  because everything is different here.  You will see the loss we

18  will have here in three months.  All the this and that.  Yes,

19  you made a contract with us.  That's fine.  I, uh -- it can be

20  like that for five years, if you want.  We don't care about

21  that.  Also, what we have here is that I wouldn't do that when

22  I have money in the future also, but you did that.  That's

23  fine.

24  A.   Yes.

25  Q.   By that you --

1    A.    You can't -- you can't manage money.  Your numbers --

2    Q.    That's true.

3    A.    You understand?  You --

4    (READING OF TRANSCRIPT PAUSED)

5          MS. KAPLAN:  Then going ahead to Page 9, Line 127,

6    starting with Line 127.

7    (READING OF TRANSCRIPT CONTINUED):

8    A.    You come to me, you come to me at the opening, and the

9    next day you tell me I had a manager and nine people disappear.

10   One killed himself.  My brother did this one.

11   Q.    I am telling you that, that I can do that.

12   A.    What can you do?

13   Q.    What can I do?  This is what I can do.  When I had

14   problems with those people in the office --

15   A.    Yes, hmm.

16   Q.    The ones I told you about in the office when I saw that

17   they wanted to hit --

18   A.    Hmm, hmm.

19   Q.    I just wanted to kill all five people right on the spot.

20   It was just a matter of a minute.  And my brother didn't let

21   me.  It took just a minute.  Something happened and they ran

22   away.  How is that possible?  But you won't be able to do

23   anything like that, for instance, because you are different.

24   I, I am different.  Let's say I cannot -- I was just standing

25   there, and they all ran away, and all five people don't live in

1   Boston.  I am just saying this.

2   A.   Well, yes, but we are doing business together.  Why are

3   you saying that?

4   Q.   I'm not saying this to you.  I'm not saying because we

5   want to scare someone.  I am telling you because you are my

6   partner.  We are together.

7   A.   Hmm.  Yes, what does it mean?

8   Q.   And so that you know to not end up in those situations, so

9   that you know that.

10  A.   What should I know?  Why the "f" do you need to know such

11  things, David?

12  Q.   Oh, Come on.  (Chuckles).

13  A.   Yes?

14  Q.   Like, really.  We'll kill those five people, damn it.

15  We'll catch everyone.  They will close down everything.

16  A.   Well --

17  Q.   And everything, man.  How can you not know all that?  You

18  should know everything.

19  A.   Yes, David.  I don't want to.

20  Q.   And the same things about my brother, the same things.  We

21  are different people.  Honestly, that's why we created all

22  this.  We fucking bought them here.  We put everyone in their

23  place, in short the way it's supposed to be so that all are

24  happy.  My family.  Kenton has been with us for three years,

25  and we are keeping an eye on everything.  Uh, Saba, he hasn't

1   seen his family for four years.  He worked with me and he

2   didn't take a dollar from me.

3   A.   Why?

4   Q.   Because --

5   A.   Let him work.  Why don't you -- I don't understand.

6   Q.   Look, we cannot work for other people.  We work for us,

7   Brother.  He works for himself now.  He does his thing.  He

8   helped me to create this.

9   A.   So, you are saying he's your friend, but then you say,

10  yesterday you told me he was not your friend.

11  Q.   He -- a friend is a different thing, you know what I mean?

12  He is a good person.

13  A.   You -- I haven't seen any friend that you have.

14  Q.   In America, I have a few friends in America.  That's one.

15  Then a friend is -- see, you tell me you have 50 friends,

16  right?  From those 50 only one may not stand up.  Let's say

17  someone shoots at you.

18  A.   Why shooting?  Why do you think that way?

19  Q.   For example, when you need money everyone should be by

20  your side.  When you have something --

21  A.   Well, when I needed money I took it.  And you --

22  Q.   No.  Taking is one thing.  When you say a word they all

23  have to come by and ask you what do you need, "How much do you

24  need?"

25  A.   Why?

1    Q.    If someone needs $2,000,000, do you think I could sleep at

2    night?  How can I do that knowing you need money, man?  I would

3    not be able to sleep.  I have no money, but I send to Saba in

4    order that, if something is needed.

5    A.    So, dear, honestly --

6    Q.    Friendship means something else for us.

7    A.    No, that's --

8    Q.    That's how friendships should be.  For example, I have

9    friends in Georgia.

10   A.    No.  You know what --

11   Q.    It only takes one phone call and I know that they will

12   come on foot and do whatever I need.  That's real friendship.

13   A.    But, you see, you aren't behaving properly.  You

14   understand?  You know, in front of, hmm, Olga you, hmm, want to

15   go off on -- you went off on Kenton.  Hmm.  You strike your

16   hand on the table, and here you do the same.  Why so?

17   (READING OF TRANSCRIPT PAUSED)

18   BY MS. KAPLAN:

19   Q.    Okay.  I'm going to stop you now, and if I may ask you,

20   back to Line 154, where you say, "Let's say someone shoots at

21   you," or David Tkhilaishvili says that, and then you say, "Why

22   shooting?"

23   A.    Yes.

24   Q.    The word for shoot, what is that in Russian?

25            MR. CRUZ:  Objection, your Honor.

1          THE COURT:  He may answer.

2   A.   Shooting, there are different -- you can use the words

3   "streelet" (ph), one, and "book book" (ph), and the different

4   words -- in slang -- they have other slangs.  If I read then I

5   can tell.  They have many slangs in the Russian language for

6   the "book book" that says there shooting as well.

7   Q.   But this word "shooting," when you first read this

8   transcript did you see that word?

9   A.   I believe it was a different word, and I changed it, and

10  if I may look at the old one I can remember what it was,

11  because in the slang they have different slangs, and I don't

12  know all the slangs.

13  Q.   Does it also mean drunk or drinking?

14          MR. CRUZ:  Objection, your Honor.

15  A.   No, no, no, no, no, no, no.

16          THE COURT:  Sustained on that.  It's a leading

17  question.

18          MS. KAPLAN:  Okay.

19  BY MS. KAPLAN:

20  Q.   Did you listen to the disc?

21  A.   Yes, I did.

22  Q.   And did you hear -- is this an accurate representation of

23  what you heard?

24  A.   It is the accurate representation, yes.

25  Q.   Okay.  Turning to Page 13, Line 181, we'll continue.

1    A.    Yes.

2    (READING OF TRANSCRIPT CONTINUED):

3    A.    David, you want to do business like they do it on the

4    street.

5    Q.    No, I don't want to do it like on the street.  I don't

6    want to do that.  I want us to make billions, and that we are

7    like other people who know how life works.

8    A.    Yes.  You know, you know, you know what the main thing is?

9    The thing is that, when you want to do -- when you want us to

10   be together you come to me, close the door and start

11   threatening me.  Why?  You walk back and forth, hitting things.

12   Why?  What's the point?

13   Q.    I hit things because my brother told me when I came that

14   Victor and I spoke and we agreed it is going to be this, this,

15   this and this way, and when those --

16   A.    I, I -- yes.

17   Q.    -- conversations started here, I told him, "What's going

18   on, man?  What's happening?  Why is it not that way?"

19   A.    Why don't you tell your brother, "Why does Victor have to

20   give his interest to other people?"  Did you ever tell him

21   that?

22   (READING OF TRANSCRIPT PAUSED)

23         MS. KAPLAN:  Okay.  And then turning to Page 15, Line

24   213.

25   (READING FROM TRANSCRIPT CONTINUED):

A.   When we -- every other time we talk both of you and your

brother say things like, "I'll burn this place, I'll break this

place," hundred times.  Why?  Why do you say such things?

What's the point?

Q.   Because we worked here for three years to create this

place.

A.   Hmm.

Q.   If for this place -- I told you this is our family.

A.   Hmm.

Q.   And this is our house.

A.   Hmm.

Q.   We grew up here.  We put everything in here we earned in

10 or 11 years.

A.   Hmm.

Q.   You put in half a million or 600,000 in a year, but we put

in three years and 1,000,000.

A.   Hmm.

Q.   All our money, all our -- all the debts, everything.

Everything has been put into this.

A.   Hmm.

Q.   And everyone, not just me.  Besides me there are ten other

people.

A.   Hmm.

Q.   Starting with Vakho, Tengo, everyone worked hard here and

did everything.

1    A.    Hmm, hmm.

2    Q.    This is our family business.

3    A.    Hmm.

4    Q.    In our family business we know how all of this is done.

5    A.    Hmm.

6    Q.    If someone does something that we may not like or approve

7    of, everything will be destroyed and fucked up.  That refers to

8    our relationship in the business.  That's why we don't want

9    anyone, and that's why we are alone and always have to, what do

10   we say?  That we -- that's why with our partners or people our

11   word is law.  The word is important.

12   A.    Dav, Dav, we are not on the street.

13   Q.    That's it.  That's why.

14   A.    In business?

15   Q.    No, no, wait.  The word is --

16   A.    It is --

17   Q.    It's not the street.  The word is --

18   A.    No, no, no.

19   Q.    -- a man's thing.

20   A.    You are wrong, Dav.

21   Q.    Wait.

22   A.    A man is not --

23   Q.    Wait, Victor.  They will ask everywhere.

24   A.    Ask whom?  Where?

25   Q.    You have to give a word.

```
 1   A.   What are you talking about?

 2   Q.   Not here.  We will sit down at a restaurant.

 3   A.   Hmm.

 4   Q.   We will come together.

 5   A.   Hmm.

 6   Q.   And if I didn't do something for you --

 7   A.   Who?

 8   Q.   -- something else will happen?

 9   A.   What do you mean "something else will happen"?

10   Q.   The word is worth a billion for me, Brother.  I don't know

11   if it is not the same for you.  Then --

12   A.   I, I --

13   Q.   -- then, then we will talk in a different fashion.  Then

14   we will be partners and we will do business, business.  You

15   will have yours and --

16   A.   David, either, either, either way, either way, either way

17   this is how it is with us, our relationship.

18   Q.   And either way, if that's the case, then a lot has to

19   change.

20   A.   Yes.  We --

21   Q.   A lot has to be done.

22   A.   We -- we don't have friendly relationship anymore.  We

23   don't.

24   Q.   Yes, yes.  Well, friendly relationship.  I don't know what

25   you think, but a friendly relationship in a minute like this I
```

1  shot a friend.

2  A.   You shot a friend?

3  Q.   Yes.  Well, it happened.  We were drunk, and he, he hit me

4  and did that thing, and then we are friends and we will always

5  be friends.  If for eight years we were friends there is no

6  excuse for these kinds of conversations.  A decision has to be

7  made.  Okay?  You do understand that it was difficult for me,

8  right?

