UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA          )
                                  )
                                  )
vs.                               )
                                  )  No. 1:16-cr-10134-DPW
                                  )
DAVID TKHILAISHVILI AND           )
JAMBULAT TKHILAISHVILI,           )
                                  )
                    Defendants.


BEFORE:  THE HONORABLE DOUGLAS P. WOODLOCK


DAY THREE OF JURY TRIAL




John Joseph Moakley United States Courthouse
Courtroom No. 1
One Courthouse Way
Boston, MA 02210
Wednesday, May 3, 2017
9:00 a.m.




Brenda K. Hancock, RMR, CRR
Official Court Reporter
John Joseph Moakley United States Courthouse
One Courthouse Way
Boston, MA 02210
(617)439-3214

1    APPEARANCES:

2
          UNITED STATES ATTORNEY'S OFFICE
3         By: AUSA Laura Kaplan
          John Joseph Moakley Federal Courthouse
4         1 Courthouse Way
          Suite 9200
5         Boston, MA 02210
          On behalf of The United State of America.
6
          FEDERAL PUBLIC DEFENDER OFFICE
7         By: Oscar Cruz, Jr., Esq.
          District of Massachusetts
8         51 Sleeper Street
          5th Floor
9         Boston, MA 02210
10        On behalf of the Defendant.

11
          HEDGES & TUMPOSKY, LLP
12        By: Michael L. Tumposky, Esq.
          Suite 600
13        50 Congress Street
          Boston, MA 02109
14

15

16

17

18

19

20

21

22

23

24

25

1                           I N D E X

2     Testimony of:          Direct  Cross  Redirect  Recross

3     VAHAGN VICTOR TOROSYAN
      (Continued)

4
      By Ms. Kaplan          10 (Cont'd)
5     By Mr. Cruz                    42
      By Mr. Tumposky                      154
6

7                          E X H I B I T S

8
                      No.                 In Evd.
9
                      15...................16
10                    28...................18
                      16...................21
11                    30...................22
                      31...................30
12                    1....................36
                      17...................83
13                    32...................113
                      33...................116
14

15

16

17

18

19

20

21

22

23

24

25

<u>P R O C E E D I N G S</u>:

1    THE CLERK:  All rise.

2    (The Honorable Court entered the courtroom at 9:00 a.m.)

3    THE CLERK:  This Honorable Court is now in session.

4    Please be seated.  Criminal Action Number 16-10134, <u>United</u>

5    <u>States v. Tkhilaishvili</u>.

6    THE COURT:  Well, two things.  One, I gather,

7    Ms. Kaplan, you had some matter you wanted to take up.

8    MS. KAPLAN:  Yes, your Honor.  I think your Honor is

9    probably aware of some of the issues that we have had in this

10   case with Defendant David Tkhilaishvili reaching out to

11   witnesses.  Your Honor issued an arrest warrant that Magistrate

12   Dein dealt with.

13   And yesterday there was an incident not necessarily

14   with the witness but somebody who came with Victor Torosyan to

15   court that I am concerned about, which is, Mr. Torosyan is

16   accompanied to court by his good friend and his spiritual

17   advisor, and in the -- I don't know whether it was lunch or the

18   first morning break both defendants went over to this

19   individual and started talking to him.  We got him away.

20   And then later on, apparently, Defendant David

21   Tkhilaishvili went over to the individual and asked how long he

22   had known Victor Torosyan and made some comment about him being

23   a liar.  There's no threat, the man is not a witness in the

24   case, but I think it's clearly a form of intimidation of some

1    sort, and I would just ask that the defendants be admonished

2    again that they not have contact with the Government's

3    witnesses.

4              THE COURT:  Okay.  Mr. Cruz, anything you want to say?

5              MR. CRUZ:  Your Honor, this is the first that I've

6    heard of this.  I was with Mr. Tkhilaishvili yesterday

7    afternoon.  I wasn't aware that he had had any contact with

8    anyone associated with Mr. Torosyan.  Understanding what

9    Ms. Kaplan has said and next time, hopefully, with some

10   appropriate notice up front if he has people here that are

11   associated with him that I have no knowledge of --

12             THE COURT:  Well, apparently Mr. Tkhilaishvili does.

13             MR. CRUZ:  I understand, because they all come from

14   the same community, and I'm happy to and the Court certainly

15   will instruct him.

16             THE COURT:  Well, I will, which is to tell the

17   defendant he may not have contact, directly or indirectly, with

18   any witness.  That has been clear throughout here.  And,

19   frankly, it is very close to contempt of Court, if proved, put

20   to one side as a result of the obstruction of justice that is

21   implicit and suffuses those kinds of contacts.

22             MR. CRUZ:  I understand, your Honor.

23             THE COURT:  So, I think you ought to admonish

24   Mr. Tkhilaishvili --

25             MR. CRUZ:  I will.

1          THE COURT:  -- with respect to it.  I have given one

2    last warning.  And I want him to understand that this survives

3    this case.

4          MR. CRUZ:  I understand.

5          THE COURT:  This is independent of the case.  That is

6    to say, if there is contempt, obstruction of justice, then I

7    will deal with it, or it will be dealt with by a separate

8    criminal case.

9          MR. CRUZ:  I understand.

10         THE COURT:  But whatever happens in this case doesn't

11   exculpate Mr. Tkhilaishvili from his obligations not to

12   interfere, directly or indirectly, with any witness, and the

13   proffer that is made by Ms. Kaplan suggests that he has.

14         MR. CRUZ:  I understand, your Honor.

15         THE COURT:  Ms. Kaplan hasn't asked for any additional

16   steps on my part.  They do not appear to be appropriate at this

17   stage while we are in the middle of the case.

18         MR. CRUZ:  I understand.

19         THE COURT:  But I urge you to talk to your client so

20   that he understands that this is an independent grounds for his

21   incarceration.

22         MR. CRUZ:  I understand, your Honor.

23         THE COURT:  Now, I have a list of the likely time

24   period that the parties have in this case.  I also have,

25   through Ms. Beatty, learned that the jury is prepared to sit

1   tomorrow for the full day, and it looks to me like we may be

2   able to finish the testimony by Friday on this.  Then I would

3   take Friday for jury instructions and charge the jury on

4   Monday, I think.  That is my present view.  Does that work for

5   the parties?

6           MS. KAPLAN:  I believe so, your Honor.

7           THE COURT:  I will tell you I am disinclined,

8   generally, to put a case to a jury on a Friday.  If the parties

9   have some different view about that, of course, I will consider

10  that.  But this jury has been attentive, and I think they will

11  be prepared to come back on Monday to get instructions on it.

12          Mr. Tumposky?

13          MR. TUMPOSKY:  One housekeeping matter.  I have

14  someone additional from my office here, Andrew Courossi.  He is

15  going to be here I think for the remainder to help manage some

16  of the exhibits on my side while I am doing the examination.

17          THE COURT:  Do you want me to introduce Mr. Courossi

18  to the jury?

19          MR. TUMPOSKY:  It may be prudent to do that.

20          THE COURT:  Okay.

21          MR. TUMPOSKY:  There's also an issue -- I understand

22  the Government intends to call Olga, and I won't even try to

23  pronounce her last name today.  During the testimony of

24  Mr. Torosyan the Court allowed inquiry into statements that

25  Olga made to him about the backgrounds of James so that,

1    presumably, Mr. Torosyan could then testify how he felt or what

2    his state of mind was after hearing this from Olga.  I would

3    ask the Court to exclude any further testimony from Olga again

4    repeating what she told Mr. Torosyan, because we don't need the

5    additional evidence we have already heard.

6            THE COURT:  I am not sure about need being the measure

7    of --

8            MR. TUMPOSKY:  Well, it's irrelevant.

9            THE COURT:  -- the admissibility of evidence.  The

10   issue with respect to Olga is in two parts; one, the impact

11   upon Mr. Torosyan; the other is the awareness of the defendant

12   that Mr. Torosyan was made aware of her comments.

13           So, what is she going to say about that?

14           MS. KAPLAN:  I don't know that she has knowledge

15   whether the defendants knew she told the victim.

16           THE COURT:  She would be a principal person to tell

17   him, and I think, unless there is some indication that she told

18   him or told the defendants or that she told someone else who

19   told the defendants, any repetition of the statements that she

20   made to Mr. Torosyan ought to be avoided.

21           MS. KAPLAN:  And I think I was going to do that, and I

22   was going to ask her about whether she went to Mr. Torosyan at

23   the auto-repair shop about the construction issue and talked to

24   him about that.  And then I was going to say, "Did you have

25   further discussion with him," and as a result of that -- well,

1   that was probably it, yeah.

2          THE COURT:  I do not think you need to do that, the

3   second part of that.  So, if she can connect it up in some

4   fashion you can have additional testimony with respect to that,

5   but not if you don't, and it sounds to me like it is unclear

6   about that.  All right?

7          MS. KAPLAN:  Okay.

8          THE COURT:  Anything else we need to take up?

9          MS. KAPLAN:  No, your Honor.

10         THE COURT:  Okay.  So, we will bring the jury in, and

11  if you can get Mr. Torosyan on the stand.

12         Do we have Mr. Torosyan?

13         THE CLERK:  All rise.

14         (The jury entered the courtroom)

15         THE CLERK:  Please seated.

16         THE COURT:  Good morning, ladies and gentlemen.  I

17  will ask my customary good morning question:  Have any of you

18  been exposed in any way, had any conversations about, in any

19  way talked to or communicated with anyone with respect to this

20  case outside of the courtroom?  And I see a negative response

21  to that.

22         I also understand from Ms. Beatty that you will be

23  prepared to sit on Thursday in the afternoon, and that will be

24  very helpful in getting this case to you as promptly as we

25  possibly can.

```
 1              So, with that in mind, then, Ms. Kaplan, you may

 2    continue with your examination of Mr. Torosyan.

 3              MS. KAPLAN:  Thank you, your Honor.

 4              THE COURT:  One other thing.  I'm sorry to interrupt.

 5    Mr. Tumposky is being assisted now by one of his colleagues,

 6    Andrew Courossi, who is in the courtroom, and I made a point of

 7    trying to introduce everybody so that you knew who was sitting

 8    in the well of the court during the course of the trial.  So, I

 9    think Mr. Courossi will be here assisting Mr. Tumposky for the

10    remainder of the trial.

11              You may proceed.

12              MS. KAPLAN:  Thank you.  If we could have Exhibit 22,

13    please, which is in evidence.

14         VAHAGN VICTOR TOROSYAN, PREVIOUS DULY SWORN BY THE CLERK

15                   CONTINUING DIRECT EXAMINATION

16    BY MS. KAPLAN:

17    Q.   Mr. Torosyan, yesterday we talked about this, that this

18    was the QuickBooks for Allied Health?

19    A.   Yes.

20    Q.   And can you tell us what the QuickBooks reflects?

21    A.   Generally at Allied Health we used the QuickBooks.  That's

22    accounting software program that allows us manage the sales and

23    expenses, also day-to-day business transaction.

24              THE COURT:  Is the QuickBooks still up?

25              MS. KAPLAN:  No.  Oh, it's my fault.  I'm sorry.
```

1           THE COURT:  Okay.

2    BY MS. KAPLAN:

3    Q.   And so these are -- the QuickBooks shows the expenses in

4    and out of Allied Health?

5    A.   Correct, correct.

6    Q.   And just calling your attention to the middle, where my

7    finger is from December 14th of 2014, what is H&H Brothers?

8    A.   H&H Brothers, that is the construction company.

9    Q.   And there is a payment for $70,000?

10   A.   70,000, yes.

11   Q.   That's a payment that you made?

12   A.   That's $70,000 for renovation.

13   Q.   Where did that money come from?

14   A.   That's come from my personal saving account.

15   Q.   And then right below it you see the Krokidas & Bluestein.

16   Who is that?

17   A.   That's our legal representative for Allied Health Clinic.

18   Q.   And that's December 14th of 2014?

19   A.   Yes.

20   Q.   And then right below that on December 14th of 2014 you see

21   DiGiorgio Associates.  Who is that?

22   A.   That's the architectural firm which we hired to do the

23   drawing for the Department of Public Health.

24           THE COURT:  Can I just interrupt?  Is there a way to

25   take the ink blot off the page?  I think it's your software,

1    but perhaps not.

2              MS. KAPLAN:  I think it's gone now.  Okay.

3    BY MS. KAPLAN:

4    Q.    So, DiGiorgio Associates is the architect?

5    A.    Yes.

6    Q.    For $8,500?

7    A.    Yes.

8    Q.    And you paid that from your personal account?

9    A.    From my personal account, that's correct.

10   Q.    Do you know whether that architect had been retained prior

11   to your involvement with Allied Health?

12   A.    As far as I know, David told me he hired it, but he has to

13   pay him some money for his work, and so he wants the money, and

14   that's when I pay, when he complete the work.

15   Q.    And 12/15 a little below is Sau Cai.  Who is that?

16   A.    That's our landlord.

17   Q.    And it's $3,600 that you paid in December of 2014?

18   A.    Yes, that's correct.

19   Q.    And you had been talking earlier about the construction

20   delay.  Do you recall that?

21   A.    Yes.

22   Q.    And then in the conversations that we heard, the

23   consensual recordings yesterday, there was some talk about

24   Hang?

25   A.    Yes.

1   Q.   Is that the same person as this H&H Brothers?

2   A.   It is.

3   Q.   Okay.  And in that conversation we heard you saying that,

4   "He keeps calling and calling."  Do you remember that?

5   A.   I do.

6   Q.   Why did he keep calling and calling?

7   A.   Well, David was talking to him as far as all the finances

8   and the progress, and David had to pay him money, and that

9   instead of, I believe that money when I put in account he has

10  to pay him.  Instead of paying him, he just took the money for

11  himself.  I'm assuming that's why he calling.

12  Q.   So, he was owed money?

13  A.   Yes.

14  Q.   Has he been paid in full?

15  A.   I'm not sure yet, but I saw him approximately a month ago.

16  He told me that there is still outstanding balance, and I told

17  him we can take a look, see what you have been paid and just --

18  Q.   Okay.

19          THE COURT:  Mr. Torosyan, if you could keep your voice

20  up so that the jury can hear fully what you have to say.

21          THE WITNESS:  Sure.

22  BY MS. KAPLAN:

23  Q.   Now, where in the Letter Agreement, the Operating

24  Agreement, where are the salaries recited for how much salary

25  each of you was to receive?

1    A.   According to Letter Agreement.

2    Q.   Okay.  So, it's in the Letter Agreement?

3    A.   Yes, it is.

4         MS. KAPLAN:  Could you pull up Exhibit 2, please.

5    BY MS. KAPLAN:

6    Q.   And do you know where in the Letter Agreement it is?

7    A.   If I may take a look, I can find it.  Thank you.

8    Q.   Let me see if I can find it for you.  Here it is.

9         (Document provided to the witness by Ms. Kaplan)

10   A.   Page 8.

11   Q.   Page 8?

12   A.   It says, "David will be paid $3,000 per month for his work

13   at HMG until AHC is operational."

14   Q.   Okay.  And does it say anywhere how much money you will

15   receive?

16   A.   We can take a look.  I believe it should say someplace

17   what my salaries are.  According to our agreement I was going

18   to receive 2,000 per month.

19   Q.   Does it say that in there?

20   A.   I just need a minute or so.

21   Q.   Oh, let me direct your attention to Page 7 under "Victor."

22   It says, "Once the AHC Operating Agreement is executed, Victor

23   will be paid $2,000 per month"?

24   A.   Yes, yes.

25   Q.   Okay.  And did the salary -- you became operational when?

1    A.    We started seeing patients November 16, 2015.

2    Q.    Okay.  And did there come a time in late October or

3    November of 2015 that you had discussions with David

4    Tkhilaishvili about his salary?

5    A.    Yes.

6    Q.    Tell us about that.

7    A.    David came to me, and he would come quite often and ask

8    for some money and that he asked me for, he wants to receive --

9    he needed $3,000.  I told him, "I can't give you $3,000,"

10   because I owed a payment in advance for full month.  So, we

11   went back and forth, back and forth arguing, and I told him,

12   "Look, I'll give you $3,000.  If you don't pay me back within a

13   week, this will count for next month's payment for your

14   salary."

15   Q.    And that time were you taking -- do you remember when this

16   was that he came to you?

17   A.    I believe it was late October, I would say.

18   Q.    And was anyone taking salary at that time?

19   A.    We were paying some stuff.  Kenton was getting paid.

20   People were getting paid some.

21   Q.    Okay.  I am going to show you, with the Court's

22   permission, Exhibit 15, which has been agreed to by the

23   parties, and ask if you recognize Exhibit 15.

24   A.    Yes.  This is the amount I was talking about.

25           THE COURT:  And that is received.

```
 1              (Exhibit No. 15 received into evidence)
 2    BY MS. KAPLAN:
 3    Q.    So, this is a check from Elen Gevorgyan.  Who is that?
 4    A.    My wife.
 5    Q.    And is this your personal account?
 6    A.    That's our personal account, joint account.
 7    Q.    And whose handwriting is on this check?
 8    A.    That is my handwriting.
 9    Q.    And you wrote this on October 25th of 2015?
10    A.    That is correct.
11    Q.    What does it say in the "Memo" section?
12    A.    "Borrowed."
13    Q.    And you signed this check?
14    A.    I did.
15    Q.    For $3,000?
16    A.    Yes.
17    Q.    And was that his salary for November?
18    A.    November.  If he wouldn't pay me by the 1st of the month,
19    this would have considered, that was the agreement, as a salary
20    for next month.
21    Q.    And why did you give David Tkhilaishvili this money?
22    A.    Look, we were about to open up the Clinic, and David, he
23    had a way always to convince and talk me out of things, and he
24    needed the money and I'm, like, "Fine."  It's very hard for me
25    to get in an argument and go back and forth.  I told him, "I'll
```

1    pay you, but just be clear this going to be your salary for

2    next month."  He has done it all the time.

3    Q.    And you said yesterday that you had done a review of the

4    financials of Allied Health.  During that review did you

5    discover that David Tkhilaishvili had taken money -- other than

6    the $5,000 check and the $6,000 check you testified to

7    yesterday, did you find that he had taken other monies as well?

8    A.    Yes, I did.

9    Q.    And what did you discover?

10   A.    I discovered few things.  One of them, he took the money

11   for, number one, for November, I believe was 15th another

12   $1,500, and then he called the payroll and processed another

13   payroll for himself without my authorization.  So, he made a

14   payment for himself without my authorization.  Also, he paid

15   some previous, his own Comcast debt from my account.

16   Q.    Comcast?  Do you know what that was for?

17   A.    Yeah.  That was his previous debt he had with his previous

18   practice, and he paid from my account.

19   Q.    Is that Davis Health?

20   A.    Davis Health, yes.

21   Q.    Was it a Comcast bill for Davis Health?

22   A.    Yes.

23   Q.    Do you know how much that was?

24   A.    Well, I seen a bill for 800, 1,100, so I think

25   approximately plus/minus, close to $2,000 he paid from my

1    account for his debts.

2    Q.    So, he paid on multiple occasions?

3    A.    Yes.

4    Q.    And when you say from your account, is that your personal

5    account?

6    A.    From my personal account.  That's correct.

7            MS. KAPLAN:  With the Court's permission, if I may

8    show the witness Exhibit 28?

9            THE COURT:  I'm sorry.  The number?

10           MS. KAPLAN:  28.  This is agreed upon.

11   BY MS. KAPLAN:

12   Q.    Do you recognize Exhibit 28?

13   A.    Yes, I do.

14   Q.    And what do you recognize that to be?

15   A.    So, he wrote a check for himself for $1,500.

16   Q.    Is that what you were just talking about?

17   A.    Yes.

18           THE COURT:  That document is received.

19           MS. KAPLAN:  Thank you.

20           (Exhibit No. 28 received into evidence)

21   BY MS. KAPLAN:

22   Q.    So, this is dated November 3rd of 2015?

23   A.    Yes.

24   Q.    And whose handwriting is on this check?

25   A.    His.

1   Q.   That's David Tkhilaishvili's handwriting?

2   A.   Yes, David Tkhilaishvili's.

3   Q.   Do you recognize the signature?

4   A.   I do.

5   Q.   Whose is it?

6   A.   David Tkhilaishvili's signature.

7   Q.   And it's for $1,500, correct?

8   A.   Yes, correct.

9   Q.   And when did you learn about this check?

10  A.   After he cashed it, and when he was -- approximately, I

11  believe, was late September I requested log-in and a password

12  for Bank of America.  So, I logged in, and I noticed that there

13  was a cashed check, and then I called him up and asked, "What's

14  going on here?"  He's, like, "This is my salary."  I'm, like,

15  "Listen, you're not supposed to take this money, and we had

16  this discussion.  The 3,000 you have been paid in advance."

17  Like, "Well, I need the money."  And that's it.

18  Q.   Did you authorize him to take that money?

19  A.   I did not.

20  Q.   And this check was from Allied Health Clinic, correct?

21  A.   That is correct.

22  Q.   Then you talked about that he took a payroll.  Was it a

23  draw?

24  A.   No.  He processed the payroll for himself.

25  Q.   Okay.  And from what payroll company?

1    A.    From the Granite Payroll Company.

2    Q.    And when did you discover that?

3    A.    I want to say either late December or late January.

4    Q.    Of?

5    A.    2015 or 2016.

6    Q.    That's when you discovered it?

7    A.    Yes.

8          MS. KAPLAN:  With the Court's permission, if I may

9    show the witness Exhibit 16, which is agreed upon?

10         THE COURT:  All right.

11   BY MS. KAPLAN:

12   Q.    Do you recognize Exhibit 16?

13   A.    Yes, I do.

14   Q.    What do you recognize it to be?

15   A.    This is his check for the payroll.  So, we do

16   automatically deposit, auto deposit, from the payroll company

17   into the personal saving account.

18   Q.    So, this is a void check?

19   A.    Correct.

20   Q.    And it's David Tkhilaishvili's check?

21   A.    Yes.

22   Q.    It indicates his bank account; it has his bank account

23   number on it, correct?

24   A.    That is correct.

25         THE COURT:  That is received as Exhibit 16.

1      (Exhibit No. 16 received into evidence)

2      MS. KAPLAN:  Thank you.

3  BY MS. KAPLAN:

4  Q.   When did you discover that he had taken a draw from

5  Granite Payroll?

6  A.   Again, I think it was late December or mid-January, around

7  that time.  So, I made a phone call and I asked him if he --

8  first of all, I told him, "David is not authorized to make any

9  transaction behalf of Allied Health, so do not process any

10 payrolls."

11     And we had multiple, like, I believe it was on

12 November 2, one time he called me, put a 20,000 for payroll,

13 but I told him that was late November or early December, that

14 was all when everything happened.  I told him, "David, I'm not

15 going to pay any money until you provide me with the hours how

16 much people have to get paid."  And then he sent me

17 completely -- he asked me to put 20,000.  I believe 20.  He

18 just provide me with 11 or 12,000 payroll.  Then I made a phone

19 call, start investigating a little more, so that's when I

20 learned.

21 Q.   In November of 2015 did you ever have a conversation with

22 David Tkhilaishvili where you told him that no one was

23 receiving a salary?

24 A.   I did multiple times.

25 Q.   And what did he say?

1    A.    He says, well, he needs the money, so we had agreement, he

2    told me, to be paid.  I told him, "David, first of all, entire

3    November you took the money in advance."

4          And the second thing, based on our agreement I was

5    going to -- I was supposed to get paid $8,300 per month,

6    anything spent over $500,000, but I haven't got paid nothing

7    yet.  "We both understand there is no money, so we can't take

8    the salaries, especially me and you.  I'm not taking personal,

9    and I can't have you take either."

10   Q.    I'm going to show you Exhibit B, which I am not sure are

11   agreed to.

12                         (Pause)

13         MS. KAPLAN:  Your Honor, I understand these are now

14   agreed to.  They were Exhibit B.

15         THE COURT:  So, we will mark these as Exhibit 30.

16         (Exhibit No. 30 received into evidence)

17   BY MS. KAPLAN:

18   Q.    Can you look through Exhibit 30 and tell us what these

19   are.

20   A.    Those are the paychecks what I have paid to David from my

21   personal account, his salary.

