UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA           )
                                   )
                                   )
vs.                                )
                                   )  No. 1:16-cr-10134-DPW
                                   )
DAVID TKHILAISHVILI AND            )
JAMBULAT TKHILAISHVILI,            )
                                   )
                Defendants.


BEFORE:  THE HONORABLE DOUGLAS P. WOODLOCK


**REDACTED**
<u>JURY CHARGE CONFERENCE</u>




John Joseph Moakley United States Courthouse
Courtroom No. 1
One Courthouse Way
Boston, MA 02210
Friday, May 5, 2017
9:35 a.m.




Brenda K. Hancock, RMR, CRR
Official Court Reporter
John Joseph Moakley United States Courthouse
One Courthouse Way
Boston, MA 02210
(617)439-3214

1    APPEARANCES:

2          UNITED STATES ATTORNEY'S OFFICE
           By: AUSA Laura Kaplan
3          John Joseph Moakley Federal Courthouse
           1 Courthouse Way
4          Suite 9200
           Boston, MA 02210
5          On behalf of The United State of America.

6
           FEDERAL PUBLIC DEFENDER OFFICE
7          By: Oscar Cruz, Jr., Esq.
           District of Massachusetts
8          51 Sleeper Street
           5th Floor
9          Boston, MA 02210
           On behalf of the Defendant.
10

11         HEDGES & TUMPOSKY, LLP
           By: Michael L. Tumposky, Esq.
12         Suite 600
           50 Congress Street
13         Boston, MA 02109

14

15

16

17

18

19

20

21

22

23

24

25

1            (The following proceedings were held in open court

2     before the Honorable Douglas P. Woodlock, United States

3     District Judge, United States District Court, District of

4     Massachusetts, at the John J. Moakley United States Courthouse,

5     One Courthouse Way, Courtroom 1, Boston, Massachusetts, on

6     Friday, May 5, 2017):

7            THE CLERK:  All rise.

8         (The Honorable Court entered the courtroom at 9:35 a.m.)

9            THE CLERK:  This Honorable Court is now in session.

10    Please be seated.  Criminal Action Number 16-10134, United

11    States v. Tkhilaishvili.

12           THE COURT:  Well, a couple of preliminary things.  I

13    do want to have a redacted version of the Indictment go in to

14    the jury.  The way I think I would like to have this work is to

15    do it with the charging paragraphs.  So, the first page would

16    stop at, "The grand jury charges that, colon."  Then you go to

17    the charging paragraphs for Count One, and maybe Count One I

18    think can fit on that first page.  Maybe it can't.  I don't

19    know.  I guess maybe just having separate pages for each of the

20    counts is going to work.

21           So, the first page would be the caption, the word

22    "Indictment," "The grand jury charges that, colon."

23           Then the next page would be Count One, and it would be

24    what is now Paragraph 12.  I think I would take the paragraph

25    numbers out of it, and I would like to have identified John

1    Doe A and the clinic as well.  Maybe we do not have to identify

2    the clinic by name, but John Doe A should be identified in

3    that.

4         Then, similarly for Count Two.  I guess the question I

5    have with respect to Count Two, though, is whether or not

6    aiding and abetting really is in this case any longer.

7         Ms. Kaplan, do you have a view about it?  They are

8    either up or down on attempted extortion, it seems to me.

9         THE INTERPRETER:  Could you speak louder, please?

10        THE COURT:  Oh, I'm sorry.  What I was saying is that

11   I want to be sure, first, that we have separate charging

12   paragraphs, and I have moved Count Two, which is the charging

13   paragraph for attempted extortion.  The Government has charged

14   it both as a violation of the Hobbs Act but also a violation of

15   Section 2, which is aiding and abetting, and I just do not see

16   an aiding and abetting theory as being applicable in this

17   setting.  They were acting together or not at all in this

18   attempt.

19        MS. KAPLAN:  That's fine, your Honor.

20        THE COURT:  And, again, John Doe A would be

21   identified.  What I would ask you to do is give me a clean copy

22   of this sometime today, maybe before lunch, so that we can all

23   look at it and make sure that is what we are agreed on.

24        MS. KAPLAN:  Okay.

25        THE COURT:  Then, Count Three is one with respect to

1    the healthcare program, and I would keep it as it is, but I

2    don't know, again, why aiding and abetting would be appropriate

3    under these circumstances.  He either did it or he did not; he

4    didn't aid and abet anybody.

