UNITED STATES DISTRICT COURT
                    DISTRICT OF MASSACHUSETTS


    UNITED STATES OF AMERICA            )
                                        )
                                        )
    vs.                                 )
                                        )  No. 1:16-cr-10134-DPW
                                        )
    DAVID TKHILAISHVILI AND             )
    JAMBULAT TKHILAISHVILI,             )
                                        )
                    Defendants.



    BEFORE:  THE HONORABLE DOUGLAS P. WOODLOCK


                        SENTENCING HEARING




            John Joseph Moakley United States Courthouse
                        Courtroom No. 1
                        One Courthouse Way
                        Boston, MA 02210
                    Thursday, September 14, 2017
                            2:35 p.m.




                    Brenda K. Hancock, RMR, CRR
                        Official Court Reporter
            John Joseph Moakley United States Courthouse
                        One Courthouse Way
                        Boston, MA 02210
                        (617)439-3214

1    APPEARANCES:

2        UNITED STATES ATTORNEY'S OFFICE
         By: AUSA Laura Kaplan
3        John Joseph Moakley Federal Courthouse
         1 Courthouse Way
4        Suite 9200
         Boston, MA 02210
5        On behalf of The United State of America.

6
         FEDERAL PUBLIC DEFENDER OFFICE
7        By: Oscar Cruz, Jr., Esq.
         District of Massachusetts
8        51 Sleeper Street
         5th Floor
9        Boston, MA 02210
         On behalf of the Defendant.
10

11       HEDGES & TUMPOSKY, LLP
         By: Michael L. Tumposky, Esq.
12       Suite 600
         50 Congress Street
13       Boston, MA 02109

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (The following proceedings were held in open court

 2    before the Honorable Douglas P. Woodlock, United States

 3    District Judge, United States District Court, District of

 4    Massachusetts, at the John J. Moakley United States Courthouse,

 5    One Courthouse Way, Courtroom 1, Boston, Massachusetts, on

 6    Thursday, September 14, 2017):

 7              THE CLERK:  All rise.

 8         (The Honorable Court entered the courtroom at 2:35 p.m.)

 9              THE CLERK:  This Honorable Court is now in session.

10    Please be seated.  Criminal Action Number 16-10134, United

11    States v. Tkhilaishvili.

12              Alex, please raise your right hand.

13              (Interpreter duly sworn by the Clerk)

14              THE CLERK:  Please be seated.

15              THE COURT:  Well, I have received a series of

16    materials recently, and so I want to be sure that I have

17    identified what is outstanding here.  I have received a

18    supplement to Jambulat Tkhilaishvili's Motion for Judgment of

19    Acquittal.  There has not been a response by the Government to

20    the original motion and nor, obviously, much time for the

21    second one.

22              MS. KAPLAN:  No.  It was served yesterday, your Honor,

23    but I can certainly orally argue it.  I think it is completely

24    distinguishable.

