UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA            )
                                    )
                                    )
vs.                                 )
                                    )  No. 1:16-cr-10134-DPW
                                    )
DAVID TKHILAISHVILI AND             )
JAMBULAT TKHILAISHVILI,             )
                                    )
                Defendants.


BEFORE:  THE HONORABLE DOUGLAS P. WOODLOCK


CONTINUATION OF SENTENCING HEARING




John Joseph Moakley United States Courthouse
Courtroom No. 1
One Courthouse Way
Boston, MA 02210
Tuesday, December 19, 2017
10:10 a.m.




Brenda K. Hancock, RMR, CRR
Official Court Reporter
John Joseph Moakley United States Courthouse
One Courthouse Way
Boston, MA 02210
(617)439-3214

1    APPEARANCES:

2         UNITED STATES ATTORNEY'S OFFICE
          By: AUSA Laura Kaplan
3         John Joseph Moakley Federal Courthouse
          1 Courthouse Way
4         Suite 9200
          Boston, MA 02210
5         On behalf of The United State of America.

6
          FEDERAL PUBLIC DEFENDER OFFICE
7         By: Oscar Cruz, Jr., Esq.
          District of Massachusetts
8         51 Sleeper Street
          5th Floor
9         Boston, MA 02210
          On behalf of the Defendant.

10

11        HEDGES & TUMPOSKY, LLP
          By: Michael L. Tumposky, Esq.
12        Suite 600
          50 Congress Street
13        Boston, MA 02109

14

15

16

17

18

19

20

21

22

23

24

25

1          (The following proceedings were held in open court

2    before the Honorable Douglas P. Woodlock, United States

3    District Judge, United States District Court, District of

4    Massachusetts, at the John J. Moakley United States Courthouse,

5    One Courthouse Way, Courtroom 1, Boston, Massachusetts, on

6    Tuesday, December 19, 2017):

7          THE CLERK:  All rise.

8        (The Honorable Court entered the courtroom at 10:10 a.m.)

9          THE CLERK:  This Honorable Court is now in session.

10   Please be seated.  Criminal Action Number 16-10134, United

11   States v. Tkhilaishvili.

12         THE CLERK:  Mister Interpreter, please raise your

13   right hand.

14         (Interpreter duly sworn by the clerk)

15         THE CLERK:  Please be seated.

16         THE COURT:  Well, I want to see if I can get this back

17   on track a bit as a result of the supplemental Rule 29 motion,

18   and I guess I have to ask Mr. Cruz why it wasn't raised at an

19   earlier stage.

20         MR. CRUZ:  Your Honor, this was an issue that was

21   discussed between myself and David Tkhilaishvili sometime after

22   the jury was released and the verdict entered.  I had discussed

23   with Mr. Tkhilaishvili the pros and cons of raising the issue

24   at that point in time and also looked into it further to see if

25   it, quite frankly, had any merit.  I brought it before the

1    Court's attention because, upon review of the case record or

2    the trial record, it became apparent to me that HMG was a

3    separate business entity.

4            THE COURT:  Well, but what is the con of raising it,

5    and why it wouldn't have been clearer earlier?

6            MR. CRUZ:  Quite frankly, your Honor, because I didn't

7    spot that issue, and if Mr. Tkhilaishvili did and brought it to

8    my attention I felt I was obligated at least to bring it to the

9    Court's attention if I thought that it had some merit.

10           THE COURT:  So, Ms. Kaplan, I guess the issue for me

11   is this; that this goes to the question of whether the statute

12   itself applies, and while I understand Rule 29 to be designed

13   to encourage prompt framing of the issues here or in any

14   criminal case, I do not know why as a practical matter I should

15   not address it at this stage.  By ruling adversely to the

16   defendant, it becomes an issue framed for appeal.  You have

17   made clear your view that it is untimely.  That is one of your

18   grounds but not the only ground.  If I rule favorably to the

19   defendant, then the issue is teed up for the Court of Appeals

20   to take up if the Government chooses to cross-appeal with

21   respect to it.

22           I am not sure I see, except a kind of, I will call it

23   a wooden adherence to a time frame, a reason not to take it up

24   here.  If it were some other kind of issue that did not go

25   right to the core of whether or not federal jurisdiction is

1    proper here I might feel differently about it, but this goes to

2    the core of it, I think.

3          If there is anything else you want to say, I think you

4    know where I am going, but if there is something I am missing

5    there on that aspect of it, I would like to know.

6          MS. KAPLAN:  No, I don't think so, your Honor, and

7    that's why I did address it in the Government's response and I

8    addressed the merits.

9          THE COURT:  Right.  So, let me go to the merits of

10   this.  Why isn't it the case that with respect to Count Four

11   that this is embezzlement but it is not federal embezzlement,

12   it is embezzlement from a separate entity.  A separate entity

13   has control of these funds.  The funds may have a purpose of

14   serving the health care institution that is within the scope of

15   the federal statute, but I have some difficulty, now that it

16   has been framed.

17         Thinking about this as anything other than state fraud

18   or state embezzlement and nothing else.  So, let me understand

19   that.

20         MS. KAPLAN:  I think, your Honor, because I think what

21   strikes me, your Honor, is that this defendant set up these

22   accounts.  This isn't somebody who took a draw from an account

23   that he didn't realize was a health care benefit program.  He

24   knew that all of the money in the HMG account came from the

25   Allied Health account, which was clearly monies that were

1    earmarked as monies of a health care benefit program.

2         THE COURT:  But were they monies of a health care

3    benefit program?  As a practical matter, could the health care

4    benefit program -- I understand that maybe I should not say,

5    "As a practical matter," I should say as a structural matter

6    the monies of the health care benefit program couldn't force

7    HMG to give it back to them, could they, the $2,000?

8         MS. KAPLAN:  Well, I think they could.

9         THE COURT:  How?

10        MS. KAPLAN:  I think that what's also important is

11   that the transaction occurred -- was at the direction of David

12   Tkhilaishvili.  It happened on the same day.  He realized that

13   there wasn't enough money in the HMG account, because it was

14   solely funded by the Allied Health account, so he took the

15   money.  He caused the money, which were health care benefit

16   program monies from the Allied Health account, to be put into

17   the HMG account, to then be put into the payroll account.  So,

18   he knew that those monies were monies that he was taking from

19   Allied Health Care, which was a health care benefit program,

20   and he purposely put them in the HMG account to go into the

21   payroll account.

22        THE COURT:  Is the movement of the funds into the HMG

23   account itself fraud?  I say "fraud."  I mean embezzlement.

24        MS. KAPLAN:  Yes.

25        THE COURT:  Because that is what is charged here.  HMG

1    is there to receive monies from --

2              MS. KAPLAN:  Allied Health.

3              THE COURT:  -- Allied Health for its payroll.  He is

4    in a position to make that choice.  It's a two-stage process.

5    I understand that.  The question is whether or not the

6    formalities of separate corporate entities make a difference

7    here.  And so, I will break it up into two parts; the first

8    part being a person with authority to make the transfer, which

9    he had, I believe --

10             MS. KAPLAN:  Yes.

11             THE COURT:  -- orders the transfer to be made.  If the

12   monies from HMG had been used for appropriate payroll purposes,

13   not the one that actually took place, but appropriate payroll

14   services, that wouldn't be embezzlement, right?