9  A.   Well, look --

10  Q.   So, come, come.  There is no problem here.

11  A.   How can -- how can one shoot a friend?

12  Q.   Well, uh, and hit each other, and I had a gun, and I

13  fired.  What's the problem?

14  A.   What do you mean?  That's a big problem.

15  Q.   Well, that's how it is.  These things happen.  He's

16  childhood friend.

17  A.   Well, that's not normal.

18  Q.   Well, whether it's normal or not, it happens, sometimes

19  this way and sometimes that way.  But let all of this go.

20  Well, we remained friends.  Are you telling me you have never

21  hit a friend?

22  A.   A friend?

23  Q.   Yes.

24  A.   Of course I haven't.

25  Q.   Well, how come?  Sometimes it happens that you --

1    A.    Hit a friend, David?

2    Q.    You do something, like you would be drunk and would do

3    something fucking crazy.

4    A.    Well, how can you hit a friend?  Tell that we will --

5    right there.  (Background voices).

6    Q.    You would be drunk, and you would do a fucking crazy

7    thing.  You need to come to your senses a little.  Everything

8    happens.  This happens and that happens.

9    A.    Look, David, you -- even now that --

10   Q.    There is nothing here.

11   A.    We just started the business.  You are saying that you

12   went, hmm, somewhere recently, hmm, and met up with people and

13   showed them a gun.  Why the "f" would you do such things?

14   Q.    I need to.  First of all, I always carry a gun with me.

15   A.    Always?  You always carry a gun with you?

16   Q.    Always.  I always carry a gun with me.  That's first.

17   A.    But you don't have a gun license.

18   Q.    I have a license, and I have other kinds, too.  That's

19   first.  Secondly, secondly, my brother has a license and other

20   kinds too unregistered.  That's that.  That's first.

21   A.    Both of you?  Both of you have both legal and --

22   Q.    Both of us.  That's first, yes.  That's first.  Secondly,

23   when I go to places like that, I always carry it with me.

24   A.    A gun?

25   Q.    Yes.  Why not?  That's the problem?

```
 1    A.    Well, you don't have a right to have it on you.

 2    Q.    Why can't I?

 3    A.    If you run into problems, you will get arrested.

 4    Q.    No, I won't get arrested.

 5    A.    How so?

 6    (READING OF TRANSCRIPT PAUSED)

 7    Q.    I think you have Line 303, for you.

 8    A.    Oh.

 9    (READING OF TRANSCRIPT CONTINUED):

10    A.    Yes, but you need to understand.

11    Q.    It won't create a problem for you.

12    A.    Look, you are talking to me and you are telling me that

13    you -- you understand I'm doing business with you, and you are

14    saying that I'm talking to you and your brother, your brother.

15    You told me on the phone your brother told me, told me on my

16    face, "We don't live by the contracts we live by, hmm, well, by

17    our ways and the ways we see it."

18    Q.    No, no.

19    A.    We have a co -- co-- contract, contract.

20    Q.    So what?  We have a contract, a contract we have with

21    people and how we need to carry ourselves, that's all.  What's

22    the problem?  We have a contract.  That's good.  All is good.

23    Whatever we agreed upon with you we have to make a decision on

24    all of that and finalize it.  That's all.  There is nothing

25    else there.
```

1   A.   Dav, you see, when you know that your partner, hmm, is,

2   you see, you are telling me such things that we are working

3   together, we are in a business together and --

4   Q.   Look, here in a word, whatever we have here I know

5   everything, and I will set things up in here in such a way that

6   no one -- just stand and observe.

7   A.   David, you don't have a, hmm, basic education, a simple

8   education.

9   Q.   I don't need education.  What I have --

10  A.   Of course you do.

11  Q.   -- no one has here.  Yesterday I told Joan what to do, and

12  she was fucking shocked, all of the finance information.

13  A.   Well, they --

14  Q.   Wait, wait.  I had this company.  I have everything here.

15  If there's a problem or something happens, you tell me.  I will

16  set up things here in such a way that --

17  A.   Well, to tell every time, every time --

18  Q.   Your money, look --

19  A.   Every time, every time these conversations and threats, it

20  just kills me, David.

21  Q.   Conversations -- no, I came to you and I told you and

22  that's how it was supposed to be so that you and I --

23  A.   Well, yes.

24  Q.   -- so that you and I are one company.

25  A.   David, when you do those -- do you understand?

1   Q.   You and I --

2   A.   Do you understand what a partner is?

3   Q.   You and I --

4   A.   A partner is when people communicate.

5   Q.   No.

6   A.   That's what a partner is.  I have a partner now.

7   Q.   I have --

8   A.   Excuse me, excuse me.  I have a partner now, Kostya.  I

9   sit down and talk to him -- a guy -- talk to the guy.

10  Q.   Well, come on.  Kostya, Kostya, may God keep him in good

11  health.  He is a different person from a different life.  We

12  are different people.  Kostya --

13  A.   How different?

14  Q.   Uh, four centuries will pass, four centuries, 400 years.

15  A.   Hmm.

16  Q.   And in this business --

17  A.   Well, what does business have to do with this?

18  Q.   Shouldn't be working.

19  A.   I'm talking about the business.  I'm talking about the

20  human relationship, David.  Do you understand?

21  Q.   I am telling you to leave all this behind.

22  A.   David, look, there is --

23  Q.   So that you, you would be respected, and you --

24  A.   David, look, there is more and if -- yes, if -- educate

25  yourself a little.  For example, read the Warren Buffett works

1    and Charlie Munger.  Those people have billion-dollar

2    companies.

3    Q.   You see, you want to make your money, don't you, and make

4    the company work?

5    A.   No, David.

6    Q.   I can't read that Buffett.  I --

7    A.   David, these are different problem that you can't --

8    Q.   -- set up things so that everyone would make money so that

9    everything would be fine and so that everyone would be happy.

10   A.   Yes.  Our money.  I -- I don't want to go to jail because

11   of the way we make the money --

12   Q.   To jail?

13   A.   What?

14   Q.   People made $10,000,000 --

15   A.   Hmm.

16   Q.   -- in a year or two, and no one went to jail.

17   A.   But, Dav, dear, I don't want to live like that.  I don't

18   live --

19   Q.   No one lives like that.  Here, ten people do one thing

20   that -- this is not what I pay for.  I don't need a big staff,

21   but I specifically do everything so that we all -- so that we

22   have all the notes and everything we need, you know, so that

23   everything would be correct so that we don't lose $1 and never

24   go to jail for that.

25   A.   Dav, dear, what you say, hmm --

1    Q.    Those conversations --

2    A.    The way you behave yourself as a business partner and as a

3    human being is not normal.

4    Q.    That's because when I don't like something, like it was

5    with Fabrick, right?  When I didn't like something I could have

6    stepped back.  If I don't like something I do this right on the

7    spot because --

8    A.    What do you say you do?

9    Q.    Well, Fabrick, for example, he started this bullshit,

10   started it, well, childish talk when he was drunk.  He started

11   saying like things, "I will leave and Olga will too," this and

12   that, and I could, you know, say, "Well, okay, where would you

13   go," this and that.  But I did the opposite.  I tell him, "If

14   you leave I will fuck you.  Go ahead."  Something of this

15   nature, you know.  That's not our style, and that's why I do my

16   part.

17   A.    You live like a street thug and not like a businessman,

18   David.

19   Q.    A street thug, really?  He owes me.  I put $200,000 or

20   $300,000 in for him, and he wanted to destroy everything here.

21   So, I just drinking --

22   A.    Dav --

23   Q.    That's not going to fly here.

24   A.    Dav, do you understand in the business, look, like I told

25   you before you opened the place, and as soon as you opened it

1    you took a vacation for three months.  I don't know any

2    businessman in the world that opens a business and takes a

3    three-month vacation right away.

4    Q.    No.  I took my vacation and went because it was needed,

5    and, uh, my life needed that.

6    A.    David, I'm like, like a businessperson, and I know that

7    when you have a brand new business you don't take three months

8    off.  I -- and that's why I fell apart.

9    (READING OF TRANSCRIPT PAUSED)

10   Q.    Okay.  And if I could just ask you, when you're talking

11   about that he took three months off for vacation, are you

12   talking about Allied Health?

13   A.    No.  He's talking -- we're talking about Davis Health, PC.

14   Q.    Davis Health Clinic?

15   A.    Davis Health Clinic, yeah.

16   Q.    And when you were referring to "Fabrick," was that Kenton

17   or Kurt Fabrick?

18   A.    Kurt Fabrick.

19   Q.    Do you know who Kurt Fabrick is?

20   A.    I never met him, but I believe he is the brother of Kenton

21   Fabrick.

22   Q.    And was he involved in Davis Clinic?

23   A.    Yes.

24   Q.    And you mentioned somebody by the name Kostya.  Who is

25   that?

1    A.    Kostya, he's my partner at the gym.

2    Q.    At the gym?

3    A.    In Watertown, yeah.  And, if I may, and I believe the word

4    on the pass was, on the slang was booknich (ph).

5              MR. CRUZ:  Objection, your Honor.

6              THE COURT:  I am striking the answer.

7              You are only to answer questions that are put to you.

8    Don't volunteer information.

9    BY MS. KAPLAN:

10   Q.    So, I'm looking at Line 364 on Page 23, where it says, "So

11   I just drinking."

12   A.    Yes.

13   Q.    Is that the word?  Is that what it said, "drinking"?

14             MR. CRUZ:  Objection, your Honor.

15             THE COURT:  He may answer this question.

16   A.    I believe -- it says "drinking" here.  I don't remember.

17   I don't remember.  I just don't remember.  I don't remember.

18   Q.    Okay.  That's fine.

19             Okay.  Turning to Page 27, Line 440, and I'll start

20   with, "Today or tomorrow.  I came to you?"

21   (READING OF TRANSCRIPT CONTINUED):

22   A.    You came to me 20 times, and I turned you down 20 times.

23   Q.    Yes, that was before.  Last time when I came to you I told

24   you about my idea and said, "Victor, there is money in this.

25   If you have money invested, it will be like this and this and

1    this.  You will be in satellites, you will be in management."

2    I opened everything for you.

3    A.    Hmm.

4    Q.    Okay.  All this.  You, from here from there, you said

5    33 percent and 40 percent.  Well, I didn't start negotiating.

6    I don't like negotiating.  Then this and that happened.

7    Whatever it was, 40 percent or 33 percent, I didn't have a

8    problem with that.  Later you talked to my brother and agreed

9    upon 40 percent.

10   A.    Your brother, your brother came to me at work and he want

11   me to take out my 10 percent and give to Saba and other people.