22   Q.    And, again, we see the name Elen Gevorgyan on here?

23   A.    Yes.

24   Q.    And that's your wife?

25   A.    My wife on the joint account, correct.

1   Q.   And that's your personal account?

2   A.   Yes, it is.

3   Q.   And starting on December 26 of 2014 you paid David

4   Tkhilaishvili $1,500?

5   A.   Yes.

6   Q.   What does it say in the "Memo" section?

7   A.   This is, "From December 15 through December 31st payment."

8   Q.   And that is salary?

9   A.   That is a salary.

10   Q.   And next page, please.

11   A.   It's the same thing, "From January 1 to January 15

12   payment."   His salary.

13   Q.   And then the next one, please.

14   A.   "From January 15 to February 1 payment."   Salary.

15   Q.   And that's $1,500?

16   A.   $1,500 as well.

17   Q.   And the next one, please.

18   A.   It's $2,500 for February payment.

19   Q.   Can you tell us why it was $2,500?

20   A.   At the end of January, and I request a meeting at the --

21   we were doing at that time the meeting, I believe we met at

22   David's apartment -- yes, we did -- and I told David -- he came

23   back from Georgia.   I told him, "David, that's what you start

24   the project.   Now our entire plan is on jeopardy so we could

25   lose -- I could lose" -- at that time I invested close to

1    150,000.  "I could lose 150,000, plus I could inherit

2    personally some of those debts.  So, at this time nobody is

3    doing any work.  We have to shut down the project until we

4    received our permit from City of Quincy."  And so we stopped,

5    nobody was doing anything.

6            Then, after that, a week later David came to me, like,

7    "Victor, you know, I understand, but, you know, we had an

8    agreement.  I know I made a mistake, but at the same time I

9    need some money.  I made some plans."  I'm like, "David, I

10   mean, that's already costing a lot of money.  And,

11   additionally, nobody is going to do any work, especially you.

12   You were going to overlook the construction, but there is no

13   construction going on now.  Why should I pay you?"

14           So, he talked back and forth.  I'm like, "Okay, fine,

15   and I will deduct from you $500 per month and I'll pay for --

16   before we get the permit for $2,500 and just pay your expenses,

17   whatever."

18   Q.   So, that was for the full month of February, correct?

19   A.   That is correct.

20   Q.   If we could have the next check, please.

21   A.   It's the same one in March:  $2,500.

22   Q.   $2,500.  And now this is?

23   A.   March payment.

24           MS. KAPLAN:  Are you able to blow this up?  Thank you.

25   BY MS. KAPLAN:

1   Q.   So, this is what date?  Oh, March 30th.

2   A.   Yep.

3   Q.   And the "Memo" section says, "March payment"?

4   A.   "March payment," correct.

5   Q.   And, again, it's $2,500 for the same reason?

6   A.   For the same reason, correct.

7   Q.   Okay.  And if we could have the next one, please.  So,

8   this is your check to David Tkhilaishvili in March, and it's

9   $3,000.  What does the "Memo" section say?

10   A.   Basically within a week he took 25 plus.  He took from 4/1

11   till 4/30 payment in advance.  So, he took a full month payment

12   in advance, $3,000.

13   Q.   Okay.  And next check?  So, this is, again, your check to

14   David Tkhilaishvili?

15   A.   Yes.  He came.  Instead of $3,000 he says, "I need again

16   in advance."  I told him, "I can't pay you in advance.  I will

17   pay you for 20 days."  We pay every 15th and 30th, so I gave

18   him 20 days of the payment, which was $2,000.

19   Q.   And in the "Memo" section what does it say?

20   A.   "1 to 20 of May."

21   Q.   Okay.  And the next check?  Again, it's your check to

22   David Tkhilaishvili.

23   A.   For the last $1,000 to David Tkhilaishvili.

24   Q.   Okay.  That's the last payment for May?

25   A.   May, correct.

1    Q.   The next one, please.

2    A.   Then, again, it's a June payment advance for $3,000.

3    Q.   So, that's the full salary?

4    A.   Full salary in advance, yeah, for the month of June.

5    Q.   And the next one, please.

6    A.   It's $1,500, June 1, 2015 -- July 1 to 15, technically.

7    Q.   Well, what does the "Memo" section say?

8    A.   I believe we wrote down "June," but it should be July.  It

9    was an error.

10   Q.   Okay.  And the next one?

11   A.   That's the $2,500 was July payment, plus -- and David at

12   that time, when we start construction, he said, "We're going to

13   be doing some meetings at my house, and I have to charge the

14   fee as using the office $1,000 per month."  So, he took $1,000

15   extra charge for his apartment.  I mean, we meet time to time

16   for the meetings.  I told him, "Fine."

17   Q.   So, this should have been $1,500?

18   A.   1,500, but I add extra 1,000 for that.

19   Q.   Okay.  And the next one, please?

20   A.   That's the August.  That's already about the time when we

21   -- the agreement, as I told you, we agreed before we start when

22   we receive from Department of Public Health and from City of

23   Quincy our permit so we will start using the Allied Health

24   account.  So, that transition time, then $1,500 for David.

25   Q.   Okay.  And that's for?

```
1    A.    August --

2    Q.    Two weeks?

3    A.    Two weeks, for the first 15 days.

4    Q.    And the next check, please?

5    A.    For the second 15 days of David's salary, August.

6    Q.    Okay.  And the next check, please?

7    A.    This is for the next -- excuse me -- the third for I

8    believe was September payment for David's salary.

9    Q.    $1,500, correct?

10   A.    $1,500, correct.

11   Q.    And the next check?

12   A.    $1,500 for the last payment for the month of September,

13   even though here I wasn't agreeing to pay the second $1,500,

14   and I told him, "You are going away, and so far I can't pay you

15   for that time."  And he's, like, "Well, I work and I need a

16   vacation."  I'm like, "David, you already took two weeks on the

17   last year when you wasn't overseas.  You said you're going to

18   take in advance vacation money, which I paid.  Now you want

19   again a second time vacation money for two weeks."

20         And so, we went again the argument and back and forth,

21   back forth, and sort of we didn't go anywhere.  I'm like, "Just

22   take it.  Fine."

23   Q.    So, you agreed to give it to him?

24   A.    I guess I did.

25   Q.    The next check, check number 1226, this is a check for
```

1    $1,000 to David?

2    A.    $1,000, yes.

3    Q.    And it says, "For salary"?

4    A.    "Salary."

5    Q.    Why is it $1,000?

6    A.    Looking at the other one, I believe he took it in advance.

7    I really don't know this one why I put 1,000.  I don't

8    remember.

9    Q.    And this is October 6 of 2015?

10   A.    October 10, yes.

11   Q.    All right.  And the next check is --

12   A.    Oh, yes.  So, okay it adds up $3,000, so he took another

13   2,000.  So, it's 3,000 for -- I'm assuming that's October

14   payment.

15   Q.    Okay.  Now, you had testified yesterday about the American

16   Express Card that was in Olga Dorofyeyeva's name, correct?

17   A.    That is correct.

18   Q.    And did you have anything to do with her obtaining that

19   credit card?

20   A.    No, I did not.

21   Q.    Do you know when she obtained it?

22   A.    Absolutely no idea, zero information.

23   Q.    Did you tell her to obtain that in her name?

24   A.    No, I did not.

25   Q.    When you got to -- when you became involved in Allied

1    Health was that credit card already in existence, to your

2    knowledge?

3    A.    Afterwards I learned it was, yes.

4    Q.    And you later started paying off the --

5    A.    He was paying off, so initially he would have bring the

6    fees, and I would have paid for it.  Then he had an access to

7    make an automatic payment on accounts, so he had a log-in

8    access on American Express, and he put the payment information

9    in my checking account.  He wouldn't make a payment himself,

10   David.

11   Q.    He had access?

12   A.    To Olga's American Express account log-in.  Then in the

13   payment section he entered my checking account.  That's how he

14   made the payments.

15   Q.    From your personal checking account?

16   A.    From my personal checking account.

17   Q.    Did you give him access to that?

18   A.    He had it, so he had company expenses.  He says, "That's

19   where we spent it."

20            MS. KAPLAN:  If I could just have a moment, your

21   Honor?

22            THE COURT:  You may.

23                       (Pause)

24   BY MS. KAPLAN:

25   Q.    So, Exhibit 30, the checks that we just went through, and

1    prior to that the checks that you had looked at, the one for

2    $1,500 in November and then the Granite Payroll draw that David

3    Tkhilaishvili took, the 2,000 plus the 1,500, those were over

4    and above these salary payments that we just looked at?

5    A.    That is correct.

6    Q.    I'm going to show you --

7          MS. KAPLAN:  I believe Exhibit C is now agreed upon.

8          THE COURT:  All right.  So, we will mark it as

9    Exhibit 31.

10          (Exhibit No. 31 received into evidence)

11   BY MS. KAPLAN:

12   Q.    Showing you Exhibit 31, I ask you if you recognize these

13   documents?

14   A.    Yes, I do.

15   Q.    What do you recognize them to be?

16   A.    When we start this business and David told me he had some

17   debts, and as a friend, again, I helped him on many occasions.

18   And I asked him, "David, I don't mind lending you $20,000.  Pay

19   off your debts.  I don't want no interest, no nothing.  Just

20   pay me back.  I want you to pay people money.  I don't want you

21   to owe people money, so I don't want people knocking at your

22   door now to ask for money.  Pay the people off.  Let's start

23   fresh."  And I gave him $20,000 as a loan.

24   Q.    Okay.  And is that the loan money we saw in Exhibit 2, the

25   Letter Agreement?

1    A.    That is correct.

2    Q.    Okay.  So, starting with the first one, what is this on

3    the screen?

4    A.    It's a $5,000 payment which I give him, David

5    Tkhilaishvili.

6    Q.    And that's on December 14th, 2014?

7    A.    Yes.

8    Q.    And is that right around the time that you entered into

9    the Letter Agreement with him?

10   A.    That is correct.

11   Q.    And that's from your personal account?

12   A.    From my personal account.

13   Q.    If we could see the next one, please.  And what is this,

14   Check Number 175?

15   A.    So, he came again a week later for the rest of it, even

16   though I told him that 20,000, I didn't want to pay it once --

17   him to gradually payment, but I'm like, "Fine.  You have to

18   pay?"  He's, like, "Vic, I have to pay people."  I'm like, "You

19   promise?"  I'm like, "Okay, I promise you I'll give you the

20   money."

21         So, that's the second $10,000 payment to him.

22   Q.    So, a few days later you gave him the $10,000, correct?

23   A.    Correct.

24   Q.    So, that's 15,000 now, correct?

25   A.    15,000.

1    Q.   And in the "Memo" section it says what?

2    A.   "Borrowed."

3    Q.   All right.  And this is from your personal account?

4    A.   That's the $1,000, the office rent David charged us for

5    November as well while he used his house.  So, he charged me

6    $1,000 rent for his office.

7    Q.   And the check is dated what?

8    A.   5/7, I believe, 2015 or 5/1/2015.

9    Q.   So, that's May?

10   A.   May.

11   Q.   So, why are you saying "November"?

12   A.   I'm sorry.  It was May.  Sorry.

13   Q.   In the "Memo" section it says, "Office rent"?

14   A.   "Office rent," correct.

15   Q.   And the next check is Check 1157, and what is that check?

16   A.   $1,000.  I'm assuming that's a June payment for his

17   office.  I'm assuming.

18   Q.   For the rent?

19   A.   For the rent for his office, yes.

20   Q.   Okay.  The next check?  And that last check was on Allied

21   Health Clinic account, and so is this one, Check 1190, correct?

22   A.   Correct.

23   Q.   And this is for $5,000.  Can you tell us what this is?

24   A.   The $5,000.  This is the check that he took from, without

25   my authorization, from my account.

```
 1    Q.   Whose handwriting is on this check?

 2    A.   David's.

 3    Q.   So, you didn't write this check?

 4    A.   I did not.

 5    Q.   And this is -- the check is dated 8 -- oh, this is the one

 6    we already saw in evidence?

 7    A.   Yes.

 8    Q.   Okay.  If we could just show you Exhibit 7, please, which

 9    is in evidence.  Is that the same check?

10    A.   That is the same check, correct.

11    Q.   Okay.  Thank you.

12         We can go back now to Exhibit 31.  And going to the

13    next check, and that's the $6,000 one that we already saw?

14    A.   Yes.  This is the amount on exhibit we saw, and that's --

15    he took this money without my authorization as well.

16    Q.   Okay.  And the next check?  This is Check Number 1198 on

17    Allied Health Clinic?

18    A.   Yes.

19    Q.   And who is this a check to?

20    A.   Well, I learned later on recently this is the -- he paid

21    his personal immigration attorney from my personal account --

22    from the business account, even though the attorney paid this

23    amount back to me.

24    Q.   Okay.  So, is this your handwriting on the check?

25    A.   It is not.
```

1    Q.    Did you authorize this check?

2    A.    I did not.

3    Q.    And whose signature is that on the check?

4    A.    David's.

5    Q.    And it says, "Pay to the order of" who?

6    A.    "Nareg Kandilian."

7    Q.    And it's for $1,000?

8    A.    $1,930.

9    Q.    And do you have an understanding of who this person is?

10   A.    Well, I know him.  He's the person next door.  I

11   introduced him to David for his immigration attorney.  So, I

12   know the person.

13   Q.    And when you learned about this check did you do

14   something?

15   A.    I went first to the guy.  I told him, "Listen, you know,

16   if you didn't cash it, don't cash the check.  That's my money.

17   He has to pay from his account, and he has to pay me back."

18   Then I just talked with David, and then end up Nareg paying

19   from his personal account back to me.  I'm like, "I'll collect

20   the money from him."

21   Q.    So, this had nothing to do with Allied Health, correct?

22   A.    No, no, no.  That's his personal.

23   Q.    If we could have the next check, please.  This is Check

24   Number 1231 from Allied Health.  Can you tell us what this is?

25   A.    I don't know.

1    Q.    And whose handwriting is on this check?

2    A.    David's.

3    Q.    And in the "Memo" section what does it say?

4    A.    "Bonus."

5    Q.    And it's for $604.11?

6    A.    I believe so, yes.

7    Q.    And it's dated October 13th of 2015?

8    A.    Mm-hmm.  Yes.

9    Q.    Were you giving out bonuses at Allied Health?

10   A.    There was nothing for take.  I mean, why should we give

11   the bonus?  Nobody got the bonus, no.

12   Q.    And the next one, please.  Did you authorize him to take a

13   bonus?

14   A.    No, there was no bonus for -- we haven't started working,

15   there is no profit coming in.  There is no point to anybody get

16   a bonus.

17   Q.    So, this Exhibit 31, these were just additional checks,

18   payments that you made from either your personal account or

19   Allied Health that were either authorized or not to David

20   Tkhilaishvili, correct?

21   A.    That is correct.

22   Q.    Do you have a gun license?

23   A.    Yes, I do.

24        MS. KAPLAN:  With the Court's permission, I ask to

25   show the witness Exhibit 1, which is agreed upon.

1          THE COURT:  All right.  It will be received.

2              (Exhibit No. 1 received into evidence)

3    BY MS. KAPLAN:

4    Q.    What do you recognize this to be?

5    A.    This is my firearm license to carry.

6    Q.    And when did you obtain this license?

7    A.    Late November 2014.

8    Q.    Why did you obtain this license?

9    A.    First of all, my plan was to start hunting, I like to

10   hunt, and just as a Second Amendment to have it.

11   Q.    And back in 2014 and then into 2015 did you carry a gun?

12   A.    No.

13   Q.    Did there come a point when you started to carry a gun?

14   A.    Yes, I did.  Right after the threats I was carrying the

15   gun, firearm.

16   Q.    Why were you carrying the gun?

17   A.    Well, God knows that those days were --

18           MR. CRUZ:  Objection, your Honor.

19           THE COURT:  Overruled.  He may answer the question.

20   A.    So, while I went through it, so day and night me and my

21   wife and my family we couldn't sleep, and I didn't know what's

22   gonna to happen.  You hear the stories he done, and every time

23   at nighttime we would hear a little sound, I would have jumped

24   to the window, look.  We were -- the whole family were scared.

25   We didn't know what to do.  We were so close to just rent a

1    place somewhere far away just to live for a while.

2              MR. CRUZ:  This isn't responsive, your Honor.

3              THE COURT:  Yes, I am going to strike the last portion

4    of it.

5              The question had only to do with why you carried the

6    gun.

7    BY MS. KAPLAN:

8    Q.   And you told us that you spoke to the FBI in November of

9    2015, correct?

10   A.   That's correct.

11   Q.   From that point on, when you met with either of these

12   defendants, were you carrying a gun?

13   A.   Never.

14   Q.   Do you know somebody by the name of Maria Mana (ph)?

15   A.   Yes, I do.

16   Q.   And who is she?

17   A.   She was our lab technician at Allied.  David and Kenton

18   hired her for -- do the lab services.

19   Q.   And do you know how long -- is she still working at

20   Allied?

21   A.   She's not.  She left our practice, I believe, January --

22   early January of this year, January 5th or 7th of 2017.

23   Q.   Did you ever loan her any money?

24   A.   Yes, I did.

25   Q.   On how many occasions?

1   A.   Well, she asked me three times, but I only gave her once.

2   Q.   And what did she tell you that she needed a loan for?

3   A.   All different reasons.  First time she has to pay the rent

4   and her son has to come from -- he was in the Military, he

5   needed the money to pay the rent, and he will pay me back

6   within a short period of time, week or two, but it took her

7   like I think four or five months to pay that off.

8   Q.   How much did you loan her?

9   A.   $2,000.

10  Q.   Did she pay it all back?

11  A.   Yes, she did.  So, we made her sign agreement.  Sometimes

12  agreement was that we could have deduct from her paycheck, and

13  she said, "Oh, don't deduct it.  I need money."  Then really we

14  had a lot of argument before we took it.  It was very hard to

15  take the money back.

16  Q.   Hard to get the money back?

17  A.   Hard to get the money back from her, yes.

18  Q.   And do you know why she left?

19  A.   Yes, I do.  She text me she had --

20          MR. TUMPOSKY:  Objection.

21          THE COURT:  It sounds to me like it is hearsay.

22          THE WITNESS:  May I answer?

23          THE COURT:  I'm sorry.  I'm sustaining the objection,

24  unless there is a better foundation provided.

25  BY MS. KAPLAN:

1  Q.   Prior to her leaving in January of 2017 did Maria Mana

2  come to you and ask you for something?

3  A.   Yes.  She -- not only me.  She --

4       MR. TUMPOSKY:  Objection.

5       THE COURT:  Overruled.  The question is whether she

6  asked you for something.  The answer is, "Yes."  And now next

7  question.

8  A.   She asked me --

9       THE COURT:  No.  Just a moment.  It's going question

10  and answer.  You answer just the question that is put to you.

11  BY MS. KAPLAN:

12  Q.   Okay.  As a result of the conversation that you had, did

13  she leave?

14  A.   Yes, she did.

15  Q.   How soon after that conversation did she leave?

16  A.   She asked me money.  Within less than a week she gave her

17  notice and left.

18  Q.   So, other than that one occasion did you loan her any

19  other money?

20  A.   Well, no.  She asked me twice for money.  I did not.  She

21  was given the money from somebody else at the Clinic, $10,000.

22  Q.   When was the last time that you took salary from Allied

23  Health?

24  A.   I believe that's in 2015.  I haven't taken penny from

25  there since.  October, September, something like that.

1    Q.   Of 2015?

2    A.   Yes.

3    Q.   And why haven't you taken salary?

4    A.   I mean, there is no money.  The company is not profitable,

5    why should I take the salary?  There is nothing for me to take.

6    Q.   And in January of 2016, after the defendants were removed

7    from Allied Health, did you learn that David Tkhilaishvili had

8    ordered something and used --

9            MR. CRUZ:  Objection.  Leading.

10           THE COURT:  Yes, sustained.

11   BY MS. KAPLAN:

12   Q.   You testified that you had closed Health Management Group?

13   A.   Yes.

14   Q.   You closed Health Management Group?

15   A.   Yes, I did.

16   Q.   When did you close Health Management Group?

17   A.   I believe it was mid-January of 2016 or early February.

18   Q.   And did you ask your lawyers to do something with respect

19   to Health Management Group?

20   A.   Yes, to dissolved the Health Management.

21   Q.   Why did you do that?

22   A.   There was no point to have Health Management, that extra

23   expense for the Clinic.

24           MS. KAPLAN:  If I may just have a moment, your Honor.

25                        (Pause)

BY MS. KAPLAN:

Q.   The credit card that was in Olga Dorofyeyeva's name, do
you know what that credit card was used for other than for
Allied Health expenses?

A.   I'm not sure.  I believe sometimes meetings and certain
occasions they used that.

Q.   Was it used for anybody's personal expenses?

A.   Well, they used for the personal expenses for the vehicle,
the insurance.  They've been used for the cell phones.  And
that's how much -- for Comcast previous debt which has no
association with Allied Health.

Q.   So, you testified that these threats by the defendant
started in August of 2015; is that right?

A.   That is correct.

Q.   And you went to your attorneys, what you have told us, in
November of 2015?

A.   That is correct.

Q.   Can you tell us why you waited that amount of time?

A.   Well, a few reasons.  Number one, right after that
August -- first of all, I put all the money, so that's all of
the -- my young-age years I worked hard, and very hard.  He
knows how hard I worked, and I earned some savings.  That was
entire my savings there.  And he said, "Victor, you know, going
to attorneys, they're not going to fix your problems.  You're
gonna go through litigation, each side gonna spend hundreds of

1   thousand dollar, and you're not gonna go anywhere.  Look what

2   happened with Kurt Fabrick.  Look what happened with the people

3   in the past."  I sort of took that as a consideration.  I did

4   not go to authorities, but I was sort of 50/50 going or not.

5   Q.   And as you sit here today, how do you feel about having to

6   testify?

7   A.   I feel --

8            MR. CRUZ:  Objection.

9            MR. TUMPOSKY:  Objection.

10           THE COURT:  Overruled.  I will permit it.

11  A.   First of all, it breaks my heart to see him like this, and

12  I see on this side going through dispute, but I really -- I

13  want the best thing for him.

14           MR. CRUZ:  Objection, your Honor.

15  A.   I tried everything I could.

16           THE COURT:  I will end it at that point.

17           MS. KAPLAN:  I have no further questions, your Honor.

18           THE COURT:  All right.

19           Mr. Cruz.

20                        CROSS-EXAMINATION

21  BY MR. CRUZ:

22  Q.   Good morning, Mr. Torosyan.

23  A.   Good morning.

24  Q.   Mr. Torosyan, you had testified that you've known David

25  Tkhilaishvili for approximately 10 years.

1    A.   Now, yes.

2    Q.   And during those 10 years you came to socialize with him?

3    A.   We were friends, yes.

4    Q.   You spoke with him on many occasions?

5    A.   Yes, we did.

6    Q.   You spoke about your family?

7    A.   Yes, I did.

8    Q.   You spoke about David's family?

9    A.   Yes, we did.

10   Q.   And that included his brother, Jambulat?

11   A.   Yes.  On some occasions he mentioned his brother's name.

12   Not often, but he did.

13   Q.   You spoke about David's parents, whom you met?

14   A.   Yes.

15   Q.   And in addition to that, you spoke about things you had in

16   common from being immigrants from outside of the United States?

17   A.   We discussed that.  I don't particularly remember that,

18   but we discussed that.

19   Q.   In addition to that, you discussed things such as David's

20   relationships?

21   A.   Like, what do you mean by "relationships"?

22   Q.   With women.

23   A.   Sometimes he discussed, sometimes we did not.  Not all the

24   time, though.

25   Q.   That's how you knew about Kristina Ursova, correct?

1    A.    Yes.  He said, "She's my girlfriend."

2    Q.    Okay.  Now, during the course of your relationship you

3    came to learn many things about David Tkhilaishvili, correct?

4    A.    I don't know what you mean by "many things," but certain

5    things I did.