5              MS. KAPLAN:  I think that's fine.

6              THE COURT:  So, we'll take reference to Section 2 out

7    of that.  And similarly with respect to Count Four.  So, it is

8    not going to have all of the underlying factual background in

9    it, but it will have the specific charges themselves without

10   the paragraph numbers, because we have renumbered the

11   paragraphs, and with the identification of Mr. Torosyan in

12   there as John Doe A.

13             So, as I said, if you could have that by, say,

14   lunchtime today.  I will take a look at it, and the parties can

15   take a look at it.

16             Now, turning to the charging issues, I have received a

17   number of various submissions with respect to it, but I want to

18   step back a bit and explain my theory of charging and also my

19   theory of Rule 29 motions.

20             My view is that there is an asymmetry with respect to

21   the appeal rights of the Government and a defendant.  If a

22   judgment of acquittal is entered in a case before it goes to

23   the jury, the Government has no appeal rights, and so

24   throughout my career I have been prepared to put a case to the

25   jury on the Government's theory, reserving the Rule 29 motions

1    to look at them more carefully if the jury comes back and

2    convicts.  What that means is that, if I have a different view

3    ultimately with respect to the Government's theory or the

4    evidence in the case, then the Government is in a position to

5    take it up on appeal and contest it or not.  But, in any event,

6    that theory of Rule 29 is what guides me in dealing with issues

7    both of Rule 29 but also issues of instruction.  It provides

8    symmetry to what is otherwise an asymmetrical access to

9    guidance from the Court of Appeals.

10          So, now let's go back.  With respect to a number of

11   objections and the Rule 29 motion as it exists now, it is based

12   on to some degree defendant's desire and the Government's

13   desire to have me introduce references to evidence in my charge

14   to the jury.  I am not going to do that.  I will provide a

15   broad outline of what the standards are, and counsel can argue

16   the evidence to the jury, and the jury will make its

17   determination.

18          There are some suggestions that the evidence is

19   inadequate or insufficient here.  To the degree that this

20   survives a jury verdict, close attention to the record is going

21   to be necessary, but I am not going to at this stage act on the

22   Rule 29 motions in that regard.

23          So, let's go back, then, to what am I going to say to

24   the jury?  Well, with respect to the question of interstate

25   commerce, I am going to put it at a relatively high level of

1    generality, that essentially if there is anticipated, because

2    we are dealing with conspiracy and attempt, a more than

3    *de minimis* effect on interstate commerce, the Government has

4    satisfied that.  Now, there is a lot of case law out there or

5    language in case law about heightened standards and that sort

6    of thing.  That is, it seems to me, law talk, judges talking to

7    each other about legal standards.  But for purposes of

8    presenting it to the jury, we are really talking about a

9    realistic possibility of a minimal effect on interstate

10   commerce.  That is what I am going to say to the jury, and you

11   will argue whatever facts you want to argue with respect to

12   that.

13        What I am trying to do is cover the things that we

14   have discussed a little bit before that I see arising from the

15   submissions of the parties.

16        The question of obtaining, I think I indicated

17   yesterday, and I am pretty firmly of this view, although,

18   obviously, I am going to spend a bit of time this weekend

19   thinking more about the instructions, but my basic view is that

20   obtaining can be obtaining for oneself, that is, the alleged

21   extortionist obtaining something for himself, or the

22   extortionist directing the person who is the victim to provide

23   something of economic value, or I should say an economic

24   interest, because I will get to that in just a second, to

25   someone else that he designates.

1          I recognize that there is a little bit of uncertainty

2     or at least reservation with respect to this in the case law,

3     but, A, this does not seem to be one of those cases that rubs

4     up against the developing case law, or at least the

5     reservations in the case law here; and, second, my view is that

6     the Hobbs Act does include obtaining property, or the theory of

7     obtaining property includes directing it to somebody else.

8          Now, what is the property?  Well, the kind of ironic

9     argument of the defendants is nothing here, it is a bankrupt

10    entity, so there is no economic value being transferred.  I do

11    not buy that at all.  I view it as the transfer in economic

12    interest, and the parties will assess and the jury will assess

13    whatever value it has, but it is an economic interest that is

14    purported to be taken by consent from the victim through the

15    use of threats of harm here, physical harm.

16          But that is a kind of broad outline of what I think I

17    am going to do with what I think are the contested issues in

18    the case.  Do not look to me to argue your case or to say, "The

19    Government says this, the defendant says that, and here is how

20    it ties into particular pieces of evidence," although I may use

21    particular pieces of evidence to illustrate it, but it will be

22    plain vanilla evidence that I am referring to and not the

23    contested evidence that the parties are focused on.  I do not

24    argue the case, you do, and I mean to provide you with a

25    framework in which the argument will take place.