25              THE COURT:  Well, maybe we will hear oral argument.
```

1    But on the earlier Motions for Judgment of Acquittal there was

2    no opposition filed; not that it is an opposition, but no

3    explanation.

4          MS. KAPLAN:  Oh, I see.  I don't even remember that

5    they filed a written --

6          THE COURT:  May 4th and May 5th.

7          MS. KAPLAN:  Well, I will certainly file something in

8    short order.

9          THE COURT:  Well, we will talk about it, I think, but

10   I want to be sure that I have got all the papers, and it may be

11   that it is necessary to talk about it before reaching a final

12   conclusion here.  Jambulat Tkhilaishvili has also asked for a

13   Motion to Supplement, and obviously I am going to allow that on

14   the Motion for Judgment of Acquittal.  Jambulat has filed a

15   Sentencing Memorandum, and I believe that is all for Jambulat.

16          Is that right, Mr. Tumposky?

17          MR. TUMPOSKY:  There were two attachments, your Honor.

18          THE COURT:  Attachments to the memorandum itself?

19          MR. TUMPOSKY:  Two letters, yes.

20          THE COURT:  Right, from James Tkhilaishvili and Mia

21   Shvarts?

22          MR. TUMPOSKY:  Exactly.

23          THE COURT:  All right.  So, we have those.  And then

24   with respect to David I have the defendant's Sentencing

25   Memorandum, a Motion for Leave to File Late Objection to the

1   Final Presentence Report, and I think Probation has responded

2   to that, Mr. Cruz, haven't they?

3           MR. CRUZ:  Your Honor, I don't know that they have --

4   well, they've responded with regard to the objection having to

5   do with the monies.  I think it was the $11,000, or I believe

6   it was the $11,000.

7           THE COURT:  Right.  Well, is there anything else

8   outstanding as a result of this late filing?

9           MR. CRUZ:  I don't think so.  I think everything is

10  before the Court, your Honor, on that issue.

11          THE COURT:  Okay.  And I have received yesterday a

12  collection of letters on behalf of David Tkhilaishvili.

13          MR. CRUZ:  Yes, your Honor.

14          THE COURT:  All right.  So, have I identified all of

15  the materials that I should have here, all the written

16  materials?

17          MR. CRUZ:  Yes, your Honor.

18          THE COURT:  Okay.  So, let me just perhaps frame the

19  issue, although I obviously am not going to go anywhere until I

20  resolve the judgment-of-acquittal issues.

21          But with respect to Jambulat Tkhilaishvili, I do not

22  see that there are any objections that I need to resolve here,

23  and what we are dealing with, by the numbers, is a Total

24  Offense Level of 20 and Criminal History Category of I, which

25  generates a guideline range of 33 to 41 months in prison, 1 to

1    3 years of supervised release, a fine of $15,000 to $150,000,

2    and a $200 Special Assessment.  Is that shared numbers?

3              MR. TUMPOSKY:  That is the applicable range, your

4    Honor.

5              THE COURT:  All right.  And I take it, Mr. Tumposky,

6    you and your client have fully discussed the Presentence

7    Report?

8              MR. TUMPOSKY:  Yes.

9              THE COURT:  And, Ms. Kaplan, I take it you agree as

10   well with respect to that?

11             MS. KAPLAN:  Yes, your Honor.

12             THE COURT:  So, then we turn to the question of David

13   Tkhilaishvili, and here for guideline purposes I understand

14   that the relevant guidelines are not disputed, although there

15   are claims with respect to other matters embedded in the

16   discussion.  But the guideline range for David Tkhilaishvili is

17   a Total Offense Level of 20, a Criminal History Category of II.

18   That leads to a guideline range of 37 to 46 months, supervised

19   release of 1 to 3 years, a fine of $15,000 to $150,000,

20   restitution, which is embodied in the Government's amended

21   proposed judgment here, of $14,000, and a Special Assessment of

22   $400.

23             I guess I want to be sure, Mr. Cruz, that I do this

24   properly.  I do not think the objection to the Criminal History

25   Category is an objection to the calculation; it is more an

1    objection to or suggesting that it overstates?

2            MR. CRUZ:  That's absolutely right, your Honor.

3            THE COURT:  Okay.  And then with respect to the

4    $14,000 --

5            MR. CRUZ:  Yes.

6            THE COURT:  -- that is an objection to the guideline

7    calculation?

8            MR. CRUZ:  As a technical matter, your Honor, it is an

9    objection, because it does affect the guideline for the

10   embezzlement counts, although it doesn't affect the overall

11   outcome, because that is not the guideline that controls under

12   the grouping provisions.

13           THE COURT:  All right.  But I think we probably should

14   take up the question of the calculation of restitution here as

15   an initial matter or a threshold matter.  So, let me

16   understand, because I do not believe the Government has filed a

17   Sentencing Memorandum, what the Government's recommendations

18   are going to be.

19           MS. KAPLAN:  With respect to both defendants, your

20   Honor, the Government is asking for incarceration at the high

21   end of the guidelines for each of them, for 3 years of

22   supervised release, a Special Assessment with respect to David

23   Tkhilaishvili of $400, $200 for Jambulat Tkhilaishvili, and

24   restitution in the amount of $14,000 as to David Tkhilaishvili,

25   and fines for both, I believe, in the amount of -- I think it's

1  $15,000, your Honor.

2  THE COURT:  And am I correct that this is consistent

3  with the current Administration's view that the guidelines are

4  to be adhered to, that is, the guideline sentence is supposed

5  to be imposed?

6  MS. KAPLAN:  Yes.

7  THE COURT:  That is going to be the Government's

8  recommendation in virtually all cases under the new

9  Administration, newish Administration?

10  MS. KAPLAN:  I don't know, your Honor, but I did plan

11  to articulate for you why I am asking for a high-ends guideline

12  as to each.

13  THE COURT:  Well, we will get to that.

14  So, let's go back, then, to Jambulat Tkhilaishvili and

15  his Motion for Judgment of Acquittal as supplemented most

16  recently in light of Burhoe.  Do you want to speak to that now,

17  Ms. Kaplan or not?

18  MS. KAPLAN:  The Burhoe issue, your Honor?

19  THE COURT:  Right.

20  MS. KAPLAN:  Yes.  I think that this is taking what --

21  we're also trying to digest what the First Circuit said in that

22  case, but I think it's taking what they said with respect to

23  this matter way too far.  The issue in Burhoe and the property

24  in Burhoe was very different than here.  It involved LMRDA

25  rights as well as wages and benefits, and I think that what

1  happened was that the First Circuit felt that the Government

2  did not identify what the property actually was.  It was not

3  the issue -- well, with respect to one victim, Eddie

4  Flaherty --

5          THE COURT:  But I am less concerned about the facts of

6  Burhoe than the language that Judge Torruella used here, which

7  is somewhat broad but does not directly address itself to these

8  particular facts.

9          If I might frame it, number one, the property here is

10  interest in the business, and that is something that is

11  transferrable, that was the whole point, and it is something

12  that was directed by the defendants through conspiracy here or

13  attempted to be directed.  That is the gist of the distinction,

14  isn't it --

15          MS. KAPLAN:  Yes.

16          THE COURT:  -- between this and Burhoe?

17          MS. KAPLAN:  Yes.  And, specifically, that the

18  property here, we know what the property was, and that with

19  respect to some of it the property was supposed to go into

20  David Tkhilaishvili's hands.  So, we know exactly -- so, it

21  went into the hands of the defendant.  Now, with respect to

22  whether --

23          THE COURT:  But to be directed to somebody else.

24          MS. KAPLAN:  Well, I believe there was also testimony

25  that they wanted 40 percent of any of the -- that Mr. Torosyan

1    give up his priority distribution right, and that he give

2    40 percent of any clinic funds available for distribution to

3    David Tkhilaishvili.  So, that's first, that there was a direct

4    benefit to the defendants.

5           But also with respect to monies being directed or

6    interest being directed to Saba, who was the third party, I

7    think it's clearly distinguishable from Burhoe, because we know

8    exactly where that money was going to go; whereas, in the

9    Burhoe case it was not so clear where the property was going to

10   go.

11          THE COURT:  Well, as to the second part of it, the

12   Government's position on this I assume in the wake of Burhoe,

13   so long as the defendant exercises sufficient dominion and

14   control over the property as to be able to direct it to

15   whatever place he wants to direct it to, then --

16          MS. KAPLAN:  Yes, that the law in Green is still the

17   law.

18          THE COURT:  The question that is raised by Burhoe, I

19   suppose, is the reach and maybe underlined the continued

20   vitality of Green, although not explicitly; nor could it be

21   explicitly challenged by the First Circuit.

22          MS. KAPLAN:  But, again, I think that part of the

23   problem that they had was, as Mr. Tumposky says in his motion,

24   that they say the Government couldn't show the defendant

25   controlled the property and received an unidentifiable benefit.

1    They struggled with what exactly the property was in <u>Burhoe</u> as