15             MS. KAPLAN:  Correct.

16             THE COURT:  So, the point of embezzlement, the mode of

17   embezzlement is with H M G paying out here.

18             MS. KAPLAN:  Correct.

19             THE COURT:  And that seems to me to be state court

20   embezzlement.

21             MS. KAPLAN:  Well, no.  I think the embezzlement comes

22   when he has Allied Health transfer the monies into the HMG

23   account into the payroll account, because he knows what he's

24   doing.  He knows that the monies that he's transferring from

25   Allied Health are monies that are appropriated from a health

1    care benefit program.

2         THE COURT:  But that is why I asked the question

3    earlier of assume that he does make the transfer.  Assume that

4    the transfer, just for purposes at the time of transfer it

5    could equally be used for his special use or for a general

6    payroll, which is the appropriate use under these circumstances

7    for whoever does work for Allied Health.

8         MS. KAPLAN:  Correct.

9         THE COURT:  So, it is the payout from HMG that is the

10   embezzlement, and it is no longer within the scope of Allied

11   Health.  I guess that is my concern here.  There is a reason

12   for the formalities to be observed.  The federal criminal

13   jurisdiction does not extend generally to all sorts of

14   embezzlement that is associated with health care; it deals with

15   the particular entities themselves, I think.  And so, that is

16   why I am, now focused on it, a bit puzzled by how to treat

17   this.  Not really puzzled, but I think that it properly has to

18   be said that this particular transaction itself is not a

19   federal criminal violation.

20        MS. KAPLAN:  Well, I guess I don't agree.  I think

21   that the embezzlement occurs when he causes the money to be

22   taken out of Allied Health.  It's all in one transaction.  And

23   he takes that money and has it put into --

24        THE COURT:  That is not quite what is charged, is it?

25   What is charged is the payment to him.  You see, if what were

1   charged were embezzlement by taking money out of Allied Health

2   and putting it into the health care, whatever it is called

3   again, HMG, if that were charged that would be a different

4   issue, because that is taking the money and putting it in HMG;

5   but what is charged, as I recall, is the transfer from HMG to

6   him.

7          MS. KAPLAN:  I'd have to look at the indictment, but I

8   think it is from a health care benefit program.  It's

9   embezzlement --

10         THE COURT:  No.  I think it talks about that

11   transaction out to him, but let me go back to the --

12         MS. KAPLAN:  I don't have the indictment.

13         THE COURT:  -- the indictment here.

14                        (Pause)

15         MS. KAPLAN:  I'm sorry.  I don't have the indictment.

16         THE COURT:  Okay.  So, let me see if I can pull it up.

17         MS. KAPLAN:  I think the language read exactly the

18   same way between Counts Three and Four.

19         THE COURT:  Right, but the transaction is different.

20                        (Pause)

21         THE COURT:  Yes, I guess you are right, it is

22   capacious enough to deal with this.  But let's, then, go to the

23   question whether there is a charge here.  Let me just work

24   through it.  There is a charge here that is cognizable by the

25   *Federal Criminal Code*, and it is the decision by

1    Mr. Tkhilaishvili to transfer from -- take the money out of

2    Allied Health and put it into the account in HMG --

3              MS. KAPLAN:  Correct.

4              THE COURT:  -- not the payment from HMG to him.

5              MS. KAPLAN:  Correct.  And they stipulated at trial

6    that Allied Health was a health care benefit program.

7              THE COURT:  So, let me get back to this issue at

8    trial.

9              Assume, Mr. Cruz, that someone, Mr. Tkhilaishvili,

10   takes money out of Allied Health and puts into the payroll

11   account --

12             MR. CRUZ:  Yes, your Honor.

13             THE COURT:  -- as the first step in a scheme to get

14   the money to him personally.  Why isn't that covered?

15             MR. CRUZ:  Your Honor, I think the answer to that lies

16   in the way that the business structure was set up for both

17   Allied Health and HMG, which is that Mr. Tkhilaishvili, as the

18   Chief Operating Officer, had the ability or authorization from

19   Mr. Torosyan and the other co-owners of the business to

20   transfer money from one account, that being Allied Health, to

21   HMG.

22             THE COURT:  Could he do that with fraudulent intent?

23             MR. CRUZ:  Well, your Honor, I guess that is

24   something --

25             THE COURT:  See, here is the issue or one of the

1    issues:  There are these formalities.  The formalities should

2    be observed.  On the other hand, if someone is directing all of

3    this with a view toward extracting money from Allied Health for

4    ultimately his own personal benefit and the first step of that

5    is to exploit and manipulate these formalities by transferring

6    it into another entity and then the other entity is going to

7    pay him, I am not sure why that should not be within the scope

8    of 669.  There is a transfer that can be treated as

9    embezzlement out of Allied Health.  It would have to be out of

10   Allied Health, from my perspective, but it is a transfer out of

11   Allied Health.

12           MR. CRUZ:  Yes, your Honor.  And I think that's a

13   question of what the evidence supports in terms of

14   Mr. Tkhilaishvili's intent with regard to that transfer of

15   money, because, as I pointed out in the attachment with Granite

16   payroll records that were relevant to this transaction, not

17   only was Mr. Tkhilaishvili paid out at that point in November,

18   but several other employees of HMG were paid out, and with that

19   I guess the question is --

20           THE COURT:  Well, but if it had been them, that is

21   different, but that is not what was alleged here.  It is the

22   $2,000 payment out --

23           MR. CRUZ:  Correct.

24           THE COURT:  -- which ended up in Mr. Tkhilaishvili's

25   hands, right?

1       MR. CRUZ:  Yes.  But I guess the point I am trying to

2   make is that the transfer of money for payroll purposes

3   generally was authorized, and then if he chooses to pay himself

4   $2,000 out of a separate account for HMG I agree with what the

5   Court's saying, that could be seen as fraudulent with regard to

6   HMG.

7       THE COURT:  So, where else could I have gotten it

8   wrong?  Did I charge the jury improperly with respect to this?

9   I don't think so.  I think it was a general charge on this.  Is

10  there evidence from which a jury could find that this two-step

11  transaction was embezzlement?  I think so.  Now, things to

12  argue the other way say, "Well, he just tried to provide a

13  mechanism or conduit for payment, which is the role of HMG, to

14  pay payroll."

15      MS. KAPLAN:  Your Honor, could I just add one fact

16  that also came out at trial, which is that the clinic's, Allied

17  Health Clinic's Operating Agreement provided that no member was

18  permitted to write checks in excess of $1,000 without all of

19  the members' approval?  So, he wasn't actually authorized to be

20  transferring this money.

21      THE COURT:  That itself wouldn't be embezzlement.  It

22  has to be part of a chain that led to an embezzlement by him.

23  That is to say, if he had done that without authorization -- I

24  will take your point about a $1,000 cap on authorization --

25  that I don't think would have been an embezzlement.

1          MS. KAPLAN:  No.  It's just another factor that went

2     in, and I think Victor Torosyan testified that he had not given

3     Mr. Tkhilaishvili the authorization to take that money.  So,

4     it's just another factor that goes into the defendant's intent,

5     I suppose.

6          THE COURT:  Well, I am going to deny the Supplemental

7     Motion for Judgment of Acquittal focused specifically on

8     Count Four here.  It is a multiple-stage process that

9     Mr. Tkhilaishvili engaged in, but the initial transfer was one

10    out of a health care benefit program with a view toward

11    embezzling from that program itself.  So, I decline to grant a

12    judgment of acquittal on that count.