12   Why should I do that?

13   Q.    Well, if not, then you should tell him, "Jaba, we can't do

14   this in five minutes."  You should have said --

15   A.    Well, he came to me at work.  What could I --

16   Q.    When he came you should have told him, "Sorry, I am at

17   work now.  Let's meet in the evening."

18   A.    Right.  Well, listen --

19   Q.    Instead of giving him your word.

20   A.    Okay, I get it.  But what do you think, why should I give

21   my 10 percent to Jaba?

22   Q.    It doesn't matter.  You --

23   A.    If I tell you, "Give me all your interest," will you give

24   it to me?

25   Q.    I will tell you that, uh, if you, you wanted to take all

1    the interest, put it under your name and leave us nothing.

2    Remember that?  But if you tell me that you need 5 percent and

3    explain that you need that to sell everything, then I would

4    tell you --

5    A.    To sell it whom?  You are telling me that your interest --

6    Q.    I may.  I may tell you --

7    A.    You can give it to --

8    Q.    I may tell you that I may say, "Yes," I may say, "No," and

9    I may say whatever it is.  I will not tell you "Yes" and

10   then --

11   A.    Dav, you understand in any normal business partners don't

12   talk about things like, "If it doesn't work out I'll burn the

13   place up, if it doesn't work out, I will destroy it."  They

14   don't say things like that.

15   Q.    We don't say things like that.  We do say that if

16   something here doesn't work out the way we want --

17   A.    Hmm.

18   Q.    We won't be here, and you won't be here, and there won't

19   be because --

20   A.    But what will be?  What will be?

21   Q.    Because what will be, what will be is that our souls will

22   be empty, and when our souls are empty --

23   A.    Hmm.

24   Q.    -- who the fuck knows what will be then?

25   A.    But what?  What exactly?

1    Q.    Well, I don't know.  It can be anything.  Who the fuck

2    knows?

3    A.    What does, "Who the fuck knows," mean?

4    Q.    Well, I don't know.  Well, anything can happen.  Maybe we

5    will end up kicking everyone out of here, everything --

6    A.    What do you mean kick out?

7    Q.    Well, I don't know.  Let's say we may tell Fariba (ph),

8    "Fuck you.  Get the hell out of here."  For example, anything

9    can happen.  Or maybe we will do something to you.  Maybe --

10   A.    But what will you do to me?

11   Q.    Well, I don't know.  I cannot tell you.  God forbid if I

12   turn against you what would you do?  The same goes for you.

13   A.    Well, what would I do?  I wouldn't do things like that to

14   you.

15   Q.    Would you just sit at home?

16   A.    No.

17   Q.    If you don't have power in you, that's the fucking end of

18   it.  That's why I want to --

19   A.    I won't sit at home.  There are laws, and I will do

20   everything according to the law.

21   Q.    Look, today doing things by law may take 20 years, so you

22   may say something, and I may say something else, and God

23   forbid, but in a word that's not going to work.  Instead of

24   sitting and having this conversation here, we could have the

25   insurance a week ago.  We don't have the insurance because of

1   these conversations.  I swear on my mother's life we are

2   different people.  We are God's children, and whatever happens

3   to us comes from up there.  We are honest towards God and in

4   life and everything.

5   A.   So how --

6   (READING OF TRANSCRIPT PAUSED)

7   Q.   No, no.  Stop there.  I just want to ask you, who is

8   Fariba (ph)?

9   A.   Dr. Fariba (ph) was our initial professional service

10  director.

11  Q.   He was working at Allied Health?

12  A.   He was working at Allied Health.

13  Q.   Okay.  And then turning to Page 42, Line 719.

14  (READING OF TRANSCRIPT CONTINUED):

15  A.   You made a contract, entered into the contract.  You took

16  a 6,000 and 5,000 and made a new contract with Hang and went to

17  Georgia.  You need it for your nerves.  You, hmm, had no right

18  to draw a new contract with Hang.  You didn't tell me a word

19  about it.  You didn't show me a single contract.  You took

20  11,000.

21  Q.   Look, look.  I'll tell you everything now.

22  A.   Go ahead.  Tell me, please.  I'm listening.

23  Q.   I told you that we needed to pay Hang in July $22,000.

24  A.   Right.

25  Q.   Otherwise he would want -- okay?

1    A.    Yes, and I put the money, put the money so that --

2    Q.    $22,000.  Wait.  Yes.  We needed to pay Hang $22,000.  In

3    order not to pay Hang, I would talk to him so that we could pay

4    all the -- and I transferred your $11,000 to September and took

5    my $11,000 out of Hang's money.

6    A.    But, David, do you understand what you have done?  You

7    took it from the company.

8    Q.    Yes.

9    A.    You took the money from the company which we were supposed

10   to pay him in September.

11   Q.    Uh-huh.

12   A.    You took the money from the company, and you were supposed

13   to pay Hang, and you didn't pay Hang, and you still haven't

14   paid him.

15   Q.    Well, I didn't pay Hang.  What can we do?

16   A.    What?

17   Q.    Well, we have big expenses.

18   A.    Well, everybody has expenses, David.

19   Q.    Wait, wait.

20   A.    I don't have money either.  Do you understand what the

21   point is?

22   Q.    If you don't have money, look, money --

23   A.    When I met you I had a perfect life.  Then --

24   Q.    Okay, okay, because we don't have money, and that's why I

25   do everything to take money from other people, too.  I have

1    five people now --

2    A.    Hmm.

3    Q.    -- who want to invest money.  If you want --

4    A.    Who are those five people?

5    Q.    Wait.  If you want, they can give it to us by charging

6    interest.  If you want, they can give it to us on interest, and

7    we will pay back the interest.

8    A.    Dav --

9    Q.    If you want, will buy interest?

10   A.    Yes.  You know, all of your people, I really don't want to

11   meet anyone.  I'm sick and tired of your people.

12   Q.    Well, if you are sick and tired, then don't bring up the

13   money issue.

14   A.    Okay.

15   Q.    Yes.  In order to get money --

16   A.    You take 11,000 David.

17   Q.    Wait.  I take $11,000.

18   A.    How about the telephone, my phone?  I paid for five people

19   for entire year, and when I bring it up to you, you tell me,

20   "Shame on you bringing up the subject."

21   Q.    Please don't talk about the telephones anymore.

22   A.    Why not?

23   Q.    Well, because --

24   A.    $6,000, $7,000 is big money.

25   Q.    No, no, no.  $6,000 or $7,000 is big money, yes.  It

1    wasn't $6,000 or $7,000.

2    A.    It was six, six, six.

3    Q.    It was $250 for five months.  It's $1,000.

4    A.    No, no, no.  It was 11 months.  I counted.

5    Q.    Okay.  Write that down also, please.  You will take that

6    back too, and I don't want to hear about the phones again

7    anymore.

8    A.    Dav, do you understand, you take things --

9    Q.    I swear on my mother's life no more.  That's it about the

10   telephones.  Whatever happened, forget it.  It's ending in

11   April.  Forget about it.

12   A.    Olga's car is on the credit card.  Why should I pay her

13   personal car insurance?

14   Q.    No.  Regarding insurance, I told you that --

15   A.    I told you all that before.

16   Q.    -- we owe her money, and she said that --

17   A.    No, no, you didn't -- you did it prior to that also,

18   David.  You did that prior to that also.

19   Q.    I never did it.

20   A.    You did it, David.

21   Q.    In November she had a cancellation.

22   A.    David, you are telling the truth -- you are not telling

23   the truth.

24   Q.    And she used --

25   A.    David, dear, prior to that you paid from the company money

1    and --

2    Q.   Look, you know my situation this year, but I haven't spent

3    $1 on my personal expenses, not a dollar.  I did everything and

4    didn't alarm you.

5    A.   What's there to alarm me for?  You --

6    Q.   What alarm?

7    A.   And I -- I sucked all my blood out of me.  You sucked all

8    my blood out of me.

9    Q.   50,000.  You should have just given me a minimum of

10   $50,000 as a gift.

11   A.   I should have given you 50,000 a gift?

12   Q.   Yes, at a minimum.

13   A.   You are insane, David, I swear.

14   Q.   If you bring me an idea like that, I will give you

15   $100,000 as a gift.

16   A.   You, you are crazy, I swear to God.

17   Q.   No, I'm not crazy.

18   A.   You say such things that --

19   Q.   That's right.  I gave you $30,000 in a heartbeat.

20   A.   You have not given me a penny in your life.  For six years

21   I have known you, you have not given me a penny as a gift, and

22   you want me to give you a gift?

23   Q.   You sound like you are unhappy here.  Is that so?

24   A.   Yes.

25   Q.   Yes?

1   A.   I'm not happy with you, David.

2   Q.   Okay.  If you are not happy, then let's talk, and you can

3   take your money, and it's your life.  It's up to you.  What can

4   I do?

5   A.   David, the thing is that I put up the money.

6   Q.   The thing is that I don't want people to be unhappy here.

7   It's the opposite.  People should be happy and --

8   A.   Well, how can I be happy with you when every time I talk

9   to you, you say, every other word you say, "I'll burn down the

10  place up.  I'll shortly speak.  I had nine people whom I kicked

11  out."

12  Q.   I never tell you -- I don't repeat it many times.  I --

13  A.   You told me everything then, David.

14  Q.   The day before yesterday I said --

15  A.   Right here.

16  Q.   Wait.

17  A.   What did you say?

18  Q.   What I told you is --

19  A.   You told me that you had a manager.  I quote you.  Is that

20  correct?

21  Q.   Yes.

22  A.   Who was a problem, correct?

23  Q.   Yes.

24  A.   You told me he ended up dying, and the second one was

25  deported back, correct?

1    Q.   Yes, yes.

2    A.   Those are your words.

3    Q.   Yes, it did happen to both of them.

4    A.   Yes, it did happen to both of them?  Hmm.  If I am with

5    you, I'm your partner.  When you tell me such things, then that

6    means the same will happen to me?

7    Q.   No.

8    A.   So, why you tell me such things?

9    Q.   He stole my money.

10   A.   So, if he stole your money you should kill him, hmm?

11   Q.   No.

12   A.   Then you tell me --

13   Q.   He stole my money.

14   A.   Yes, but --

15   Q.   I forgave him for that and just let him go, and later he

16   went after, wanted to come after me, to come after us.

17   A.   Yes, to come after you, and then you made a contract to

18   have kill him?

19   Q.   No, I didn't make a contract to have anyone killed.

20   A.   Hmm.  Common.

21   Q.   We didn't make a contract to have him killed.  He, uh --

22   they fucked up his mom, and he just went crazy afterwards,

23   started shooting up drugs and ruined his life.