6    Q.    Okay.  And you reached a certain comfort level with him?

7    A.    Yes, I did.

8    Q.    To the point where you invited him into your home?

9    A.    Yes.

10   Q.    On many occasions?

11   A.    That is correct.

12   Q.    You also invited him to your second home in Mashpee?

13   A.    Yes.

14   Q.    On many occasions?

15   A.    Yes, I did.

16   Q.    In addition to that, you visited him at his home?

17   A.    I have been his house only once.

18   Q.    And you have interacted with both him and with James, or

19   Jambulat, correct?

20   A.    When?

21   Q.    During the course of your 10-year relationship.

22   A.    I seen -- I requested before we start the business, I

23   asked, "David, I want to come to sit down and talk with your

24   family, because -- "

25   Q.    Well, I'm not asking about the business issue.  I'm just

1    asking about --

2    A.   Well, that's the family.  That's the same thing with the

3    family, I'm asking the family.  That's why I went to his house.

4    He never invite me to his house, so I'm like, "I want to come

5    to your house, and I want to meet your -- I want see your

6    parents."  And I asked them to -- opinion.  That's how I went

7    to his house.

8    Q.   All right.  And during the course of your relationship, I

9    believe that you said that you looked upon David as a younger

10   brother?

11   A.   That is correct.

12   Q.   And along those lines, David would come to you for advice?

13   A.   That's true.

14   Q.   He would come to you when he needed money for business

15   purposes?

16   A.   Different.  It's not all the business.

17   Q.   Okay.  And you would gladly help him?

18   A.   That is true.

19   Q.   In addition to that, every time that he borrowed money

20   from you, which I believe you said was in excess of ten

21   times -- is that correct?

22   A.   Plus/minus.  I never counted, but, yes, many occasions.

23   Q.   But he always paid you back?

24   A.   He always paid me back.

25   Q.   You never had to worry about that?

1   A.   Well, I had to worry about that.  Sometimes he was late.

2   Q.   Well, I just asked you if he always paid you back.

3   A.   Yes, he paid me back.

4   Q.   And you continued to loan him money when he asked you to,

5   correct?

6   A.   In certain occasions, when he asked me, the way I did, I'd

7   give him money.  He had to pay me back before he asked money

8   again.  I never give him money then added more.  I didn't do

9   that way.

10  Q.   I understand that.  But he was good to his word, for his

11  word, correct, as far as money was concerned?

12  A.   He paid me back in the past.

13  Q.   Okay.  Now, with regard to the relationship that you had,

14  the two of you are very similar in terms of your personalities,

15  aren't you?

16  A.   Well, I don't think so, no.

17  Q.   Well, isn't that why you get along so well with him?

18  A.   Not necessarily.  We have different type of friends.

19  Q.   Okay.  But I'm talking about your relationship to David.

20  There is obviously something about him that you can relate to?

21  A.   We're from the same region and area, you could say, from

22  old U.S.S.R., Caucus, and you could say we're friends.  You

23  know, I have different type of friends.  I have artist friends

24  and I have musician friends.

25  Q.   So, you had lots of things in common?

1    A.   I couldn't say lots of things.  We get along, so that's

2    the answer.

3    Q.   Right.  And that's why you continued in your relationship

4    with him?

5    A.   We were friends because we continued the relationship,

6    yes.

7    Q.   Yes.  And that relationship was continuous over these

8    10 years or so, correct?

9    A.   Until -- until we start having those disputes.

10   Q.   Okay, okay.  Now, as far as your business relationships

11   with David, I believe you testified that you had never been

12   involved in any business relationships with David prior to

13   Allied Health.

14          MS. KAPLAN:  Objection.

15          THE COURT:  If the witness adopts that, I will permit

16   it.

17   BY MR. CRUZ:

18   Q.   Isn't that true, sir?  Isn't that what you said yesterday?

19   A.   Well, I have to answer differently.

20   Q.   Well, no, no, no.

21          THE COURT:  No. You asked the question.  Now you get

22   the answer.

23   A.   So, he brought the business, an idea so we could have what

24   is called the home-care business, but we never got anything

25   done, and we sort of left it.

1    Q.   But you didn't tell the jury that yesterday, did you?

2    A.   Well, I wasn't specific.  They didn't ask me anything -- I

3    meant running the business as far as operating something.  We

4    didn't operate anything.  That was an idea.

5    Q.   Sir, I believe you were asked if you had prior business

6    dealings with Mr. Tkhilaishvili yesterday.

7    A.   And I meant, again, I meant which is operating the

8    business.  That's what I meant.

9    Q.   Okay.  So, you're qualifying your answer now and saying

10   that you misunderstood the question yesterday?

11            MS. KAPLAN:  Objection.

12            THE COURT:  Yes.  Sustained.  I will strike it.  It is

13   argumentative.  Put a question, not an argument.

14            MR. CRUZ:  I understand, your Honor.

15   BY MR. CRUZ:

16   Q.   So, you were involved in a business relationship or at

17   least had discussed entering a business with David

18   Tkhilaishvili back in 2010 for something called "All Home

19   Care," correct?

20   A.   Yes, we discussed that.

21   Q.   So, you discussed that?  You had a comfort level with

22   doing this with him, potentially?

23   A.   Well, we discussed the business.  He proposed that

24   business, and we discussed, and we didn't reach any -- we

25   couldn't bring appropriate people.  We left it.

1    Q.    Okay.  But you did discuss entering a business together?

2    A.    Yes, I did.

3    Q.    In addition to that, you also discussed investing in

4    David's transportation business, correct?

5    A.    That is not correct.  He asked me a loan.  That was as a

6    loan for him and not investment as investment.  He says,

7    "Victor, I need -- my transportation is dying, so please give

8    me some money, I can purchase the vehicles, I can run it.  If

9    that become very profitable, I will give you something.  If

10   not, then I'll pay your money back."  And because he was losing

11   it, that's the only thing he had.  He said, "I'm losing that."

12   Q.    But my question was the two of you did discuss it, your

13   being a part of the transportation business?

14   A.    I never been as a partner in a business.  So, I was --

15   Q.    I'm not asking you that.  I'm asking you if you discussed

16   it.

17   A.    He gave me the option.  If it was very profitable, he

18   would have give me some money back.  So, if you call it a

19   "partnership," perhaps.

20   Q.    So, you did discuss it, but you didn't enter into that

21   sort of relationship with him, correct?

22   A.    So, again, I gave him, lend him the money.  If he was

23   profitable, he would have paid me something extra; if not, he

24   would have paid me my money back.

25   Q.    But you continued in that relationship with him, and you

1   agreed to service the vehicles for the transportation company?

2   A.   Yes, I did.

3   Q.   You had an agreement for that?

4   A.   Mm-hmm.

5   Q.   Okay.  Now, during the course of your relationship with

6   David over these 10 years there were instances where, as I

7   asked you earlier, you socialized, correct?

8   A.   Yes, we did.

9   Q.   And you socialized with people like Saba Kikoliashvili?

10  A.   Recently we start more socializing, but before -- I

11  haven't seen him often.

12  Q.   Okay.  And when the two of you do get together, you and

13  David Tkhilaishvili, you had discussions?

14  A.   If we get together, yes, we always talk.  People talk when

15  you get together.

16  Q.   And sometimes those discussions become animated or heated,

17  correct?

18  A.   I mean, I don't know what you're referring to.

19  Q.   Well, the two of you are very much alike, so you get into

20  very animated discussions about different things, correct?

21       MS. KAPLAN:  Objection.

22       THE COURT:  Just a moment.  If the witness adopts that

23  characterization, he may answer.

24  A.   I really don't know -- I can't answer that question,

25  "Yes."  I would say most like no than yes.

1    Q.    You'd do that?

2    A.    We don't argue.  We -- most --

3    Q.    And, again, I didn't ask you if you argued.  I asked if

4    you got into animated discussions about different things.

5    A.    Well, we talk about it, we have opinions, but that's -- we

6    have opinion about everything.  People, when they talk, they

7    have to express their opinions.  That's what we do.

8    Q.    Sure.  And you have discussions amongst common friends of

9    the two of yours, correct?

10   A.    I'm assuming.  I don't remember every time we talked.

11   Again, we're friends.  We talk about different things.  We

12   could have talked about the common friends.

13   Q.    Okay.  And is it fair to say that you looked upon David as

14   your younger brother, correct?

15   A.    Now?  No.

16   Q.    No.  Then.

17   A.    Yes.

18   Q.    And a family member?

19   A.    Yes.

20   Q.    That David tried to emulate you or be like you, correct?

21   A.    No, no, I wouldn't say so.  Now I believe that he used me.

22   Q.    Well, that's not what I asked you.  What I asked you was

23   whether or not during the course of your relationship David

24   tried to model himself after you?

25   A.    I think you should ask that question to him.  I can't

1    answer for him.

2    Q.   Well, you were very successful with your businesses,

3    correct?

4    A.   Well, I was successful on my end, yes, but I don't know

5    what his motivation -- what he has in his brain.

6    Q.   Well, you were successful with your businesses, and David

7    saw that, correct?

8    A.   That's correct.

9    Q.   And when he needed assistance or advice with regard to his

10   business situations, he came to you for advice?

11   A.   Yes, he did.

12   Q.   In addition to that, when he needed assistance financially

13   he would come to you, correct?

14   A.   That is correct.

15   Q.   And you gladly gave him the help?

16   A.   That's true.

17   Q.   Now, with regard to your prior businesses, your personal

18   businesses, you currently are or you were involved or still are

19   involved, I should say, with Belmont Auto, correct?

20   A.   Yes.

21   Q.   And you worked your way up with regard to that particular

22   situation, right?  In other words, how did you start at Belmont

23   Auto?

24   A.   Well, I start as a gas attendant, and I worked my way up,

25   and then I end up in supervisor, manager, part owner, then I

1    purchased the business.

2    Q.    Okay.  And now you own the business, correct?

3    A.    That's correct.

4    Q.    And you don't have any partners?

5    A.    In the business?

6    Q.    Correct.

7    A.    I do not.

8    Q.    You're the only owner of Belmont Auto?

9    A.    Belmont Auto Center I'm the only owner, yes.

10   Q.    And with regard to the other business venture that you

11   mentioned, Prompt Auto, do you recall that?

12   A.    Yes, I do.

13   Q.    Did you have any business partners as far as Prompt Auto

14   was concerned?

15   A.    I did not.

16   Q.    And are there any other businesses that you're currently

17   involved in?

18   A.    Well, I have my personal other businesses, but my personal

19   business --

20   Q.    I'm sorry.  Other than Allied, are there any other

21   businesses that you are involved in?

22   A.    Well, I have the business projects in my mind, yes, but

23   that's my personal business.

24   Q.    Okay.  Now, when you were first approached about being a

25   part of Allied, this was in the latter part of 2014, correct?

1    A.   First we started late, I would say June, that's when we

2    start discussing the -- he approached me to invest into Allied.

3    Q.   Well, you started discussing in June, but you did not

4    agree to become a part of it until November or December of

5    2014, correct?

6    A.   That is correct.

7    Q.   So, in not agreeing to become a part of it you weren't

8    involved in what was going on at 21 School Street in Quincy,

9    Massachusetts, correct?

10   A.   Ask the question again, please.

11   Q.   So, because you had not signed on as a partner in Allied

12   Health until late 2014, you were not involved in what David was

13   doing --

14   A.   No, I was not.

15   Q.   -- at 21 School Street?

16   A.   I was not involved.

17   Q.   But you knew what was going on at 21 School Street?

18   A.   No, I didn't know what's going on.  Certain things he told

19   me, certain things he did not.

20   Q.   Well, he told you what his idea was about creating Allied

21   Clinic.

22   A.   Well, Allied Health Clinic, an idea he told me, yes, but

23   at the same time 21 School Street he had a previous business.

24   Q.   That's right, but that previous business was not operating

25   during the time that he talked to you about Allied, correct?

1    A.    As far as I know -- I haven't gone to Allied to take a

2    look, so I'm assuming it wasn't.

3    Q.    Okay.  But he did talk to you about Allied in June of

4    2014, correct?

5    A.    Yes, he did.

6    Q.    And he told you what his idea was for the business?

7    A.    Yes, he did.

8    Q.    And he also told you that, if the business was successful,

9    his vision was that there would be satellite clinics?

10   A.    Well, there was no "if."  The way he presented this is

11   already a model from day one it's going to be profitable, and

12   it's going to be, yes, he'd build the satellites and sort of

13   that will be retirement for everybody.

14   Q.    But that was the vision, to have Allied initially and then

15   to have satellite locations that would offer the same services?

16   A.    Yes.

17   Q.    And you saw this as a good idea?

18   A.    I saw that as a good idea.

19   Q.    You knew David had prior experience with Davis Management

20   and Davis Clinic, PC, correct?

21   A.    I did not have any experience with him, no.

22   Q.    Well, what I'm asking you is you knew that he had

23   previously been involved in Davis PC, correct?

24   A.    He was involved.

25   Q.    Yes.

1  A.   Yes, he was.

2  Q.   And so you understood that David knew what he was talking

3  about when he discussed the plans for Allied Health with you?

4  A.   Well, understanding is I believed him as a friend, as a

5  family member, and I want to help him.

6  Q.   No.  Mr. Torosyan, you are an intelligent businessman.

7  You understand that you're not going to get involved in a

8  venture unless the person that is approaching you knows what

9  they're talking about, correct?

10  A.   Yes and no.  When it comes for the close family members,

11  sometimes a lot of things you just close your eyes.  That's how

12  it is.

13  Q.   Well, Mr. Torosyan, let me ask you this:  In terms of your

14  current business, Belmont Auto, you're not involved with any

15  family members as partners, are you?

16  A.   No, I'm not.

17  Q.   Okay.  And, again, you're not going to involve yourself in

18  a business relationship with someone who isn't educated about

19  that subject, correct?

20  A.   Well, two things:  He told me he and his brother --

21  Q.   I'm asking you if you would do that, sir.  Yes or no?

22  A.   Again, I have to answer differently.

23  Q.   Well, there has to be a yes or a no.

24  A.   I would like to answer differently.

25  Q.   Well, let me put the question to you again.

```
 1              As a businessman, you are not going to involve
 2      yourself with a business partner who isn't knowledgeable about
 3      this subject of the business they're proposing?
 4      A.   Everything was -- my decision was, number one, based on
 5      our friendship.  That's how I engaged in the business.
 6      Q.   Well, I'm not asking you about your relationship with
 7      David.  I'm asking you in general if this is how you operate as
 8      a businessman.
 9      A.   As a business --
10      Q.   -- let me finish the question.  If you get involved in
11      business relationships where people propose ideas to you for
12      projects that have no background or education in those areas.
13      Is that what you do?
14      A.   Answer is this way:  If you have --
15      Q.   That's a yes or a no.
16      A.   Answer is, if I may allow?
17      Q.   No, no.  It's yes or no.
18              THE COURT:  All right.  So, the witness has indicated
19      he can't answer yes or no.  If you want an answer to the
20      question, it has to be released from yes or no.
21              MR. CRUZ:  I understand.
22      BY MR. CRUZ:
23      Q.   So, David approached you -- or strike that.
24              You talked to David about the Allied Health Clinic
25      idea --
```

1   A.   Yes, I did.

2   Q.   -- in June of 2014?

3   A.   Yes.

4   Q.   But you didn't commit at that point to become a partner?

5   A.   Initially I told him, "I have no interest."

6   Q.   All right.  But you knew from your discussions with David

7   at that point that he was already involved in the process of

8   creating Allied Health?

9   A.   I was not aware of what he was planning.  He give me -- he

10  told me that he planned to have this idea, and he has the

11  investor from Azerbaijan, the brother of the President, he was

12  going to put the money, and I told him it's great.

13  Q.   Now, when you testified earlier today you mentioned things

14  like the architect who was hired to work on the building at

15  21 School Street for Allied Health Clinic, correct?

16  A.   Yes.

17  Q.   That was DiGiorgio Associates?

18  A.   Yes, it was.

19  Q.   And there was an individual named Tom Lam who you were

20  dealing with?

21  A.   Yes.  That's correct.

22  Q.   Isn't it true that David Tkhilaishvili started that

23  process before you became involved in Allied?

24  A.   Later on I learned he start talking to him, yes.  He start

25  the process with him before I --

1   Q.   Yes.  He started the process with him, had meetings with

2   DiGiorgio?

3   A.   Yes, he met with him, of course.  Yes, he did.

4   Q.   So, by the time you came onboard by the latter part of

5   2014 this was already in the works, correct?

6   A.   He already had started with him an idea, because David had

7   it in mind, and that the Azerbaijani guy was going to invest

8   the money.  He did not.

9   Q.   So, the question is he was already involved in that

10  process with the architects, correct?

11  A.   He did, yes.

12  Q.   Before you became involved?

13  A.   Yes.

14  Q.   In addition to that he also had consulted with attorneys

15  in order to discuss various aspects of Allied Health going

16  forward, correct?

17  A.   I am not sure if he did or not.  And when I met the first

18  time I asked him, "David, we have to have appropriate attorney

19  for the --"

20  Q.   Well, did you know that he was dealing with attorneys or

21  not?

22  A.   Well, I knew he had attorney for his litigation, and also

23  he said --

24  Q.   I'm not asking you about that.  I'm asking you about

25  whether you knew that he was working for attorneys in

```
 1   discussing this proposed Allied Health business?

 2   A.   As far as I know, he did not have an engagement yet, so

 3   that everything started when we went to see attorney together.

 4   Q.   Okay, okay.  So, no engagement, but he was speaking to

 5   people?

 6   A.   He was talking with his personal attorney who had a

 7   connection to we could have make that happen.

 8   Q.   All right.  Very good.  In addition to that, David -- and

 9   before I get to the next question, David had started these

10   conversations with attorneys prior to your involvement at the

11   end of 2014, right?

12   A.   I have no idea if he did or not.

13   Q.   You just said that he did enter into discussions.

14            MS. KAPLAN:  Objection.

15   A.   His personal attorney.

16   Q.   Fine, fine.

17   A.   With his personal attorney he did.

18   Q.   That's what I was referring to.  In addition to that,

19   David had talked to a construction company, H&N Construction,

20   correct?

21   A.   Yes, he did.

22   Q.   And he already had started plans for a remodel of

23   21 School Street, correct?

24   A.   He did not start the plans.  He had an estimate.

25   Q.   Right.  So, he dealt with H&N Construction about the
```

1    remodel.  He consulted with them, correct?

2    A.   He talked with them.  He got an estimate for the project,

3    correct.

4    Q.   Exactly.  And he did all of that before you signed on at

5    the end of 2014?

6    A.   That's correct.

7    Q.   In addition to that he was communicating with vendors,

8    people who would help provide products that were necessary,

9    supplies that were necessary for Allied going forward?

10   A.   I don't think so.

11   Q.   You don't think so?

12   A.   I don't think so.

13   Q.   Are you familiar with a Beckman Coulter?

14   A.   Yes, I am.

15   Q.   And what is Beckman Coulter?

16   A.   Beckman Coulter, they analyzer for our clinic.

17   Q.   And that's part of the equipment that you use?

18   A.   Right now we use, but initially when we start David told

19   me, "We do not need analyzer.  We have our own analyzer."

20   Q.   Well, all that I asked you about is whether you were

21   familiar with Beckman Coulter.

22   A.   Yes, I'm familiar.  We used them, yes.

23   Q.   And that's a provider that you deal with for Allied,

24   correct?

25   A.   That's correct.

1    Q.    Are you familiar with what Orchard Software is?

2    A.    Yes, I'm familiar.

3    Q.    And what is it?

4    A.    The Orchard Software provides the data information for the

5    patients electronically to use with EMR, what's called

6    "Electronic Medical Record," that transfers to the doctors.

7    Q.    And that software is currently being used at Allied

8    Health, correct?

9    A.    That is correct.

10   Q.    Now, David was dealing with these providers prior to your

11   involvement?

12   A.    I don't think so.

13   Q.    Well, let me ask you this:  When he was part of Davis

14   Clinic PC and Davis Clinic Management he dealt with those

15   providers, correct?

16   A.    I have no idea.

17   Q.    Well, I believe you testified yesterday that David had

18   retained a client list from Davis PC.

19   A.    Yes.  He provided a client list, correct.

20   Q.    So, you discussed a client list, but you didn't discuss

21   the providers that might service Allied Health going forward?

22   A.    Absolutely not.

23   Q.    Okay.  Now, when you finally did sign on in 2014, you did

24   so because David had the knowledge and the background that you

25   did not in the medical business?

1    A.    Is that the question you're asking me?

2    Q.    Yes.

3    A.    Yes.  The answer was first I trusted him and --

4    Q.    Sir, let me put it this way.

5    A.    Sure.

6    Q.    Had you ever worked in the medical business prior to

7    Allied Health?

8    A.    I did not.  The only thing I was instructed is drivers.

9    Q.    So, you'd never worked in that business?

10   A.    In the outpatient clinic I did not, no.

11   Q.    You never dealt with these providers that we have talked

12   about?

13   A.    I did not personally, no.

14   Q.    You had never dealt with architects that would be utilized

15   to remodel the Clinic or build the Clinic?

16   A.    I dealt with the architects but not in a clinical-wise.

17   Q.    And as you've come to learn, that's a whole different

18   process, correct?

19   A.    Architectural work is architectural work.

20   Q.    So, you're saying that there's no difference between a

21   residential project and a medical clinic?

22   A.    Indeed there is difference.

23   Q.    There is a difference, right?

24   A.    Yes.

25   Q.    And those are differences you had never dealt with before?

1    A.    I personally didn't get involved in any medical business.

2    Q.    And prior to being involved with Allied Health you had

3    never dealt with attorneys on the subject of creating a clinic

4    such as this?

5    A.    That's true.

6    Q.    But David had, right?

7    A.    I'm assuming he did.

8    Q.    David had done all of those things.

9    A.    He had an attorney who represent him on a case.  I think

10   he introduced the --

11   Q.    I understand that, sir.  What I'm asking you is whether

12   David had dealt with these issues in the past.

13   A.    I'm assuming he did.

14   Q.    Well, assuming you did -- you signed on as a partner,

15   correct?

16   A.    I did sign a partner based on our friendship, and

17   hopefully he had that information, he knows what he's talking

18   about because he worked at a clinic before me, he run a clinic.

19   Q.    So, you're telling the jury you would have sunk a half a

20   million dollars into this business with someone who didn't know

21   what they were talking about?

22   A.    Well, it's not "talking about."  He had a running

23   practice.  Again, it's a family member.  He was like a brother.

24   Q.    Exactly.  He had a running practice, so he knew what he

25   was doing, right?

1    A.    I was hoping he did.

2    Q.    Okay.

3    A.    I didn't know the details in his PC.

4    Q.    That's fine, sir.  That's fine.

5          So, once you do become involved in this business you

6    have a conversation with David about it, correct?

7    A.    Yes, I did.

8    Q.    You come to learn that he'd been working with people in

9    order to get the project going, correct?

10   A.    I mean, when I start with him he had a few people who were

11   going to invest money that he was working with.

12   Q.    I'm not asking you about investors.  What I'm asking about

13   is people who were helping him at 21 School Street, such as

14   Kenton Fabrick, right?

15   A.    Kenton Fabrick was, I believe at that time was living

16   somewhere else and he was --

17   Q.    I'm not asking you where Kenton Fabrick was living.  What

18   I'm asking you is whether Kenton Fabrick was working with David

19   prior --

20   A.    Oh, prior.  Yes, yes.

21   Q.    -- to your getting involved with Allied?

22   A.    He told me there was a Kenton Fabrick work -- he gonna be

23   working with us, yes.  He did tell me that, yes.

24   Q.    In fact, Kenton Fabrick is now your current Clinic

25   Administrator, correct?

1   A.    That's right.

2   Q.    But he used to be David's Clinic Administrator at

3   Davis PC?

4   A.    I'm assuming.

5   Q.    You don't know that?

6   A.    Well, he said he worked -- I think he told me he worked on

7   the front desk.  I don't know if that's the same position as

8   the Administrator or not.

9   Q.    Well, you've had conversations with Mr. Fabrick about his

10  work at Davis PC, right?

11  A.    Not really.  Very rarely.

12  Q.    So, when you told the jury yesterday that he had talked to

13  you about David hitting Kristina Ursova, that wasn't true that

14  Kenton told you that?

15  A.    Say one more time.  Kenton said --

16  Q.    Well, let me ask you --

17  A.    Olga told me that.

18  Q.    Okay.  But Kenton never did?

19  A.    Kenton didn't tell me that.

20  Q.    Okay.  Let's talk about Olga.

21  A.    Okay.

22  Q.    Olga worked at Davis Clinic PC with David, right?

23  A.    Yes, she did.

24  Q.    And she was working with him before you became involved in

25  Allied Health?

1    A.    Yes.

2    Q.    She was helping him prepare the plan for Allied Health?

3    A.    She helped him, yes.

4    Q.    And is Olga Dorofyeyeva working with you now?

5    A.    She's not.

6    Q.    Do you communicate with her now?

7    A.    Time to time.

8    Q.    And she has no business interest whatsoever in Allied

9    Health currently?

10   A.    That's correct.

11   Q.    No percentage ownership in the company?

12   A.    She doesn't want to work at the Clinic.

13   Q.    Well, what I'm asking you is whether or not she has an

14   ownership interest in the company, not whether she works there.