1          Now, having given that or maybe somewhat repeated my

2     views with respect to that, are there things that you need to

3     know from me so that you do not get blind-sided, I guess.  That

4     is an issue for instructions; that is, you get up and say

5     something to the jury along the lines of, "Judge Woodlock will

6     tell you," and then all of a sudden Judge Woodlock does not

7     tell them.  In fact, he tells them something else.

8          MR. TUMPOSKY:  Well, the issue that I would inquire

9     about is the relevance or use for the prior bad act evidence

10    that came in.

11         THE COURT:  I think you are going to have to be more

12    specific about that, and let me go back about that.  This is

13    not a challenge; it is simply if you want me to do something

14    more you are going to have to be more specific about it.  I

15    have two aspects of views.  I think I expressed them yesterday.

16    One is whether or not the jury could reasonably understand that

17    what is called "prior bad acts," we will just say violence that

18    may be associated with one or both of the defendants, can be

19    said to have been brought to the attention of and known to the

20    defendants to have been brought to the attention of the victim.

21    That is in.

22         MR. TUMPOSKY:  I'm sorry.  I didn't hear the last,

23    previous part of it.

24         THE COURT:  Known to have been brought to the

25    attention of the victim.

1          MR. TUMPOSKY:  Known by the defendants to have been

2     brought to the attention of the victim?

3          THE COURT:  Yes.  That is in.

4          MR. TUMPOSKY:  Right.

5          THE COURT:  Second, I think about it in terms of an

6     alternative ground -- or not alternative but simply a separate

7     ground for the introduction of the evidence, for instance, of

8     Olga referring to being cut.  A jury, I think, might evaluate

9     this in a more settled fashion after a verdict, if it becomes

10    necessary, but I do not think it is going to be become

11    necessary, because it is admissible on other grounds.  A jury

12    could understand that the nature of the relationships among the

13    several participants in the clinic was such that this

14    information about the minatory quality of the defendants would

15    be brought to the attention of the victim.

16         But with respect to the cutting, it goes to her bias

17    under these circumstances.  She said that she was told that she

18    was going to be cut.  That tells the jury something about why

19    she might testify in a particular way.  She made reference to,

20    and I permitted it to come in, I believe directly, but perhaps

21    it came in somewhat obliquely, the woman-scorned argument.

22    This is not a case about dating or relationships, but dating,

23    relationships are relevant to whether or not a particular

24    witness has a bias or prejudice that the jury should evaluate

25    in deciding how much, if any, of the witness's testimony they

1   should credit.

2        So, I am not now aware, but I am asking you to tell me

3   if there are particular things that you want me to either call

4   out or be aware of.  I am not asking you to say tell me the

5   thing that you do not want me to tell the jury and then I'll

6   tell the jury not to think about the things that you don't want

7   me to have the jury think about, but if you have got a

8   cautionary instruction, something like that that is focused on

9   some aspect of it, I would like to know about it.

10        MR. TUMPOSKY:  I did propose one, your Honor.

11        THE COURT:  Well, yes, but as to particular aspects.

12   The kind of generalized statements are not enough here.  I made

13   my rulings with respect to evidence.  If you want them to be

14   reconsidered at this stage, then you have got to help me out on

15   that so that I know what it is that you are upset about.

16        But I will use the cut, for example.  It is a prior

17   bad act, I suppose, threatening someone.  On the other hand, it

18   is a prior bad act directed to a witness who is testifying and

19   in a context in which the character of the relationships among

20   the several participants in the clinic could be expected to be

21   understood by all of the participants either in a general sort

22   of way or in a more particular sort of way.

23        That is where I stand on it.  If there is something

24   more specific that you want with respect to specific kinds of

25   evidence, then I will ask you to propose it there.  This is not

1    a pop quiz.  You have got the weekend to think about that.  But

2    that is how I think I am thinking about it right now.