2    well, which led to some of the problem.

3          THE COURT:  So, Mr. Tumposky, you have some language,

4    not altogether clear as it applies to this case, from the Court

5    of Appeals.  It seems to me that the labor cases in the

6    Hobbs Act context are going to generate some activity on the

7    part of the Supreme Court ultimately.  I do not know what the

8    Government's intentions are with respect to <u>Burhoe</u>.  There is a

9    Second Circuit matter that is argued this month -- maybe it has

10   already been argued as well -- but the labor cases are a little

11   bit different from the kind of traditional Hobbs Act cases.

12         MR. TUMPOSKY:  Well, they are different in the context

13   that certain types of threats are perhaps more privileged in

14   the labor context than they would be in a non-labor context.

15   But in terms of the definition of "property" and what it means

16   to obtain property, there is no distinction --

17         THE COURT:  So, then, maybe we will look at it this

18   way:  Any question that there was property involved here, an

19   interest in a business?  That is not property?

20         MR. TUMPOSKY:  No, that is.

21         THE COURT:  And it is property that can be

22   transferred?

23         MR. TUMPOSKY:  Yes.

24         THE COURT:  So, we don't have a property problem, or

25   do we?

1          MR. TUMPOSKY:  No.  What we have is an obtaining

2     problem.

3          THE COURT:  So, now the obtainment problem, if I

4     understand what you are saying, is it has to go directly to a

5     defendant; is that it?

6          MR. TUMPOSKY:  I would suggest that Burhoe could be

7     read that way.  It could also be read to suggest there must at

8     least be a direct benefit to the defendant.  It's not, quite

9     frankly, 100 percent clear.  In this case as to Jambulat

10    Tkhilaishvili I disagree with the Government's contention that

11    actually the testimony about splitting profits ever developed

12    at trial.  That was mentioned in some of the papers in the

13    case, but I don't believe the victim ever testified to that.

14         THE COURT:  Let's assume that it was not for a moment.

15    If that is going to be critical, then we are going to get the

16    transcript to deal with it first.  But let's assume that it is

17    simply this, which is I think the minimum model of what

18    Ms. Kaplan was talking about, and that is the defendant or the

19    conspirators or the leading conspirator directs that a piece of

20    property go from one person to another and uses extortionate

21    means to obtain that.  Why isn't that within Hobbs Act?

22         MR. TUMPOSKY:  Well, what Burhoe had was a situation

23    where a union boss, I guess you would call him, threatened

24    employees to get them to transfer certain wages and benefits to

25    employees that he wanted to have those benefits.

1          THE COURT:  Well, Burhoe went off on the earlier or

2     the antecedent question -- went off in part on the antecedent

3     question what was it that was being transferred here.

4          MR. TUMPOSKY:  That's part of the question, yes.

5          THE COURT:  And that is where it comes in the labor

6     context, which has become perhaps ambiguous, perhaps was

7     ambiguous from the beginning, but ambiguous now.  But that does

8     not seem to be the case here.  We have got real property that

9     is being directed by the conspirators.  Whatever "right to

10    wages" means in the context of Burhoe is not really relevant

11    here.

12          MR. TUMPOSKY:  Well, I think it's relevant because the

13    Court identified that as a property interest, just the Court in

14    -- excuse me, I'm blanking on the first case -- it's Sekhar and

15    the other Supreme Court case, Scheidler, identified that there

16    was a property interest and that the defendants in that case

17    had attempted to deprive the victim of that property interest.

18          THE COURT:  Well, no, I think it was a little less

19    clear than that, and certainly such property interest as it

20    existed was attenuated from the attainment dimension.

21    Something else was going on other than the traditional transfer

22    of property, I think, in this context.

23          So, here I am faced with this:  There is property.  I

24    recognize that.  The jury could have found that there was

25    property, and I do too, and the defendant's conspiracy seeks to

1    direct that property to go to someone else.  There may be more

2    involved than Ms. Kaplan has alluded to.  But on that minimum

3    model I do not know how I can say that there is not a Hobbs Act

4    violation in the non-labor context.

5          MR. TUMPOSKY:  Because in the context of obtaining,

6    your Honor, I don't think there is a distinction between the

7    labor and non-labor context, and the Court seems to be and the

8    First Circuit agrees that the Supreme Court is turning away

9    from the sort of third-party extortion, that what you are

10   describing is a crime of coercion, which is not covered by the

11   Hobbs Act.

12         THE COURT:  No.  Well, I am not going to speak for the

13   Supreme Court, but I have a feeling that the Supreme Court is

14   speaking to particular kinds of concerns and particular kinds

15   of activities.  But I am not sure that the Supreme Court, when

16   faced with what I will call "classic Hobbs Act extortion," is

17   going to be indulgent of it.

18         The short of it is I do not see that as a grounds,

19   certainly not a grounds I am going to take up.  I would be less

20   than candid if I did not recognize that this is a yeasty area

21   now, become yeasty as a result of labor issues.  Perhaps one

22   way of looking at Enmons is Justice Stewart knew it when he saw

23   it, but it was a little difficult for him to communicate

24   precisely what the standards were for it.

25         That is all above my salary bracket.  The short of it

1    is there is a Hobbs Act violation, it is at the core of this,

2    and this is a classic, and I do not think, while there is some

3    language in Burhoe that perhaps is somewhat Delphic if it is

4    applied to other contexts, I do not see this as a case that is

5    subject to acquittal on that ground.

6         So, is there anything else from your acquittal motion?

7         MR. TUMPOSKY:  I have several other grounds, your

8    Honor.

9         THE COURT:  Do you want to talk to them a little bit,

10   and I will see whether or not I want to hear from Ms. Kaplan

11   about them?

12        MR. TUMPOSKY:  So, the first issue that I raised

13   initially was this issue of interstate commerce.

14        THE COURT:  How can there be really any question about

15   interstate commerce here?  We are dealing with all kinds of

16   commodities that are being used in interstate commerce.

17        MR. TUMPOSKY:  No, we do, because the extortion was

18   from a person, not from a business, your Honor.

19        THE COURT:  But it is the impact under those

20   circumstances, isn't it?

21        MR. TUMPOSKY:  It is, but the fact that the business

22   purchased drugs or supplies from out of state I don't think is

23   relevant.  The issue is whether there is sufficient proof that

24   the depravation, if successful, would have caused an impact on

25   interstate commerce because of the victim's connections to

1   interstate commerce, and the key issue here is the value of the

2   asset that was sought.  The evidence at trial was undisputed

3   that the value of the clinic was then, and perhaps even still

4   is now, worthless.  They had not made a penny, in fact, they

5   were losing money.  At the time of trial they still had not

6   turned a profit.  And the victim himself testified, and I think

7   the Court can credit this, should credit this as dispositive,

8   that the clinic was worthless.  And so, a transfer of a

9   percentage of a worthless asset, a piece of paper, from one

10  person to another, that's not going to impact interstate

11  commerce.

12          THE COURT:  Well, I think I understand the argument.

13  I have to reject it.  So, what else?

14          MR. TUMPOSKY:  I think we addressed the two main

15  arguments, your Honor.

16          THE COURT:  All right.  So, I am formally going to

17  deny the Motion for Judgment of Acquittal by Jambulat

18  Tkhilaishvili, after having considered as well the supplement

19  and the new perspectives that are thrown on this by the Burhoe

20  decision, but none of them satisfy me that there is not

21  sufficient evidence here for a finder of fact to find, and I

22  also find by a somewhat different standard, that all of the

23  elements are met.  I say a "somewhat different standard,"

24  because, of course, it impacts the way in which I would have to

25  evaluate the case for purposes of sentencing.

1        So let's, then, turn to the Motion for Judgment of

2   Acquittal with respect to David Tkhilaishvili.  I am not sure

3   that as to Counts One and Two there is anything new that you

4   have to add beyond what Mr. Tumposky offered.

5        MR. CRUZ:  That's correct, your Honor.  And, for the

6   record, Mr. Tumposky had filed that supplement regarding the

7   Burhoe decision yesterday.  I just want to note for the record

8   that I'm joining in that argument as well.

9        THE COURT:  All right.

10        MR. CRUZ:  Your Honor is correct with regard to Counts

11   One and Two.  With regard to Counts Three and Four having to do

12   with embezzlement, your Honor, I would reiterate the argument

13   that we made previously, which is that the issue of whether or

14   not the clinic at the time of the embezzlement, Counts Three

15   and Four, was a health care benefit program falls squarely on