13         Now, does that substantively deal with all of the

14    outstanding issues?  There is a question of forfeiture, but I

15    think that now is taken up by this; that is, there is a money

16    judgment forfeiture that flows from this.

17         MR. CRUZ:  Yes, your Honor.

18         THE COURT:  There is, in addition, Mr. Torosyan's

19    various filings claiming some sort of entitlement to particular

20    monies.  They are pretty much barebones, and I just want to be

21    sure I have dealt with the question of restitution on this.

22         Ms. Kaplan, does the $3,500 become restitution too, or

23    is it forfeiture or what?

24         MS. KAPLAN:  I think it probably will become

25    restitution, your Honor.  I think the additional monies that

1    Mr. Torosyan has requested, I don't think that they are a basis

2    for restitution, frankly.

3            THE COURT:  Let me just be sure I've got them out

4    here.

5            MS. KAPLAN:  It's the amount of monies that he put

6    into the clinic and never got back.

7            THE COURT:  Right.  He asked for $20,000 for

8    December 2014 to January 2015 due to the defendant's actions.

9    I do not see that as restitutionary in this setting.

10           MS. KAPLAN:  I don't either.

11           THE COURT:  Then he asked for $11,000 on August 2015.

12   Again, I am not sure I see that as restitution.  I guess I

13   don't see the $3,500 as restitution to him personally.  It's

14   restitution to --

15           MS. KAPLAN:  Well, it would be restitution to the

16   clinic.

17           THE COURT:  -- the clinic.

18           MS. KAPLAN:  Yes.

19           THE COURT:  Yes.  Okay.  So, I think I am simply going

20   to make that restitution in addition to forfeiture as well.

21           MR. CRUZ:  Yes, your Honor.  And, for the record, I

22   just want to note my objection to the Court's denial of the

23   supplemental Rule 29 motion, and for purposes of the record I

24   would state that the 3,500 should be parsed down to 1,500 if

25   the Court were to divorce the 2,000 that is the subject of the

1    supplemental Rule 29 from the equation.

2            THE COURT:  Right.  I would reformulate, obviously,

3    the money judgment to include only $1,500 forward from Count

4    Three, if I allowed it, but, of course, I am not going to.

5            MR. CRUZ:  Thank you.

6            THE COURT:  So, that is where it stands now for those

7    purposes.

8            So, are there any other issues that we need to take up

9    before going to the actual question of sentencing?

10           MS. KAPLAN:  So, I just want to make sure.  It sounds

11   like you have the letter from Victor Torosyan.  Do you also

12   have the letter from his wife?

13           THE COURT:  Yes, I do.

14           MS. KAPLAN:  Okay.

15           THE COURT:  The letter from Mr. Torosyan, apart from

16   claiming money, was July 8th, and the letter from Mrs. Torosyan

17   does not bear a date, but I think it came in about

18   October 16th.  Right?

19           MS. KAPLAN:  Yes.

20           THE COURT:  Anything else that we need to take up,

21   then?

22           MR. CRUZ:  Your Honor, just to be clear for the

23   record, there was an overarching Rule 29 motion for Counts

24   Three and Four.

25           THE COURT:  Right.

1          MR. CRUZ:  That, I believe, argument is precluded to

2     the extent there was a stipulation.

3          THE COURT:  Right.

4          MR. CRUZ:  What I would state to the Court is that the

5     stipulation was entered into based upon the belief that the

6     Department of Public Health certification received by the

7     clinic was sufficient to qualify Allied Health as a health care

8     benefits program under the statute.

9          THE COURT:  Well, there are two parts to that.  There

10    also was a *nunc pro tunc* certification by the federal

11    authorities, as I recall.

12         MR. CRUZ:  Yes, your Honor, and it didn't become

13    apparent until the course of the trial that there was lack of

14    evidence, I would suggest, regarding treatments being actually

15    made to patients during the relevant time period and requests

16    for reimbursement from these insurance carriers, which I think

17    arguably was the motivation to file the Rule 29s, because that,

18    I think, is the more crucial issue, whether monies were

19    received for services rendered from these insurance carriers.

20    But I just want to state that for the record.

21         THE COURT:  Okay.  I think I understand the issue.  My

22    view is that the certification puts this entity into a position

23    of being subject to the protection of the *Federal Criminal*

24    *Code*, and the *nunc pro tunc* quality of it indicates when that

25    was, and it is well before these transactions.

1          MS. KAPLAN:  There is one issue, your Honor, and I'm

2     not sure that this is the time in what you are about to do

3     next, but I thought I would bring it to the Court's attention.

4     Since we last were before you, it has come to the Government's

5     attention that David Tkhilaishvili has been providing

6     information to an inmate or other inmates about Victor Torosyan

7     such that the Watertown Police Department where Mr. Torosyan

8     lives has now been put on notice.  I don't know what type of

9     investigation they have commenced.  But we have seen the

10     information that Mr. Tkhilaishvili has provided, and it's all

11     the same stuff that came out at trial.  So, again, I'm just

12     bringing it to your attention.

13          THE COURT:  Well, I do not know what I should do about

14     that.  If you are saying I should consider post-verdict call it

15     retaliatory action against Mr. Torosyan as part of an

16     enhancement as to Mr. Tkhilaishvili, I would like to, of

17     course, hear from Mr. Cruz.  That may just simply open up an

18     additional dimension to this.  It is also, I suppose,

19     independently prosecutable as obstruction of justice if all of

20     the elements are met.  I think my inclination at this stage is

21     to say I am simply not going to consider that, if it's true,

22     because it will simply extend this sentencing process here, and

23     it is sufficiently divorced from the trial itself and the

24     relevant conduct at the trial that I think it is improvident to

25     review it.

1          MS. KAPLAN:  Okay.

2          MR. CRUZ:  And for the record, your Honor, this is the

3    first that I have heard of this, so I wouldn't be prepared to

4    respond, in any event.

5          THE COURT:  Right.  Well, I think we have reached -- I

6    have tried to do this in an orderly fashion, but order takes

7    time, and I do not want to take any more time to get to this.

8          So, back to where we were before.  With respect to

9    David Tkhilaishvili, we are dealing with a total Offense

10   Level of 20, a Criminal History Category of X [phonetic].  That

11   leads to a guideline range of 37 to 46 months, supervised

12   release of 1 to 3 years, a fine of $1,500 to $150,000,

13   restitution that I am setting at $3,500.  That is a little

14   different from what Probation had outlined.  And there is a

15   Special Assessment of $400, $100 on each of the counts.

16         I assume we are dealing with the same set of numbers

17   here; is that correct?

18         MS. KAPLAN:  Yes, your Honor.

19         MR. CRUZ:  Your Honor, I do agree, with the caveat

20   that I will be arguing that the Court should depart to

21   Category I for various reasons cited in the memo.

22         THE COURT:  Right.  But in terms of the literal terms

23   of the guidelines, I take it there is not an objection about

24   that?