24   A.   And then you tell me, "My brother is crazy, I can't

25   control him.  He went to the neighbor's house and shot the guy

1    in the head," did this and that.

2    Q.   It was an accident.  When, uh, the police -- and he shot

3    seven times nine bullets at people.

4    A.   At people?

5    Q.   Yes, it happened.

6    A.   Well, look, if you tell me such things, what do you want

7    me to think?

8    Q.   No, because you, you wait, you are a person who --

9    A.   What person?  I'm your business --

10   Q.   You understand life.  Wait, wait.

11   A.   What's there to understand?  David, dude --

12   Q.   Understand life, understand life.

13   A.   David, do you understand I started to work with you, we do

14   business.

15   Q.   Wait.  All normal people understand that everyone has a

16   background, you understand?  Everyone has a background and

17   everyone has all kind of stuff, but we don't do something just

18   for nothing.

19   A.   David, I am talking to you.

20   Q.   Everything.

21   A.   And you tell me, uh, "We will get together, we'll go to

22   ten thieves-in-law, let them resolve the problem."

23   Q.   I never told you that.

24   A.   You told me that.

25   Q.   Never in life have I said "thieves-in-law."

1    A.    "I will bring ten thieves-in-law to tell you that you are

2    wrong."  I am repeating your words.

3    Q.    No, I didn't.

4    A.    And your brother said that same.

5    Q.    I didn't, no.  My brother said that thieves-in-law don't

6    have the last word on us.  That's first.

7          And, secondly --

8    A.    You told me, "Atenk (ph), go ahead, go to Atenk, to ten

9    thieves-in-law."

10   Q.    I went to -- I went to Atenk to get this business, and,

11   fuck it all, I could get that without that, but I don't want it

12   to be on my soul.

13   A.    You -- you went to Atenk?

14   Q.    Yes, I was in -- I was in Ukraine, and I was in Moscow

15   and --

16   A.    Who did you go to?

17   Q.    To everybody.  Twenty thieves-in-law have been informed

18   about my business, twenty, twenty people, and they will control

19   the entire world.

20   A.    But, Dav, you understand you do such abnormal things --

21   Q.    Well, that's how you get in this business.

22   A.    David, you are a thug.  You know that?

23   Q.    You won't get in.

24   A.    Act like a businessman, not like a thug.

25   Q.    You won't get in.

1    A.    What do you mean?  What are thieves-in-law?

2    Q.    They won't let you.

3    A.    Why won't they?

4    Q.    No way.

5    A.    Listen, who are the thieves-in-law that let you?

6    Q.    Who are they?  They were those who gave the idea, and he

7    was stopped, and that's all.

8    A.    Dude, Dav, dear, you have been watching movies like that.

9    Q.    And he would be stopped for life.

10    A.    I don't know.  Either you watch movies or --

11    Q.    No, I don't watch movies.  We are people who, God forbid,

12    if someone tries to go against us, we go against them.

13    A.    Against me?  Are you going to go against me now?

14    Q.    No, no.  Against you?  If you go against us, God forbid.

15    You get it?

16    A.    I get what?  What are you going to do?

17    Q.    Against -- well, like I told you, one can't tell what will

18    happen.  No one knows what will happen.  That's why everything

19    should be done nicely in a normal fashion.  Let's say, man,

20    literally, he was my partner, friend, man, he said some

21    bullshit, and he got cut right in Downtown Boston, man, Arno,

22    man.  How could he get cut?  The whole idea was in my hands.

23    How could --

24    A.    Listen, do you understand these are abnormal things

25    that --

1    Q.   Because he said bullshit.  He was drunk and he said

2    bullshit.  He shouldn't have said that, and when you say

3    bullshit you have to pay for it.  I'm not saying to pay by

4    being cut or killed or, uh, in a word, in Downtown Boston.

5    A.   It's not normal.  Your brother is crazy too.  How can you

6    do things like that?

7    Q.   That's why he is nicely getting his ticket soon, and he

8    will leave for Ukraine for good.  He will never go to Boston

9    again.  That's why before he leaves he wants to --

10   A.   Dav, dude, you know what?  I'm so tired of this.

11   Q.   Everything.  Set everything up, transfer everything, and

12   everything will be okay.

13   A.   You just -- you got me into this whole thing to just use

14   me.  That's what it is.

15   Q.   Oh, come on.

16   A.   I know you.

17   Q.   To use -- you think I am using you?  I don't take a dollar

18   from you.  Eight months --

19   A.   You don't take -- you don't take it?  You are lying.

20   Every month you take your salary upfront, upfront, the $3,000

21   upfront, upfront.

22   Q.   It doesn't matter if I take it upfront or --

23   A.   It does matter.

24   Q.   If there is money, what difference does it make?

25   A.   Yes, it makes a difference, a big difference.  It is not

1    your money.  It is my money.

2    (READING OF TRANSCRIPT PAUSED)

3    Q.   I just want to stop here and ask a few questions.  Back on

4    Page 42 you start talking about entering into a contract with

5    Hang.  Who is that?

6    A.   Hang is the general contractor who David hired to do

7    renovation at Allied.

8    Q.   Okay.

9           THE COURT:  Ms. Kaplan, is this a good place to take a

10   brief break?

11          MS. KAPLAN:  Sure.

12          THE COURT:  Okay.  So, we will take maybe a ten-minute

13   break, ladies and gentlemen.

14          THE CLERK:  All rise.

15          (The jury exited the courtroom at 2:55 p.m.)

16          THE COURT:  So, we will take five, ten minutes.

17                      (Recess taken)

18          THE CLERK:  All rise.

19       (The Honorable Court entered the courtroom at 3:08 p.m.)

20          THE COURT:  Ready for the jury?

21          MS. KAPLAN:  Yes, your Honor.

22          (The jury entered the courtroom at 3:09 p.m.)

23          THE CLERK:  Please be seated.

24          THE COURT:  You may continue, Ms. Kaplan.

25                  CONTINUED DIRECT EXAMINATION

BY MS. KAPLAN:

Q.   Mr. Torosyan, during that last section of the transcript
that we were reading there was some conversation between you
and Mr. Tkhilaishvili about the telephone, and he tells you not
to talk about the telephones anymore.  Do you recall that?

A.   Yes.

Q.   Can you tell us what the situation was with the
telephones?

A.   Well, when Olga came to me back in May and told me about
that, and I start checking things out on David, and one of the
important things I find out, that he used the telephone for
five lines for -- and paid that from my account, from the
business account.

Q.   So, when you say he paid it from your business account --

A.   He paid from the credit card, I believe, and the credit
card paid by my personal account.

Q.   Okay.  So, what credit card was it?

A.   My personal -- oh, Olga's American Express, I believe,
initially it was.

Q.   And who had possession of that card?

A.   He did.

Q.   "He" being who?

A.   David Tkhilaishvili.

Q.   And how did you know that he was using the American
Express card in Olga's name?

1   A.   Well, two ways.  The first thing I did, I started checking

2   into the statements on American Express, and on the statement I

3   noticed that it was in a file in the management office, and I

4   noticed the bills.  I believe it was AT&T.  And I asked him,

5   "What is this AT&T bill?"  Then I start doing a little more

6   checkup, and I find out that those are the phones he used for

7   five lines.

8   Q.   Did you have a company phone?

9   A.   No, I never did.  I used my personal cell phone.

10  Q.   Did anyone have company phones?

11  A.   No, just him and --  he had, and Kenton didn't have.  I

12  didn't have.

13  Q.   And how many phones were being paid for?

14  A.   Five.

15  Q.   Over what period of time?

16  A.   As far as I find out, maybe it was earlier, from day one

17  until May, when I discovered that he promised me he gonna stop,

18  and I sort of believed again, and then again I noticed that on

19  September.  Then I sort of stopped that, and I told Olga to

20  cancel her account; "I'm not going to pay anymore for that

21  credit card."

22  Q.   So, the American Express account you told him you

23  canceled?

24  A.   Yes.

25  Q.   But you were paying the American Express bill in Olga's

1    name that David Tkhilaishvili had possession of with your

2    personal monies?

3    A.    Correct.

4    Q.    And why didn't he want you to talk about that anymore?

5    A.    About?  About the phones?

6    Q.    The phones.

7    A.    Well --

8              MR. TUMPOSKY:  Objection.

9              THE COURT:  Well, if he knows.  If he had a

10   conversation where it had been revealed to him.

11   BY MS. KAPLAN:

12   Q.    Had you had prior conversations with David Tkhilaishvili

13   about that?

14   A.    I -- I talked to him in May, and I told him, "David,

15   that's the wrong thing to do."  He asked me apologies, and I

16   told him -- he said, "That will never happen again," and then

17   the same thing happened months later.  And for him it's

18   nothing.  For him it's thousands, nothing, phones are nothing.

19   Everything is nothing.

20   Q.    Because it's your money?

21   A.    It's my money.  It's not his money.

22   Q.    And then you say on one page, "Olga's car is on the credit

23   card.  Why should I pay her personal car insurance?"  What was

24   that about?

25   A.    When I was checking the statement I noticed some sort of

1    payment towards the account, and I asked him, "What is that?"

2    And David said, "She had to pay the --" Olga's personal car

3    insurance.  I told him, "Why do I have to pay Olga's

4    insurance?"  And David says, "We didn't have no money.  We used

5    that."  David told me he didn't have money to pay Olga's car

6    insurance.  He used the credit card to pay.

7    Q.   Do you know why he would be paying Olga's car insurance?

8    A.   God knows.  No.

9    Q.   So, did you pay for Olga's car insurance?

10   A.   Well, he did pay it in the past, yes.  I did.

11   Q.   He paid it with what?

12   A.   What he did, he used the credit card for transaction.

13   Then he would pay the credit card outstanding balance from my

14   account, from my personal account.

15   Q.   So, when you say he used the credit card, he used the

16   American Express card in Olga's name --

17   A.   Yeah.

18   Q.   -- and then that bill was paid with your personal money?

19   A.   Correct.

20   Q.   And going to Page 48 at the bottom, Line 843, do you see

21   at the bottom where you say, "And you tell me we will get

22   together, we'll go to ten thieves-in-law and let them resolve

23   the problem."  What is your understanding of what

24   "thieves-in-law" are?

25   A.   Well, in the old U.S.S.R., the criminal world, everything

1   being sold by what is called the thieves-in-laws, and if any

2   dispute on the street, they get involved and solve that.

3   Q.   And then you talk about going to -- you're asking -- he

4   tells you that he went to Atenk, and you said, "You went to

5   Atenk?"  What is "Atenk"?

6   A.   Atenk is the Greece, the capital of --

7   Q.   Athens?

8   A.   Athens, yep.

9   Q.   And after that David Tkhilaishvili is talking about

10  somebody, it sounds like -- I thought it was, "Arnak cut right

11  in Downtown Boston."  Arno.  Do you know who he is talking

12  about there?