15   A.    Ownership goes as people work at the Clinic, contribute

16   something to the Clinic.

17   Q.    So, it's your testimony that she has no share in the

18   ownership interest of Allied Health currently?

19   A.    As of now, according to our contract with her, her

20   ownership becomes, her percentage becomes active as she's

21   supposed to start working at Allied Health Clinic.  That's the

22   contract we have with her.

23   Q.    So, let me see if I understand this.  So, Olga has a

24   potential ownership interest if she works at the Clinic?

25   A.    That's correct.

1  Q.   So, it's dormant, in other words?  It's being reserved for

2  her?

3  A.   Yes.

4  Q.   And if she elects to come back and work for you, that

5  ownership interest is activated?

6  A.   Absolutely, yes.

7  Q.   So, she has an interest still, doesn't she?

8  A.   I don't think she does.

9  Q.   So, you're telling the jury that she is not curious about

10 whether or not Allied becomes a successful company?

11      MS. KAPLAN:  Objection.

12      THE COURT:  Sustained.

13 BY MR. CRUZ:

14 Q.   Suffice it to say that she does have an ownership interest

15 if she elects to take it, correct?

16      MS. KAPLAN:  Objection.

17      THE COURT:  He may answer the question, if he knows.

18 It's a legal question.

19 A.   Can you ask the question again, please?

20 BY MR. CRUZ:

21 Q.   So, what you're saying is that Olga Dorofyeyeva currently

22 has an ownership interest in Allied Health that she can elect

23 to take if she wants to?

24 A.   Yes, reserved.  Correct, yes.  Absolutely.

25 Q.   And that's why you continue your communications with her?

1    A.    No.  We just continue as a friendship.

2    Q.    Have you talked to Olga Dorofyeyeva about this case?

3    A.    In the past I did.

4    Q.    And have you talked to her leading up to this trial?

5    A.    Well, in the past I did until the FBI Agent told me I

6    can't talk to her anymore.  I haven't talked to her.

7    Q.    When exactly was that that the FBI Agent told you you

8    couldn't talk to her?

9    A.    I would say a few weeks ago, plus/minus.  About two weeks

10   ago.

11           THE COURT:  Just so the jury is aware that during the

12   course of preparing the case for trial there was an Order

13   issued by the Court that the parties or any witnesses may not

14   communicate with each other in connection with their testimony

15   here.

16   BY MR. CRUZ:

17   Q.    Now, have you paid Olga Dorofyeyeva any money in the

18   months leading up to this trial?

19   A.    We borrowed money from her.  We paid her back certain

20   percentages.

21   Q.    Well, you are going to need to explain what that is.

22   A.    I'll explain to you.

23   Q.    How did she borrow money from you?  When?

24   A.    She did not.  We did.

25   Q.    So, you borrowed money from her?

1  A.    Yes.

2  Q.    When?

3  A.    Actually, Kenton did.  Not me personally.  Kenton

4  borrowed.

5  Q.    Well, let me ask you this:  Did Kenton borrow on behalf of

6  Allied Health, or did he borrow for himself personally?

7  A.    Olga didn't want to lend Allied.  He want somebody

8  personally, give to somebody, but she knew that was for Allied.

9  Q.    So, she lent Allied Health money?

10  A.    It was, in other words, Allied --

11  Q.    Sir, it's not a simple question.

12        THE COURT:  Just a moment.  It's not a simple

13  question.  If you want a complete answer, you can have a

14  complete answer.  If you don't want a complete answer, I'm

15  sustaining an objection to that on my own behalf.

16        MR. CRUZ:  He can answer, then, your Honor, and I'll

17  put the question to him again.

18  BY MR. CRUZ:

19  Q.    Did Olga lend Allied Health money?

20  A.    He lent Kenton, but the money was for the Allied.

21  Q.    All right.

22  A.    She was aware of that.

23  Q.    So, this is something similar to what you were doing in

24  terms of your bank accounts.  You were depositing money that

25  was being written in checks in your wife's name that were being

1  deposited into Allied Health.  The same type of thing, right?

2  A.    No, it's not.  That's a loan.

3  Q.    Okay.  So, why don't you tell us a little bit about why

4  Olga Dorofyeyeva had to lend Allied Health money.

5  A.    Why?

6  Q.    Yes.

7  A.    Friendship, the same way I lent David 20,000.  Friends

8  help each other.  When I was in the middle of the harsh -- this

9  situation I asked some of my friends to help me with the funds.

10  They'd give me funds, and I paid them back.  It's normal.

11  Q.    Let me ask you this:  Did you tell the FBI that Olga had

12  lent Allied Health money?

13  A.    Yes, I told her that we borrowed money from them.  Not

14  Allied Health.  Kenton did through the --

15  Q.    Well.  All right, sir.  So, you didn't tell them that Olga

16  lent the business money; you told them that Olga lent Kenton

17  the money?

18  A.    Well, it's for the business.  Again, the money wasn't

19  Kenton.  Kenton doesn't have -- it's not his personal debt.

20  The money we paying from Allied, she lent the $10,000 to it for

21  Allied take payroll, so we paying her back gradually.

22  Q.    So, when did she lend Allied the money?

23  A.    I don't remember the date.

24  Q.    Do you have an approximate idea of what month, what year?

25  A.    I want to say maybe March of 2016.  I could be wrong.

1   Q.   And how much money was it?

2   A.   10,000.

3   Q.   And you still haven't repaid her?

4   A.   Not the full amount.  We pay up I think about 4,000.

5   Q.   So, you still owe money to a person who is a potential

6   witness in this case?

7   A.   We borrowed the money, yes.

8   Q.   What about Kenton?

9   A.   What about?

10  Q.   Did Kenton loan money to Allied?

11  A.   No, he did not.

12  Q.   Are you paying Kenton any money above and beyond his

13  salary at Allied Health?

14  A.   No, we are not.

15  Q.   You haven't lent him any money for any purpose?

16  A.   No.

17  Q.   In addition to -- strike that.

18           You're working with Olga and Kenton currently at

19  Allied Health, right?

20  A.   Say it again.

21  Q.   Kenton Fabrick and Olga Dorofyeyeva are still involved in

22  Allied, I should say, correct?

23  A.   Olga is not involved in Allied Health.  No, she's not.

24  Q.   But Kenton is?

25  A.   Kenton is, yes.

1   Q.   And have you talked to Kenton about this case?

2   A.   Again, we discussed in the past certain things, but until

3   FBI Agent told me to not discuss I haven't discussed anything.

4   Q.   Let me ask you this:  Are you currently paying any money

5   for Kenton Fabrick's housing?

6   A.   For what?

7   Q.   For his housing, his apartment, the place where he lives.

8   A.   Am I paying for it?

9   Q.   Yes.

10   A.   No.  I'm not paying.  He's paying his part.

11   Q.   Are you paying for any vehicles that he has in his

12   possession?

13   A.   He doesn't have under his possession.  He has the Clinic

14   vehicle.  Everybody use it.  In the past David and him use it.

15   Now he use it along with other members.

16   Q.   And how is that vehicle paid for?

17   A.   That's a Clinic vehicle.  From the Clinic account.

18   Q.   It's not paid for with a credit card?

19   A.   The vehicle?  No.  The vehicle -- the first vehicle we

20   purchased with one payment; then there was no loan or lien on

21   the vehicle.  So, now we just -- a month ago we just leased

22   another vehicle.

23   Q.   So, when you became involved in Allied Health initially,

24   you and a number of other people, including David

25   Tkhilaishvili, signed a Letter Agreement, correct?

1    A.    Initially the Letter Agreement been signed by me and

2    David.

3    Q.    And that Letter Agreement has been submitted into

4    evidence, right?

5    A.    Yes.

6    Q.    And that Letter Agreement set a number of directions and

7    rules for how the company was going to be run --

8    A.    Yes.

9    Q.    -- including the salary amounts for certain people

10   involved in the business?

11   A.    Yes.

12   Q.    You were going to make approximately $2,000 a month,

13   correct?

14   A.    Yes.

15   Q.    And David was going to make $3,000 a month?

16   A.    Yes.

17   Q.    And those payments were going to be split into two

18   payments a month, correct?

19   A.    Yes.

20   Q.    Now, there's a provision in the Letter Agreement that

21   states that when the Clinic becomes operational the salary will

22   change for David Tkhilaishvili.

23   A.    Yes.

24   Q.    That he will get to -- he will be granted a $52,000

25   salary?

A.    Yes.   That's after November 16th.

Q.    And that works out to approximately $4,000 a month, right?

A.    Approximately, yes.

Q.    And that would be split into two payments of $2,000 a month, correct?

A.    Yes, would have been.

Q.    Okay.   Now, in addition to that there is a provision in the Letter Agreement called the "Special Consent Authority."

A.    Yes.

Q.    And that Special Consent Authority essentially gives -- gave you the right to make all ultimate business decisions?

A.    That's correct.

Q.    And David agreed to that?

A.    Yes, he did.

Q.    He didn't argue with you about that?

A.    Well, he says, "Victor, you know, the Special Consent Authority, what is that?"  And I told him, "This is the only way I want to do it," and he's, like, "Fine.  Do it."

Q.    And the attorneys looked at it?

A.    Yes.

Q.    And it was approved?

A.    Yes.

Q.    So, can you explain to the jury what that means?

A.    "Special Consent Authority"?

Q.    No.  Yes.  I'm sorry.  "Special Consent Authority," what

1    does that mean?

2    A.    "Special Consent Authority" give me a right in the event

3    of dispute between me and David make the final decision until

4    I've been paid entire my investment back to me.

5    Q.    And that relates strictly to business decisions, right?

6    A.    Everything has to do with the business.

7    Q.    Well, let me ask you this:  Isn't it true that you were

8    allowed or that you were granted that special authority because

9    you did contribute a lot of money to the business venture,

10   right?

11   A.    Well, that's only way I wanted to make sure.  You know,

12   friendship is friendship, but I want to make sure if anything

13   goes wrong I can save my investment.

14   Q.    You want to make sure your interests are protected?

15   A.    Correct.  Not interests, my investment, the money.  Not

16   about the investment.  The money input.

17   Q.    And you wanted to make sure that you had some amount of

18   control over this business, right?

19   A.    Well, I wasn't concerned about the control.  So, from day

20   one my duty was supposed to be as a salaried investor and

21   advisor.  That was the agreement.

22   Q.    And you were concerned because you had placed a large

23   amount of money in as an investment, right?

24   A.    Yes.

25   Q.    Right?

```
 1   A.    That's all my money.

 2   Q.    That's everything you had?

 3   A.    At that time, yes.

 4   Q.    And that was approximately what, $200,000 initially?

 5   A.    No.  It was the initial 2- to 300,000 for initial

 6   investment.  After that 1- or 200,000 for the second

 7   investment, and that's how much I had in my account back then.

 8   Q.    So, when you signed onto Allied you continued the process

 9   with David -- strike that -- you continued the process that

10   David had started to try to make this business a reality,

11   right?

12   A.    Can you ask the question again, please?  I'm sorry.  I

13   didn't understand your question.

14   Q.    When you signed on in 2014 --

15   A.    '14, yes.

16   Q.    -- the Letter Agreement --

17   A.    Yep.

18   Q.    -- you worked to continue the process that David had

19   started in creating Allied Health, correct?

20   A.    Well, we took it over and we try his vision to put in

21   reality.  Yes, we did.

22   Q.    It was his vision?

23   A.    The vision was his.

24   Q.    And you shared it?

25   A.    What do you mean, "You share it"?
```

1    Q.    You shared that vision, and you wanted to make it a

2    success?

3    A.    Well, he came with the business proposal, yes, and I want

4    to be successful for himself and for me, yes.

5    Q.    And under the Letter Agreement you effectively controlled

6    it, didn't you?

7    A.    Controlled what?

8    Q.    Allied Health.

9    A.    Again, it's not about having control.  Everybody knows I

10   wasn't day-to-day involved.  It was in the event of something,

11   he makes a decision or somebody makes a decision, I can stop

12   it.  That was the whole idea to a Special Consent Authority.

13   Q.    Now, let's talk about August of 2015, a few months later.

14   You had been working with David, with Kenton and with Olga to

15   get this business, Allied Health, going, correct?

16   A.    I believe Olga was gone by then.

17   Q.    I'm sorry?

18   A.    I believe Olga was no longer part of Allied Health, I

19   believe.

20   Q.    You're not sure?

21   A.    I'm not sure, no.

22   Q.    But you did work with her for some of that time, correct?

23   A.    Before then we talked, yes, before the August.  I remember

24   talking definitely in January, February.  I believe she left

25   around March.

1    Q.    Okay.   And, actually, before we get to August of 2015, can

2    you repeat what happened with regard to the construction issue

3    with H&N Construction and doing the work.   When was that whole

4    situation, December 2014?

5    A.    What do you mean the construction situation?

6    Q.    The construction, the remodel of the space at 21 School

7    Street.

8    A.    Okay.

9    Q.    That was going on in December of 2014, right?

10   A.    He started December of 2014, correct.

11   Q.    Yes.   Yeah.   And you testified about that and answered

12   questions about that yesterday, right?

13   A.    Yes, I did.

14   Q.    And I believe that you said that Olga had told you, before

15   we get there, that David was away in December of 2014, right?

16   A.    I didn't understand your question.   I'm sorry.

17   Q.    David was on vacation?   He left?

18   A.    Well, he start the project, then he left.

19   Q.    Okay.   He started the project?

20   A.    Then he left.

21   Q.    And he talked to you before he left, didn't he?

22   A.    Talk to me about what?   We always talk.

23   Q.    Well, you had just signed onto the business, right?

24   A.    Yes, we signed on the business.

25   Q.    And so, there was construction that needed to be done to

1   remodel the space for the Clinic, right?

2   A.    Yes.

3   Q.    And David told you, "I'm going away on vacation for a few

4   weeks," right?

5   A.    Yes.

6   Q.    And he told you, "The project is going to continue in my

7   absence," correct?

8   A.    Yes.

9   Q.    And he asked you to oversee it, didn't he?

10  A.    Well, more like I would have definitely gone, regardless.

11  I don't remember he asked me specifically, "Can you look," but

12  if he's gone, the way that I looked at a partnership, if one of

13  them goes away, the other one look over the business.

14  Q.    Sure.  And that was the understanding you had with him,

15  that you were going to look over it while he was gone?

16  A.    Yes.

17  Q.    And he told you that there were certain things that needed

18  to be done and the scheduling of this construction, correct?

19  A.    That's not correct.

20  Q.    Okay.  So --

21  A.    "Certain things" refer to like, "Just keep your eye on the

22  construction, make sure everything goes right."  If you call

23  that "certain things," yes.

24  Q.    All right.  But you didn't do that, did you?

25  A.    Of course I did.  I was going back and forth in the

1    construction, reviewing.

2    Q.   Well, I believe you testified yesterday that you weren't

3    really involved in overseeing the project, and that you didn't

4    know there was a problem until Olga Dorofyeyeva told you.

5    A.   No, no, no.  That's not what it is.  What I said

6    yesterday, Olga Dorofyeyeva told me that David is abusing me.

7    Q.   Well, I'm not asking you about that, sir.  What I'm asking

8    you about is whether you were overseeing that construction

9    project in David's absence or not?

10   A.   When David was gone I went to see what's going on.  That's

11   when I discovered he start the project without the permit.

12   Q.   But you didn't go until Olga said something to you about

13   problems with the project, right?

14   A.   No.  No, no, no.  I'd been going there -- I went there

15   many occasions.

16   Q.   So, if you went there on many occasions, then it shouldn't

17   have been a surprise to you that there were issues with the

18   work, right?

19   A.   Well, not a work.  That's a permit.  The people working.

20   Q.   Let me ask you this:  Sir, you've got real estate

21   experience, right?

22   A.   Yes.

23   Q.   You've worked on projects where there are construction

24   people involved, right?

25   A.   Yes, I did.

1    Q.   And you understand that on many occasions or most

2    occasions the contractors are responsible for getting the

3    building permits, right?

4    A.   No.

5    Q.   It's usually written into the bill?

6    A.   I made it very clear to David that, "David, before you

7    start anything you have to make sure, go to the Zoning

8    Department, go to the Building Department, make sure zoning

9    allows."   I was very clear.   I was very clear with him.

10   Q.   So, when you were talking to David about the project you

11   had already seen the invoice or the estimate for the work,

12   right?

13   A.   Yes, I saw the estimate when we were talking.

14   Q.   You knew it was $176,000 or --

15   A.   Yes, approximately.

16         MR. CRUZ:   And that's been marked as an exhibit.

17   Could we bring that up.   And I apologize; I don't recall the

18   exhibit number.

19         MS. KAPLAN:   I believe it's 17.

20         MR. CRUZ:   Number 17.   Thank you.

21                      (Pause)

22   BY MR. CRUZ:

23   Q.   All right.   So, Mr. Torosyan, you're looking at what's

24   been marked as Government's Exhibit 17, and that's the estimate

25   that H&N Construction gave, correct?

1   A.   Yes, it looks like it.

2   Q.   And if you could look at that part that is highlighted,

3   there is a fee included in the estimate for the permits, isn't

4   there?

5        THE COURT:  And I just note for the record that it is

6   now received in evidence.  It hadn't previously been received.

7        MR. CRUZ:  Yes, your Honor.

8            (Exhibit No. 17 received into evidence)

9   A.   Okay.

10  BY MR. CRUZ:

11  Q.   So, the estimate states that the contractor,

12  H&N Construction, is responsible to get the necessary permits.

13  You're paying for that, right?

14  A.   Yes and no.

15  Q.   Well, you're paying for that, right?

16  A.   Again, when we talk about the --

17  Q.   Sir --

18  A.   I have to answer differently.

19  Q.   Sir, listen.  The bottom line is that it was the

20  contractor's responsibility to get the permits, correct?

21  A.   The permits, yes.  The zoning has nothing to do with that.

22  Q.   I'm not asking you about the zoning.  So, it's the

23  contractor's responsibility to get the permits, yet yesterday

24  you said over and over again that this was David's fault,

25  right?

1    A.    I -- okay.

2    Q.    That's what you said, right?

3    A.    Yes, it is his fault.  Absolutely, yes.

4    Q.    Sir, it's the contractor's responsibility.  You're paying

5    for that service, so you're not responsible to get the permits,

6    right?

7    A.    I have to disagree with you.

8    Q.    So, you're paying them for nothing, essentially?

9    A.    That's -- at the end there are always error in the

10   construction and at the end, especially in Massachusetts, that

11   falls only on the owners, so it's going to be -- we were the

12   only one who get hurt.

13   Q.    So, you are stating today that you were there and you were

14   overseeing the construction all along in David's absence,

15   right?

16   A.    I went back and forth, yes.

17   Q.    You didn't need Olga to tell you that there were problems,

18   because you were already there, right?

19   A.    I was there.

20   Q.    And you were dealing with the construction people, right?

21   A.    The person named "Hung," he wasn't there all the time.

22   His crew was working most of the time.

23   Q.    So, let me ask you this:  Did you ask somebody in the crew

24   or Hung, "Hey, where's the building permit?  I'm paying you for

25   this"?

1    A.    I did ask, yes, many occasions.

2    Q.    So, you solved the problem because you showed up and you

3    asked the contractor about the permits, which was their

4    responsibility?

5    A.    I asked, "Where is the permit?"  But at that time,

6    regardless of what he signed or not, I asked specifically,

7    "David, you have to make sure the zoning allows --"

8    Q.    So, now you're excusing the contractor from their

9    responsibilities under the contract?

10   A.    I'm not excusing him.  That's not what it is.  Either one

11   of them could have checked, but the zoning goes with the owner.

12   Q.    I'm not asking you about the zoning.

13   A.    Again --

14   Q.    Sir, the point is that it was the contractor's

15   responsibility, not yours and not David's, correct?

16   A.    I disagree with that.

17   Q.    All right.  Let's move on to August of 2015.  At that

18   point you're getting ready with David Kenton to get the Clinic

19   open, right?

20   A.    I'm sorry.  When was it, August 2015?

21   Q.    August 2015.

22   A.    Yes.

23   Q.    And in August of 2015 David is going to take a vacation,

24   right?

25   A.    August, yes, he was going to take a vacation.  Correct.

```
 1    Q.    And you know about the vacation, right?

 2    A.    Yes.

 3    Q.    He's going to the Republic of Georgia?

 4    A.    Georgia, his hometown, yes.

 5    Q.    And he tells you about the reason for his trip, right?

 6    A.    Yes, he did.

 7    Q.    He tells you that he's going there to see his fiancee?

 8    A.    Fiancee.

 9    Q.    And in addition to that he tells you that he's going there

10    to try to secure investors for the Clinic, right?

11    A.    No.

12    Q.    Let me ask you this, sir:  How much money had you put into

13    Allied Health by the time August of 2015 came around?

14    A.    I believe about 400, 450,000.

15    Q.    There was no money coming in at that point, was there?

16    A.    There was not.

17    Q.    And there were still bills to pay, correct?

18    A.    Yes.

19    Q.    You had to pay the rent?

20    A.    Yes.

21    Q.    You had to pay for all of these consultants?

22    A.    That's true.

23    Q.    You had to pay for attorneys?

24    A.    Yes.

25    Q.    And those things are expensive, aren't they?
```

```
 1   A.   Very expensive.

 2   Q.   And at that point David had run out of money, right?

 3   A.   David never had any money to --

 4   Q.   Well, he never had money because he kept this thing going

 5   from May of 2014 until you came onboard in December of 2014,

 6   right?

 7   A.   When I -- when I -- I never seen him put in the money.

 8   Even the Georgia bill he present me to pay $8,500 myself.

 9   Q.   I don't dispute that he didn't put any money in after you

10   came --

11            MS. KAPLAN:  Objection.

12            THE COURT:  Well, no, you are not a witness.  Put a

13   question to the witness.

14            MR. CRUZ:  I understand, your Honor.

15   BY MR. CRUZ:

16   Q.   What I'm saying to you is that I understand that David

17   didn't put any money in from the point you signed on and

18   thereafter, but prior to that he had expended a lot of money in

19   preparing things for you to become a partner?

20   A.   I haven't seen him that.

21   Q.   And, again, when August of 2015 came along you had already

22   expended $400,000, things were expensive, and you needed

23   investors.  You didn't want to have to keep paying for this

24   yourself, right?

25   A.   Well, let me answer this way:  There is no way he could
```

1    have bring the investor from Georgia, because it's not only if

2    you have money or not.  You have to be qualified by Department

3    of Public Health for transferring your ownership.  I knew that

4    very clearly.  There is no way he would have gone there and I

5    would have said, "Okay, go bring the investor."  The investor

6    has to be from here.  The Department of Public Health has to

7    approve the person's ownership.

8    Q.    Well, I understand that they have to approve it, but that

9    process hadn't been finalized yet, had it?

10   A.    What finalized?  If there is --

11   Q.    Did you have a license at that point?

12   A.    Finalize what?

13   Q.    Did you have the DPH license at the point, August 2015?

14   A.    We got, I believe, DPH license on October of 2015, but I

15   knew we can't have somebody from Georgia or Armenia or Poland

16   put in the money.

17   Q.    Well, let me ask you this, sir:  In the months before you

18   got the license from DPH, Department of Public Health, you were

19   negotiating your Operating Agreement contract, right?

20   A.    I didn't understand the question.  I'm sorry.

21   Q.    In the months before you finally got your Department of

22   Public Health licensing you were negotiating the Operating

23   Agreement, the contract for Allied Health, right?

24   A.    Yes.

25   Q.    And during that negotiation process you were both removing

1   people in terms of their ownership interest, and you were

2   changing the percentages of the ownership interest, right?

3   A.   I was only one who did that.

4   Q.   Okay.  But the point is that's possible up until -- that's

5   possible prior to getting the DPH license, right?