3            Right now I would give the jury the general scienter

4    instruction that the critical factor is what did the defendants

5    believe the victim understood here that they were communicating

6    to the victim.  There is a lot of this kind of, you look at

7    those transcripts, it is ragtime.  I don't think that is a

8    musical approach of the Caucuses, but it communicates what it

9    is.  "I am not threatening you.  That would be wrong, that's

10   for sure."  We've seen that in other transcripts, Presidential

11   transcripts over the years.  The jury could find them to be,

12   "Wink, wink, nod, nod, we are going to do it to you," or they

13   could say this is someone who suffers from logorrhea, talking

14   all the time.  That is up to them.  But my own view is that it

15   is more likely than not that they knew that he understood that

16   it was a threat.  That is why I say that this is sufficient for

17   purposes of the Petrozziello findings.

18           Ms. Kaplan?

19           MS. KAPLAN:  I just want to make sure I understand.

20   The last part that you just said, I'm with you on that, that

21   the Government has to prove that the defendants knew that the

22   statements that they made to the victim were intended to

23   exploit his fear, but I am not sure I'm understanding -- it

24   sounds like you're also saying that the defendants had to have

25   known, for instance, that Olga told Victor Torosyan about these

1    past incidents of violence with the defendants, that the

2    defendants needed to know specifically, and I don't know that

3    that is the law.

4         THE COURT:  Well, I think that is an evidentiary

5    issue, more an evidentiary issue.  That is to say, if the

6    threats to Olga were to have taken place, put to one side the

7    alternative grounds or separate grounds of permitting their

8    introduction that goes to her credibility or the nature of her

9    credibility, but if the victim were unaware of some violent act

10   that the defendants performed, then that could not contribute

11   to the victim's fear, and the victim's fear is evidentiary of

12   the knowledge of the defendants concerning the impact of their

13   statements, their various statements.  That is the step by

14   step.

15        Now, am I going to play that out in my instructions to

16   the jury?  No, I'm not.  I am simply going to say themes and

17   variations of, "You look to what the defendants knew and

18   understood about the impact of their statements and actions

19   upon the victim."  That is what I am going to say.

20        Now, Mr. Tumposky has got some concerns that he may

21   refine a bit as to particular pieces of evidence, and I will

22   look at it when he offers it up.  But right now I don't think

23   that I have before the jury any bad-act evidence that has been

24   introduced for simply bad acts.  What I have is evidence that a

25   jury could find of prior violent activity that was communicated

1    in some fashion to Mr. Torosyan as a result of the nature of

2    the relationships and so on.

3            So, any other issues that you would like me to --

4    obviously, I am going to look more carefully at the materials

5    that have been filed this morning and yesterday afternoon.

6            MS. KAPLAN:  Not from the Government.  No, your Honor.

7            THE COURT:  Mr. Cruz, anything else?

8            MR. CRUZ:  No.  Thank you, your Honor.

9            THE COURT:  As I said, there have been sneak previews

10   of argument in this case.  You are going to get the chance to

11   argue legitimately on Monday, but that is what you are going to

12   do.  What I am going to do is provide this general framework.

13           MR. CRUZ:  No.  I understand, your Honor.  For

14   purposes of the record, I would, with regard to the Rule 29,

15   the Court is denying at this point, correct?

16           THE COURT:  Not yet.

17           MR. CRUZ:  Or not taking action on it?

18           THE COURT:  No, I am not taking action on it.  I want

19   to be able to review it with the full record, if it comes to

20   that there, with a period of reflection on it.  But I am going

21   to let the case go to the jury.

22           MR. TUMPOSKY:  Well, there's the issue of Enmons and

23   the claim of right defense that I raised, your Honor, also.

24           THE COURT:  Don't count on it.

25           THE COURT REPORTER:  Could you repeat that, please.

1          MR. TUMPOSKY:  Enmons, E-N-M-O-N-S, and the claim of

2    right defense.

3          THE COURT:  I understand the hope and aspiration of

4    defense counsel in white-collar cases that there is going to be

5    an eradication of some white-collar initiatives in the future.

6    I will look at it again, but do not expect that you are going

7    to get any help from me regarding that, legal help.

8          MR. TUMPOSKY:  Well, there is more traditional

9    employment contracts that I would be framing.

10         THE COURT:  See, I do not buy the idea that this is --

11   and maybe we are talking at cross purposes or in a parallel

12   way -- that the Hobbs Act is just a union case, that Green

13   doesn't have radiations elsewhere, that the Hobbs Act I think

14   deals, obviously, with union matters but also can be held to

15   deal with what I will call private economic matters.  Now,

16   somebody somewhere may say, "This is madness.  The Federal

17   Government ought not to be involved in threats in this

18   context," but we are not there yet, or nobody has told me that

19   yet.  People examine the entrails of various Supreme Court

20   cases and assume that it augers well for their case, and maybe

21   it does, but the Supreme Court is going to have to examine the

22   entrails.