16   whether or not the clinic had been contracted with Medicare

17   and --

18        THE COURT:  If I can, what is the standard that you

19   want to apply here, some sort of bright line when the contract

20   is actually signed?

21        MR. CRUZ:  Well, when the clinic itself starts

22   receiving reimbursements for having treated patients.

23        THE COURT:  But doesn't the case law out there suggest

24   a much more functional approach to it; that is, if this would

25   receive benefits then it comes within the scope?

1          MR. CRUZ:  Well, I think in terms of the -- the

2     embezzlement count is specific to November of 2015.

3          THE COURT:  Right.

4          MR. CRUZ:  And I think the issue as it was charged in

5     that way is whether or not the clinic itself had contracted

6     with these insurance carriers and was receiving these

7     reimbursement payments at the time of the alleged offense

8     conduct, and there's no evidence to support that, your Honor.

9          THE COURT:  Well, did they ever receive reimbursement?

10         MR. CRUZ:  They would have received reimbursement

11    after they had received those letters in January and thereafter

12    of 2016 indicating that the contracts with the insurance

13    carriers had been approved.  Then they could submit requests

14    for reimbursement at that point.

15         THE COURT:  So, the thrust of it is, if at the time

16    that the service was rendered --

17         MR. CRUZ:  Yes, your Honor.

18         THE COURT:  -- there was not in place an enforceable

19    agreement to pay for it --

20         MR. CRUZ:  Yes, your Honor.

21         THE COURT:  -- then it comes out -- from your

22    perspective is outside of this kind of embezzlement?

23         MR. CRUZ:  Yes, your Honor, because I don't think it

24    can be defined as a health care benefit program if no benefit,

25    quote, unquote, is passing to a patient and being reimbursed by

1   an insurance carrier.

2           THE COURT:  Do you want speak to that?

3           MS. KAPLAN:  Yes, your Honor.  I don't know what case

4   Mr. Cruz is referring to.  The definition is in 18 U.S.C.

5   Section 24(b), which defines a "health care benefit program,"

6   and it clearly states that the contract just needs to be in

7   place, and the contracts were in place as early as July for

8   Medicare, the Medicare contract, and then in November came -- I

9   believe it was November came the MassHealth.

10          THE COURT:  All right.  But let's just take the

11  particular transactions that are involved here.

12          MS. KAPLAN:  Okay.  So, the $5,000 and $6,000 --

13          THE COURT:  But those were not charged.

14          MS. KAPLAN:  They were not charged.

15          THE COURT:  So, let's talk about the ones that were

16  charged first.  Then we will go to the other ones.

17          MS. KAPLAN:  Okay.  So, those were monies that

18  Mr. Tkhilaishvili took, I believe, in November, and so there

19  was two contracts in place.

20          THE COURT:  So, if I may, any time he takes money and

21  the business is related in some fashion to a health care

22  program, then that is subject to embezzlement?

23          MS. KAPLAN:  Yes, as long as the definition of 24(b)

24  is met, which is that there is a contract in place, and it says

25  "which payment may be made under the plan or contract."  "May

1    be made."  There is nothing that says that payments or

2    reimbursements have to have been made.  There has to be a

3    contract in place, and there were.

4          THE COURT:  Would the clinic at that time have a right

5    to enforce payment on its services?

6          MS. KAPLAN:  Yes, I believe so.

7          THE COURT:  How?

8          MS. KAPLAN:  From the time that the contract is signed

9    and in place, from the time they get an executed contract with

10   Medicare or with Harvard Pilgrim, if they have rendered

11   services after that time period --

12         THE COURT:  Why was there the lag?

13         MS. KAPLAN:  What lag?

14         THE COURT:  The lag between this kind of payment and

15   the authorization right.  Let me just understand that more

16   fully.

17         MS. KAPLAN:  I'm not sure I'm following your question.

18         THE COURT:  Well, you have got a payment made on

19   November 3rd of $1,500; then you have a payment made of $2,000.

20   You do not have any income coming in from the insurers, right,

21   during that time period?

22         MS. KAPLAN:  Okay.

23         THE COURT:  Did we have evidence that, in fact, there

24   were payments made thereafter?

25         MS. KAPLAN:  So, there had been clients seen who had

1    submitted claims and that Allied Health would have gotten

2    reimbursed, you mean?

3             THE COURT:  Yes.

4             MS. KAPLAN:  As I am sitting here right now, I can't

5    remember if we did have that evidence.

6             THE COURT:  Well, let's assume that they did not, not

7    that I am saying that they did not.  Let's assume that they did

8    not, and so what we have is a contractual provision that says

9    "may be paid" is the triggering event.

10            MS. KAPLAN:  Yes.

11            THE COURT:  And here they have a contract that says,

12   "We could be paid," but no evidence that they were, in fact,

13   paid.

14            MS. KAPLAN:  I believe that the evidence was --

15            THE COURT:  I am assuming for a moment that there was

16   not.

17            MS. KAPLAN:  That there were not.  I still think that

18   it's money that's available to them under a health care benefit

19   program, and those monies are health care monies.

20            THE COURT:  So, a "health care benefit program," if I

21   understand it from your perspective, is a business that has

22   contracts with one of these entities to receive reimbursement?

23            MS. KAPLAN:  It "means any public or private plan or

24   contract...under which any medical benefit, item or service is

25   provided to any individual."

1          THE COURT:  "Is provided."

2          MS. KAPLAN:  Right.  And then it says "any individual

3    or entity who is providing a medical benefit..." and ..."which

4    payment may be made under the plan or contract."

5          THE COURT:  How do I know that they were providing to

6    an individual a medical benefit for which payment would be

7    made?

8          MS. KAPLAN:  Well, that was what the business was.

9    They weren't doing anything else.  And I believe there was

10   testimony that they started seeing patients in November, so

11   they were providing health care benefits.

12         THE COURT:  If they were not.

13         MS. KAPLAN:  If they weren't providing health care

14   benefits?

15         THE COURT:  I am asking more a factual-sufficiency

16   question.

17         MS. KAPLAN:  Right.  I still think that whatever

18   monies are there in that account, once they have those

19   contracts in place, they are a health care benefit program,

20   regardless of whether they have opened their doors and started

21   seeing patients or not.  Those monies are dedicated to and

22   devoted to a health care program.

23         THE COURT:  Where did the monies come from?

24         MS. KAPLAN:  Victor Torosyan.

25         THE COURT:  So, these are misapplications of monies,

1    funds, securities, premiums...or other assets of a health care

2    program, and they are assets because they are capital that is

3    provided by Mr. Torosyan?

4          MS. KAPLAN:  Yes.

5          THE COURT:  Do you want to speak to that?

6          MR. CRUZ:  Your Honor, just briefly.  The contracts

7    are not in place until after the first of the year, January in

8    2016.

9          THE COURT:  Well, what was signed in July?

10          MR. CRUZ:  What was done in July is applications were

11   made with regard to Medicare, and then there was a later

12   application to Harvard Pilgrim Health that was contingent on

13   Department of Public Health certification.

14          THE COURT:  So, the point, I guess, is that you have

15   triggering events, and your triggering event is approval of the

16   application; is that it?

17          MR. CRUZ:  Triggering event, yes, is approval of the

18   application.  At that point I would suggest that reimbursements

19   can be made upon request by the clinic.  As the Court noted --

20          THE COURT:  Don't they do *nunc pro tunc*?

21          MR. CRUZ:  In terms of paying back, if you will, for

22   services provided?

23          THE COURT:  Right.

24          MR. CRUZ:  Again, your Honor, how the Court looks at

25   the evidence, I don't think there was any evidence provided to

1    the Court about that --

2         THE COURT:  Well, okay.  So, let me just suggest this

3    with respect to this aspect of it, which is I think facts are

4    important on this one.  I want to have the Government's

5    response as to these two counts, and I think -- well, there is

6    going to be a record created, so it should be the record, and

7    the Government can show me the evidence that you rely upon, and

8    Mr. Cruz can more clearly identify what -- not more clearly --

9    but with reference to the evidence actually submitted what we

10   do with Counts Three and Four.

11        MS. KAPLAN:  I don't have a problem with that, your

12   Honor.  I don't have the exhibits in front of me, but they were

13   in evidence before this jury.

14        THE COURT:  I understand there is a dispute about them

15   and a larger dispute that I think I would like to have

16   developed.

17        MS. KAPLAN:  Okay.

18        THE COURT:  I think it is possible to take the

19   position -- I think it is possible to argue the position that