25         MR. CRUZ:  Correct.

1          THE COURT:  And then, with respect to Jambulat

2     Tkhilaishvili, we are dealing with a total Offense Level of 20,

3     a Criminal History Category of I.  That leads to a guideline

4     range of 33 to 41 months' incarceration, 1 to 3 years of

5     supervised release, $1,500 to $150,000 in fine, and a Special

6     Assessment of $200.

7          Are we dealing with the same set of numbers?

8          MR. TUMPOSKY:  That's correct, your Honor.

9          THE COURT:  Okay.  So, Ms. Kaplan, I will hear you on

10    the Government's recommendation.

11         MS. KAPLAN:  Oh.  I thought I had made mine last time.

12    You want me to go through it again?

13         THE COURT:  Yes, if you will, just because we have

14    been through several iterations of the issue.

15         MS. KAPLAN:  Okay.  Taking into account the sentencing

16    factors under 3553(a), your Honor, we believe -- and we are

17    talking about David?

18         THE COURT:  David first and then Jambulat.

19         MS. KAPLAN:  Okay.  With respect to David

20    Tkhilaishvili, we believe that -- the Government recommends a

21    sentence at the high end of the sentencing guideline range, and

22    we believe this is sufficient but not greater than necessary to

23    comply with the purposes of the *Sentencing Guidelines*.

24         THE COURT:  Let me just ask --

25         MS. KAPLAN:  Yes.

1          THE COURT:  -- you use "high end of the guidelines,"

2     rather than a particular number.  I just don't know --

3          MS. KAPLAN:  Forty-six months, your Honor.

4          THE COURT:  Okay.

5          MS. KAPLAN:  Looking at the nature and circumstances

6     of the offense, there is no question that the crime of

7     extortion is a serious offense.  Your Honor, you presided over

8     the trial and you heard about the defendant's conduct with

9     respect to the victim in this case and the threats to harm him,

10    his family, his business.  You also heard about during the

11    trial a threat -- well, I think it was during the trial -- a

12    threat to kill one of the FBI Agents.  The defendant made a

13    decision to take the law into his own hands with respect to

14    Allied Health and the victim in this case, and he should not

15    have done that.

16          Looking at this particular defendant and his

17    particular role in the offense, we believe that a sentence of

18    46 months is appropriate to address several specific concerns.

19    First, the defendant threatened the victim's family members,

20    and under Section 2B3.2 the Application Note says that if the

21    offense involved a threat to a family member of the victim an

22    upward departure may be warranted.

23          Secondly, immediately prior to the trial the defendant

24    reached out --

25          THE COURT:  But you are not asking me to make an

1    upward departure?

2         MS. KAPLAN:  No, no.  But that would be one of the

3    reasons for the Government seeking a high end of the guideline

4    sentence.

5         Second, immediately prior to the trial the defendant

6    reached out to a witness in the case in direct violation of the

7    Court's Order not to have contact with any of the witnesses.

8    He paid this witness, which the Government views as an attempt

9    to tamper with the witness or some sort of obstruction of

10   justice.

11        Similarly, your Honor may recall that after that

12   occurred and during the trial the defendant again disobeyed the

13   Court's instructions and order not to have contact with any

14   witness or person connected with the case, and he approached a

15   person who had accompanied Mr. Torosyan to court and told him

16   that Mr. Torosyan was a liar.  This was yet another attempt to

17   intimidate this individual as well as get a message to the

18   individual in this case in direct contradiction of the Court's

19   Order.

20        And, finally, as I mentioned, when the agents arrested

21   the defendant, who had been in violation of the Court's Order,

22   the defendant David Tkhilaishvili threatened to kill the

23   FBI Agent.

24        This defendant clearly has no regard or respect for

25   the law.  The way he behaved before and during the trial

1   demonstrates as much, and your Honor heard the tapes in this

2   case where he says he has no respect for the law and indicated

3   that he is above the law or believes he is above the law.

4         In the letters from the defendant's family they seem

5   to be under the impression that this defendant funded Allied

6   Health, when the evidence at trial was completely undisputed

7   that Allied Health was completely funded by Victor Torosyan,

8   and even in counsel's argument to the Court in the sentencing

9   memo that they filed the defendant accused the victim of having

10   taken his business, a business that was entirely funded by the

11   victim.

12         The victim, as you may remember, was a man who had

13   taken David Tkhilaishvili under his wing, had loaned him money,

14   had treated him like a son, given him a ring to give to

15   Mr. Tkhilaishvili's fiancee, gave him gifts, and the defendant

16   did nothing to thank him but stole all of his life savings and

17   took loans from him that he never repaid.  He then threatened

18   to use physical violence to try and steal from him things that

19   were not his, and he left the victim in this case, a man who

20   came to this country with nothing and built up several

21   successful businesses, a shattered man and caused him great

22   emotional distress, not only to him, but, as you can see from

23   the letter from Mr. Torosyan's wife, great physical distress to

24   her as well.  And he has shown no remorse even today.  He is a

25   con man.  He uses people, and he takes things by threatening

1   people, things that are not his.

2          The jury also heard from two other witnesses, your

3   Honor, who were employees of Allied Health that the defendant

4   got so angry at them he threw a table over, he went to hit

5   Kendrick (ph) Fabrick.  And on another occasion the witnesses

6   reported that the defendant had hit the former girlfriend,

7   Kristina, while at work while he was in a rage.

8          These are the reasons, your Honor, that the Government

9   believes that a sentence at the high end of the guidelines

10  range is appropriate, it's necessary, it will promote respect

11  for the law, it will deter the defendant from engaging in

12  further criminal conduct and tell him that he cannot take the

13  law into his own hands, and that he cannot when he gets angry

14  threaten to kill people and extort them.  It will protect the

15  public from further crimes of this defendant, and it will send

16  a message that threats to cause physical harm cannot be used to

17  settle business disputes, and such conduct will be prosecuted.

18         These are the reasons, your Honor, that the Government

19  is seeking a sentence of 46 months, supervised release of

20  3 years, restitution in the amount of $3,500 to the Allied

21  Health, a Special Assessment of $400, and a fine of $1,500.

22         THE COURT:  All right.  Do you want to speak also to

23  Jambulat as well?

24         MS. KAPLAN:  Oh, sure.  Again, with respect to the

25  3553(a) factors, the Government is seeking a sentence at the

1    high end of the guidelines range, which is 41 months.  Again,

2    this is a crime that is extremely serious.

3                THE COURT:  Can I just pause on that?

4                MS. KAPLAN:  Yes.

5                THE COURT:  This is a deportable crime, right?

6                MS. KAPLAN:  I'm sorry?

7                THE COURT:  Deportable crime?

8                MS. KAPLAN:  Yes.  Yes, it is.

9                THE COURT:  He will serve the time, and then the

10   assumption is that he will be deported?