13  A.   Yes, I do.

14  Q.   And who is that?

15  A.   That's one of the community guys.

16  Q.   What's a "community guy"?

17  A.    In the Armenian community in Watertown.  That's how I know

18  him.

19  Q.   And had you heard anything about Arno prior to your

20  involvement in Allied Health with David Tkhilaishvili?

21  A.   David, yes.  David himself told me they had a business

22  together and they had a dispute.

23  Q.   And did he tell you what happened?

24  A.   He did not personally tell me what happened.

25  Q.   But here in this conversation he's telling you that he got

1    cut in Downtown Boston?

2    A.    Arno got cut, yes.  His brother got cut.  Down in the road

3    when I learned from two people about Arnok, and I asked him, I

4    asked the same to Olga, and I heard that from Saba as well, and

5    I asked him.  He says, "There were issues, and he didn't behave

6    properly, and my brother had to cut him."

7    Q.    "My brother" being who?

8    A.    Jambulat.

9    Q.    And then turning ahead to Page 55, Line 971, starting with

10   reading on Line 971.

11   (READING OF TRANSCRIPT CONTINUED):

12   A.    You're not normal.  You, hmm, will either scare them or

13   you will beat them up.

14   Q.    What do you mean I will scare them?  Why would I?

15   A.    You knocked Kristina out right in front of the people in

16   the office, so people, people are scared.

17   Q.    Wait, wait.  No one is scared of me.  Everyone knows my

18   personality, those who know and everyone knows how to do

19   everything.  I don't beat anyone up for nothing, and I don't do

20   anything to anyone.

21   A.    But do you understand you have no right to touch her?

22   Q.    Wait.  To touch who?

23   A.    Kristina.  You hit her in the office in front of staff.

24   You can't do that.

25   Q.    In front of Kenton.

1   A.    In front of Kenton.

2   Q.    It's ours, and she made me do that, and uh, anyway,

3   because --

4   A.    Well, so you might get agitated and hit me also.  You are

5   not normal.

6   Q.    Wait, wait.  Mistakes.  When I told her fucking ten times

7   that her money was supposed to be returned, it was something

8   else here.  She's an idiot, and that idiot almost lost $95,000.

9   A.    Come on.  What does an idiot have to do with this?

10  Q.    Because when you tell someone once, twice, three times --

11  (READING OF TRANSCRIPT PAUSED)

12  Q.    Okay.  And then turning to Page 59, please, and Line 1046.

13  (READING OF TRANSCRIPT CONTINUED):

14  Q.    "We have a nice, clean, normal life."

15  A.    He doesn't.

16  Q.    Everyone, thieves listen to us, people listen.  It takes a

17  phone call to Georgia and the word goes out.  Let's say if

18  people are killing each other we make a phone call and our word

19  is all it takes.

20  A.    Hmm.

21  Q.    That's it.

22  A.    Hmm.  But that's too bad if that's the case.

23  Q.    That's how it is in my family.  That's it.  Because that's

24  how we roll.  That's first.

25          Secondly, a friend like Saba, let's say all your fifty

1    friends combined can't do what Saba can do alone, but as a

2    friend -- you know what a friend is?  It's the one who you will

3    stand for till the end.  You know, he may do something that

4    will hurt me later, and then he will stop being a friend, and

5    that's why --

6    A.   Dav, Dav, that's why I'm telling you.

7    Q.   The same thing when in a quiet place.  You know, they want

8    to do everything.

9    A.   You tell me you have five, five, five friends.  From five

10   friends name one.  You didn't name one yet.

11   Q.   In Boston?

12   A.   Yes.  Hmm.

13   Q.   In America?

14   A.   You told me you have five friends.  Name one, please.

15   Q.   In America I have my brother, like I told you.

16   A.   No.  A brother is a blood brother.

17   Q.   The rest of them are friends, like friends, not this kind

18   of friend.

19   A.   So, you don't have friends?

20   Q.   Well, what do you mean I have no friends?  I have Vakho,

21   Tengo, Irakliy, Revaz, Zurab.  They're all mine.  When I go

22   home I have Rasha.

23   A.   Oh, come on.

24   Q.   Who else do you want?  I have Miro.  I have about twenty

25   people in New York.  I have Bakha, the thief-in-law.  He's our

1   brother, our brother.  When I'm in Georgia --

2   A.    Who?

3   Q.    Bakha?

4   A.    Whose Bakha?

5   Q.    He's our friend in New York, a thief-in-law.  Uh, when

6   left -- he lived with us for three years in Batumi.  We brought

7   him in.  Anyway --

8   A.    Of course, our friend, our brother, he controls

9   everything.

10   (READING OF TRANSCRIPT PAUSED)

11   Q.    No.  You missed Line 1071.

12   A.    Oh, I'm sorry.

13   (READING OF TRANSCRIPT CONTINUED):

14   A.    In New York there is a thief-in-law and he's your friend?

15   Q.    Of course, our friend, our brother.  He controls

16   everything in New York and everywhere.  But, anyway, besides

17   that this kind of friend is a different thing.

18   A.    For example, I don't --

19   Q.    A friend, a friend.

20   A.    I don't have friends that are thieves-in-law.  I live a

21   normal life.

22   Q.    Well, that's how we grew up.  What can I do?

23   A.    You understand?

24   Q.    They are good people.  They don't do anything bad.

25   A.    I'm not saying they are bad, but you understand in

1   business I don't think we should have people like that

2   involved.

3   Q.   Well, they don't come to business establishments here.

4   The person who came here was my father.  Peter, who is building

5   churches, he consecrated it.  Thieves-in-law don't come here,

6   and there is none of that here.  It's when the thieves, when

7   someone informs about something, then they -- everyone has

8   their business.  Everyone has their position.

9   A.   Dav, dude, I don't know.  You just, you know, you live a

10  street life, and that, hmm, is what scares me a lot.

11  Q.   Well, I live an honest life, not like you do everything

12  today, and tomorrow someone will backstab you.

13  (END OF READING OF TRANSCRIPT)

14          MS. KAPLAN:  At this time, your Honor, I would ask if

15  we could play the portion that we just read so that the jury

16  can hear for themselves and see the video of this portion.

17          THE COURT:  Yes.

18          MS. KAPLAN:  And I believe that's 19-2.

19                          (Video played)

20  BY MS. KAPLAN:

21  Q.   Okay.  Directing your attention to November 30th, did you

22  meet again with defendant David Tkhilaishvili where you were

23  wearing a wire?

24  A.   When?

25  Q.   November 30th.

1    A.    I believe I was, yes.  It was that date.

2    Q.    And who put a wire on you?

3    A.    FBI Agent Kristin.

4    Q.    And was there a video as well?

5    A.    The initial time you're talking about?

6    Q.    No, this is the second time, November 30th, now.

7    A.    Second time.  I don't remember the second time.  I really

8    don't remember.  If I may read it, if I show, it brings me

9    memory.  I really don't remember.

10   Q.    Okay.  I'm going to show the witness Exhibit 20 in

11   evidence and ask did you review that transcript?

12   A.    Yes, I reviewed this.

13   Q.    And did you listen to the tape with the transcript?

14   A.    Give me one second.  Yes, yes, yes, yes, yes, yes.  I

15   remember, yes.

16   Q.    And what language are you speaking in during that

17   conversation?

18   A.    Russian.

19   Q.    Do you remember having that meeting now with David

20   Tkhilaishvili?

21   A.    Yes, I do.

22   Q.    Can you tell us if you recall what happened during that

23   meeting?

24   A.    Well, we talk about the percentages and we talk about the

25   general what happened that day.  So, that's what we discussed.

1          MS. KAPLAN:  All right.  I'm going to ask, your Honor,

2     to do the same thing, read certain portions of Exhibit 20 with

3     the witness.

4          THE COURT:  Yes, you may.

5          MS. KAPLAN:  Starting with Page 2, Line 26, and I will

6     start with DT, being David Tkhilaishvili.

7     (READING FROM TRANSCRIPT OF RECORDING, EXHIBIT 20):

8     Q.   If just one, just one percent hears something, he is

9     Armenian, and that will be the fucking end of it.  A Georgian?

10    He doesn't know anything, but an Armenian, he knows very well.

11    You know how you need do this business?  Quietly so that no one

12    knows, to sneak in and out and that's all.  Basically like

13    that.

14    A.   But what would it change that you would need to be so

15    sneaky?  She hasn't done anything, has she?

16    Q.   Wait, wait.  That's because this is a general clinic.

17    A.   Hmm.

18    Q.   One that is closely monitored by the DEA.

19    A.   Well, let it be.

20    Q.   And everything.

21    A.   For Heaven's sake.

22    Q.   No.  Well, yes, for Heaven's sake.  Everything should be.

23    A.   That's good that it's being monitored.

24    Q.   There should not be even one complaint.  God forbid

25    tomorrow the person has 40 percent and he will shoot someone.

1   A.   Who will he shoot?

2   Q.   Let's say Jaba, for example.

3   A.   Jaba?  Well, tell him he can't shoot people.

4   Q.   I know that, but his brain is not working.  If the

5   person -- anyways, I told him just that, man.  I told you a

6   hundred times already.  It has been that the person was close

7   by and do it together and then see what --

8   A.   Tell me why there, hmm, you are saying that he'll shoot.

9   Why should you shoot?  Tell him, "Well, man, are you crazy or

10  what?"

11  Q.   Well, you can't explain him that.  If the person sees that

12  it's like that, that's why I didn't -- it was -- he said before

13  that regarding the financing his final word would be needed.

14  There won't be.  But you did everything, and that's how the

15  conversation started.

16        And the second thing was regarding this.  When he came

17  you could have told him, "Jaba, this is a very serious subject.

18  Let's talk after five o'clock or tomorrow.  I am going to

19  Armenia.  When I return we will."  You shook his hand, and

20  that's it, that's all.

21  A.   Dude, Dav, I was there.  I was the one who talked to him,

22  and I know what I said.  You are saying this as if you were

23  there.  It didn't happen the way you are saying.  (Ringing

24  sound).

25  (READING OF TRANSCRIPT PAUSED)

1       MS. KAPLAN:  And then turning to Page 8, Line 118:

2   (READING OF TRANSCRIPT CONTINUED):

3   Q.    "Look what we've done.  Fucked two doctors, two doctors.

4   One was stripped of his license, and the other one we are

5   working with the DEA now.  Yes, the prosecutor's office is

6   working on it.  We are going to fuck him soon.  Plus, plus, we

7   got the office, we brought in Bob, we brought in you and set

8   everything up.  Now we're up and running.  God willing, we have

9   done that.