6   A.   Well, you have to have Operating Agreement in order to

7   become a clinic.  That's correct.

8   Q.   Right.  But things are fluid until the time that that

9   Operating Agreement is signed, correct?

10  A.   What do you mean things "fluid"?

11  Q.   That means things can change, right?

12  A.   Things always change.  I don't understand your question.

13  Q.   Well, you can have a new investor plugged in, you can have

14  percentages of ownership changing.  Anything is possible up

15  until the contract's signed, right?

16  A.   Yeah, but he can't bring somebody from Georgia.  That was

17  not a subject for discussion.  That was not.

18  Q.   Okay.  So, you're saying that it would not have been

19  possible for someone to invest?

20  A.   I believe almost impossible.

21  Q.   Okay.  And that's because you wouldn't have taken their

22  money?

23  A.   No, not because I wouldn't taken their money.  I don't

24  think the Department of Public Health would have approved it.

25  You can't just transfer anybody.  It has to be qualified from

1     the Department of Public Health, that person.

2     Q.    Okay.  Well, did you tell the Department of Public Health

3     about Nato Rusia?

4     A.    Did I tell them about Nato Rusia?

5     Q.    Yeah.

6     A.    No.  I removed her before we submit to --

7     Q.    You removed her because you said you didn't even know who

8     she was.

9     A.    That's correct.

10    Q.    So, her name was listed as a potential investor/owner in

11    the business or had an ownership interest up until the time

12    that you were negotiating that contract, and you didn't even

13    know who she was, correct?

14    A.    That's not true.  I'm sorry, but what happened is he

15    presented Nato Rusia as a doctor, and she was going to do

16    the -- work as a doctor.

17    Q.    Sir, the point is her name was on the papers for the

18    contract, right?

19    A.    In the Letter Agreement it was, yes.

20    Q.    And you didn't know who she was?

21    A.    That's correct.

22    Q.    And you're telling the jury that, if there was an investor

23    that was obtained from Georgia or wherever, that person

24    wouldn't have been able to be included in this contract

25    discussion?

1   A.   If a Georgian citizen comes from here and bids, it's going

2   to be very complicated, almost impossible.

3   Q.   All right.  All right.  So, David was going to Georgia in

4   August of 2015, and you discussed the trip with him, right?

5   A.   I did.

6   Q.   In fact, you paid for the trip.

7   A.   Through my credit card, yes.

8   Q.   In addition to that, you paid for an engagement ring for

9   his fiancee?

10  A.   I gave him a gift, correct.

11  Q.   And you did all of those things because he deserved it?

12  A.   Well, now it's not deserve at that point or not.  So, in

13  our culture we have in Caucus, when somebody is getting married

14  you give some gift -- they do here, too -- and I bought that

15  engagement ring way before then.

16  Q.   He had worked hard for you up until that point, and you

17  rewarded him by paying for that trip?

18  A.   No.  I have to disagree.  I'm sorry, Oscar.

19  Q.   But you did pay for the trip, right?

20  A.   Well, he has to pay me back, yes.

21  Q.   So, it was a loan?

22  A.   That's a loan.

23  Q.   Okay.  Isn't it true that you told the FBI that the $11

24  ,000 that David took, quote, unquote, without your permission

25  was part of a loan that you gave him?

1    A.   That wasn't part of the loan.  There is no loan.  The

2    $11,000, he just took it without my knowledge.

3              MR. CRUZ:  May I approach, your Honor?

4              THE COURT:  No.  There is no indication that the

5    witness has exhausted recollection or if there is any reason to

6    confront him with something other than his testimony here in

7    court.

8              MR. CRUZ:  Let me rephrase the question.

9    BY MR. CRUZ:

10   Q.   Sir, do you remember telling the FBI in February of 2016

11   that David borrowed $11,000 in amounts of six and $5,000?

12   A.   No, no, no, I didn't tell 'em "borrowed."  There was no

13   borrowed.  He took that money.

14   Q.   Do you remember telling them that or not?

15   A.   No, I didn't tell them that.

16             THE COURT:  The question has now been asked three

17   times, and the witness each of those three times has said,

18   "No," and so, one does not get to backdoor a reference that is

19   not admissible itself through this mechanism.  So, no further

20   questions with respect to that.  It has been answered.

21             MR. CRUZ:  Okay.

22   BY MR. CRUZ:

23   Q.   Do you recall telling the FBI that you had also loaned

24   David money to pay for an immigration attorney?

25   A.   No.

1    Q.    You don't recall that?

2    A.    No, I didn't tell them.

3    Q.    Okay.  So, you don't remember speaking to Keith Nelson

4    about that?

5    A.    I told him he took the money, but that's it.

6    Q.    Okay, okay.  So, in August of 2015 you paid for David's

7    trip and the engagement ring for his fiancee, correct?

8    A.    It's two different things.  The engagement ring I bought

9    way before then as a gift when I knew he was going to get

10   married.  And in the past, even in 2013, he always used my

11   credit card, went to trips with his family by himself, and he

12   paid me back.  So, he took that as going to the trip, and when

13   he come back, he would have paid me back.

14   Q.    All right.  And just prior to his going on this trip,

15   August 22nd of 2015, you stated that he -- I'm sorry -- that

16   you had a meeting regarding Allied, correct?

17   A.    Yes.

18   Q.    And that at the conclusion of that meeting you had talked

19   to David and James alone.

20   A.    Yes.

21   Q.    And that David and James had talked to you about this

22   release regarding their pizza business?

23   A.    Yes.

24   Q.    And this is the situation where they had pledged a

25   business that they owned, this restaurant, to secure your

1    investment, right?

2    A.    Yes.

3    Q.    And you had talked to them, or they approached you about

4    being able to sell the restaurant, correct?

5    A.    Yes.

6    Q.    So, they produced this release for you to sign?

7    A.    Yes.

8    Q.    And you had a discussion about a release that you had

9    produced, right?

10   A.    Right.   Yes.

11           MR. CRUZ:   And I believe that's -- and I apologize --

12   a Government's exhibit.   If we could bring that up.

13           THE COURT:   Is this a point maybe to break, Mr. Cruz?

14           MR. CRUZ:   Yes, that's fine, your Honor.

15           THE COURT:   So, we will take our morning break, ladies

16   and gentlemen.

17           THE CLERK:   All rise.

18           (The jury exited the courtroom at 11:00 a.m.)

19           THE COURT:   How much longer with this witness?

20           MR. CRUZ:   I think we will probably be going most of

21   the time we have left, your Honor.

22           THE COURT:   You mean the rest of the day?

23           MR. CRUZ:   I understand we are going until 1:00.

24           THE COURT:   Right.

25           MR. CRUZ:   If we come back in approximately 15

1    minutes, I would estimate another one to two hours with him.

2            THE COURT:  I asked that there be identified what the

3    time was that the parties were going to take with respect to

4    the witnesses.  I gather you were not here until the last

5    minute this morning, so you were not able to help us with that.

6            I am passing back the document that the parties worked

7    on.  I want to get a clear idea of how long this case is going

8    to take.  I have to tell you, and this is directed to those who

9    have inquired of this witness so far, a little bit of

10   discipline ought to be shown both by the Government and by the

11   defendant.  It is taking too long.

12           It was represented to me that this was a one-week

13   trial.  I have listened at great length, as has the jury, to

14   testimony that is not really focused.  So, I encourage the

15   parties to think carefully about focus in this case.  But, in

16   any event, we will listen to the next testimony.

17           Let me make another point clear.  I do not permit

18   people to impeach with 302s unless the witness adopts it --

19           MR. CRUZ:  All right.

20           THE COURT:  -- directly or indirectly.  I do not

21   permit them to ask questions that bring to the attention of the

22   jury that there must be a 302.  That, it seems to me, is a

23   backdoor.

24           MR. CRUZ:  Okay.

25           THE COURT:  You should be on notice, Mr. Tumposky

1    should be on notice with respect to that.  That is what

2    happened here --

3            MR. CRUZ:  All right.

4            THE COURT:  -- including non-verbal communication to

5    the jury, looking at a document to suggest to them that there

6    was such a document.  That is not his statement.  That is a

7    statement of an FBI Agent, if, in fact, it exists.

8            MR. CRUZ:  Yes, your Honor.

9            THE COURT:  So, I want it to be clear that now I am

10   going to start imposing discipline in this case.  This is not

11   going to be a meandering through years of interrelationships

12   between people.  Get to the point, whether or not the

13   Government can prove its case, and that means both sides have

14   to show a bit more discipline than has been shown so far.

15           So, we will be back here at 11:20, and perhaps you

16   will have an opportunity first to tell me how much longer this

17   is going to be, and that goes for all of the witnesses in this

18   case.

19           MR. CRUZ:  I understand, your Honor.

20           THE COURT:  And it includes the defense witnesses, who

21   are not listed, as I now look at this, as appearing.  I asked

22   for this yesterday.  Maybe it is just whenever the Judge asks

23   for something we will wait until he asks for it again.  I am

24   asking for it again.  I want it done.  You have an obligation

25   to the parties, to the jury, and to the Court to respond to

1    those Scheduling Orders that I have issued.  So, this will get

2    done over the break, I hope for everyone's sake.

3              We will be in recess.

4              MR. TUMPOSKY:  Your Honor, may I just make a brief

5    inquiry, a housekeeping matter?  Is it permissible for me to

6    conduct my cross-examination from this position here next to

7    counsel table?

8              THE COURT:  I prefer not, but --

9              MR. TUMPOSKY:  Just in terms of communicating with my

10   colleague about displaying documents and so forth, if it's

11   permissible.

12             THE COURT:  All right.  I will permit you to do it,

13   but if the jury cannot understand it or if is there some

14   difficulty in the positioning with the witness, then it is

15   going to be a problem.

16             MR. TUMPOSKY:  That's fine, your Honor.  Thank you.

17             THE COURT:  And it may be that you just have to take

18   that computer, if that is what Mr. Carosi (ph) is going to be

19   using, and put it in a different setting over there, that is,

20   where Ms. Gotlieb is now.

21             MR. TUMPOSKY:  Okay, your Honor.

22             THE COURT:  All right?

23             MR. TUMPOSKY:  Yes.

24             THE COURT:  We will be in recess.

25         (The Honorable Court exited the courtroom at 11:06 a.m.)

1          (Recess taken)

2          THE CLERK:  All rise.

3      (The Honorable Court entered the courtroom at 11:22 a.m.)

4          THE COURT:  So, have you worked out a reliable list?

5   We will talk about this at the conclusion of the day.  You have

6   now taken up basically five more days.  I don't know what

7   people were thinking, but, in any event, we will go through it

8   and be sure that we have got all of the time that is necessary.

9          So, bring the jury in.

10         THE CLERK:  All rise.

11         (The jury entered the courtroom at 11:23 a.m.)

12         THE CLERK:  Please be seated.

13         THE COURT:  You may continue, Mr. Cruz.

14         MR. CRUZ:  Thank you, your Honor.

15               CONTINUED CROSS-EXAMINATION

16   BY MR. CRUZ:

17   Q.   So, Mr. Torosyan, we are looking at the releases that were

18   signed on August 22nd of 2015.  Do you recognize those?

19   A.   May I see it, please?

20   Q.   It should be on your screen.

21   A.   Yes.

22   Q.   And as far as those releases are concerned, the one that

23   David and James had presented to you allows them the right to

24   sell the pizza business and retain the money to use as they

25   want to, correct?

1    A.   I wasn't agreed that way, so my agreement was, "You sell

2    the pizza place, you keep the money until" -- it was a short

3    period of the time -- "you keep the money in an escrow account.

4    After that, you may do what you want."

5    Q.   You also presented them with a revised release that's

6    pictured there, correct?

7    A.   Correct.

8    Q.   And that revised release allows for the money to be kept

9    in escrow?

10   A.   Correct.

11   Q.   In other words, it ties up their money, right?

12   A.   My money?

13   Q.   It ties up the money, the proceeds from the sale of the

14   pizza business, correct?

15   A.   Well, there had to be there, yes.

16   Q.   Okay.  But you negotiated that?

17   A.   There was not negotiation.  He gave this to me in five

18   minutes, and I sat down in front of the computer, just wrote

19   this quickly, and this took about five, ten minutes.

20   Q.   Right.  But you wrote it, and they accepted it, correct?

21   A.   Yes.

22   Q.   And immediately after that, after you had gotten them to

23   do what you want, you claim that they both threatened you?

24   A.   That's not what I want.  That's what he want.  He wants

25   the release of the pizza place.

1    Q.   He did want the release of the pizza place?

2    A.   Yes, so he can do what he wants, and he got it.  Now he's

3    free.

4    Q.   No, he didn't get it, because --

5         THE COURT:  No.  I think the witness should testify,

6    rather than you.

7         MR. CRUZ:  All right.

8    A.   So, he --

9         THE COURT:  No.  Just a moment.  Let's get the order

10   of responsibilities clear.  Mr. Cruz asks questions, but he

11   just asks questions, he doesn't get to make statements.  This

12   is not the opportunity to do that.  That is called "closing

13   argument."  So, Mr. Cruz will not be doing that again.

14        Similarly, you just answer the question that is put to

15   you.  You do not volunteer information, you don't start

16   answering questions after I sustain objections.

17        We have a jury here, we are imposing on their time,

18   and I intend that the parties crisply present their case, and

19   that includes instructing their witnesses what the rules are

20   with respect to this so that the witnesses do not take up too

21   much time.

22        So, put a question.

23        Answer only the question that is put to you.  If you

24   do not understand the question, you will say, "I don't

25   understand the question."  We will move on.  But we have a

1 special obligation to the jury not to be consuming time in this

2 fashion.

3 BY MR. CRUZ:

4 Q.   Sir, the second release that's pictured there that you

5 wrote up, that ties up any money that is realized from the

6 profit or the sale of the pizza place in escrow, correct?

7 A.   In escrow account, correct.

8 Q.   And that was the document that you generated or you wrote?

9 A.   Yes.

10 Q.   And immediately after all of this takes place you stated

11 that David and James threatened you?

12 A.   That's correct.

13 Q.   They threatened you with physical violence?

14 A.   Not physical violence.

15 Q.   They didn't?

16 A.   They did not.

17 Q.   Okay.  They threatened your family?

18 A.   They did.

19 Q.   And they threatened to burn down the Clinic?

20 A.   Yes.

21 Q.   And they were very demonstrative about that, moving their

22 hands around, correct?

23 A.   Yes.

24 Q.   And you were frightened?

25 A.   I was.

1  Q.   And after that happened you didn't tell anybody about it,

2  correct?

3  A.   The first thing I told, I told my family, and I called and

4  I some portion discussed with Bob and with my attorney.

5  Q.   You did that in November of 2015, correct?

6  A.   I did the same thing in August as well.

7  Q.   And who did you talk to in August?

8  A.   My attorney as well as Bob Griffith.

9  Q.   So, you talked to the -- which attorney are you talking

10  about?  Sorry.

11  A.   Andrew Rusczek, Verrill Dana.

12  Q.   So, you talked to them in August of 2015?

13  A.   August as well as in November.

14  Q.   Okay.  And you didn't go to the police?

15  A.   I did not.

16  Q.   And you didn't move your family anywhere?

17  A.   It was close, but I did not, no.

18  Q.   Now, after that you kept working with David and with James

19  in order to get the Clinic operational, opening, correct?

20  A.   After that a month and a half we didn't see each other, so

21  after that our relationship fell apart.  Very rarely I seen

22  David, and I haven't seen James.

23  Q.   Sir, you didn't continue working at Allied with David?

24  A.   I did after in October and some portion of November as it

25  needed.

1    Q.    Okay.  After this issue with the threats in August of 2015

2    you paid for David to go to Georgia, correct?

3    A.    Ask the question again.  I'm sorry.  I didn't understand.

4    Q.    After these threats had occurred in August of 2015 you

5    paid for David to go to Georgia?

6    A.    He had my credit card account.  I don't remember if I paid

7    or he paid, but I believe that was before then.

8    Q.    But you approved of it?

9    A.    Approved in event of paying me back.

10   Q.    And you didn't change any plan with regard to that trip

11   even after these alleged threats took place?

12   A.    I didn't want to even talk to him after that.

13   Q.    Now, when he got back in September of 2015 --

14   A.    Yes.

15   Q.    -- is that correct, you didn't talk to him?

16   A.    I believe prior I got in a plane (ph), perhaps I could

17   have talked to him.  I don't remember.  But I didn't see him.

18   Q.    You actually communicated with him while he was in

19   Georgia, correct?

20   A.    Yes, I did.

21   Q.    Were you text-messaging and email?

22   A.    Most of them was through Viber.

23   Q.    Okay.  And you talked about the business?

24   A.    We discuss about the business, yes.

25   Q.    Okay.  And you kept working, as I said, at Allied,

1   correct?

2   A.   On and off.

3   Q.   Okay.  Now, in September of 2015 you had started

4   negotiations for the Operating Agreement for the business,

5   correct?

6   A.   Correct.

7   Q.   And the Operating Agreement for the business was much

8   different than the Letter Agreement, correct?

9   A.   Not much different.  It's the terms and conditions are the

10  same.

11  Q.   Well, I believe that yesterday you stated that --

12  A.   Percentages were different, but most of the terms and

13  conditions the same.

14  Q.   Now, with regard to the Special Consent Authority that's

15  listed in the Letter Agreement, that gives you the ability to

16  have final say with regard to business decisions, correct?

17  A.   Regards to with the business, yes.

18  Q.   But the Operating Agreement is different in the sense that

19  it contains something called a "Duty of Loyalty Provision,"

20  correct?

21  A.   Well, it's called "Vahagn Authority."  That's it converted

22  to.  The same thing.  The Special Consent Authority, it's the

23  same thing.

24  Q.   Now, that special Duty of Loyalty Provision was placed

25  into that agreement by your attorneys, correct?

1    A.    Yes.

2    Q.    And that special Duty of Loyalty Provision allows you to

3    remove David and James' interests from the business?

4    A.    That give me the opportunity to do it in the event, yes.

5    Q.    And the basis for that is if you feel that David and James

6    have violated a duty of loyalty to the company, correct?

7    A.    Not only that.  Also personally, because I told you they

8    have demonstrated one-time threat, and I want to make sure that

9    doesn't happen again.

10   Q.    Well, that could be a duty of the -- that could be a

11   violation of the duty of loyalty, correct, making a threat?

12   A.    It is the violation, yes, of course.

13   Q.    And also it could be taking money without authorization,

14   correct?

15   A.    Yes.

16   Q.    So, that contract, when it was finalized, worked to your

17   benefit, correct?

18   A.    It's the same contract what we had in the past.

19   Q.    Except that you didn't have the ability to eliminate their

20   interests completely under the Letter Agreement?

21   A.    Because they already produced a threat towards me, and I

22   have to make sure in event if they do something and I can

23   protect me and the Clinic.  It's a medical business.  I didn't

24   want them do something crazy, then I end up in a jail.

25   Q.    But the power that you had was increased in the Operating

1    Agreement, correct?

2    A.    It's not.  It's the same thing.  Special Consent Authority

3    in the first place, that's the same thing as removing them from

4    the company.  Same thing.  So, any dispute we could have -- I

5    could have make a final decision.

6    Q.    Well, we have those in evidence, and I'm going to ask you

7    to take a look at them.

8    A.    Yeah, I'll take a look.

9    Q.    Sir, do you recognize that?  Yes?

10   A.    It looks like -- yes.

11   Q.    That's from one of the exhibits that's been introduced.

12   It's the final draft of the Operating Agreement?

13   A.    Mm-hmm.  Yes.

14   Q.    And that's the Duty of Loyalty Provision, correct?

15   A.    Yes.

16   Q.    And at the end of the provision there is a sentence that

17   has been added related to the interests of the members

18   potentially being forfeited, correct?

19   A.    Read the section.  Most of the time our attorneys were

20   negotiating mine's and David's and Jambulat's, so -- but, yes,

21   I see it, mm-hmm.

22   Q.    Okay.  So, that's different from the Special Consent

23   Authority that you had in the Letter Agreement, correct?

24   A.    Not necessarily.

25   Q.    So, you signed the final Operating Agreement in September

1    of 2015, correct?

2    A.    Yes, I did.

3    Q.    And then you went on a trip to Dubai?

4    A.    Yes.

5    Q.    And you went on that trip?

6    A.    I went to Armenia, then Dubai.

7    Q.    Okay.  And you had talked to David about your trip?

8    A.    I did talk to him about it, yeah.

9    Q.    Despite the -- well, you talked to David about the trip,

10   and you had given him some instruction with regard to preparing

11   for the DPH procedure, correct, the licensing?

12   A.    I didn't give him much instructions.  I was -- most of the

13   time I was getting instruction from them.  I didn't know much

14   about the business in the first place.  I was in the middle of

15   starting the business, so --

16   Q.    Okay.

17   A.    -- I discussed the matters of -- but I didn't give him

18   instruction, so we just discussed how things has to be.

19   Q.    Okay.  So, you discussed things before you left on

20   vacation?

21   A.    Yes, I did.

22   Q.    And he told you what he was going to do in terms of

23   working at the business?

24   A.    We discussed that, yes.

25   Q.    And you went on a trip with your family.  There were no

1    issues, correct?

2    A.    No issues.

3    Q.    Now, as far as the business was concerned in terms of the

4    finances, you had access to the bank accounts, correct?

5    A.    I believe I got an access later on, not in the beginning,

6    but initially I didn't.  Later on I request an access,

7    especially I believe when he was overseas somehow the Bank of

8    America account was blocked and I couldn't, and I even through

9    the text messages I think I asked him if I could get the user

10   name, password, and he sent it to me.

11   Q.    Did you also communicate with him via email in terms of

12   getting the password information?

13   A.    I don't remember that.

14   Q.    Okay.  Do you recall that David Tkhilaishvili had sent you

15   an email with the passwords?

16   A.    I remember I got it, but how I got it I really don't

17   remember.

18   Q.    But you had it?

19   A.    He gave it to me.  I believe it was through Viber.

20   Q.    Okay.  And you had it in April of 2015?

21   A.    I had it -- I definitely had it in September.  April he

22   gave it to me but somehow got blocked out, I couldn't log in,

23   and then I ask him again in September.  I was able to log in.

24   Q.    Okay.  So, you had information about the bank accounts,

25   and you were able to track what checks were being written,

1    et cetera, right?

2    A.    More or less.

3    Q.    Okay.  And you also testified that you noticed a couple of

4    the checks that David had written, the 5- and the $6,000

5    checks?

6    A.    That's correct.

7    Q.    And you noted that because you checked the accounts while

8    he was away?

9    A.    Yes.

10   Q.    And so, you had access to all of the checking information,

11   and you did look into it because you had a large investment

12   involved?

13   A.    I did afterwards, more detailed.

14   Q.    Okay.  And you stated yesterday that David didn't have the

15   authority to sign checks that were above $1,000 without

16   authorization.

17   A.    It was there, yes.

18   Q.    And you had stated that you both had to sign the checks,

19   correct?

20   A.    We had to sign, but a lot of times we did a lot of things

21   with the word of mouth.

22   Q.    Okay.  So, he could sign checks occasionally for amounts

23   over $1,000 without your authorization?

24   A.    Unless he specifically tells me what it is and it had to

25   be done right away.

1  Q.    Okay.  But he did sign checks for many of the providers,

2  correct?

3  A.    Perhaps he did, I'm assuming.  I haven't checked a lot of

4  back, because when I took over, I started getting involved in

5  the company, there's a lot of things I have to look to try to

6  keep the company.

7  Q.    Now, in terms of the payroll situation, that started in

8  November of 2015, correct?

9  A.    I don't remember when exactly it started, but

10  approximately that time, October, November.

11  Q.    And David was still getting his $3,000 salary at that

12  point?

13  A.    Well, I believe in late October, November.  Yeah, it was

14  late in October, definitely.  I told him, "David, David,

15  listen, I'm voluntarily gonna stop my salary because there is

16  no money for us, so we can't afford paying you either, so what

17  you propose to us as far as the investment, we over it."  At

18  the time of January I already spent over $700,000,

19  approximately.

20  Q.    And as far as the payroll was concerned you had stated

21  that David in November of 2015 had taken a $1,500 check and a

22  $2,000 payment without your authorization?