23         My view is that we are still in a position where this

24   kind of case law is not going to affect my charge to the jury.

25   If there is something more specific you want to hear me say --

1   you are not likely to hear me say, "Claim of right means..."  I

2   am just not going to do it.  As I said, it is hopeful in this

3   area for particularly white-collar defense people and then

4   maybe when you are dealing with not quite white-collar but in

5   an economic context people raise it.  I do not think I am going

6   to do it.  You can make whatever arguments you want to make,

7   but you may be undercut to some degree when I say that is not

8   the standard.

9           Okay.  Anything else?  So, we will get the draft of

10  the redacted Indictment to go to the jury, and I may suggest

11  some additional changes in it, but I think you understand what

12  it is that I want.

13          MS. KAPLAN:  I do.

14          THE COURT:  I just want the jury to understand they

15  have got four different counts, and here is basically what the

16  Government is charging so that they do not say, "Now, Three,

17  does that mean $1,500, or does that mean $2,000?"  So it will

18  be clear in the Indictment that goes to them.  All right?

19          So, we have a couple of short witnesses, brief

20  witnesses?

21          MS. KAPLAN:  So, a couple of things.  I do have the

22  two 302s -- well, I have all three 302s of Victor Torosyan by

23  the FBI Agents so you can see the prior consistent and prior

24  inconsistent statements.

25          THE COURT:  Right.

1          (Documents provided to the Court by Ms. Kaplan)

2          THE COURT:  With respect to the prior consistent

3     statements --

4          MS. KAPLAN:  They are highlighted.

5          THE COURT:  -- is there going to be argument about

6     this?  You played up this prior inconsistent statement.  I

7     don't know what the agents is going to say, but I am going to

8     assume he is going to say, "Sounded like he said 'borrow' to

9     me."

10          MR. CRUZ:  Your Honor, I brought this issue up during

11     the cross-examination.

12          THE COURT:  Right.

13          MR. CRUZ:  My intention is simply to ask the agent

14     whether or not that's what Mr. Torosyan told him, and then my

15     intent would be to argue to the jury, if that was an

16     inconsistent statement, that affects their view or potentially

17     affects their view of what is being alleged in Counts Three and

18     Four.

19          THE COURT:  Right.  So, then there are other

20     statements that do not quite, as I quickly go through this,

21     other statements that do not quite go as far as you would like

22     to go with that from Mr. Torosyan.

23          So, for example, I'm looking at the 302 with a date of

24     entry of 3/14/16.

25          MR. CRUZ:  Mm-hmm.

1       THE COURT:  It says, "The checks Torosyan knew were

2   not authorized were Checks 1190 and 1191."

3       MR. CRUZ:  Mm-hmm.

4       THE COURT:  So, Mr. Torosyan has come down firmly on

5   both -- assuming that this is what the testimony is going to be

6   -- he has come down firmly on both sides with predictable

7   impact on his anatomy when you come down on both sides of a

8   fence.  But that is fair game, it seems to me, to bring out the

9   prior consistent statements at the same time as the prior

10  inconsistent statements.

11      MR. CRUZ:  I understand, your Honor.  Thank you.

12      THE COURT:  All right.  So, they will simply be before

13  the jury for their evaluation of his testimony here.  But these

14  statements are not substantive evidence; they are evidence that

15  can go to the credibility of the statement that he made here in

16  his testimony.  All right?

17      MR. CRUZ:  Mm-hmm.

18      MR. TUMPOSKY:  The only other issue is I did propose

19  specific language on the defendant's right not to testify that

20  I would ask the Court to include.

21      THE COURT:  You heard what I did to the jury at the

22  beginning.  I tend to do something like that again.  It is not

23  that I have pride of authorship, but I generally don't adopt

24  people's ways of characterizing.  If there is something that I

25  missed there or some different formulation that is critical,

1   then I will consider it, but I am going to give them an

2   instruction of the right not to testify, and it will be

3   something like the instruction that I gave to the jury during

4   the course of the jury selection.

5            Okay.  Anything else?

6            MS. KAPLAN:  Just a housekeeping matter.

7            THE COURT:  Sure.

8            MS. KAPLAN:  I did provide to Ms. Beatty this morning

9   a copy of JERS, and it contains all of the Government's

10  exhibits.  I was not sure what your practice was.  Ms. Beatty

11  thought maybe I should have the defendants' exhibits on JERS.