20   there has to be a triggering event.  You are essentially saying

21   the triggering event is when they applied for this, right?

22        MS. KAPLAN:  No, I'm not.  I'm saying --

23        THE COURT:  Then, that is why I go back to this

24   earlier question.  Assume that they rendered these services at

25   this time and then sought reimbursement at that time.  Could

1    they be paid?

2         MS. KAPLAN:  Okay.  That I would have to look at the

3    contracts for, because I have a recollection that those

4    contracts do, in fact, address that issue.  But the triggering

5    event that we used was there was actually a contract in place,

6    and the evidence that we submitted, the Medicare, is a

7    contract, and it says, Medicare said, "You can now start

8    providing services, and we will reimburse you."  That's in

9    July.  And the second contract --

10        THE COURT:  I would really have to look at it.

11        MS. KAPLAN:  Okay.

12        THE COURT:  You say so.  I do not have a clear

13   recollection about it, and this may turn on precisely that.

14        MS. KAPLAN:  Okay.

15        THE COURT:  So, how long do you need to respond to it?

16        MS. KAPLAN:  I can get it to you early next week, your

17   Honor.

18        THE COURT:  Okay.  So, we will deal with that part of

19   it.  I think I may, however, address the question of sentencing

20   here, at least preliminarily, because I am not sure that it

21   turns on this, apart from the restitution, which we will get to

22   in just a second.  Does it?  It does not drive the guidelines,

23   does it?

24        MR. CRUZ:  Your Honor, you are correct.  Counts One

25   and Two, the Attempted Extortion and Conspiracy, are what

1   drives the guidelines here.

2           THE COURT:  And this is in addition to it.

3           MR. CRUZ:  Mm-hmm.

4           THE COURT:  All right.  So, let's talk about the, what

5   is it, $6,000 and $5,000 checks?

6           MR. CRUZ:  Yes, your Honor.

7           THE COURT:  Not that it is necessary, but why didn't

8   you charge it?

9           MS. KAPLAN:  Because we didn't realize at the time

10  that there was a Medicare contract that had already been

11  signed.  We didn't have --

12          THE COURT:  But you must have for purposes of the

13  other, Counts Three and Four.

14          MS. KAPLAN:  We did, and that came later, because we

15  had the Harvard Pilgrim contract, which I believe was signed in

16  November.  Whatever contract we had I believe was in November.

17  That's why we charged the November amounts.  It was completely,

18  you know, an oversight that we just didn't have that contract

19  or didn't realize that Medicare was, in fact, in effect as

20  early as July, and then the $5,000 and $6,000 came afterwards.

21          THE COURT:  Well, let me go back to that, then.  So,

22  this is depending on the Medicare contract, which is contingent

23  on the discussion that we have had already here --

24          MS. KAPLAN:  Yes.

25          THE COURT:  -- that I want more on that to get it

1    clarified.

2         But let me understand from Mr. Cruz, assume that this

3    is a Medicare contract.  Why isn't it related?

4         MR. CRUZ:  Assuming that it is -- well, your Honor,

5    it's not related because I don't believe that it is -- and if

6    we're talking about relevant conduct for purposes of the

7    guidelines, there is --

8         THE COURT:  We are thinking about two things.  We are

9    thinking, number one, about relevant conduct for purposes of

10   the guidelines.  That drives the number a bit.

11        MR. CRUZ:  Yes, your Honor.

12        THE COURT:  The second is forfeiture.

13        MR. CRUZ:  Yes, your Honor.  And, again, I think those

14   are separate issues.  If I can deal with the relevant conduct

15   issue first?

16        THE COURT:  Sure.

17        MR. CRUZ:  The argument that I would make to the

18   Court, essentially, is that the evidence before the Court that

19   was placed to the jury on those issues, again, the jury didn't

20   pass on them because they are not charged conduct, but the

21   Court heard conflicting evidence about whether that amount of

22   money, the $11,000, was lent to Mr. Tkhilaishvili or whether he

23   took it without Mr. Torosyan's knowledge and/or authorization.

24   And if the standard is the Government at this point has to

25   prove to the Court at a sentencing hearing under a

1    preponderance of the evidence that this was somehow related to

2    the offense conduct, I don't think they have made that

3    threshold showing based on the inconsistencies not only from

4    the testimony --

5            THE COURT:  Then, that is a question of factfinding by

6    me.

7            MR. CRUZ:  Yes, your Honor.

8            THE COURT:  Do I rely upon the testimony of

9    Mr. Torosyan?  Do I find it credible?

10           MR. CRUZ:  Yes, your Honor.  It's the testimony of

11   Mr. Torosyan, which I recall was that he said on the stand he

12   didn't know about Mr. Tkhilaishvili taking the money.  Then

13   there is the testimony of Special Agent Keith Nelson, who took

14   a statement from Mr. Torosyan stating that the money was lent

15   to Mr. Tkhilaishvili in the exact same increments, $5,000 and

16   $6,000, totalling $11,000.  Then the Government presented a

17   prior consistent statement where Agent Koch testified that he

18   reiterated that or stated at that point at a later date that

19   the monies were taken by Mr. Tkhilaishvili, that he didn't

20   authorize it.

21           I would suggest to the Court those are the facts.  The

22   Court can look at the prior consistent statement as, I would

23   argue, less credible than the initial statement when the

24   information was fresh in Mr. Torosyan's mind and he's telling

25   Agent Nelson --

1          THE COURT:  Maybe you will remind me of the chronology

2     here.

3          MR. CRUZ:  Yes, your Honor.

4          THE COURT:  Mr. Torosyan is interviewed by -- I forget

5     the other agent's name.

6          MR. CRUZ:  Agent Nelson.

7          THE COURT:  Nelson.  On what date?

8          MR. CRUZ:  That is February 5th of -- I'm sorry -- the

9     report is dated February 5th, 2016.

10          THE COURT:  And the interview with Agent Koch is when?

11          MR. CRUZ:  That is March 14th, 2016.

12          THE COURT:  So, about a month later?

13          MR. CRUZ:  Yes, your Honor.

14          THE COURT:  About, I should say, 13 months later; is

15     that right?  March of 2015?

16          MR. CRUZ:  I'm sorry, your Honor.  February 5th, 2015

17     to March 14th, 2016.

18          THE COURT:  Okay.  So, a month later.  All right.

19          MS. KAPLAN:  And I believe there was a second prior

20     consistent statement.  I believe that there were two.

21          THE COURT:  Let me tell you again I am not going to

22     pretend that I have mastered this, and I want to see the

23     transcript references to this.

24          MR. CRUZ:  Yes, your Honor.

25          THE COURT:  So, this is stuff that you should get the

1       transcript on, I think.

2                   MR. CRUZ:  Mm-hmm.

3                   THE COURT:  This is kind of for the Government as

4       well.  Get what you think is necessary for me to resolve these

5       kind of factual questions.

6                   MR. CRUZ:  Yes, your Honor.

7                   THE COURT:  So, we will put both the embezzlement and

8       the restitution forfeiture to one side for a moment.

9                   MR. CRUZ:  That's fine, your Honor.  But with regard

10      to the criminal forfeiture, there is one thing that I want to

11      add, that the statute that's referenced by the Government in

12      its request is 982(a)(7), and that specifically references a

13      Federal health care offense, and what I just want to note for

14      the Court is that the item that is subject to forfeiture has to

15      be "derived, directly or indirectly, from gross proceeds

16      traceable to the commission of the offense," and I believe that

17      references the offense of conviction that is stated in the

18      Indictment.

19                  THE COURT:  So, I am going to let you brief that as

20      well --

21                  MR. CRUZ:  That's fine, your Honor.

22                  THE COURT:  -- as an opposition to the Amended Motion

23      for Forfeiture --

24                  MR. CRUZ:  Yes, your Honor.

25                  THE COURT:  -- which was filed, I believe, yesterday.

1          MR. CRUZ:  Yesterday.  Yes, your Honor.

2          THE COURT:  So, let's sort through the schedule for

3    these two aspects of it, although I want to hear argument from

4    both parties as to sentence.

5          MR. CRUZ:  Yes.

6          THE COURT:  I want to get this so I am not getting

7    bits and pieces and it is coming at more or less the same time.

8    Ms. Kaplan said that she would be able to get this to me next

9    week, but there is evidentiary material I think that has to be

10   developed on aspects of it.  So, what is a more realistic time

11   for it?

12         MS. KAPLAN:  Well, if we need to get the transcript,

13   I'm not sure so.

14         THE COURT:  In the ordinary course the transcript

15   would be a month?

16         THE COURT REPORTER:  Yes.

17         THE COURT:  So, assume that the transcript ordered

18   today is available to you on the 16th of October, that is

19   Monday, the 16th, then can you have a response by October 23?

20         MS. KAPLAN:  On all the issues?

21         THE COURT:  On all the issues, yes.

22         MS. KAPLAN:  Yes.

23         THE COURT:  Okay.  Then, Mr. Cruz, October 30 for

24   response.

25         MR. CRUZ:  That's fine, your Honor.  Thank you.