11               MS. KAPLAN:  I believe so.  I believe so.

12               THE COURT:  Okay.  Go ahead.

13               MS. KAPLAN:  With respect to this particular defendant

14   and his role, in his Sentencing Memorandum Mr. Tkhilaishvili

15   tries to pin all of the responsibility on his younger brother,

16   who he claims he was just following.  But short of actually

17   writing the checks to himself and embezzling the money from

18   Allied Health, this defendant was with his brother in lockstep

19   every step along the way of this conspiracy to extort Allied

20   Health, including threatening to harm the victim, Victor

21   Torosyan.  This defendant threatened Mr. Torosyan even when his

22   brother was out of the country.  He did that on his own, not at

23   his brother's direction.  Your Honor also heard at trial about

24   threats that Jambulat Tkhilaishvili made to another witness,

25   Olga, that if she wronged him he would cut her.

1          Mr. Tkhilaishvili argued that his family needs him and

2     depends on him, but he was not thinking of his family prior to

3     entering into this conspiracy to extort Mr. Torosyan, and he

4     has essentially ruined Mr. Torosyan's life needlessly.

5          We believe that a sentence of 41 months would promote

6     respect for the law, it will deter the defendant from engaging

7     in further criminal conduct, it will protect the public from

8     further crimes of this defendant, and, again, it will send a

9     message that threats to cause physical harm cannot be used to

10    settle business disputes, and this type of conduct will be

11    prosecuted.  So, we are seeking a sentence of 41 months,

12    supervised release of 3 years, a Special Assessment of $200,

13    and a fine of $15,000.

14          THE COURT:  I'm sorry.  The period of supervised

15    release is?

16          MS. KAPLAN:  Of 3 years.

17          THE COURT:  Three years.  All right.

18          So, Mr. Cruz.

19          MR. CRUZ:  Your Honor, with regard to David

20    Tkhilaishvili, I am asking the Court to consider what is at

21    this point approximately 7 months and 11 days that he has been

22    held in custody since the conclusion of the trial.  That, in

23    addition to time that he spent in custody prior to that

24    awaiting release on conditions, would equate to approximately

25    9 months or so at this point as a period of incarceration of

time served, followed by a period of supervised release of

2 years, the first 6 months of which would be served in home

confinement with electronic monitoring.

I suggest to the Court that this is the appropriate

sentence, first of all, because, although there is an agreement

with regard to the guideline calculation, I would suggest to

the Court that the Criminal History Category that is imposed

should more appropriately be a Category I as opposed to a

Category II.  The entirety of his criminal history is

encapsulated in Paragraph 57 of the Presentence Report, which

is one case charging multiple counts of Assault With a

Dangerous Weapon.  For that particular case the Probation

Department awards him four total criminal history points, three

of which are appointed under 4A1.1E.  And an argument that I

raise in my Sentencing Memorandum, your Honor, is that it is

not an appropriate reading of that particular section of the

*Guidelines*, because what the Sentencing Commission originally

envisioned when amending that section of the *Guidelines* was

that a person who had committed multiple offenses at different

times could potentially receive a windfall if sentenced for all

of those things on the same date.

In this particular case we don't have an incident or

multiple incidents that are separated by time or intervening

arrests.  What we have is one case involving multiple counts in

the same charging document for which he is being assessed four

1     Criminal History points.  So, I am suggesting to the Court that

2     is not what this section of the *Guidelines* was geared toward

3     addressing, and that the Court should depart to Category I

4     under the circumstances.  This was a Continuance Without a

5     Finding that resulted ultimately in a dismissal and no jail

6     time.  So, to say that he is a Category II under these

7     circumstances I would argue is somewhat overstated.  If the

8     Court were to agree that Category I applies, then the range

9     that would come to bear is 33 to 41 months, as opposed to 37 to

10    46 months.

11              THE COURT:  That gets you closer to time served but

12    not much.

13              MR. CRUZ:  Not much, your Honor, but I think that

14    there is something to be said for the floor being lowered

15    somewhat under the circumstances.

16              THE COURT:  Well, what do I do with someone who is --

17    we use the phrase "anger management."

18              MR. CRUZ:  Well, your Honor --

19              THE COURT:  It is more than that.

20              MR. CRUZ:  But I think --

21              THE COURT:  It is part of the way in which he did

22    business.

23              MR. CRUZ:  I think the Court has the hit the literal

24    nail on the head with regard to the reference to

25    anger-management issues.  This is a person -- and the Court has

1    at length seen the testimony of Victor Torosyan, assessed him

2    as a witness, et cetera, and other factors that the Court heard

3    about at trial.

4         Also with regard to Mr. Tkhilaishvili, and as argued

5    previously, these are two people that were very similar in

6    terms of their personality.  These are people who talked to

7    each other in the ways that the Court heard and that the jury

8    heard on that tape without incident prior to that.  But at the

9    heart of all of this is an argument over this business.

10        And the Government suggests that all of Mr. Torosyan's

11   life savings were taken.  The fact of the matter is that

12   Mr. Torosyan is still operating that business, that he has

13   opened a second business at another location and has plans to

14   open other branches.

15        THE COURT:  Not to be arch about it, but through no

16   help of Tkhilaishvili.  Is that the case?

17        MR. CRUZ:  No, I understand, your Honor.

18        THE COURT:  So, what we have is one person who

19   undertook to use illegal activity to advance his own business

20   interests and someone who, I suppose the argument is, could

21   give as good as he took but did not, and ended up relatively

22   better off than Mr. Tkhilaishvili but still not where he would

23   have wanted to be.

24        MR. CRUZ:  No, your Honor.  And, granted, we can't get

25   around the jury's finding in this case with regard to all of

1   these counts, but I think that the Court has, again, hit on an

2   important point, which is that Mr. Tkhilaishvili is someone

3   whose actions I would argue can be mitigated to a certain

4   extent, given the relationship that existed and, more

5   importantly, given Mr. Torosyan's own actions during the course

6   of the time that he is allegedly being threatened and that his

7   family is being threatened.  He continues to work with Mr.

8   Tkhilaishvili and his brother through the end of 2015.  This is

9   months after these threats have allegedly been made.  He

10  appears with them at an opening party for the clinic, and he

11  brings his family there with absolutely no fear, I would argue

12  or suggest, of being harmed himself or having his family

13  harmed.  He allows Mr. Tkhilaishvili access to his home in

14  Mashpee after he is threatened with bodily harm and his family

15  is threatened.

16          So, I would suggest that there's some level of proof

17  there that the Court can take in order to consider mitigation

18  in this sentence, albeit there is a violation of the law that

19  the jury found, but it is not to the extent or within the

20  heartland, I would suggest, of what the Court would routinely

21  see in a case like this, where acts of physical violence are

22  proven by the Government or other factors come to bear that

23  make this a much more serious situation, still a violation of

24  the law, but a much more serious situation, and that's why I

25  think the Court should consider to a certain extent departing

1      from what the guidelines say, at least as I have described

2      them.

3              In addition to that, your Honor, this is a man who has

4      never spent a day in prison, and he has spent the last

5      approximately 8 to 9 months in prison, and that has changed his

6      view, as the Court as read in his statement.  This is not

7      activity or conduct that he wants to continue or repeat in the

8      future.  He understands the consequences that come from

9      outbursts, if you will, because he is upset or because things

10     aren't working out with regard to his business relationships,

11     and the last thing that he wants to do is to continue to spend

12     time in jail where he is arguably not receiving -- and I

13     understand the Court has a view of what the Bureau of Prisons

14     can offer in terms of medical treatment -- but he is not

15     receiving adequate medical treatment with regard to his

16     diabetes.