10  A.    Well, you, you tell me, you --

11  (READING OF TRANSCRIPT PAUSED)

12  Q.    No.  Line 119 on Page 8.

13  A.    Sorry.  Sorry.  I had the wrong page.

14  (READING OF TRANSCRIPT CONTINUED):

15  A.    What two doctors?  What are you talking about?

16  Q.    They fucked Fabrick and the Pakistani?

17  A.    Oh, the Pakistani is working here.

18  Q.    Well, he -- Fabrick is in basement.  Pakistani works.  The

19  DEA is working on it.  The prosecutor's office is working on it

20  and is working on it.  We're going to fuck them over, the

21  Pakistani and all of them.  We are going to lock them up at

22  least for six months.  It just costs a little money.  They're

23  all working.  I have all the CDs and everything.  You don't

24  know what they're going to do with him.  They're going to fuck

25  him over.  He will bring a half a million dollars, and there

1   will be everything.

2   A.   Well, will you make him bring the money?

3   Q.   Of course.  They are going to make him pay and everything.

4   As for Fabrick, he will never get his license back, but the

5   Pakistani will go to jail.

6   (READING OF TRANSCRIPT PAUSED)

7   Q.   Do you know what David Tkhilaishvili is talking about

8   there, the Pakistani?

9   A.   Well, as far as I remember, down in the road when we start

10  having the Clinic, and time to time I want to understand what

11  went wrong on his previous practice, so he told me there was a

12  guy from Pakistan, and I don't think he ever mentioned the

13  name.  He always called him "Pakistani."  And he and Kurt

14  Fabrick had a dispute with him, and he made Kurt Fabrick lost

15  his license.

16  Q.   Okay.  And turning to Page 17, Line 276.  Are you on

17  Page 17?

18  A.   Yes.

19  (READING OF TRANSCRIPT CONTINUED):

20  Q.   Yes, we need to straighten this out for Kenton, and, look,

21  I also, you know, was getting everything incorrectly.  You get

22  the first check at the end of the month, then one in the

23  middle, and then again at the end of the month.  I was getting

24  once for the entire month.

25  A.   Well, you, you tell me, you come before it begins that you

1    want your salary for the entire month up front.

2    Q.    Yes, but --

3    A.    And you did that not once but a hundred times.

4    Q.    Well, for example -- yes, but that was a mistake.  You

5    guys get -- you get -- let's say Kenton gets $4,500 and I get

6    3,000?

7    A.    Well, that's because you, you, your job cannot be compared

8    to his job.

9    Q.    That's a mistake.

10   A.    You think you do the same thing?  I don't get it.

11   Q.    No, no, no.  Kenton gets $1,500, and I get $1,500.

12   A.    Where did you get 1,500?  He doesn't get 1,500.

13   Q.    Well, he was getting it for two weeks.

14   A.    Oh, you mean for two weeks?

15   Q.    Yes.

16   A.    Yes, I see.

17   Q.    Yes.  And you guys were getting yours on the 30th, the

18   15th and the 30th, so for three pay periods you were getting --

19   Kenton gets 4,500.

20   A.    And I'm getting 3,000.

21   (READING OF TRANSCRIPT PAUSED)

22   Q.    No.

23   A.    Oh.

24   (READING OF TRANSCRIPT CONTINUED):

25   A.    Ooh, ooh.

1    Q.   And I am getting 3,000.

2    A.   But your salary got 4,000 extra before that, and you got

3    other things, and you got everything.  You got that much

4    already, David.

5    Q.   No, no.  I got bonuses, but that's a different thing.  I

6    am talking about this.  Now it's the end of --

7    A.   And you also put the apartment up as a rent office.  You

8    already did so many things, you know.

9    Q.   That's because the apartment --

10   A.   Oh, come on, man.  Stop it.

11   Q.   If you look at all of this, where Christmas comes and then

12   I spoke to Sao, Sao tells me that 10 percent is not a problem.

13   We will give what's needed.  And he also says that there are a

14   couple of other people, so that if we want more money later he

15   can work it out.  In short, he will find it and bring it for

16   10 percent or even less.

17   A.   Simply Ja -- you need to hold yourself together and not

18   get rattled and do things like that, to be professional and do

19   your job.  You don't need to.  Hmm, no.  You don't need to,

20   hmm, on the table, hmm.  You don't need to do that, you know.

21   Q.   Who told you that?  Why did I slam on it?

22   A.   You don't need --

23   Q.   That's because I told him that --

24   A.   Dude, if you, hmm, if you, you had something, then you

25   wouldn't right on the spot.  Why do you?

1    Q.   Man, you told him that you -- you with me stood on my

2    side.  We told him, "Just wait for now about this percentage

3    until, until MassHealth comes in, until, until --"

4    A.   Later.

5    Q.   And later, whatever he told you, sit down and make a

6    decision.  Plus, I was drinking with friends all night, and

7    when it all -- this and that, I wasn't feeling good, and when

8    we started these conversations, these conversations kill me.

9    A.   David, but before that you hit Kristina before the staff

10   also.  You did that and went off on Kenton.

11   Q.   These conversations, these conversations --

12   A.   You need to conduct yourself properly.

13   Q.   Properly, yes.  I -- what I do properly, as I see it, I

14   have my job, I do my -- whatever you tell me to do, I have to

15   do it.  What we cannot have between our parents and our

16   everything, this, this and this, that's our whole life, man.

17   We all got in.  I don't know if you know everything.  It was a

18   fucking mess, man.  One hundred patients came in, 20,000,

19   25,000.

20   A.   What are you saying yourself?  You are saying that Jaba,

21   hmm, one needs to understand his mindset, you know?

22   Q.   Yes, but don't tell him that, tell what to do.  But then

23   things come at him from here, from there, from everywhere.  He

24   said he went and celebrated -- we went and celebrated.  You

25   know how we celebrated Saba's 5 percent?  We celebrated it in a

1   big way.  That's because he -- we always wanted -- I offered

2   him.  I swear on my mother he refused it.  That's why I put in

3   Nato.  I wanted to put in Saba.

4   A.   And Nato.  Who is Nato anyways?

5   Q.   Nato is our relative who --

6   A.   You owe her money?

7   Q.   We do owe her money.  That's first.  And also she is a

8   nurse?

9   A.   How much money did you take from her?

10  Q.   Well, about $70,000, in short.  She is studying to be a

11  Registered Nurse, and she will be with us tomorrow or the day

12  after tomorrow, and also, if anything, I wanted that.  But,

13  brother, I swear I didn't want to get Saba in at all.  I know

14  that Saba is the kind of person --

15  A.   Dude, you brought Saba a few days later.

16  Q.   Huh?

17  A.   You brought Saba.  It all happened.  You had this planned

18  out, because Saba appeared from out of blue.  "This is Saba,

19  and I'm going to be 5 percent."

20  Q.   He came, and I swear to God, I swear on -- Jaba made that

21  decision himself, too.  If I also knew our -- that's it, in

22  short.  He decided that for himself and said, in short, "David,

23  he said, there is God in this life, right?"  And this guy for

24  three years, three years, man, every day, you know how he

25  lived?  He took, uh, stupid pills because he had --

1    A.    Hmm.

2    Q.    Yes, then.  I didn't know, very serious.

3    A.    Dude, if he is taking pills like that --

4    Q.    His neurosis was going through the roof.  It was

5    impossible.

6    A.    He's taking pills like that, and you want him to come here

7    and --

8    Q.    No, not now, man.  It was then.  He is relaxed now,

9    doesn't smoke cigarettes anymore, and he's smart.  He does

10   everything.  Just tell him how he needs.  Before it wasn't.

11   Every day we got emails about court, about this, about that.

12   He was fucked up.  Four guys came over here.  He was sitting in

13   the room writing a restraining order.  You know what he wrote

14   about me?  It was fucking bad.  I -- everything for him.  They

15   were fucking shocked, man.  It was all Saba.  Bob and I -- in

16   short, it was *War and Peace*.  Did for him for $10.  Can you

17   imagine, they were fucking him for eight months?  At the same

18   time we kept the office.  I went to Georgia, my home was put

19   for collateral.  $1,100 just to pay for the amount.

20   A.    You take money from everybody, you understand?  You owe

21   Kristina, you owe Nato.

22   Q.    Kristina?  Put 110,000 --

23   A.    Dude, everyone, you understand?  Debt, debt, debt.

24   Q.    Look, put 110,000 --

25   A.    You owe Olga --

1   Q.   Look, put 110,000.

2   A.   You owe me too.

3   Q.   This faggot did this.  What can I do?

4   A.   What can you do?  Hmm.  We started work.

5   Q.   We need to, we need to -- and hire professionals, and we

6   need to know --

7   A.   Oh, dude, come on.  If you were professional everything

8   would be -- everything would be -- why did we start this

9   conversation the first day?  Everything was just fine before

10  that.  We went and celebrated at the North End, and in the

11  morning gave them to sign, and the two brothers went off on me.

12  Q.   Yes.  Look, he knew that you had the last word on that

13  here.  Then, when we started on the agreement, we told him, and

14  he said, "No," and then these conversations started here.

15  That's because I told you there also, I told you there,

16  "Victor, all the finances, all the money that you invested as

17  an investor -- "

18  A.   Yes, but I told you from the first day that I wanted it

19  this way.  If you didn't want --

20  Q.   But that way, that way, I didn't want, I didn't have a

21  clue about that.  I didn't know such a project at all, how it

22  works.

23  A.   Also, you to people -- there were cases where you also to

24  people -- we will talk about that later.  I'd tell you more.

25  Q.   Man, like I told you, there is God, there are people and

1    there is life.  Everyone has their thing.  I never -- somebody

2    else's -- I asked Kristina, "How much do you have?"  She says,

3    "I have 14,000 left," right?  I gave 96,000 when I -- besides

4    that there was 20,000 for this, then 150,000 for that.

5    A.    From the company -- when you went to Georgia you said

6    about 150-200,000.  How much did you take from the company all

7    together, 150, 200, as you said before?

8    Q.    How much did I take?

9    A.    Yes.

10   Q.    Uh, took 300.

11   A.    300,000.

12   Q.    And all that money started coming since January.  Before

13   January it was like that, you know.  We were paying all the

14   debts, this and that.  Well, I managed, man.  That's why I hit

15   her, Kristina, you know?  48,000 and she sent it.  She was not

16   supposed to send it.  $48,000, man.  Then I went and stopped --

17   A.    Yes, you understand you hit one in the Clinic, man.  It's

18   a serious thing.  You could have been sued for that and just

19   fucked up.