23  A.    That is correct.

24  Q.    And you would have seen the $1,500 check because you had

25  access to the bank accounts, correct?

1    A.    I seen it, and I discussed that with him, I believe.

2    Q.    Okay.  And you also would have had access to the payroll

3    information at that point?

4    A.    I never accessed the payroll information, not till

5    recently.

6    Q.    Well, sir, did you communicate with David about the

7    payroll system, Granite Payroll?

8    A.    Yes, I did.

9    Q.    And did you via email get information related to David's

10   payroll information --

11   A.    Yes.

12   Q.    -- for November?

13   A.    Well, we got an email back and forth through David, and I

14   was very clear that his salary is not going to be included.  I

15   was very clear with him.

16   Q.    And did you get that email in November of 2015?

17   A.    We communicate about the payroll.  I remember he sent me

18   the email.  He initially told me about $20,000.  Then 11- or

19   12,000, and that's -- we communicated through an email.  But I

20   was very clear that, "David, we cannot take salary.  That has

21   to stop."

22   Q.    Okay.  But do you specifically recall getting an email on

23   November 27th of 2015 about the payroll details?

24   A.    If I may take a look, I can --

25              MR. CRUZ:  May I approach, your Honor?

1          THE COURT:  You may.

2    BY MR. CRUZ:

3    Q.    Do you recognize that email?

4    A.    Yup.  I'm assuming -- I don't remember, but I'm assuming

5    he sent it.

6    Q.    That email is to you, correct, directed to you?

7    A.    It says, "From -- "

8          THE COURT:  No, no, don't tell us what it says.  The

9    question is, is it to you.

10         THE WITNESS:  Yes, yes.  I see my name on it.  That is

11   my email --

12         THE COURT:  Just answer the question.

13         THE WITNESS:  I'm assuming, yes.  I see my name on it.

14   BY MR. CRUZ:

15   Q.    The email is directed to you, and it is from David,

16   correct?

17   A.    Yes.

18   Q.    And in the email --

19         THE COURT:  If the email is going to be disclosed, the

20   substance is going to be disclosed to the jury, then it has to

21   be offered.

22         MR. CRUZ:  I will offer it, yes, as an exhibit.

23         THE COURT:  Any objection?

24         MS. KAPLAN:  I have no objection, your Honor.

25         THE COURT:  All right.  Is it previously marked?

```
 1              MR. CRUZ:  It would be marked, because it was
 2    presented to refresh his recollection, as Defendant's Exhibit
 3    RR, I believe.
 4              THE COURT:  Defendant's exhibit?
 5              MR. CRUZ:  I think we started at R for ours.
 6              THE COURT:  Well, in any event, I guess we will mark
 7    it as Exhibit 32.
 8              MR. CRUZ:  Thank you, your Honor.
 9                  (Exhibit No. 32 received into evidence)
10              THE COURT:  Just so the record is clear, you can state
11    the date of the email and the "To" and "From."
12              MR. CRUZ:  The date of the email is November 27th,
13    2015, "From:  David Tkhilaishvili," "To:  Victor Torosyan."
14              THE COURT:  All right.
15    BY MR. CRUZ:
16    Q.   I'm just going to leave this with you.  So, sir, that
17    email is from David Tkhilaishvili, correct?
18    A.   Yes.
19    Q.   And it provides you with all of the payroll information up
20    until November 23rd of 2015?
21    A.   It doesn't have no detail.
22    Q.   Well, I'm going to ask you to read the email.
23    A.   Okay.  Sure.  "Upon your request -- "
24    Q.   To yourself.  To yourself, sir.
25    A.   Okay.
```

1              (Witness read document)

2         THE COURT:  I'm sorry.

3    A.   Okay, I did.

4         THE COURT:  I'm sorry?

5         THE JUROR:  I apologize, your Honor.  Are we supposed

6    to see anything on the screen?

7         THE COURT:  Not at this point.  It hasn't been

8    presented to you.

9         THE JUROR:  All right.

10   BY MR. CRUZ:

11   Q.   Have you read it, sir?

12   A.   Yes, I did.

13   Q.   And David Tkhilaishvili is telling you that he is

14   providing you, upon your request, with payroll information for

15   November of 2015 up to November 23rd, correct?

16   A.   That's not the information that says -- on the email, on

17   this specific email it says, "Take a look and see what," but I

18   don't see any attachment or anything like that.

19   Q.   But it does reference that payroll period, correct?

20   A.   I'm assuming, yes.

21   Q.   And that payroll period is the payroll period where the

22   $2,000 draw was taken, correct?

23   A.   $2,000 he wrote it down by himself.  We only got paid for

24   November.  He had no right even to think about taking the

25   money.

1    Q.   I understand that, but that payroll information was

2    provided to you, according to that email, correct?

3    A.   Yes.

4    Q.   So, you knew about it?

5    A.   I knew about what?

6    Q.   The $2,000.

7    A.   No, I didn't know about $2,000.  Absolutely not.

8    Q.   Now, sir, when the Clinic opened in November -- I'm

9    sorry -- in October of 2015, you and David and James attended

10   an opening party, correct?

11   A.   Yes.

12   Q.   And this was after the threats were made to you on

13   August 22nd of 2015?

14   A.   Yes.

15   Q.   And at that point you attended the opening party, correct?

16   A.   I did.

17   Q.   And the other employees in the Clinic attended the party?

18   A.   Yes.

19   Q.   Your family attended the party?

20   A.   Yes.

21   Q.   And you celebrated the opening of the business?

22   A.   Yes.

23   Q.   Now, there were photographs that were taken of that event,

24   correct?

25   A.   Yes. Took the photographs, yes.

1    Q.   And those photographs depict you and members of your

2    family at this party?

3    A.   Yes.

4         MR. CRUZ:  Your Honor, may I approach?

5         THE COURT:  You may.

6    BY MR. CRUZ:

7    Q.   I'm just going to ask you to take a look at those.

8    A.   Sure.

9    Q.   Do you recognize those, sir?

10   A.   Yes, I do.

11   Q.   Are those the photos of the opening party?

12   A.   Yes, it is.

13        MR. CRUZ:  Your Honor, I'm presenting those as

14   Defendant's Exhibit 33.

15        THE COURT:  Well, they are Exhibit 33.  They are not

16   Defendant's or Government's.

17        MR. CRUZ:  Collectively, yes, your Honor.

18        THE COURT:  Okay.  Are they going to be displayed to

19   the jury?

20        MR. CRUZ:  I would like to, yes, your Honor.

21        THE COURT:  Okay.

22             (Exhibit No. 33 received into evidence)

23   BY MR. CRUZ:

24   Q.   These are the photographs, correct?

25   A.   That's correct, yes.

1    Q.    And they depict you with David?

2    A.    Yes.

3    Q.    And you with James?

4    A.    Yes.

5    Q.    If we could move on to the next photographs.  That

6    photograph depicts you, your wife and your children, correct?

7    A.    Yes.

8    Q.    And that photograph depicts you with David and James

9    Tkhilaishvili's parents?

10   A.    Yes.

11   Q.    And this last photograph shows everybody involved in the

12   Clinic celebrating and then outside of the Clinic, correct?

13   A.    Correct.

14   Q.    And there were no problems with David and James on that

15   particular date, correct?

16   A.    That day we had no problems.

17   Q.    And you felt comfortable enough to bring your family

18   there?

19   A.    Well, at that specific location, yes.

20   Q.    You did?  Okay.

21   A.    Yes.

22   Q.    And you also felt comfortable enough being around David

23   and James's family, correct?

24   A.    That day, yes.

25   Q.    And this was all in spite of the fact that they had

1    threatened you several months earlier?

2    A.    That's correct.

3    Q.    And at that point you still hadn't notified law

4    enforcement about these threats?

5    A.    Correct.

6    Q.    And you didn't speak to the FBI until November of 2015?

7    A.    I spoke with an FBI -- I don't remember the date, but that

8    was after the main -- the second -- the main threat, what they

9    did, locked me in a room.

10   Q.    I'm sorry?

11   A.    I spoke with an FBI after the second, the big threat what

12   they did at the Clinic, when they locked me in a room.

13   Q.    This was November 8th, I believe?

14   A.    The date was November 9th, and I went to FBI afterwards.

15   Q.    Okay.  And that's the date you were there with your friend

16   Levon?

17   A.    That's correct.

18   Q.    And Levon is currently the Chief Financial Officer for

19   Allied Health?

20   A.    That's correct.

21   Q.    He replaced David?

22   A.    That's correct.

23   Q.    He is going to be a witness in this case?

24   A.    (Witness indicated).

25             MS. KAPLAN:  Objection.

1          THE COURT:  Well, the witness indicated he doesn't

2     know.

3          THE WITNESS:  Well, if they call --

4          THE COURT:  Well, I guess you have to answer orally.

5     The gesture, however, discloses the witness's answer.

6     BY MR. CRUZ:

7     Q.   And Levon was there on November 8th when you talked to

8     David and James at the Clinic?

9     A.   November 9th.

10    Q.   Or November 9th.  I'm sorry.

11    A.   Inside the Clinic or outside the Clinic?

12    Q.   Both.

13    A.   Inside he was not.

14    Q.   He waited for you, correct?

15    A.   Yes, that is correct.

16    Q.   And you went into a room with David and James?

17    A.   Yes.

18    Q.   And this is when they threatened you yet again?

19    A.   Yes.

20    Q.   And they were very agitated with you?

21    A.   They were very angry with me.

22    Q.   Okay.  And they said the same things, that they're going

23    to hurt you, your family, and burn down the Clinic?

24    A.   Correct.  Even worse.

25    Q.   And you dealt with Levon when you left right after that

1    meeting, correct?

2    A.    Say it again.

3    Q.    When you ended your meeting with David and James you

4    talked to Levon?

5    A.    I talked to Levon afterwards, yes.

6    Q.    Okay.  And Levon is the person who saw how you were

7    feeling at that point?

8    A.    Yes.

9    Q.    Now, on November 8th, or November 9th, I should say, when

10   this happened, while you were at the Clinic -- don't you have

11   surveillance cameras that are set up there?

12   A.    We do, but we don't have it in the room, exam rooms, we

13   don't.

14   Q.    Do you have them in the lobby area?

15   A.    Yes, we do.

16   Q.    Do you have them in the parking lot?

17   A.    Yes, we do.

18   Q.    And did you give the FBI information related to that

19   surveillance?

20   A.    I don't think they ever asked, so it wasn't on my mind.

21   Q.    But it was there, and it existed, right?

22   A.    It records, yes.

23   Q.    Okay.  And you never offered to turn it over to them?

24   A.    I never thought that way.  I never thought about that.

25   Q.    All right.  But it would have shown you dealing with Levon

1    in the lobby, right?

2    A.    Dealing in lobby?  We just, through the lobby, we'll walk

3    outside parking lot.

4    Q.    And it would have shown you outside in the parking lot,

5    correct?

6    A.    It would, yes.

7    Q.    And David and James were with you, right?

8    A.    Yes.

9    Q.    Now, after this incident, that's when you dealt with the

10   FBI for the first time, right?

11   A.    That's correct.

12   Q.    And when you did speak to the FBI, you did so through your

13   attorney?

14   A.    I did through the attorney, correct.

15   Q.    Now, this attorney contacted the U.S. Attorney's Office,

16   correct?

17   A.    I'm assuming.

18   Q.    And set up a meeting with you?

19   A.    Yes.

20   Q.    Now, during the course of your first meeting with the FBI

21   you told them everything that you could recall as far as the

22   August 22nd set of threats?

23   A.    I did tell them about the threats, yes.

24   Q.    And you also talked to them about November 8th?

25   A.    Yes.

1   Q.   And you never said anything about David and James telling

2   you not to talk to the police, correct?

3   A.   I don't remember saying something like that.

4   Q.   Okay.  Now, when you did become involved with the FBI,

5   they did tell you that they would like to have you record

6   conversations with David, correct?

7   A.   Yes.

8   Q.   And you agreed to do it?

9   A.   That's true.

10   Q.   And when you agreed to do this, they gave you some

11   direction as to how it would work?

12   A.   Yeah.  They just -- they did give me some direction, yes,

13   they did.

14   Q.   Okay.  They gave you the equipment, and they told you

15   there were certain things that you should ask of David?

16   A.   Nope, nope, they did not tell me that.  They put the

17   recorder on me.  They told me, "Just go to the Clinic, just

18   talk to him like anyone there."  They didn't tell me any

19   specific question to ask David, no.

20   Q.   Now, you did that twice with David, correct?

21   A.   I did I believe one the audio and video.  The second time

22   was the audio only.

23   Q.   And this was November 25th, right?

24   A.   The second one was approximately within a week,

25   plus/minus.

1    Q.    November 25th and November 30th, correct?

2    A.    It sounds like about the time, yes.

3    Q.    Okay.  Now, as far as those meetings were concerned, you

4    met with David at the Clinic, right?

5    A.    Yes.

6    Q.    And James wasn't there?

7    A.    He wasn't.

8    Q.    And when you engaged in conversation with David, where did

9    that happen?

10   A.    When we got to the Clinic on the left side.  It's on the

11   left side.  It's in the Clinic on the left side.

12          THE COURT:  Mr. Torosyan, you are going to have to

13   keep your voice up.

14          THE WITNESS:  Okay.  So, on the left side of the

15   Clinic.

16   BY MR. CRUZ:

17   Q.    Okay.  And is that in an office?

18   A.    It's in a vacant space.

19   Q.    Okay.  And you were wearing this video equipment as well?

20   A.    Yes.

21   Q.    Okay.

22   A.    Then after that -- so sorry -- I didn't finish.  After

23   that we went also the exam room, too.  So, we went from one

24   point to another, two places.

25   Q.    Was this the same day or on separate days?

1    A.    Same day.

2    Q.    So, did you do that both days, go from the lobby area to

3    the exam room or no?

4    A.    I don't remember the second time.

5    Q.    Okay.  And there were people there working that day,

6    right?

7    A.    In the building, yes.

8    Q.    Okay.  Now, when you spoke to David on those occasions,

9    you talked to him and you understood that the FBI was

10   listening?

11   A.    I didn't know they're listening.  I know they're

12   recording.

13   Q.    Right.  But they knew you were there, and they had talked

14   to you just before you went in to speak to David?

15   A.    Yes.

16   Q.    When you had these conversations with David, you

17   specifically brought up different things during your

18   conversations, correct?

19   A.    Not specifically.  I would just talk about it the way --

20   the same thing he'd been started talking after that, yes.

21   Q.    Okay.  And with regard to these conversations that you

22   had, you came to find out that those conversations and

23   recordings were written down in English, translated, correct?

24   A.    Yes.

25   Q.    And you helped at some point with that translation, right?

```
 1   A.   I not helped, and I reviewed them just to make sure it's
 2   consist.
 3   Q.   Can you tell the jury how that works?  What did you do
 4   when you helped the FBI with these transcripts?
 5   A.   I did -- the help was I read it and I listened.  They
 6   asked me if it was the same thing or not.  If anything I
 7   thought was different I told them, "This was different."
 8   That's what I did.
 9   Q.   Who did you work on it with?
10   A.   With Laura and Kristin.
11   Q.   I'm sorry?
12   A.   Laura and Kristin.
13   Q.   Okay.  And how did that process work?  Did you read the
14   original transcripts?
15   A.   Yup.  I just listened and read, and just they asked me if
16   it makes sense -- it's the same thing what happened or not.
17   Q.   Did you read those corrections or write those corrections
18   down as you went?
19   A.   Yes, I wrote it down myself.
20   Q.   And what did they do with that information?
21   A.   I have no idea what they did with the information.
22   Q.   Okay.  Did you talk to anybody else about this translation
23   process other than them?
24   A.   No, I did not.  After that, after Kristen instructed me, I
25   haven't talked with anybody else.
```

1    Q.   Okay.  You didn't talk to any other translators or people

2    that were there to help with this process?

3    A.   No.  I talked with Kristen, Kate and Laura.

4    Q.   Now, do you recall that you had made changes to these

5    transcripts that had to do with various words?

6    A.   Yes.

7    Q.   And one of the words that you repeatedly changed in these

8    transcripts was the word "drunk"?

9    A.   That's not "drunk."  It says, "Booknich (ph)."

10    Q.   But that's one of the words that you repeatedly changed,

11    right?

12    A.   Yes, that's the word I change it, yes.

13    Q.   And the word went from "drunk" to "shoot"?

14    A.   Well, if you put a "drunk" in a sentence, it doesn't make

15    much sense.

16    Q.   Right, but that's what you changed it to, correct?

17    A.   Yes, correct.

18    Q.   And you did this many times?

19    A.   When I saw it.  I didn't count how many times, but

20    whenever I seen it, yes.

21    Q.   Okay.  And how many times would you estimate you did that?

22    A.   I don't remember.  I can't tell -- answer that.

23    Q.   How much time did you spend with Kristin and with Laura on

24    that?

25    A.   Just, I read it, and English is not my native language, so

1    it took me, I don't know, an hour or two to just read it and

2    listen, just compare and make sure that the word makes sense.

3    Q.    Okay.  Now, as far as the transcripts are concerned, on

4    many of those transcripts or many parts of those transcripts

5    David told you repeatedly that he wouldn't go against you,

6    correct?

7    A.    There were cases he'd say that.  David had that ability.

8    In one second he could have --

9    Q.    Well, sir, I'm just asking if that's what he said.

10   A.    Yeah.

11   Q.    Right?

12   A.    He would have said that, yes.

13   Q.    There were instances in the transcript where David

14   repeatedly said, "I'm not threatening you, I'm not trying to

15   scare you"?

16   A.    I don't remember that part.

17   Q.    Well, we went through that yesterday.  Do you recall that?

18   A.    But I don't remember the whole thing.  I'm sorry.  I just

19   don't remember.

20          MR. CRUZ:  Your Honor, could we pull up the

21   transcript?

22          THE COURT:  Yes.

23          MR. CRUZ:  If we could pull up Page 10, Line 136.

24   BY MR. CRUZ:

25   Q.    This is part of the November 25th transcript, and you read

1    this into evidence yesterday?

2    A.    Yes, I did.

3    Q.    So, in this particular part of the transcript David is

4    saying, "I'm not saying this to you.  I'm not saying because we

5    want to scare someone.  I'm telling you because you are my

6    partner.  We are together."  Right?

7    A.    That's what it says here, yes.

8    Q.    Okay.  In addition to that, some of the threats that David

9    made to you had to do with giving up 5 percent of your

10   interest, correct?

11   A.    That is correct.

12   Q.    And there's a portion in this transcript where David says,

13   "I don't have a problem with the 5 percent."  Do you recall

14   that?

15   A.    I think there was something like that, yes.

16   Q.    It's Page 14, Line 192.  If you read that, it says he

17   doesn't care about the 5 percent, correct?

18   A.    Well, the way he talks, that's not what I -- He says, "I

19   don't give a 'f' about the 5 percent.  There will be billions

20   of dollars.  I don't have a problem with 5 percent.  There is a

21   relationship here."

22   Q.    Right.  So, he doesn't care about this 5 percent that you

23   reported that he threatened you for, correct?

24   A.    That's what he's saying, but at the same time saying, "You

25   talk with James."  So, what he did, he instructed James to take

1    the 5 percent.

2    Q.    Okay.  There was also some discussion yesterday about this

3    term "thieves-in-law"?

4    A.    Yes.

5    Q.    Do you remember that?

6    A.    I do.

7    Q.    And in the transcript David told you that he doesn't --

8    there's no thieves-in-law; he doesn't deal with thieves-in-law,

9    right?

10   A.    Well, if you read that, he says, "No."  Then, on the other

11   hand, he says there is a friend.

12        THE COURT:  The question is as to the entire

13   transcript, and I will permit the witness to answer with

14   respect to the entire transcript, not a particular set of words

15   at a particular set of times.

16   A.    So, in one section he says he has no connection, and later

17   on he says, "There is this guy, he's a thief-in-law, he's a

18   friend of mine, He's my brother."

19   Q.    I understand.

20   A.    Now you take the answer.

21   Q.    Right.  But there is a portion of the transcript or an

22   excerpt where he says, "I don't deal with thieves-in-law,"

23   correct?

24   A.    On the other section he say there's one and his friend.

25   So, I didn't understand what he meant.  I personally did not.

1    Q.   Okay.  But he did say that, correct?

2    A.   He did say that.

3    Q.   Okay.  Now, you have the same type of conversation on

4    November 30th, correct?

5    A.   On November 30, yes, in my conversation.

6    Q.   But that's more along the lines of a business discussion,

7    correct?  There's a lot of talk about the Clinic, right?

8    A.   I believe we discussed certain things about the Clinic,

9    correct.

10   Q.   Okay.  And I believe that's the one that was recorded as

11   well, right?

12   A.   Yes.

13   Q.   So, when you were speaking to David during these

14   interactions, you were talking to him the way that you normally

15   would, correct?

16   A.   No.  It wasn't normal, no.

17   Q.   Okay.  You had talked about a lot of the things that you

18   discussed during these recorded conversations in the past,

19   right?

20   A.   Yes.

21   Q.   And you specifically brought up things that you knew about

22   him, right?

23   A.   I didn't understand your question.  Sorry, Oscar.

24   Q.   During these conversations you brought things up that you

25   knew about David, correct?

1    A.   What happened, that's what I -- we talk about it, because

2    every time for that period we seen him, that's what he was

3    dealing with.

4    Q.   Okay.  And in addition to that you also brought up things

5    that involved his girlfriend, Kristina Ursova, right?

6    A.   Yes, I did.

7    Q.   And all of these things you knew because of your long-term

8    relationship to him, right?

9    A.   I knew those things because Olga told me.  I did not

10   before then.

11   Q.   But none of those things ever stopped you from being his

12   friend in the past, correct?

13   A.   I didn't know those things before.  If I knew them, then I

14   wouldn't have conducted a close friendship with him.  I didn't

15   know anything about his girlfriend, and I didn't know his

16   involvement with the thieves-in-law.  I didn't know.  The

17   answer is, "No."

18   Q.   Well, the thieves-in-law he said he had nothing to do

19   with, correct?

20   A.   But later on he said his close friend is thief-in-law.  I

21   mean, you take the answer.  Is it yes or no?

22   Q.   So, let's talk about Saba Kikoliashvili.

23   A.   Yes.

24   Q.   Okay.  So, with regard to Saba, the threats against you

25   personally and your family and the Clinic were repeatedly about

1   giving 5 percent of your ownership interest to Saba, correct?

2   A.   Yes.

3   Q.   That's what they wanted you to do?

4   A.   Yes.

5   Q.   And you told them repeatedly that you weren't going to do

6   that?

7            THE WITNESS:  Can I ask, I mean, either defense or,

8   Judge, I'm sorry if it's an inappropriate question, but is

9   there any way I could use the bathroom?

10            THE COURT:  If you can't answer the question, you

11   don't answer the question.  Put another question.

12            MS. KAPLAN:  No, no.  I think he needs to use the

13   restroom.

14            THE COURT:  Pardon?

15            MS. KAPLAN:  Restroom.

16            THE WITNESS:  Very quick.

17            THE COURT:  Oh, I'm sorry.  We will take a break at

18   this point, ladies and gentlemen, just about five minutes.

19            THE WITNESS:  I'm sorry.

20            THE CLERK:  All rise.

21              (The jury exited the courtroom at 12:07 p.m.)

22            THE CLERK:  You can leave the courtroom.

23                   (Witness exited the courtroom)

24            THE COURT:  Well, we will take advantage of the time

25   here.  I note that Ms. Conrad is here, and she is concerned

1    about when her trial is going to start.  It is going to start.

2          MS. CONRAD:  Oh, I'm hoping it's going to start, your

3    Honor.  I'm actually here to observe this trial.

4          THE COURT:  All right.  Well, you may have dual

5    purposes.  Everybody can be seated.  But I want to find out how

6    long this case is going to take.

7          So, as I indicated, even with the outline that was

8    provided to me, adding up what was filled in -- and, of course,

9    I do not have the Government's cross-examination of the

10   witnesses that the defendants are proposing -- another five

11   days.  I do not know what people are thinking.  Maybe it is a

12   new math that people are thinking about.  You have 14 days for

13   the remainder of the direct examination.  That is how it adds

14   up.  Maybe somebody did not add it.  But this is, as I said, if

15   it were a tight case, I would feel differently about it.