12           THE COURT:  The ultimate thing that goes to the jury

13  has to be both, but, apart from pronouncing broad generalities,

14  I leave implementation to Ms. Beatty.

15           MS. KAPLAN:  So, I would just ask for the defendants

16  to get us their exhibits.

17           THE COURT:  All right.

18           MR. TUMPOSKY:  I don't think I actually ended up

19  offering any, but there was also the issue of the juror who I

20  notified the Court --

21           THE COURT:  Oh, I'm sorry.  Yes.  I am not sure I

22  understand.  You said the juror -- your colleague, I guess,

23  told you the juror in Seat Number Seven --

24           MR. TUMPOSKY:  Actually, I was incorrect.  It was the

25  far back row closest to the audience.  So, that would be Seat

1    Number Nine, I suppose.

2            THE COURT:  Boy, that is one I have not seen.  As I

3    indicated, I have observed but satisfied myself that two jurors

4    who seemed at some point not to be looking directly at the

5    witness were nevertheless absorbing information and just that

6    was their way of doing it.  Now you said juror in Seat Number

7    Nine, who is Mr. XXXXX, who is the seat closest to the --

8            MR. TUMPOSKY:  Back row closest to the audience, yes.

9            THE COURT:  That is the one that you are concerned

10   with?

11           MR. TUMPOSKY:  Yes.  I went back just to make sure I

12   understood what seat number it was.  I spoke to her, and that's

13   what she said.

14           THE COURT:  And she said that she observed him falling

15   asleep?

16           MR. TUMPOSKY:  That he was asleep from 2:00 to 2:30,

17   during the direct of Saba.

18           THE COURT:  Boy, I can't say that I observed that, but

19   I can't say that I was focused on that.  Do the other parties

20   have any view or anything they --

21           MS. KAPLAN:  Well, I certainly didn't, but I've asked

22   Agent Nelson, who has been sitting in the back, and he said he

23   didn't see any jurors sleeping, but I don't think specifically

24   he saw that -- was looking at that juror.

25           THE COURT:  Okay.  Mr. Cruz, anything?

1          MR. CRUZ:  Your Honor, I didn't observe.  I was

2     focused on the witness at that point.

3          THE COURT:  Okay.  So, here is where I will leave it:

4     You think about it over the weekend.  If the parties are

5     agreeable to having him one of the alternates, I can deal with

6     it that way, but everybody has to agree to that.  If not, and

7     you want to press it, then I will have to evaluate the

8     testimony with respect to it against what else I know in the

9     case.  That means bringing in your colleague to testify with

10    respect to that.  So, you can all think about what you want to

11    do with it.

12          What I would otherwise do, ordinarily do, is take the

13    two individuals who were identified in the process as the

14    alternates and excuse them.  So, Mr. XXXXXXXXX and Ms. XXXXX

15    would otherwise be excused as the jurors.  If Mr. XXXXX were

16    excused, then I guess Mr. XXXXXXXXX would become the next

17    juror, would fill the space.  So, again, I am not going to

18    force you to make a decision right now, but that is the process

19    that I would follow, and I probably would do it, make the

20    inquiry and make findings after we complete the evidence but

21    before closings start.  So, think about whether that is

22    something that you want to press, given the procedural

23    dimensions of it.  And there is, as always, strategic

24    evaluation of what is coming over the hill after Mr. XXXXX

25    departs, if he departs.  Okay?

1          MR. TUMPOSKY:  Yes.

2          MS. KAPLAN:  Yes, your Honor.

3          MR. CRUZ:  Thank you.

4          THE COURT:  All right.  So, we will see you Monday

5     morning.

6          THE CLERK:  All rise.

7      (The Honorable Court exited the courtroom at 10:08 a.m.)

8        (WHEREUPON, the proceedings adjourned at 10:08 a.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                    C E R T I F I C A T E

3

4

5            I, Brenda K. Hancock, RMR, CRR and Official Court

6    Reporter of the United States District Court, do hereby certify

7    that the foregoing transcript constitutes, to the best of my

8    skill and ability, a true and accurate transcription of my

9    stenotype notes taken in the matter of *United State of America*

10   *v. Tkhilaishvili, et al.*, No. 1:16-cr-10134-DPW.

11

12

13

14

15   Date:    04/30/18              /s/ *Brenda K. Hancock*
                                    Brenda K. Hancock, RMR, CRR
16                                  Official Court Reporter

17

18

19

20

21

22

23

24

25