1              THE COURT:  And then with respect to the narrower

2      issue or separable issue of the forfeiture amendment I think it

3      is probably better for you to file your opposition, Mr. Cruz,

4      by the 28th.

5              And then, Ms. Kaplan, you can respond -- what did I

6      have, the 23rd, October 23rd, for the other --

7              MS. KAPLAN:  November 23rd?

8              THE COURT:  October 23rd, didn't I, for the --

9              MS. KAPLAN:  He's filing October 28th.

10             THE COURT:  No, he is going to file on September 28th.

11             MS. KAPLAN:  Oh, September 28th.

12             MR. CRUZ:  That's fine, your Honor.

13             THE COURT:  Yes.  I am just trying to give you one

14     date to remember.

15             MS. KAPLAN:  Okay.  On 10/23 I will respond to that.

16             THE COURT:  Yes.  And you will get a reply on 10/30.

17             What we do by way of rescheduling -- well, I want to

18     hear preliminary argument.  I think it is not appropriate for

19     me to sentence Jambulat Tkhilaishvili and not David at the same

20     time, because they are comparators, and I do not want to have

21     dealt with Jambulat without dealing with David.

22             But let me understand the Government's position with

23     respect to at least so much as deals with the conspiracy and

24     the attempted extortion.

25             MS. KAPLAN:  So, do you want me to start with Jambulat

1    or --

2            THE COURT:  Both.

3            MS. KAPLAN:  -- both?

4            THE COURT:  It is just that I am not going to be

5    ruling on both of them today.

6            MS. KAPLAN:  I understand.  Okay.  So, I'll start with

7    David Tkhilaishvili.  And, again, the Government understands

8    that the Court has to look at the sentencing factors under

9    3553(a) in fashioning a sentence which is sufficient but not

10   greater than necessary to comply with the purposes of the

11   *Sentencing Guidelines*.  And, as I said, we are recommending a

12   sentence at the high end of the guidelines, and I will explain

13   why.

14            Looking at the nature and circumstances of this

15   offense, there's no question that the crime of extortion, in

16   general, is a serious offense and, in particular, this one.

17   Your Honor, you presided over the trial.  You heard about the

18   defendants' conduct.  With respect to the victim in this case

19   and the threats to harm him, to harm his family, to burn his

20   business down, this defendant made a decision to take the law

21   into his own hands and to take property from the victim that

22   was not his.

23            Looking at this particular defendant and his

24   particular role in the offense, we believe that a sentence at

25   the high end of the guidelines is appropriate for these

1    reasons:  First, the defendant threatened the victim's family,

2    and under *United States Sentencing Guidelines,* Section 2B3.2,

3    Application Note 8, it says that if the offense involved a

4    threat to a family member of the victim an upward departure may

5    be warranted.  So, I am not asking for an upward departure, but

6    I am asking for a high end of the guideline sentence.

7         Second, immediately prior to the trial your Honor may

8    recall that the defendant reached out to a witness in the case

9    in direct violation of the Court's Order not to have contact

10    with any witnesses.  He, in fact, gave this witness money,

11    which the Government views as an attempt to tamper with a

12    witness.

13         Similarly, your Honor may recall that after that

14    occurred and during the trial this defendant again disobeyed

15    your Honor's instructions and order not to have contact with

16    any witnesses or persons connected with the case, and he

17    approached the person that had come to court with Mr. Torosyan

18    and told him that Mr. Torosyan was a liar; and we, again, view

19    this as yet another attempt to intimidate this individual as

20    well as Mr. Torosyan in direct contradiction to your order.

21         And, finally, your Honor, you may recall that when the

22    agents arrested the defendant on your arrest warrant for having

23    been in violation of the conditions of release, which was that

24    he not contact the witnesses, he specifically threatened to

25    kill the case agent.

1          This defendant has no respect or regard for the law,

2    and the way that he behaved before and during trial, as well as

3    the tapes in this case where he says he has no respect for the

4    law, indicate that he believes he's above the law.

5          In the letters from the defendant's family that were

6    submitted, they seem to be under the impression that David

7    Tkhilaishvili funded Allied Health, when the evidence at trial

8    was completely undisputed that Allied Health was completely

9    funded by Victor Torosyan.

10         And moreover, even in Mr. Cruz's arguments to the

11   Court in the Sentencing Memo the defendant accuses the victim

12   of having taken his business, a business that was entirely

13   funded by the victim, a man who the evidence showed had come to

14   this country with no money.  He took the defendant under his

15   wing, he treated him like a son and on numerous occasions he

16   gave him money and gifts.  The defendant did nothing to thank

17   the victim in this case for his generosity both with respect to

18   person loans and the gifts as well as funding Allied Health,

19   and he used the victim's money which funded Allied Health as

20   his own personal bank account.

21         What he did was to use threats of physical violence to

22   try and steal what was not his and threats not only to his own

23   life but to that of the family and business of Mr. Torosyan.

24   He has left the victim in this case, who did not want to come

25   to court today, but I believe did submit a letter -- I hope the

1     Court has seen it -- but he has left him --

2           THE COURT:  I don't believe I have.

3           MS. KAPLAN:  Oh.

4           THE COURT:  I don't know if it is on file.

5           MS. KAPLAN:  We did give that to Probation.  I have a

6     copy, if your Honor --

7           THE COURT:  Why don't you pass it up.

8           (Document provided to the Court by Ms. Kaplan)

9           THE PROBATION OFFICER:  Your Honor, I believe it may

10    have been attached with the final disclosure of the Presentence

11    Report, but I do not recall if it, in fact, was attached or

12    not.

13          THE COURT:  It is not in the copy that I had.

14          THE PROBATION OFFICER:  My apologies to the Court.

15          MS. KAPLAN:  So, as you can see from this letter, this

16    is -- and you saw from his testimony, your Honor -- this is a

17    man who had come to this country with nothing, he built up

18    these businesses, and he is now a shattered man who has been

19    caused great emotional distress and financial injury by David

20    Tkhilaishvili.

21          And the defendant in his papers shows no remorse for

22    any of the conduct.  The Government submits that he is a con

23    man.  He uses people.  He takes things by threat, things that

24    are not his.  He refers to himself in his letter as a person

25    who has always shown respect for people, yet the evidence at

1     trial showed otherwise.  With respect to how he treated Victor

2     Torosyan, your Honor heard the words for yourself on the tapes.

3     The jury also heard from two other witnesses who were employees

4     of Allied Health who testified that the defendant got so angry

5     at them he threw a table over and went to hit Kenton Fabrick.

6     This was witnessed also by Olga Dorofyeyeva.  On another

7     occasion these witnesses reported that the defendant had hit

8     his former girlfriend, Kristina, also while at work, also while

9     Mr. Tkhilaishvili was in a fit of rage.

10        And these are the reasons, your Honor, that the

11     Government believes that a sentence at the high end of the

12     guideline range is necessary.  This sentence will promote

13     respect for the law.  It will deter this defendant from

14     engaging in further criminal conduct.  It will tell him that he

15     cannot take the law into his own hands, and he cannot when he

16     gets angry threaten to kill people and extort them.  It will

17     protect the public from further crimes of this defendant, and

18     it will send a message that threats to cause physical harm

19     cannot be used to settle business disputes, and such conduct

20     will be prosecuted.

21        We believe that a sentence of 46 months is not greater

22     than necessary, but it is sufficient to protect the public and

23     send a message to the defendant.

24        THE COURT:  To what degree is your recommendation

25     inflected by the embezzlement dimension to it?

1          MS. KAPLAN:  It's not, your Honor.  It's not at all.

2          THE COURT:  And I will hear you as to Jambulat as

3   well.

4          MS. KAPLAN:  Okay.  Sorry.  Again, using the 3553(a)

5   factors in fashioning his sentence, the Government also

6   believes a sentence at the high end of the guideline range is

7   appropriate in this case.  Again, there's no question of the

8   seriousness of this offense, and, again, your Honor heard the

9   facts in this case.  In the defendant's Sentencing Memorandum

10  he tries to pin all of the responsibility on his younger

11  brother who he claims to have just been following.  He claims

12  he's done this all his life.  He came to this country to follow

13  his younger brother.

14         But short of actually writing checks to himself and