17             He is separated from his business, which is literally

18     hanging on by a thread at this point.  They've lost employees,

19     although they're still open, and the business is being run to

20     the extent possible by friends and/or his relatives who aren't

21     in a position really to do this successfully, because they were

22     never a part of it previously.

23             In addition to that, your Honor, his relationship with

24     his fiancee is in jeopardy, because her fiancee visa would

25     expire at the end of this year unless he continues with her in

1    this process.

2         So, there is a lot on the line here in terms of

3    consequences of an extended period of incarceration, not the

4    least of which is his connection to his parents, who are here

5    in court, who rely on both him and his brother to take them to

6    medical appointments, to see to their well-being generally, to

7    lend them support financially, and they're on their own

8    literally at this point, getting by as well as they can, but

9    they are devastated by this.  And I understand that there's

10   some blame to be cast here, but he doesn't want them in that

11   position, he wants to help them.

12        And he wants the Court to know that it shouldn't worry

13   about his continuing to do these things.  This was a unique

14   situation involving a relationship with Victor Torosyan.  There

15   is no evidence in his prior criminal history that he has been

16   convicted or charged of anything like this in the past, and it

17   is a result of his and other individuals' personalities.

18        He wants the Court to be just as I know it will with

19   regard to sentencing, and he wants an opportunity to prove to

20   the Court that everything that Ms. Kaplan stated about what

21   happened pretrial -- and, your Honor, all of those things were

22   dealt with either in front of the Magistrate Judge with regard

23   to contacts with witnesses, those were all addressed in front

24   of the Magistrate Judge and shown to be, albeit not proper use

25   of judgment in paying an individual who he owed money to at

1    that particular time, but the Magistrate Judge heard all of

2    those things and still released him.

3          In addition to that, this issue of accusing him of

4    wanting to kill an arresting agent, I believe that what the

5    report said was he said, "God kill you," which, again, is part

6    and parcel to what we have in this case, which is an emotional

7    outburst with regard to a frustrating situation but not an

8    actual attempt or desire to hurt anyone.  So, all of these

9    things can be addressed under these circumstances I have

10   suggested to the Court.

11         Nine months is a long time for him, and it has been a

12   long time, through which he has literally re-thought his

13   personality and what he wants to do with his life while sitting

14   in jail and its effects and its consequences on the rest of his

15   life and the individuals whom he loves.  And he wants an

16   opportunity to prove to the Court that he can change his

17   behavior, and that if there is any contact in the future -- or

18   that there won't be any, I should suggest, any contact with

19   Mr. Torosyan whatsoever.  These are things the Court through

20   the Probation Department can monitor and assure that no one is

21   going to be in harm's way, and that he will do as he has

22   promised or suggested that he won't repeat this behavior in the

23   future.  Thank you.

24         THE COURT:  All right.  Thank you.

25         Mr. Tkhilaishvili, I will hear from you, if there is

1    something you would like to say at this point.

2          MR. CRUZ:  Your Honor, before Mr. Tumposky starts,

3    Mr. Tkhilaishvili just wanted me to refer to the letters that

4    were submitted on his behalf.

5          THE COURT:  Yes.  I have them, and I have been through

6    them as well.

7          MR. CRUZ:  Thank you, your Honor.

8          THE COURT:  But this is an opportunity for him to

9    speak directly in open court, if he chooses to.  He does not

10   have to, but he has that opportunity.

11         MR. CRUZ:  And he would rest on what has been

12   submitted as a personal statement.  Thank you.

13         THE COURT:  All right.  Thank you.

14         So, Mr. Tumposky.

15         MR. TUMPOSKY:  Yes, your Honor.  On behalf of Jambulat

16   Tkhilaishvili, I am also asking for a sentence of time served,

17   which would be approximately 8 months between the time of the

18   verdict to now and the pretrial detention, and I do that for

19   several reasons.

20         Until 2015 Mr. Tkhilaishvili was living what some

21   might describe as the classic American dream.  He came here

22   with very little.  He worked hard in not very big jobs but sort

23   of menial jobs, delivering pizzas, driving patients for a

24   dentist's office.  He was trying to do what he could to support

25   his family, to make a living, to try and better his life, and

1    this was the life that he lived from the time that he came here

2    and until the time that he got involved with the clinic and

3    with Mr. Torosyan.

4         He doesn't have any record of any criminal conduct

5    before this.  His conduct while he was on release was

6    exemplary.  This incident that he has been convicted of really

7    stands out as aberrant in the life that he has led since he has

8    been in the United States, your Honor.  And so, the question is

9    what should the Court do about what he was convicted of?

10        Now, the Government says in their presentation these

11   two, they were all in it together, there's no difference

12   between Jambulat and David.  The Court sat through the

13   testimony at trial, and I would suggest that's simply not the

14   case; that, in fact, Jambulat Tkhilaishvili was not there every

15   step of the way with his brother.  He really had no involvement

16   in the business at all, quite frankly, and stood to gain

17   nothing, the evidence showed at trial.  Even if the extortion

18   had been successful he stood to gain nothing.  He did not take

19   a single dollar in money from that business.  He didn't even

20   work there.  He was still working at the pizza place while

21   others were running the clinic.  And so, this notion that he

22   was an equal and alongside David every step of the way is

23   simply untrue.

24        So, I think the Court should take that into account,

25   understanding, yes, he has been convicted of two serious

1    crimes, and I say "serious" in that the allegations in any

2    federal crime is serious.  But I think I have to point out,

3    your Honor, that if Mr. Torosyan had gone to the Quincy Police

4    Department instead of his civil lawyers or the FBI, that the

5    sentence these two would be facing would be far different, and

6    he could have very easily gone in this direction as a state or

7    local offense, rather than a federal offense.  He'd probably

8    get 6 months of probation with someone with his record and

9    where there was no actual physical injury to the victim, and I

10   think the Court should take that into account as well.

11         He has his wife that he supports, her child.  His

12   parents who are here, they are elderly, he supports them as

13   well, or at least he was while he was out.

14         And, as the Court noted, there is a possibility of

15   deportation in this case, but it isn't certain.  It isn't

16   certain.  And so, the sentence that the Court gives will

17   actually have an impact on that.  So, the question I think the

18   Court might want to ask itself is, yes, he has done something

19   wrong, but has he forfeited his right to be here forever?  Has

20   he forfeited his right to live with his wife, to support his

21   parents and to support his wife's child forever?

22         And so, I'm asking for a sentence of time served

23   because I think it's appropriate, given his prior record, his

24   conduct on release, which is exemplary, his relative

25   involvement in the criminal case, and his family and what he

1    has tried to do positively, as the letters indicate, for his

2    family.

3         Now, I also want to give an alternative to the Court,

4    if the Court feels that a sentence of time served isn't

5    sufficient, and that is a sentence of 11 months on Count One

6    and up to 11 months on Count Two.  A sentence of 11 months on

7    either count, either concurrent or consecutive, would

8    potentially, potentially protect his right to remain in the

9    United States.  If the Court gives him more that than that, his

10   deportation is almost certain.

11        And so, I would ask the Court to consider a sentence

12   of time served or, alternatively, 11 months on Count One and

13   11 months, if necessary, on Count Two to run on and after, if

14   the Court truly believes that a longer sentence is necessary,

15   give him the opportunity, however slim it might be, when he

16   gets out to remain in the United States, continue to work hard,

17   as he was doing before, continue to support his wife and her

18   child, and continue to support his elderly parents.  Thank you.