20   Q.    I knew it, but anyways, when -- look, when something goes

21   wrong in the Clinic he comes in the morning, you know, he's so

22   mad.

23   A.    Who?

24   Q.    Fabrick.  He's mad, sits there and -- "Don't fire, don't,"

25   things like that.  You know?  Ah -- oh, in a word his madness

1    transferred onto me, you know?  Olga then took me outside and

2    said, "David, please," this and that.  You know, she calmed me

3    down.

4    A.    David, the problem is that when you get upset at the

5    moment, like I'm telling you, you shouldn't ever have any

6    weapons on you.  You can -- at the moment you are capable of

7    doing anything to anyone.  There I -- I had never seen you like

8    that.  The way you went off on me, I thought you were going to

9    -- me right there.

10   Q.    Uh, why did I hit?

11   A.    Ooh, ooh.

12   Q.    Had it been someone else in her place -- if the person is

13   an idiot -- you know what it is for him?  Life.

14   A.    For me, for me, you went off on me.

15   Q.    No, no.

16   A.    Not him.  If you talked to him that would be different

17   story.  You went off on me.

18   Q.    I did that so he wouldn't start anything here.  I did that

19   so that -- I wanted to talk to you.

20   A.    You went off on me.  If you were talking to him I wouldn't

21   understand, but you went off on me.

22   Q.    Well, why shouldn't I be talking to him?  I told you that

23   he -- now is not the time to talk.  I couldn't tell him that.

24   A.    Why not?  Tell him, "Listen, control of yourself."

25   Q.    No.  He would ask, "How come?  You gave your word, did you

1    this and did that.  That's it, we are done."  I just told him,

2    "Wait."

3    A.   Dude, just so that you know, I never gave him my word,

4    never in my life that --

5    Q.   This is what he told:  "David, he said, everything must be

6    as -- "

7    A.   He came over to me.  I just wanted to close the subject at

8    that moment, because there were clients and everything.  I

9    couldn't --

10   Q.   That's not how you close a subject.

11   A.   Of course that's how I close it.

12   Q.   No, no, no.

13   A.   Man, I never told him that I agreed with his conditions.

14   You have that personality, and so has Jaba.  You guys think

15   that whatever you say I have to say, "Yes."  That's not how it

16   works.

17   Q.   No, no.

18   A.   I have to think about it.  I need a day or a month or two.

19   Q.   Yes, that's why that's -- that's why I did that.  He

20   called and told me, "David, I talked to Victor."

21   A.   You say something at night, then in the morning you think

22   it's all done.

23   Q.   33 percent here, 33 percent there.  I told him, "However

24   it shapes out, that's how -- "

25   A.   You tell him, hmm -- I was thinking.

1    Q.    Fourteen percent.

2    A.    I want him, "Why do you thi-thi-think I should give my

3    percentage?  You give away your percentage?"

4    Q.    About Sao?  What do you think?  Where do we stand

5    regarding money?  How much money do we have here?  Is there

6    100,000?

7    A.    There is 100,000, yes.

8    Q.    Is there anything else in the house?

9    A.    We can get more if we need to.  We don't need debts now.

10   We have a lot of debts now.

11   Q.    We don't need Sao's money now, do we?

12   A.    No, not now.  Don't say anything.  We don't need money

13   now.

14   Q.    Then I will tell Sao, I will tell Sao that we are waiting

15   for permits and stuff.

16   A.    Yes.

17   Q.    And we will let him know after that, because --

18   A.    That's fine.  Say that is one -- hmm -- should talk.

19   Q.    And what's going on with Hang?  He keeps on calling and

20   calling and calling.  He annoyed the fuck out of me already.

21   It's been a while.  Anyways, we need to straighten this out.

22   Also everyone, everything has to be in writing.  Uh, the fact

23   that we give more salary to Kenton, other things we give -- I

24   also need something, this and that.

25   A.    You already got your salary for this month.

1    Q.   This month.  But now at the end of the month --

2    A.   You took it on the 1st of the month.

3    Q.   Yes.  At the end of the month now I need another check.

4    Then we will get on the payroll, you know?

5    A.   No, you have already got your salary for the entire month,

6    including today.  I already told you.

7    Q.   Yes, but it wasn't -- you guys got yours on the 30th, the

8    15th and the 30th.  You just got yours now on the 30th, then on

9    the 15th, and then again on the 30th.  I got mine on --

10   A.   It is the same thing.

11   Q.   The 30th and on the 15th.  That's it.

12   A.   No, David.  Hold on, hold on, hold on.  I got mine on the

13   15th, on the 3rd, and I mean 30th.  That's it.

14   Q.   No.  You got it on the 30th.

15   A.   On the 15th and 30th, and you got the money up front twice

16   and sometimes more.

17   Q.   Yes, but you guys get it three times:  on the 30th, the

18   15th and the 30th, and I got it twice.

19   A.   What are you talking about, David?

20   Q.   I got 1,500 all together.

21   A.   David, you -- what are you talking about?

22   Q.   Two weeks; isn't that so?

23   A.   No, the 15th.  Our contract says the 15th and 30th.  What

24   now?  Do you want more money again now?

25   Q.   Contract, contract, no, no, no.  Contract is one thing,

1    but, uh, for Kenton, it, uh, causes problems, because he also

2    had the same contract at first that he cannot do that.

3    A.    We need to -- we need to -- we need to --

4    Q.    That's what I'm saying.  That's a problem.  It needs to be

5    every two weeks.

6    A.    We need to, we need to -- with Kenton, Kenton's money, his

7    -- the person that did his job, got his money, and the rest

8    is --

9    Q.    Yes, I understand.  But, anyways, you know it's fucked up.

10    I have no time to get it.  It's fucked up, man.  For $3,000

11    raised the salary, but we need to do something.  It's the end

12    of the year, Christmas is coming, this and that.  It's fucked

13    up.

14    A.    There is no money, David.

15    Q.    If there is no money, then we need to take it from Sao.

16    (READING FROM TRANSCRIPT PAUSED)

17    Q.    So, let me ask you, who is Sao?

18    A.    Sao is our landlord for the Allied Health Clinic.

19    Q.    Okay.  And what is David Tkhilaishvili trying to do with

20    Sao?

21    A.    David was -- after he took that $11,000 and then he start

22    engaging in a conversation with Sao to obtain another loan, and

23    I did not want him to take any loans behalf of Allied Health.

24    Q.    Was he authorized to do that?

25    A.    No, he was not.

1    Q.   And there is talk in this portion of the conversation

2    about Kenton and his salary.  Can you tell us what that was

3    about?

4    A.   The Kenton salary.  So, he talks about sometimes he takes

5    the money up front, and then he would have come back again, he

6    wants the money again.  Then he compares his salary with

7    Kenton's salary.  I believe Kenton was receiving 3,000 at that

8    time, so 1,000 we are accumulating for the future.  We had some

9    agreement with Kenton.  I have to review that.  So that was

10   referring to he wants the money, 4,000, up front, David.

11   Q.   And there are a few times where you are talking about he,

12   you keep talking about he came to you and that you should

13   have -- but that's not how -- that you should have said

14   something else to him.  Who was he talking about?

15   A.    If you may read that paragraph again?

16   Q.   Okay.  So, on Page 22, Line 361, where you say, "Not him

17   --" do you see that?  "If you talk to him that would be a

18   different story.  You went off on me."

19          And then David Tkhilaishvili says, "I did that so he

20   wouldn't start anything here."

21          Do you know who David Tkhilaishvili is talking about

22   there?

23   A.   Just give me one second a little further up, if I may, to

24   refresh my memory.

25                        (Pause)

1    Q.   And where you say, "Why not tell him, 'Listen, control,

2    take control of yourself.'"

3    A.   Yeah, yeah.  Yes, that's Jambulat, Jambulat's story, I

4    believe.  That's Jambulat.  "Him" is Jambulat, yes.  He talks

5    about Jambulat.

6    Q.   And where we've just read, and you've seen the

7    conversation about Kristina and the money, does that have

8    anything to do with Allied Health, or is that about Davis

9    Clinic?

10   A.   That absolutely has nothing to do with Allied Health.

11   It's between him and Davis Health hitting Kristina.

12   (END OF READING OF TRANSCRIPT)

13           MS. KAPLAN:  That's it for the recording.

14   BY MS. KAPLAN:

15   Q.   Did you also meet after these two conversations with

16   Jambulat Tkhilaishvili wearing a wire?

17   A.   I met with Jambulat wearing a wire.  Yes, I did.

18   Q.   And where was that meeting?

19   A.   In Taunton at his pizza place.

20   Q.   You went to the pizza place?

21   A.   Yes.

22   Q.   And who put the wire on you?

23   A.   Agents, Federal Agents.

24   Q.   And tell us what happened at that meeting.

25   A.   When I went to Jambulat, I was expecting completely

1  different responses, but he was completely different person at

2  that day, and he start talking about, like, completely

3  different, 180 degrees different person.  Then I talked to him

4  at the Clinic, or I talked to him when he came to the repair

5  shop.

6  Q.   And how was he different?

7  A.   So, he was talking nice, and he even hugged me, which was

8  a surprise.  He was tapping my back.

9  Q.   Had he ever done that before?

10  A.   No.  We've seen each other only a few times.

11  Q.   Do you know why he was acting so differently at that

12  meeting?

13         MR. TUMPOSKY:  Objection.

14         THE COURT:  If he knows, he can answer.

15         THE WITNESS:  I might -- I thought about that.  I

16  believe --

17         THE COURT:  Do you know anything from talking to him,

18  or is this your speculation?

19         THE WITNESS:  I just have my own --

20         THE COURT:  So, I am going to exclude the answer.

21  Q.   From the opening of the Clinic in November of 2014 through

22  December of 2015 how many times did you see Jambulat

23  Tkhilaishvili at the Clinic?

24  A.   From opening day till?

25  Q.   December 2015, when you had this meeting with him.

1    A.    I seen him -- I believe the opening took place October.  I

2    seen him once in Watertown.  I seen him once when he threatened

3    me at the Clinic on November to -- also that time when -- I

4    went two, three times when I went to Taunton.

5    Q.    So, it sounds like you saw him once at Allied Health

6    Clinic.

7    A.    Yes.

8    Q.    And that was at the opening party?

9    A.    It was opening party.  Then after opening party was when

10   he threatened me.