16         MS. KAPLAN:  Your Honor, I think there's nine hours

17   for the Government left, so I think that --

18         THE COURT:  No, but then there is cross-examination.

19         MS. KAPLAN:  Right.

20         THE COURT:  Right.

21         MS. KAPLAN:  Well, when I estimate --

22         THE COURT:  The trial that takes the jury's time has

23   to do with that.  So, apart from the hangnail of perhaps

24   misunderstanding what I meant by, "How long is the trial going

25   to take?", I have made representations to the jury, as you

1    heard me, and now it appears that those representations are

2    inaccurate, and so I want to figure out what do we have?  So, I

3    will tell you.

4         Mr. Cruz tells me that you have got at least the rest

5    of the day with Mr. Torosyan.

6         MR. CRUZ:  Well, I should be able to wrap it up within

7    45 minutes, your Honor.

8         THE COURT:  Forty-five minutes is the rest of the day.

9    It is now 12:10.

10        MR. CRUZ:  I understand, your Honor.

11        THE COURT:  Well, maybe that gives us five minutes,

12   but I don't think so, because Mr. Torosyan had to leave the

13   courtroom to use the facilities.

14        So, the short of it is, this is not -- this isn't kind

15   of manana time; this is trying to figure out how much time we

16   are going to take of the jury and, of course, the increasing

17   anxiety of Ms. Conrad, who is waiting to go on trial shortly

18   thereafter.

19        So, I have this list.  I hope that the parties can tie

20   it up.  I am going to have to tell the jury at some point about

21   this, and, frankly, I think that it can be tried in a tighter

22   way than it has been.  I have made that point clear.  I asked

23   how much longer we were going to be with Mr. Torosyan of the

24   Government.  "An hour," until it wasn't an hour.  It was

25   another 3 1/2 hours.

1          We have a problem of incontinent presentation of

2     evidence.  I encourage some tighter presentation of evidence.

3          Now, we have the defendants' witnesses or people that

4     have been identified as defendants' witnesses.  I don't have

5     any figures for what the cross is going to be.  Have you looked

6     at the defendants' witnesses?

7          MS. KAPLAN:  I have, your Honor, and I don't think

8     cross is going to be particularly long.

9          THE COURT:  Well, even with real numbers they are not

10    reliable, but "particularly long" compared to what?

11         MS. KAPLAN:  I don't think they will be longer than

12    half an hour.

13         THE COURT:  Longer than half an hour for --

14         MS. KAPLAN:  For Saba.

15         THE COURT:  For Saba?

16         MS. KAPLAN:  Perhaps a half an hour, and Maria Mana as

17    well, and for the Agents I don't think it will be that long.

18         THE COURT:  What about Ehraki -- Mr. Torosyan, if you

19    could leave the courtroom, because we are having some

20    discussion about the case.

21              (Mr. Torosyan exited the courtroom)

22         MS. KAPLAN:  If my understanding -- I'm not sure why

23    he is being called.  I think he may just be called to say that

24    the defendants are nice guys, so I don't think my cross would

25    be very long of him at all.

1          THE COURT:  Okay.  So, then I have an hour of

2     cross-examination of Saba and Mena.  We don't know what Erakhi

3     is going to be done here.  What is he going to be doing here?

4          MR. CRUZ:  Your Honor, he has information related to

5     something that I said during my opening statement which was

6     that -- and I'm going to ask Mr. Torosyan about this quickly --

7     but Mr. Torosyan had given Mr. Tkhilaishvili access to his home

8     on Cape Cod after these alleged threats were made.

9          THE COURT:  All right.

10          MR. CRUZ:  I want to put that in, obviously, to --

11          THE COURT:  Okay.  But this is not character evidence.

12          MR. CRUZ:  Oh, no, no.

13          THE COURT:  So, he is a percipient witness as to an

14     interaction --

15          MR. CRUZ:  Yes.

16          THE COURT:  -- or character of interaction?

17          MR. CRUZ:  Yes.  And it won't be terribly long, your

18     Honor.

19          THE COURT:  Well, "terribly long" is 30 minutes to

20     talk about how he used the house?

21          MR. CRUZ:  Well, your Honor, it could possibly be less

22     than that.

23          THE COURT:  I would assume that it will be less than

24     that, if that is what it is.

25          MR. CRUZ:  You're right, you're right.

1          THE COURT:  Okay.  And I assume the cross-examination

2    will be even less than that --

3          MS. KAPLAN:  Yes.

4          THE COURT:  -- whatever that is.

5          MS. KAPLAN:  Yes.

6          THE COURT:  Now, with respect to Nelson, I don't

7    understand what Agent Nelson is going to be offering in this

8    case.  If you think that you are going to impeach with a prior

9    inconsistent statement, you are stuck with the statements that

10   were made here in court.  It was too open-textured, the nature

11   of the communication was too open-textured, and I am not going

12   to let you go back into what an agent hears him say and reduces

13   to a 302, unless there is a compelling reason for doing it.

14         MR. CRUZ:  Well, I can proffer what that would be,

15   your Honor.  One of the main things that the Government is

16   arguing here is that Mr. Tkhilaishvili used money from the

17   clinic in an unauthorized fashion.

18         THE COURT:  I understand all of that, but that doesn't

19   mean that you get to have essentially hearsay statements come

20   in.

21         Now, there is a rule with respect to the introduction

22   of collateral statements, and you are going to have to satisfy

23   me that I should permit that under these circumstances.

24   Ordinarily, you just do not get back to it, you are stuck with

25   the statement.  That is the constant of this kind of matter.

1  The fact that there may or may not be inconsistent statements

2  is just the beginning.  There has to be some showing of how

3  material it is and whether or not it is going to be misleading

4  the jury.

5          So, I don't have the 302, although it is clear as a

6  bell that you were trying to induce in the jury the perception

7  that there was a 302, something that I cautioned you about, but

8  you are going to have to make a showing to me with respect to

9  Agent Nelson, if that is what the purpose of that testimony is.

10         MR. CRUZ:  Yes, your Honor.  Do you want me to do it

11  now?

12         THE COURT:  No.  I want it in writing.  I want to see

13  the 302, and I am going to look at it carefully.  But if you

14  think you are going to do that, you are going to have to prove

15  it up for me in some fashion.

16         MR. CRUZ:  That's fine.

17         THE COURT:  Now, with respect to Agent Koch, what's

18  that?

19         MR. TUMPOSKY:  That would be my witness.  There would

20  be perhaps some impeachment, but actually mainly it would be

21  the circumstances of the arrest of the defendant.  I would be

22  seeking to discuss probably five, ten minutes, at most, I would

23  think on that.

24         THE COURT:  Well, what about the circumstances of --

25         MR. TUMPOSKY:  Consciousness of innocence.  He was

1    cooperative.  He went, he volunteered --

2         THE COURT:  "Consciousness of innocence"?

3         MR. TUMPOSKY:  Yes.  In other words, he was

4    cooperative, he went and volunteered, he got his gun license,

5    he let them look around.  He was not acting as someone who felt

6    that he had done anything wrong.

7         THE COURT:  Okay.  Well, I will consider that when it

8    is proffered, but ordinarily compliance with requests is more

9    or less irrelevant.

10        MR. TUMPOSKY:  Well, I don't think he was obligated to

11   let them search the house without a warrant, your Honor.

12        THE COURT:  Well, maybe, maybe not.  But, in any

13   event, I am not sure that it is relevant in this setting.  So,

14   forewarned about the need to make a compelling case with

15   respect to that as well.

16        So, we are still back to five days here.  I have got

17   the jury coming in for the equivalent of two days tomorrow, so

18   we have got that.  Then we have got Friday.  That gets us to

19   three days.  Then we have got Monday and Tuesday.  That gets us

20   to five days.  And, of course, we have to charge the jury and

21   have a charging conference.  So, think carefully about how much

22   time you are taking on this, and Ms. Conrad can count on us

23   picking the jury as soon as we can, which may or may not be

24   Tuesday, Wednesday, Thursday, or Friday of next week.

25        All right.  So, if we can get Mr. Torosyan in here, we

1   can start again.

2              (Mr. Torosyan retook the witness stand)

3              THE CLERK:  All rise.

4                  (The jury entered the courtroom at 12:15 p.m.)

5              THE CLERK:  Please be seated.

6              THE COURT:  You may continue your inquiry, Mr. Cruz.

7              MR. CRUZ:  Thank you, your Honor.

8                      CONTINUED CROSS-EXAMINATION

9   BY MR. CRUZ:

10  Q.   Now, Mr. Torosyan, we were just talking about Saba

11  Kikoliashvili, and that Saba was the person who David and James

12  had threatened you regarding giving him 5 percent of your

13  ownership interest?

14  A.   Yes.

15  Q.   And you had stated that you weren't going to do that?

16  A.   That's correct.

17  Q.   Now, you know who this Saba Kikoliashvili is, correct?

18  A.   I do.

19  Q.   And he's someone who has worked in connection with Davis

20  Clinic?

21  A.   I heard some stories.

22  Q.   Okay.  And you personally had contact with him?

23  A.   I did.

24  Q.   Okay.  Now, you had contact with him in October of 2015,

25  correct?

1    A.    I don't remember.

2    Q.    Do you remember meeting at a restaurant -- I believe you

3    testified about this yesterday -- a restaurant in Watertown

4    with David and James?

5    A.    I believe that was in November, though.  I could be wrong,

6    but I think it was November 4th or -- it was few days before

7    the threat.  It wasn't October.  I believe it was November.

8    Q.    Okay.  Do you remember that Saba was at this meeting?

9    A.    He was.

10   Q.    And it was in Watertown?

11   A.    It was in Watertown, yes.

12   Q.    And was it at La Casa De Pedro Restaurant?

13   A.    I believe so, yes.

14   Q.    Okay.  Now, when all of you met there, isn't it true that

15   you promised Saba personally that he would get 5 percent of the

16   ownership interest that you had in Allied Health?

17   A.    That's not true at all, no.

18   Q.    Okay.  Now, you worked with the FBI after that meeting in

19   October of 2015, correct?

20   A.    I worked with them after November when I met -- not right

21   after the meeting.  It was about after a month, month and a

22   half.

23   Q.    All right.  Do you recall that they asked you to make a

24   call to Saba?

25   A.    Yes.

1    Q.   And you did speak to him, right?

2    A.   Yes, I did.

3    Q.   And during the course of that conversation do you recall

4    telling Saba that he was entitled to the 5 percent?

5    A.   I don't remember entire what I talked, but it could have

6    been, because I always made it clear he's not going to be

7    5 percent ownership in Allied from day one.

8    Q.   Would it refresh your memory if you saw a transcript of

9    that call?

10   A.   Yes.

11        MR. CRUZ:   May I approach, your Honor?

12        THE COURT:   You may.

13   BY MR. CRUZ:

14   Q.   I'm just going to ask you to look at the highlighted

15   section.

16   A.   Sure.

17   Q.   You can read that to yourself.

18                  (Witness read document)

19   A.   Yes.

20   Q.   Have you had an opportunity to read that?

21   A.   Yes, I did.   Thank you.

22   Q.   And the passage that I just showed you that's

23   highlighted --

24   A.   Yes, I read that.

25   Q.   You tell Saba that he's entitled to 5 percent.

```
1    A.    No.  And I was very, very clear not in Allied Health.  I

2    was very clear.

3    Q.    Did you promise him 5 percent to have something?

4    A.    In the future, if we open up the clinics, if he work at

5    the future clinics he can get the 5 percent, yes, not at

6    Allied.  I was very clear.

7    Q.    Okay.  And the future clinics would be part of Allied

8    Health, correct?

9    A.    That's correct.

10   Q.    So, you did promise him 5 percent of a future interest?

11   A.    If he work in the future clinics, for that he can get

12   5 percent.  That's all that was the agreement, yes.

13   Q.    But you told him personally over the phone that he was

14   going to be getting that?

15   A.    In the future, if he work at the Clinic, he will get the

16   5 percent.

17   Q.    Okay.  Now, after David and James had threatened you in

18   August and in November you continued to have contact with them,

19   right?

20   A.    I had contact with David most of the time.

21   Q.    Okay.  And in addition to the opening party that we talked

22   about, you had occasion to have David at your home in Mashpee,

23   correct?

24   A.    There were many occasions.  I don't remember when was the

25   last time he'd been, but there were many occasions David been
```

1    to my house, even he went my house many time, other friends

2    been in the house.  The Clinic members been in the house.  Yes.

3    Q.    Okay.  Do you remember that around Halloween, October 30th

4    of 2015, you allowed David to use your home in Mashpee?

5    A.    David always had keys to use my house, and he used for

6    many occasions.  I don't remember the particular date.  I

7    don't.

8    Q.    So, you let him use your keys to your house?

9    A.    He had a code for my key box outside of my house.  He had

10   those for many, many years.

11   Q.    And you never took them back, even after he threatened

12   you?

13   A.    Well, the key was there.  It wasn't only for him and me.

14   The key was there for the people to clean up the house, for the

15   general maintenance, for alarm people.

16   Q.    Okay.  But you didn't tell him he couldn't use it,

17   correct?

18   A.    I don't think there was -- I never thought about that.

19   Q.    Did you also have a security system at your house in

20   Mashpee?

21   A.    Yes, I do.

22   Q.    And you provided him with a code to your security system,

23   too, correct?

24   A.    He always had that for many years.  Since I bought the

25   house, I believe it was 2011, that was the same code until now.

1    Even today it's the same code.

2    Q.   Okay.  Do you recall that you told the FBI that you were

3    changing all of the locks and all of the access to the Clinic

4    at a certain point because of these threats?

5    A.   Yes.

6    Q.   You didn't do that with regard to your personal residence,

7    did you?

8    A.   I never thought about it, he would have gone to the

9    personal resident.

10   Q.   But he did go in October of 2015?

11   A.   I don't remember that.

12   Q.   Okay.  Would it refresh your recollection if you saw a

13   text message?

14   A.   Yeah, it could.

15           MR. CRUZ:  May I approach, your Honor.

16           THE COURT:  You may.

17           MR. CRUZ:  Your Honor, is it just possible to put it

18   up on his screen so he can see it?

19           THE COURT:  Yes.  Ms. Beatty will arrange that.

20           This is just use of a document to refresh his

21   recollection, if it can.  It is not in evidence itself.

22   BY MR. CRUZ:

23   Q.   Sir, can you take a look at that?

24   A.   Yes, I do.

25   Q.   And do you recognize it?

1          THE COURT:  No, it does not make any difference

2     whether he recognizes it or not.

3          MR. CRUZ:  Oh, I'm sorry.  I'm sorry.

4     BY MR. CRUZ:

5     Q.   So, sir, that is a --

6          THE COURT:  No.  It does not make any difference what

7     it is.  The question is does it refresh his recollection with

8     respect to the question that you have asked him.  This document

9     is not in evidence.

10         MR. CRUZ:  I understand, your Honor.

11    BY MR. CRUZ:

12    Q.   Does it refresh your memory?

13    A.   Well, I'm looking at it, and I don't remember, but it

14    looks like it's my code.

15    Q.   Okay.  And that's the code that you gave to David,

16    correct?

17    A.   Yes.  I gave that code in the past as well verbally many

18    times.

19    Q.   And he had that code even after these alleged threats

20    occurred, correct?

21    A.   Well, when the first threats occurred, Oscar -- and,

22    again, and I put all of the money and we put on the line our

23    friendship, and, again, my background is the Born Again

24    Christian.  I tend to forgive and work on it.  I'm just telling

25    you what it is.  I always tried to work out with him.  And I

1    don't remember specifically, but I always tried to work out

2    with him on things.

3    Q.   So, you were comfortable with letting him keep access to

4    your home in Mashpee?

5    A.   I don't remember this incident.  I don't remember.  Honest

6    to God, I don't remember.

7    Q.   So, sir, you were ultimately able in December of 2016 to

8    exercise your Duty of Loyalty Provision in your contract,

9    correct?

10   A.   When?

11   Q.   In December of 2015.

12   A.   I'm assuming -- yes, I was.

13            MS. KAPLAN:  Objection.  The first question was

14   December 2016, and then he changed it to 2015.

15            THE COURT:  Right.

16            MR. CRUZ:  I'm sorry.  It's December of 2015.  I

17   apologize.

18            THE COURT:  So, let's just put the question again so

19   it's clear what you are asking.

20   BY MR. CRUZ:

21   Q.   In December of 2015 you consulted with your lawyers in

22   order to exercise your Duty of Loyalty Provision, correct?

23   A.   After November threat I've been talking to my lawyers all

24   the time.

25   Q.   And in January of 2016 you actually sent David and James

1   notice that you were exercising your duty of loyalty rights,

2   correct?

3   A.   That's correct.

4   Q.   And they were to leave the Clinic?

5   A.   Yes.

6   Q.   And they were not to return?

7   A.   Correct.

8   Q.   Now, the FBI was aware of this because you told them you

9   were doing it, correct?

10  A.   I don't remember.  I might have.  I don't remember.

11  Q.   And this Special Consent Authority, or Duty of Loyalty

12  Provision, I should say, was executed on January 6th of 2016,

13  correct?

14  A.   Correct.

15  Q.   And I think we had an exhibit yesterday where your

16  attorneys notified them that they weren't to return.

17  A.   I believe so.

18  Q.   Okay.  When that happened you had sole control over the

19  company, correct?

20  A.   After that, yes.

21  Q.   And when you exercised that provision, you specifically

22  said that it was because of threats they had made?

23  A.   And the stealing.

24  Q.   And taking money, correct?

25  A.   Correct.

 1    Q.    Now, after January of 2016 they ended up suing you,

 2    correct?

 3    A.    Well, it took them, I believe, 3 1/2 months before they

 4    sued me.

 5    Q.    But they did?

 6    A.    After 3 1/2 months they sued me, yes.

 7          THE COURT:  The question is did they sue you after

 8    that took place?  "Yes" or "No"?

 9          THE WITNESS:  Yes, they sued me afterwards.

10    BY MR. CRUZ:

11    Q.    And that litigation is still pending, correct?

12    A.    That is correct.

13    Q.    Now, as far as your -- you had criticized David for taking

14    money without authorization for personal expenses, correct?

15    A.    Correct.

16    Q.    Sir, isn't it true that you have, as the owner of Allied

17    Health, been paying for people's personal expenses?

18    A.    What do you mean by it?  You have to be more specific.

19    Q.    Dr. Susan Johnson.

20    A.    Okay.

21    Q.    You paid rent for her apartment, correct?

22    A.    That's not a personal expense at all.

23    Q.    But you did pay for that out of the Clinic funds?

24    A.    Yes.  That's part of our contract, yes.  That's absolutely

25    not a personal expense.

1    Q.   Okay.  You also paid for or have paid for employees'

2    personal expenses in the past, correct?

3    A.   You have to be specific, Oscar.

4    Q.   With regard to Maria Mana, you had paid for personal

5    expenses for her in the past?

6    A.   I did not pay personal expense.  She asked a loan, and she

7    sent the text.  I provide that to FBI.  You could read the

8    text.  She need it, and nothing wrong to help the people if in

9    case they need it.  It's human nature.  That's all.

10   Q.   But you have done that before, correct?

11   A.   Before that?  No, I didn't do that before then.  That was

12   only time.  I mean, I could have drive back from Clinic home

13   and I would have see her walking outside, I would have dropped

14   her off home, if that's considered --

15   Q.   And at this point you're still paying Olga Dorofyeyeva,

16   correct?

17   A.   Well, we pay her as we could, yes.  We pay her

18   approximately the loan we took.  I believe we pay her about

19   approximately $4,000.

20   Q.   And you also paid expenses for Belmont Auto out of Allied

21   Health, correct?

22   A.   Not expenses.  What do you mean by expenses?

23   Q.   Well, you write checks on Allied Health accounts for

24   Belmont Auto, correct?

25   A.   It depends.  Right now quite often Allied needs money and

1   Belmont is giving the money, let them borrow the money,

2   hopefully return back.

3   Q.   And you write checks to yourself out of the Allied Health

4   account, correct?

5   A.   Now I don't write any checks to myself.  I put the

6   money -- for example, I couldn't borrow the money -- like, many

7   occasions we were short on the payroll.  I would have borrowed

8   from somebody, put the cash, and then I would have take the

9   money, give back in the next day or so.  So, we trying to

10   survive, Oscar.  That's what it is.

11   Q.   Now, sir, just a few more questions.

12   A.   Sure.

13   Q.   You had stated that in November of 2015 to David that you

14   were not able to pay his salary, or there was no money because

15   you weren't treating any patients at that point, correct?

16   A.   Well, we went over our limits, Oscar.  Initially, he said

17   by November 16 we were supposed to have $200,000 minimum in our

18   reserve, and we exceeded that over $100,000.  We had no money.

19   We really had no money, absolutely nothing.

20   Q.   And you told David you couldn't pay salaries because of

21   that?

22   A.   I told him, "David, you put this project together, so I'm

23   not going to take it, so be a partner.  Just, you can't take it

24   either, so we have to -- if it's gonna to work out, gonna work

25   out."

1   Q.   You stated that you were so low on money that you had to

2   go to the extent of selling your wife's jewelry, correct?

3   A.   That is true.  That's true.

4   Q.   But, sir, isn't it true that in November of 2015 you

5   opened Powerhouse Kickboxing Gym in Watertown?

6   A.   That's very true, yes.

7   Q.   And that was a very expensive project?

8   A.   Well, that was expensive, but that has nothing to do with

9   this.  My finances, before I engaged with David and I planned

10  it, $500,000 for this and a few $100,000 for that.  So, that

11  was the money on the side.  And that money can't cross, because

12  that money belong to Powerhouse.  That has nothing to do with

13  that.

14  Q.   Do you have partners in Powerhouse?

15  A.   The company -- the money -- the business didn't become

16  profitable.  We closed it down.

17  Q.   I'm asking at the time did you have a partner in --

18  A.   Yes, I had partner.  Yeah.

19  Q.   And did you make a significant investment of money into

20  that business?

21  A.   I did some investment.  I don't know what you mean by

22  "significant."

23  Q.   How much?  How much did you invest in that business?

24  A.   Approximately $100,000, maybe, plus/minus.

25  Q.   Okay.  And that was money that you could have placed into

1    Allied, correct?

2    A.    Why should I do that?

3    Q.    I'm just asking if you could have done it, if you chose

4    to?

5    A.    Absolutely that doesn't make sense.  One has nothing to do

6    with the other.  I could have not eat meat, and I could have

7    put that money to Allied Health, too.  Is that a fair thing to

8    do?  I don't think so.

9    Q.    But at that point, in November and December of 2015, you

10   were paying all of Allied's expenses out of your pocket,

11   correct?

12   A.    Yes, but with the hope of -- I engaged in Powerhouse

13   before then with the hope of -- only $300,000.  I had to invest

14   an extra 200,000 in event if there is need.  That's what I was

15   prepared, Oscar.

16   Q.    And at that point in November and December of 2015 you

17   weren't receiving payments from insurance carriers, were you?

18   A.    No, we weren't receiving.  No.

19   Q.    Not until January, after January 2016, correct?

20   A.    The first one I believe we got either -- I believe it was

21   February 23rd or January -- February 3rd.

22   Q.    So, you were treating patients for free at that point?

23   A.    Yes.

24   Q.    Now, my final question is you stated that the business now

25   is not doing well; you're losing money?

1    A.    That is correct.

2    Q.    Yet, isn't it true that you opened a second clinic called

3    Elm Tree Clinic in Lowell, Massachusetts?

4    A.    We haven't opened it yet.

5    Q.    You don't have a website indicating that that clinic is

6    open?

7    A.    The Clinic is not open.  There's no clinic.

8    Q.    What is the status of that project?

9    A.    Well, it's a pending status.

10   Q.    Do you have employees that you've hired for that clinic?

11   A.    No, absolutely not.  No employees.  Nobody.  Nothing.

12             MR. CRUZ:  I have no further questions, your Honor.

13             THE COURT:  All right.

14             Mr. Tumposky

15                         CROSS-EXAMINATION

16   BY MR. TUMPOSKY:

17   Q.    Good afternoon.

18   A.    Good afternoon.

19   Q.    I want to talk to you about the formation of the Clinic

20   just very briefly.

21   A.    Sure.

22   Q.    So, when the clinic started you were the silent partner,

23   right?