15  embezzling the money from Allied Health, this defendant was

16  with his brother and was in lockstep every step along the way

17  of this conspiracy to extort Allied Health, including

18  threatening to harm the victim, Victor Torosyan.  He even at

19  one point met with Victor Torosyan when David Tkhilaishvili

20  wasn't here.

21         Your Honor also heard about the threats made to

22  another witness, Olga again, that if she wronged him he would

23  cut her.

24         Jambulat Tkhilaishvili argues that his family needs

25  him and depends on him, but the Government submits that he

1   should have thought about that before he entered into a

2   conspiracy with his brother to extort Mr. Torosyan.

3         We believe that the sentence of 41 months will promote

4   respect for the law.  It will deter specifically this defendant

5   as well as the general public.  It will send a message of

6   deterrence that you simply cannot use threats of physical harm

7   to settle business disputes.

8         And we believe, again, that 41 months is not greater

9   than necessary, but it is sufficient to protect the public and

10   send a message to the defendant.

11         THE COURT:  All right.  So, I have the defendant's

12   Sentencing Memorandum, but I think for present purposes, so

13   that this is not left unanswered here, what I would frame is

14   simply this:  Assume that I believe Mr. Torosyan.  How do I

15   treat the threats?  Whiskey talk?  What is it?

16         MR. CRUZ:  Well, your Honor, with regard to David

17   Tkhilaishvili, I think the Court had actually during the course

18   of trial also referenced the conversations as, quote, unquote,

19   ragtime.

20         THE COURT:  It is, but just so you know what you are

21   dealing with --

22         MR. CRUZ:  Yes, your Honor.

23         THE COURT:  -- they were instinct with menace.

24   Whatever the linguistic rigor was of those conversations there

25   is no question in my mind that what was attempted to be

1   delivered was threats of physical harm, not merely to

2   Mr. Torosyan, but to his family.  So, assume that that is the

3   case and delivered in ragtime syncopation.  But there is

4   melody, and then there are lyrics, and the lyrics were

5   menacing.  What am I supposed to do with that?  Do I treat it

6   as someone who is volatile?  Is that it?  That is really what I

7   am asking about here.

8           MR. CRUZ:  And I would say no to that question, your

9   Honor, and the reason for that is because the Court can look at

10  this from the perspective of what started the entire dispute

11  here, which was what is going to happen with this business in

12  terms of the ownership.  That doesn't take away from the

13  severity of threats, but what I would suggest to the Court is

14  that those threats, quote, unquote, have to be measured by the

15  actions and activities of the person who the threats were

16  directed to.

17          THE COURT:  Yes, but the person who the threats were

18  directed to was not suggesting physical harm as his means of

19  resolving the conflicts.

20          MR. CRUZ:  No, he wasn't, your Honor.  And, again, how

21  severe the Court looks at the threats depends I think to some

22  extent on the reaction of the person who the threats are

23  directed to, and I think the evidence in the case is clear

24  that, despite these threats being made, Mr. Torosyan continued

25  to work with not only David but his brother James for a lengthy

1    period of time.  In addition, he allowed David access to his

2    home in Mashpee, despite the fact that these threats, quote,

3    unquote, were made to him personally and to his family.  And I

4    would suggest to the Court that the jury could have found,

5    obviously, any type of threat was made in order for the

6    enhancement to the base Offense Level to be made.  I believe

7    the footnote to that particular guideline section states that a

8    threat to property would be sufficient to trigger that

9    two-level enhancement from the base Offense Level of 18.

10          THE COURT:  So, I look at this and say it is somewhat

11   perplexing that Mr. Torosyan stayed on.  On the other hand,

12   given the threats, it might have been thought to be a good

13   career move, too.  So, I am supposed to look at this and say

14   David had reason to be upset, he delivers these threats, they

15   must not have been so serious or Mr. Torosyan would not have

16   continued in his relationship with him?

17          MR. CRUZ:  I think that there would have been more of

18   a response along those lines.  And, again, not taking away or

19   disrespecting the decision of the jury, but obviously they

20   found that something happened here that was an attempt to

21   coerce or to force Mr. Torosyan to do something he didn't want

22   to do, and I think that has to be seen from the perspective of

23   not only the, quote, unquote, threats themselves and

24   Mr. Torosyan's reactions to them after the fact, but also it

25   has to be couched in their relationship, which at that point

1    was a decade old.

2           Mr. Torosyan well knew who he was dealing with when he

3    entered a business relationship with Mr. Tkhilaishvili.  He

4    knew about all of the problems that he had had with regard

5    to --

6           THE COURT:  But had not been the subject of threats,

7    or even was there any evidence that he was aware that David

8    Tkhilaishvili had anger-management problems?

9           MR. CRUZ:  And, again, your Honor, if he knew those

10   things he could have disassociated himself with

11   Mr. Tkhilaishvili at a much earlier point.

12          THE COURT:  But he did not.  The point is he did not,

13   or at least there is no evidence that he did.

14          MR. CRUZ:  Yes, your Honor.  And he didn't do that

15   over the course of eight to ten years because he felt that he

16   couldn't do that.  He did that because he knew this man very

17   well.  He knew what he was --

18          THE COURT:  What I guess I am getting at is this was

19   the first occasion on which, in the evidence anyway, the first

20   occasion on which he was exposed to this side of

21   Mr. Tkhilaishvili.

22          MR. CRUZ:  Yes, which I would suggest to the Court

23   perhaps on prior occasions he had shrugged off as

24   Mr. Tkhilaishvili, this is his character, this is how he acts,

25   these are the things that he says, he doesn't always mean what

1   he says.  But now we're dealing with a business relationship

2   where money is at stake, and, "He is saying things to me in

3   order for me to do something I don't want to."  I think that's

4   the context of it.

5           But, again, your Honor, he would have disassociated

6   himself with Mr. Tkhilaishvili at a much earlier point if he,

7   in fact, was in fear of him or had any reservation whatsoever

8   about his safety or the safety of his family.  He certainly

9   wouldn't have entered into a business relationship with him,

10  but he knew him well enough at that point to trust that this

11  was a good decision for him.

12          THE COURT:  Well, there are several different points

13  in time, but I think I understand that.  Is there anything else

14  that you would like to talk to at this point?  I simply want to

15  be sure that I have got the tenor.

16          MR. CRUZ:  Yes, your Honor.  And just to get back to

17  what we were just discussing, I think that's an argument

18  generally that the case to a certain extent can be taken out

19  of, if the Court will, the heartland of these types of cases

20  where there is a direct threat made to an individual, where

21  there is violence exerted upon an individual in order to force

22  them to do something.  It is not an indirect situation,

23  necessarily, where you are saying at one point that you are

24  going to do something and then you're saying, "Well, I wouldn't

25  do that to you," that sort of thing.  There may be some

 1    distinction that the Court can make under the circumstances,

 2    given the prior relationship and what happened with these two

 3    men during the course of the offense conduct that I just want

 4    the Court to consider.

 5            THE COURT:  All right.

 6            MR. CRUZ:  In addition to that, your Honor, with

 7    regard to the 3553(a) factors, just the points that I highlight

 8    in my Memorandum, including the effect that this will have on

 9    his family and on his future in terms of his fiancee.  His

10    parents are here in court.  They rely on him.  They rely on his

11    brother.  Any extended period of imprisonment certainly affects

12    them in terms of their financial and emotional well-being.

13            THE COURT:  Well, but this is the not-uncommon

14    circumstance in which a defendant attempts to hold other people

15    hostage to his misfortune.  I am not sure that that is

16    necessarily going to be persuasive to me.  These turn out to be

17    other victims of his crime.

18            MR. CRUZ:  And I state these things as part of his

19    background and circumstances, your Honor.

20            In addition to that, I highlight his health situation,

21    which has suffered to a certain extent while he has been held

22    in custody.  He is a diabetic, and my understanding from

23    reviewing information from the Plymouth County facility, is

24    that, not only has he experienced a somewhat appreciable weight

25    loss because of the situation, but also the treatment that he

1    is receiving isn't effectively treating his condition.

2            THE COURT:  That is Plymouth County.  That is not the

3    Bureau of Prisons.

4            MR. CRUZ:  I understand that, and I am highlighting