19        THE COURT:  Thank you.  Again, I will hear from

20   Mr. Tkhilaishvili, if he wants to speak at this point.

21        MR. TUMPOSKY:  He'll rest on the letter that he

22   submitted, your Honor.

23        THE COURT:  All right.  Well, I guess I will start

24   with the larger question here, which is the potential for

25   disparity between federal embezzlement and state embezzlement.

1    The Congress made a choice to include this kind of activity in

2    the Hobbs Act and it was, I think, a considered choice, that

3    there are certain kinds of activity that, because of their

4    effect on interstate commerce and their character, are ones

5    that require the attention of the Federal Government.  I am

6    putting to one side the question now of health care violations.

7         It is a serious offense.  It is at the same time at

8    the crossroads of federalism, and so I do want to be sensitive

9    to how this would be treated in the State Court as opposed to

10   in the Federal Court, not because I think there is parity, but

11   to be sure that, as a cross-check, I understand the seriousness

12   of the offense and the choice to have it here as opposed to

13   elsewhere.

14        But I start, then, with the idea of the seriousness of

15   the offense.  I think it is a very serious offense.  In the

16   case of David Tkhilaishvili it is compounded by interference

17   with a kind of business that is servicing the most vulnerable

18   and ought to be handled with great integrity.  It was not.

19   That does not appear to be his *modus operandi*.  Rather, it is a

20   choice to engage in business in a manner that is suffused with

21   threats of violence, which I discount to some degree as

22   cultural, but not entirely.

23        This is heartland Hobbs Act extortion, as far as I am

24   concerned.  Congress meant it.  It is my obligation to deal

25   with it in that fashion.

1          I look at the character of the defendant, and, while I

2     do not see here the long-range criminal activity, I do not view

3     the previous conviction, which I will assimilate as one item

4     intellectually as opposed to how the guidelines are treated, as

5     being aberrant nor this being aberrant.  This is an individual

6     who chooses to conduct his affairs with others, no matter how

7     he conducts his affairs with his family, with others in a

8     threatening fashion, who feels no particular obligation to

9     comply with the law, no particular obligation to comply with

10    rules that are established by the Court, and, frankly, offers a

11    pretextual explanation for why he cannot bring himself to

12    comply.

13         In short, I find here nothing that would cause me to

14    mitigate the application of the guidelines as a framework

15    having to do with the nature and characteristics of the

16    defendant.

17         Mr. Cruz makes the point that the defendant has never

18    spent much time in jail.  Well, that is not a way to stay out

19    of jail; that is simply a way of saying that perhaps things

20    have not become as clear to him as they should have.  I have

21    considerable concern as a matter of specific deterrence

22    regarding this individual's enlargement prematurely.  It is, it

23    seems to me, very important for this defendant to understand

24    that the costs of engaging in activity like this, even with

25    someone who responds in a somewhat aggressive fashion himself

1   but not with violence or threats of violence, cannot be

2   countenanced, and the consequences will be severe.  That is

3   what the guidelines here speak to, and they seem to me to be

4   appropriate.

5         I also look in terms of general deterrence.  There is

6   a kind of subtext here that this is cultural, that this is just

7   the way people talk, the way they relate kind of

8   aggressiveness.  I do not really buy that.  What I see here is

9   an unwillingness to accept conventions of business activity

10  that it is very important for this country to uphold and not to

11  give some special discount to someone who cannot comply with

12  those conventions.

13        I would not like to leave it as a matter of general

14  deterrence that this is the kind of thing to be winked at, or

15  ignored, or treated as if it does not belong in the Federal

16  Court.

17        I am aware of considerations having to do with the

18  prison system, a claim of difficulties in medical care.  Of

19  course, I have considered that, although, as Mr. Cruz

20  indicated, I have also come to the conclusion that the medical

21  conditions that the defendant complains of are ones that the

22  Bureau of Prisons can deal with effectively and does on a daily

23  basis.

24        I have also looked at the question of disparity.  I

25  have some sense of the range of sentences for offenses like

1    this.  I think the guidelines are a bit high for ultimately

2    unexecuted threats in this area, and, consequently, I am going

3    to vary from the guidelines themselves.  I am going to impose a

4    sentence of 36 months' incarceration.  I will impose a period

5    of 3 years of supervised release.  I am going to impose a

6    $3,500 restitution figure.

7         I will not impose a fine under these circumstances.

8    It seems to me that, given the interrelationship of family and

9    family needs, that taking a fine as well would be further

10   inflicting harm on family members who were not complicit in

11   this criminal activity.  I emphasize what I think we all

12   understand, which is to say that there are multiple victims,

13   including victims like his parents, but those are people who

14   were the collateral damage created by his activity for which he

15   is responsible, and, while some mitigation is appropriate in

16   the sentence, that is, to speak specifically to the fine, it

17   seems to me that the family members who were not directly

18   involved cannot be held hostage to the defendant's misconduct.

19        There will be a forfeiture order, money judgment

20   forfeiture order entered as well.  And there must be a Special

21   Assessment of $400 imposed.

22        There are the customary mandatory conditions of

23   supervision:  that the defendant not commit another federal,

24   state or local crime, that he not unlawfully possess a

25   controlled substance, that he refrain from any unlawful use of

1    a controlled substance, and I will require that he submit to

2    one drug test within 15 days of his release from prison and for

3    as many as 104 drug tests per year by Probation.  This is not

4    someone who has a history of drug problems.  On the other hand,

5    this is a person who has a demonstrated inability to conform

6    his lifestyle to matters that can be productive and who could

7    well, in my estimation, find himself leading into drug use.

8    And so, I mean to have the Probation Office supervise that as

9    they see fit within that range.

10        There is an obligation that he cooperate in the

11   collection of DNA as directed by the Probation Office.

12        In addition to the standard conditions of supervised

13   release, I am going to require him to participate in a drug

14   treatment program.  There is a certain irony involved here that

15   he chose to exploit the drug difficulties of vulnerable people.

16   It seems to me important for him to understand with some

17   particularity who those people are by participation in a drug

18   treatment program.

19        He is obligated to pay the balance of restitution and

20   the money judgment immediately, but if he cannot pay it

21   immediately, then according to a Court-ordered repayment

22   schedule.

23        He is prohibited from incurring any new credit charges

24   or opening additional lines of credit without the approval of

25   the Probation Office while any financial obligations are

1    outstanding.  He is obligated, while those financial

2    obligations are outstanding, to provide any requested financial

3    information to the Probation Office, and that may be shared

4    with the United States Attorney's Office Financial Litigation

5    Unit.

6            He is specifically required not to knowingly have any

7    contact, direct or indirect, with Mr. Torosyan and his

8    immediate family.

9            Turning, then, to Jambulat Tkhilaishvili, I accept the

10   argument that Mr. Tumposky has made that there is a disparity

11   in the involvement here and that he is not at the core of

12   creating this business environment that his brother, David, did

13   that falls within the heartland, as far as I am concerned, of

14   Hobbs Act extortion.  That having been said, this is serious

15   business, and he lent himself to the larger purposes of

16   extortion here, the effort to suffuse the atmosphere with

17   threat, lest the business be conducted in a way that,

18   improperly, he and his brother wanted to have it conducted.