11   Q.    Twice?

12   A.    So, that was twice.

13   Q.    Did you ever see him at Allied Health Clinic to work?

14   A.    Never seen him do anything over there.

15   Q.    Did he ever do any work for Allied Health Clinic?

16   A.    No, he did not.

17   Q.    Did he appear to you to have any knowledge of how to run a

18   Suboxone Clinic?

19   A.    Initially when we met he said, "Yes," he has an idea, but

20   I requested several times to meet and discuss how we are going

21   to run the business, because to me that was the business I was

22   -- I had no knowledge of it.  But David and him, they assured

23   me David will start the initial process.  Once we get the

24   permit done and we become declared from the Department of

25   Public Health recognized clinic, Jambulat can run the Clinic.

1    Q.    Did you ever have any conversations with Jambulat

2    Tkhilaishvili about running the Clinic?

3    A.    Nothing at all.

4    Q.    Did there come a time that your lawyers, some of your

5    lawyers took legal action to have the defendants removed from

6    Allied Health Clinic?

7    A.    Yes, they did.

8    Q.    And which lawyers were that?

9    A.    Verrill Dana.

10   Q.    And when was that?

11   A.    I believe it was January 6th or 7th of 2016.

12          MS. KAPLAN:  If I may show the witness Exhibit 21?  It

13   is agreed to by the parties, your Honor.

14          THE COURT:  All right.

15              (Exhibit No. 21 received into evidence)

16   BY MS. KAPLAN:

17   Q.    Do you recognize that document?

18   A.    Yes, I do.

19   Q.    What do you recognize that to be?

20   A.    So, in this document, using my Special Consent Authority

21   and right, I removed Jambulat and David from the Clinic.

22   Amendment to our Operating Agreement as well.

23          MS. KAPLAN:  Okay.  And can we see Page 2, please.

24   BY MS. KAPLAN:

25   Q.    And Paul Shaw, is that one of the attorneys at Verrill

1    Dana?

2    A.    Yes.

3    Q.    And this letter tells both defendants that they are

4    prohibited from conducting any business in the name of or on

5    behalf of either the Clinic or Health Management, correct?

6    A.    Yes, correct.

7    Q.    And that they are prohibited from coming onto the premises

8    or having any contact with any employees or other personnel of

9    the Clinic; is that correct?

10   A.    That's correct.

11   Q.    And the letter was dated January 7th of 2016?

12   A.    Yes.

13   Q.    And at that time you had already -- had you already gone

14   to your lawyers and the FBI?

15   A.    Yes, I did.

16   Q.    Now, did there come a time that you were sued by somebody?

17   A.    Yes, there was.

18   Q.    And who sued you?

19   A.    David and Jambulat Tkhilaishvili.  They sued me.

20   Q.    And when was that?

21   A.    I have to, if I may have -- I believe it was late February

22   or March.  I have to -- if I can take a look at the notes, then

23   I can tell you.  I don't remember exact date, but it was later

24   on.

25   Q.    But it was after you had already gone to the FBI?

1    A.   Absolutely, yes.

2    Q.   And do you know what the status of that case is?

3    A.   It's pending.

4    Q.   And you are a defendant in that case?

5    A.   I was the -- I was defendant, they were plaintiff.

6    Q.   And did you ever sue the defendants?

7    A.   Well, we'd in a pending (ph), so I did not ever sue them,

8    so I applied for the -- for the -- on their comments, and, as

9    far as I know, my attorney postponed that civil case before we

10   find an answer for the federal case.

11   Q.   What is the status of Allied Health Clinic now?

12   A.   Financial-wise or generally?

13   Q.   Well, is it operating?

14   A.   It is operational, yes.

15   Q.   And are you making money?

16   A.   I'm not --

17           MR. TUMPOSKY:  Objection.

18           THE COURT:  Overruled.  You may answer.  The answer

19   stands, I guess.

20           MR. TUMPOSKY:  I'm sorry.  I didn't hear the answer,

21   then.

22           THE COURT:  Repeat your answer.

23           THE WITNESS:  Sure.  So, we are not making money.

24   BY MS. KAPLAN:

25   Q.   How is Allied Health Clinic being funded?

1    A.    Until now I've been funding Allied Health Clinic from my

2    personal account.

3    Q.    Has anyone else contributed any money from the time that

4    Allied Health Clinic started operating till now?

5    A.    No.

6    Q.    Can you tell us how much money you have invested since the

7    beginning of Allied Health Clinic?

8    A.    As far as I know, it's a little over 890,000.

9    Q.    And how much did David Tkhilaishvili invest?

10   A.    Nothing.

11   Q.    What about Jambulat Tkhilaishvili?

12   A.    Nothing.

13   Q.    Did either of the defendants ever pay you back any part of

14   your investment?

15   A.    They haven't paid me anything back yet.

16   Q.    Did they ever sell Classic Pizza?

17   A.    I have no information.

18   Q.    You don't know?

19   A.    I don't know.

20   Q.    And since you went to the FBI have you done a complete

21   review of the financial documents of Allied Health Clinic?

22   A.    Yes, I did.

23   Q.    How were the books kept at Allied Health?

24   A.    In a very, very bad way.  So, he put all the notes when he

25   was there at that time -- he's supposed to --

1    Q.    "He" who?

2    A.    David.  Sorry.  David was going to keep all the books and

3    records, which everything was misplaced, so we have to start

4    from beginning, from day one.

5    Q.    But how were the finances --

6    A.    Through the QuickBooks.

7    Q.    And who was responsible for QuickBooks?

8    A.    Back in the days, David was responsible.

9    Q.    And can you tell us what "QuickBooks" is?

10   A.    Yeah.  That's every time, in other words, when we use

11   expenses we put profit and loss statements in it at the end of

12   the year.  Electronically we transfer that to our account, and

13   an accountant is able to create the taxes for the Clinic as

14   well as for the individuals.

15   Q.    And were you asked by the FBI to produce all of the

16   QuickBooks for Allied Health Clinic?

17   A.    Yes, I did.

18   Q.    And did you?

19   A.    Yes, I did.

20         MS. KAPLAN:  I show the witness Exhibit 22, which is

21   agreed to by the parties.

22         THE COURT:  All right.  It is received.

23         (Exhibit No. 22 received into evidence)

24   BY MS. KAPLAN:

25   Q.    Do you recognize that document?

1   A.   Yes, I do.

2   Q.   And can you tell us what it is.

3   A.   Yes.  They printed this from our QuickBooks.  That's my

4   investment chart.

5   Q.   I'm sorry.  It's your what?

6   A.   That's my investment, my contribution towards Allied

7   Health Clinic.

8   Q.   Okay.  You are talking about the whole of QuickBooks is?

9   A.   Well, this is my overall what I invested into Allied

10  Health Clinic.

11  Q.   Okay.  So, this is a record of all the monies that were

12  coming into Allied Health Clinic and going out?

13  A.   Let me take a look how much you have.  This shows how much

14  I contributed to Allied Health Clinic, my contribution.

15  Q.   Okay.  And turning to Page 7, if you would, do you see

16  that handwriting?

17  A.   Yes, I do.

18  Q.   Whose handwriting is that?

19  A.   That's -- I wrote it down, and me and David, we both

20  signed.

21  Q.   And what does it say?

22  A.   As of 10/15/15 we both agreed that I invested over --

23  Q.   Just read what it says in your handwriting.

24  A.   "As of 10/15/2015 everything is correct."

25  Q.   And is that your signature underneath?

1   A.   Yes, it is.

2   Q.   And underneath is whose signature?

3   A.   David's signature.

4   Q.   And then there's more handwriting underneath.  Can you

5   tell us what that is?

6   A.   "American Express 15,000," and then, "Terminal."

7   Q.   What does that mean?

8   A.   Well, I guess something with American Express expenses.

9   This is additional 15,000.

10   Q.   Okay.  And do you remember the circumstances of David

11   signing this, agreeing that as of 10/15/2015 everything is

12   correct?

13   A.   I do remember that day, yes.

14   Q.   Tell us what happened.

15   A.   Well, we just went over the books, and we checked it and

16   how much I invested, and we both agreed and signed it.

17   Q.   Did there come a time in late October or November of 2015

18   that you had discussions with David Tkhilaishvili about his

19   salary?  We heard some of that on the recording.

20   A.   Yes, I did.

21          THE COURT:  Ms. Kaplan, are we going to be going on

22   for a bit more?

23          MS. KAPLAN:  Yes.

24          THE COURT:  So, we will break for the day, I think,

25   here.

1          Ladies and gentlemen, I want to raise with you, and

2     perhaps you will think overnight about this, the prospect of

3     sitting all day on Thursday to keep moving through and try to

4     make progress here.  If you can do it, that's fine.  If one of

5     you cannot do that, just tell us and we will not do it.  I have

6     told you we would be sitting from 9:00 to 1:00, and when I make

7     a representation I try to live up to it, but if we can make

8     additional time on Thursday it might be helpful.  So, think

9     about it, and Ms. Beatty will inquire of you tomorrow morning

10    regarding that.

11         In any event, you will be back here tomorrow morning

12    in the jury room by 8:45 so we can start promptly at 9:00 and

13    continue with the case.  Again, bear in mind my instructions.

14    Do not talk to anybody about the case, do not do any research.

15    Take a breather from the case.  We will see you tomorrow

16    morning.

17         THE CLERK:  All rise.

18         (The Jury exited the courtroom at 4:00 p.m.)

19         THE COURT:  Please be seated.  What I think I would

20    like is just a written outline of the anticipated time taken

21    with witnesses so I can get a clearer understanding of how much

22    longer this is going to go.  So, tomorrow morning if you can

23    share it with each other and give me a prognosis for how much

24    time the evidence is going to take in this case so I can do

25    some planning about dealing with the witnesses.  That is both

1   from the prosecution and from the defense here.  I just want to

2   get a sense of how much longer we are going to go.  I don't

3   know whether the jury is going to buy into a full day Thursday,

4   but we will go step by step.  Okay?

5           Anything else that we need to talk about?

6           MR. CRUZ:  No.

7           MS. KAPLAN:  No, thank you.

8           THE COURT:  Okay.  We will be in recess.

9           THE CLERK:  All rise.

10      (The Honorable Court exited the courtroom at 4:02 p.m.)

11          (WHEREUPON, the proceedings adjourned at 4:02 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

4          I, Brenda K. Hancock, RMR, CRR and Official Court

5    Reporter of the United States District Court, do hereby certify

6    that the foregoing transcript constitutes, to the best of my

7    skill and ability, a true and accurate transcription of my

8    stenotype notes taken in the matter of *United State of America*

9    *v. Tkhilaishvili, et al.*, No. 1:16-cr-10134-DPW.

10

11

12

13

14   Date: 4/30/17          /s/ *Brenda K. Hancock*
                            Brenda K. Hancock, RMR, CRR
15                          Official Court Reporter

16

17

18

19

20

21

22

23

24

25