24   A.    Correct.

25   Q.    And David was the Financial Officer?

```
 1   A.   Correct.
 2   Q.   And David was also responsible for overseeing
 3   construction, the build-out?
 4   A.   Correct.
 5   Q.   James was not involved -- was not the Chief Financial
 6   Officer?
 7   A.   James wasn't CFO.  He was not.
 8   Q.   And he was not supervising the construction?
 9   A.   He wasn't.
10   Q.   And beginning when things were established you had a
11   salary, a monthly salary?
12   A.   Yes, we did.
13   Q.   And David had a monthly salary?
14   A.   Yes.
15   Q.   James had no salary?
16   A.   That's because he wasn't gonna to --
17        THE COURT:  No.  The question was, "Did he have a
18   salary when you started?"  "Yes" or "No"?
19        THE WITNESS:  No, he wasn't.
20        THE COURT:  All right.  Just answer the question that
21   is put to you.
22   BY MR. TUMPOSKY:
23   Q.   You wrote checks on behalf of Allied Health to various
24   vendors?
25   A.   Yes, I did.
```

1   Q.   David wrote checks on behalf of Allied Health for various

2   vendors?

3   A.   I said that he did, yes.

4   Q.   James never wrote any checks to anyone?

5   A.   I believe he didn't, unless I missed it.

6   Q.   But there were some rules that were set up at the

7   formation about who had to consent to what type of expenses.

8   Am I right about that?

9   A.   Yes.

10  Q.   Expenses over $1,000 the Class A Members had to agree?

11  A.   That's correct.

12  Q.   In the case of the Clinic the Class A Members were you and

13  James?

14  A.   That's correct.

15  Q.   You have testified on direct that on numerous occasions

16  David made expenditures for over $1,000 without your

17  permission?

18  A.   And he was with permission, without.

19  Q.   Sometimes with, sometimes without?

20  A.   Correct.

21  Q.   There were many times during the course of Clinic

22  operations when you made expenditures over $1,000; isn't that

23  right?

24  A.   That's correct.

25  Q.   And many of those times you did not obtain the consent of

1   James for those expenses; isn't that true?

2   A.   That is true.

3   Q.   Now, you denied on direct and during cross-examination

4   that you ever paid for any inappropriate expenses out of the

5   Allied account.

6   A.   I will like to see what you're referring to.

7   Q.   Certainly.  Well, there was one occasion where you wrote a

8   large check from Allied to your auto body shop; isn't that

9   right?

10  A.   Yes, there was.

11  Q.   That was for the purchase of some sort of a car?

12  A.   That's true.

13  Q.   Okay.  So, that benefited your other business; isn't that

14  right?

15  A.   That's not right.

16  Q.   It did not benefit your other business?

17  A.   It did benefit, but that wasn't the purpose of it.  The

18  purpose of David -- because of we gonna be open up the Clinic,

19  and he told me he had a list of patients, which wasn't true,

20  and now I ask him, "We have to do marketing," and he says, "For

21  marketing we need a vehicle, and where are we going to buy the

22  vehicle?"  And he left overseas, and that's only thing I could

23  have done, get the car and fix from the top to the bottom, make

24  it safe car, and he and Kenton were driving that vehicle.

25  Q.   Okay.  But the car was fixed in your shop?

1   A.    That's correct, yes.

2   Q.    So, you used Allied money to pay for the car repairs, and

3   that money ended up going to you?

4   A.    That wasn't Allied.  That was my personal money, that was

5   my personal money, and I paid to purchase the vehicle for

6   Allied with the request of David and Kenton.

7   Q.    Well, you say it was your personal money, but you intend

8   to recoup that money if Allied ever becomes profitable.

9   A.    Well, we agreed it had to be up to $500,000.  By January

10   we went over 700, approximately.  So, we went way over it.  So,

11   I was trying to do everything I could to try to, until now,

12   until today, try to survive.

13   Q.    I understand that, but your testimony was that it wasn't

14   Allied money; it was your own personal money.  That's what you

15   said, right?

16   A.    That's my money, and I bought the vehicle for Allied with

17   David and Kenton's request.  Correct, yes.

18   Q.    It's money, however, that you expect Allied to repay you

19   in the event that Allied becomes profitable?

20   A.    Well, there are two parts.  The parts were the Belmont.

21   Belmont needs some money to survive as well.  Until now, like

22   yesterday I put some money for payroll and I took -- I'm

23   sorry -- the day before I put money for payroll, and I just

24   took 8,000 back I have to pay because I have the rent and it's

25   my expense at Belmont.

1          THE COURT:  Just a moment.  I am going to strike the

2    answer.  It is not responsive.  Listen to the question, answer

3    the question itself, not volunteering other material.  I am

4    going to do that without counsel, because counsel is apparently

5    happy enough to have this go on forever, but I am not.

6          THE WITNESS:  Okay, sir.

7          THE COURT:  So, he put a particular question to you.

8    Answer the particular question.

9          Now put another question to him.

10          MR. TUMPOSKY:  Yes, your Honor.

11   BY MR. TUMPOSKY:

12   Q.   So, Belmont needed money, so you decided to spend $6,000

13   of money that was dedicated to Allied on repairing a car in

14   your Belmont garage?

15   A.    That's not -- that wasn't the case.  That was different,

16   no.

17          THE COURT:  Okay.  That is the answer.  He says it is

18   not the case.  Next question.

19   BY MR. TUMPOSKY:

20   Q.    Isn't it true that you also took a trip to Fort Lauderdale

21   in February of 2015, I believe it was?

22   A.    Fort Lauderdale?

23   Q.    Yes.

24   A.    2015.  I don't remember.  February.  I really don't

25   remember.

1    Q.    February 27th, Fort Lauderdale.

2    A.    I don't remember going.  I don't.

3    Q.    Is there something that might refresh your memory as to

4    whether you went to Fort Lauderdale?

5    A.    Yeah, I can take a look on it.

6              MR. TUMPOSKY:  Can I show him a document, your Honor?

7              THE COURT:  Yes, you may.  Do you want to show it just

8    to the witness by the computer?

9              MR. TUMPOSKY:  Yes, please.  Can we display it on the

10   witness's monitor?

11             THE COURT:  All right.

12             THE CLERK:  Are you doing HDMI or --

13             MR. TUMPOSKY:  HDMI1, please.

14   BY MR. TUMPOSKY:

15   Q.    Does that refresh your memory, sir, as to whether you took

16   a trip to Fort Lauderdale February 27th of two thousand and --

17   I guess that would be '14.

18   A.    I really don't remember, honestly.  I have no idea.  I

19   really don't remember.  Is it February 2017?

20   Q.    Did you take a trip to Fort Lauderdale and use an Allied

21   expense?

22   A.    No, no. If I take a trip, I always use my money.  I

23   haven't done it, no.  I don't remember doing something like

24   that.  I don't even remember -- I really don't remember.  I

25   believe --

1          THE COURT:  All right.  That's the answer.  Enough.

2    We are not going to deal with this particular document that was

3    used to refresh his recollection.  If there is something more

4    that is going to be adduced, we will do that.

5          MR. TUMPOSKY:  That's all.  We can take that down,

6    your Honor.

7          THE COURT:  Okay.

8    BY MR. TUMPOSKY:

9    Q.   Now, at the beginning of your involvement with Allied you

10   had to file an application with DPH, is that right, the

11   Department of Public Health?

12   A.   That's correct.

13   Q.   When was that?

14   A.   Well, we start from day one to work on it.  I believe, if

15   I looked with our consulting firm they sent it out, I believe

16   it was finalized late, about September or October, but I

17   believe we sent around sometime in May or June, approximately.

18   We could check.

19   Q.   Of 2014?

20   A.   No, '15.

21   Q.   '15 you had the DPH application?

22   A.   It could be plus/minus, but approximately.

23   Q.   So, in the original Letter Agreement and both in the

24   Operating Agreement there were certain percentages that were

25   delineated as to who would have what ownership, right?

1    A.    That's true.

2    Q.    And the Letter Agreement was December 11th of 2014; is

3    that right?

4    A.    That's true.

5              MR. TUMPOSKY:  Okay.  Can we deactivate the monitor

6    now?

7              THE COURT:  Just to the witness?

8              MR. TUMPOSKY:  No, can we turn it off?

9              THE COURT:  Oh, I see.

10              MR. TUMPOSKY:  Thank you.

11   BY MR. TUMPOSKY:

12   Q.    December 11th, 2014 was when the Letter Agreement was

13   executed?

14   A.    Yes.

15   Q.    And there were certain percentages that were delineated as

16   to who was the owner and who had what percentage, right?

17   A.    Yes.

18   Q.    So, in that Letter Agreement James had 45 percent, and you

19   had 41, and other people had smaller percentages, right?

20   A.    I believe so.  If that's what it says, that's what it

21   says, yes.  If I may take a look.

22   Q.    All right.  We'll bring that up, and we can go through

23   that, the Letter Agreement.

24   A.    Sure.

25              MR. TUMPOSKY:  Can we display the -- this is in

1    evidence.  Can we display this to the --

2                THE COURT:  Yes.  What is the exhibit number?

3                MR. TUMPOSKY:  It is Exhibit --

4                MS. KAPLAN:  2.

5                MR. TUMPOSKY:  -- 2.

6                THE COURT:  All right.  This is for everyone.

7    BY MR. TUMPOSKY:

8    Q.   This is the breakdown?

9    A.   Yes.

10   Q.   So, James had 45 percent, and you had 41 percent?

11   A.   That's what it says, yes.

12   Q.   But this was not the final breakdown of the percentages,

13   was it?

14   A.   What do you mean the "final"?  That was final at that

15   time, yes, it was.

16   Q.   In the end you had 43.45 percent, and James had

17   42 percent, isn't that right, by the end?

18   A.   That's correct, yes.

19   Q.   So, your percentage actually increased by the time the

20   Clinic opened and James's decreased?

21   A.   You can't say "Yes" or "No."  It's different answer.  I

22   have to provide you with different answer, if the Judge allows.

23   Q.   Well, let me ask you this:  Here it has James at

24   45 percent.  Is that the final percentage that James ended up

25   with?

1  A.   I guess we see it's not.

2  Q.   His percentage ended up being lower, right?

3  A.   It has a different answer.  I can't say "Yes" or "No."

4  It's not the answer I could say "Yes" or "No."

5  Q.   Okay.

6  A.   Not "Yes" and "No," because if the Judge allows, I can

7  explain why.

8          THE COURT:  No, the question has not been put to you.

9  BY MR. TUMPOSKY:

10 Q.   We're talking numbers here, right?

11 A.   The number's different, correct, yes.

12 Q.   James's number in the end was lower than the 45 percent?

13 A.   By the number=wise, yes.

14 Q.   By the number-wise.  And your number ended up being

15 slightly higher than what is displayed here?

16 A.   Again, there is an answer, but number-wise, yes.

17 Q.   And your number went up even after you say that James and

18 David began to threaten you; isn't that right?

19 A.   Well, that wasn't the case.  That David put the other

20 people on the account that's supposed to be working at the

21 Clinic, but that's at the beginning.  So, now we are submitting

22 legal department to the Department of Public Health.  We can't

23 submit the people's name.  I mean, I never seen -- that's first

24 of all, illegal and inappropriate.  There's no reason to do

25 that.  And the 5 percent that James -- I have to explain.  I'm

1    sorry.  The 5 percent --

2         THE COURT:  Well, you have not been asked the

3    question, so I am going to strike the answer.  If somebody

4    wants to develop this further, they can, but you answer the

5    question that is put to you.  Do you understand?

6         THE WITNESS:  I do, Judge.  Yeah, your Honor.

7    BY MR. TUMPOSKY:

8    Q.   Now, we also discussed or you discussed on your direct

9    this percentage that Olga had that depended on whether or not

10   she worked there, right?

11   A.   Yes.

12   Q.   And while she's not working there she doesn't get a

13   percentage of the ownership?

14   A.   That's true.

15   Q.   And that percentage that she would have if she worked

16   there, because she's not, that reverts to you, right?

17   A.   Well, initially that was the Clinic's percentages.

18   Q.   But now it's yours?

19   A.   Well, now they are out of the Clinic.

20   Q.   So, it belongs to you?

21   A.   Apparently, you could say, "Yes."  If Olga comes back she

22   always have that 5 percent.

23   Q.   But if she doesn't, it's yours?

24   A.   That's whoever owns the Clinic.

25   Q.   So, we discussed -- you discussed on your

1    cross-examination with Mr. Cruz that there was a party to which

2    you brought your family, right?

3    A.    Yes.

4    Q.    There was also some discussion about whether David was

5    invited to your house in Mashpee?

6    A.    Yes.

7    Q.    And then we talked about or you talked about this boxing

8    gym that you had opened, right?

9    A.    Yes.

10   Q.    And you opened that when?

11   A.    November 7th.

12   Q.    2015?

13   A.    2015, yes.

14   Q.    So, this was after there had been these supposed threats

15   against you?

16   A.    The first threat, correct.

17   Q.    The first threat.  And you had a party to commemorate the

18   opening of the boxing gym?

19   A.    We did.

20   Q.    And you invited David?

21   A.    I did.

22   Q.    He didn't just show up?

23   A.    No.  I invited him.

24   Q.    You invited him personally?

25   A.    Yes.

1    Q.   I want to talk to you about some of the other things that

2    you said on your direct examination.  You testified that you

3    came to this country on an H1B Visa, right?

4    A.   Yes.

5    Q.   And you testified that your first job was pumping gas?

6    A.   Well, that was my first job as -- job working at the

7    station.

8    Q.   That was the first job that you came to the U.S., working

9    at the gas station?

10   A.   Well, I work a week or ten days at Burger King, but that's

11   it.  But that wasn't my job as in hired.  I never had an

12   employment agreement with anybody.  That was the first

13   agreement I had.

14   Q.   Right.  So, you came here on an H1B Visa, which is a work

15   exchange visa, right?

16   A.   Yes, that's true.

17   Q.   And your testimony is that you came here, and your first

18   job as the work exchange was at a gas station pumping gas?

19   A.   No.  The exchange visa was at the hotel, but the hotel at

20   the time had no positions, so I had to seek another job.  I

21   came to the hotel, but they hired other people.

22   Q.   Okay.  So, you did not come and take the job that your

23   visa obligated you to take when you arrived here?

24   A.   The job wasn't available, and I was entitled to take any

25   other job.

1   Q.   Okay.  So, you took a job at the gas station?

2   A.   I took it for a week, 10 days at the Burger King.  Then I

3   had a contract with the gas station.  Then I took a year

4   contract with the gas station.

5   Q.   And you said that when you came here you had $365 in your

6   pocket?

7   A.   That's very true.

8   Q.   That's somewhat of an apocryphal story, isn't it, sir?

9   A.   What kind of story?  I'm sorry.

10  Q.   That it is not true?

11  A.   No.  That's very, very true.

12  Q.   $365?

13  A.   That's all I had, as God is my witness, yes.

14  Q.   You had a college education of some sort, right?

15  A.   Yes, I did.

16  Q.   Your degree was in what?

17  A.   I have two degrees, one completed, one not.  In Economy.

18  The second one computer engineering, non-completed.

19  Q.   So, your degree is in Economics?

20  A.   Yes.

21  Q.   And I'm assuming that you took a plane here?

22  A.   I took a plane.

23  Q.   That cost money?

24  A.   That cost money.

25  Q.   You needed somewhere to live when you got here?

1    A.    Yes.

2    Q.    That cost money?

3    A.    I stayed with a friend.

4    Q.    Okay.  Well, you needed to eat?

5    A.    Yes.

6    Q.    Clothing, other expenses?

7    A.    (Witness nodded).

8    Q.    You had no one helping you out, just the $365 in your

9    pocket?

10   A.    That's exactly how it is.  And I borrowed that money to

11   pay back when I work here.

12   Q.    All right.  Now, I want to talk to you a little bit about

13   a conversation that you had with James in December of 2015.

14   A.    In December -- yes.  At the pizza shop, Taunton?

15   Q.    I'm sorry?

16   A.    At the Taunton?

17   Q.    Yes, right.  So, during this conversation you were

18   outfitted by the FBI with a wire?

19   A.    Correct.

20   Q.    And you went to visit him in Taunton at his pizza place

21   specifically so you could record a conversation with him?

22   A.    That's correct.

23   Q.    And you went there in the hopes that you would get him to

24   say something on tape that you could take back to the FBI as

25   some sort of valuable evidence, right?

1   A.   Well, that was the idea.

2   Q.   That was the idea.  So, that was your purpose in going

3   there, was to get him to say something incriminating?

4   A.   Well, not saying something; so that the hope when I go see

5   him, because he always acted that way for past two times I seen

6   him it's going to be sort of put the end, and because you have

7   to understand what I was going at that time with my family.

8   Q.   Well, my question simply was whether it was your hope that

9   you would get him to say something incriminating.

10  A.   Initially I didn't want to go.  Initial day I didn't want

11  to go, and the FBI says, "We will protect you."  And I'm, like,

12  "Okay, if I go, he do something crazy."  He says, "You're

13  safe."  And I'm, like, okay, he gonna say something, then we

14  gonna be end.

15  Q.   Right.  So, when you went there you discussed -- before

16  you went there you discussed it with the FBI, right?

17  A.   I discussed what?

18  Q.   What the purpose of going there was.

19  A.   I was just gonna go see him and he gonna be threaten me

20  again.

21  Q.   Right.  So, the hope was, quite frankly, is that what he

22  would do, that you would go there and you would get the threats

23  on tape.  That was the point, right?

24  A.   That's what he did for the past three times.

25  Q.   My question was whether when you went to the pizza store

1    in Taunton, your hope was that he would threaten you and you

2    would have it on tape.  That was the plan, right?

3    A.   The idea was I would have gone and talked to him and

4    discussed few things.  But I personally didn't want to go, and

5    I was afraid, and I'm like --

6             THE COURT:  I'm striking the answer to the question.

7    The question is was that the hope or not?

8             THE WITNESS:  It was on certain hope that I was going

9    to just discuss it with him, but I knew he would have

10   threatened me.  You could have taken it as a, "Yes."

11            THE COURT:  So, I am striking the answer.  I am not

12   sure you fully understand.

13            THE WITNESS:  Maybe I don't understand question,

14   Judge, maybe.  I'm sorry, your Honor.

15            THE COURT:  No, my instruction.  My instruction is to

16   answer only the question.  If you don't understand the

17   question, then you say you don't understand the question.

18            THE WITNESS:  Okay.

19            MR. TUMPOSKY:  May I ask it one more time, your Honor?

20            THE COURT:  Yes.

21   BY MR. TUMPOSKY:

22   Q.   When you wore the wire and went to the pizza store to meet

23   with James, your hope was that he would say something

24   threatening to you that you could now have on tape?

25   A.   I had hope on that, yes.

1   Q.   And, in fact, you discussed this plan with the FBI prior

2   to going?

3   A.   I did not discuss my motivation with the FBI.

4   Q.   Well, you discussed the fact that you were going to go

5   with the FBI?

6   A.   And I asked them to have me protected, and they assured me

7   I'll be safe over there.

8   Q.   And they gave you a wire to wear to record?

9   A.   Correct.  And also they told me there were going to be FBI

10  Agents in the area.

11  Q.   So, you went there and engaged James in conversation?

12  A.   Yes.

13  Q.   Right?  And during this conversation you tried to get him

14  to say something that would be somehow conceived of as

15  threatening, right?

16         THE COURT:  I think we have been over this enough.

17  The same question has been asked over and over again, and the

18  witness has answered in the same fashion.  So, I am excluding

19  the question.

20         MR. TUMPOSKY:  I will get more specific, your Honor.

21         THE COURT:  All right.

22  BY MR. TUMPOSKY:

23  Q.   Okay.  So, at one point during this conversation you talk

24  about how David supposedly threatened you, right, at one point

25  during this conversation?

1    A.    Yes, I believe so.  If I take a look.

2    Q.    Okay.  You want to take a look?

3          MR. TUMPOSKY:  We'll pull that up.

4    Page 3.

5          THE COURT:  Solely for the witness.

6          MR. TUMPOSKY:  We'll come back to that in a second.

7    BY MR. TUMPOSKY:

8    Q.    At some point during the conversation you tried to get

9    James to agree that he had locked you in a room, right?

10   A.    I'm sorry, sir.  Repeat the question again.

11   Q.    Sure.

12         THE COURT:  We are not going to get into the specifics

13   back and forth.  You can ask the general question about threat,

14   but the specifics back and forth run into a hearsay problem.

15         MR. TUMPOSKY:  Okay.

16   BY MR. TUMPOSKY:

17   Q.    On several occasions during this conversation you brought

18   up things that happened in the past between yourself, David and

19   James, right?

20   A.    I did.

21   Q.    And several times during this conversation you tried to

22   get James to agree that these things had happened?

23   A.    I asked him that's where he was standing, and I was more

24   than certain he would have said, "Yes," because that's what he

25   did in the past.

1    Q.   But you asked him to agree with these things that you were

2    bringing up, and he didn't?

3    A.   That's correct.  He was completely different person that

4    day.

5    Q.   Completely different person?

6    A.   Completely.

7    Q.   The one time that you had the tape recorder on when you

8    were talking to him, it's your testimony that he was a

9    completely different person?

10   A.   Completely different person, correct.

11          THE COURT:  All right.  Is this a point to break,

12   then, Mr. Tumposky?

13          MR. TUMPOSKY:  That's fine, your Honor.

14          THE COURT:  So, we will break for the day, ladies and

15   gentlemen.  I have, with appreciation, received your agreement

16   to sit the full day tomorrow.  As you probably understand by

17   now, I am doing my very best to make sure this case is

18   presented to you as expeditiously as possible, and I will be

19   providing additional assistance to counsel and the witnesses in

20   that regard.

21          So, we will see you tomorrow morning at 9:00 for the

22   continuation of the evidence.

23          THE CLERK:  All rise.

24       (The jury exited the courtroom at 1:00 p.m.)

25          THE COURT:  You may be seated.

1              Mr. Torosyan, I have told you on a number of occasions

2      to answer only the question that is put to you.  You have

3      disregarded that.  I want you to understand that if this

4      happens in the future I am going to hold you in contempt of

5      Court.  You are not listening to what I have instructed you to

6      do.  You are willfully choosing to go beyond the questions that

7      are presented to you to offer your observations on a variety of

8      matters.  If you do not understand that by now, then you should

9      ask me a question about it.

10             THE WITNESS:  I will ask.

11             THE COURT:  You understand?

12             THE WITNESS:  I do.

13             THE COURT:  All right.  So, you may leave the

14     courtroom.

15                  (Witness exited the courtroom)

16             THE COURT:  So, I want counsel to think long and hard

17     about tightening up their cases here.  Asking the same question

18     six times does not make it six times more credible.  I think

19     you have got to understand that the *Rules of Evidence* are going

20     to be applied in this case; and that, frankly, my view is that

21     there has been much too much time taken by all of the parties

22     here, more than is necessary and certainly more than what was

23     represented to the jury.  So, you will think about it.  We will

24     move this case along more promptly than it has so far.

25             Anything else we need to talk about?  And I assume

1    that you will talk to your witnesses here to make sure that

2    they understand what the instructions are.  I can't imagine

3    that it is helpful to anybody's case to have the Judge have to

4    make instructions in the presence of the jury, but if something

5    happens in the presence of the jury, the consequence will take

6    place in the presence of the jury.  So, I hope you understand

7    what the rules of the game are and are prepared to play

8    according to the rules.

9            Anything else we need to talk about?

10           MR. CRUZ:  No.

11           MS. KAPLAN:  No.

12           MR. TUMPOSKY:  No, your Honor.

13           THE CLERK:  All rise.

14       (The Honorable Court exited the courtroom at 1:04 p.m.)

15         (WHEREUPON, the proceedings adjourned at 1:04 p.m.)

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

4              I, Brenda K. Hancock, RMR, CRR and Official Court

5    Reporter of the United States District Court, do hereby certify

6    that the foregoing transcript constitutes, to the best of my

7    skill and ability, a true and accurate transcription of my

8    stenotype notes taken in the matter of *United State of America*

9    *v. Tkhilaishvili, et al.*, No. 1:16-cr-10134-DPW.

10

11

12

13

14   Date:    4/30/17           /s/ *Brenda K. Hancock*
                                 Brenda K. Hancock, RMR, CRR
15                               Official Court Reporter

16

17

18

19

20

21

22

23

24

25