5    that only to the extent that under the 3553(a) factors the

6    Court has to consider the administration of medical treatment

7    in the most effective manner, and what I am suggesting to the

8    Court is that it's not just an issue of whether medical

9    treatment is available within the BOP, it's an issue of whether

10   or not that is going to address the issues that he is currently

11   dealing with.

12           THE COURT:  Well, but I think that you have to address

13   who is going to be administering it post-conviction here.

14           MR. CRUZ:  Yes, your Honor.

15           THE COURT:  And that is the distinction I think I am

16   drawing between them.  And I am not necessarily agreeing that

17   there has been less-than-adequate medical services at Plymouth

18   County, but that is a different kind of facility than the

19   facilities that are available in the Bureau of Prisons, which

20   for whom diabetes is not an unknown circumstance among inmates.

21           MR. CRUZ:  No, I understand that, your Honor.  And,

22   again, it's a consideration for the Court in terms of

23   medical-treatment issue.

24           In addition to that, your Honor, I do highlight, and

25   this may go back to the point the Court just made, the issue of

1    his business and his employees.  That's also affected

2    negatively by any prolonged incarceration.

3         I would also ask the Court to consider in terms of the

4    case itself that it isn't necessarily effective to sentence a

5    man for a lengthy period of time.  He has been in prison just

6    about five months, a little over five months at this point.

7    This is the first incarceration that he has dealt with.  In

8    terms of sending a message to him and others who are similarly

9    situated, he has certainly learned from this experience, as he

10   stated to the Court in the letter that he provided.  This is

11   not something that he wants to be a prolonged experience, and

12   it is not something that he would repeat and risk in the

13   future.

14        This situation is limited, I would suggest, to the

15   relationship that he had with Mr. Torosyan.  But for that

16   relationship I would suggest there may not have been an issue

17   with anyone else, your Honor, in the sense that the

18   relationship itself --

19        THE COURT:  I do not understand that.  He has a close,

20   ten-year relationship with somebody, and he nevertheless

21   engages in these kinds of threats?  What does he do for people

22   he doesn't know very well?  That is the flip side of the

23   argument, which you may want to address at a certain point.

24        MR. CRUZ:  Yes, your Honor.  But, again, just that

25   that is what it is rooted in, is this prior relationship, and

1    that is why the Court should look at it with regard to being a

2    unique set of circumstances as opposed to a general behavioral

3    trait of Mr. Tkhilaishvili's.

4              So, those are the things that I would want to

5    highlight for the Court.

6              THE COURT:  All right.  I will keep them in mind.

7              Mr. Tumposky, anything that you want to address?

8              MR. TUMPOSKY:  So, to answer the Court's question,

9    your Honor, about how do you evaluate the threats as it relates

10   to Jambulat, I think one way to do it is look at the rest of

11   his life.  He is someone who's 47 years old with no criminal

12   record.

13             THE COURT:  What do I do about the slashing of -- I

14   forget her name now -- or the proposed cutting?

15             MR. TUMPOSKY:  Well, you know, I addressed it my memo,

16   and I think I'm somewhat at a disadvantage because of the

17   trial.  That came in for a very limited purpose.

18             THE COURT:  Well, it came in for a limited purpose

19   because I had to instruct the jury that that is not going to

20   affect their judgment about making liability, but it does

21   affect mine --

22             MR. TUMPOSKY:  Well, understood.

23             THE COURT:  -- in formulating a sentence.

24             MR. TUMPOSKY:  But my point is that, because it came

25   in for that purpose, it wasn't really the forum in which I

1    could possibly address the allegation.

2           THE COURT:  Well, let me suggest that this probably

3    will be the forum in which you are going to be addressing at

4    least that to some degree.

5           MR. TUMPOSKY:  And what I am saying is that, if I had

6    had the opportunity to do so at the trial or now, he would say

7    it didn't happen, and so what more can I say at this point,

8    unless we want to have another trial?

9           THE COURT:  I am not sure that changes very much, does

10   it?  This is not a kind of Catch 22, but I am not going to have

11   that evidence, apart from your assertion that that would be

12   said if he could say it.

13          MR. TUMPOSKY:  Understood, your Honor, and what I'm

14   suggesting --

15          THE COURT:  He is not proposing to offer testimony on

16   this, is he?

17          MR. TUMPOSKY:  No, he's not.  But what I'm suggesting

18   is that that came in at trial, it was a passing reference, had

19   a very specific purpose, and I don't think it rises to the

20   level of a sentencing consideration, quite frankly, your Honor.

21          THE COURT:  I will have to tell you that it probably

22   does, probably will affect me here, or at least I am assuming

23   that I find it, and I just tell you tentatively that it was

24   convincing to me at the time.  The argument is made that he is

25   the subordinate here, and to some degree that has to do with

1    skills and forcefulness I think, but I am not sure that he is

2    differently situated for purposes of the conspiracy, somewhat

3    different role.

4            MR. TUMPOSKY:  From a legal perspective of course it

5    doesn't matter, right?

6            THE COURT:  Right.

7            MR. TUMPOSKY:  And I'm not even suggesting that it

8    would be appropriate for there to be a guideline reduction.

9    But as far as consideration of relative culpability and how

10   that affects the likelihood of re-offense, I think certainly

11   the Court can examine what his role was in the entire

12   operation, including the legal parts of it and the not-so-legal

13   parts of it, and his role was almost inconsequential in the

14   running of the operation.

15           THE COURT:  I certainly would not take that position

16   about it.  Subordinate, less significant perhaps, but not

17   inconsequential.

18           MR. TUMPOSKY:  And I don't mean in the offense.  I

19   mean in the operation of the business.

20           THE COURT:  Right.  So do I.

21           MR. TUMPOSKY:  He never got a single dollar.  He

22   didn't even have a title.  In fact, I think the evidence was he

23   showed up twice in the year that they were open.

24           THE COURT:  Right, but for critically important

25   occasions.

1          MR. TUMPOSKY:  Well, Victor Torosyan testified that

2     one occasion I think was to threaten him.

3          THE COURT:  Right.

4          MR. TUMPOSKY:  So, I'm not saying that he didn't have

5     a role in the criminal offense.  Obviously, the verdict spoke

6     to that, and I am not contesting it.  What I am saying is the

7     Government has gone on about all of the sort of goings on in

8     the relationships between various people, particularly David

9     and others, as somehow suggesting that that warrants a sentence

10    at the high end, and, quite frankly, none of those things, to

11    whatever extent they are true, could be applied to Jambulat.

12    His role in the offense is he has no criminal record and his

13    exemplary behavior while on release.  There is no evidence that

14    this is anything but a one-off, an aberrant, quite frankly,

15    behavior for him.

16         And so I think the Court should take those factors

17    into account, and I think the sentence I request is a

18    appropriate.

19         THE COURT:  All right.  Well, you understand the

20    things that are on my mind.  All three of you will have an

21    opportunity to address them when we get to sentencing.

22         What I propose to do is have sentencing renewed and

23    take up the rest of the questions that have to do with the

24    acquittal and forfeiture on November 9th at 2:30.

25         MS. KAPLAN:  That's fine with the Government.

1          MR. TUMPOSKY:  Yes, your Honor.

2          MR. CRUZ:  Yes, your Honor.

3          THE COURT:  All right.  Is there anything else that we

4   can at least clear up at this point?  I don't think there is.

5          All right.  So, we will take up the remaining

6   questions of judgment of acquittal and the forfeiture issue,

7   which I will treat as related to the larger question of

8   restitution here of the additional $11,000.

9          We will be in recess.

10          THE CLERK:  All rise.

11      (The Honorable Court exited the courtroom at 3:45 p.m.)

12        (WHEREUPON, the proceedings adjourned at 3:45 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                      C E R T I F I C A T E

2

3

4              I, Brenda K. Hancock, RMR, CRR and Official Court

5      Reporter of the United States District Court, do hereby certify

6      that the foregoing transcript constitutes, to the best of my

7      skill and ability, a true and accurate transcription of my

8      stenotype notes taken in the matter of *United State of America*

9      *v. Tkhilaishvili, et al.*, No. 1:16-cr-10134-DPW.

10

11

12

13

14     Date:    04/30/18              /s/ *Brenda K. Hancock*
                                      Brenda K. Hancock, RMR, CRR
15                                    Official Court Reporter

16

17

18

19

20

21

22

23

24

25