19           I am going to impose a sentence of 18 months'

20   incarceration here on Jambulat Tkhilaishvili.  Mr. Tumposky

21   tells me it makes a difference what the length of particular

22   sentences are.  I don't know that, but what I will do is make

23   it 9 months on Count One, 9 months on Count Two.  They are

24   consecutive.  If that makes a difference, that is a matter for

25   the immigration authorities.  But that is meant, 18 months in

1   aggregate, to reflect the seriousness of the offense here.

2          In terms of personal characteristics, I buy much of

3   what Mr. Tumposky has said here, a hard-working man attempting

4   to deal with a series of family dimensions that are

5   challenging.  But he did not simply allow himself to be drawn

6   in.  He lent himself to this activity, and that, it seems to

7   me, is something that overcomes the particular problems or

8   family issues that are created by that.

9          The question of specific deterrence I think is

10  adequately addressed by the 18-month sentence here for Jambulat

11  Tkhilaishvili.  It seems to me that he has a greater sense of

12  remorse than his brother does, and it was demonstrated to me by

13  observation throughout.  But there is a general deterrence

14  that, it may be your brother, but you do not help him out in

15  Hobbs Act extortion, and others who are facing that sort of

16  thing should understand that there are consequences for a

17  choice that does help out a brother by lending yourself to

18  Hobbs Act extortion, and others who are faced with that sort of

19  thing must address it, and to understand that there is no

20  cultural-difference discount that is appropriate for this kind

21  of conduct, this kind of threat.

22          I have looked at the question of jail, prison, to see

23  whether it should inflect my judgment here.  It does not.  It

24  seems to me to be a neutral factor here.  I do recur to my

25  understanding of the range of sentences that are imposed for

1    non-executed threat cases that are Hobbs Act cases.  This seems

2    to me to be a not-disparate sentence for someone in the

3    position of Mr. Jambulat Tkhilaishvili.

4         The short of it is that this is a serious offense in

5    the Federal Court.  It is not the most serious, but it is a

6    serious offense, not the most serious of Hobbs Act cases, but

7    it is a serious offense, and it cannot go without substantial

8    consequence.  The substantial consequence that I have imposed

9    is in both cases a departure from the guidelines themselves,

10   which seem to me to be, for these circumstances, a little bit

11   severe, more than a little bit severe.  This sentence is

12   tailored to try to deal with that issue.

13        Now, turning to the specifics of supervised release

14   for Jambulat Tkhilaishvili, I am going to impose 3 years of

15   supervised release upon him as well.  It is very important that

16   he be subject to the supervision of the Court if he is not

17   deported in this case.  The question of whether he will be

18   deported is, of course, an open question.

19        He is obligated to pay a Special Assessment of $200.

20   I will not impose a fine under these circumstances.

21        Why do I use 3 years of supervised release?  Well,

22   because if he gets involved in this kind of thing again in any

23   way, he should understand that he is subject to further

24   consequences.  He has to conform himself here.

25        Part of this, of course, is the standard conditions of

1    supervised release, the mandatory ones, that he not engage in

2    another federal, state or local crime, and that he not possess

3    a controlled substance.  I see no reason to impose drug testing

4    on him at this time, apart from the obligation to submit to one

5    drug test within 15 days of release and at least two periodic

6    drug tests thereafter.  If there appears to be some sort of

7    problem, Probation will bring it to my attention.

8         He is obligated to cooperate in the collection of a

9    DNA sample, as directed by the Probation Office.

10        The standard conditions are those that are set forth

11   in the *Guidelines*.  I will not rehearse them again here, but

12   there is a special condition, because of his vulnerable

13   immigration status, and that is that if he is ordered deported

14   he is obligated to leave the United States and not to return

15   without the prior permission of the Secretary of the Department

16   of Homeland Security.  He is obligated to use his true name,

17   and he is prohibited from the use of any false identifying

18   information, and that includes but it is not limited to any

19   aliases, or false dates of birth, or false Social Security

20   numbers, or incorrect places of birth.

21        He is, of course, obligated to pay a Special

22   Assessment of $200.  That is due immediately.  I suspect that

23   it will be handled through a prison financial-responsibility

24   program, so I make no further conditions with respect to that.

25        I think I have been as clear as I can about my view of

1   the seriousness of this offense.  It is not something to be

2   ignored, not something to be sloughed off by letters to the

3   Court indicating that the defendant has seen the light in

4   particular ways.  I have no doubt that the experience of being

5   in custody here has been eye-opening for the defendants, but

6   the amount of time in custody should reflect the seriousness of

7   offense.  This set of sentences I think does that.

8          Both of the defendants should be aware that they have

9   a right of appeal.  They will want to consult counsel with

10  respect to that.  There has already been an indication, of

11  course, that that is possible or likely.

12         Now, are there any other conditions that the parties

13  or Probation would ask me to consider?

14         THE PROBATION OFFICER:  No, your Honor.

15         THE COURT:  Ms. Kaplan, anything?

16         MS. KAPLAN:  No, your Honor.

17         MR. CRUZ:  Your Honor, I would just ask the Court to

18  consider making a recommendation on Mr. Tkhilaishvili's

19  judgment that he be designated by the Bureau of Prisons to FMC

20  Devens, if at all possible.  It would serve two purposes,

21  including having his family accessible and dealing with his

22  medical issues.

23         THE COURT:  I think I will make the recommendation

24  with respect to Devens.  It is, as you know, a recommendation.

25  They are not required to follow it.  But the recommendation

1    will be Fort Devens or such other facility that can attend to

2    his medical needs and as close as possible to his parents.

3              MR. CRUZ:  Thank you, your Honor.

4              MR. TUMPOSKY:  And I would ask for a recommendation

5    that he be assigned as close as possible to the Boston area,

6    which I think would be Berlin or Danbury.

7              THE COURT:  I will make that.  I am not going to make

8    a Devens recommendation for him.

9              MR. TUMPOSKY:  No.

10             THE COURT:  But I will make the general area.

11             MR. TUMPOSKY:  Thank you.

12             THE COURT:  Is there anything further that we need to

13   take up?

14             MS. KAPLAN:  No, your Honor.

15             MR. CRUZ:  No, thank you.

16             THE COURT:  All right.  Then, we will be in recess.

17   Thank you.

18             THE CLERK:  All rise.

19       (The Honorable Court exited the courtroom at 11:23 a.m.)

20        (WHEREUPON, the proceedings adjourned at 11:23 a.m.)

21

22

23

24

25

1          C E R T I F I C A T E

2

3

4          I, Brenda K. Hancock, RMR, CRR and Official Court

5     Reporter of the United States District Court, do hereby certify

6     that the foregoing transcript constitutes, to the best of my

7     skill and ability, a true and accurate transcription of my

8     stenotype notes taken in the matter of *United State of America*

9     *v. Tkhilaishvili, et al.*, No. 1:16-cr-10134-DPW.

10

11

12

13

14   Date:    04/30/18              /s/ *Brenda K. Hancock*
                                    Brenda K. Hancock, RMR, CRR
15                                  Official Court Reporter

16

17

18

19

20

21

22

23

24

25